**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br>**ORDER** |

This multidistrict litigation proceeding ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude opinions of Plaintiffs' experts Bernard C. Camins, M.D., M.Sc. and William R. Jarvis, M.D. Doc. 4833. The motion is fully briefed. The Court will grant the motion in part.

**I.   Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition, usually to very sick patients. IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs. Bard IPCs contain barium sulfate, a radiopaque substance that makes the IPC visible on diagnostic imaging such as X-Ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims the IPC was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing

defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See id.*

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1

The parties plan to call various expert witnesses at trial. Plaintiffs have identified Drs. Camins and Jarvis as infectious disease experts. These doctors have jointly produced a single expert report. Doc. 4833-1. Defendants move to exclude the doctors' opinions under Federal Rule of Evidence 702.

## II. Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert

testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies the rule. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Dr. Camins is a Professor of Medicine at the Icahn School of Medicine and the Medical Director of Infection Prevention at Mount Sinai Health System in New York City. He was trained in internal medicine and infectious diseases, receiving his M.D. and a Master of Science in Clinical Research from Emory University. He has published more than 60 peer-reviewed articles, books, and book chapters addressing various types of infections and interventions before, during, and after surgery to reduce infections. He has investigated and reported on complications associated with healthcare devices, including infection and thrombosis. He has led multiple grant-funded research projects on reducing catheter-related bloodstream infections and improving antimicrobial use through various means, including the utilization of medical devices. Doc. 4883-1 at 5.

Dr. Camins has advised hospitals around the world on prevention of healthcare-associated infections, serves on the editorial boards of infection-related journals, and participates in various medical societies and committees related to infectious diseases. As part of his practice, he regularly evaluates methods to reduce the risk of infection, including the modifiable and unmodifiable risks of infection associated with implanted medical devices generally and central venous catheters specifically, including IPCs. He regularly

treats patients who have developed infections related to central venous catheters, including IPCs. *Id*.

Dr. Jarvis served as a Pediatric Infectious Diseases Fellow at the University of Toronto's Hospital for Sick Children; as a Pediatric Infectious Diseases, Virology and Epidemiology Fellow at Yale University School of Medicine; and as an Epidemic Intelligence Service Officer and a Preventive Medicine Resident at the Centers for Disease Control and Prevention's (CDC's) Hospital Infections Program. He has worked in various leadership roles at the CDC in Atlanta, Georgia, focusing on the investigation and prevention of infectious diseases – particularly infections and other complications associated with healthcare. He has held a number of titles during his 23 years at CDC, including Assistant Chief, National Nosocomial Infections Surveillance system (currently, the National Healthcare Safety Network); Chief, Epidemiology Branch; Chief, Investigation and Prevention Branch; Acting Director, Hospital Infections Program; Assistant Director for Science, Division of Healthcare Quality Promotion; and Director, Office of Extramural Research, Office of the Director, National Center for Infectious Diseases. For 17 years he supervised all divisional outbreak investigations of healthcare associated infections (HAIs) in healthcare settings, the development of HAI prevention guidelines, and studies of HAIs and their prevention. *Id.* at 6-8.

Dr. Jarvis also served as a Clinical Associate Professor at the Emory University School of Medicine and an Assistant Professor at the Emory University Rollins School of Public Health, and as President of the Society for Healthcare Epidemiology of America. He has published more than 400 peer-reviewed articles, book chapters, editorials, and CDC surveillance reports, and has edited four books, including the latest edition of Hospital Infections. He chairs the Food and Drug Administration's (FDA's) General Hospital and Personal Use Committee. *Id*.

### A.   Exclusion of the Entire Report for Methodology Issues.

Defendants assert that Camins and Jarvis undertook a flawed literature review. Defendants argue the doctors did not use objective metrics when conducting the review,

and the review therefore cannot be replicated to confirm it is free of bias. Doc. 4883 at 2. Defendants argue that Camins and Jarvis should have provided search criteria and explained how they selected articles to review and discuss in their expert report. *Id*. at 5, 7. Defendants ask the Court to exclude all of their opinions on this basis. *Id*. at 2. This argument clearly fails.

