WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br><br>**ORDER**<br><br>**Expert Witness Keilye R. Pampillonia** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Keilye R. Pampillonia. Doc. 4801. The motion is fully briefed and no party requests oral argument. *See* Docs. 4801, 5332, 5567. The Court will grant the motion in part.

**I.   Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs may remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties intend to use various expert witnesses at trial, including medical professionals. Defendants have identified Keilye R. Pampillonia, B.S.N., O.C.N. as a medical professional expert. Pampillonia received a bachelor's degree in nursing in 2018 and certification as an Oncology Certified Nurse in 2020. Doc. 4801-1 at 30, 32. She currently holds the positions of staff nurse and rotating charge nurse in an oncology unit, providing direct patient care. *Id.* at 30; Doc. 4801-2 at 9-10.

Plaintiffs argue Pampillonia should be excluded entirely as an expert witness under Federal Rule of Evidence 702. Doc. 4801. Alternatively, they argue she cannot provide several specific opinions under Rules 702 and 403: opinions based on her personal experience with her son's cancer treatment (*id.* at 9); that the benefits of IPCs outweigh the risks (*id.* at 11); addressing benefits of IPCs she has not observed through her clinical experience (*id.* at 13); that "patients who have experienced complications would still recommend port placement to others or would get a port again should the need arise" (*id.* at 14); and an opinion on complication rates and comparative risks of IPCs (*id.* at 15).

## II. Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony

3

is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine . . . that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.   Discussion.**

Plaintiffs argue that Pampillonia should be excluded entirely as an expert because she fails all four prongs of Rule 702. That argument will be addressed in parts A and B below. Plaintiffs' further contention that various specific opinions should be excluded will be addressed in parts C through G.

/ / /

/ / /

### A. Pampillonia's Qualifications.

Plaintiffs argue Pampillonia's "limited and distant experiences with ports and patient care" is insufficient to constitute the "scientific, technical, or other specialized knowledge" necessary to aid the trier of fact under Rule 702(a). Doc. 4801 at 4. The Court disagrees. Pampillonia has specialized knowledge as an Oncology Nursing Society ("ONS") provider and as an Oncology Certified Nurse ("OCN"). Doc. 4801-1 at 6, 32. The OCN credential requires a threshold level of patient care in an oncology setting, a minimum of two years of oncology nursing experience, and passing an oncology-focused exam. Doc. 5332 at 3.

In addition, during 12 years of clinical experience, Pampillonia has "provided primary care for thousands of patients with [IPCs] and other central venous access devices." Doc. 4801-1 at 7. As a staff nurse and rotating charge nurse (since August 2022), she provides direct patient care to approximately ten IPC patients per week or 500 IPC patients per year, and is responsible for teaching, supervising, and validating the competency of nursing personnel in venous and central venous access. *Id.* at 6-7, 30. Before her current position, Pampillonia was an oncology and palliative clinic nurse manager for a year and managed "a high-volume oncology clinic seeing over 100 patients per day[.]" *Id.* at 30.

Plaintiffs focus on Pampillonia's administrative nursing positions, arguing that they removed her from immediate patient care, but she testified that even her administrative nursing positions involve direct patient care. Doc. 5332-1 at 10-13. Plaintiffs also assert that Pampillonia now works part-time, but she testified she has part-time status because of its hourly wage benefits and she still works a full-time schedule. Doc. 4801-2 at 11-12.

Rule 702(a) recognizes expertise based on a range of sources, including knowledge, skill, experience, training, and education. Pampillonia has acquired expertise from all of these sources with respect to IPC use, care, and procedures. *See* Doc. 4801-1. Relying on this experience, Pampillonia provides detailed explanations of how and when various Vascular Access Devices (VADs) are used, including peripheral veinous catheters (IVCs),

peripherally inserted central catheters (PICCs), central veinous catheters (tunneled and non-tunneled) (CVCs), and IPCs. *Id.* at 6-19. This will be important educational testimony for the jury, and Pampillonia is qualified to provide it. "Instruction on relevant matters beyond the understanding of a typical juror is an appropriate function of an expert witness." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696724, at *4 (D. Ariz. Dec. 21, 2017) (citing *EEOC v. S&B Indus., Inc.*, No. 3:15-CV-0641-D, 2017 WL 345641, at *4 (N.D. Tex. Jan. 24, 2017) ("If an expert distills a complicated subject into language a jury can understand, and that subject is relevant, she can be admitted as a 'teaching witness.'")).

