WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br><br>**ORDER**<br><br>**Daniel Bergsagel, M.D., and Benjamin Musher, M.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Daniel Bergsagel, M.D., and Benjamin Musher, M.D. Doc. 4818. The motion is fully briefed and no party requests oral argument. See Docs. 4818, 5328, 5570. The Court will grant the motion in part.

**I.   Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs may remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration. Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties intend to use various expert witnesses at trial, including medical professionals. Defendants have identified Drs. Daniel Bergsagel and Benjamin Musher as medical professional experts. The doctors are board-certified hematologist oncologists. Docs. 4818-1 at 4, 26, 4818-3 at 4, 24-25.

Dr. Musher is a Professor of Medicine in the Hematology-Oncology Division of Baylor College of Medicine, and the Director of the Gastrointestinal Cancer Program at Baylor's NCI-designated Dan L Duncan Comprehensive Cancer Center. Doc. 4818-1 at 4, 26. He is certified by the American Board of Internal Medicine in Internal Medicine and Medical Oncology, and is a member of the American Society of Clinical Oncology among other medical societies. *Id.* at 4, 28. Dr. Musher specializes in gastrointestinal malignancies and has treated thousands of patients with ports. *Id.* at 5-6.

Dr. Bergsagel is an Associate Professor of Pediatrics at Emory University School of Medicine, an Attending Physician at Children's Healthcare of Atlanta, and a member of Winship Cancer Institute of Emory University. Doc. 4818-3 at 24. He is certified in Pediatric Hematology Oncology by the American Board of Pediatrics and a member of the American Society of Pediatric Hematology Oncology among other medical societies. *Id.* at 25. Dr. Bergsagel specializes in pediatric hematology oncology and has treated thousands of patients with IPCs. *Id.* at 4-6.

Plaintiffs do not dispute the doctors are qualified experts under Federal Rule of Evidence 702. They move to exclude Dr. Bergsagel's causation opinion and both doctors' opinion that the benefits of using ports outweigh the risks. Doc. 4818 at 3-6.

## II. Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it

can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

### III. Dr. Bergsagel's Causation Opinion.

Bergsagel opines that port characteristics do not cause port-related infections:

> This emphasizes to me that port related infections are not due to inherent features of the port, but are the result of how they are handled and managed, and with use of the lessons learned by the collaborative efforts of these hospitals, the rate can be reduced to close to zero.

Doc. 4818 at 3 (quoting Doc. 4818-3 at 16).

Plaintiffs argue this opinion "attribute[s] all port-related infections exclusively to hospital practices while categorically discounting design-related causes," which they contend he is not qualified to do under Rule 702(a). *Id.* at 4 (emphasis omitted). They further contend that he does so without sufficient data or a reliable methodology under Rule 702(b)-(c) because he "has no knowledge or experience with (and did not investigate) whether and to what extent the material properties of ports might affect the rate of infection[.]" *Id.* Defendants argue Bergsagel is qualified to provide this opinion based on his education and clinical experience in hematology-oncology, his review of medical literature, and his involvement in a national collaborative effort to reduce port-related infections, which they argue also serves as sufficient data and a reliable methodology. Doc. 5328 at 5-7.

Bergsagel explains in his report that he participated in a national collaborative effort among 32 hospitals to reduce the rate of "catheter and line associated blood stream infections (CLABSI)." Doc. 4818-3 at 15-16. For ease of reference, the Court will follow the parties' briefing and simply refer to CLABSI as "port-related infections."[1]

The collaborative produced a set of principles to be followed by the participating hospitals in installing, using, and maintaining "central line" methods of administering

---

[1] It is not clear to the Court that CLABSI is limited to IPCs, but the Court will assume so for purposes of this order.

5

chemotherapy, medication, and nourishment.[2]  Bergsagel's report states that the "early results" of following these principles showed a 28% reduction in port-related infections. *Id.* at 16.  He then notes that "[i]n one recent report[,] application of the principles learned through these collaborations has led to them achieving a rate of [port-related infections] approaching zero."  *Id.* (footnote omitted).  This sentence leads to Bergsagel's single-sentence opinion quoted above – "that port related infections are not due to inherent features of the port, but are the result of how they are handled and managed[.]"  *Id.*

Bergsagel's opinion on this subject includes only this sentence.  Other than his description of the 32-hospital collaboration and citation to one study, he provides no explanation of the basis for this causation opinion or the methodology he used in arriving at it.  *Id.*

Bergsagel's single citation is to Daniel N. Willis et al., *Eliminating Central Line Associated Bloodstream Infections in Pediatric Oncology Patients: A Quality Improvement Effort*, Pediatric Quality & Safety, May 29, 2023.  *Id.* at 16 n.28.[3]  The article reports on findings at a single hospital – the St. Louis Children's Hospital.  *See* Willis et al., *supra*, at 1-2.  The article describes a multi-year effort at the hospital to reduce the rate of port-related infections among pediatric oncology patients by rigorously monitoring procedures for installing, using, and maintaining central lines.  *Id.*  The article does state, as Bergsagel notes, that these measures reduced port-related infections in pediatric oncology patients to a level "approaching zero."  *Id.* at 1, 5.  But the actual numbers behind this conclusion are instructive.

