**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br>**ORDER**<br>**Expert Witness Madris Kinard** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Madris Kinard. Doc. 4825. The motion is fully briefed and no party requests oral argument. *See* Docs. 5319, 5549. The Court will grant the motion in part.

**I.     Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port

1   typically is implanted beneath the chest skin and below the collarbone. Port bodies vary
2   in shape and size and are made of plastic, silicone, or titanium. The port is attached to a
3   catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter
4   is tunneled under the skin to an insertion point in a central vein. Catheters vary in width
5   and are made of silicone or polyurethane. IPCs typically are implanted by an interventional
6   radiologist or a vascular surgeon. A nurse or other medical professional then accesses the
7   IPC to inject the medication, which flows from the port to the catheter and into the vein.

8   This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims the IPC was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing

defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See id.*

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including FDA experts. Plaintiffs have identified Ms. Kinard as an expert FDA data analyst. *See* Doc. 4825-5 at 3. Kinard is the founder and CEO of Device Events and a former FDA public health analyst. *Id.* Plaintiffs retained Kinard to analyze relevant data with the assistance of proprietary software she developed at Device Events, and to opine on Bard's adverse event reporting to the FDA and Bard's adherence to FDA regulations. *See id.* at 3, 22. Under the regulations, medical device manufacturers are required to report certain adverse events to the FDA by filing medical device reports ("MDRs"). 21 C.F.R. §§ 803.1(a), 803.3(n), 803.10(c), 803.50(a). The FDA uses MDRs to detect "safety signals" – indications that a device may be presenting safety issues – and ensure that medical devices are safe and effective for their intended uses. *Id.* § 803.1(a).

Kinard opines generally that due to Bard's improper reporting of adverse events, a safety signal did not appear, or did not appear as quicky as it should have, for Bard IPCs. Doc. 4825-5 at 23. She offers several specific opinions in support of this conclusion. *Id.* at 23-27, ¶¶ 1-7. Defendants argue that Kinard's opinions are inadmissible under Federal Rule of Evidence 702. Doc. 4825.

**II.    Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the

3

1  trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony
2  is based on sufficient facts or data," (c) "the testimony is the product of reliable principles
3  and methods," and (d) "the expert's opinion reflects a reliable application of the principles
4  and methods to the facts of the case." Fed. R. Evid. 702(a)-(d).  The proponent must show
5  by a preponderance of the evidence that the testimony satisfies each of these requirements.
6  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment
7  ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be
8  admitted unless the proponent demonstrates to the court that it is more likely than not that
9  the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis
10 v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023
11 amendment, our precedent establishes that Rule 702 requires a proponent of expert
12 testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the
13 evidence.").

14 The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702.
15 *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not
16 to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy
17 Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir.
18 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the
19 expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-
20 DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert
21 opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the
22 Rule 702 requirements to be satisfied by a preponderance of the evidence.").

23 **III.    Discussion.**

24 Defendants argue that Kinard is not qualified to offer certain regulatory opinions
25 (Doc. 4825 at 7-8), her opinions are not relevant or helpful to the jury (*id.* at 8-10), and her
26 opinions are not reliable (*id.* at 10-18).  Kinard's qualifications will be addressed in part A
27 below.  The relevance and reliability of her opinions will be addressed in parts B and C.
28 / / /

4

### A. Kinard's Qualifications.

Kinard earned a Master of Business Administration with a concentration in Information Technology ("IT") from American University in 2004. Docs. 4825-5 at 3, 4825-7 at 3. In 2005, Kinard began working at Kaiser Permanente, a healthcare services company. Docs. 4825-5 at 4, 4825-7 at 7. She created the company's IT best practices and served as a liaison between health plan directors, health care providers, and the IT help desk during the rollout of the Epic electronic health record system. *Id.* Her primary role was to determine how to extract patient data from the system and make the data usable. *Id.*

In 2008, Kinard joined CGI Federal, a technology and professional services company that helps federal agencies achieve efficiencies and eliminate fraud and waste. Docs. 4825-5 at 4, 4825-7 at 6-7. Kinard led a team implementing a Medicaid provider enrollment project for the Centers for Medicare & Medicaid Services ("CMS"). *Id.* Kinard and her team incorporated hundreds of state enrollment applications into a single form. *Id.*

