WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br>**ORDER**<br>**Expert Witness Ralph Reichle, M.D**. |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Ralph Reichle, M.D. Doc. 4821. The motion is fully briefed. *See* Docs. 4821, 5329, 5571. The Court will grant the motion in part.

**I.     Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

1    IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

2

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including medical professionals. Defendants have identified Ralph Reichle, M.D., as a medical expert. Dr. Reichle is a board-certified interventional radiologist with over 30 years of practice. Docs. 5329 at 2, 4821-1 at 37. He is certified in Diagnostic Radiology by the American Board of Radiology and maintains a Certificate in Interventional Radiology from the American Board of Radiology. Doc. 4821-1 at 4. Reichle is the Director of the Thoracic Radiology Section at Mount Auburn Hospital, where he has practiced radiology since 1994. *Id.* at 4, 27. He was appointed Quality Assurance Officer for the Department of Radiology in 1998, a position in which he oversees quality measures and patient safety. *Id.* at 27, 37. Reichle has served as an Assistant Professor of Radiology at Harvard Medical School since 1994 and as a clinical instructor at Massachusetts General Hospital since 2007. *Id.* at 27. Plaintiffs move to exclude Reichle's opinions under Federal Rule of Evidence 702.

**II.   Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles

and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.   Discussion.**

Plaintiffs do not challenge Reichle's general qualifications, but instead move to exclude specific opinions under Rule 702. Doc. 4821 at 3.

**A.   Performance of Bard Ports.**

Plaintiffs argue generally that Reichle's opinions regarding the "safety and efficacy of ports" are drawn from his personal experience and anecdotally from the experience of his colleagues, and thus cannot satisfy Rule 702(b)-(c) because they lack support from reliable data. *Id.* at 4. This portion of Plaintiffs' motion does not cite to any specific "safety

1  and efficacy" opinion offered by Reichle. *Id.* at 4-7. Because the report does mention
2  "safety" and "effective" a few times (*id.* at 15, 17, 18, 19, 21), the Court will assume these
3  references are the targets of Plaintiffs' motion. Defendants argue generally that Reichle's
4  opinions on port safety and efficacy are sufficiently supported by his clinical experience,
5  and further supported by the literature he cites. Doc. 5329 at 4-6.

6  Plaintiffs contend Reichle's opinions have no reliable foundation because his clinical experience and that of his colleagues provide no measurable data demonstrating application of the scientific method. Doc. 4821 at 4. But "a doctor's experience can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice," including his opinion the device is "safe and effective." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018); *see also Engilis*, 151 F.4th at 1053 ("[A]n expert's specialized knowledge . . . . can also 'serve as the requisite "facts or data" on which they render an opinion.'" (citation omitted)).

Reichle's report describes his extensive clinical experience with managing ports and demonstrates an awareness of their risks. *See* Doc. 4821-1 at 5. As an interventional radiologist, Reichle has "placed approximately 500 ports manufactured by companies including Bard" and "removed approximately 200 ports." *Id.* He understands "the benefits of ports, the desirability of ports over alternative venous access devices for certain patients, and the potential short-term and long-term complications associated with all manufacturers' implanted ports, including infection, clotting/thrombosis, fibrin sheaths, port site erosion, and device and/or catheter fracture." *Id.* This knowledge from his clinical experience supports his general opinion on port safety and efficacy.

Reichle's opinion is bolstered by medical literature he cites. Plaintiffs argue without citation that "Reichle's opinions find no support in the literature" (Doc. 5571 at 4), but Defendants point to Reichle's reliance on medical literature presenting "scientific evidence for the risk and complications" of ports, including "numerous meta-analyses of the complication rates from hundreds of thousands of ports placed" that aligns with his own

1  clinical experience. Doc. 5329 at 5-6 (citing Doc. 4821-1 at 14-19). The literature
2  discussed by Reichle supports his opinion that ports are "safe and effective." *See e.g.*,
3  Doc. 4821-1 at 14-15 (discussing the Lin study, which concluded through meta-analysis
4  that "PORT achieved safety benefits compared with chemotherapy through PICC.
5  Therefore, PORT is regarded as safe and effective vascular access for the administration
6  of chemotherapy" (quoting Li Lin et al., *Peripherally Inserted Central Catheters Versus*
7  *Implantable Port Catheters for Cancer Patients: A Meta-Analysis*, Frontiers Oncology,
8  July 14, 2023, at 1)).

