WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| Robert Cook,<br><br>Individual Plaintiff,<br><br>v.<br><br>Becton Dickinson and Company, et al.,<br><br>Defendants. | No. CV-23-01975-PHX-DGC<br><br>**ORDER**<br><br>**Expert Witness Keilye R. Pampillonia** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiff Robert Michael Cook has filed a motion to exclude the expert opinions of Keilye R. Pampillonia. Doc. 5784. The motion is fully briefed and no party requests oral argument. *See* Docs. 5784, 6241, 6405. The Court will grant the motion in part.

I.    **Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication,

1

intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Robert Michael Cook brings his lawsuit in this MDL. Doc. 216 (Case No. CV-23-01975-PHX-DGC). On August 24, 2022, Plaintiff had a Bard port implanted, and he subsequently suffered from an infection. *Id.* at 4. Plaintiff raises claims typical to this MDL, alleging the infection was caused by the implanted Bard port. *Id.* at 5.

Defendants have identified Keilye R. Pampillonia, B.S.N., O.C.N. as an expert witness in the Cook case. Pampillonia received a bachelor's degree in nursing in 2018 and certification as an Oncology Certified Nurse in 2020. Doc. 5784-1 at 15, 17. She currently holds the positions of staff nurse and rotating charge nurse in an oncology unit, providing direct patient care. *Id.* at 4, 15. Plaintiff Cook moves to exclude certain opinions of Pampillonia under Federal Rule of Evidence 702. Doc. 5784 at 2-3.

II.     **Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles

and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.   Discussion.**

Plaintiff seeks to exclude Pampillonia's opinion that Plaintiff's deaccessing of the port – the procedure where the needle is removed from the port after treatment is complete – was the most likely source of his infection, and her opinions on potential sources of contamination and improper techniques used during deaccessing. Doc. 5784 at 2-3.

   **A.   Causation Opinion.**

Pampillonia testified during her deposition that "most likely [Plaintiff's] infection resulted of poor deaccessing at home." *Id.* at 4 (quoting Doc. 5784-2 at 8); *see also* Doc. 5784-2 at 18 (answering that "at-home deaccess[ing]" was "the most likely source of

4

his infection"). Plaintiff argues this opinion was untimely, she is unqualified to render it, and she fails to provide a differential diagnosis. Doc. 5784 at 5-10. The Court agrees that Pampillonia is not qualified to opine on causation.

Plaintiff argues Pampillonia's causation opinion should be excluded because as a nurse, not an infectious disease doctor, she is unqualified to opine about the cause of an infection. *Id.* at 7-9. Defendants argue Pampillonia does not opine on causation, and that her testimony and report opine only that at home deaccessing "presented the 'most likely' *opportunity* for infection." Doc. 6241 at 5-6 (emphasis added).

Defendants are correct that Pampillonia's report opines that Plaintiff Cook's deaccessing created a "significant opportunity for infection." Doc. 5784-1 at 5. But her deposition goes further. She testified that at-home deaccessing was "the most likely source" of Plaintiff's infection. Doc. 5784-2 at 18; *see also id.* at 8. This is a causation opinion.

As noted by Plaintiff, cases within the Ninth Circuit hold that nurses are unqualified to render causation opinions. *See, e.g.*, *Flores ex rel. Clark v. United States*, 780 F. App'x 420, 422 (9th Cir. 2019) ("Flores' second expert, a nurse, was not qualified to offer an opinion on medical causation." (citation omitted)); *Gordon v. Sunrise Senior Living Servs., Inc.*, No. 08-CV-02299-REB-MJW, 2009 WL 3698527, at *3 (D. Colo. Nov. 5, 2009) ("Numerous opinions from both federal and state courts, including courts both in this district and in California, . . . support the conclusion that registered nurses and nurse practitioners are not competent to testify regarding medical causation[.]"); *Earp v. Cnty. of Tulare*, No. 1:11-CV-0196-MJS PC, 2012 WL 1076217, at *4 (E.D. Cal. Mar. 29, 2012) ("[R]egistered nurse Mary Dromi, is not competent to opine on the medical causation issues raised in this case. . . . This Court agrees with the reasoning in the line of cases which rejects opinion evidence from a registered nurse, rather than a qualified physician, on such issues." (citation omitted)); *Scolaro v. Vons Companies, Inc.*, No. 217CV01979JADVCF, 2020 WL 8920999, at *1 (D. Nev. Mar. 2, 2020) (excluding nurse's causation opinion where she "lack[ed] experience diagnosing" the injury at issue).

