**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br><br>**ORDER**<br><br>**Expert Witness Michael G. Beatrice** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Michael G. Beatrice, Ph.D. Doc. 4826. The motion is fully briefed and no party requests oral argument. *See* Docs. 5320, 5550. The Court will grant the motion in part.

**I.     Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port

1   typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary
2   in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a
3   catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter
4   is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width
5   and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional
6   radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the
7   IPC to inject the medication, which flows from the port to the catheter and into the vein.

8        This MDL involves multiple versions of Bard IPCs, each of which received
9   premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain
10  barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as
11  X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene
12  ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard
13  IPCs have a port with raised palpation bumps on the silicone center, which help identify
14  these IPCs as power-injectable devices.

15       Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims
16  the IPC was defective and caused serious injury.  Plaintiffs allege that the barium sulfate
17  in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities
18  that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's
19  manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize
20  the POM to prevent oxidative degradation, which causes cracks, fissures, and other
21  physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.
22  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue
23  compression stress on the tissue surrounding the port, leading to ulceration and tissue
24  necrosis.  *See* Docs. 23, 1889.

25       Plaintiffs claim that safer alternative designs and manufacturing processes were
26  available to Bard and that Bard IPCs are more dangerous than other available treatment
27  options.  Plaintiffs assert a host of state law claims, including design and manufacturing
28

defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See id.*

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including FDA experts. The FDA applies different levels of scrutiny to medical devices before approving or clearing them for market. The most rigorous level of scrutiny is known as "premarket approval," often referred to as the "PMA" process. 21 U.S.C. § 360e(a). To comply, a manufacturer must file an application that provides a broad range of detailed information to the FDA to show the device is safe and effective. 21 U.S.C. § 360e(c). Other medical devices can be cleared through the less rigorous section "510(k)" review. A manufacturer can satisfy this review and be exempt from the PMA process by providing premarket notice to the FDA that its device is substantially equivalent to another device that is already on the market, typically referred to as a "predicate" device. 21 U.S.C. § 360c(f)(1)(A).

Because the FDA regulatory process for medical devices is complex and beyond the ken of average jurors, it will be helpful to have qualified FDA experts describe how the process works. *See In re Bard IVC Filters Prods. Liab. Litig.,* No. MDL 15-02641-PHX DGC, 2017 WL 5625547, at *6 (D. Ariz. Nov. 22, 2017). Plaintiffs have identified Dr. Beatrice as an FDA expert. Beatrice has prepared a 57-page report which discusses the FDA's regulation of medical devices and standards for device labeling (Doc. 4826-1 at 5-15); the regulatory history of implantable vascular devices, including Bard IPCs (*id.* at 16-18); and the effect of the FDA's clearance of Bard IPCs under 510(k) review instead of the PMA process (*id.* at 22-27). Beatrice provides various opinions throughout the report, which he summarizes at pages 54 through 57. He opines that: (1) Bard made the decision not to seek a safety and effectiveness determination for its IPCs through the PMA process

and instead elected 510(k) clearance (*id.* at 11; 54 ¶¶ 227-28); (2) Bard did not report all IPC complaints to the FDA (*id.* at 18-22; 54 ¶ 229); (3) Bard did not recall its IPCs after receiving reports of complications (*id.* at 18; 54 ¶ 230); (4) certain adverse events Bard reported through the FDA's Alternative Summary Reporting ("ASR") program should have been submitted as individual Medical Device Reports ("MDRs") (*id.* at 19; 54 ¶ 231); (5) Bard failed to report "unconfirmed" and "inconclusive" complaints to the FDA, resulting in low complaint rates (*id.* at 20-22; 54 ¶¶ 232-33); (6) Bard failed to warn about risks associated with its IPCs (*id.* at 27-37; 54-56 ¶¶ 234-35); (7) Bard failed to comply with FDA design control regulations and industry standards meant to prevent material degradation (*id.* at 37-48; 56 ¶¶ 236-38); and (8) Bard failed to follow up on known defects in its IPCs (*id.* at 48-53; 57 ¶¶ 239-41). Defendants argue that many of these opinions are inadmissible under Federal Rule of Evidence 702. Doc. 4826.

