**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| Robert Cook, | No. CV-23-01975-PHX-DGC |
| Individual Plaintiff, | **ORDER** |
| v. | **Expert Witness Ban Allos, M.D.** |
| Becton Dickinson and Company, et al., Defendants. | |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port cateters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiff Robert Cook has filed a motion to exclude the expert opinions of Ban Allos, M.D. Doc. 5864.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5864, 6282, 6531.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication,

intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Robert Cook brings his lawsuit in this MDL. Doc. 216 (Case No. CV-23-01975-PHX-DGC). Plaintiff had a Bard port implanted on August 24, 2022, and he subsequently suffered from an infection. *Id.* at 4. Plaintiff alleges the infection was caused by the implanted port. *Id.* at 5.

Defendants have identified Ban Allos, M.D., as an expert witness in the Cook case. Dr. Allos is an Associate Professor of Medicine in the Infectious Diseases Division of the Department of Medicine at Vanderbilt University School of Medicine. Doc. 5864-1 at 3. She also maintains an active clinical practice at the Vanderbilt University Medical School Hospital and Clinic, where she evaluates and treats patients with infectious diseases. *Id.* She is certified by the American Board of Internal Medicine in Internal Medicine and Infectious Diseases. *Id.* Plaintiff Cook moves to exclude certain opinions of Allos under Federal Rule of Evidence 702. Doc. 5864.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony

is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III. Discussion.**

    **A.    Causation Opinion.**

Dr. Allos opines that "Mr. Cook's port infection with MSSA more likely than not was caused by inadvertent contamination of the line when it was de-accessed by individuals (either Ann or Megan) who were inexperienced with handling port lines." Doc. 5864-1 at 11. Plaintiff challenges Allos's opinion for lack of reliable methodology and insufficient facts or data.

1

                    **1.    Differential Etiology.**

2        Plaintiff concedes that Allos is qualified to opine on the source of his infection.

3   Doc. 5864 at 4 ("Dr. Allos is qualified to offer such an opinion").  But Plaintiff argues

4   Allos's causation opinion cannot satisfy Rule 702(c) because it is not supported by a

5   differential etiology or any other reliable methodology.[1]  *Id.*  "[A] reliable differential

6   [etiology] may form the basis of an expert's causation testimony."  *Messick v. Novartis*

7   *Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014).  In a differential etiology, the expert

8   "first assumes the pertinence of all potential causes, then rules out the ones as to which

9   there is no plausible evidence of causation, and then determines the most likely cause

10  among those that cannot be excluded."  *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227,

11  1234 (9th Cir. 2017).  "A causation opinion arrived at by ruling out various possible causes

12  is reliable only if the expert first 'ruled in' only those potential causes that could have

13  produced the injury in question."  *Jensen v. Camco Mfg., LLC*, No. CV-23-00266-PHX-

14  DGC, 2024 WL 4566781, at *3 (D. Ariz. Oct. 24, 2024), *aff'd*, No. 24-7092, 2026 WL

15  64295 (9th Cir. Jan. 8, 2026).  "The expert must provide reasons for rejecting alternative

16  hypotheses 'using scientific methods and procedures' and the elimination of those

17  hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'"

18  *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003), *as amended on denial*

19  *of reh'g* (Sept. 25, 2003).  "A district court is justified in excluding evidence if an expert

20  utterly fails . . . to offer an explanation for why the proffered alternative cause was ruled

21  out."  *Id.* (citation modified).

22        Defendants cite *Engilis*, 151 F.4th 1040, for the proposition that the Ninth Circuit

23  endorses "a liberal thrust favoring admission," and that "where experts' opinions are not

24  junk science that Rule 702 was meant to exclude, the interests of justice favor leaving

25  difficult issues in the hands of the jury and relying on the safeguards of the adversary

26

27  [1] The parties use the terms "differential diagnosis" and "differential etiology."  *Compare* Doc. 5864, *with* Doc. 5784.  Because it more accurately describes what the parties are

28  discussing, the Court uses "differential etiology."  *See Engilis*, 151 F.4th at 1044 n.1.

1    system to attack shaky but admissible evidence."  Doc. 6282 at 4 (quoting *Engilis*, 151

2    F.4th at 1049-50 (citation modified)).  The Court disagrees with this reading of *Engilis*.

3    The Ninth Circuit instructed that "'shaky' expert testimony, like any expert testimony,

4    must still be 'admissible,' and this requires a determination by the trial court that it satisfies

5    the threshold requirements established by Rule 702." *Engilis*, 151 F.4th at 1050.  There is

6    no "categorical preference for admitting expert testimony," and the proponent "must

7    always establish the admissibility requirements of Rule 702 by a preponderance of the

8    evidence." *Id.*  For Allos's causation opinion to be admitted, the Court must find by a

9    preponderance of the evidence that it is "the product of reliable principles and methods."

