**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Darren R. Hurst, M.D. and Jeffery Weinstein, M.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Darren R. Hurst, M.D. and Jeffery Weinstein, M.D. Doc. 4832. The motion is fully briefed and no party requests oral argument. *See* Docs. 4832, 5326, 5564. The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including medical professionals.  Plaintiffs have identified Darren Hurst, M.D., and Jeffrey Weinstein, M.D., as medical experts.  Drs. Hurst and Weinstein are interventional radiologists.  Docs. 4832-1 at 5, 4832-2 at 5.  Dr. Weinstein practices in the Department of Radiology at the Beth Israel Deaconess Medical Center and is an Assistant Professor in Radiology at Harvard Medical School.  Doc. 4832-1 at 42.  Dr. Hurst practices as the Chief of Vascular and Interventional Radiology for the St. Elizabeth Health System, among holding other radiology-practice positions.  Doc. 4832-2 at 5, 50. He is also an Assistant Professor of Interventional Radiology at the University of Kentucky College of Medicine.  *Id.* at 51.  In their medical practices, both doctors regularly implant and remove port catheters.  *See* Docs. 4832-1 at 5, 4832-2 at 5.  Defendants move to exclude their opinions under Federal Rule of Evidence 702.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles

3

and methods to the facts of the case." Fed. R. Evid. 702(a)-(d).  The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

### A. Substantially Similar Reports.

Defendants argue the Hurst and Weinstein reports should be excluded entirely under Federal Rule of Civil Procedure 26 because their strong similarities show the doctors did not prepare their reports as required by Rule 26.  Doc. 4832 at 6; s*ee also* Fed. R. Civ. P. 26(a)(2)(B) (instructing an expert report must be "prepared and signed by the witness"). The Court is not persuaded.

The reports are similar.  They state many of the same opinions, follow the same general organization, have many of the same footnotes, and cite many of the same sources

and authorities.  Clearly, they were prepared in collaboration with Plaintiffs' counsel to present opinions supportive of Plaintiffs' case.

But the reports are not identical; they contain meaningful differences.  For example, while the reports include much of the same language in their introductions and general descriptions of port catheters and how they are placed, Weinstein's report includes a significantly more detailed description of port catheter complications than Hurst's. *Compare* Doc. 4832-1 at 16-31, *with* Doc. 4832-2 at 15-21.  Hurst's report contains a detailed discussion of Bard's internal data regarding serious complications and testing of alternative designs that is not found in the same form or location in Weinstein's report. *Compare* Doc. 4832-2 at 23-35 (subsections II.E-F), *with* Doc. 4832-1 at 33 (no similar subsections).

The doctors' first opinions about Bard's calculation of complication rates are similar, but not identical (Docs. 4832-1 at 33-35, 4832-2 at 35-37).  Their second opinions also differ.  Weinstein opines in three pages that doctors expect manufacturers to implement design improvements (Doc. 4832-1 at 35-37), and he separately discusses Bard's potential design improvements for thrombosis prevention, infection prevention, and fracture prevention in his background section (*id.* at 16-31).  Hurst discusses the same in his opinion section but also opines on the consequences of Bard's decision not to implement these improvements.  Doc. 4832-2 at 37-43.  Both doctors opine that Bard failed to warn the medical community, but their presentations of these opinions differ in wording and organization.  *Compare* Doc. 4832-1 at 37-38, *with* Doc. 4832-2 at 43-45.  The same is true of their fourth opinion – that Bard failed to warn the medical community in a manner expected by physicians.  *Compare* Doc. 4832-1 at 38-40, *with* Doc. 4832-2 at 45-47.  Finally, Hurst's report is eight single-spaced pages longer than Weinstein's and contains 28 more footnotes.

