**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Steven MacLean, Ph.D., P.E.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Steven MacLean, Ph.D., P.E.  Doc. 5203.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5203, 5757, 6024.  The Court will deny the motion.

## I.     Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including materials science experts.  Defendants have identified Steven MacLean, Ph.D., P.E. as a materials science expert.  MacLean is a Principal Engineer and the Practice Director of the Polymers and Chemistry Practice at Exponent, a technical consulting firm.  Doc. 5203-1 at 17.  He holds a Doctor of Philosophy degree in Materials Science, a Master of Science degree in Materials Science and Engineering, and a Master of Engineering degree in Mechanical Engineering.  *Id.*  Through his advanced education, MacLean's chosen field of study was polymer science and engineering, and he has since spent a 30-year career in this field.  *Id.* at 17, 21.  He is a registered Professional Engineer in several states and a Senior Member of the Society of Plastics Engineers, among other professional memberships.  *Id.*  Plaintiffs move to exclude his opinions under Federal Rule of Evidence 702.

**II.    Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent of the

expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

Plaintiffs do not dispute that MacLean is qualified under Rule 702 to render his opinions. They challenge the methodology and factual foundation underlying several of his opinions.

### A. Non-Testing Opinions.

Plaintiffs argue MacLean's "non-testing" opinions should be excluded because Defendants cannot show they were the product of a reliable methodology. Doc. 5203 at 4. They rely primarily on MacLean's use of assistants during report preparation to contend his methodology is unreliable, but they also challenge MacLean's failure to describe his methodology.

1

### 1.    Use of Assistants.

It is unclear what Plaintiffs mean by "non-testing" opinions.  They explain that "'[n]on-testing opinions' refers to all opinions not based on Exponent's SEM, Fouriertransform infrared spectroscopy ('FTIR'), differential scanning calorimetry ('DSC'), or thermogravimetric analysis ('TGA') testing," and they cite 215 pages of MacLean's 233-page report.  *Id.* at 4 n.2.  Given this broad-stroke approach to identifying the challenged opinions, the Court will rule on the admissibility of MacLean's general opinions outside of those requiring scientific testing.

The Court will not exclude MacLean's non-testing opinions based on his use of assistants to prepare his report.  "The fact that [an expert's] opinions are based on data collected by others is immaterial; Federal Rule of Evidence 703 expressly allows such opinion testimony."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997); *see also Kim v. Benihana, Inc.*, No. 22-55529, 2023 WL 3674673, at *1 (9th Cir. May 26, 2023) ("In arriving at an opinion, an expert may rely on . . . reliable data collected by others[.]" (citation modified)).  "Additionally, an expert may collaborate and converse with colleagues before reaching his or her opinions."  *Wolkowitz v. Lerner*, No. SA CV 07-777-CAS, 2008 WL 1885770, at *4 (C.D. Cal. Apr. 21, 2008) (citing *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir.1998); *United States v. Golden*, 532 F.2d 1244, 1248 (9th Cir. 1976)).  "An expert may [also] use assistants in performing his work, so long as those assistants do not 'exercise professional judgment that is beyond the expert's ken.'"  *Id.* (quoting *Dura Automotive Sys. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002)).  But the expert must "substantially participate" in the report's preparation.  *Arrowood Indem. Co. v. City of W. Sacramento*, No. 221CV00397WBSJDP, 2021 WL 5989746, at *2 (E.D. Cal. Dec. 17, 2021) (citation modified).

Thus, MacLean was free to reach his opinions and prepare his report in reliance on data collected by others, in collaboration with his colleagues, and with support from assistants.  It is not dispositive that "21 other employees" participated in the report preparation.  Doc. 5203 at 5 (emphasis omitted).  Plaintiffs note that MacLean billed only

14% of the 1,800 hours charged by his firm for the report (*id.*), but this amounts to 252 hours – more than 31 eight-hour days.  This is equivalent to six weeks of full-time work on his report and opinions for this case.

The Court also notes that MacLean's collaboration with his colleagues is aligned with his employer's internal peer-review process.  Doc. 5757 at 6.  Exponent's quality management system mandates that work product be reviewed by peers, including review of relied-upon documents.  Doc. 5757-1 at 3 ("Q. What's the [quality control] process? A. So when we generate work product, we have a formal process where peers have to look at documents after the initial author to confirm that there is accuracy and quality of what was written.").  It was part of Exponent's peer review process for MacLean's colleagues and assistants to also review and synthesize data relied on by him.  *Id.* at 23 ("If I am going to have a cited Bard document in my report, I need to have at least two sets of eyeballs that have also read it, distilled it, synthesized it.  So there would have been overlap.").