The opinions of Camins and Jarvis are not based solely on their literature search. Camins' and Jarvis' opinions are based on "over 50+ years of collective education, training, and experience in infectious diseases, healthcare epidemiology and infection prevention," depositions and documents produced in this case, and a systematic search of the medical literature. Doc. 4833-1 at 8-9. This methodology, they assert, is "broadly accepted" and the methodology they "have used and taught in [their] work as infectious diseases and healthcare epidemiology-trained physicians, researchers, educators, and administrators." *Id.* at 8.

In addition to treating patients, their background includes publishing more than 460 peer-reviewed articles on infections and infection prevention; positions on scientific advisory bodies that provide infection-prevention guidelines; infection surveillance investigations; and co-authoring the CDC's original definition of "central line associated bloodstream infection" ("CLABSI") – a significant form of infection in this case. *Id.* Given this broad experience, the Court cannot conclude that all their opinions should be excluded because of an alleged flaw in their literature search.

The case primarily relied on by Defendants, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 174 F. Supp. 3d 911 (D.S.C. 2016), is readily distinguishable. The doctor in that case was not an epidemiologist and yet sought to give epidemiological opinions. *Id.* at 929. "[N]either of his reports state[d] what methodology he [was] using or attempting to use to reach his conclusions[.]" *Id.* The counsel offering his testimony asserted the opinions were based on a literature search, making the search the sole basis for his opinions. *Id.* In that context, flaws in the literature search would seriously undermine the reliability of his opinions. This is not such a case.

6

In addition to their qualifications described above, Camins and Jarvis reviewed over 420 peer-reviewed publications in developing their opinions. Doc. 4833-1 at 69-81. This portion of Defendants' motion does not identify any relevant publications they missed or overlooked. And while Defendants argue that Plaintiffs' counsel provided Camins and Jarvis with scientific literature to support their opinions, the doctors explain they also conducted their own searches. Doc. 4833-1 at 8 ("We individually searched the medical literature systematically for relevant materials to formulate our opinions.").[1]

The Court will not exclude all of the Camins and Jarvis opinions based on an alleged flaw in their literature search, particularly when the doctors otherwise are very qualified to opine on infections and treatment-related infection issues – qualifications Defendants do not challenge.

**B.     Exclusion of Specific Opinions.**

Defendants ask the Court to exclude several specific opinions in the doctors' report.

**1.     Available Technologies and Alternative Designs.**

This portion of Defendants' motion challenges two opinions. First, that "[t]echnologies exist that effectively reduce the key mechanism of infection (e.g., microbial adhesion) and/or effectively reduce one of the biggest facilitators of biofilm formation (e.g. protein adhesion)." Doc. 4833-1 at 9. Second, that "[i]f Defendants had used safer alternative designs, the incidence of IPC-related infections would have been reduced." *Id.* at 10.

The expert report produced by Camins and Jarvis is 65 single-spaced pages, with more than 100 pages of exhibits. Doc. 4833-1. Defendants do not address specific portions of the report that should be excluded. They highlight portions of the opinion summary at the beginning of the report. *Id.* at 9-10. On the first opinion they cite two additional report pages (*id.* at 10 (citing pages 29-30)) and on the second they cite 13 additional pages (*id.*

---

[1] Defendants later cite a recent study they claim Camins and Jarvis ignored. Doc. 4883 at 14. The Court will consider the effect of that study on specific opinions, but cannot conclude that one study out of 420 reviewed reports and articles undermines every opinion the doctors give in this case.

7

at 10 (citing pages 48-61)), but they provide no discussion of what should be excluded from those pages. Plaintiffs' reply simply responds to the broad arguments made by Defendants.

Because Defendants have not identified specific statements in the report other than the general opinions, Plaintiffs do not attempt to demonstrate why specific statements found in the pages identified by Defendants satisfy the requirements of Rule 702 by a preponderance of the evidence. Doc. 5337. Given this broad-brush approach by the parties, the undersigned judge has been required to read the entire 65-page report in an attempt to identify what is said by the experts and what grounds they provide for those statements. This review helped the Court understand Camins' and Jarvis' asserted bases for their opinions, but the Court is not equipped by the briefing to rule on specific statements. For this portion of Defendants' argument, the Court therefore will rule on the admissibility of general opinions. This will help the parties identify portions of the report that are inadmissible, but any disagreements on specific statements will need to be resolved through objections at trial.