Further, "[a]lthough some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). For medical experts such as Pampillonia, "clinical experience is sufficient to satisfy the threshold reliability requirements of Rule 702." *Id.* (quoting *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018)). The Court will not exclude all of her testimony as requested by Plaintiffs on the basis of insufficient qualifications.

**B.  Plaintiffs' General Rule 702(b)-(d) Arguments.**

Plaintiffs also ask the Court to exclude Pampillonia entirely because she fails to satisfy Rule 702(b), (c), and (d). The Court disagrees.

Plaintiffs first argue that Pampillonia fails to articulate a reliable methodology as required by Rule 702(c). Doc. 4801 at 6. "[T]o satisfy its gatekeeping duty under *Daubert*, the court must make an explicit reliability finding." *United States v. Valencia-Lopez*, 971 F.3d 891, 899 n.6 (9th Cir. 2020) (citation modified). While the methodology section of Pampillonia's report is brief, when read in the context of her qualifications, experience, and report, her methodology can be identified. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *5 (D. Ariz. Dec. 21, 2017)

("[A]lthough Dr. Parisian's description of her methodology could be clearer, the Court concludes from her report as a whole that her methodology is sufficient to support [her] opinions[.]").

Pampillonia explains her opinions were "formed using the same methods [she] appl[ies] in [her] clinical practice," which include "critical clinical reasoning, analysis of relevant data[,] and review of current policies and procedures." Doc. 4801-1 at 8. These methods, Pampillonia explains, derive from her "12 years of experience as a practicing Registered Nurse, [and her] certifications in oncology," through which she has "extensive experience in accessing, infusing, troubleshooting, and deaccessing ports[.]" *Id.*

Pampillonia has advanced training in IPC management through her credentials as an oncology nurse and ONS chemotherapy and immunotherapy provider, and has "knowledge in the safe administration of antineoplastic therapy, patient education, side effect management, infusion related reactions, venous access devices . . . and dosing calculations." *Id.* at 6. She has "provided primary care for thousands of patients with ports and other central venous access devices" and has "accessed multiple different types of implantable ports . . . , including Bard implantable ports." *Id.* at 7. She teaches, supervises, and certifies "the proper port management technique including, but not limited to, accessing, infusing, and deaccessing of port systems," and deals with common port complications such as infection and fractures. *Id.* at 7, 21-27.

Her methodology, as explained in her report, is to use "the same methods [she] appl[ies] in [her] clinical practice[.]" *Id.* at 8. The Court finds this methodology sufficient for her explanations of VAD use and care for reasons noted in the preceding section.

Plaintiffs also argue that Pampillonia "relies upon literature she does not understand," defeating any claim that her opinions are "based on sufficient facts or data." Doc. 4801 at 7. Plaintiffs argue her "lack of understanding and improper application of foundational scientific principles renders her opinions fundamentally unreliable" under Rule 702(d). *Id.* at 8. While these arguments have force with respect to some specific opinions discussed below, they are not grounds for excluding her testimony entirely. As

explained above, and as one example, she clearly is qualified to provide expert testimony on nursing uses and care of VADs – testimony based on her years of experience, not on her review of medical literature. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

The Court is not persuaded it should exclude Pampillonia's testimony in its entirety based on the literature she reviewed, and will deny this portion of Plaintiffs' motion.

### C. Opinions Based on Pampillonia's Son's Treatment.

Plaintiffs argue Pampillonia cannot provide opinions that rely on her personal experience with her son's pediatric cancer treatment. Doc. 4801 at 9. Plaintiffs seek exclusion under Rules 702 and 403. *See* Docs. 4801 at 9-11, 5567 at 7-8.

Under Rule 702, Plaintiffs argue Pampillonia should not be permitted to discuss her son's cancer treatment because she did not possess the specialized knowledge required under Rule 702(a) at the time of the treatment (during her nursing education). *Id.* at 10. Plaintiffs further argue that Rule 702(c)-(d) are not met because Pampillonia could not have applied a reliable methodology to her son's cancer treatment – "extrapolat[ion] from a single data point is not consistent with the scientific method." *Id.*

Defendants respond that Pampillonia's experience with her son's cancer treatment is not a primary basis for her opinions. They instead describe it as "a valuable reference" and state that her opinions primarily are based on nursing experience and literature review. Doc. 5332 at 9-10. Defendants argue that "her personal experience has no bearing on whether the underlying opinions themselves are admissible under Rule 702." *Id.* at 10.