The metric used by the article for measuring the rate of infections is the number of port-related infections per 1,000 central line days (presumably, the days a central was in

---

[2] It is not clear that "central line" methods are limited to IPCs either, but the Court will assume so in this order.

[3] Footnote 28 of Bergsagel's report contains only an abbreviated citation to the Willis article and refers the reader to footnote 16 of his report.  But footnote 16 contains no reference to the article.  The full article reference is found in footnote 22.  *See* Doc. 4818-3 at 15 n.22.  To follow the page numbers cited by the Court, the Willis article can be reviewed in PDF format via https://journals.lww.com/pqs/toc/2023/05000.

place in patients at the hospital). *Id.* at 1. The hospital recorded 11 port-related infections during 2020, a year when the hospital had 5,814 central line days. *Id.* at 4. This results in a rate of 1.89 infections per 1,000 central line days. *Id.* The "aim" of the hospital's effort "was to reduce the CLABSI rate by 50% from a baseline of 1.89/1000 central line days to less than 0.9/1000 central line days" in 2021. *Id.* at 1. In fact, the hospital exceeded this goal. It reduced the rate of infections to 0.73/1000 central line days in 2021. *Id.* This represents a 61.4% reduction in the rate of infection.[4] While this is a significant improvement, and better than the 50% aim of the study, it also means that 38.6% of the original infection rate was *not* eliminated by the careful hospital procedures.

The Court understands why the authors of the article would describe 0.73/1,000 as a number "approaching zero." It is a very small number. But it must be remembered that the starting point – 1.89/1,000 – is also a very small number. This is due to the relative infrequency of port-related infections. The article itself notes that the overall rate of port-related infections for pediatric oncology patients is very small – "around 2.3 infections per 1,000 central line days[.]" *Id.*

Given the rareness of these blood infections, the focus must be on the amount of improvement this single-hospital study achieved, not on the simple smallness of the number. And as noted above, the study achieved a 61.4% reduction in pediatric oncology infections rates. While this is highly commendable, it is not a robust basis on which to conclude that inherent port features have nothing to do with port-related infections. Bergsagel focuses only on the "approaching zero" reference in the article; he does not address the fact that 38.6% of the original rate of infections was not eliminated by the careful procedures adopted by the hospital. What does he do with these remaining infections? How does he conclude they are not caused by inherent port features? His single-sentence opinion never addresses these questions.

---

[4] The 2021 result of 0.73 port-related infections per 1,000 central line days represents 38.6% of the 2020 number of 1.89 infections per 1,000 days. Thus, the hospital's efforts reduced the rate of infection by 61.4% between 2020 and 2021.

7

The only other number mentioned by Bergsagel in connection with this opinion is the 32-hospital collaboration's three-year port-related infection reduction of 28%. Doc. 4818-3 at 16. But Bergsagel provides no context for this number. He does not give us the starting rate of infections or the rate that remained. Logically, a 28% reduction in infections would mean that 72% of the infections remained after the collaboration's efforts. Bergsagel does not address this remainder or explain why it cannot be attributed to inherent port features.

Added to this, Bergsagel does not purport to be an expert on port design or materials or their effect on infections. He agreed in his deposition that he lacks expertise on the impact of port design on infection rates. *See*, *e.g.*, Doc. 4818-4 at 7 ("Q. So there are features of ports that either have or don't have that can affect the infection rate associated with those ports, the infection risk associated with those ports. But you have not researched that, and you don't have any experience with that, right? A. Correct." (objection omitted)).

Additionally, Defendants fail to address other questions arising from Bergsagel's reliance solely on the Willis article. They do not explain whether the article was peer-reviewed, why a single-hospital study that covered relatively few port-related infections can be extrapolated to support a broad causation opinion, whether pediatric oncology patients are representative of the broad range of patients represented in this MDL, whether the study was limited to IPCs, or whether the hospital used any particular type of IPC.

In short, Defendants have not shown by a preponderance of the evidence that Bergsagel's single-sentence causation opinion is based on sufficient facts and data or is supported by a reliable methodology. Defendants contend Bergsagel's "extensive training and more than 30 years of clinical experience with IPCs and CVADs" serves as a reliable methodology for his opinion. Doc. 5328 at 9. Defendants are correct that "a doctor's experience 'can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice.'" *Id.* at 10 (citing *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018)). And the Court is satisfied that Bergsagel's experience as a hematologist oncologist serves

as a reliable basis for him to opine that many port-related infections "are the result of how they are handled and managed[.]" Doc. 4818-3 at 16. But his opinion that inherent port features do not contribute to infections is not support by adequate facts, data, or methodology, and will be excluded under Rule 702(b) and (c).