In 2010 and 2011, Kinard worked at Booz Allen Hamilton as a CMS consultant. Docs. 4825-5 at 4-10, 4825-7 at 6. She created software tools for Medicare auditors. *Id.* She also worked on a project to determine whether the adverse event reporting system being implemented by the FDA's drug and biologics divisions could also be used by the FDA's Center for Devices and Radiologic Health ("CDRH"). *Id.* She continued to work with CDRH leadership in the postmarket surveillance division to determine how the Medical Device Adverse Event Reporting System ("MAUDE") should be improved to comply with applicable regulations. *Id.*[1] Kinard was trained in every aspect of MDR regulation and adverse event reporting. Doc. 4825-7 at 5.

---

[1] MAUDE is a searchable database containing data from MDRs submitted to the FDA. *See Manufacturer and User Facility Device Experience (MAUDE) Database*, U.S. FDA (Dec. 31, 2025), https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm. Reporting by patients and healthcare professionals is voluntary, but manufacturers and hospitals must submit reports when they become aware of information that reasonably suggests a device may have caused or contributed to a death or serious injury. *Id.*; *see also* 21 C.F.R. §§ 803.1(a), 803.3(b)-(c).

Kinard served as the FDA's adverse event reporting system manager. *Id.* She developed performance metrics to be used by system testers and tested the system herself to determine whether it met FDA requirements. *Id.*; Doc. 4825-5 at 10.

Kinard also served as the CDRH liaison to the FDA's MedWatch team, which consists of public health analysts from the drug, biologics, and device centers. *Id.* Kinard made recommendations to change certain fields and requirements for the MedWatch form submitted by device manufacturers (Form FDA 3500A), which FDA analysts then use to manually enter data into MAUDE. *Id.*[2] Kinard also met with the CDRH postmarket surveillance division to understand how MAUDE was used and to determine what functions needed to be added to meet changing regulations and guidance documents. Doc. 4825-5 at 6-8.

Kinard's next role at the FDA was as project manager for the Unique Device Identifier ("UDI") system that requires manufacturers to label devices or device packaging to better identify products. *Id.* at 8-10; Doc. 4825-7 at 5.

In March 2013, Kinard accepted a full-time position with the CDRH as a Public Health Analyst at level GS-14. *Id.*; Doc. 4825-5 at 10. A GS-14 designation is generally applied to high-level officials such as supervisors, technical specialists, and professionals holding advanced degrees. *See* GS 14 Pay Scale – General Schedule 2025, FederalPay.org, https://www.federalpay. org/gs/ 2025/GS-14 (last visited Jan. 13, 2026). Kinard continued to work on the UDI system and transitioned to the MAUDE team to manage the design and development of a new MAUDE database. Doc. 4825-5 at 10-12. She created rules for when an "Additional Information" letter needed to be sent to manufacturers to submit information not included in their MDRs. *Id.* at 12. Kinard left the FDA in 2014, two years before the new MAUDE database was released. *Id.* at 13.

Between April 2014 and July 2015, Kinard served as the senior manager of the business intelligence division at Avalere Health, which created software used by CMS,

---

[2] One such recommendation was removal of the "Other" code from the MedWatch form, which according to FDA analysts was being used too often by manufacturers to specify what adverse event had occurred. *Id.* at 5-6; Doc. 4825-7 at 5.

research consultants, and medical providers. *Id.* at 13-14; Doc. 4825-7 at 4. She worked on software that would help predict when a medical device recall might occur. *Id.*

In July 2015, Kinard founded Device Events as an alternative to MAUDE. Docs. 4825-5 at 14-15, 4825-7 at 3. Device Events is a medical device surveillance system that uses natural language processing to provide clear and comprehensive metrics on the millions of MDRs submitted to the FDA. *Id.*[3] Device Events has been used by the FDA, the Agency for Healthcare Research and Quality, the National Institutes of Health, the Department of Homeland Security, the Mayo Clinic, and Consumer Reports. Doc. 4825 at 3, 15.

Since founding Device Events, Kinard has consulted with the FDA, other health agencies, congressional members and staff, healthcare associations, journalists, and producers of documentaries regarding adverse event reporting and postmarket surveillance of medical devices. Docs. 4825-5 at 16-22, 4825-7 at 4. Kinard also has authored or contributed to peer-reviewed articles on these topics. Doc. 4825-7 at 2-3.