Defendants have shown by a preponderance of the evidence that Reichle's general opinion that IPCs are safe and effective is sufficiently supported by clinical experience and literature. The Court separately considers narrower opinions Plaintiffs seek to exclude.

### B.   Risks Described in Instructions for Use.

Plaintiffs seek to exclude Reichle's opinion that "the risks of Bard ports discussed in the IFU [Instructions for Use] are widely known among the practitioners at Mount Auburn Hospital." Doc. 4821 at 4. They contend Reichle provides "no data to support this personal observation," and they posit two hypothetical data points that could have been, but were not, provided in support:

> Dr. Reichle admits that he cannot identify any colleague who has reported adverse events to the Manufacturer and User Facility Device Experience ("MAUDE") database as required when circumstances dictated it, and he reviewed no internal Bard materials to evaluate whether the Instructions for Use ("IFU") warnings properly reflected the company's knowledge of its product's risks.

*Id.* (citations omitted). But it is not clear how these data points are relevant. They do not bear on Reichle's opinion about risks widely known among practitioners at his hospital – a fact known from 30 years of practice and 28 years as his hospital's Quality Assurance Officer for the Department of Radiology. Doc. 4821-1 at 37.

This Court has recognized that "expert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant

6

discipline.'" *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *4 (D. Ariz. Jan. 22, 2018) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010)); *see also* Doc 5329 at 6-7. Although the briefs do not attach the IFU for the Court to consult, Reichle's report indicates that the risks of Bard ports discussed in the IFU track the IPC-related risks widely known at his hospital and reported in the medical literature. *See* Doc. 4821-1 at 12-17 ("The risks of ports have been widely reported in the medical literature" (citing studies) and the "complication profiles [of ports] are widely known, reported, and taught, and clinicians have a vast pool of personal and institutional experience with ports. These risks are also long known and well-known to me and my colleagues at Mount Auburn Hospital[.]"). Reichle's opinion that "the risks of Bard ports discussed in the IFU are widely known among the practitioners at Mount Auburn Hospital" satisfies Rule 702(b)-(c).

        **C.**     **Port Infections Within the First Month.**

Plaintiffs seek to exclude Reichle's opinion "that infections involving the port that occur within the first month of port placement likely are due to the initial placement procedure." Doc. 4821 at 5 (quoting Doc. 4821-1 at 14). They argue this opinion is not supported by any data or methodology where it is "based solely on his own experience and discussions with other colleagues." *Id.* Defendants contend Reichle explained in his deposition that his conclusion is "commonly known in his interventional radiology peer group and among infectious disease, oncologists, and other providers who treat IPC patients." Doc. 5329 at 7.

Reichle's report provides no explanation for this opinion – no discussion of the observations or experiences that have led him to conclude that first-month infections likely are due to placement procedures (Doc. 4821-1 at 14) – and Defendants cite no medical literature to support this opinion (Doc. 5329 at 7). Reichle testified that the opinion was based on his experience and conversations he had with infectious disease doctors, but he could not recall the names of or conversations with those doctors. Doc. 4821-2 at 25-27. Nor was he able to cite any medical literature that supported the opinion. *Id.* at 26.

7

This type of quantifiable opinion – that first-month infections are due to placement procedures – generally must be based on more than personal experience. *See Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS, 2022 WL 1225031, at *9 (N.D. Cal. Apr. 26, 2022), *aff'd in part*, 111 F.4th 1018 (9th Cir. 2024) ("Although an expert may testify based on their 'personal knowledge or experience[,]' courts have excluded doctors' observations about rates of patient outcomes 'where the expert was unable to provide verifiable data from the expert's practice.'" (citations omitted)). Defendants have not shown that this opinion is supported by sufficient facts or data and reliable principles and methods as required by Rule 702(b)-(c).