Pampillonia concedes that "diagnosing is not part of the safe nursing practice." Doc. 5784-2 at 3-4. And the "Expert Background and Qualifications" section of her report does not mention any experience, education, or training in diagnosing sources of infection. *See* Doc. 5784-1 at 32-33. Defendants have not demonstrated that Pampillonia has the "scientific, technical, or other specialized knowledge" required by Rule 702(a) to opine on the most likely source of Plaintiff's infection. Her causation opinion is excluded.[1]

### B.   Sources of Contamination and Improper Technique Opinions.

Pampillonia renders opinions about the procedures for safely deaccessing, and whether safe protocols were followed during Plaintiff's deaccessing. Doc. 5784 at 11-12. Plaintiff argues such opinions improperly rely on an absence of evidence and are prohibited *ipse dixit*. *Id.* at 11-13. Plaintiff also argues Pampillonia's opinions are unhelpful where they are not connected to any causation theory. *Id.* at 14.

#### 1.   Absence of Evidence and *Ipse Dixit* Testimony.

Plaintiff argues that two specific opinions from Pampillonia's report rely on an absence of evidence.

First, Plaintiff contends Pampillonia "claims someone 'may [have] cough[ed], sneeze[d] or inadvertently spit . . . onto the clean area'" and there is no evidence of such events. *Id.* at 11 (quoting Doc. 5784-1 at 11). Pampillonia makes no such claim. She claims only that the instructional video followed by those who performed Plaintiff's deaccessing – Ms. Potter and Ms. McGuigan – "did not include guidance for the use of a mask for the patient and individual deaccessing the port," which "includes anyone in the immediate area who may cough, sneeze or inadvertently spit . . . onto the clean area to prevent the transmission of bacteria." Doc. 5784-1 at 11. During her deposition, Pampillonia testified that "[i]f the patient's not wearing a mask and they turn to talk or . . . spit when they're talking, they contaminated their own device." Doc. 5784-2 at 16. This explanation was given in support of her opinion that "it's best practice for everyone to wear

---

[1] The Court notes that Pampillonia's deposition causation opinion was not untimely because it was elicited by Plaintiff's counsel. *See* Doc. 114 at 3, ¶ F.

6

1  a mask." *Id.* at 15-16. Pampillonia thus opines on best practices, an opinion supported by her training and years of experience. She does not rely on an absence of evidence to speculate about whether anyone coughed, sneeze, or spat in Plaintiff's case.

Plaintiff next contends Pampillonia improperly relied on an absence of evidence to opine that tape attached to a "connection" during Plaintiff's deaccessing "would have potentially left sticky residue around the connection at the hub, increasing the risk of bacteria." Doc. 5784 at 11 (emphasis omitted) (quoting Doc. 57841-1 at 11). Plaintiff argues there is no evidence of where the tape was attached or that any tape residue was present, and Pampillonia's opinion therefore is speculative and should be excluded as both unreliable and lacking support from sufficient facts or data. *Id.* at 12.