## II.  Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert

testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.   Discussion.**

Defendants argue that several of Beatrice's specific opinions are inadmissible. Their specific arguments will be addressed in the sections that follow.[1]

**A.   Failure-to-Follow-Up Opinions.**

Defendants move to exclude Beatrice's opinions that Bard failed to follow up on known defects in its IPCs. Doc. 4826 at 3-6 (citing Doc. 4826-1 ¶¶ 210-11, 220-22, 226, 236, 241-42; Doc. 4826-2 at 65-66). Defendants argue that these opinions are based on insufficient facts and are unreliable because Beatrice "did not review all of Bard's internal assessments and investigation reports that it prepared about those issues." *Id.* at 4.

Plaintiffs explain that Beatrice reviewed many Bard documents, including product performance data, clinical evaluation reports, and failure investigation reports. Doc. 5320 at 7 (citing Doc. 5320-1 at 17-19). The portions of his report describing Bard's internal review and evaluation process encompass some 40 paragraphs and cite many Bard documents. *See* Doc. 4826-1 at 44-51. Beatrice also relies on the testimony of several

---

[1] The opening page of Defendants' motion seems to argue that Beatrice is not qualified to render his opinions (Doc. 4826 at 2), but Defendants do not ask the Court to exclude his opinions on this basis (*id.*) and their reply brief faults Plaintiffs for spending time addressing his qualifications (Doc. 5550 at 2 n.1). The Court accordingly will address only Defendants' opinion-specific requests for exclusion.

5

Bard employees in forming his opinion that Bard did not follow up on design issues identified in their product performance analysis. *Id.* (deposition citations in footnotes). And he cited medical literature regarding failure rates of IPCs, including Bard IPCs. *Id.* at 27-29, 32-33, 35. The Court finds, by a preponderance of the evidence, that Beatrice's failure-to-follow-up opinions are based on sufficient facts and data.

Defendants identify various categories of documents Beatrice did not review and argue that his failure to review them makes his opinions unreliable and inadmissible. Doc. 5550 at 4-5. Plaintiffs disagree that the documents identified by Bard are essential, and rely instead on other documents. The Court's task is not to determine who is right, but to confirm that Beatrice's opinions, by a preponderance of the evidence, are based on sufficient facts and data. The Court concludes this requirement is satisfied. "[T]here is no legal requirement that experts review every document produced in litigation." *In re Takata Airbag Prods. Liab. Litig.*, No. 15-MD-02599, 2022 WL 18956175, at *3 (S.D. Fla. Dec. 28, 2022); *see also Kang v. Mayor & Aldermen of City of Savannah*, No. CV421-111, 2024 WL 150082, at *5 (S.D. Ga. Jan. 12, 2024) ("The challenged opinions are not based on insufficient facts or data simply because Register and Vowell did not review every available document before writing their expert reports."); *Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *11 (D. Ariz. Feb. 13, 2023) ("Defendants complain Wert's opinions are not based on 'sufficient facts or data' because he did not review 'thousands of pages' they believe are relevant. . . . Defendants do not cite any authority establishing such a rule[.]") (citation omitted); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696720, at *3 (D. Ariz. Dec. 22, 2017) (similar). Defendants of course will be free to cross-examine Beatrice at trial about documents he did not review.

Defendants also argue that Beatrice's failure-to-follow-up opinions are irrelevant because he cannot say whether the results of any follow-up investigation would have resulted in a design or labeling change. Doc. 4826 at 5. But Beatrice is not offered as an expert on whether there were alternative designs Bard should have adopted for its IPCs,

and he does opine that some of Bard's labelling was insufficient. *See, e.g.*, Doc. 4826-1 at 27-36. Relevancy is a relatively low bar. *See* Fed R. Evid. 401 ("any tendency" to make a fact of consequence more or less probable). Beatrice's opinions that Bard knew of and failed to act on problems with its IPCs could, if accepted by the jury, be relevant to Plaintiffs' claims for failure to warn, fraudulent misrepresentation, fraudulent concealment, consumer fraud, and negligence. The fact that Beatrice's opinions may not be sufficient by themselves to establish any of these claims does not mean they are not relevant to the claims. The Court will deny Defendants' motion with respect to Beatrice's failure-to-follow-up opinions.