10    Fed. R. Evid. 702(c).

11        Plaintiff refers to the report of Dr. Bernard Camins to highlight Allos's failure to

12    frame her methodology as a differential etiology or to include a methodology section in

13    her report.  Doc. 5864 at 5-6.  But Plaintiff acknowledges that Rule 702 does not require

14    Allos to do either so long as she ruled in potential causes and ruled out those without

15    plausible causal evidence. *Id.* at 6; *Triant v. Am. Med. Sys. Inc.*, No. CV-12-00450-PHX-

16    DGC, 2020 WL 4049844, at *6 (D. Ariz. July 20, 2020) (admitting causation opinion

17    where the expert "did not phrase his report in terms of a differential diagnosis, but he

18    provided a basis for ruling out the Devices as a cause of each condition he addressed").

19        The Court has reviewed Allos's proposed testimony carefully and concludes that

20    she provides a sufficient explanation to satisfy Rule 702(c).  Her report admittedly is short

21    and lacks an explanation of her methodology. *See* Doc. 5864-1.  But Plaintiff's counsel

22    chose to depose her in detail, probing and challenging the reasons for her opinions. *See*

23    Doc. 5864-2.  In response to this questioning, Allos made the basis for her opinions clear

24    and demonstrated that they satisfy Rule 702.  The Court advised the parties early in this

25    litigation that it would limit experts to the testimony disclosed in their reports, but it also

26    made clear that it would permit experts to provide testimony elicited by opposing counsel

27    in deposition. *See* Doc. 114, ¶ II.F ("Full and complete disclosures of such testimony are

28    required on the dates set forth above; absent extraordinary circumstances, the parties will

6

not be permitted to supplement expert reports after these dates. *The Court notes, however, that it usually permits parties to present opinions of their experts that were elicited by opposing counsel during depositions of the experts. Counsel should depose experts with this fact in mind*." (emphasis added)).  When Allos's deposition testimony is considered with her report, the Court concludes that she engaged in a sufficient differential etiology.

As seen in the record citations below, Allos makes clear that she considered three possible sources for Plaintiff's infection: (1) implant of the Bard port at Mayo Clinic, (2) access of the port at Mayo Clinic, and (3) de-access of the port at Plaintiff's home by his wife, Ms. Potter, and her friend, Ms. Oglesbee.[2]  Allos ruled out the first two sources for sufficient reasons, as explained below, and settled on the third source for sufficiently reliable reasons.

Before addressing her reasons for ruling out the first and second sources, the Court notes that Plaintiff claims Allos overlooked two additional possible sources – hematogenous spread and infusate contamination.  Doc. 5864 at 7.  Allos did identify these as general possible sources of contamination when blood infections occur (Doc. 5864-1 at 7), but Plaintiff provides no explanation for why they should have been considered possible sources in his case.  Plaintiff cites no evidence to suggest that his infection spread from another part of his body (hematogenous spread) or was transmitted by the medicine injected through his port (infusate contamination), and the Court notes that Plaintiff's own infectious disease expert, Dr. Bernard Camins, whose report Plaintiff cites and relies on in his motion (*see* Doc. 5864 at 5-6), found no evidence for either of these sources in Plaintiff's case (*see* Doc. 5825-1 at 11-12).  As noted above, "[a] causation opinion arrived at by ruling out various possible causes is reliable only if the expert first 'ruled in' *only* those potential causes that could have produced the injury in question." *Jensen*, 2024 WL 4566781, at *3 (emphasis added).

---

[2] The Court notes that Ms. Oglesbee is referred to as Ms. McGuigan in other orders filed in this litigation. The record uses these names interchangeably, and the Court follows the name used in the parts of the record relevant to this motion.

In her deposition and report, Allos explained why she ruled out her first two possible sources – implant of the port at Mayo Clinic and accessing of the port at Mayo – and why she settled on the third source – de-accessing the port at Plaintiff's home.

### a.     Implant at Mayo.

Allos concluded that Plaintiff's infection did not start when the port was implanted at Mayo Clinic. She provided this explanation:

> I'm basing my opinion on the fact that there are standard guidelines for placing these lines, that there was competent and capable interventional radiologists who placed the line under standard methods, and on the fact that he has an exceedingly low infection rate. That's what I'm basing my statements on.