The Court does not find that the reports' similarities violate Rule 26.  When the rule was amended in 1993 to require retained experts to prepare detailed reports of their opinions and testimony, the Advisory Committee on the Federal Rules of Civil Procedure

specifically instructed that the new rule "does not preclude counsel from providing assistance to experts in preparing the reports[.]" Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment. The Advisory Committee further amended Rule 26 in 2010 by providing that attorney-expert communications, including in preparing reports, were not subject to discovery with the exception of a few narrow categories of information. *See* Fed. R. Civ. P. 26(b)(4)(C); Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment ("Rule 26(b)(4)(C) is added to provide work-product protection for attorney-expert communications regardless of the form of the communications, whether oral, written, electronic, or otherwise."). These amendments underscored the reality that attorneys can work with experts in preparing their testimony. Courts thus recognize that lawyers can assist experts in preparing reports, including counsel's "editorial assistance on the report, counsel's composing of initial drafts of reports based upon communications with the expert and allowing the expert to substantively revise the report to reflect the expert's opinions, or counsel's drafting of the report with the expert's substantive assistance[.]" *Accentra Inc. v. Staples, Inc.*, No. CV 07-5862 ABC (RZX), 2010 WL 11459205, at *4 (C.D. Cal. Oct. 7, 2010) (citations omitted) (collecting cases). But the expert must "substantially participate in the preparation of his report." *Id.* (citation omitted).

It is not surprising that Plaintiffs would retain interventional radiologists who share common opinions on key issues that support Plaintiffs' claims. The Court has instructed that parties may present only one expert per issue during trial, but both sides have retained multiple overlapping witnesses to cover the six separate bellwether trials that will be held over the course of the next year.

Hurst and Weinstein testified that they prepared their respective reports. *See* Docs. 5326-1 (Hurst) at 5-6 ("Q. And did you write your report and rebuttal report? A. I did."; "Q. And the words and analysis contained in your report and rebuttal report are your words, your analysis, and your opinions? A. Yes, sir."; "Q. [Y]our report and your rebuttal report contain the opinions that you are offering in this case, right? A. Correct."), 5326-2

(Weinstein) at 3-4 ("Q. [T]he actual analysis and facts and opinions contained in Exhibit 9 and Exhibit 10 you wrote? A. Correct."; "Q. And your report and your rebuttal report state the substance of your opinions that you're expected to testify to? A. That's my understanding.").  Courts tend to find Rule 26 satisfied when an expert testifies that he wrote his report or that it accurately reflects his opinions.  *See, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 477 (9th Cir. 2021) (affirming admission of expert testimony where expert testified his report "accurately reflected his analysis and opinion with regard to the case"); *Keystone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 567 (W.D.N.Y. 2005) (admitting expert testimony where the expert testified he was "actively and substantively involved in the preparation and content of his report").

The doctors' reports state that they conducted medical literature reviews. Docs. 4832-1 (Weinstein) at 6 ("I personally conducted a medical literature review and analyzed literature relevant to the topics discussed in this report."), 4832-2 (Hurst) at 6 ("I personally performed a medical literature research and reviewed literature relevant to the topics discussed in this report.").  Further, both doctors signed their reports, attesting that the opinions described in their reports are based on their review of the documents and materials provided to them, their own independent research, and their medical experience. Docs. 4832-1 (Weinstein) at 40, 4832-2 (Hurst) at 47.  And both doctors' invoices to Plaintiffs' counsel show extensive communications with counsel before the reports were completed.  *See* Docs. 5326-3, 5326-4.

The Court finds these reports similar to those addressed by the Ninth Circuit in *Optronic Techs., Inc.*, 20 F.4th 466.  Even though 60% of the expert's report in that case was written by counsel, the Court of Appeals held that the trial court properly admitted the expert's opinion.  *Id.* at 477.  As in this case, the introductory sections of the report were heavily influenced by counsel, and the expert testified that he reviewed and edited the report and that it accurately reflected his opinions.  *Id.*  The Court of Appeals noted that Rule 26 "permit[s] counsel to assist experts in preparing reports[.]"  *Id.*

1   Defendants essentially argue that the Court should disbelieve the doctors' assertions

2 regarding how their reports were prepared.  Choosing to distrust the doctors' accounts,

3 Defendants assert, should lead the Court to conclude not only that Rule 26 has been violated

4 but also that the doctors' opinions are unreliable under Rule 702.  But courts normally do

5 not make witness credibility determinations.  That is the jury's task.

6   The Court does not find that the similarities between the Hurst and Weinstein reports

7 renders their opinions inadmissible under Rule 26 or Rule 702.  Each expert's report

8 provides a detailed description of the opinions he will give at trial, fulfilling a primary

9 purpose of Rule 26 – to enable Defendants to prepare for trial.  If Defendants believe the

10 similarities between the reports calls into question the doctors' credibility, they are free to

11 cross-examine the doctors on this point at trial.