There is also evidence MacLean substantially participated in preparing his report.  MacLean testified that he instructed his team to "review documents [and] synthesize them," followed by "lots of team discussions on what information people were finding, [and what] data they were finding."  Doc. 5203-5 at 7; *see also* Doc. 5757-1 at 24.  MacLean also participated in the review and synthesizing process.  Doc. 5757-1 at 12, 23-24, 26.  He had "complete editorial control" over the report.  *Id.* at 27.  He reviewed the report thoroughly before signing it.  For example, he reviewed "every single citation that's in the report[.]"  Doc. 5203-5 at 8.  The Court is satisfied that MacLean substantially participated in the preparation of his report.

The Court finds no evidence that MacLean's assistants impermissibly "exercise[d] professional judgment beyond" his ken.  *Wolkowitz*, 2008 WL 1885770, at *4.  Plaintiffs argue MacLean "cannot explain what methodological choices generated his report" because he acknowledged he did not know everyone on his team or what particular work they conducted.  Doc. 5203 at 5-6; *see, e.g.*, Doc. 5203-5 at 35-37.  But in his firm's invoices, team members described tasks well within MacLean's expertise such as

"document review," "technical review," and "internal technical discussions." Doc. 5203-6 at 36-37. These are the kinds of information gathering and synthesizing for which MacLean can rely on assistants. *See Kim*, 2023 WL 3674673, at *1 ("[A]n expert may rely on . . . reliable data collected by others[.]" (citation modified)).

Plaintiffs contend MacLean's assistants impermissibly engaged in "core analytical work" by "organizing, synthesizing, and interpreting the scientific literature, internal documents, and testing data." Doc. 5203 at 7. But Rule 703 instructs that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of[.]" *See* Fed. R. Evid. 703. It follows that an expert can be made aware of facts or data through the work of assistants. *See Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *11 (D. Ariz. Feb. 13, 2023) ("Defendants fail to explain why it was improper for Wert to rely on the work of associates in crafting his opinions. Given the requirements of Rule 703, Wert was free to rely on reliable facts or data provided to him by others.").

Plaintiffs challenge the roles of certain assistants. They argue that because Dr. Kreder, as project manager, "assigned tasks, managed the workflow, and oversaw the team," then MacLean cannot explain his methodology. Doc. 5203 at 5. As project manager, Kreder was responsible for "the division of labor" and "handle[d] the work flow." Doc. 5203-5 at 35. MacLean explained Kreder helped write the draft report, assisted in document review, reviewed depositions, and read expert reports. Doc. 5757-1 at 12, 14, 23-24, 26-27. But MacLean also conducted these tasks. *Id.* at 12, 23-24, 26. He testified that instructions for assistants came from him, not Kreder. Doc. 5203-5 at 9-10 ("[Q.] And was [Dr. Kreder] also responsible for providing instructions in the review? A. No. Those instruction would have come from me."). That Kreder assisted in report preparation as the project manager does not detract from MacLean's methodology.

Plaintiffs also challenge the role of Dr. Favreau. They cite *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075 (S.D. Fla. 2022), for the proposition that the Court should exclude opinions where the "testifying expert delegated methodological

decisions to the unarticulated 'judgment and discretion of individual [Ph.D.] analysts.'" Doc. 5203 at 7 (quoting *In re Zantac*, 644 F. Supp. 3d at 1125-26). They refer to MacLean delegating literature review to Favreau but not knowing what keywords she used to conduct her review. Doc. 5203-5 at 29. Keyword searching is not the kind of methodological decision contemplated by *In re Zantac*, which scrutinized the use of judgment in a laboratory technique. *See* 644 F. Supp. 3d at 1125 (finding an unreliable methodology where "[a]nalysts were allowed to use their judgment when manually integrating the results of the chromatography that the laboratory conducted for th[e] litigation").

Plaintiffs next argue that Dr. Holyoak, who drafted sections of the report addressing FDA 510(k) and ISO standards, impermissibly exercised judgment outside of MacLean's expertise. Plaintiffs contend – without explanation – that Holyoak has expertise in these areas, "in stark contrast to Dr. MacLean[.]" Docs. 5203 at 8, 5203-5 at 19-20. But as noted by Defendants, MacLean testified that he and Holyoak "have similar knowledge" in those areas. Docs. 5203-5 at 22, 5757 at 8 n.9. A review of the doctors' resumes confirms this. *See* Doc. 5757-2 at 5, 12. MacLean and Holyoak hold Ph.D.s in Materials Science and Biomedical Engineering, respectively. Doc. 5757-2 at 6, 12. Although Holyoak specializes in regulatory compliance and has experience applying ISO standards (*id.* at 12), MacLean has experience in product compliance assessments and in assessing risk during the product qualification stage (*id.* at 5-6). He is "well versed in product recall investigations" across numerous federal agencies and is "familiar with testing and material standards[.]" *Id.* at 5. MacLean also testified that Holyoak's role in the report was limited. Doc. 5203-5 at 21 ("I would give [Holyoak] some sort of starting point. And he might say, . . . 'Here's a comment for you to think about. Let's discuss.' I mean, that's how the QC process works."). The Court is satisfied Holyoak's contributions to the report were not beyond MacLean's ken. *See Wolkowitz*, 2008 WL 1885770, at *4.