Defendants argue that Camins and Jarvis, as infectious disease doctors, are not qualified to opine on alternative technologies that could have been used in Defendants' IPCs. They note the doctors are not trained in material science, engineering, product development, or regulatory approval. And they cite portions of the doctors' depositions where they admit their proposed alternative designs have not been tested for use in IPCs. Doc. 4883 at 10.

Plaintiffs argue that Camins and Jarvis do not opine on the design, engineering, development, or regulatory approval of their proposed alternatives, leaving those opinions to Plaintiffs' other experts. Instead, their "opinions address whether commercially available technologies reduce microbial adhesion, biofilm formation, and ultimately bloodstream infections." Doc. 5337 at 7. Plaintiffs also claim "[t]he experts center on the *clinical effect* of incorporating these technologies (i.e., whether those features reduce

infection risk), not on whether Bard could economically or technologically implement them." *Id.* at 11 (emphasis in original).

Plaintiffs' position is not entirely correct. Camins and Jarvis describe the infection and thrombosis process, how it occurs on Vascular Access Devices (VADs) like IPCs, how the condition of VADs can inhibit or promote infection and thrombosis development, and how technologies used in some devices help inhibit these developments. These opinions are well within their expertise. Both doctors have years of training and experience in infectious diseases, primarily HAIs like those at issue in this MDL. They not only see patients suffering from these health issues, but have also managed hospitals and organizations seeking to reduce HAIs, including through the use of selected devices. Camins has consulted with hospitals around the world on how to control infections, and Jarvis consults with medical devices manufacturers on how to improve their products. The doctors are qualified to testify about the infection process, how it works with VADs, what kinds of surfaces are more problematic, and how VAD surfaces and devices (such as peripherally inserted catheters (PICCs) and central veinous catheters (CVCs)) have been successfully modified to reduce infections.

But the doctors do more than render these infectious disease opinions. They also provide opinions about Defendants' products. They describe how Defendants failed to incorporate commercially available technologies that would reduce the risk of infection. Doc. 4833-1 at 44-48. And they opine that if Defendants had used these safer designs, the incidence of infections and thrombosis would have been reduced in Defendants' products. *Id.* at 48-61. These opinions include discussions of how barium sulfate behaves when combined with other catheter materials (*id.* at 25-26), alternative reservoir materials and designs (*id.* at 26-27), and internal corporate communications, knowledge, and decisions of Defendants (*id.* at 32-34). These opinions also implicitly assert that better materials were commercially available to Defendants in the U.S. market, that these technologies could have been incorporated into Defendants' IPCs, that this incorporation could have

9

been made in a commercially viable way, and that it could have been done in the time frame of the alleged injuries at issue in this MDL.

These are not infectious disease opinions. They involve materials evaluation and performance, commercial availability of technology for a specific manufacturer, product design and manufacturing, commercial viability, regulatory approval, and market timing. Defendants argue that Camins and Jarvis are not qualified to provide such opinions, and Plaintiffs make no showing to the contrary. *See* Doc. 5337 at 7-8.

The Court reaches the following conclusions on this portion of Defendants' motion. Defendants seek to exclude the opinion that "[t]echnologies exist that effectively reduce the key mechanism of infection (e.g., microbial adhesion) and/or effectively reduce one of the biggest facilitators of biofilm formation (e.g. protein adhesion)." Doc. 4833-1 at 9. But Camins and Jarvis are qualified to render these opinions with respect to technologies they used or reviewed in their capacities as infectious disease doctors during the years at issue in this case. They can testify to the infection-reducing capability technologies they encountered.

For reasons explained above, however, the Court will grant Defendants' motion on the doctors' opinions that these technologies could have been used in IPCs where they were not used, or in Defendants' IPCs specifically, and that their use in IPCs would have reduced infections. The availability and viability of alternative technologies for Defendants' products must be addressed by other experts.

The second challenged opinion is that "[i]f Defendants had used safer alternative designs, the incidence of IPC-related infections would have been reduced." Doc. 4833 at 10. This opinion implicitly assumes that commercially used technologies were available to Defendants in the U.S. market, the technologies could have been incorporated into Defendants' IPCs, this incorporation could have been made in a commercially viable and regulatorily acceptable way, and it could have been done in the time frame of the alleged injuries at issue in this MDL. Camins and Jarvis are not qualified to opine on these

10

nonmedical issues. The Court will grant Defendants' motion and preclude Camins and Jarvis from rendering this opinion.