The Court agrees with Defendants' suggestion that Pampillonia's experience with her son's treatment is not the foundation of her expert opinions and is at most a "valuable reference." *Id.* at 9. But given this marginal role, the Court finds that this experience is of limited probative value and that its limited value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. The Court agrees with Plaintiffs' argument that "[t]estimony regarding pediatric cancer is inherently emotive, and Nurse Pampillonia's

8

reliance on her personal experience to support her opinions about the purported safety, efficacy, and quality-of-life benefits of Defendants' IPC devices presents a serious risk that the jury may be swayed by sympathy rather than the facts." Doc. 5567 at 8. Applying Rule 403, the Court will grant Defendants' motion with respect to Pampillonia's mention of her son's treatment.[1]

### D. Opinion That Port Benefits Outweigh the Risks.

Pampillonia opines that "the benefits of ports outweigh the risks." Doc. 4801-1 at 19; *see also id.* at 27. Plaintiffs argue that this opinion should be excluded for two reasons: (1) it will not be helpful to the jury, and (2) it states a legal opinion. Doc. 4801 at 11-12. These arguments are not persuasive.

Plaintiffs' master complaint alleges that the risks of Defendants' IPCs outweigh the benefits. *See* Doc. 1889 at 55, ¶ 309 ("Bard IPCs . . . [are] unreasonably dangerous because the foreseeable risks exceeded the alleged benefits associated with the use of Bard IPCs"). The jury will be required to address this allegation, and this Court has found testimony on this issue admissible in product liability cases. *See*, *e.g.*, *Triant v. Am. Med. Sys. Inc.*, No. CV-12-00450-PHX-DGC, 2020 WL 4049844, at *2 (D. Ariz. July 20, 2020) (finding admissible a board-certified urogynecologist's opinion that "[t]he Elevate is a safe and useful device . . . whose benefits far outweigh their risks," and "[t]he MiniArc sling['s] . . . benefits outweigh its risks"). The Court cannot accept Plaintiffs' argument that testimony on this issue would be unhelpful to the jury.

Plaintiffs also suggest that the inquiry under some state laws is whether a product's *design* is outweighed by the risk, and Pampillonia is not qualified to opine on design. Doc. 4801 at 11-12 (citing Missouri and Florida examples). But Plaintiffs do not contend that this is the law in every state or will be the law applied in every bellwether trial. The Court therefore cannot rely on this argument to exclude Pampillonia's opinion in all cases.

---

[1] The Court does not mean to suggest that Nurse Pampillonia's son's treatment is unimportant or that it did not have a significant effect on her and her family. This is purely a rule-of-evidence decision. The Court hopes the treatment was successful.

The Court also rejects Plaintiffs' second argument. Whether the risks of a product outweigh its benefits is not a legal issue to be decided by the Court. The existence and extent of a product's risk is a factual issue to be decided by the jury from the evidence introduced at trial, not a legal issue to be resolved by the Court. The same is true of the existence and extent of a product's benefits. The Court will not exclude this opinion as an improper legal conclusion.

### E. Opinions on Port Benefits Not Observed Through Clinical Experience.

Plaintiffs argue Pampillonia cannot opine that port catheters improve life expectancy and improve treatment compliance, and that delivery of contrast medium in close proximity to the right atrium may achieve better image resolution than when delivered in peripheral veins. *Id.* at 13-14. Plaintiffs argue that neither Pampillonia's clinical experience nor the single study she cites is sufficient to support such opinions under Rule 702. *Id.*; *see also* Doc. 4801-1 at 20.

Defendants contend Pampillonia is qualified to opine on port benefits based on her experiences educating patients on port care, supervising nursing staff in port management, and advocating for appropriate device placement to improve patient satisfaction. Doc. 5332 at 12. But such clinical experiences do not provide a basis for her opinion that port catheters improve life expectancy. Pampillonia cites no facts or data derived from her experience as an oncology nurse that would equip her with such knowledge. Nor is her clinical experience a basis for opining on improved contrast imaging. Pampillonia does not explain how her experience provided expertise or knowledge in imaging or image resolution necessary to support such an opinion.

Defendants argue that literature cited by Pampillonia provides a basis for these opinions. *Id.* at 13. But Pampillonia is not an epidemiologist, statistician, or a comparable professional who principally relies on such literature. Instead, she typically reviews medical literature only once a month through an OCN Newsletter. Doc. 5567-1 at 4-5. Defendants have not shown that the literature she reviews monthly through the newsletter provides a reliable basis or methodology for her opinions.