## IV.     Opinion that Port Benefits Outweigh Risks.

Both doctors opine that the benefits of using ports outweigh the risks. Docs. 4818-1 at 8, 22, 4818-3 at 14. Plaintiffs make two arguments for exclusion of these opinions: they will not help the jury as required by Rule 702(a), and they are improper legal conclusions. Doc. 4818 at 5-6. The Court disagrees.

Plaintiffs' master complaint alleges that the risks of Defendants' IPCs outweigh the benefits. *See* Doc. 1889, ¶ 276 ("[T]he foreseeable risks [of Bard ports] exceeded the alleged benefits associated with their use"), ¶ 309 ("Bard IPCs . . . [are] unreasonably dangerous because the foreseeable risks exceeded the alleged benefits associated with the use of Bard IPCs"). The risk-benefit comparison is thus part of Plaintiffs' claims that the jury will be required to address. This Court has found testimony about risk-benefit analysis admissible in product liability cases. *See*, *e.g.*, *Triant v. Am. Med. Sys. Inc.*, No. CV-12-00450-PHX-DGC, 2020 WL 4049844, at *2 (D. Ariz. July 20, 2020) (finding admissible a board-certified urogynecologist's opinion that "[t]he Elevate is a safe and useful device . . . whose benefits far outweigh their risks," and "[t]he MiniArc sling['s] . . . benefits outweigh its risks").

Plaintiffs argue that the inquiry under some state laws is whether a product's *design* is outweighed by the risk, and that the doctors are not qualified to opine on design. Doc. 4818 at 6 (citing Missouri and Florida examples). But Plaintiffs do not contend that this is the law in every state or will be the law applied in every bellwether trial. The relevancy of risk-benefit analysis likely will turn on a close look at the state law applied in a particular case, and perhaps on how courts in the relevant state have dealt with the test. This is not a decision that can be made now, in the abstract, for all cases.

9

Portions of Plaintiffs' arguments are somewhat confusing. They seem to agree that a risk-benefit opinion could be relevant background information at trial. *See* Doc. 5570 at 5.[5] And they acknowledge that some states apply a consumer-expectation test that may call for evidence on whether the magnitude of a product's risk outweighs its utility. *Id.* at 6.

Additionally, and as argued by Defendants, the doctors' risk-benefit opinions might be relevant to other claims brought by Plaintiffs. *See* Doc. 5328 at 13-14. Plaintiffs' master complaint alleges, in different claims, that the risks of using Bard ports outweigh the benefits. *See*, *e.g.*, Doc. 1889, ¶ 297(d) (alleging in support of negligence claim that Defendants were aware "the risks outweighed any benefit or utility of Bard IPCs"); ¶ 309 (alleging in support of failure-to-warn claim that "the foreseeable risks exceeded the alleged benefits associated with the use of Bard IPCs"); ¶ 408 (alleging in support of negligent misrepresentation claim that "Defendants . . . misrepresent[ed] to Plaintiffs and the medical community the safety and efficacy of Bard IPCs").

The Court also rejects Plaintiffs' second argument. Whether the risks of a product outweigh its benefits is not a legal issue to be decided by the Court. The existence and extent of a product's risk is a factual issue to be decided by the jury from the evidence introduced at trial, not a legal issue to be resolved by the Court. The same is true of the

---

[5] The doctors routinely weigh the benefits and risks of using ports. *See* Docs. 4818-1 at 7-8 (Dr. Musher's Report) ("[O]ncologists use a combination of medical knowledge and experience to weigh th[e] risks and benefits[.]"; "Like all clinical decisions I make, I carefully weigh the potential risks and benefits of port placement in each patient."); 4818-3 at 6 (Dr. Bergsagel's Report) ("I soon learned through first-hand experience that ports were safe and that their benefits were much appreciated by patients and staff."). This testimony could help the jury understand why doctors recommend port placement over other methods of venous access, a potentially relevant fact in evaluating the parties' claims and defenses under various legal theories. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696724, at *4 (D. Ariz. Dec. 21, 2017) ("Instruction on relevant matters beyond the understanding of a typical juror is an appropriate function of an expert witness.").

existence and extent of a product's benefits. The Court will not exclude these opinions as improper legal conclusions.

**IT IS ORDERED** that Plaintiffs' motion (Doc. 4818) is **granted in part** and **denied in part**. Dr. Bergsagel is precluded from opining that port-related infections are not due to inherent features of the port, but are the result of how they are handled and managed. The motion is otherwise denied.

Dated this 9th day of January, 2026.

*David G. Campbell*

David G. Campbell
Senior United States District Judge