Defendants ask the Court to exclude Kinard's opinions "in their entirety" because she is not qualified to offer opinions on what is MDR-reportable under the regulations or to make determinations on the seriousness of medical events for reporting and coding purposes. Docs. 4825 at 2, 7. Defendants assert that she is merely an IT professional who spent a brief period working adjacent to FDA experts. Docs. 4825 at 2, 5549 at 2, 7. The Court does not agree with this characterization. Kinard clearly is an IT professional (Docs. 4825-5 at 3-5, 4825-7 at 3-7), but she also has significant experience working with the FDA on adverse event reporting and postmarket surveillance of medical devices. And as a high-level Public Health Analyst at the CDRH, Kinard "managed the design, development and rollout of the replacement system for internal MAUDE" – the very database about which she intends to testify. Doc. 4825-5 at 12. Kinard was trained at the FDA "in every aspect of the eMDR regulation [and] adverse event reporting (intake, modifications, coding, redaction, and regulatory requirements)." Doc. 4825-7 at 5. She

---

[3] *See also Device Events*, https://deviceevents.com/ (last visited Jan. 13, 2026).

1  then founded Device Events, a medical device surveillance system that has been used by
2  the FDA itself. Doc. 4825-7 at 3.

3  Defendants note that Kinard was never a safety analyst at the FDA, never made
clinical reportability determinations, never assisted with promulgating or enforcing FDA
regulations, and has no training or background in medicine. Docs. 4825 at 6-8, 5549 at
7-8. Defendants contend that determining whether a device-related event should have been
reported and coded as a patient problem requires medical judgment, and that persons
qualified to make medical judgments include physicians, nurses, risk managers, and
biomedical engineers, not IT experts like Kinard. Docs. 4825 at 7, 5549 at 4-6 (citing 21
C.F.R. § 803.20(c)(2)).

Plaintiffs make clear in their response, however, that Kinard's analysis involves no
medical judgment and she will offer no opinion on medical causation. Doc. 5319 at 5-8.
In fact, Kinard confirmed in her deposition that she is not qualified to review medical
records and determine whether a device actually caused or contributed to an injury.
Doc. 4825-8 at 10-11. Plaintiffs and Kinard assert that her approach is reliable even
without medical judgment. She reviews MDR narratives already contained in MDR reports
to identify where Bard or other healthcare professionals attributed events to devices, and
then compares these events to Bard's coding. *See* Docs. 4825-5 at 44-55, 5319 at 6-8; *see
also* 21 C.F.R. § 803.3(c) (explaining that for reporting purposes, "[c]aused or contributed
means that a death or serious injury was or may have been *attributed to* a medical device")
(emphasis added). Plaintiffs have shown by a preponderance of the evidence that Kinard's
years of experience in medical event reporting, both at the FDA and with proximate
companies and agencies, equip her to rely on the narratives already contained in MDR
reports and compare them to established FDA codes in order to opine on whether reporting
complied with FDA requirements.

The Court will deny Defendants' motion to the extent it is based on an alleged lack
of qualification.

/ / /

8

**B.      Relevance of Kinard's Opinions.**

Defendants argue that three categories of Kinard's opinions are not relevant. Doc. 4825 at 8-10. Defendants' reply brief addresses only one of these three arguments (FDA's Alternative Summary Program). Doc. 5549.

### 1.      Bard Obscured Safety Signals from the FDA.

Kinard opines generally that Bard obscured potential safety signals from the FDA by misreporting and miscoding adverse event reports for Bard IPCs. Doc. 4825-5 at 23. Defendants contend that this opinion is irrelevant because there is no failure-to-report claim in this litigation. Doc. 4825 at 9.

Plaintiffs allege that Bard concealed and failed to warn about the alleged defects, risks, and complications associated with its IPCs, and concealed its own knowledge about these alleged dangers. Doc. 1889 ¶¶ 242-57. Plaintiffs also assert a fraudulent concealment claim in the master complaint. *Id.* ¶¶ 427-38 (Count XI). Relevancy is a relatively low bar. *See* Fed R. Evid. 401 ("any tendency" to make a fact of consequence more or less probable). The Court agrees with Plaintiffs that Kinard's opinion that Bard obscured potential safety signals is relevant to the fraudulent concealment claim, statute of limitations issues, and punitive damages. Doc. 5319 at 11-14; *see* Doc. 1889 ¶¶ 484-500.