### D. Complication Rates Among Colleagues.

Plaintiffs seek to exclude Reichle's opinion that "[n]one of my colleagues at Mount Auburn Hospital have ever relayed to me that they have higher complication rates with Bard ports compared to other ports." Doc. 4821 at 5. Plaintiffs argue Reichle improperly relies on the "'collective experience' of unnamed colleagues," where "neither his personal experience nor the collective experience . . . is susceptible to scientific testing or verification." *Id.* But Reichle's opinion does not need to be verifiable by the scientific method to satisfy Rule 702. "Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *McBroom v. Ethicon*, Inc., No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Defendants contend Reichle may rely on his clinical experience to opine that "he has not encountered unexpectedly high complication rates with Bard [] devices," citing in support *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 6186496, at *2 (D. Ariz. Feb. 21, 2018) (holding admissible interventional radiologist's opinion that "[in his] own experience, [he has] not encountered unexpectedly high complication rates with Bard filter devices"). Doc. 5329 at 8. They further contend that where Reichle was responsible for the "systematic review of institutional complication

data in his official [Quality Assurance Officer] capacity," it is within his clinical experience to testify about the absence of unexpectedly high Bard complication rates among his colleagues. *Id.* at 9.

Reichle has "experience with hundreds of Bard ports over the course of [his] practice," and his responsibilities as Quality Assurance Officer include "track[ing] all of the complications for port placements" at his hospital. Docs. 4821-1 at 18, 4821-2 at 9. As Quality Assurance Officer, he observes "that all complications are documented, tracked, and discussed at monthly QA meetings." Doc. 5329 at 9 (numerous deposition citations). This experience sufficiently supports his testimony that "[n]one of my colleagues at Mount Auburn Hospital have ever relayed to me that they have a higher complication rate with Bard ports compared to other ports." Doc. 4821-1 at 18; *see also In re Bard*, 2018 WL 993675, at *2 ("[A] doctor's experience 'can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice.'"); *In re Bard*, 2018 WL 6186496, at *2 ("Dr. Grassi may rely on his own clinical experience in stating his opinions" including that "[in his] own experience, [he has] not encountered unexpectedly high complication rates with Bard filter devices.").

### E. The Term "Flex Fatigue."

Reichle testified that "'flex fatigue' . . . is not a common term known to practicing interventional radiologists." Doc. 4821-2 at 28-29. Plaintiffs contend that where Reichle acknowledged he had not spoken to a single colleague about "flex fatigue" or the similar term "flexural fatigue," he is impermissibly "relying on the absence of comments" to give such an opinion. Docs. 4821 at 5, 4821-2 at 30. Defendants assert Reichle's opinion is supported by the fact he has never heard the term in his 30 years of practice, including from his colleagues, nor did he see it used when reviewing medical literature. Doc. 5329 at 7.

"Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" *McBroom*, 2021 WL 2709292, at *5 (quoting *Kumho Tire Co.*, 526 U.S. at 150). The fact that Reichle has not heard the term "flex fatigue" or seen it used during his clinical

9

experience is a fact supported by his 30 years of practice. Doc. 4821-2 at 28-29. This experience supports his opinion by a preponderance of the evidence.

### F. Complication Rates.

Plaintiffs argue Reichle's opinions "regarding his own complication rates" and "rates of complications and adverse events associated with ports" within his hospital cannot satisfy Rule 702(b)-(c). Doc. 4821 at 8. They contend that "[a]n expert cannot present precise-sounding statistics based solely on his own assurances of reliability without any supporting data." *Id.* at 9 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). Defendants argue Reichle's clinical experience, particularly his "systematic review of institutional complication data in his official [Quality Assurance Officer] capacity," supports his opinions on complication and adverse event rates. Doc. 5329 at 8-9.

Defendants assure the Court that Reichle "will not offer any 'estimated' complication rates at trial." *Id.* at 10. Yet "he testified that Bard's IPC complication rates were less than 5% because if they had reached or exceeded his institution's 5% threshold complication rate that would have triggered a review, which never happened." *Id.* at 9 (citing Doc. 5329-1 at 17-18, 20-21). Reichle has not provided a record of the data that he claims to have "specifically reviewed" and which form the basis of his 5% opinion. As noted above, such quantifiable opinions generally must be supported by more than a mere reference to experience. *See Montera*, 2022 WL 1225031, at *9 ("[C]ourts have excluded doctors' observations about rates of patient outcomes 'where the expert was unable to provide verifiable data from the expert's practice.'" (citation omitted)); *see also Rose v. Bos. Sci. Corp.*, No. 2:20-CV-00716-BJR, 2020 WL 4195470, at *1 (W.D. Wash. July 21, 2020) ("[E]xperts cannot testify on personal complication rates where they have not provided "objective data to back up [such] assertion[s]."). Defendants assert "complication data and [Quality Assurance] reviews are necessarily kept privileged at [Reichle's] institution" (Doc. 5329 at 9), but this fact does not remove their obligation to present data Reichle relies on for his opinion. Because Defendants have not presented the underlying

data, the Court concludes that they have not shown by a preponderance of the evidence that Reichle's 5% opinion is supported by sufficient facts or data and a reliable methodology. The Court will exclude the opinion.