Pampillonia's opinion that tape attached to a connection during deaccessing "would have potentially left sticky residue around the connection at the hub, increasing the risk of bacteria" (Doc. 5784-1 at 11) is not unsupported by the evidence. Pampillonia names "device contamination" as a primary cause of port-related infections, which she is qualified to opine about as an oncology nurse whose role is the safe management of ports. *Id.* at 4, 7. And the evidence suggests that a connection was taped during Plaintiff's deaccessing. *See* Docs. 5784 at 12 ("Ms. Potter did testify that the 'connection' was 'taped[.]'"), 5784-1 at 11 ("In Ms. Potter's testimony she states, 'there was a connection that was also taped.'"). From this evidence, Pampillonia may opine as to how the presence of tape during deaccessing could create a risk of infection.

Plaintiff contends there is no evidence in the record "that any tape ever contacted the needleless connector specifically, brushed against a contaminant source, or left any residue" (Doc. 6405 at 8), which are the events most likely to create a risk of infection due to presence of the tape. *See* Doc. 5784-1 at 7-8 (Pampillonia explaining that "the goal should be to eliminate surface pathogens before accessing the needleless connector" to reduce the risk of contamination (footnote omitted)). This argument would carry weight if Pampillonia was testifying that the tape did cause the infection. But she opines only that the tape "would have potentially left sticky residue . . . increasing the risk of bacteria." *Id.*

7

at 11. The presence of the tape provides a sufficient factual basis for her opinion that the risk of bacteria would be increased.

Plaintiff also summarily contends that Pampillonia's opinions "about not wiping the table, not wearing a mask, and not scrubbing the hub for sufficient time" during deaccessing are improperly speculative. Doc. 5784 at 11 (citing Doc. 5784-1 at 10-12). But again, Pampillonia may opine about best practices known to her as an oncology nurse – practices the record suggests were not followed in Plaintiff's case. *See* Doc. 5784-1 at 11 ("The parties involved are unable to positively confirm that the surface area where the deaccessing took place (dining room table) was wiped down prior to gathering supplies. This is the first step of the 'Deaccessing a Port' video and a deviation from the instructions provided in the video from Mayo Clinic." (citation omitted)); *id.* at 12 ("Ms. [McGuigan] mentions the use of alcohol wipes and states that Ms. Potter used them to 'wipe, with an alcohol swab, the tips of everything. . . . .' While 'wiping' the line is reasonable, best practice standards require the hub or end of the needleless connector to be vigorously 'scrubbed' for 15-20 seconds immediately prior to syringe connection." (citation omitted)); *id.* ("Ms. [McGuigan] and Ms. Potter acknowledged not all parties involved wore a mask which is considered best practice.").

Plaintiff argues the instructional video did not even recommend all the best practices discussed by Pampillonia, apparently to dispute their relevance. Doc. 5784 at 12. But Pampillonia does not base her opinion on the instructional video. Her opinion is based on her clinical experience as an oncology nurse. In fact, she cites the absence of these best practices in the instructional video to support her opinion that Plaintiff's deaccessing was not conducted safely. *See* Doc. 5784-1 at 11 ("[T]he 'Deaccessing a Port' video lacks essential information on how to safely deaccess a port in the home setting. . . . The video did not include guidance for the use of a mask for the patient and individual deaccessing the port. . . . The video lacks guidance for proper interventions when sterility is questioned. The video also does not endorse best-practice pulsatile flushing technique."). Pampillonia's opinions are not unreliable because they differ from or even criticize the

8

video, provided she is otherwise qualified to give them and they are based on sufficient facts or data and reliable methods. The Court concludes that these requirements of Rule 702 are satisfied by a preponderance of the evidence.

The Court also concludes, however, that Pampillonia's opinion concerning the adhesion of the port dressing must be excluded. She opines that Plaintiff's port dressing "detached easily" and that "reduced adhesion can be associated with the presence of moisture beneath the dressing," where "[m]oisture beneath a dressing can compromise the sterile barrier and increase infection risk." *Id.* at 13. In support, she cites Ms. McGuigan's testimony and a nursing report dated September 19, 2022 – approximately a month after Plaintiff's deaccessing of the port – which described Plaintiff as having "very sweaty skin. His [PICC line] dressing does not stay on for a full week," and "keeping the PICC line for a long period would put him at increased risk for infection with the constant peeling up of dressing." Doc. 6405-1 at 4.