**B.     Opinions Regarding Design Projects and Safer Alternative Designs.**

Defendants argue that Beatrice has no expertise or reliable basis to opine on whether Bard should have pursued various design projects or whether such projects were scientifically feasible. Doc. 4826 at 6-8. Plaintiffs state in their response that Beatrice offers no such opinions. Doc. 5320 at 9. Plaintiffs explain that Beatrice discusses Bard's design projects related to potential alternative designs as factual support for his opinions that Bard had notice of product issues that triggered obligations under FDA regulations that Bard failed to meet, including the failure to implement a design control process. *Id.* at 9-10 (citing Doc. 4826-1 ¶¶ 138, 140).

The Court has reviewed the paragraphs of Beatrice's report cited by Defendants and agrees with Plaintiffs that Beatrice offers no explicit opinion that Bard should have pursued certain design projects or that such projects were scientifically feasible. *See* Doc. 4826-1 ¶¶ 108-10, 112, 116-18, 120, 123-24, 127-34, 137-40, 142-44, 147-48, 234, 240. But Beatrice implies as much by describing product deficiencies, describing Bard redesign projects related to those deficiencies, and then stating that Bard never released safer alternative designs. *See id.* ¶ 110 ("No Generation 2 braided or reinforced catheter was ever released by Bard."); ¶¶ 112, 234(c) ("No Groshong 2.0 was ever released."); ¶¶ 117, 123 ("Bard . . . has never released a safer, more fracture resistant design."); ¶ 134 ("Bard at no time finished development and never marketed a port catheter product intended to be

anti-microbial or anti-bacterial."); ¶ 137 ("Bard also never launched an antibacterial or antimicrobial port catheter product."); ¶ 139 ("Bard . . . has never released a safer design such as an antimicrobial coated catheter."); ¶ 142 ("Despite knowledge of the risk associated with thrombosis and significant development work on a safer alternative, Bard eventually canceled the project and never released a port catheter with a thrombosis resistant coating.").

The Court will permit Beatrice to discuss Bard's design projects as factual support for his opinions that Bard had notice of product issues that triggered obligations under FDA regulations, but the phrasing of this testimony will be important. Beatrice lacks expertise to opine on whether any particular alternative design was feasible and should have been pursued, and he will not be permitted to imply that opinion in his testimony. The Court will hold Plaintiffs to their word that Beatrice will not opine that Bard should have pursued various design projects or that such projects were scientifically feasible. If Defendants believe the questioning of Beatrice is crossing that line, they may object.[2]

### C. Opinions Regarding Bard's Failure to Report Certain Complaints.

Beatrice opines that Bard failed to report unconfirmed and inconclusive complaints to the FDA, resulting in low complaint rates. Doc. 4826-1 ¶¶ 76-78, 81-84, 96-98, 232-33. Bard argues that this opinion is not based on sufficient facts and is not the product of a reliable methodology. Doc. 4826 at 8-13.

Beatrice's opinion is based solely on deposition testimony of former Bard employee Shelly Gilbert. Beatrice states: "According to Shelley Gilbert, who worked for Bard and BD in various roles in quality systems and field assurance, complaints are considered 'unconfirmed' if Bard is unable to verify the information and 'inconclusive' if a sample of the product was not received or was considered compromised." Doc. 4826-1 ¶ 77 (citing Gilbert Depo. Tr. at 50:21-51:12; (Doc. 4826-5 at 11)). Beatrice then opines that "Bard

---

[2] Defendants note in their reply that Beatrice testified that a pinch-proof catheter should have been pursued and was feasible from an engineering standpoint. Doc. 5550 at 6 (citing Doc. 4826-2 at 42-44). The Court will not permit Beatrice to offer this opinion at trial.

does not consider a complaint reportable unless, by their definitions and determinations, it has been confirmed." *Id.* ¶ 78 (citing Gilbert Depo. Tr. at 100:9-11 (Doc. 4826-5 at 22)). Defendants contend that Beatrice misconstrues Gilbert's testimony and that the testimony provides no factual basis for this opinion. Doc. 4826 at 8-12. The Court agrees.

At her deposition, Gilbert was shown a product complaint summary containing rate calculations for certain complaint types. Doc. 4826-5 at 19-22; *see* Doc. 4826-6. She testified that she had never seen the document or any other product complaint summary and had no understanding of how rate calculations were made. Doc. 4826-5 at 20-22. She agreed, however, that the document appeared to contain only confirmed complaints:

> Q. And so this appears to only include the confirmed complaints; is that correct?
>
> A. Yes.