Doc. 6282-1 at 12.

Allos further noted in her report and deposition that Plaintiff received three different Bard ports during the course of his chemotherapy and yet contracted no infection the other two times he had ports implanted at Mayo. Doc. 5864-1 at 11. She also relied on the timing of his infection – seven days after his port was de-accessed at home – as more consistent with the infection originating from the de-accessing. *Id.*; Doc. 6282-1 at 14. And she noted that the port insertion site and port body showed no sign of an infection. Doc. 5864-1 at 9-11.

These explanations sufficiently explain why Allos excluded the port's implant as a source of Plaintiff's infection. As an infectious disease doctor, Allos is qualified to opine on sources of infections. Doc. 5864 at 4. She relied on the standard guidelines doctors use when placing ports, the fact that the port was implanted by an interventional radiologist, and the fact that doctors following standard guidelines have exceedingly low infection rates. She further relied on the fact that Plaintiff had two other ports implanted at the same facility with no infection, and that the timing of his infection was most likely associated with the de-accessing at home. She further noted that the implant site showed no signs of infection. Thus, as required for differential etiology, Allos articulated why she found "no plausible evidence of causation" for the implant procedure. *Wendell*, 858 F.3d at 1234.

8

###### b.    Access at Mayo.

Plaintiff's port was accessed by Mayo nurses to start his chemotherapy before he went home.  For several reasons, Allos concluded that this procedure was not a likely source of his infection.  She expressed complete confidence that the Mayo nurses used sterile needles for the procedure.  Doc. 5864-2 at 25.  She found it "[e]xceedingly unlikely" that Mayo nurses would have breached the standard of care when accessing the port.  *Id.* at 26.  She further noted that Plaintiff's port was accessed by nurses at Mayo on two other occasions with no infection.  Doc. 5864-1 at 11.  And she found that the timing of Plaintiff's infection – seven days after the de-accessing – pointed to de-accessing as the source.  *Id.*; Doc. 6282-1 at 14.  Allos thus explained why she found "no plausible evidence of causation" for the accessing of the port at Mayo Clinic.  *Wendell*, 858 F.3d at 1234.

###### c.    De-Accessing at Home.

When Plaintiff's chemotherapy was completed, Ms. Potter and Ms. Oglesbee de-accessed the port at Plaintiff's home, rather than drive 90 minutes to the hospital for the procedure.  Mayo Clinic provided instructions and a video to explain the proper procedure and also gave a demonstration to Ms. Potter.  Doc. 5864-1 at 9.  Allos concluded, nonetheless, that the home de-accessing was the most likely source of Plaintiff's infection.  She provided several reasons:

- She opined as an infectious disease doctor that de-accessing is a common route of infection.  *Id.* at 11.
- She noted that the medical providers in this procedure – Ms. Potter and Ms. Oglesbee – were inexperienced.  *Id.* at 11-13.
- She noted they had limited training.  *Id.* at 12-13.  And she noted that even nurses in her infectious disease clinic do not perform de-accessing for the first time without having an experienced nurse present.  Doc. 5864-2 at 15.
- She testified that the bacteria which caused Plaintiff's infection – MSSA – is found in the eyes and nose, and that it would have been easy for Ms. Potter or Ms. Oglesbee to touch their eyes or nose inadvertently.  *Id.* at 29-30, 46.

- She testified that sterile procedures can be complicated for someone doing it for the first time.  *Id.* at 39.
- She found no evidence that Ms. Potter or Ms. Oglesbee cleaned the table before the de-accessing procedure.  *Id.* at 37-38.
- She observed that nervousness can increase the likelihood of contamination based on her experience with thousands of patients.  *Id.* at 45.
- She noted that the infection's appearance seven days after the de-accessing suggests that de-accessing was the source.  Docs. 5864 at 11; 5864-2 at 46-48. Plaintiff's counsel asked her if a longer latency period was possible, but Allos testified that "eight days or nine days or ten days is really stretching it way too long if you are going to look at the time line."  Doc. 5864-2 at 47.
- Allos concluded that "all of the available information in this story points overwhelmingly to the fact that the de-access is the point where this occurred." *Id.*  She testified that 17 or 18 out of 20 infectious disease doctors would reach the same conclusion.  *Id.* at 42.