12   The Court has considered the cases cited by Defendants and is not persuaded to

13 reach a different conclusion.  One of Defendants' primary cases, *GEICO v. The Right*

14 *Spinal Clinic*, 608 F.Supp.3d 1184 (M.D. Fla. 2022), presented an extreme case of expert

15 neglect.  The expert "did not contribute a single word" to the report, did "not know who"

16 wrote the report, and allowed others to write the report "from beginning to end."  *Id.* at

17 1189.

18   In another of Defendants' primary cases, *Holley v. Gilead Scis., Inc.*, No. 18-CV-

19 06972-JST, 2023 WL 2440237 (N.D. Cal. Mar. 9, 2023), the district court made a

20 credibility finding, choosing to disbelieve the experts' assertions about the extent of their

21 involvement in preparing their reports.  *Id.* at *2.  The Court does not make a similar finding

22 here.  Applying the test used in many of Defendants' cases – whether the expert

23 substantially participated in the preparation of his report, *Accentra*, 2010 WL 11459205,

24 at *4 – the Court declines to exclude the Hurst and Weinstein opinions for violating Rule

25 26.  While Plaintiffs' counsel played a significant role in the development of these expert

26 reports, it is clear the doctors substantially participated as well and signed the reports as

27 accurate statements of their opinions.  The purpose of Rule 26 is satisfied.

28 / / /

**B.      Challenging Opinions Under Rule 702.**

Defendants argue several of the doctors' opinions should be excluded under Rule 702.  Doc. 4832 at 11-21.

**1.      Opinions on Reporting Complication Rates.**

Both doctors criticize Bard's internal method of complication tracking.  They opine that medical device manufacturers historically underreport complication rates to the FDA, Bard knew this fact but did nothing about it, and Bard used an inaccurate method of calculating complication rates that resulted in artificially low rates.  *See* Docs. 4832-1 at 33-35, 4832-2 at 35-37.

Defendants argue the doctors are unqualified under Rule 702(a) to render opinions "regarding the accuracy of, or proper methodologies associated with, determining medical device complication rates" because both "doctors concede a lack of any formal education, training, or experience in designing or working with post-market adverse event systems" and neither has "analyzed an IPC manufacturer's complication rate in their private practice" or "track[ed] adverse events associated with IPCs[.]"    Doc. 4832 at 11-12. Plaintiffs respond that the doctors' opinions are quite limited: "as physicians, they expect a manufacturer to track complication rates that accurately reflect clinical realities." Doc. 5326 at 9.  But the doctors' opinions are not so limited.

Hurst and Weinstein opine that Bard knew complication rates were historically underreported by medical device manufacturers, and yet calculated its own rates using total units sold rather than units implanted, artificially lowering the complaint rate.  Docs. 4832-1 at 34, 4832-2 at 36.  Plaintiffs argue the doctors are qualified to render this opinion because they are "experienced implanting physicians who have managed complications directly and reviewed relevant literature."  Doc. 5326 at 9.  True, but the doctors' clinical experience in managing IPC complications does not qualify them to opine on the proper method for calculating corporate complication rates.  As Defendants note, neither doctor has any formal education, training, or experience in designing or working with post-market

adverse event reporting systems and neither has calculated complication rates in their private practice.  Doc. 4832 at 11-12 (citing doctors' depositions).

Plaintiffs also argue the doctors reached their opinions on Bard's complication rate by "applying reliable clinical logic and real-world experience to critique a metric that affects their medical decision-making."  Doc. 5326 at 9-10.  But Plaintiffs have not shown that the clinical knowledge of interventional radiologists has anything to do with calculating device complication rates.

Further, Defendants note that although Hurst and Weinstein criticize Bard's use of total units sold rather than total units implanted as the denominator in its internal complaint systems, they offer no alternative methodology to calculate the rate.  Hurst testified that a registry could track every implant, but he acknowledged that he has no experience in setting up such a registry.  Doc. 4832 at 12.  Hurst further asserted that Bard's complaint tracking systems fail to incorporate comparison with competitor devices, and that such a comparison likely would have highlighted its IPCs as having higher-than-expected complication rates. *Id.* at 13.  But Hurst concedes that he does not know the internal complaint rates for any other port manufacturer, rendering his opinion speculative. And Hurst did not undertake any analysis of Bard's adverse event data to arrive at what he believes is a reliable adverse event rate beyond a brief evaluation during his deposition. *Id.*

Both doctors cite several studies to support their opinions, but an expert cannot merely recite the findings of a study without independently verifying those findings. *See In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("[I]t's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *aff'd sub nom. Engilis*, 151 F.4th 1040; *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)).  Neither doctor claims to have verified the studies he cites or to have the expertise to do so.  The Court will exclude the doctor's opinions on Bard's reporting of complication rates.