Plaintiffs next challenge the reliability of MacLean's literature and document reviews. They argue "there is simply no way for the Court to determine whether the literature cited in Dr. MacLean's report was gathered and evaluated in a systematic,

scientifically valid manner" (Doc. 5203 at 8), presumably given his reliance on assistants to conduct portions of the literature review.  But MacLean testified that he reviewed every source cited in the report.  Doc. 5203-5 at 8 ("[E]very single citation that's in the report I would have reviewed.").  He also testified that his assistants shared his methodology for the document review process.  *Id.* at 7 ("Q. So what was the methodology used by whoever went through these documents to decide what documents to use in the expert report? A. It's the same process. You review, synthesize. Q. What were the instructions given by you? A. Just that, review documents, synthesize them. We had lots of team discussions on what information people were finding, data they were finding.").

Plaintiffs argue MacLean's document review is methodologically flawed because neither he nor his assistants "had access to (and thus could not search) the two-million some documents produced in discovery," and that he instead reviewed "a carefully curated subset of documents."  Doc. 5203 at 8.  But Plaintiffs – who themselves provided their experts with selected Bard documents – do not get to decide what documents Defendants' experts review.  Rule 702 does not require an expert to review every document produced through discovery.  *See Walsh*, 2023 WL 1966921, at *11 ("Defendants complain Wert's opinions are not based on 'sufficient facts or data' because he did not review 'thousands of pages' they believe are relevant. . . .  Defendants do not cite any authority establishing such a rule[.]")

Plaintiffs contend "MacLean has no idea who reviewed what [during document review], what standards guided their review, or what criteria governed the selection of documents to include or exclude from the report."  Doc. 5203 at 8.  As discussed, MacLean may rely on data gathered by his assistants – he may employ assistants to perform document review, a task well within his ken.  *See Kim*, 2023 WL 3674673, at *1 ("[A]n expert may rely on . . . reliable data collected by others[.]"  (citation modified)); *Wolkowitz*, 2008 WL 1885770, at *4 ("An expert may use assistants in performing his work, so long as those assistants do not exercise professional judgment that is beyond the expert's ken."  (citation modified)).

9

Beyond challenging MacLean's literature and document reviews, Plaintiffs contend the level of assistance in MacLean's report renders his non-testing opinions without any reliable methodology. Doc. 5203 at 8-9. They argue that "[l]aboratory testing, material analyses, and data interpretation were, once again, all performed by others. Even the process of 'building out the structure' of the report was largely handled by helpers." *Id.* at 8. But Rule 702 does not place parameters on how an assistant can help with an expert's report, so long as they "do not exercise professional judgment that is beyond the expert's ken" and the expert substantially participates. *Wolkowitz*, 2008 WL 1885770, at *4; *Arrowood*, 2021 WL 5989746, at *2. Both conditions are met here.

### 2. MacLean's Methodology.

Of the six pages Plaintiffs dedicate to arguing MacLean's non-testing opinions lack methodology for his use of assistants, they spend only one paragraph contending that his methodology fails because it is not sufficiently described in his report. Doc. 5203 at 9. Plaintiffs then commit all 13 pages of their reply to expanding on and particularizing this one-paragraph argument. Doc. 6024. The Court disagrees with the argument. Defendants have shown by a preponderance of the evidence that MacLean's non-testing opinions are supported by a reliable methodology.

Contrary to Plaintiffs' contention that "[n]o methodology whatsoever is disclosed in [MacLean's] report" (*id.* at 3), the Methodology Employed section describes MacLean's methodology. Doc. 5203-1 at 23. He reached his non-testing opinions by "review[ing] relevant production documents provided by counsel, deposition testimony[,] and scientific and engineering literature." *Id.* He reviewed "design history files, Bard internal performance testing data, manufacturing records and protocols, regulatory submissions, post market surveillance data, industry standards, regulatory guidance, clinical data, and studies conducted on relevant materials and devices," as well as Plaintiffs' experts' reports. *Id.* MacLean provides a list of materials he considered. *Id.* (citing Appendix C). His review of these sources for his non-testing opinions was "based on [his] education, technical training, and experience[.]" *Id.*

10

The Court acknowledges MacLean's methodology section is short on particularity, but it is not "no methodology whatsoever" as Plaintiffs contend.  Further, in identifying MacLean's methodology, the Court may consider his report in its entirety, including his qualifications and experience.  *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *5 (D. Ariz. Dec. 21, 2017) ("[A]lthough Dr. Parisian's description of her methodology could be clearer, the Court concludes from her report as a whole that her methodology is sufficient to support [her] opinions[.]").