### 2. Whether Defendants' IPCs Increased the Risk of Infection.

The doctors opine that "Defendants' IPC design increased the risk of IPC-related infections. Defendant's IPCs have rough and variable surfaces. Defendant's uncoated IPCs permit rather than inhibit microbial adhesion, thus increasing the risk of IPC-related infection." Doc. 4833-1 at 9 (emphasis omitted). Defendants ask the Court to exclude this opinion. Doc. 4833 at 15.

Defendants contend that "[t]he doctors lack sufficient expertise to opine on polymer science issues such as IPC surface properties and roughness, coating of IPCs, barium sulfate diffusion, biodegradation, and port body design features." *Id.* They assert that "Drs. Camins and Jarvis lack any experience with materials science issues related to medical devices generally or IPCs specifically," and that they "simply draw inferences from the company documents and literature assembled by counsel." *Id.* at 15-16.

The Court agrees with much of this argument. Camins and Jarvis do not purport to be materials scientists or product design experts, and yet they describe preferable port designs (*id.* at 27-29); opine on the effects of Defendants' including barium sulfate in their catheter components (*id.* at 41-42); describe at length what Defendants' product development officers and employees "knew," "believed," "were aware" of, and could have made (*id.* at 32-33); discuss Defendants' internal research, testing, and acquisitions during product design and development efforts (*id.* at 36-39); describe the materials degradation that Defendants' products experience once implanted in the body (*id.* at 42); and opine that Defendants failed to incorporate commercially available technologies that reduce the risk of infection and thereby increased the risk of infection for their patients (*id.* at 44-48). These are not medical opinions. They are opinions of materials experts, design and production experts, corporate behavior experts, and experts who can opine on the viability of incorporating new technologies into IPCs during the time periods at issue in this case. The Court will grant Defendants' motion and exclude these opinions.

The Court notes, however, that Camins and Jarvis are clearly experts on infection processes and the effectiveness of existing medical products in reducing infections. They are qualified to opine on the conditions that lead to infections (including the physiological conditions that promote infection development and growth and the product conditions (such as rough surfaces) that they have seen promote infections), and the measures that have proven helpful in reducing infections, including coatings and other characteristics of PICCs and CVCs they have seen and worked with.

Further, to the extent their opinions about the effectiveness of existing technologies in reducing infections are based on medical literature rather than their personal experience, the Court is not persuaded by Defendants' arguments that their literature is unreliable and selective. *See* Doc. 4833 at 14. The doctors rely on numerous relevant reports sufficient to satisfy the preponderance of the evidence standard (*see* Doc. 4833-1 at 31-61), and the weakness or insufficiency of those reports – or the strength of competing reports – are matters for cross-examination. The doctors thus will be permitted to describe the infection process and technologies that have helped curtail it. But they cannot cross the line and testify about what Defendants could or should have done with it.

### 3. Whether Defendants Were Obligated to Research and Improve Devices.

Defendants argue that the doctors are not qualified to opine that Defendants were obligated to conduct further research and improve their products. Doc. 4833 at 18. Defendants provide no citation for the location of these opinions. *Id.* Plaintiffs contend the doctors will not provide such opinions and do not do so in their report. Doc. 5337 at 20.

The report does opine on corporate responsibility to improve products:

> Medical device manufacturers are responsible for designing safe, effective, and reliable products. Indeed, guidelines from the International Organization for Standardization state that medical device manufacturers must reduce risk as far as possible without economic consideration.
>
> Patient safety must always be the highest priority for medical device manufacturers. To achieve this, device manufacturers like the Defendants

12

should always try to make their devices as safe as they reasonably can. Indeed, the Defendants admit "training, education, labeling" are "less effective than eliminating the failure mode outright". Thus, the Defendants must account for "user error"—like infection from placement or access—in its design of its devices. If risks have not been reduced to an "acceptable level", the Defendants must determine if further reduction is possible and take action. If safer technologies exist that can reduce that risk of harm, "both from a moral standpoint and also from a commercial standpoint" the Defendants must evaluate, and if feasible, incorporate that technology in the design of its devices. This is true even if failure rates are "low".

Doc. 4833-1 at 16-17.