10

Also, Pampillonia's deposition suggests that she does not understand scientific principles underlying most scientific literature. For example, she acknowledged that she does not understand the terms "meta-analysis," "odds ratios, confidence intervals, model outcomes, or statistical significance." Doc. 4801-2 at 19-25. Nor could she answer whether a specific study she cited had been peer reviewed. *Id.* at 16-17. Her unfamiliarity with both the studies she cites and the principles underlying them cuts against finding that she can testify on the basis of the studies. As several courts have recognized, an expert witness cannot simply adopt and repeat the findings of scientific literature as Pampillonia does in her report. *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("For an expert to express an opinion . . . that expert must have engaged with the relevant literature enough to assess whether a study is credible, to explain why they relied on one study more than another, and to articulate how they reached their conclusion in the face of conflicting evidence."), *aff'd sub nom. Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025); *Nix v. Chemours Co. FC, LLC*, No. 7:17-CV-189-D, 2025 WL 2924613, at *18 (E.D.N.C. Sept. 30, 2025) (same); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)).

Defendants have not shown by a preponderance of the evidence that Pampillonia's opinions on life expectancy and contrast imaging performance satisfy Rule 702(a)-(d). These opinions will be excluded.

While Pampillonia's experience in educating patients on port care and patient satisfaction might support an opinion that IPCs improve patient treatment compliance, she does not base this opinion on her experience. She instead cites only the Ryan study. Doc. 4801-1 at 20 n.34. Plaintiffs note this study does not address treatment compliance, but instead was a focus group of 42 patients undergoing chemotherapy that addressed how they felt about their treatment. Doc. 4801 at 13. Defendants admit the study does not directly find that IPCs improve treatment compliance, but argue such a conclusion can be

inferred from the study's finding that IPCs are associated with more positive and less negative outcomes and are more discreet, more secure, less disruptive of hobbies and activities, and easier to live with and maintain. Doc. 5332 at 13. But Pampillonia never explains whether or how she drew such an inference from the Ryan study. And her opinion is comparative – that IPCs "improve" treatment compliance, presumably as compared to other VADs – and she does not explain how the Ryan study enables such a comparison to other products. As the Ninth Circuit has made clear, such an explanation must be included in the expert's report. *Engilis*, 151 F.4th at 1051-55. Because Pampillonia cites no other basis for her treatment compliance opinion, Defendants have not shown by a preponderance of the evidence that it satisfies Rule 702(a)-(c).

### F. Opinions on Patients Recommending IPCs.

Plaintiffs argue Pampillonia cannot opine that her "experience and the literature confirms [sic] that patients who have experienced complications would still recommend port placement to others or would get a port again should the need arise." Doc. 4801 at 14. Plaintiffs contend that Pampillonia treated only "a handful" of patients who reported port complications and this opinion therefore is not based on sufficient facts or data. *Id.* Nor can the opinion draw from the studies cited, Plaintiffs contend, because it would merely restate a conclusion not reached or verified by Pampillonia herself. *Id.* Defendants respond that Pampillonia's clinical experience, which "involves patient education and advocacy, including with respect to VAD selection," supports her opinion on "patient preferences," and that the cited studies provide secondary support. Doc. 5332 at 14.

Pampillonia's report suggests that very few of her patients have experienced port complications. For six of the eight port complications discussed in her report, she either never observed the complication, saw only one to three patients with the complication, or in one instance had "rarely" seen the complication. *See* Doc. 4801-1 at 23-27 ("In my experience, line infections rarely occur."; "I have not encountered a confirmed case of pinch-off in my experience."; "I have not encountered a confirmed case of fracture in my experience."; "I have encountered extravasation with a port one time in my career."; "In

my experience, I have encountered one case of skin erosion."; "In my experience, I have encountered two to three patients with flipped ports."). For the other two complications discussed by Pampillonia – thrombosis and occlusion – she provides no data on the number observed through her practice. *See id.* at 21-22. And her report gives no indication of how many of the patients who experienced complications would recommend port placement or would use a port again, as stated in her opinion.