Defendants also assert that Kinard's opinion is irrelevant because she states only that the FDA potentially could have identified a safety signal. Doc. 4825 at 9. But the fact that her opinion may not be sufficient by itself to establish all aspects of fraudulent concealment does not mean it is not relevant to the fraudulent concealment claim, nor that it is irrelevant on punitive damages and statute of limitations issues.

### 2.      FDA's Alternative Summary Reporting Program.

In 1997, the FDA established the Alternative Summary Reporting ("ASR") program to alleviate the paperwork backlog that impeded its ability to import data from individual MDRs into MAUDE. The ASR program allowed certain medical device manufacturers to submit quarterly summary reports, instead of individual MDRs, for specific well-known and well-characterized adverse events. *See* Docs. 4825 at 3-4, 4825-1.

9

The FDA issued exemption letters to Bard authorizing it to participate in the ASR program. *See* Docs. 4825 at 4-5, 4825-2, 4825-3. In 2019, the FDA ended the ASR program, revoked exemptions for all manufacturers, and made the ASR data publicly available. *See* Doc. 4825 at 5.

Kinard spends parts of her expert report discussing and criticizing the ASR program. Doc. 4825-5 at 25-26, 30-36, 39-40. Defendants argue that Kinard's personal criticisms of the ASR program are not relevant and will not assist the jury because they are properly directed to the FDA, not Bard. Doc. 4825 at 9. Plaintiffs do not address this argument in their response. *See* Docs. 5319 at 11-14, 5549 at 2.

While Kenard will need to describe the ASR program to some degree in describing what she did to form her opinions about Bard's reporting, the Court cannot conclude that her personal disagreements with or criticisms of the FDA's ASR program are relevant to any issue in this case. The Court will grant Defendants' motion on this issue. Kinard should not spend time voicing her criticisms of the FDA's ASR program, but she will be permitted to describe it as part of her testimony. If Defendants believe she crosses the line from describing ASR to criticizing the FDA for implementing it, they can object.

### 3.     Quantity of Bard's Reported Adverse Events.

Defendants argue that Kinard's opinions quantifying her search results and the number of Bard's reported adverse events and their associated coding are irrelevant. Doc. 4825 at 10 (citing Doc. 4825-5 at 23-27, 39-42, 44-53). Defendants contend that Kinard never analyzed whether a hit was identified as a complication associated with the device or whether the word just appeared in the narrative of the report. *Id.* As noted above, the Court finds that Kinard is qualified to opine that the description of a reported event did not match the FDA required code for such an event without being a medical professional. Bard of course can present contrary evidence to show that Kinard inaccurately concluded that certain descriptions required particular codes.

Defendants also argue that Kinard does not know how many Bard IPCs have been sold over the years, a number that Defendants assert is the denominator to any relevant

analysis. *Id.* Plaintiffs counter that the number of Bard's reported adverse events and their associated miscoding are relevant even without the denominator. Doc. 5319 at 14. They argue that Kinard describes not just raw numbers, but patterns – temporal clustering of similar events, recurring failure modes, and escalating severity over time – that tend to show what Bard knew and when it knew it. *Id.*

The Court agrees that this evidence is relevant. The existence of substantial instances of miscoding, if believed by the jury, would be relevant on fraudulent concealment and notice. It likely will also be responsive to Defendant's expected assertion that they complied fully with FDA requirements in the development, sale, and reporting on IPCs. Defendants can seek to put Kinard's number in perspective by informing the jury that millions of Bard IPCs have been implanted, and this may decrease the persuasiveness of Kinard's testimony, but the fact that evidence can be rebutted in some degree does not make it irrelevant.

### C. Reliability of Kinard's Opinions.

Expert testimony is reliable if it is based on sufficient facts or data, is the product of reliable principles and methods, and reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702(b)-(d). Defendants argue that Kinard's opinions as a whole are unreliable (Doc. 4825 at 10-11) and that various specific opinions should be excluded for lack of reliability (*id.* at 12-18).