Plaintiffs also seek exclusion of Reichle's testimony that "he had removed a device due to a fracture in the catheter 'a [few] times,'"[1] and "that he 'can't remember' whether he had ever encountered a complete disconnect fracture due to pinch-off." Doc. 4821 at 8-9 (citing Doc. 4821-2 at 6-8). This testimony reflects Reichle's own clinical experience, not broader product statistics, and is sufficiently supported by that experience. Specific complications associated with a medical device that a doctor has encountered are squarely within that doctor's clinical experience. *See In re Bard*, 2018 WL 993675, at *2 ("[A] doctor's experience 'can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice.'").

Plaintiffs also seek exclusion of Reichle's testimony "estimat[ing] that he has implanted approximately 500 ports from various manufacturers" and "estimat[ing] that '80 percent plus' [of implanted ports] were Bard," but where he did not "provide a breakdown by manufacturer" and "could not account for the distribution of the remaining 20 percent" of ports he implanted. Doc. 4821 (citing Doc. 4821-1 at 42). This testimony also is based on his own clinical experience. Rule 702 does not require such opinions be supported by verifiable data where they do not implicate complication rates or adverse event rates. *See McBroom*, 2021 WL 2709292, at *6 ("If *Daubert* required an expert witness to independently verify every single clinical experience he had over the course of his career, the court would never make it past pre-trial motions" (quoting *Bellew v. Ethicon, Inc.*, No. 2:13-CV-22473, 2014 WL 12685965, at *19 (S.D. W. Va. Nov. 20, 2014))).

Plaintiffs attempt to undermine Reichle's clinical experience by contending that he "has not implanted a single chest port in the last two years." Doc. 4821 at 8. But Reichle continues to practice interventional radiology and teach within a radiology residency.

---

[1] The Court replaces Plaintiffs' cite to "a couple of times" to "a few times" to accurately reflect the record. *See* Doc. 4821 at 8 (citing Doc. 4821-2 at 7-8).

Docs. 4821-1 at 27, 4821-2 at 12.  Any recent gap in Reichle's practice implanting ports does not negate his experience of 30 years.  *See* Doc. 4821-1 at 5 ("I have extensive experience in the placement, maintenance, and removal of ports. Over the course of my practice, I estimate that I have placed approximately 500 ports manufactured by companies including Bard, Meditech Devices, Angiodynamics, and Navilyst Medical. I have removed approximately 200 ports.").

### G.     Design of Ports.

Plaintiffs seek to exclude Reichle's opinion on the alleged inadequacy of alternative designs, where he "challenges 'the benefits of adding antithrombotic or antimicrobial technologies to catheters'" and claims "such coatings 'may introduce new risks.'" Doc. 4821 at 10 (citing Doc. 4821-1 at 20-21).  Plaintiffs primarily argue Reichle is not qualified to opine on the design of IPCs under Rule 702(a) where he concedes to having "no experience designing an implantable medical device, is not an engineer, and is not an expert in Food and Drug Administration ('FDA') regulations." *Id.* at 9-10.  Plaintiffs also contend that Reichle fails to identify any reliable methodology.  Doc. 5571 at 6. Defendants argue Reichle's opinions are "informed by his clinical experience, the medical literature, and the FDA."  Doc. 5329 at 11.

Reichle is not qualified to discuss materials composition or port design.  An expert may be qualified in one subject matter but not another.  *See Zellars v. NexTech Ne., LLC*, 895 F. Supp. 2d 734, 743 (E.D. Va. 2012), *aff'd*, No. 12-2267 (4th Cir. July 17, 2013). Reichle is an interventional radiologist, and Defendants identify nothing in his education or clinical experience that would prepare him to evaluate "the benefits of adding antithrombotic or antithrombotic technologies to catheters."  *See* Doc. 4821-2 at 13-15 (testifying he is not a "materials engineer," has never "designed an implantable medical device," has no "education, training, or experience in the manufacturing processes relating to implantable medical devices" or "in developing polymers used in catheters," and has never "developed any studies to assess the differences in coatings that could be applied to catheters").  Defendants point to Reichle's experience publishing medical literature

(Doc. 5329 at 11), but none of Reichle's literature reports on catheter materials, port materials, or even IPCs more broadly. Docs. 4821-1 at 34-36, 4821-2 at 13-15 ("Q. Have you ever conducted any studies in which the primary focus was safety or efficacy of implantable chest ports? A. No."; "Q. Have you ever published any articles in peer-reviewed medical literature regarding implantable chest ports? A. No."; "Q. Have you ever developed any studies to assess the differences in coatings that could be applied to catheters? A. No.").