Ms. McGuigan testified that Plaintiff's port dressing "was dry and adhered to the skin." Doc. 6405-2 at 3. Given this undisputed and port-specific testimony, the Court concludes that a later report of sweaty skin during the PICC-line process in a different part of the body does not provide a sufficient factual basis for Pampillonia to conclude that the port dressing was subject to moisture and easy detachment. Her opinion concerning the adhesion of the port dressing lacks a factual foundation and will be excluded.

**2.    Unhelpful Opinions.**

Plaintiff argues several of Pampillonia's opinions regarding how best practices were breached during his deaccessing are not relevant under Rule 702(a) because no expert qualified to render a causation opinion cites them in a theory of causation. Doc. 5784 at 14. Plaintiff points to Pampillonia's opinions on wearing masks, the pulsating flushing technique, and wiping of syringe tips. *Id.*

Plaintiff relies on his contention that only Dr. Allos is qualified to render causation opinions. Plaintiff has filed motions to exclude the causation opinions of Drs. Musher and

9

Srinivasa (*id.* at 15 n.3) and the Court has not yet ruled on those motions. Even relying only on Allos for causation, Pampillonia's opinions are relevant.

Allos opines that "Mr. Cook's port infection . . . more likely than not was caused by inadvertent contamination of the line when it was de-accessed by individuals (either [Ms. Potter] or [Ms. McGuigan]) who were inexperienced with handling port lines." Doc. 5784-4 at 10; *see also id.* ("[Mr. Cook] experienced a complication that was likely the result of imperfect sterile technique by an inexperienced family member accessing the port[.]"). Allos does not specify the source of the inadvertent contamination during deaccessing. Allos instead opines that contamination during deaccessing is "quite easy to do," that there is no way of knowing how sterile technique was breached, and that Ms. Potter would likely be unaware of how she caused the contamination. *Id.* at 11-12. Where Allos opines that Plaintiff's infection more likely occurred during deaccessing, Pampillonia's opinions about the possible ways deaccessing could have increased the risk of infection are plainly relevant. They will not be excluded for failure to satisfy Rule 702(a).

Plaintiff contends Pampillonia's opinions regarding how Plaintiff could have caused contamination by failing to wear a mask during deaccessing should be excluded because Allos only opines that Ms. Potter or Ms. McGuigan, not Plaintiff, could have caused contamination. Doc. 5784 at 15; *see also* Doc. 5784-4 at 10 ("Mr. Cook's port infection . . . more likely than not was caused by inadvertent contamination of the line when it was de-accessed by individuals (either Ann or Megan) who were inexperienced with handling port lines."). But Ms. Potter and Ms. McGuigan were responsible for following sterile technique during deaccessing, a responsibility they understood. They watched an instructional video and reviewed an information sheet to inform them on how to safely conduct deaccessing. *See* Doc. 5784-5 at 10-11 (Ms. Potter "recalled the Mayo Clinic step-by-step video and said she watched it 'more than once,' . . . . In addition to the video, Ms. Potter recalled an 'info sheet.'"); *id.* at 10 ("[Mr. Cook] also recalled that Mayo provided a link to a video to watch, which he said that Ann watched prior to the first de-access procedure."); Doc. 5784-8 at 7 ("[Ms. Potter and Ms. McGuigan] said at their depositions

that they watched a video about deaccessing the port[.]"). Ms. Potter even attended in-person training for deaccessing. *See* Doc. 5784-5 at 11 ("[T]here was an in-person training, which Mr. Cook described as [Ms. Potter] having the opportunity to practice flushing and de-accessing[.]"). Ms. Potter and Ms. McGuigan were tasked with performing the deaccessing safely, and Pampillonia's opinion that they failed to have Plaintiff wear a mask is relevant to the causation opinion provided by Allos.