*Id.* at 22. This testimony is the only evidence Beatrice cites to support his opinion that "Bard does not consider a complaint reportable unless, by their definitions and determinations, it has been confirmed." Doc. 4826-1 ¶ 78 & n.26; ¶¶ 97-98. But the document about which Gilbert was testifying did not concern reports to the FDA. It was an internal Bard email containing a product complaint summary which included confirmed complaint types. Doc. 4826-6 (Ex. 14 to Gilbert Deposition). Gilbert had never seen the document before (Doc. 4826-5 at 20), did not know if it was part of Bard's tracking and trending of product complaints (*id.*), and did not know how the document's calculations were made (*id.* at 22).

And in particular, Gilbert did not say that Bard reported only internally-confirmed complaints. To the contrary, she testified that even where a complaint is unconfirmed or inconclusive, "we always will send the FDA the initial report." Doc. 4826-5 at 25; *see id.* at 29 (even if the complaint is inconclusive "we still have reported the complaint"). She also explained that it is the *type of event* that determines reportability, not whether the complaint has been confirmed. *Id.* at 12-13 ("The event is how they determine the reportability. . . . So confirmed or not is not how they determine reportability. . . . And

9

same with inconclusive.").[3]  Gilbert also testified that just because a complaint was unconfirmed or inconclusive does not mean it was not included in the complaint rate calculations. *Id.* at 30. What is more, Beatrice agreed that the email about which Gilbert testified does not indicate whether the complaints it identified "were reported or not reported." Doc. 4826-2 at 78. Gilbert's testimony provides no sufficient basis for Beatrice's opinion that Bard failed to report unconfirmed and inconclusive complaints.

Plaintiffs assert that Beatrice cited instances where Gilbert identified complaints that were not reported. Doc. 5320 at 11 (citing Doc. 4826-1 ¶ 100). But the cited paragraph from Beatrice's report addresses whether certain inconclusive complaints would "be counted in the complaint rates Bard calculated," not whether they would be reported to FDA. *See* Doc. 4826-1 ¶ 100 (citing Gilbert Depo. Tr. at 170-85).[4]

Plaintiffs have not shown by a preponderance of the evidence that sufficient facts or data support Beatrice's opinion that Bard chose not to report unconfirmed and inconclusive complaints to the FDA. This opinion will be excluded.

**D.    Madris Kinard's Opinions and Data.**

Defendants argue that Beatrice parrots and vouches for certain opinions stated by Madris Kinard, another of Plaintiffs' FDA experts, including the opinion that certain adverse events Bard reported through the FDA's ASR program should have been submitted as individual MDRs. Doc. 4826 at 13-14 (citing Doc. 4826-1 ¶¶ 67-73 (recounting and adopting Kinard's findings), ¶ 231 (repeating Kinard's findings); *see also* Doc. 4826-3 at-3 ("The adverse event data compiled by Madris Kinard and Device Events is yet another example of how Bard failed in its responsibilities to adequately protect the safety of patients[.]")).

---

[3] This is consistent the FDA regulations requiring manufacturers to report a device-related "event" that may have caused or contributed to a death or serious injury. 21 C.F.R. §§ 803.3(o)(2), 803.50(a)

[4] Plaintiffs do not provide the deposition transcript Beatrice cites in paragraph 100. In the portions of the transcript Defendants provide, Gilbert stated that it was "not correct" that complaints are not included in the complaint rate unless confirmed. Doc. 4826-5 at 30 (Gilbert Depo. Tr. at 185).

Beatrice vouches for the reliability of Kinard's findings, stating that "I have reviewed the methodology used by Madris Kinard to pull this dataset from Device Events, as well as information about the construction of the Device Events database itself, and believe this data to be equivalent to what I would have gathered from MAUDE and ASR if I had been the one to do so." *Id.* ¶ 68. His only citation for this assertion is "Report of Madris Kinard." *Id.* ¶ 68 n.17. Beatrice provides no explanation of the methodology he reviewed or the information he received about the construction of the Device Events database, and does not explain why the methodology and construction led him to conclude that Kinard's results were a reliable reproduction of what he would have found by studying the FDA databases himself.