The Court's task is not to decide whether Allos's causation opinion is correct, only whether it satisfies Rule 702.  The Court concludes that Allos effectively engaged in differential etiology, which is a reliable methodology for medical causation.  She ruled in reasonable possible sources, and she articulated reasonable grounds, based on the facts in this case, for excluding two of those sources and retaining the third.  *See Engilis*, 151 F.4th at 1045 (explaining that "ruling out[] potential hypotheses" must be done "on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case" (citation modified)); *id.* at 1053 ("[P]hysicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties to make a sound judgment in each case." (citation modified)). The Court concludes by a preponderance of the evidence that Rule 702(c) is satisfied.[3]

---

[3] The Court further notes that temporal proximity – in this case the seven days between Plaintiff's de-accessing procedure and his infection – has been found sufficient to support causation opinions.  *Clausen*, 339 F.3d at 1059.

10

### 2.     Factual Foundation.

Plaintiff argues Allos's causation opinion should be excluded because it is not supported by sufficient facts or data. Doc. 5864 at 7. Plaintiff addresses six facts: (1) the timing of the infection, (2) only one of three ports became infected, (3) de-accessing is a common route of infection, (4) neither the port nor its insertion site showed signs of infection, (5) Ms. Potter was nervous while performing de-accessing, and (6) Ms. Potter had an incomplete memory of de-accessing. *Id.* Plaintiff challenges each factual basis. *See id.* at 8-11.

The Court does not agree that Allos relies on insufficient facts or data. Her 30 years of experience as an infectious disease physician inform her opinions on the common routes of port-related infections, the typical timing for an infection to become symptomatic, and the impact of an inexperienced non-medical professional performing port management. *See* Docs. 5864-1 at 4 ("For over 30 years as a busy clinician at an academic medical center, I have diagnosed and treated a variety of infectious illnesses in both in-patient and out-patient settings. These illnesses have included infections of central venous devices such as ports[.]"), 11 (Plaintiff's "symptoms began exactly one week after it was de-accessed . . . , which is a common route of contamination and the typical timing for patients to become symptomatic from such infections."), 5864-2 at 45 ("I base my statement that the nervousness may have resulted in . . . an increased chance of contaminating the line . . . on my experience with patients, my experience as a physician, my experience of treating probably thousands of people who administer home IV antibiotics all the time. And I think that people who are nervous and upset and stressed and overwhelmed are more likely to make errors."). "An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).

Further, Plaintiff's medical records, which were reviewed by Allos (Doc. 5864-1 at 38), memorialized the timing of his infection symptoms. From those records Allos also

found that only one of his three ports became infected and that the port insertion site and port body showed no sign of an infection. *Id.* at 9-11 ("One week after Ms. Potter and Ms. Oglesbee first de-accessed the port, Mr. Cook awoke from sleep early in the morning of 9/3/2022 with a fever."; "[The doctor] commented that the port site did not look inflamed."; "There was no report of pus or erythema at the port pocket").

The Court finds by a preponderance of the evidence that Allos's opinion is supported by sufficient facts and data in satisfaction of Rule 702(b).

### B.     De-Accessing Training Opinions.

Plaintiff argues Allos is unqualified to render opinions on de-accessing training because she has no experience performing de-accessing or creating training materials. Doc. 5864 at 11-12; *see* Doc. 5864-2 at 4.  Allos concedes she has never de-accessed a port. Doc. 5864-2 at 4.  Defendants contend that "[a]s an Associate Professor of Medicine and practicing medical doctor in infectious diseases," Allos is qualified to render opinions on de-accessing. Doc. 6282 at 9.  As an infectious disease physician, Allos is undeniably trained in following sterile clinical protocols, and she testifies as such. Doc. 5864-2 at 13. But she has no basis for opining about training of home de-accessing procedures when she has no experience and has done no training in de-accessing.

Defendants point to Allos's experience working with patients who administer medications at home. Doc. 6282 at 10.  But Allos's experience does not include training or performing de-accessing.

At the time of rendering her report, Allos's knowledge of de-accessing was based on two sources:  a de-accessing instructional video,[4] and a set of instructions on de-accessing. Doc. 5864-2 at 4, 6.[5]  Apparently, these instructions refer to the Sloan Kettering

---

[4] Plaintiff and Defendants dispute which de-accessing instructional video Allos watched before authoring her report.  Docs. 5864 at 12, 6282 at 10-11.  This is inconsequential to the Court's analysis of whether Allos is qualified to opine about de-accessing training.