1        **2.    Alternative Design Opinions.**

2        Weinstein opines that:

3        [A]ntimicrobial coatings have been shown to lower infection rates, structural
         reinforcements improve catheter durability, and thromboresistant materials
4        reduce clot formation, all of which, in my opinion, could have contributed to
         safer and more effective implantable port catheters. Despite this, Bard did
5        not incorporate these improvements into its marketed implantable port
         catheters, leaving physicians without access to devices in the Bard line with
6        enhanced safety features.
7
8        Doc. 4832-1 at 36.

9        Similarly, Hurst opines that "coatings [on Bard ports] would have reduced the risk

10  of infection and thrombosis" (Doc. 4832-2 at 39), "incorporating mesh reinforcement into

11  Bard's catheter design could have significantly reduced the risks of kinks and fractures"

12  (*id.* at 39-40), and "Bard's decision not to implement these low-cost safer alternative

13  designs . . . exacerbated healthcare costs, compromised the integrity of the informed

14  consent process, and subjected patients to serious and preventable complications" (*id.* at

15  42-43).

16        Defendants argue the doctors are not qualified to render such opinions because

17  neither has "any formal training, education, or experience in the manufacturing processes

18  for implantable medical devices," in polymer development, or in "developing materials

19  used for catheters or ports specifically." Doc. 4832 at 14. Nor has either doctor "designed

20  an IPC, conducted any studies on IPCs, or published any peer-reviewed medical literature

21  regarding IPCs," or conducted studies comparing polymer and non-polymer catheters. *Id.*

22        Plaintiffs cite three cases for the proposition that "practicing physicians, such as

23  Drs. Hurst and Weinstein, are qualified to opine from the physician's perspective on

24  whether a design feature would be expected to reduce complications based on clinical

25  literature, their treatment experience, common medical knowledge, and internal corporate

26  documents." Doc. 5326 at 10. The cases are distinguishable.

27        In *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*,

28  No. 2:18-CV-01509, 2020 WL 6605612 (S.D. Ohio Sept. 11, 2020), the doctor was

11

qualified to discuss the current design of the medical device based on his clinical experience using the existing product.  *See id.* at *5 ("Dr. Novitsky's knowledge of and experience with hernia mesh devices, and specifically with the Ventralight ST, qualifies him to opine on the design and function of the device from the perspective of a hernia surgeon and end-user of the device.").  The doctors in this case are opining about possible product changes they have never used in a port catheter.

In *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19MD2885, 2021 WL 6327375 (N.D. Fla. Sept. 2, 2021), the expert's opinion was also based on personal experience.  The audiologist had experience selecting, fitting, and creating custom hearing devices and was therefore "qualified to opine, from a clinical perspective, on how particular aspects of the CAEv2's design prevented proper fit and seal due to the variability in the anatomy of the human ear and ear canal[.]"  *Id.* at *14.  The expert was "not qualified to opine on the CAEv2's design from an engineering perspective[.]"  *Id.*

Finally, the Court disagrees with the legal standard applied in the third case for finding an expert qualified under Rule 702(a).  *See Alonzo v. Biomet, Inc.*, No. 0:21-CV-62232-WPD, 2023 WL 3484192, at *1 (S.D. Fla. Apr. 13, 2023) ("The qualification standard for expert testimony is 'not stringent[.]'" (citation omitted)).

Hurst and Weinstein have no experience designing ports or testing port materials.  *See* Docs. 4832-3 (Weinstein) at 4 ("Q. Have you ever designed an implanted medical device? A. . . . . I've never done it."), 4832-4 (Hurst) at 4 ("Q. Have you ever designed an implantable medical device? A. No.").  Neither doctor has produced any studies, research, or literature on port materials or design.  Docs. 4832-3 (Weinstein) at 4-5 ("Q. Have you ever conducted clinical studies on implantable devices? A. Not that I recall, no."; "[Y]ou ha[ve] not written any articles in the peer-reviewed medical literature where the subject matter of the article is ports? A. No, I have no recollection of anything like that."),[1] 4832-4 (Hurst) at 4 ("Q. Have you ever conducted any studies on implantable ports? A. No. Q.