MacLean has actively practiced in the field of polymer science and engineering for 30 years.  Doc. 5203-1 at 18.  As a Principal Engineer and the Practice Director of the Polymers and Chemistry Practice at Exponent – a technical consulting firm engaged in "the analysis and prevention" of engineering and scientific failures – MacLean "lead[s] a technical staff of approximately 60 practicing scientist and engineers[.]" *Id.* at 17.  He is a Senior Member of the Society of Plastics Engineers (SPE), a member of SPE's Medical Plastics division, and an "active, voting member of the ASTM International D20 Committee which develops and publishes consensus-based standards for polymeric materials." *Id.*  MacLean has engaged in scientific research that "reviewed and synthesized hundreds of journal articles, authoritative texts and other technical treatises to guide [his] understanding of the physico-chemical interactions between the human body and implantable devices made from polymeric materials." *Id.* at 21.  He has published and presented his research.  *Id.* at 22.  He employed this "review and synthesizing" process when developing the opinions at issue here.  *See* Doc. 5203-5 at 6-7.

The Court is satisfied MacLean applied a sufficiently reliable methodology to his non-testing opinions.  *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *4 (D. Ariz. Dec. 17, 2019) ("Under Rule 702 and *Daubert*, expert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)).

Plaintiffs argue MacLean's report outline is evidence of the absence of a methodology. Doc. 6024 at 3. They argue that "[b]efore reviewing a single scientific source, Dr. MacLean created an outline of his Opinions[.]" *Id.* This allegation is not supported by the testimony Plaintiffs cite. MacLean testified he worked from an outline as "a starting point for the expert report" and that it preceded document review, but he never stated the outline contained pre-determined opinions. Doc. 6024-1 at 29-30. MacLean testified about "building out" the report and how it was a "living document" (*id.* at 32, 38-39, 40-41), but this testimony does not support a finding that he reached his opinions before completing his research. In fact, MacLean clarified that the building-out process was an objective inquiry. *Id.* at 29 ("There was no bias in terms of we're looking for specific citations because we wanted to, you know, have some specific objective on something in the outline. I mean, that's not how it works."). The Court is not persuaded that MacLean's use of a report outline shows an absence of methodology.

Plaintiffs contend MacLean's experience cannot serve as methodology, relying on *Farmers Ins. Co. of Ariz. v. DNS Auto Glass Shop LLC*, 2024 WL 1256042 (D. Ariz. Mar. 25, 2024). Doc. 6024 at 4. But in *Farmers*, the expert rendered opinions that were "only based off of [his] beliefs." 2024 WL 1256042, at *9. The expert based other opinions on his "analysis," which he never described. *Id.* ("Mr. Hart's report never describes this analysis, what it entailed, or what it found. He states that he analyzed 'the local physical market' in the region and relied on his 'background and many years of experience in the industry,' but he never describes the local market or what it disclosed, or what he learned about prices from his years on the industry. One reads his report in vain for any indication of the facts and data on which he relied or the methodology used in his analysis." (citation omitted)). This Court excluded the expert's opinions in *Farmers* because he relied on his experience with no explanation of how it helped him reach his opinions and with no facts or data to support the opinions. That is not the case here. MacLean describes his methodology in his report and cites extensively to the facts and data on which he relies. *See* Doc. 5203-1. His experience only supplements his described methodology.

Plaintiffs argue the testimony in MacLean's errata (Doc. 6024-1) should not be considered because his errata were disclosed after Plaintiffs' motion to exclude was filed and "exceed the scope of permissible changes to deposition testimony under Federal Rule of Civil Procedure 30(e)." Doc. 6024 at 6. Yet, Plaintiffs cite MacLean's errata repeatedly to support their own arguments. *See, e.g.*, Doc. 6024 at 3 (citing Doc. 6024-1 at 27-32, 38-39, 40-41), 4 (citing Doc. 6024-1 at 6-7, 10, 13, 19-21, 22-24). While the Court has cited a few statements from MacLean's errata in support of its findings, the Court would reach the same conclusion even if it disregarded the errata.