Neither Camins nor Jarvis purports to have experience with the procedures or ethics involved in manufacturing medical devices. Docs. 4833-1 at 5-8; 4833-2 at 16, 19; 4833-3 at 30. They do not claim any expertise on ethics and industry standards for device manufacturers, including what factors must be accounted for when designing a device, what obligations manufacturers have when selecting the technology to use, and the acceptable level of risk in a medical device. Because Camins and Jarvis are not qualified to give the opinions quoted above, the Court will grant Defendants' motion and exclude them. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 823277, at *3 (D. Ariz. Feb. 12, 2018) ("[T]he Doctors have no expertise in the FDA regulatory process, corporate compliance or ethics, or the design, testing, and marketing of IVC filters. . . . Such opinions are outside the realm of their expertise and are not supported by sufficient facts and data or evaluated through reliable principles and methods.").

### 4. Whether Device Design is the Primary Area for Risk Reduction.

Camins and Jarvis opine that "[a]lthough scientific literature shows that infection prevention protocols have been effective in reducing (but not eliminating) infection risk, the primary opportunity for further risk mitigation rests in device design changes that further reduce the risk of infection." Doc. 4833-1 at 9. Defendants ask the Court to exclude this opinion, asserting that it is not based on reliable methodology or scientific principles. Doc. 4833 at 20. Defendants also assert that Jarvis has published an article that contradicts this claim, stating that infection rates can be brought to near-zero with appropriate clinical

practices. *Id.* Plaintiffs contend that this opinion is squarely within the doctors' expertise and Jarvis' article is not to the contrary. Doc. 5337 at 20.

The Court concludes that Camins and Jarvis are qualified by their years of infectious disease experience to opine that a primary opportunity to further reduce infection rates lies in improved products, but it is not clear to the Court why this opinion will help the jury. Fed. R. Evid. 702(a). The fact that an opportunity to improve medical outcomes exists does not mean that a manufacturer has an obligation to seize that opportunity, or that its existing products are defective. Defendants do not, however, make this argument. The Court will deny Defendants' motion to exclude this opinion as unreliable and will rule on its relevancy at trial.

### 5. Accuracy of Defendants' IPC-Related Infection Rate Claims.

Camins and Jarvis provide this opinion:

> Defendants reported complaint rates for IPC-related infection were well over 1000x lower than the rate of IPC-related infection reported in scientific literature. Defendants' significantly lower IPC-related infection rate is due to Defendants' flawed methodology in risk assessment. When using a proper methodology, Defendants' IPCs are associated with an intolerable risk of infection based on its own policies.

Doc. 4833-1 at 10. This opinion is supported by four pages of explanation in the doctors' report. *Id.* at 62-66.

Defendants argue that Camins and Jarvis are not qualified to opine on Defendants' calculated infection rates. They note the doctors claim no expertise in compiling corporate infection rates, in policies and methodologies for device risk and assessment, and in what constitutes an intolerable risk of infection for Defendants. Doc. 4833 at 21.

Plaintiffs claim the doctors will not calculate Defendants' "precise complaint rates" or opine on their adverse event responsibilities (Doc. 5337 at 21), and yet that is essentially what the doctors do. They explain Defendants' internal method of calculating complaint rates, explain why the method is flawed, opine the internal rates are artificially low, recalculate the rates using "proper methodology," opine that the correct calculation shows

Defendants "IPCs are associated with an intolerable risk of infection," and opine that "Defendants must determine if further reduction [in infection rates] is possible and take action." Doc. 4833-1 at 62-66.

Plaintiffs make no showing that Camins and Jarvis have any training or experience in corporate complaint rate calculations or obligations. They argue the doctors "provide clinical context on why Bard's reported infection rates . . . are not reliable indicators of real-world complication rates and potentially misleading to the medical community." Doc. 5337 at 21. But with the exception of one sentence, this portion of the doctors' report is not about the clinical context. The exception is this sentence: "In our clinical experience, it would be extraordinarily rare for a clinician to send an explanted device from a patient with a confirmed CLABSI to the manufacturer." Doc. 4833-1 at 63 (emphasis in original). The doctors can give this clinical opinion at trial, but the remainder of their discussion in pages 62-66 of the report, and the summary in paragraph 6 on page 10, lie clearly outside their expertise and will be excluded.

**IT IS ORDERED** that Defendants' motion (Doc. 4833) is **granted in part** and **denied in part** as set forth above.

Dated this 22nd day of December, 2025.

David G. Campbell
Senior United States District Judge

15