"[E]xperts cannot testify on personal complication rates where they have not provided 'objective data to back up [such] assertion[s].'" *Contra Rose v. Bos. Sci. Corp.*, No. 2:20-CV-00716-BJR, 2020 WL 4195470, at *1 (W.D. Wash. July 21, 2020) (citation omitted). Pampillonia cannot opine that patients who experienced port complications would recommend port placement or would use a port again based only on a few patients per complication. This data set is simply too small to satisfy Rule 702(b). *See Collinge v. IntelliQuick Delivery, Inc.*, No. 2:12-CV-00824 JWS, 2018 WL 1088811, at *7 (D. Ariz. Jan. 9, 2018) (excluding expert opinion under Rule 702(b) where the opinion was based on a sample size deemed too small to represent sufficient facts or data). This opinion will be excluded.

### G. Rates or Risks of Adverse Events.

Pampillonia opines that "[w]hen ports are compared with PICCs, CVCs, and IVs for administration of long term or vesicant therapies as well as different clinical or adverse effects, ports have superior safety profile with lower incidences of overall adverse effects, catheter-related thrombosis and allergic reactions than IVs, CVCs, or PICCs." Doc. 4801-1 at 21 (footnote omitted); *see also id.* (opining that "ports demonstrate a significantly lower incidence of complications compared to other devices" and have a "superior safety profile" and a "reduced complication rate" as compared to other VADs); *id.* at 23 ("As they are not external to the body, ports carry with them a lower infection risk than other types of venous access devices." (footnote omitted)).

Plaintiffs contend she is not qualified to offer these opinions, the opinions are not based on sufficient facts or data, and the opinions are not the product of reliable principles

13

and methods. Doc. 4801 at 15. Plaintiffs note Pampillonia is not a biostatistician or epidemiologist (*id.*), has never conducted or published any study on VADs or their complication rates (Doc. 4801-2 at 13), has never personally collected data on complication rates, and has no knowledge of complication rates for the devices she purports to compare to IPCs (*id.* at 26).

Defendants respond by addressing the medical studies Pampillonia cites. Doc. 5332 at 14-15. But as already noted, Pampillonia cannot merely recite what other studies have found when she lacks the expertise to evaluate and confirm their reliability. *In re Roundup Prods. Liab. Litig.*, 2023 WL 7928751, at *3 ("For an expert to express an opinion . . . that expert must have engaged with the relevant literature enough to assess whether a study is credible, to explain why they relied on one study more than another, and to articulate how they reached their conclusion in the face of conflicting evidence."); *Nix*, 2025 WL 2924613, at *18 (same); *Buck*, 810 F. Supp. 2d at 844 ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)).

Defendants further contend that her experience and training enable her to opine on comparative complication rates. Doc. 5332 at 15. Pampillonia reports that "[i]n my experience, ports demonstrate a significantly lower incidence of complications compared to other devices." Doc. 4801-1 at 21. But she discusses her clinical experiences only in the complication frequency of IPCs – she does not discuss the complication frequency of other devices. *See id.* at 23-27. Her comparative opinion therefore is not supported by sufficient facts and data. *See Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS, 2022 WL 1225031, at *9 (N.D. Cal. Apr. 26, 2022) ("[C]ourts have excluded doctors' observations about rates of patient outcomes 'where the expert was unable to provide verifiable data from the expert's practice.'" (citation omitted)), *aff'd in part*, 111 F.4th 1018 (9th Cir. 2024).

Defendants also argue that Pampillonia is qualified to provide this opinion, and has sufficient facts and data to support it, through her work educating patients and "participat[ing] in the training and supervision of other nurses," and through keeping "up

14

1  to date on new developments through nursing newsletters and continuing education."
2  Doc. 5332 at 15. But Defendants provide no information on how this work or these
3  newsletters address comparative complication rates in VADs or provide sufficient facts
4  and data for rendering comparative opinions.

   Defendants have not shown by a preponderance of the evidence that Pampillonia is
qualified to opine on the comparative complication rates of VADs, or that her opinion is
based on sufficient facts and data or supported by reliable methodology. This opinion
therefore is inadmissible under Rule 702.

**IT IS ORDERED:**

1. Plaintiffs' motion to exclude the opinions of Nurse Keiley R. Pampillonia (Doc. 4801) is **granted in part and denied in part**.
2. Nurse Pampillonia cannot (1) provide testimony based on her son's pediatric cancer treatment; (2) opine that IPCs improve life expectancy and improve treatment compliance, and that delivery of contrast medium in close proximity to the right atrium may achieve better image resolution than when delivered in peripheral veins; (3) opine that patients who have experienced complications would still recommend IPC placement to others or would get an IPC again if needed; or (4) render opinions on complication rates and comparative risks of IPCs.

Dated this 9th day of January, 2026.

*David G. Campbell*

David G. Campbell
Senior United States District Judge

15