#### 1. Kinard's Assessment of IPCs for this Litigation.

Noting that Kinard's only engagement with IPCs has been as an expert in this litigation, Defendants contend that her opinions are unreliable because they do not grow naturally and directly out of research she conducted independent of the litigation. Doc. 4825 at 12. But this is only one of many factors relevant in determining whether expert testimony is reliable, none of which is dispositive. *See* Fed. R. Evid. 702 advisory committee notes to 2000 amendment ("[o]ther factors may also be relevant" and "no single factor is necessarily dispositive of the reliability of a particular expert's testimony"). Defendants do not address the other reliability factors. *See* Doc. 4825 at 11.

Additionally, Defendants' argument is not accurate. Although it is true that Kinard has not addressed IPCs before this litigation (*see* Doc. 4825-6 at 36), her expertise and opinions do not focus on IPCs. Rather, they focus on FDA reporting. As noted above, Kinard has done much work concerning and related to FDA reporting outside of this litigation, including the development and use of her Device Events software. The Court will not exclude Kinard's opinions on the basis that they do not grow out of research she conducted independent of this litigation.

### 2.     Replication of Kinard's Analysis.

Defendants contend that Kinard's opinions are based on an unreliable methodology because she has admitted that her work cannot be replicated without access to her proprietary software. *Id.* (citing Doc. 4825-6 at 5-14). But Kinard testified that while replication would be time consuming, "it can be done" using keyword searches and the FDA's public search tools. Doc. 4825-6 at 9-10. The fact that replication would be difficult and time-consuming does not make it impossible or warrant exclusion of Kinard's opinions. *See* Doc. 5319 at 16.

Plaintiffs explain in their response that Kinard's methodology is not the proprietary software itself but her comparison of Bard's coding decisions against the contents of the MDR narratives to determine whether patient reports were properly coded. *Id.* Plaintiffs argue that Defendants can test the validity of Kinard's methodology and opinions by checking her outputs, noting that every row of her spreadsheets contains a link to the relevant MDR. *Id.*

Defendants state in their reply that their experts checked Kinard's outputs and found "numerous mistakes" in her analysis. Doc. 5549 at 10. But Defendants provide the Court little to support this assertion. Their reply simply cites back to two pages in their motion (Doc. 5549 at 10), and those pages argue that Kinard incorrectly concluded that Defendants miscoded "thrombus" or "thrombosis" in three separate instances (Doc. 4825 at 14-15). But Defendants do not identify the three instances or cite any evidence to show that Kinard erred. *Id.* Defendants cite one example where they contend Kinard incorrectly concluded

that a cases of sepsis had been miscoded. Doc. 4825 at 15. While Defendants provide public citations for two reports they claim showed correct coding by Defendants (*id.* at 15 n.11), their supporting citation is to Kinard's rebuttal where she states that two reports cannot be determined to have been for the same patient (*id.* at 15; Doc. 4825-13 at 8). In short, Defendants provide virtually no evidence for their assertion that they checked Kinard's outputs and found numerous mistakes.

Plaintiffs have shown by a preponderance of the evidence that Kinard's opinions about Defendants' FDA reporting is sufficiently reliable to be admitted under Rule 702. Defendants' arguments to the contrary are not persuasive.[4]

### 3. Bard's Alleged Misuse and Violation of the ASR Program.

Kinard opines that "[m]any of the events Bard reported through ASRs actually involved serious patient outcomes (including sepsis, necrosis, thrombus, extravasation, perforation, and foreign body removal) that should have been submitted as regular MDRs according to FDA regulations." Doc. 4825-5 at 26, ¶ 4(d). Kinard offers similar opinions throughout her expert report. *See id.* at 27 ("Serious injury should have been filed as MDRs with a narrative since surgical intervention was required to retrieve the device."); *id.* at 31 ("Certain Problem Codes associated with the ASRs indicate that these reports included patient involvement, and surgical intervention was sometimes required to treat the patient. If surgical intervention is required to treat a patient, the adverse event report is MDR-reportable."); *id.* at 37 ("[T]here were Device Problems and Patient Problems that were serious enough to indicate they should have been submitted as MDRs according to FDA regulations. . . . [O]nce the malfunctions that were being reported as ASRs had recurred, Bard should have ceased using ASRs and used MDRs for the reporting of these malfunctions."); *id.* at 40 ("ASRs were not supposed to be used to report events that, if