Reichle's reliance on medical literature and an FDA publication are also insufficient. Doc. 5329 at 11. Reichle cites the Ullman study and a 2015 FDA Safety Alert.[2] He relies on Ullman to support his opinion "questioning the benefits of adding antithrombotic or antimicrobial technologies to catheters,'" and he relies on the FDA Safety Alert to claim "such technologies may introduce new risks.'" Doc. 4821-1 at 20-21 & n.13. But an expert may not merely repeat the findings of other experts. *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("It is not enough to simply read the conflicting studies in the literature and describe their findings. And it's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *aff'd sub nom. Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025); *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)). That is what Reichle does:

> [E]ven within PICC literature, there is evidence questioning the benefits of adding antithrombotic or antithrombotic technologies to catheters. For instance, the Ullman study, a randomized controlled trial of 1098 patients comparing hydrophobic (BioFlo) and chlorohexidinecoated (Arrowg+rd Blue Advance) PICCs to standard polyurethane PICCs, found no significant differences in device failures and complications. Furthermore, adding such technologies may introduce new risks, as demonstrated by a 2015 FDA Safety Alert. In that Alert, the FDA noted that hydrophilic and hydrophobic

---

[2] Reichle provides no citation to the 2015 FDA Safety Alert in his report, but it is referenced in his "Materials Considered" list (Doc. 4821-1 at 46) and attached to Defendants' response as exhibit C. Doc. 5329-3.

13

> coatings on medical devices, including catheters, can separate (peel, flake, delaminate), causing severe complications, including pulmonary infarction, myocardial embolism, stroke, tissue necrosis, and death. The agency documented nearly 500 medical device reports since January 2015 and numerous recalls since 2014. This regulatory warning highlights the potential risks of adding coatings to medical devices. This and the Ullman study suggest caution in interpreting claims of superior safety and decreased complications based solely on antithrombotic or antimicrobial coating or technologies.

Doc. 4821-1 at 20-21 (footnote omitted). Reichle cannot simply restate the findings of the Ullman study and 2015 FDA Safety Alert to express an opinion on catheter materials. He concedes that such an opinion is "not in the scope of the standard daily practice and beyond the expertise of an[y] interventional radiologist[] [he has] worked with[.]" Doc. 4821-1 at 20.

Defendants assert physicians such as Reichle conduct risk benefit analyses in their patient care, which would be informed by literature such as the 2015 FDA Safety Alert that discusses "the potential risks of adding coatings to medical devices." Doc. 5329 at 11. The Court does not dispute that Reichle may consult such literature to inform his patient care, but Rule 702 does not permit him to state materials opinions based on nothing more than two pieces of literature he has read.

The three cases cited by Defendants are distinguishable. *Id.* at 11-12. In two of them, expert opinions were supported by specific clinical experience not shared by Reichle. *See Heinrich v. Ethicon, Inc.*, No. 220CV00166APGVCF, 2021 WL 1854648, at *3 (D. Nev. May 10, 2021) (doctor's opinion on medical device materials was supported by "his own experience with both [material] types"); *Godreau-Rivera v. Coloplast Corp.*, 598 F. Supp. 3d 196, 210 (D. Del. 2022) (doctor opining on the design of mesh products had "authored multiple peer-reviewed articles . . . relating to mesh products"). Reichle does not claim to have managed ports with and without the catheter materials at issue, nor has he authored literature on ports or catheter materials. Docs. 4821-1 at 34-36, 4821-2 at 13-15. In the third case, the doctor offered only a broad opinion as to the safety and efficacy

of the medical device he has used. *See Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2315077, at *4 (S.D. Fla. May 11, 2020) (holding admissible doctor's opinion that the medical device was "safe and effective" and "there [was] no medical or scientific support for the theory that [it was] defective").