Plaintiff contends Pampillonia's opinion that the pulsatile flushing technique should have been discussed in the instructional video, and should have been employed during Plaintiff's deaccessing, should be excluded as irrelevant under Rule 702(a) because she only opines this technique is a "best-practice" as opposed to the "standard of care." Doc. 5784 at 16-17. But there is no malpractice case against Ms. Potter and Ms. McGuigan in this case. The question is whether their deaccessing created an opportunity for Plaintiff's infection, and the opinion of a well-trained nurse on best practices for reducing the risk of infection is relevant to whether there could have been such an opportunity.

Plaintiff also contends that neither Pampillonia nor Allos explain how failure to use the pulsatile flushing technique could cause infection. *Id.* at 16. Defendants cite Plaintiff's expert, Nurse Joan Sorich, for the proposition that flushing may contribute to reduced risk of catheter infection (Doc. 6241 at 11), but the actual testimony from Sorich is that this is only a secondary possibility for which there are "no studies" (Doc. 6241-5 at 5). Sorich states that the primary reason for flushing is to reduce the risk of clot formation. *Id.* Allos includes Sloan Kettering guidance on steps for deaccessing and states that they constitute "aseptic technique," but he provides no explanation for why flushing (which is included in the steps) reduces the risk of infection. *See* Doc. 5784-4 at 17. In short, Defendants cite no evidence to show that flushing is an infection-reduction technique and fail to show by a preponderance of the evidence that Pampillonia's flushing opinion satisfies Rule 702(b).

Plaintiff next contends Pampillonia's opinion that the instructional video should not have instructed wiping of the syringe tip, and that this technique was inappropriately used during Plaintiff's deaccessing, is irrelevant because "[Pampillonia] fails to explain how

11

that has anything to do with Plaintiff's infection." Doc. 5784 at 16-17. But Pampillonia testified the syringe-wiping technique increases the risk of infection. *See* Doc. 5784-2 at 12 ("Ms. [McGuigan] in her deposition states that Mrs. Potter wiped the end of the syringe, which you should never do, and then connected it to the hub. So you have the opportunity now of the hub being a source of infection as well as this wiped syringe that she wiped, which shouldn't have been part of the instructions."). As discussed above, this is relevant to Allos's causation opinion.

Plaintiff similarly argues that Allos does not cite the syringe-wiping technique (Doc. 5784 at 16), apparently to suggest that no expert qualified to render a causation opinion cites the technique as a potential cause of Plaintiff's infection. But Allos does opine that Plaintiff's infection could be the result of the ""inadvertent[] contaminat[ion] . . . [of] syringe tips." *Id.*; *see also* Doc. 5784-4 at 14-15 (Allos Report). Pampillonia may render opinions on the syringe-wiping technique because Allos cites inadvertent contamination of syringe tips as a potential cause of Plaintiff's infection.

Lastly, Plaintiff summarily contends that Pampillonia's opinions should be excluded under Rule 403 as "unduly confusing." Doc. 5784 at 17. The Court disagrees. Plaintiff does not explain the confusion that would result from Pampillonia's testimony, much less why it would substantially outweigh the probative value of her opinions as required by Rule 403.

**IT IS ORDERED:**

1. Plaintiff's motion to exclude the opinions of Nurse Keiley R. Pampillonia (Doc. 5784) is **granted in part and denied in part**.

2. Nurse Pampillonia cannot opine (1) that Plaintiff's at-home deaccessing is the most likely source of his infection; (2) that the adhesion of the port dressing may have been compromised by Plaintiff's sweaty skin; (3) that failure to flush the catheter increased the risk of infection.

Dated this 27th day of January, 2026.

*David G. Campbell*

David G. Campbell
Senior United States District Judge