Experts are required to describe the bases for their opinions. *See Farmers Ins. Co. of Ariz. v. DNS Auto Glass Shop LLC*, No. CV-21-01390-PHX-DGC, 2024 WL 1256042, at *8 (D. Ariz. Mar. 25, 2024) ("Courts are not required to guess whether an expert has relied on sufficient facts or data. 'Experts must explain the basis for their conclusions in a manner that allows the Court to determine whether they are using reliable principles and methods and are applying them to the facts of the case in a reliable manner.'") (citation omitted). Expert opinions cannot be provided to the jury merely on the expert's say-so. *Id.* ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)); *Tetrault v. Cap. Grp. Companies*, No. 2:23-CV-05144-WLH-JPR, 2025 WL 3154657, at *3 (C.D. Cal. Aug. 20, 2025) ("As the Ninth Circuit has explained, courts must 'analyze not what the experts say, but what basis they have for saying it.'") (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)). Because Beatrice provides no information with which to understand the basis for his adoption of Kinard's findings, Plaintiffs have not shown that his opinion about her findings is based on sufficient facts or data and reliable principles or methods. Beatrice's testimony about Kinard's findings, including his calculations using Kinard's numbers, will be excluded.

Defendants assert that Beatrice cannot present a narrative review of record evidence. Doc. 4826 at 15. Narrative testimony is appropriate in some circumstances. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696724, at *8 (D. Ariz. Dec. 21, 2017) (citations omitted). Defendants may object at trial if Beatrice begins simply reciting facts instead of using relevant facts to support his expert opinions. *See id.*

### E. Failure-to-Warn Opinions.

Beatrice opines repeatedly that Bard did not adequately warn about particular risks. Doc. 4826-1 ¶¶ 104-06, 117, 123, 139, 148, 152, 235, 242. Defendants argue that these opinions are improper legal conclusions on ultimate issues. Doc. 4826 at 16. The Court does not agree. Defendants rely on this Court's decision in *In re Bard Filters Prods. Liab. Litig.*, 2017 WL 6523833, at *6 (D. Ariz. Dec. 21, 2017), which in turn relied on *United States v. Diaz*, 876 F.3d 1194 (9th Cir. 2017). *Diaz* established this rule for determining when an expert is offering an improper legal opinion on an ultimate issue in the case: "We hold that if the terms used by an expert witness do not have a specialized meaning in the law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion." *Id.* at 1198-99. In this case, Beatrice opines that Bard omitted various warnings from its IFUs (Doc. 4826-1 ¶ 106) and failed "adequately" to warn about various risks (*id.* ¶¶ 117, 123, 139, 148, 152, 235). This language does not have a specialized meaning in the law and does not instruct the jury on how to apply the law to the facts. It therefore does not constitute impermissible legal conclusions on an ultimate matter to be decided by the jury.

Defendants contend that Beatrice's opinions on the adequacy of Bard's warnings are based on insufficient facts and data because he relies only on IFUs for Bard IPCs sold outside the United States. Doc. 4826 at 16. But Beatrice testified that he reviewed 510(k) submissions – which include IFUs – for at least 10 of the 16 Bard IPCs listed in his report. Doc. 5320-1 at 5. The Court finds this to be a sufficient factual basis for his opinions.

Defendants further contend that Beatrice's opinion regarding the lack of redundant warnings in Bard IFUs lacks a reliable basis because he identifies no applicable FDA regulation or guidance document. Doc. 4826 at 17 (citing Doc. 4826-1 ¶ 149). Beatrice testified in his deposition that there is an FDA regulation and guidance document explaining that redundancy is important, but he could not identify them. Doc. 4826-2 at 33. Plaintiffs do not address this issue in their response. Doc. 5320 at 14. Beatrice and Plaintiffs have failed to provide any basis for his opinion that Bard's IFUs should contain redundant warnings. This opinion will be excluded.

Defendants assert there is no basis for Beatrice's opinion that the dwell-time warning in the Japanese IFU should have been included in Bard's U.S. IFU. Doc. 4826 at 17-18 (citing Doc. 4826-1 ¶¶ 104-06). But Beatrice explains that Bard knew that increased dwell time correlates with increasing rates of the IPC complications, as evidenced by its Japanese IFU (Doc. 4826-1 ¶ 105), and that he saw no research indicating that the dwell-time problem occurred only in Japan (Doc. 4826-1 at 37). Bard's warning in Japan suggests Bard knew of a dwell-time risk and provides a sufficient basis for Beatrice's opinion that the warning should have been provided elsewhere.

The Court will exclude Beatrice's redundancy opinion and deny Defendants' motion with respect to Beatrice's other opinions on the adequacy of Bard's warnings.