[5] Allos's report lists several references, some of which discuss ports.  Doc. 5864-1 at 20-21.  Defendants do not cite her review of these references to argue she is qualified to discuss de-accessing training.  The Court finds no support through its own review of these sources

outline provided at the end of her report.  Doc. 5864-1 at 18.  Allos acknowledges that she did not compare these two instructional sources and does not know whether they included the same de-accessing steps.  Doc. 5864-2 at 38.  Allos's cursory review of these two sources is an insufficient basis to opine on de-accessing training.

Defendants clarify that Allos only intends to opine that "Ms. Potter may not have been adequately trained" in de-accessing.  Doc. 6282 at 10.  But Defendants have not shown by a preponderance of the evidence that Allos is qualified by "by knowledge, skill, experience, training, or education" to render such opinions.  Fed. R. Evid. 702.

### C.    Potential Sources of Contamination Opinions.

Allos opines that Ms. Potter "may have put her hands to her face or nose and then touched the needleless catheter infusion hub, or her hands may not have been sufficiently clean from the outset."  Doc. 5864-1 at 15.  Plaintiff argues Allos's opinion is not supported by sufficient facts or data where she improperly relies on the absence of evidence.  Doc. 5864 at 15.  He further argues these opinions are speculative and should be excluded as improper *ipse dixit*.  *Id*.[6]

The Court disagrees.  Allos discusses Ms. Potter's potential face contact or insufficient hand washing as examples of the "multiple opportunities [during de-accessing] for an inexperienced person to inadvertently contaminate the catheter hub and/or syringe tips[.]"  Doc. 5864-1 at 15-16.  And Allos notes that the very infection found in Plaintiff – MSSA – is also found in the eyes and nose.  Doc. 5864-2 at 29-30, 46.  Plaintiff does not

---

except for the Sloan Kettering source, which presumably is the reference for the Sloan Kettering outline detailed in Allos's report (Doc. 5864-1 at 18).

[6] Plaintiff cites *Grenier v. United States*, No. CV 22-00396 LEK-KJM, 2024 WL 4287990, at *3 (D. Haw. Sept. 25, 2024), for the apparent holding that it is "pure speculation" for an expert to opine that a "plaintiff's 'birth canal was inadequately cleansed during her labor . . . and that this was the cause of her child's infection.'"  Doc. 5864 at 16.  Plaintiff mistakes the expert's opinion for the court's holding.  *See Grenier*, 2024 WL 4287990, at *3 (excluding *expert's opinion* that "[i]t would be pure speculation that Jenna Grenier's birth canal was inadequately cleansed during her labor with J.A.G. and that this was the cause of her child's infection").  This case is not instructive.

dispute Allos is qualified to discuss the ways in which the port could have become contaminated. Allos may give examples of how contamination could have occurred during Plaintiff's de-accessing.

Plaintiff argues there is no evidence to suggest anything came into contact with the catheter's needless connector, and that Ms. Oglesbee's testimony is evidence "that nothing came in contact with the needleless connector except the alcohol pad used to sanitize it." Doc. 5864 at 15 (citing Doc. 5864-3 at 6). But as testified by Allos, "[t]here could never be evidence" of a breach of aseptic technique during Plaintiff's de-accessing because the breach would be inadvertent and undetected. Doc. 5864-2 at 28. That Ms. Oglesbee testified she did not "observe anything touch the open end of [the] heparin syringe" or the "open end of the [port] tubing" (Doc. 5864-3 at 6-7) does not disprove an inadvertent breach.

The Court reaches the same conclusion on Plaintiff's contention that there is no evidence Ms. Potter insufficiently cleaned her hands. Plaintiff points to the depositions of Ms. Potter and Ms. Oglesbee, claiming both testified that they sanitized their hands with alcohol-based hand sanitizer (Docs. 5864-3 at 3, 5864-4 at 5-6). The Court notes Ms. Potter never actually states she sanitized her hands in her testimony cited by Plaintiff. *See* Doc. 5864-4 at 5-6 (Ms. Potter stating "you would make sure you're wearing gloves" and that "[o]f course, [Plaintiff] would be sanitized").

Plaintiff next argues that several opinions disclosed through Allos's deposition should be excluded for insufficient facts or data where she testifies in various ways that contamination likely occurred during de-accessing. *See* Doc. 5864-2 at 27. For reasons explained above, the Court finds that her opinion on the likely source of contamination is supported by sufficient facts and reliable methodology.