---

[1] The Court notes Weinstein mentored a resident who conducted a quality assurance project on ports.  *See* Doc. 4832-3 at 5-6.  This alone does not qualify him to opine on port design.

Have you ever published any articles in the peer-reviewed medical literature regarding implantable ports? A. No."; "Q. In your CV you don't list any research that you have done over the course of your career on implantable ports, do you? A. I do not.").

The doctors rely almost exclusively on Bard's internal documents, not medical literature. *See, e.g.*, Docs. 4832-1 (Weinstein) at 35 ("Bard's internal testing demonstrated that Dextran Glycoconjugate Polymer (DGP) technology reduced thrombus adherence by 90–99%, yet Bard did not integrate this technology into its IPCs."), 4832-2 (Hurst) at 38 ("Bard's internal documents confirm that the company had longstanding awareness of antimicrobial coatings that could reduce catheter-related bloodstream infections (CRBSIs)."). A mere reading of Bard internal documents does not qualify these physicians to opine on feasible and effective port design. Nor can the doctors rely on published literature or other expert opinions they have not verified. *See In re Roundup Prods. Liab. Litig.*, 2023 WL 7928751, at *3 ("[I]t's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *Buck*, 810 F. Supp. 2d at 844 ("An expert must . . . not merely regurgitate another expert's opinion." (citation modified)).

Plaintiffs argue the doctors' opinions "do[] not address polymer chemistry, polymer engineering, materials science, manufacturing processes, or device costs." Doc. 5326 at 11. But the doctors specifically opine that Bard ports would have been safer if Bard had used certain polymer materials and structural reinforcements. Docs. 4832-1 (Weinstein) at 35-36 ("Had Bard implemented [Dextran Glycoconjugate Polymer] coatings, physicians could have offered their patients devices with a lower risk of such complication[.]"; "[A]ntimicrobial coatings have been shown to lower infection rates, structural reinforcements improve catheter durability, and thromboresistant materials reduce clot formation . . . . Despite this, Bard did not incorporate these improvements into its marketed implantable port catheters[.]"), 4832-2 (Hurst) at 39 ("Competitor products such as Orphis and AngioDynamics adopted hydrophilic coatings and non-fouling polymers to achieve

13

1  lower infection and thrombosis rates. Despite this, Bard did not incorporate similar
2  antimicrobial coatings into its implantable port catheters.").

3      Hurst further opines on the feasibility of design changes based on device costs. *See,*
4  *e.g.*, Doc. 4832-2 at 41-43 (opining that "the DGP-based thrombosis-resistant coating was
5  projected to cost only $16.25 per unit, while Bard expected to charge a $45.00 premium.
6  The cost of antimicrobial coatings was reduced to $5 per unit through vendor agreements,
7  yet Bard planned a $65.00 upcharge. And reinforcing catheter tubing to prevent fractures
8  was estimated to cost $18.75 per unit, with an expected selling price increase of $75.00"
9  (footnotes omitted)).

10      Plaintiffs have not shown by a preponderance of the evidence that the doctors are
11  qualified to opine on alternative port designs with which they have no clinical experience.
12  Nor does mere review of Bard internal documents and a few studies constitute a reliable
13  basis for the doctors to opine on the efficacy and feasibility of alternative port designs.
14  Their alternative design opinions will be excluded.

### 3. Instructions for Use Opinions.

16      Both doctors opine that certain risks associated with IPCs were not disclosed in
17  Bard's Instructions for Use ("IFUs"). Docs. 4832-1 (Weinstein) at 38-40, 4832-2 (Hurst)
18  at 45-47. Defendants argue the doctors are not qualified to render opinions on the adequacy
19  of Bard's IFUs. Doc. 4832 at 16.

20      A medical professional expert may opine on knowledge generally held within the
21  medical community. *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL
22  2709292, at *16 (D. Ariz. July 1, 2021) (holding that "[e]xpert witnesses may properly
23  offer opinions" on "knowledge of the medical community in general" (citation omitted)).
24  Interventional radiologists such as Hurst and Weinstein rely on IFUs in their clinical
25  practice to learn about the risks associated with ports. Doc. 4832-1 at 39. The known risks
26  of ports and whether those risks are communicated in Bard's IFUs are matters within the
27  knowledge of the medical community the doctors may opine on.