Plaintiffs lastly argue that Exponent's quality management process, which MacLean references when explaining the mandated peer review of the literature and documents he relies upon (*see, e.g.*, Doc. 5757-1 at 3) is not "proof" of reliability. Doc. 6024 at 11. True, but it is a factor the Court may consider in evaluating the reliability of MacLean's opinions, and it supports the reliability of those opinions.

Rule 702 rejects a bright-line approach in determining the reliability of an expert's opinions. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules."; "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (citations omitted)). The Court takes that approach here and finds MacLean's non-testing opinions are supported by a reliable methodology.

### B.    Safer Alternative Design Opinions.

Plaintiffs argue MacLean's opinions on safer alternative designs lack a reliable methodology or support from facts or data. Doc. 5203 at 10. They claim the opinions "are unsupported by any independent analysis, discernible methodology, and/or factual basis," and that "such support does not exist anywhere in Dr. MacLean's report." *Id.* Defendants respond by walking through the detailed analysis conducted by MacLean on Plaintiffs' alternative design theories, noting his extensive citations to literature, documents, and data.

1  Doc. 5757 at 10-14.  Plaintiffs' reply brief says nothing in response – it presents no further

2  argument on this issue.  Doc. 6024.

3       MacLean cites support for his rebuttal opinions on Plaintiffs' safer alternative

4  designs, including literature and internal documents.  *See* Doc. 5203-3 at 73-93.  He

5  explains that "[t]o gain a more reliable understanding of Plaintiffs' proposed alternatives

6  and evaluate their claims, [he] . . . collected associated literature from both produced

7  documents and the public domain where possible."  *Id.* at 76.  He categorized Plaintiffs'

8  experts' proposed technologies in two appendices (I and J) (*id.* at 75), which he cites

9  throughout his safer-alternative-design section.  *See, e.g.*, *id.* at 77 nn. 668-69, 82 nn. 678-

10  81.  He explains in detail why he finds Plaintiffs' proposed alternative designs

11  unpersuasive, including that some are based merely on bench tests, some are addressed

12  only in academic literature (which often never results in actual products, as he explains),

13  none has been approved by the FDA for use in IPCs, and many do not satisfy the

14  requirements Plaintiffs' experts identify for use in actual devices.  *Id.* at 73-93.  The Court

15  will not take time to recount the full detail of MacLean's report, but it clearly is supported

16  by sufficient facts and data.

17       For methodology, MacLean reviewed and analyzed various sources, including the

18  "cited literature and produced documents" from Plaintiffs' expert reports.  Doc. 5203-1 at

19  23.  His review and analysis was informed by his "education, technical training, and

20  experience."  *Id.*; *see Smilovits*, 2019 WL 6875492, at *4 ("Under Rule 702 and *Daubert*,

21  expert testimony 'is reliable if the knowledge underlying it has a reliable basis in the

22  knowledge and experience of the relevant discipline.'" (quoting *Primiano*, 598 F.3d at

23  565)).

24       Plaintiffs challenge only one specific safer alternative design opinion. MacLean

25  opines that "'Plaintiffs' experts frequently misrepresent the clinical benefits associated

26  with' their proposed safer alternative technologies."  Doc. 5203 at 10; *see* Doc. 5203-3 at

27  83.[1]  Plaintiffs argue MacLean cites "no scientific evidence contradicting Plaintiffs'

28

---

[1] Throughout their motion, Plaintiffs' record cites to MacLean's report consistently fail to

14

experts' opinions, no refutation of the existing body of data on the issue, and no methodology at all." Doc. 5203 at 10. But MacLean provides scientific evidence through his scientific testing of competitor catheters. He opines that "[Plaintiffs' expert] presents BioFlo as a non-defective, mechanically superior alternative, even though testing indicates that BioFlo catheters use more barium sulfate than Bard's ChronoFlex and silicone catheters (see Section 6.5)." Doc. 5203-3 at 86 (emphasis omitted). Section 6.5 of MacLean's report describes the results of his scientific testing of competitor catheters. *Id.* at 38-39 (*see* Section 6.5.2 and Table 13). MacLean also opines that the Rhapsody catheters discussed in Plaintiffs' expert Dr. Ratner's report "were not marketed as 'fracture-resistant' as stated by the Plaintiff's experts, but as, 'flexible, non-compressible, and reinforced silicone.'" *Id.* at 84-85 (citations omitted).

MacLean further supports his opinion that Plaintiffs' experts misrepresent the clinical benefits of alternative technologies by demonstrating their absence of clinical support. *See id.* at 87 ("I was unable to find substantial information from the manufacturer on the Orca IPC[.]"; "Dr. Ratner does not cite any documents when stating [his opinion.]"; "Dr. Ratner and Dr. Sheikhi provide no additional documentation or citations that demonstrate that the Orca IPC would offer any clinical benefit or meet applicable device standards."; "[D]ue to the limited information available, I cannot reasonably assess that the Orca IPC is a relevant alternative."). The Court finds MacLean's methodology sufficiently reliable under Rule 702(c) & (d).