---

[4] Defendants state in a footnote that a separate basis for exclusion exists under Federal Rules of Civil Procedure 26(a)(2)(B) and 37(c)(1). Doc. 4825 at 11 n.8. The Court will not exclude expert opinions based on a new argument asserted in a footnote. What is more, Defendants could have sought to compel disclosure of Kinard's proprietary software during the discovery period if they felt it was critical to their response, but did not.

they were to recur, could result in a serious injury or death. These were to be reported to the FDA in the MDR format[.]").

Defendants contend that these opinions are not reliable because Kinard cites nothing to support them. Doc. 4825 at 12. This is not correct. Kinard specifically cites the FDA regulation defining an MDR reportable event as an incident which "suggests that a device has or may have caused or contributed to a death or serious injury," or a device that has malfunctioned and "would be likely to cause or contribute to a death or serious injury if the malfunction were to recur." 21 C.F.R. § 803.3(o)(2)(i)-(ii). Kinard also provides a screenshot of online FDA guidance for when MDR reportable events occur (Doc. 4825-5 at 38) and cites an FDA publication which states that "[m]anufacturers, including foreign manufacturers, of legally marketed medical devices in the United States are required . . . to submit to us reports of MDR reportable events involving their medical devices" (*id.* at 39, citing https://www.fda.gov/media/86420/download). Kinard further relied on an FDA training session on what constitutes an MDR reportable event. Doc. 4825-6 at 96-97. These sources satisfy, by a preponderance of the evidence, the Rule 702 requirement that Kinard's opinion be based on sufficient facts and data.

Defendants argue that the sources Kinard cites discuss only what constitute MDR reportable events, not whether such events could be reported as ASRs, and that Kinard never read the specific exemption letters Bard received for the ASR program. Doc. 4825 at 12. But Kinard opines about when FDA regulations required an MDR report (Doc. 4825-5 at 26, 40), and Bard does not contend that its ASR letters negated FDA's MDR regulations. This will be fair ground for cross-examination at trial, but it does not overcome the preponderance of the evidence showing made by Plaintiffs that Rule 702(b) is satisfied. And as noted above, the Court's task is not to decide whether the expert is right or wrong. *See Alaska Rent-A-Car*, 738 F.3d at 969-70.

### 4. Bard "Gamed" the MDR Coding and Reporting System.

Kinard opines that Bard "functionally evaded" the substance of the FDA's adverse event reporting requirements by "gaming" the MDR coding and reporting system in

14

various ways, including: (1) misreporting events and miscoding patient problem codes; (2) misconducting its manufacturing reviews of adverse events; and (3) not conducting a device history review or root cause analysis when an affected device was not returned. Doc. 4825-5 at 24-25, 27, 48-55.

Defendants argue that Kinard's use of certain terms – that Bard was "gaming" the system, engaged in "misleading reporting," "evaded review," and "misleadingly gave the impression" – are improper opinions about Bard's knowledge, intent, motive, or state of mind. Doc. 4825 at 17 (citing Doc. 4825-5 at 23-25). Plaintiffs counter that Bard's reporting can be objectively misleading regardless of Bard's state of mind. Doc. 5319 at 18. But Kinard does not confine her opinions to objective facts; she repeatedly characterizes what Bard is doing in a way that suggests an intent to mislead.

Plaintiffs do not claim that Kinard is an expert in corporate psychology or has expert insight into the Bard's corporate motivations or intent. As a result, she cannot opine on Bard's knowledge, intent, motive, or state of mind, including that Bard was gaming the system, evading review, and intentionally giving misleading impressions. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) ("To the extent Dr. Eisenberg 'offers opinions on Bard's intent, state of mind, or motivations, this testimony is outside the bounds of appropriate expert testimony.'") (citation omitted). She can opine that Bard's reporting did not comply with its FDA regulations, but may not characterize what Bard was seeking to do.[5]

### 5. Other Arguments.

Defendants make other arguments as to why Kinard's opinions regarding Bard's use of the MDR coding and reporting system should be excluded under Rule 702. Doc. 4825 at 13-17. First, Defendants note that Kinard did not review certain internal Bard data and documents. *Id.* at 13. But Defendants do not explain what the data and documents

---

[5] Plaintiffs argue that Kinard said Bard "functionally evaded review," not that it "evaded review." Doc. 5319 at 18. The Court sees no meaningful description between these phrases. Both can be understood as describing what Kinard believes Bard was attempting to do, and Kinard's reference to "functionally evaded review" appears in the same sentence as her claim that Bard was "gaming" the system. *See* Doc. 4825-5 at 24.