Defendants also cite this Court's earlier decision permitting certain technical opinions from doctors. *See In re Bard*, No. MDL 15-02641-PHX DGC, 2017 WL 11696720, at *6 (D. Ariz. Dec. 22, 2017). But this Court permitted technical opinions that "might reasonably be based on expertise and experience in implanting, monitoring, and removing IVC filters," and excluded all others. *Id.* Reichle's opinion on catheter materials is not reasonably based on his clinical experiences and will be excluded.

## H. Instructions for Use.

Plaintiffs seek to exclude Reichle's opinion that "Bard's Instructions for Use [IFU] for its implantable ports 'clearly convey' risks associated with all implantable port systems, and that those risks are 'well known' among practitioners at his hospital." Doc. 4821 at 11. In making this argument, Plaintiffs assert that Reichle cannot opine on whether Bard's IFUs "meet industry norms or standards for adequate warnings." *Id.* at 13. But Reichle offers no such opinions. Rather, he testifies that he was fully aware of the risks associated with port placement before he implanted his first Bard port, that the Bard IFUs clearly describe such risks, and that the risks are widely known among practitioners at his hospital. Doc. 4821-1 at 18. Reichle's 30 years of clinical practice as an interventional radiologist and his 28 years as the Quality Assurance Officer at his hospital qualify him to give these opinions.

Plaintiffs' arguments that Reichle is unqualified because he has "no experience in drafting IFUs and/or interacting with the FDA regarding the content of IFUs" misses the mark. Doc. 4812 at 12. Such qualifications might be needed if he were opining on whether Bard's IFUs satisfy FDA regulations, but he offers no such opinion. His testimony about risks that are understood by interventional radiologists is quite different, and well within his area of expertise. Reichle and his colleagues are the doctors that implant ports – the

15

target audience for IFUs. They must assess port risks before they prescribe a port for a patient. They are well situated to describe the port risks known to them and to read an IFU and state whether it clearly communicates those risks. *McBroom*, 2021 WL 2709292, at *16 (adopting holding that "[e]xpert witnesses may properly offer opinions" on "knowledge of the medical community in general" (citation omitted)).

As argued by Defendants, the weight of the caselaw holds that a doctor's clinical experience qualifies him to discuss the adequacy of warnings in IFUs. Doc. 5329 at 13-14 (citing *Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1341-42 (N.D. Ga. 2022) ("Culligan is qualified to testify regarding the adequacy of the IFU warnings. . . . [A] doctor relying on a product warning in his or her practice qualifies him or her to make conclusions on the adequacy of the product's warning." (citations omitted)), *vacating in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023); *Arevalo v. Coloplast Corp.*, No. 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *5 (N.D. Fla. July 7, 2020) (admitting "Dr. Kohli's opinions regarding the risks physicians expect to be included in IFUs and how those compare to the risks actually included in the Aris IFU"), *aff'd sub nom. Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646 (11th Cir. Nov. 8, 2022); *Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *14 (S.D.W. Va. Feb. 7, 2015) ("Dr. [Raybon] . . . is qualified to evaluate Bard's warnings based on his knowledge of and experience with the risks of the Avaulta."); *Godreau-Rivera v. Coloplast Corp.*, 598 F. Supp. 3d 196, 210-11 (D. Del. 2022) (adopting *Wise*'s reasoning); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 719 (S.D.W. Va. 2014) ("[A]s a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT–O and whether those risks were adequately expressed on the TVT–O's IFU.").

Plaintiffs also argue Reichle's opinion is not based on sufficient facts or data because he did not "review Bard's internal documents and information regarding risks and complications." Doc. 4821 at 12. Such a review might be needed if Reichle was opining on whether Bard's IFUs adequately conveyed Bard's knowledge of risks, but he is not giving such an opinion either. He is testifying about his and his colleagues' knowledge of

16

risks. Reichle's review of medical literature on the known risks of IPCs, as well as his review of Bard IFUs and other port manufacturers' IFUs in preparation of his report, provides additional facts and data that inform his opinion. *See* Docs. 5329 at 15; 4821-1 at 14, 17-18; 4821-2 at 19.