**F.     Bard Made the Determination Not to Seek PMA for Its IPCs.**

Beatrice states in his report that Bard "made the determination not to seek a determination of safety and effectiveness for their devices (the PMA approval pathway)" and instead "elected to pursue clearance via the 510(k) route." Doc. 4826-1 ¶¶ 40, 227. Defendants argue that this opinion is irrelevant and will not assist the jury. Doc. 4826 at 18. The Court agrees.

Beatrice does not claim that Bard violated FDA regulations by seeking 510(k) clearance instead of PMA review. In fact, he testified that Bard's decision was lawful and appropriate. Doc. 4826-2 at 28. He further testified there are several reasons a company might prefer the PMA route, including competitive advantages, liability protection, ease of

obtaining approval in other countries, and avoiding the risk that 510(k) clearance may be denied. *Id.* at 81-83.

Given that Bard's 510(k) submission was lawful and appropriate and Beatrice's reasons for a corporation's possibly preferring PMA review are not related to issues in this case, Plaintiffs have not shown the relevancy of his testimony that Bard elected not to seek PMA review. Such testimony will not help the jury decide any fact in issue and is therefore inadmissible under Rule 702(a).

### G. Opinions that Bard Relied on Improper Predicate Devices.

Beatrice opines that Bard relied on an improper predicate device in 510(k) submissions for two of its IPCs. Docs. 4826-1 ¶¶ 61-62, 4826-2 at 96-103. Defendants argue that these opinions are irrelevant and have no factual basis because Bard identified multiple predicate devices in its 510(k) submissions and Beatrice has identified no evidence the FDA found them improper. Doc. 4826 at-18.

In his rebuttal report, Beatrice notes that defense expert Tillman identified additional predicate devices listed in the 510(k) submissions for the two IPCs mentioned in Beatrice's original report. Doc. 4826-3 at 4. But Beatrice does not address these predicates or explain why they were inappropriate. Doc. 4826 at 17-18. His rebuttal report declined to address them, saying simply that they were "were not an underlying basis of any of my opinions[.]" *Id*.

Plaintiffs never explain why it is relevant that Bard's 510(k) submissions included some predicates Beatrice found inappropriate and others he simply chose to ignore (and which may, in fact, have been appropriate). His opinion on the inappropriateness of some, but not all, Bard predicates will not help the jury resolve any issue in dispute. The Court will exclude this testimony under Rule 702(a).

### H. Arguments to Which Plaintiffs Did Not Respond.

Defendants argue that Beatrice's opinions about Bard's knowledge, motive, state of mind, and ethics are improper. Doc. 4826 at 15-16. Plaintiffs do not address this argument in their response. Doc. 5320. The Court will not permit Beatrice to offer such opinions.

*See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) ("To the extent Dr. Eisenberg 'offers opinions on Bard's intent, state of mind, or motivations, this testimony is outside the bounds of appropriate expert testimony.'"); *In re Bard IVC Filters*, 2017 WL 11696724, at *9 ("Neither Dr. Kessler, nor any other expert (on either side of the case), will be permitted to opine on intent or ethics.").

Defendants argue that Beatrice's opinions on federal preemption and case law are improper. Doc. 4826 at 16 n.11. Plaintiffs do not address this argument in their response. Doc. 5230. The Court will not permit Beatrice to give the jury these legal instructions.

**IT IS ORDERED:**

1. Defendants' motion to exclude opinions of Dr. Michael Beatrice (Doc. 4826) is **granted in part** and **denied in part**.

2. The motion is **granted** as follows. Beatrice cannot: (1) opine on whether Bard should have pursued various design projects or whether such projects were scientifically feasible (but he can rely on design projects as factual support for his opinions that Bard had notice of product issues that triggered obligations under FDA regulations); (2) opine that Bard failed to report unconfirmed and inconclusive complaints to the FDA; (3) testify about the findings of Madris Kinard or his own calculations based on Kinard's data; (4) opine that Bard improperly failed to include redundant warnings in its IFUs; (5) opine that Bard made the determination not to seek approval of its IPCs through the PMA process and instead elected 510(k) clearance; (6) opine that Bard relied on improper predicate devices in 510(k) submissions; (7) opine about Bard's knowledge, motive, state of mind, or ethics; and (8) testify about federal preemption and case law.

Dated this 29th day of January, 2026.

David G. Campbell
Senior United States District Judge