Plaintiff also seeks to exclude Allos's opinion that "[Ms. Potter] probably didn't follow all of the [instructional video] steps just based on knowing what happened." Doc. 5864 at 15-16 (quoting Doc. 5864-2 at 9). It is one thing for Allos to opine that de-accessing is the likely source of the infection and identify ways it could have occurred, but

14

1    another to say affirmatively that Ms. Potter failed to follow all of the steps in her training

2    video. Allos has no factual basis for this more specific opinion and it will be excluded.

3        **D.    Antimicrobial Coating Opinions.**

4        Plaintiff argues Allos's opinions on antimicrobial coatings should be excluded

5    under Rule 702(a)-(d). Doc. 5864 at 17. Defendants confirm Allos will not opine "that a

6    different coating would have impacted Mr. Cook's risk of infection" or that "Bard ports

7    have lower rates of complications than other ports," and they withdraw her opinions found

8    under the report heading: "Are Bard ports associated with a higher rate of infection when

9    compared with other implantable tunneled lines?" Doc. 6282 at 15 (citing Doc. 5864-1 at

10   8). The Court will hold Defendants to these commitments.

11       Plaintiff argues Allos is unqualified to offer any opinions on antimicrobial coatings

12   where she testified that she is "not in a position to speak knowledgeably about how this

13   technology would be utilized in ports." Doc. 5864 at 16-17 (quoting Doc. 5864-2 at 197);

14   *see also* Doc. 5864-2 at 50-51 ("I'm going to have trouble answering your question yes or

15   no because you are getting into specific polymer chemistry and substances and

16   polyurethane and silicone and the other things and it's just not something that I know a lot

17   about."; "I'm a general ID doctor. I'm not an expert in . . . plastics or whatever it is. And

18   so you know, I can't really opine here."; "I don't know about polyurethane versus

19   silicone."; "when you get into the nitty-gritty of polyurethane versus this kind of material

20   or that kind of material, you are already beyond me. I'm not going to be able to go with

21   you there.").

22       Defendants contend Allos is not offering any "opinions about polymer chemistry

23   and biomaterial" or "how that technology could be used in ports." Doc. 6282 at 14. But

24   they argue she is qualified to opine that "the CDC does not recommend using antimicrobial

25   coatings on implanted ports in institutions like the Mayo Clinic where the infection rate is

26   already low," that "there is insufficient evidence to require ports to have antimicrobial

27   coatings," and that "antimicrobial coatings are not recommended for implantable ports."

28   *Id.* at 14-15.

1    Allos does not offer these opinions on the basis of her own training or experience.
2    She merely recites CDC guidelines.  Docs. 5864-1 at 17, 6282-1 at 18-19.  This is not
3    permissible expert opinion.  *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-
4    02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("[I]t's certainly not
5    enough to read and report on the summaries of the studies performed by other bodies or
6    experts."), *aff'd sub nom. Engilis*, 151 F.4th 1040; *Buck v. Ford Motor Co.*, 810 F. Supp.
7    2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely
8    regurgitate another expert's opinion." (citation modified)).

9    For the same reason, Allos's antimicrobial coating opinions lack a reliable
10   foundation.  Plaintiff correctly notes that Allos relies on a single source – the O'Grady
11   article referred to as "CDC Guidelines" – for her antimicrobial coating opinions.
12   Docs. 5864 at 17, 5864-1 at 17.  Plaintiff further contends the CDC guidelines do not even
13   support Allos's opinions because they recommend certain catheter coatings.  Docs. 5864
14   at 17, 5864-8 at 13 (CDC Guidelines) ("Catheters coated with chlorhexidine/silver
15   sulfadiazine . . . have been studied as a means to reduce CRBSI.").

16   Defendants contend the CDC guidelines are reliably "the product of a working
17   group" composed from "medical and professional organizations" across port-related
18   disciplines.  Doc. 6282 at 15.  Even if this is true, Allos is not a part of the working group
19   and has no other expertise in this area.  Her antimicrobial coating opinions lack a reliable
20   foundation.

21   **IT IS ORDERED** that Plaintiff's motion (Doc. 5864) is **granted in part and**
22   **denied in part**.  Dr. Allos may not opine (1) Ms. Potter may not have been adequately
23   trained in de-accessing; (2) Ms. Potter probably did not follow every step of the de-
24   accessing training; or (3) on CDC recommendations for using antimicrobial coatings on
25   implanted ports or that there is insufficient evidence to require ports to have antimicrobial
26   coatings.

27   Dated this 18th day of February, 2026.

28

David G. Campbell
Senior United States District Judge