28

The weight of the caselaw holds that a doctor's clinical experience qualifies him to discuss the adequacy of warnings in IFUs. *Arevalo v. Coloplast Corp.*, No. 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *5 (N.D. Fla. July 7, 2020) (admitting "Dr. Kohli's opinions regarding the risks physicians expect to be included in IFUs and how those compare to the risks actually included in the Aris IFU"), *aff'd sub nom. Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646 (11th Cir. Nov. 8, 2022); *Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1341-42 (N.D. Ga. 2022) ("Culligan is qualified to testify regarding the adequacy of the IFU warnings. . . . [A] doctor relying on a product warning in his or her practice qualifies him or her to make conclusions on the adequacy of the product's warning." (citations omitted)), *vacating in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6554163, at *5 (D. Ariz. Dec. 22, 2017) ("The Court cannot conclude from these cases that Drs. Kinney, Roberts, and Kalva should be precluded from testifying about disclosures that reasonable radiologists expect to receive from manufacturers of IVC filters."); *Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *14 (S.D.W. Va. Feb. 7, 2015) ("Dr. [Raybon] . . . is qualified to evaluate Bard's warnings based on his knowledge of and experience with the risks of the Avaulta."); *Godreau-Rivera v. Coloplast Corp.*, 598 F. Supp. 3d 196, 210-11 (D. Del. 2022) (adopting *Wise*'s reasoning); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 719 (S.D.W. Va. 2014) ("[A]s a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT–O and whether those risks were adequately expressed on the TVT–O's IFU.").

In this case, however, the doctors' opinions extend beyond concluding that certain risks were not disclosed in Bard's IFUs. They opine on what content the IFUs should have included. *See, e.g.*, Docs. 4832-2 (Hurst) at 46 ("[T]he IFU should have provided specific, actional measures to minimize risks, while explicitly warning that these measures had not been confirmed to reduce the likelihood of compression." (emphasis omitted)), 4832-1 (Weinstein) at 39-40 (similar). The doctors' clinical experience in relying on IFUs to learn about port risks does not qualify them to opine on what content should have been included

15

in Bard's IFUs. *See In re: Ethicon, Inc.*, No. 2327, 2016 WL 4958312, at *3 (S.D.W. Va. Aug. 25, 2016) ("While an expert who is a urogynecologist may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant IFU, the same expert must possess additional expertise to offer expert testimony about what information should or should not be included in an IFU." (citation omitted)); *Foster v. Ethicon, Inc.*, No. 5:20-CV-06099-BCW, 2021 WL 1700062, at *2 (W.D. Mo. Mar. 26, 2021) (same); *Fields v. Ethicon, Inc.*, No. CV421-020, 2023 WL 348340, at *6 (S.D. Ga. Jan. 20, 2023) ("Although an expert relying solely on his experience as a urogynecologist may be qualified to opine on the risks associated with a product or procedure, and whether an IFU adequately communicates those risks, he may not offer opinions as to what [a] [d]efendant was, for example, obligated to include in its IFUs, or whether an IFU complies with regulatory standards." (citation modified)).

The doctors may opine on whether port-related risks known to the medical community were disclosed through Bard's IFUs. But they may not opine on content they believe should have been included in the IFUs. Nor may they opine on whether Bard's IFUs complied with regulatory standards, as Plaintiffs concede. Doc. 5326 at 13 ("[N]either Dr. Hurst nor Dr. Weinstein will testify that Bard was legally required to include certain information in the [IFUs].").

Defendants also contend the doctors' opinions on the adequacy of Bard's IFUs should be excluded as unreliable. Doc. 4832 at 17. But for medical experts, "clinical experience is sufficient to satisfy the threshold reliability requirements of Rule 702." *McBroom*, 2021 WL 2709292, at *5 (quoting *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018)); *see also In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *4 (D. Ariz. Jan. 22, 2018) ("[E]xpert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))). The doctors' opinions regarding whether known risks of ports were

disclosed through Bard's IFUs are supported by their clinical experience in relying on IFUs.