Plaintiffs next challenge MacLean's literature review. They argue MacLean does not address literature "central to Plaintiffs' experts' [safer alternative design] opinions" such as the *Suleman* or *Piran* study, among others. Docs. 5203 at 10-11, 6024 at 3. Plaintiffs may cross-examine MacLean on his failure to address contrary authority, but the Court does not find this a basis for the exclusion of his opinions.

Plaintiffs contend that MacLean criticizes Plaintiffs' experts for relying on the *Iida* study yet "never evaluated its data, addressed its findings, or applied any methodology to

direct the Court to the relevant material. The Court has tried to find the relevant parts of the record in preparing this order.

assess its significance," and apparently "parrots Dr. Thisted's conclusion about *Iida*." Doc. 5203 at 11-12.  This is incorrect.  MacLean independently reviewed the *Iida* study and explained why its results offer little support for Plaintiffs' alternative design.  *See* Doc. 5203-3 at 90 ("The clinical evidence presented by Iida et al. is of limited value in determining the alleged benefits of reinforced catheters compared to the material technologies used in Bard's IPCs.  Catheter fracture occurred for just one of the 308 patients with IPC's assessed in the study, corresponding to a 0.3% failure rate.  The authors did not state which catheter type fractured, meaning it is unknown whether the fractured catheter was from an Orphis IPC, a Bard IPC, or from a completely different brand of IPC (31 IPCs used in the study were not identified)." (footnote omitted)).

MacLean does not parrot Thisted's conclusion about the *Iida* study, but permissibly relies on Thisted's conclusion to supplement his own opinion.  *Id.* ("Thus, *in addition* to the limitations discussed by Dr. Thisted regarding the overall structure of the cited study, the results themselves do not support any conclusions regarding the risk of fracture in IPCs with different catheter designs." (emphasis omitted and added) (citation omitted)); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *3 (D. Ariz. Jan. 22, 2018) (explaining experts may not "simply parrot the opinions of other experts, . . . but they can rely on opinions stated by other experts").  Plaintiffs' criticisms of MacLean's review of the *Iida* study are appropriate for cross-examination but not a basis for exclusion of his opinions.

Plaintiffs argue MacLean "does not engage with the data [in his Appendices I and J], evaluate the underlying methodologies, or assess the findings of the cited studies or evidence supporting these alternative designs."  Doc. 5203 at 12.  The Court disagrees.  MacLean discusses the articles and studies contained in the appendices throughout his report.  *See, e.g.*, Doc. 5203-3 at 77 nn. 668-69, 82 nn. 678-81.  And even if MacLean did not review every source referenced in Appendices I and J, that would not render his opinions inadmissible.  *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696720, at *3 (D. Ariz. Dec. 22, 2017) ("The parties disagree on

16

the extent to which the doctors reviewed the factual material on which they rely. . . . . [E]ven if the doctors did not review every relevant Bard document . . . and relied to some extent on Dr. Kessler's extensive chronology and summary, the Court cannot conclude that this renders their opinions inadmissible.").

Plaintiffs argue, "[a]t a bare minimum, that MacLean should be precluded from commenting on scientific literature or commercial products never discussed in his report" and "from offering opinions about scientific literature or commercial products that are merely inventoried in Appendices I and J but are not otherwise discussed in his report." Doc. 5203 at 11, 13. The Court instructed the parties in Case Management Order 9 that their experts' testimony would be confined to their report and depositions. Doc. 114 ¶ II. F. Plaintiffs are free to object to MacLean's testimony if they believe he is exceeding the scope of his report and deposition testimony.

### C.    510k Clearence Opinions.

Plaintiffs argue MacLean renders opinions about the 510(k) process and industry standards that "suggest[] that those regulatory and industry mechanisms establish the 'safety and effectiveness' of Defendants' ports." Doc. 5203 at 13. Defendants contend MacLean only describes "substantial equivalence" under the 510(k) process and the industry standards used to demonstrate the comparative "safety and effectiveness" of a device submitted to the 510(k) process. Doc. 5757 at 14 (citing Docs. 5203-1 at 51, 5203-3 at 42).