15

show or how they render the bases for Kinard's opinions insufficient. Defendants will be free to present internal data and documents through their own witnesses and may cross-examine Kinard on her purported failure to review them.

Second, Defendants claim that Kinard misunderstands what Bard's references to "manufacturing review" and "device history record" describe. Doc. 4825 at 16 (citing Doc. 4825-6 at 81-83). Again, however, Defendants may cross-examine Kinard on this point, but it provides no basis for excluding her opinions under Rule 702.

### 6. Arguments to which Plaintiffs Did Not Respond.

Defendants argue that Kinard's opinions that Bard "underreported" complaints are misleading and unreliable. *Id.* at 17. Defendants explain that Kinard misuses the term "underreporting" when she means that Bard miscoded events or misreported others as ASRs. *Id.* Plaintiffs do not address this argument in their response. The Court will not permit Kinard to use the term "underreported" in her testimony.

Kinard opines that Bard had "a pattern of late reporting[.]" Doc. 4825-5 at 43-44. Defendants argue that this opinion lacks a sufficient factual basis and is unreliable. Doc. 4825 at 17. Plaintiffs do not address this argument in their response. Defendants are correct that the document Kinard references – a 2015 FDA Warning letter – is for a different Bard device (an IVC filter delivery system). Kinard also states that the alleged pattern of late reporting is identified in the MDRs for Bard IPCs (Doc. 4825-5 at 44), but she does not identify those MDRs or explain how they may show a pattern of late reporting. Her discussion of the MDRs instead addresses alleged misreporting. *See id.* at 44-55. The Court will not permit Kinard to testify that Bard had a pattern of late reporting.

Kinard opines in her report that Bard "was not granted an exemption" to report IPC malfunctions in the FDA's Voluntary Malfunction Summary Reporting ("VMSR") program that was implemented after the ASR program ended. *Id.* at 40. Defendants argue that this opinion is speculative, unreliable, and irrelevant. Doc. 4825 at 18. Plaintiffs do not address this argument in their response. Kinard admits that she has no information from the FDA or any other reliable source that Bard was not allowed to participate in the

16

VMSR program.  Doc. 4825-6 at 41-44.  The Court will not permit Kinard to speculate about Bard's lack of participation in the VMSR program.

**IT IS ORDERED:**

1. Defendants' motion to exclude opinions of Madris Kinard (Doc. 4825) is **granted in part** and **denied in part**.

2. The motion is **denied** with respect to Defendants' arguments that: (1) Kinard is not qualified to offer certain opinions; (2) her opinion that Bard obscured potential safety signals from the FDA is irrelevant; (3) her opinions quantifying her search results and the number of Bard's reported adverse events and their associated coding are irrelevant; (4) her opinions are unreliable because they do not grow out of research conducted independent of the litigation; (5) her opinions about Defendants' FDA reporting and alleged misuse and violation of the ASR program are unreliable; and (6) her opinions are unreliable because she did not review certain internal Bard data and documents and she misunderstands what Bard's references to "manufacturing review" and "device history record" describe.

3. The motion is **granted** as follows.  Kinard cannot: (1) offer her personal disagreements with or criticisms of the FDA's ASR program (but she will be permitted to describe it as part of her testimony); (2) opine on Bard's knowledge, intent, motive, or state of mind, including that Bard was gaming the system, evading review, and intentionally giving misleading impressions; (3) use the term "underreported" in her testimony; (4) opine that Bard had "a pattern of late reporting"; or (5) speculate about Bard's lack of participation in the VMSR program.

Dated this 21st day of January, 2026.

*David G. Campbell*
David G. Campbell
Senior United States District Judge