Plaintiffs argue that "a failure-to-warn claim depends on what the product manufacturer knew or should have known in making decisions about warnings," and "[w]ithout knowing what information Bard had about complications associated with its ports, Dr. Reichle could not possibly give a reliable opinion as to whether Bard sufficiently warned about those complications." Doc. 4821 at 12-13. Again, Reichle provides no such opinion.[3]

Contrary to Plaintiffs' contention, Reichle's opinion on the adequacy of Bard's IFUs is not "based on nothing more than personal conviction." Doc. 4821 at 13. It is based on 30 years of practicing interventional radiology, including 28 years as Quality Assurance Officer, by which he is well informed of the risks associated with ports. *See* Doc. 4821-1 at 18, 37. And his opinion is bolstered by his review of medical literature, in which the risks of ports "have long been reported" and which is a component of his clinical decision-making. *Id.* at 14, 17.

## I.     Risk-Benefit Balancing.

Plaintiffs argue Reichle cannot opine that "[t]he benefits of Bard ports and other implantable ports significantly outweigh their risks." Doc. 4821 at 13 (quoting Doc. 4821-1 at 19). They contend this opinion is not relevant under 702(a), and separately that it is an impermissible legal conclusion. *Id.*

---

[3] Reichle does opine that "the risk information contained in the Bard port IFU is consistent with the port IFUs of other manufacturers" (Doc. 4821-1 at 18), but Plaintiffs do not challenge this part of his opinion. Doc. 4821 at 11. Even so, Reichle's clinical experience, having practiced with different port types and reviewed their IFUs (*see* Doc. 4821-1 at 18-19), supports his opinion that the risks contained in Bard's IFU are consistent with other IFUs. *See In re Bard*, 2018 WL 993675, at *2 ("[A] doctor's experience 'can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice.'").

Plaintiffs' master complaint alleges that the risks of Defendants' IPCs outweigh the benefits. *See e.g.*, Doc. 1889 at 54, ¶ 297.d ("Defendants were also aware that Bard IPCs . . . [w]ould be implanted in patients where the risks outweighed any benefit or utility of Bard IPCs."), 55, ¶ 309 ("Bard IPCs . . . [are] unreasonably dangerous because the foreseeable risks exceeded the alleged benefits associated with the use of Bard IPCs."), 63, ¶ 376.e ("Defendants breached their express warranties insofar as Bard IPCs, . . . [c]arried a risk of use outweighed any benefit."). The jury will be required to address this allegation, and this Court has found testimony on this issue admissible in product liability cases. *See*, *e.g.*, *Triant v. Am. Med. Sys. Inc.*, No. CV-12-00450-PHX-DGC, 2020 WL 4049844, at *2 (D. Ariz. July 20, 2020) (finding admissible a board-certified urogynecologist's opinion that "[t]he Elevate is a safe and useful device . . . whose benefits far outweigh their risks," and "[t]he MiniArc sling['s] . . . benefits outweigh its risks"). The Court cannot accept Plaintiffs' argument that testimony on this issue would be unhelpful to the jury.

Plaintiffs further assert Reichle's opinion is irrelevant under 702(a) because the relevant question for many jurisdictions is "whether the benefits of the product's *design* outweigh its risks," not "the benefits and risks of the product in general" as opined by Reichle. Doc. 4821 at 13-14 (citing Missouri and Florida case). But Plaintiffs do not contend this is the law in every state or will be the law applied in every bellwether trial. *See* Doc. 5329 at 17. The Court therefore cannot rely on this argument to exclude Reichle's opinion in all cases.

The Court also rejects Plaintiffs' second argument. *See* Docs. 4821 at 14, 5571 at 8. The existence and extent of a product's risks and benefits are factual issues to be decided by the jury from the evidence introduced at trial, not a legal issue to be resolved by the Court. The Court will not exclude this opinion as an improper legal conclusion.

**IT IS ORDERED:**

1. Plaintiffs' motion to exclude the opinions of Ralph Reichle, M.D. (Doc. 4821) is **granted in part and denied in part**.

2. Dr. Reichle cannot opine (1) "that infections involving the port that occur within the first month of port placement likely are due to the initial placement procedure."; (2) on specific or estimated complication rates or adverse effect rates of ports, including that "complication rates were less than 5% because if they had reached or exceeded his institution's 5% threshold complication rate that would have triggered a review, which never happened."; or (3) on catheter materials, including his opinion on the benefits and risks of "adding antithrombotic or antithrombotic technologies to catheters."

Dated this 21st day of January, 2026.

*David G. Campbell*
David G. Campbell
Senior United States District Judge

19