### 4.    Bard's Knowledge, Conduct, and Duties Opinions.

Defendants argue the doctors are not qualified to render opinions "regarding Bard's knowledge, as well as any expert or narrative testimony regarding Bard's conduct and capabilities[.]" Doc. 4832 at 17-19. Defendants cite Weinstein's opinions that "Bard had extensive internal knowledge regarding [port catheter] complications" and that an alternative design project "was deprioritized [by Bard] due to cost constraints and resource allocation." Doc. 4832-1 at 24, 37. For both opinions, Weinstein relies on Bard's internal documents or adverse event reports. *Id.* Defendants also cite Hurst's opinion that "Bard's internal records show that the company had the knowledge and capability to implement [certain] safety enhancements . . . at relatively low production costs." Doc. 4832-2 at 41.

For reasons stated in previous cases, the Court will preclude these physician opinions on corporate knowledge. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) ("Dr. Eisenberg also expresses opinions about what Bard knew based on various internal documents, how Bard tracked adverse event reports, and what Bard failed to take into account in designing its filters. But Dr. Eisenberg is not an expert on corporate communications, behavior, or regulation[.]" (citations omitted)); *In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 495188, at *6 ("Dr. Muehrcke will not be permitted to opine about Bard's knowledge, intent, or ethics. He does not purport to be an expert on corporate information processing and he has not conducted any study of Bard internal operations, information gathering, or corporate ethics. Plaintiffs propose to have him opine about what Bard knew based on selected documents, but identify no expertise that enables him to opine on Bard's knowledge." (citation omitted)).

Plaintiffs argue the doctors' "role is to explain what Bard's internal documents mean from the perspective of a clinician[.]" Doc. 5326 at 14. But it is not clear why a physician's perspective on corporate knowledge is relevant or necessarily reliable, and it remains an

17

opinion on corporate knowledge the doctors are not qualified to provide. "Personal views on proper corporate behavior are not appropriate expert opinions." *In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 495187, at *3 (citations omitted).

Plaintiffs contend the doctors' opinions about what Bard's internal documents mean to a physician will "help the jury to understand the meaning and importance of terms such as pinch-off risk, flexural fatigue, and catheter fracture." Doc. 5326 at 15. But Hurst and Weinstein need not discuss Bard's knowledge or intent to explain medical terms that are within their knowledge as practicing physicians.

Defendants also seek to exclude the doctors' opinions on Bards "duties and responsibilities" because the doctors are not qualified to render such opinions. Doc. 4832 at 18. The Court agrees. *See In re Bard IVC Filters*, No. MDL 15-02641-PHX DGC, 2018 WL 823277, at *4 (D. Ariz. Feb. 12, 2018) (explaining because "the Doctors are not regulatory or corporate experts, . . . they will not be permitted to opine on Bard's obligations").

Defendants further contend the doctors opining "that Bard IPCs are unreasonably dangerous" is an impermissible legal conclusion because the term "unreasonably dangerous" is a term of art. Doc. 4832 at 19 (quoting *Neumann v. Home Depot U.S.A. Inc.*, No. CV-20-00387-PHX-JJT, 2022 WL 3042914, at *7 (D. Ariz. Aug. 2, 2022) ("Because Plaintiffs assert strict liability claims related to Krause ladders, Dr. Morse should refrain from characterizing them as 'unreasonably dangerous' and 'defective.' These are terms of art that will be ultimately determined by the jury." (citation omitted))). Plaintiffs bring strict liability claims in this litigation (Doc. 1889 at 50, 54, 58), but the specific legal requirements of those claims will depend on the applicable state law, something Defendants do not discuss. Defendants will need to raise this argument in specific cases when the relevant state law is known.

### 5. Narrative Testimony and State of Mind Testimony.

Defendants seek to exclude the doctors' "narrative testimony regarding Bard's internal studies and investigations of alternative designs." Doc. 4832 at 20. Defendants

do not explain what parts of the doctors' reports or deposition testimony are narrative. In any event, "[t]he objection that testimony is 'narrative' is an objection as to form, foundation, or responsiveness, and must be presented at trial." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *8 (D. Ariz. Dec. 21, 2017) (quoting *In re Actos Prods. Liab. Litig.*, No. 12-cv-00064, 2014 WL 120973, at *10 (W.D. La. Jan. 10, 2014)). The Court will rule on narrative testimony objections at trial. *See In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 495187, at *4 (explaining experts cannot "engage in lengthy factual narratives not necessary to the jury's understanding of their opinions" and that "[a]t trial, the Court will seek to strike the proper balance between allowing experts to reasonably explain their opinions in a manner helpful to the jury, and avoiding unnecessary factual recitation or argument").