Plaintiffs are correct that "[t]he 510(k) process focuses on device equivalence, not device safety." *In re Bard IVC*, 289 F. Supp. 3d 1045, 1047-48 (D. Ariz. 2018). It does not determine a device is "safe and effective," only "that the device is substantially equivalent to the predicate device." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 5625547, at *7 (D. Ariz. Nov. 22, 2017), *aff'd sub nom. In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067 (9th Cir. 2020) (citation omitted). While the FDA may find "the device 'is as safe and effective' as the predicate device," this is a comparative exercise, not a safety determination. *Id.* "The assumption is that the

predicate device is safe and effective enough to be on the market, and that the proposed device, if sufficiently similar, must be so as well." *Id.*

MacLean opines that "a substantial[ly] equivalent device [submitted to the 510(k) process] can have different technological characteristics but can be accompanied by appropriate clinical or scientific data that demonstrate the device is *as* safe and effective as a legally marketed device." *See* Doc. 5203-1 at 51 (emphasis added). This accurately describes the 510(k) process.

MacLean further opines that "FDA requires that submissions for 510(k) clearance of new IPC devices demonstrate substantial equivalence to an existing IPC product on the market to demonstrate safety and effectiveness." Doc. 5203-3 at 42. This opinion appears to overstate the effect of FDA 510(k) clearance. It implies that substantial equivalence shows a submitted device is safe and effective. Instead, the comparative exercise under 510(k) may only demonstrate the device is "*as* safe and effective" as the predicate device. Defendants should ensure MacLean discusses the 510(k) process in comparative terms only. Plaintiffs may object if he does not.

Plaintiffs separately argue that under Federal Rule of Civil Procedure 403, "[a]llowing Dr. MacLean to recast regulatory clearance and industry standards as proof of safety and efficacy also would create a substantial danger of unfair prejudice, confuse the issues and mislead the jury." Doc. 5203 at 13-14 (citation omitted). MacLean's opinions, when cabined as instructed by the Court, will not assert that clearing the 510(k) process is tantamount to an FDA determination of safety and efficacy.

**D.    Opinions on Dr. El-Ghannam's SEM Analyses.**

MacLean provides rebuttal opinions critiquing the SEM analyses of Plaintiffs' expert, Dr. El-Ghannam. Plaintiffs contend MacLean's rebuttal opinions are unreliable because they lack a factual foundation under Rule 702(b). Doc. 5203 at 14.

Through his SEM analyses, El-Ghannam applied metal coating to sample catheters to increase their conductivity. *Id.* MacLean criticizes El-Ghannam for applying too thick

a metal layer, which MacLean opines caused the cracks and defects El-Ghannam attributes to flaws in the catheter surface. *Id.*

Plaintiffs contend MacLean "analyzed too few samples and disregarded the visible fine features and surface degradation in Dr. El-Ghannam's images," which Plaintiffs claim, "by [MacLean's] own cited principles, would not be discernible if the metal coating were excessively thick." *Id.* Plaintiffs quote MacLean's report, arguing "Exponent concedes that it only reviewed '[s]ome' of Dr. El-Ghannam's catheter samples." *Id.* at 15. The citation provided by Plaintiffs does not direct the Court to the quoted language, but the Court considers the following language from MacLean's report: "*Some* of Dr. El-Ghannam's SEM catheter samples were analyzed using SEM after he completed his own analysis." Doc. 5203-4 at 2 (emphasis added). From his analysis of "some" of El-Ghannam's catheter samples, MacLean concluded the metal coating applied by El-Ghannam was too thick. *Id.*

Defendants direct the Court to testimony from Dr. Mkhoyan, who worked with MacLean to review the El-Ghannam SEM analysis and who testified that he "carefully reviewed every single image from Dr. El-Ghannam's report[.]" Doc. 5757 at 16 (quoting Doc. 5754-2 at 31). The Court will not assume MacLean reviewed the same materials as Mkhoyan to find MacLean's independent opinions have a sufficient factual foundation.

While MacLean's report does not explain how many catheter samples were tested in his analysis, there is no specific number that renders his analysis unreliable. Appendix E of his report provides numerous SEM images depicting the results of El-Ghannam's catheter samples tested by MacLean (Doc. 5205-1). These images show MacLean tested numerous catheters from El-Ghannam's sample set. The Court finds this portion of MacLean's report to be sufficiently supported by facts and data and a sufficiently reliable method of analysis to be presented to the jury. Plaintiffs dispute the evidentiary strength of the SEM images contained in Exhibit E. *See* Doc. 5203 at 16 ("[N]one of those images contain measurements of the supposed extra-thick metal coating, and the vast majority are not taken from the orientation necessary to even roughly estimate thickness, whether of the

1  coating or the catheter surface."). Plaintiffs may raise this contention on cross-
2  examination.

3    The Court also agrees with Defendants' argument that "[i]t is the proper role of
4  rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws
5  in the plaintiff's experts' reports." Doc. 5757 at 17 (quoting *Aviva Sports, Inc. v. Fingerhut*
6  *Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834 (D. Minn. 2011)). Calling into question the
7  accuracy of El-Ghannam's findings for even some sample catheters properly "point[s] out
8  the potential flaws" in his report. *Aviva Sports, Inc.*, 829 F. Supp. 2d at 834.