Defendants also seek exclusion of the doctors' testimony "infer[ring] Bard's intent and state of mind." Doc. 4832 at 20. The Court previously ruled that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 6523833, at *9 (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)). No expert may render opinions on the intent or state of mind of either party.

### 6.    Reasonable Expectations of Physicians.

Hurst and Weinstein refer to what "physicians reasonably expect" from the manufacturers of medical devices. *See, e.g.*, Docs. 4832-1 (Weinstein) at 7 ("[R]easonable physicians would have chosen devices with these features had Bard made them available. Furthermore, physicians reasonably expect manufacturers to prioritize safety improvements when the costs are manageable and the benefits to patient outcomes are substantial."), 4832-2 (Hurst) at 37 ("Physicians reasonably expect that when manufacturers identify design modifications that could reduce complications . . . , those improvements will be implemented and communicated clearly."). Defendants argue the doctors may not opine about the "reasonable expectations of physicians" because "their

1    opinions lack foundation and do not reliably flow from the application of any scientific
2    principle or method." Doc. 4832 at 20-21.

3        This Court in prior litigation found Hurst qualified to opine on the reasonable
4    expectations of physicians. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-
5    02641-PHX DGC, 2018 WL 495189, at *5 (D. Ariz. Jan. 22, 2018) ("Dr. Hurst's training
6    and years of experience as an interventional radiologist qualifies him to opine on [what
7    reasonable physicians and patients expect from medical device manufacturers].").

8        Defendants do not challenge whether the doctors are qualified to render such
9    opinions, but instead argue that "neither doctor cites any facts or data in support of their
10    assertions . . . regarding reasonable expectations." Doc. 4832 at 20-21. They contend the
11    doctors "have no foundation beyond their own experiences for their 'reasonable
12    expectations' opinions." Doc. 5564 at 12. The Court finds this experience sufficient to
13    support their opinions. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir.
14    2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts
15    or data' on which they render an opinion.").

16        Defendants also argue that "[n]either doctor cites to any methodology or industry
17    standard to measure what the 'reasonable expectations' of a physician include." Doc. 4832
18    at 21. The Court is satisfied that the doctors' clinical experience provides sufficient
19    foundation for their opinions about the reasonable expectations of physicians. *See In re
20    Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696720,
21    at *5 (D. Ariz. Dec. 22, 2017) (permitting radiologists to "testify[] about disclosures that
22    reasonable radiologists expect to receive from manufacturers of IVC filters. Such
23    testimony, if relevant, appears to be well within their expertise and experience, and the
24    Court can identify no basis under Rule 702 for precluding it.").

25        Defendants also challenge two specific "reasonable expectations" opinions rendered
26    by the doctors. They contend "[p]laintiffs cannot reconcile their experts' assertion that
27    reasonable doctors expect manufacturers to communicate comparable device data within
28    IFUs when the doctors are not aware of any manufacturer that does so." Doc. 4832 at 21.

As discussed above, the doctors may not opine on what content should have been included in Bard's IFUs. This opinion is excluded.

Defendants also contend "the doctors [cannot] reliably opine that reasonable physicians would select coated catheters if made available" because the doctors acknowledge "there are numerous factors that go into purchase decisions and there is insufficient data to determine whether coatings could carry additional risks." *Id.* The Court addressed this issue previously: "Whether the doctors should also be permitted to testify about what doctors would have done with additional information seems more problematic. Whether and when to use a particular product appears to be a more fact- and patient-specific decision, not amenable to broad generalizations. The propriety of testimony on this subject will depend heavily on the context and relevancy of the question." *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 11696720, at *5. The Court will draw these lines at trial.

**IT IS ORDERED:**

1.      Defendants' motion to exclude the reports of Drs. Darren R. Hurst and Jeffery Weinstein (Doc. 4832) is **granted in part and denied in part**.

2.      Drs. Hurst and Weinstein may not render opinions on (1) Bard's reporting of complication rates, (2) the alternative design of ports, (3) what content should have been included in Bard IFUs, (4) the knowledge, intent, or state of mind of Bard, or (5) the reasonable expectations of physicians as discussed above.

Dated this 20th day of February, 2026.

David G. Campbell
Senior United States District Judge

21