9    The Court reaches the same conclusion on Plaintiffs' contention that MacLean's
10 analysis "rests on only three measurements taken from a single location on a single
11 catheter." Doc. 5203 at 15. Plaintiffs cite figure 58 from MacLean's report that depicts
12 three measurements recorded from a single catheter. *See* Doc. 5203-4 at 3 (figure 58). But
13 this figure is demonstrative, not exhaustive. It depicts *one* of the sample catheters tested
14 by MacLean. It does not purport to contain all tested samples. Nor does MacLean state he
15 measured only one of the tested catheters or that the average thickness he recorded
16 (135.6nm) was calculated from a single catheter. That MacLean prefaced his analysis of
17 the tested sample catheters by stating he analyzed "[s]ome of Dr. El-Ghannam's SEM
18 catheter samples" (Doc. 5203-4 at 2) suggests the contrary – that MacLean took
19 measurements from a plurality of sample catheters.

20   Plaintiffs also suggest that "based on the arrows drawn on his figure" (figure 58),
21 MacLean's measurements of the catheter's metal coating may have measured the "double-
22 sided copper tape used to mount the sample," not the catheter, rendering his opinion on the
23 metal coating's thickness "misleading and methodologically flawed." Doc. 5203 at 15.
24 Defendants contend MacLean "specifically addressed both the catheters and the copper
25 tape they are mounted to" and "performed EDS to confirm that the cracks were in the
26 overly thick gold coating applied to the samples." Doc. 5757 at 16 n.15 (citing Doc. 5203-
27 4 at 3-4); *see also* Doc. 5203-4 at 5 (figure 60 depicting MacLean's EDS analysis). The
28 Court will not rely on Plaintiffs' hypothesized suggestion that MacLean improperly

measured the tape rather than the sample catheter.  In his report, MacLean distinguishes between the catheter and the tape.  *See* Doc. 5203-4 at 4 ("As can be seen in the figure, the same cracking morphology that is present on the catheter surface is also present in the background of the SEM images on the copper tape that the catheter are mounted to."). MacLean's EDS analysis also demonstrates he identified compositional differences in the catheter's polymer surface and its metal coating (*id.* at 5), indicating he measured the catheter and not the tape.   The Court will not construe the placement of an instructive arrow on a demonstrative figure as somehow undermining MacLean's methodology.

Plaintiffs contend MacLean's "central claim is that *all* of Dr. El-Ghannam's SEM images are unreliable because of excessive metal coating," and that to support such a claim, he "was required to measure a sufficiently large number of samples to determine whether overly thick coatings actually occurred with any frequency."  Doc. 5203 at 16.  Plaintiffs never cite where MacLean's report makes such a claim.

Plaintiffs next contend MacLean "completely fails to address evidence of surface degradation plainly visible in many of Dr. El-Ghannam's SEM images," which they claim demonstrates defects in the catheter samples and "bacterial colonies" on their surface.  *Id.* They argue this demonstrates an "absence of methodology altogether."  *Id.* at 17.  The Court disagrees.   As acknowledged by Plaintiffs, MacLean addresses El-Ghannam's opinions on the presence of surface degradation in the sample catheters.  *See* Doc. 5203-4 at 3-7 (MacLean responding to El-Ghannam's observations of (1) "a cracked morphology on the surface of the pristine polymer catheters," and (2) "polymer . . . flaking off the surface of the explanted SEM samples").  MacLean does not respond to every type of surface degradation discussed by El-Ghannam (Doc. 5203 at 16) or his allegations of biofilm being present (Doc. 5205-5 at 7-8), but the Court does not find this to be a basis for exclusion.  Plaintiffs may cross-examine MacLean on his failure to address certain opinions of El-Ghannam.

Plaintiffs also contend MacLean's opinion that El-Ghannam applied too thick a metal coating to his sample catheters – averaging 135.6 nm of the tested sample catheters

(Doc. 5203-4 at 2) – is undermined by his report stating that "when a gold coat is applied at more than 10-25 nm, detailed features of the surfaces are lost" (*id.* at 6), and yet "fine surface details" were "clearly visible in many of Dr. El-Ghannam's SEM images[.]"  Doc. 5203 at 17.  This alleged inconsistency may be raised on cross examination.  It is not a basis for exclusion of MacLean's otherwise sufficiently supported opinions on El-Ghannam's SEM analyses.

    **IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Steven MacLean (Doc. 5203) is **denied**.

    Dated this 24th day of February, 2026.

David G. Campbell
Senior United States District Judge