**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| Robert Cook, | No. CV-23-01975-PHX-DGC |
| Individual Plaintiff, | |
| v. | **ORDER** |
| Becton Dickinson and Company, et al., | |
| Defendants. | |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). The MDL Plaintiffs received implants of Bard IPCs and claim they are defective and have caused serious injury.

One of the MDL cases is brought by Plaintiff Robert Cook.  He received a Bard IPC in August 2022 and developed a port-related infection.  His case has been chosen as one of several bellwether cases and is set for trial in April 2026.

Defendants have filed a motion for summary judgment.  Doc. 5832.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 6248, 6416.  For reasons stated below, the Court will grant the motion in part and deny it in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  The MDL Plaintiffs allege that Bard IPCs are defective and have caused Plaintiffs to suffer serious complications, including infection, thrombosis, and catheter fracture, migration, and perforation.  Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other treatment options. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and the risks associated with IPCs are understood by the medical community and are considered by doctors when deciding whether to use them.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

## II.    Plaintiff Cook.

On August 24, 2022, Plaintiff Cook received a Bard PowerPort IPC with a ChronoFlex polyurethane catheter at the Mayo Clinic in Rochester, Minnesota for chemotherapy.  Dr Richard Frimpong, an interventional radiologist, implanted the IPC. Plaintiff developed a bloodstream infection and was diagnosed with sepsis ten days after the implant.

Plaintiff claims the PowerPort caused his infection.  He alleges the PowerPort was defectively designed because the polyurethane used in the ChronoFlex catheter is a hydrophobic material ripe for infection and Bard failed to coat the catheter with antimicrobials or to use other non-fouling technologies.  Plaintiff also alleges that Bard failed to warn about and concealed the PowerPort's risks, and that Bard made negligent and fraudulent misrepresentations about the PowerPort.

Plaintiff asserts various claims against Defendants under Minnesota law, some of which have been withdrawn.[1]   The following claims remain: design defect (Counts I and II), failure to warn (Counts III and IV), misrepresentation (Counts IX and X), concealment (Count XI), consumer fraud and unlawful trade practices (Count XII), unjust enrichment (Count XIII), and punitive damages.  *See* Doc. 216 (short-form complaint); Doc. 1889 (master complaint, as amended).[2]

Defendants move for summary judgment on these claims.  Doc. 5832 at 2.  The Court will grant summary judgment on the negligent misrepresentation claim and deny the motion in all other respects.

---

[1] The parties agree that Minnesota law governs Plaintiff's claims.  Docs. 5832 at 5, 6248 at 3.

[2] The master complaint sets forth allegations and claims the MDL Plaintiffs assert generally.  *See* Doc. 145.  Plaintiff-specific allegations are contained in individual short-form complaints, profile forms, and fact sheets.  *See id.*; Docs. 476, 477.  The master complaint asserts seventeen claims and seeks both compensatory and punitive damages. Doc. 1889 ¶¶ 268-487.  Plaintiff Cook does not assert loss of consortium, wrongful death, or survival claims set forth in the master complaint (Counts XIV-XVI), and has withdrawn claims for manufacturing defect (Counts V and VI), breach of warranty (Counts VII and VIII), false advertising (Count XII), and successor liability (Doc. XVII).  *See* Docs. 5832 at 2 n.1, 6248 at 3 n.2, 6416 at 2 n.1.

### III.    Summary Judgment Standard.

Summary judgment is appropriate if the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 322, 323 (1986).

The moving party "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and draw justifiable inferences in that party's favor, *Anderson*, 477 U.S. at 255.

### IV.    Discussion.

#### A.    Design Defect Claims (Counts I and II).

Plaintiff asserts strict liability and negligent design defect claims.  Docs. 216 ¶ 15, 1889 ¶¶ 268-300.  To recover under a strict liability theory, a Minnesota plaintiff must establish three elements: (1) the defendant's product was in a defective condition that rendered it unreasonably dangerous for its intended use; (2) the defect existed when the product left the defendant's control; and (3) the defect was the proximate cause of the injury sustained.  *Lee v. Crookston Coca-Cola Bottling Co.*, 188 N.W.2d 426, 432 (Minn. 1971); *Bilotta v. Kelley* Co., 346 N.W.2d 616, 623 n.3 (Minn. 1984).  To recover under a negligence theory, the plaintiff must also show that the defendant had knowledge of the product's defective condition and the risks involved in that condition.  *See Bilotta*, 346

1  N.W.2d at 622 (noting the distinction between the two theories and explaining that such

2  knowledge is imputed to the defendant under the strict liability theory).[3]

3         Minnesota applies a "reasonable care" balancing test to determine whether a product

4  was designed in a defective condition that was unreasonably dangerous for its intended

5  use. *Bilotta*, 346 N.W.2d at 621 (citing *Holm v. Sponco Mfg., Inc.*, 324 N.W.2d 207, 212

6  (Minn. 1982)). "[A] manufacturer is obligated to exercise that degree of care in his plan

7  or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed

8  to the danger when the product is used in the manner for which the product is intended[.]"

9  *Id.* (quoting *Holm*, 324 N.W.2d at 212). "What constitutes 'reasonable care' will, of

10  course, vary with the surrounding circumstances and will involve 'a balancing of the

11  likelihood of harm, and the gravity of harm if it happens, against the burden of the

12  precaution which would be effective to avoid the harm.'" *Id.* The test is an objective

13  standard that "focuses on the conduct of the manufacturer in evaluating whether its choice

14  of design struck an acceptable balance among several competing factors." *Id.* at 622; *see*

15  *also* CIVJIG 75.20 (listing factors for determining whether a product was "unreasonably

16  dangerous because of the manufacturer's design choices"). "Generally, the question of

17  whether a product is defective is a question of fact; however, where reasonable minds

18  cannot differ, the question becomes one of law." *Drager by Gutzman v. Aluminum Indus.*

19  *Corp.*, 495 N.W.2d 879, 882 (Minn. Ct. App. 1993).

---

[3] Defendants assert that strict liability and negligence merge into one theory. Doc. 5832 at 5 (citing *Bilotta*, 346 N.W.2d at 623; 4A Minn. Prac., Jury Instr. Guides – Civil CIVJIG 75.20 Design Defect (6th ed. 2025)). Plaintiff notes that "commentators," not the Minnesota Supreme Court, have "suggested" these "distinct theories . . . actually merge into one theory." Doc. 6248 at 3 (quoting *Bilotta*, 346 N.W.2d at 622; *see* CIVJIG 75.20 ("*Bilotta* acknowledged suggestions that strict liability and negligence theories merge into a single theory in design defect cases."). The Court need not resolve this issue at the summary judgment stage and will determine the proper jury instructions for the design defect claims at trial. *See Kociemba v. G.D. Searle & Co.*, 680 F. Supp. 1293, 1300 (D. Minn. 1988) (declining to decide the issue on summary judgment); *Bilotta*, 346 N.W.2d at 623 ("[A]ssuming proper instruction to ensure the broadest theory of recovery, a trial court could properly submit a design-defect or failure-to-warn case to a jury on a single theory of products liability. Submission of a single theory of recovery may avoid the confusion and inconsistent verdicts spawned by submission of multiple overlapping theories without restricting a plaintiff's ability to benefit from the elements of proof which make strict liability a broader theory of recovery than traditional negligence.").

Defendants argue that Plaintiff's design defect claims fail because he lacks evidence of a safer alternative design and an unreasonably dangerous defect. Doc. 5832 at 6-11.

### 1. Safer Alternative Design.

#### a. Requirements of Minnesota Law.

In *Kallio v. Ford Motor Co.*, 407 N.W.2d 92 (Minn. 1987), the Minnesota Supreme Court considered whether a design defect plaintiff "must establish as an element of his case that at the time of manufacture a safer, practicable, and technologically feasible alternative design existed[.]" *Id.* at 94. *Kallio* held that the plaintiff has no such burden, but explained that "normally evidence of a safer alternative design will be presented initially by the plaintiff" and such "evidence is relevant to, and certainly may be an important factor in, the determination of whether the product was unreasonably defective." *Id.* at 96-97.

In so holding, *Kallio* noted that "rare cases may exist where the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned." *Id.* at 97 n.8. Defendants contend that this is the one narrow exception to Minnesota's alternative design requirement, and that because Plaintiff does not claim that this is a rare case where the PowerPort should be removed from the market, he must prove that there was a safer alternative design to survive summary judgment. Doc. 5832 at 6-7. Plaintiff counters that after *Kallio* there is no alternative design requirement under Minnesota law and he must show only that the PowerPort was in a defective condition unreasonably dangerous. Doc. 6248 at 4-5.[4]

Federal district courts in Minnesota have disagreed on whether a plaintiff asserting a design defect claim must present evidence of a safer alternative design or show that the product should be removed from the market. *See* Docs. 5832 at 7, 6248 at 4-5; CIVJIG 75.20 (discussing the disagreement). In *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128 (D. Minn. 2011), the plaintiff sued the manufacturer of a catheter to recover for

---

[4] Plaintiff also states that he has not disclaimed a removal-from-market theory. Doc. 6248 at 10. Defendants argue in their reply that Plaintiff lacks removal-from-market evidence. Doc. 6416 at 3-4. The Court will not consider an argument made for the first time in a reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007).

injuries he sustained when the catheter tip broke off in his heart during a medical procedure. *Id.* at 1132. The plaintiff's expert disclaimed any intention to offer an opinion on alternative design. *Id.* at 1161. The district court concluded that "[w]ithout evidence of a proposed alternative design, a jury [could] not possibly engage in the 'reasonable-care balancing test' called for by Minnesota law." *Id.* The court then considered whether proof of an alternative design is required given the language in *Kallio* that, while plaintiffs in design defect cases will normally present evidence of a safer alternative design, "it is not necessarily required in all cases." *Id.* (quoting *Kallio*, 407 N.W.2d at 96-97). Relying on the footnote in *Kallio* regarding rare cases where the product should be removed from the market, 407 N.W.2d 92 at 97 n.8, the court in *Kapps* concluded that "*Kallio* did not dispense with the requirement of proving an alternative design[.]" *Id.* The court explained:

> *Kallio* simply explains that in conducting the reasonable-care balancing test that applies in *all* design-defect cases, the relative costs and benefits of an allegedly defective design must be weighed against the relative costs and benefits of one of two different things: either (1) a proposed alternative design, or (2) the removal of the challenged product from the market. But a plaintiff cannot prevail in a design-defect case simply by arguing, in the abstract, that a product is defectively designed. Instead, the plaintiff must explain why, under the reasonable-care balancing test, the world would be a better place if the product were either designed differently or taken off the market.

*Id. Kapps* granted summary judgment on the plaintiff's design defect claim because he presented no evidence of a safer alternative design or that the catheter should have been removed from the market. *Id.*; *see also Thompson v. Zimmer Inc.*, No. 11-CV-3099 PJS/AJB, 2013 WL 5406628, at *4-8 (D. Minn. Sept. 25, 2013) (granting summary judgment where the plaintiff did not contend that the product should be taken off the market and failed to present sufficient evidence of safer alternatives); *Am. Fam. Ins. Co., S.I. v. Pecron, LLC*, No. 21-CV-1749 (KMM/DJF), 2023 WL 8654202, at *4 (D. Minn. Dec. 14, 2023) (same).

Plaintiff relies on *McDougall v. CRC Industries, Inc.*, No. CV 20-1499 (JRT/LIB), 2024 WL 4894656 (D. Minn. Nov. 26, 2024), which reached a different conclusion.

Doc. 6248 at 4-5.  The district court in *McDougall* interpreted the footnote in *Kallio* "to merely represent an example of cases where no alternative design evidence is required[,]" explaining that "[i]f the Minnesota Supreme Court had intended to require plaintiffs to present alternative design evidence or else prove that the product is so unreasonably dangerous that it should be taken off the market, it could have said so in its opinion." 2024 WL 4894656, at *7.  The district court denied the defendant's post-verdict motion for judgment as a matter of law, rejecting its argument that the plaintiff was required to present alternative-design evidence or show that the product should be taken off the market.  *Id.*

The Eighth Circuit recently reversed the district court's decision in *McDougall*, explaining:

> [Defendant] claims it is entitled to judgment as a matter of law because [Plaintiff] failed to present evidence from which the jury could find that its duster was unreasonably dangerous.  [Plaintiff] responds that under Minnesota law he didn't have to present alternative design evidence.  The district court agreed with [Plaintiff], relying on a sentence from the Minnesota Supreme Court's decision in *Kallio* explaining that "evidence of a safer alternative design . . . is not necessarily required in all cases."  [407 N.W.2d at 96-97].  But the footnote immediately following that sentence explains its limited application: "Conceivably, rare cases may exist where the product may be judged unreasonably dangerous because it should be removed from the market rather than be redesigned."  *Id.* at 97 n.8.  *Kallio* clarified that in those "rare cases" where there is no feasible alternative design, the jury can weigh the product's potential harm against the burden of removing the product from the market.  But it is still the plaintiff's burden to either present alternative design evidence or assert that the product is so unreasonably dangerous it should be removed from the market altogether.

*McDougall v. CRC Indus., Inc.*, No. 24-3614, 2026 WL 367533, at *1 (8th Cir. Feb. 10, 2026) (citing *Kapps*, 813 F. Supp. 2d at 1161).

Because the law of the Eighth Circuit would be controlling if this case were to be tried in a Minnesota federal court, the Court will follow the Eighth Circuit's conclusion in *McDougall* that the plaintiff has the "burden to either present alternative design evidence or assert that the product is so unreasonably dangerous it should be removed from the market altogether."  *Id.*; *see also Wagner v. Hesston Corp.*, 450 F.3d 756, 760 (8th Cir.

2006) ("Wagner did not assert that his was the 'rare case' involving a product so dangerous that it should be removed from the market entirely," so "the District Court would have acted properly even if it had required the proffered experts to establish the existence of a feasible alternative design.") (citation modified). As explained below, however, Plaintiff has presented sufficient evidence of a safer alternative design to create a genuine issue for trial and avoid summary judgment.

### b.   Plaintiff's Evidence of Safer Alternative.

Defendants concede that Plaintiff's experts have identified many alternative designs to the PowerPort with a ChronoFlex polyurethane catheter. Doc. 5832 at 7. These include other IPCs such as the BioFlo, Avertex, Orphis, and Argyle, and different catheter materials and coating technologies such as Biobloc, Chlorag+ard, "hydrophilic coatings and nonfouling polymers," and catheters coated with "minocycline and rifampin," "chlorhexidine, silver, and sulfadiazine," and "silver alone, or silver combined with platinum and carbon." *Id.* at 8 (citing Doc. 5832-1 ¶¶ 49, 55).

Relying on Minnesota's Jury Instruction Guides, Defendants contend that these alternative designs are not sufficient because the experts have not identified the specific costs of implementing them or weighed these costs against any potential benefit to Plaintiff, as required to prove "feasibility." *Id.* at 7-8 (citing CIVJIG 75.20). Defendants argue that a jury would have no evidence from which it could reasonably find that any of the various alternative designs were "'feasible at the time the product was manufactured,' because to make that finding, it also 'must find' that when [Plaintiff's] IPC was manufactured in 2021, 'any increases in the cost or changes in the performance of the product would have been outweighed by the added safety of the suggested alternative design.'" *Id.* at 9 (quoting CIVJIG 75.20).

But the Jury Instruction Guides are not binding precedent. *See Damgaard v. McKennan*, No. 13-CV-2192 (SRN/JSM), 2016 WL 215271, at *5 (D. Minn. Jan. 19, 2016); *Miller v. Lewis on Behalf of Est. of Pavelich*, No. A23-1937, 2024 WL 4195602, at *3 (Minn. Ct. App. Sept. 16, 2024). And as Plaintiff notes, Defendants do not cite the

committee's standard instruction for design defect claims.  Doc. 6248 at 5.  Instead, Defendants quote committee comments that cite Oregon law.  *See* CIVJIG 75.20 (discussing a possible "feasible alternative design" instruction and explaining that "the instruction is based upon *Wilson v. Piper Aircraft Corp.*, 282 Or. 61, 577 P.2d 1332, 1326 (1978)").  The committee's standard instruction for design defect claims identifies the "cost and ease of taking effective precautions to avoid [the] harm" as a factor the jury should consider in evaluating the manufacturer's design choices, but this is one of several factors the jury should consider among "all the facts and circumstances[.]"  *Id.*; *see also Omnetics, Inc. v. Radiant Tech. Corp.*, 440 N.W.2d 177, 180-81 (Minn. Ct. App. 1989) (holding that the trial court did not abuse its discretion in refusing to give the feasible alternative design instruction set forth in the committee's comments to CIVJIG 117 (now CIVJIG 75.20) and explaining that counsel was free to argue the importance of a feasible alternative design in closing arguments) (citing *Kallio*, 407 N.W.2d at 97); *Bilotta*, 346 N.W.2d at 622 (explaining that what constitutes reasonable care will "vary with the surrounding circumstances" and the test is whether the defendant's design choices struck an acceptable balance "among several competing factors").  Defendants have not shown that they are entitled to summary judgment simply because Plaintiff's experts have not addressed specific "costs of testing, developing, and manufacturing" the alternative designs or undertaken a "complex economic analysis" of "the extensive 510(k) clearance process[.]"  Doc. 5832 at 8; *see Krumm v. Bar Maid Corp.*, No. CIV. 11-2782 JNE/SER, 2013 WL 3064442, at *6 (D. Minn. June 18, 2013) ("Whether the increased cost of adding one or both of the alternative designs is feasible . . . is a question for a jury.  Thus, there is a genuine dispute of material fact as to whether Krumm's suggested alternative designs are safer and feasible.").

Defendants' reliance on *Pecron* is misplaced.  *See* Docs. 5832 at 7, 6416 at 4.  The expert in that case said "nothing about the relative costs and benefits" of his proposed alternative design.  2023 WL 8654202, at *5.  Here, Plaintiff's expert Dr. Brian McVerry opines that the alternative designs are "cost-effective" because "the cost of coating or

additive technology remains a small percentage of the entire IPC kit[,]" and while "cost is always a consideration, the reduced morbidity/mortality and improved patient quality of life with the use of anti-fouling technologies outweighs incremental costs associated with additional manufacturing processes." Doc. 6248-37 at 43-44. Another expert, Dr. Bernard Camins, opined that "an antimicrobial and/or anti-fouling catheter likely would have prevented [Plaintiff's] CRBSI and sepsis." Doc. 5832-28 at 19; *see also* Docs. 6248 at 8-9, 6248-1 ¶¶ 59-63 (discussing similar expert testimony regarding costs and benefits of alternative designs). Plaintiff also relies on Defendants' own documents to show that alternative designs are cost-effective. Doc. 6248-1 ¶ 59; *see also McCormack*, 154 N.W.2d at 335 (upholding the jury's verdict on a negligent design claim where the evidence reasonably permitted a finding that an "inexpensive" alternative design would have substantially reduced the danger that caused the plaintiff's injuries).

Defendants note that the Avertex, Orphis, and Argyle IPCs are not available in the United States and that Plaintiff's experts do not address the likelihood that the FDA would clear the alternative designs given that there are no antimicrobial IPCs available in the United States. Doc. 5832 at 8. But Defendants cite no legal authority suggesting that an alternative design must be available in the United States to be feasible, or that a plaintiff must show the FDA would clear the device for market. Plaintiff notes, correctly, that these requirements are not contained in CIVJIG 75.20 or any Minnesota case law cited by Defendants. Doc. 6248 at 5-6 (citing *Kramer v. Ford Motor Co.*, No. 12-CV-1149 (SRN/FLN), 2016 WL 827746, at *9 (D. Minn. Feb. 29, 2016) (holding that the plaintiff sufficiently demonstrated an alternative design where the defendant had used it in vehicles sold in Europe); *Thacker v. Ethicon, Inc.*, 47 F.4th 451, 464 (6th Cir. 2022) ("[I]t is illogical to say that an *alternative design* – that, *by definition*, was never put on the market – must have been approved by the FDA to support a design defect claim. To require FDA approval for a design that never came to fruition would likely doom all design defect claims in the medical device context.")).

Plaintiff also is correct that an alternative design need not exist or be sold to be feasible. *See id.*; *Kramer*, 2016 WL 827746, at *9 ("An expert rendering an opinion regarding a feasible alternative design in a design defect case is not required to manufacture a new device or a prototype in order for the opinion to be admissible[.]"); *Kallio v. Ford Motor Co.*, 391 N.W.2d 860, 863-64 (Minn. Ct. App. 1986), *aff'd*, 407 N.W.2d 92 (Minn. 1987) ("[Kallio's expert] testified that he had designed a device that would decrease the likelihood of the gear selector lever slipping back into reverse. He indicated that this device would cost between $2.00 and $10.00 and that the device could be manufactured. We recognize that Ford presented evidence that questioned the effectiveness of this proposed device, and highlighted the fact that the proposed device had not been tested. The jury could, however, have accepted the testimony of Kallio's experts. That testimony was sufficient to permit a jury to find that a practical, inexpensive, alternative design was available.").

What is more, Plaintiff presents evidence that Defendants' own Avertex port, coated with Covalon's antimicrobial, suffices as an alternative design even if Defendants were not able to bring the port to market. Doc. 6248 at 6 (citing 6248-1 ¶ 54); *see Sanny v. Trek Bicycle Corp.*, No. 11-2936 ADM/SER, 2013 WL 1912467, at *10 (D. Minn. May 8, 2013) (denying summary judgment because "the reasonableness of [the defendant's] decision" to "forgo" an alternative design it previously employed "is a question of fact best decided by a jury"). Plaintiff also presents evidence that Defendants use antimicrobial coatings like Bardex and Biobloc on their urinary and hemodialysis catheters, noting that they may "point to use of the alternative design on similar products." *Id.* at 7 (quoting *Kramer*, 2016 WL 827746, at *9); *see also McRunnel v. Batco Mfg.*, 917 F. Supp. 2d 946, 953 (D. Minn. 2013) ("Batco argues that it is appropriate to exclude expert testimony regarding proposed design changes that have never been developed, tested, or subjected to peer review. In this case, Huitink avers that other manufacturers have equipped similar belt conveyors with guarding like Huitink's proposed alternative design and Batco itself has produced conveyors with similar guarding. . . .  Given that there is some evidence to support

feasibility, any vagueness and lack of testing for Huitink's particular recommended modification can be addressed on cross examination.").[5]

The Court will deny Defendants' motion based on an alleged absence of evidence of a safer and feasible alternative design. Doc. 5832 at 6-10.

### 2.    Unreasonably Dangerous.

Minnesota's test for determining whether a product is unreasonably dangerous involves 'a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Bilotta*, 346 N.W.2d at 621 (citation omitted). Defendants argue that Plaintiff lacks evidence of "the likelihood of harm," which Defendants claim is "the rate of early infections in the PowerPort as designed." Doc. 5832 at 10-11. But Defendants cite no legal authority suggesting that a specific infection rate is necessary to determine whether the PowerPort is unreasonably dangerous. And Plaintiff explains that his experts cite the Iida 2021 study showing an infection rate of nearly 15 percent for Bard ports. Doc. 6248 at 10 (citing Doc. 6248-1 ¶¶ 42, 46); *see* Doc. 6248-18 at 4.[6] Plaintiff also explains that Defendants recognized port-related infections as a common complication, hence their efforts to design an infection-resistant port. Doc. 6248 at 10 (citing Doc. 6248-1 ¶ 47); *see* Doc. 6248-25 (Bard project opportunity appraisal for a "PowerPort with anti-microbial coating that will resist bacterial adherence for a minimum of 31 days").

Defendants assert that Plaintiff's expert Dr. Darren Hurst "cannot say what the infection rate (i.e., 'the likelihood of harm') is for the PowerPort[.]" *Id.* at 10 (citing

---

[5] The parties dispute whether Plaintiff's experts ignore risks of alternative designs, such as peeling of polymer coating (Docs. 5832 at 9, 6248 at 9), but this dispute goes to the persuasiveness of Plaintiff's alternative design evidence and provides no basis for granting summary judgment on the design defect claims.

[6] Defendants note that the Iida study compared the Orphis port to the Bard X-Port with a silicone catheter, not the PowerPort with a ChronoFlex catheter, and that the study did not address early infection rates because it had a six-month follow-up. Doc. 6416 at 6. Plaintiff notes that Defendants found the study to be a "high-quality" study that "suggests the preventative role of MPC coating in [central venous catheter] infection." Doc. 6248-1 ¶ 46 (quoting Doc. 6248-4 at 76). Defendants will be free to cross-examine Plaintiff's experts about their reliance on the Iida study, but the jury must determine how much weight it deserves.

Doc. 5832-1 ¶ 46).  But Dr. Hurst stated only that he does "not have an infection study for Bard."  Doc. 5832-26 at 11.  Defendants also note that Dr. Hurst stated he would be "happy" with an infection rate of 4.5 percent – the rate reported for the Orphis port in the Iida study.  Doc. 5432 at 10 (citing Doc. 5832-1 ¶ 47); *see* Doc. 5832-6 at 13-14.  Dr. Hurst made clear, however, that he would want the infection rate "to be zero, if possible."  Doc. 5832-26 at 14.  Plaintiff notes that Drs. Camins and Sheikhi cited studies that found zero infections when antimicrobial catheters were used.  Doc. 6248 at 8-9 (citing Doc. 6248-1 ¶¶ 42, 58).

Defendants assert that the only evidence of early infection rates for IPCs is a study done by Dr. Frimpong that found a 0.55 percent infection rate for patients who had IPCs placed at the Mayo Clinic between May 2020 and June 2021.  Doc. 5832 at 8-9 (citing Doc. 5832-1 ¶ 43).  Defendants assert that the study involved predominately Bard IPCs, but the study does not support this assertion or otherwise discuss the specific port models involved in the study.  *See* Docs. 5832-24, 6248-1 ¶ 42, 6428-16 at 16-17.  Nor did the study involve a comparison between Bard IPCs and IPCs with an antimicrobial coating.  It compared short-term infection rates related to port placement with and without antibiotic administration.  *See id.*

The Court will deny Defendants' motion based on an alleged lack of evidence that the PowerPort was unreasonably dangerous.  Doc. 5832 at 10-11.

**B.    Warning-Based Claims (Counts III-IV and IX-XI).**

Defendants argue that the "learned intermediary" doctrine forecloses Plaintiff's failure to warn, misrepresentation, and concealment claims.  Doc 5823 at 11-17; *see* Docs. 216 ¶ 15, 1889 ¶¶ 301-34, 394-438.  Under Minnesota law, the learned intermediary doctrine is a defensive doctrine, not an offensive one.  *Kapps*, 813 F. Supp. 2d at 1152; *Gray v. Badger Min. Corp.*, 676 N.W.2d 268, 275-76 (Minn. 2004).  The defense is raised by manufacturers of drugs or medical devices who are sued for failing to adequately warn about risks associated with their products.  *Id.*  Under the doctrine, manufacturers have a duty to warn physicians, not patients, about dangers associated with a drug or medical

14

device.  *Id.*; *see Mulder v. Parke Davis & Co.*, 181 N.W.2d 882, 885 n.1 (Minn. 1970) ("The manufacturer has no duty to warn the lay public regarding prescription drugs."); *Mozes v. Medtronic, Inc.*, 14 F.Supp.2d 1124, 1130 (D. Minn. 1998) (finding that "Minnesota courts would follow the large number of jurisdictions that have applied the doctrine to cases involving medical devices"); *Bruzer v. Danek Med., Inc.*, No. CIV. 3-95-971/RHKJMM, 1999 WL 613329, at *6 (D. Minn. Mar. 8, 1999) ("Where the product at issue is a medical device or product, . . . the manufacturer's duty to warn does not run to the lay public but to the medical professional who will be using the product or device."). The learned intermediary doctrine forecloses a plaintiff's failure to warn claim if the defendant shows the plaintiff's doctor received an adequate warning from the defendant or if the doctor was aware of the information the defendant failed to provide and would have taken the same action even if warned.  *Kapps*, 813 F. Supp. 2d at 1152; *Cornfeldt v. Tongen*, 262 N.W.2d 684, 698 (Minn. 1977); *see In re Levaquin Prods. Liab. Litig.*, 726 F. Supp. 2d 1025, 1027-28 (D. Minn. 2010) ("If a defendant properly establishes the facts necessary to support the learned intermediary defense, a patient will be unable to show that the defendant's failure to warn the prescribing physician is a proximate cause of the patient's injury.").

Defendants argue that Plaintiff's warning-based claims are foreclosed under the learned intermediary doctrine because Dr Frimpong never read Bard's warnings, was aware of the information Bard allegedly failed to provide, and would have taken the same action even if Bard had included different information.  Doc. 5832 at 12-17.

### 1.    Whether Dr. Frimpong Read the PowerPoint IFU.

Defendants contend that "Dr. Frimpong testified, point blank, that he never read any information from Bard about IPCs[.]"  Doc. 5832 at 13.  The Court does not agree with this characterization of his testimony.  When asked at his deposition whether he recalled "receiving any written or oral information about their port devices," he answered "No." Doc. 5823-23 at 5-6.  But when shown the PowerPoint Instructions for Use ("IFU"), he confirmed that he had received a copy of the IFU before implanting Plaintiff's port and it

1  looked familiar to him.  Docs. 5832-23 at 13.  And when shown several sections of the

2  IFU, Dr. Frimpong testified that he "followed those warnings" and "instructions" and

3  "correctly" implanted Plaintiff's port "per Bard's directions." Doc. 6248-16 at 8-11.

4  Construing Dr. Frimpong's testimony in the light most favorable to Plaintiff, as

5  required on this summary judgment motion, *see Anderson*, 477 U.S. at 255, the Court

6  concludes that Dr. Frimpong's receipt of the IFU and familiarity with it, and his following

7  of Bard's warnings and instructions, support a justifiable inference that he read the

8  PowerPort IFU before implanting Plaintiff's port.  *See* Doc. 6248 at 12.[7]

9  **2.  Whether Dr. Frimpong Was Aware of the PowerPort's Risks.**

10  Plaintiff claims that Bard should have warned Dr. Frimpong that the PowerPort's

11  catheter was made of ChronoFlex polyurethane, a material that increases the risk of

12  infection.  Docs. 5823 at 13, 6248 at 12.  Plaintiff further claims that Bard should have

13  informed Dr. Frimpong about other available catheter coatings and materials, such as

14  antimicrobial or antithrombogenic options, that would reduce the infection risk.  *Id.*

15  Defendants argue summary judgment is warranted under the learned intermediary

16  doctrine because Dr. Frimpong was aware of the information Plaintiff claims Bard failed

17  to provide.  Doc. 5832 at 14.  Defendants cite Dr. Frimpong's testimony that infection was

18  a "known complication" that can occur with any IPC "even in the most ideal situation,"

19  that infection "remains one of the feared complications of port placement," and that

20  infection risk was "top of mind" among him and his colleagues in 2020.  *Id.* (citing

21  Doc. 5832-1 ¶¶ 22-24).  But this testimony shows Dr. Frimpong had general knowledge of

22  IPC infection risks, not that he knew the information Plaintiff claims Bard failed to provide

23

24

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[7] Noting that Dr. Frimpong was never directly asked whether he read the IFU,

26  Defendants assert that summary judgment is warranted because Plaintiff has not met his
burden of showing that Dr. Frimpong read the allegedly inadequate warnings.  Doc. 6416

27  at 8 & n.8.  But Defendants have raised the learned intermediary doctrine as a defense and
therefore have the burden of showing Dr. Frimpong never read the IFU.  *See Kapps*, 813

28  F. Supp. 2d at 1152; *In re Levaquin*, 726 F. Supp. 2d at 1027-28; *Est. of Boggess v. U.S.
Bank N.A.*, No. 24-MC-43 (DWF/DJF), 2024 WL 4647989, at *4 (D. Minn. Nov. 1, 2024)
("Defendants have the burden of proof as to their own defenses.").

regarding the increased infection risks associated with the ChronoFlex catheter.  *See* Doc. 6248 at 12-13.

Dr. Frimpong testified that he was not aware that the catheter he implanted in Plaintiff was "something called Chronoflex, a type of polyurethane" – he just knew "it was a regular Bard catheter that [the Mayo Clinic] had in stock."  Doc. 6248-16 at 4-5.  He would "go into the specifics of the product" only where a patient may not "tolerate one specific product" or may have an "allergy to latex [or] silicone."  *Id.* at 5.  He was not aware of "any different rates of infection that might be associated with different catheter substrates or materials," but would "want the manufacturer to share that information with [him]."  *Id.* at 6-7.  He made clear that Bard never informed him that different catheter materials like "polyurethane versus silicone might present different risks of infection" or "different surface roughness."  *Id.* at 7.

Defendants note that, as of August 2022, Dr. Frimpong knew that the short-term IPC infection rate could be as high as 16 percent.  Doc. 5832 at 14 (citing Doc. 5832-1 ¶ 26).  Defendants contend that this fact is dispositive because a 16 percent infection rate is nearly four times higher than the 4.5 percent infection rate Dr. Hurst said he would be happy with and twice as high as the 8 percent infection rate Dr. Hurst contends Bard should have included in its warnings.  *Id.*; Doc. 6416 at 8.  But Dr. Hurst testified that he would want the infection rate "to be as low as possible," and even "zero" percent.  Doc. 5832-26 at 14.  Similarly, when asked whether he had seen an infection rate with Bard ports that he would deem "unacceptable," Dr. Frimpong stated that "[he] would prefer [the] rate of infection to be zero. . . .  Our goal is to knock it down to zero."  Doc. 6248-16 at 21-22.  The fact that Dr. Frimpong knew generally that the short-term infection rate for IPCs could be as high as 16 percent says nothing about whether he would have wanted, and relied on, information about the alleged increased risk of infection with the ChronoFlex catheter.  Defendants have presented no evidence that Dr. Frimpong knew, as Plaintiff claims, that Bard's uncoated ports have a higher infection rate than non-fouling ports, that antimicrobial ports help prevent bacterial adhesion and infection, or that polyurethane is worse than

silicone.  *See* Doc. 6248 at 13 (citing Doc. 6248-1 ¶¶ 2, 22, 52).  Defendants of course dispute these facts, but the evidence must be viewed in Plaintiff's favor at this stage.  If the jury believes the evidence of these alleged risks in Defendants' IPCs, Defendants have presented no evidence that Dr. Frimpong knew about them.

Defendants have not shown, as a matter of undisputed fact, that Dr. Frimpong knew the information Bard allegedly failed to provide.

### 3.    Whether Dr. Frimpong Would Have Taken the Same Action.

Defendants argue that Dr. Frimpong would have taken the same action in Plaintiff's treatment even if Bard had included the information it allegedly failed to provide. Doc. 5832 at 15-17 (citing Doc. 5832-1 ¶¶ 31-40).  But Dr. Frimpong testified that he would have liked to know the "difference in infection rates between polyurethane and silicone catheters."  Doc. 6248-16 at 6-7.  He further testified that if he had information "suggesting that Bard ports have a greater risk[] of infection than other ports, such as a competitor's technology," that information "could . . . have impacted [his] decision about whether to reimplant another Bard port."  Doc. 6248-16 at 19-20.  Defendants note that this testimony addresses Plaintiff's post-infection replacement port.  Doc. 5832 at 15-16 n.8.  But Dr. Frimpong testified that, "during [the] interim from August to September of 2022," he received no "new information from Bard about the safety of their port catheter devices."  Doc. 6248-16 at 18.  Drawing all reasonable inferences in Plaintiff's favor, if the information could have impacted Dr. Frimpong's decision to use a Bard port post-infection in September 2022, it also could have impacted his decision to implant Plaintiff's original Bard port in August 2022.  *See* Docs. 6248 at 14, 6248-1 ¶ 35.

Defendants note that Dr. Frimpong testified that nothing he saw at his deposition made him "second guess" his decision to implant a Bard port in August 2022.  Doc. 5832 at 15 (citing Doc. 5832-1 ¶ 36).  But Defendants do not contend that Dr. Frimpong was shown all of Plaintiff's evidence that Bard ports have an increased infection risk, or that Plaintiff was obligated to show him the evidence.

1    Defendants also note that the Mayo Clinic has carried "predominately" Bard IPCs

2    since Dr. Frimpong began working there in 2018.  *Id.* at 16.  But contrary to Defendants'

3    suggestion, this does not show that Dr. Frimpong had no choice but to implant a Bard

4    PowerPort IPC in Plaintiff.  *See* Doc. 6248-1 ¶¶ 37-39.

5    The learned intermediary doctrine requires Defendants to prove that "the

6    prescribing physician would have taken the same course of action even if the defendants

7    had provided additional warnings."  *In re Levaquin*, 726 F. Supp. 2d at 1027.  Construed

8    in the light most favorable to Plaintiff, the evidence creates a triable issue as to whether

9    Dr. Frimpong knew the true nature of the risks of the PowerPort IPC and would have acted

10   differently if Defendants had provided additional warnings and information about these

11   risks.  *See id.* at 1036 ("[A]fter reviewing Dr. Butner's deposition transcript, the Court finds

12   that Dr. Butner's testimony regarding what he would have done if he had received a more

13   complete warning of the risks of tendon toxicity presents an issue of credibility that is

14   within the province of the trier of fact."); *Kruszka v. Novartis Pharms. Corp.*, 19 F. Supp.

15   3d 875, 895-96 (D. Minn. 2014) (denying summary judgment where the defendant did not

16   "offer sufficiently compelling evidence that [the plaintiff's] doctors would have taken the

17   exact same course of action with full warnings" and the plaintiff had presented evidence

18   that the doctor "may have altered" his conduct); *Block v. Woo Young Med. Co.*, 937 F.

19   Supp. 2d 1028, 1036 (D. Minn. 2013) (denying summary judgment where "the doctor never

20   testified that he did not read labels or . . . that he would have been unresponsive to

21   warnings"); *Johnson v. Ethicon, Inc.*, No. 2:12-CV-0498, 2016 WL 7379009, at *5

22   (S.D.W. Va. Dec. 20, 2016) (applying Minnesota law and explaining that whether the

23   doctor would have taken the same action with additional warnings is a "question[] of fact

24   to be resolved by the jury").

25   The Court will deny Defendants' motion based on the learned intermediary doctrine.

26   Doc. 5832 at 11-17.

27   / / /

28   / / /

1    **C.    Misrepresentation Claims (Counts IX and X).**

2        Plaintiff asserts negligent and fraudulent misrepresentation claims.  Docs. 216 ¶ 15,

3    1889 ¶¶ 394-426.  Defendants argue that summary judgment is warranted on the negligent

4    misrepresentation claim because Minnesota has not recognized a cause of action for

5    personal injury under a negligent misrepresentation theory.  Doc. 5832.  The Court agrees.

6        The Minnesota Court of Appeals has affirmed the grant of summary judgment for

7    this very reason:

8        [Appellants] argue that the district court erred in concluding that under
         Minnesota law, a negligent misrepresentation will not support a personal
9        injury claim.  Our supreme court has neither specifically adopted nor rejected
10       the tort of negligent misrepresentation involving physical harm.  *Smith v.
         Brutger*, 569 N.W.2d 408, 414 (Minn.1997).  Although not foreclosing the
11       possibility of recognizing the tort, the *Smith* court expressly declined to do
         so in that case.  *Id.*  We, likewise, decline to recognize the tort in this case.
12       The district court did not err in granting summary judgment in favor of
         respondents on [the] claim for personal injury based on a negligent
13       misrepresentation.

14

15   *Goeb v. Tharaldson*, No. CX-98-2275, 1999 WL 561956, at *9 (Minn. Ct. App. Aug. 3,

16   1999), *aff'd*, 615 N.W.2d 800 (Minn. 2000).

17       Plaintiff notes that whether Minnesota would recognize the claim remains an open

18   question.  Doc. 6248 at 16.  That may be true, but the Court declines to guess that Minnesota

19   will recognize such a claim.  *Id.*; *see Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F.

20   Supp. 2d 953, 988 (D. Minn. 1998) ("Given the views of the majority of the Minnesota

21   Supreme Court, and the approaches taken by other Courts on the issue before us, prudence

22   counsels that we adhere to the Court's rationale in *Smith*, and decline the Plaintiff's

23   invitation to determine the viability of the tort of negligent misrepresentation which did not

24   involve the risk of physical harm."); *Forslund v. Stryker Corp.*, No. CIV. 09-2134 JRT/JJK,

25   2010 WL 3905854, at *6 (D. Minn. Sept. 30, 2010) ("Forslund has not stated a claim for

26   negligent misrepresentation as a matter of law.  Forslund offers no support for the argument

27   that while the Minnesota Supreme Court has not foreclosed the possibility of recognizing

28   a negligent misrepresentation claim for physical harm, Minnesota law would permit such

20

a claim here."). The Court will grant Defendants' motion with respect to the negligent misrepresentation claim. Doc. 5832 at 17-18.

Defendants argue that Plaintiff's fraudulent misrepresentation claim fails because Bard made no representation to Plaintiff and Dr. Frimpong never read the PowerPort IFU. *Id.* at 18. As explained, there is a triable issue as to whether Dr. Frimpong read the PowerPort IFU before implanting Plaintiff's port. *See* Doc. 6248-1 ¶¶ 27-28. The Court will deny Defendants' motion on the fraudulent misrepresentation claim. Doc. 5832 at 18.

### D. Fraudulent Concealment Claim (Count XI).

Defendants cite *Thornberg v. State Farm Fire & Casualty Co.*, No. 14-CV-122 SRN, 2015 WL 3612550 (D. Minn. June 9, 2015), for the proposition that fraudulent concealment is not an independent cause of action in Minnesota. Doc. 5832 at 18. *Thornberg* affirmed a magistrate judge's conclusion that "fraudulent concealment is not an independent cause of action, but is a doctrine that may toll the applicable statute of limitations." 2015 WL 3612550, at *5 (citing *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 918-19 (Minn. 1990)). But as *Thornberg* made clear, *Hydra-Mac* merely "discuss[ed] application of the doctrine of fraudulent concealment to a statute of limitations [defense]." *Id.* Neither the plaintiff in *Hydra-Mac* nor *Thornberg* asserted fraudulent concealment as an independent cause of action. *See id.* (the magistrate judge "properly construed this claim as an argument that the fraudulent actions of the Gerdins tolled the limitations periods of Plaintiff's claims").

Other courts have found that a stand-alone fraudulent concealment claim is viable in Minnesota. *See Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 n.3 (8th Cir. 1999) ("Claims of fraud based on fraudulent concealment are distinct from the use of fraudulent concealment to toll the statute of limitations.") (citing *Hydra-Mac*, 450 N.W.2d at 918; *Cherne Contracting Corp. v. Wausau Ins. Co.*, 572 N.W.2d 339, 345 & n.2 (Minn. Ct. App. 1998)); *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 678 (D. Minn. 2021) ("A claim of fraudulent concealment must be based on an affirmative misrepresentation or a failure to disclose certain facts rendering the facts disclosed misleading absent a party's

special duty to disclose."); *Qwest Commc'ns Co., LLC v. Free Conferencing*, 990 F. Supp. 2d 953, 976 (D. Minn. 2014) ("To make a claim for fraudulent concealment, Qwest must allege that Defendants deliberately concealed a material fact or were silent 'in the face of a duty to speak,' that Defendants had knowledge, that Defendants intended for Qwest to rely on the concealment, causation, and damages.").

Defendants have not shown that they are entitled to judgment as a matter of law on the fraudulent concealment claim. The Court will deny Defendants' motion in this regard. Doc. 5832 at 18.

### E.    Consumer Fraud and Unlawful Trade Practices Claims (Count XII).

Plaintiff asserts claims under the Consumer Fraud Act, Minn. Stat. § 325F.68, et seq., and the Unlawful Trade Practices Act, Minn. Stat. § 325D.09 et seq. Docs. 216 ¶ 15, 1889 ¶ 444(x).[8]  Defendants argue that these claims must be brought under the Private Attorney General Statute, Minn. Stat. § 831. Doc. 5832 at 18-19. But as Plaintiff explains (Doc. 6248 at 17), Minn. Stat. § 325F.70 states that a person injured by a violation of § 325F.68 "may bring a civil action and recover damages . . . as determined by the court." And Minn. Stat. § 325D.15 provides that any person injured by a violation of § 325D.09 is "entitled to sue . . . in any court of competent jurisdiction" for the "actual amount of damages." Plaintiff also makes clear that he is not pursuing these claims under the Private Attorney General Statute (*see* Doc. 1889 ¶ 44(x)), and the public benefit requirement Defendants cite therefore does not apply. Doc. 6248 at 17.[9]

The Court will deny Defendants' motion with respect to the consumer fraud claim under § 325F.68 and unlawful trade practices claim under § 325D.09. Doc. 5832 at 18-19.

### F.    Unjust Enrichment Claim (Count XIII).

Under Minnesota law, "[a]n unjust enrichment claim sounds in equity and requires the plaintiff to establish the following elements: '(1) a benefit conferred; (2) the defendant's

---

[8] Plaintiff has withdrawn his false advertising claims under Minn. Stat. §§ 325D.43 and 325F.67. *See* Docs. 6248 at 17, 6416 at 2 n.1.

[9] Defendants' citation to *In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1076 (D. Minn. 2010), is inapposite because the case did not involve § 325F.68 or § 325D.09. Doc. 6416 at 11.

appreciation and knowing acceptance of the benefit; and (3) the defendant's acceptance and retention of the benefit under such circumstances that it would be inequitable for him to retain it[.]'" *Hull v. ConvergeOne, Inc.*, 570 F. Supp. 3d 681, 706 (D. Minn. 2021) (quoting *Dahl v. R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007)).

Plaintiff pleads his unjust enrichment claim in the alternative. *See* Docs. 1889 ¶ 461, 6248 at 18. Contrary to Defendants' assertion (Doc. 5832 at 19), a plaintiff may plead an equitable claim as an alternative to a potential adequate remedy at law. *See* Fed. R. Civ. P. 8(a)(3), (d)(2); *Seutter v. Mead Johnson Nutrition Co.*, 763 F. Supp. 3d 783, 796 (D. Minn. 2025) ("[U]njust enrichment is not available when there was an alternative adequate remedy at law. Still, that does not necessarily preclude plaintiffs from pleading equitable relief and other claims in the alternative.") (citing Fed. R. Civ. P. 8(d)(2)-(3)); *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933, 948 (D. Minn. 2009) ("Under the federal rules, a plaintiff may plead . . . alternative theories of recovery. At a later stage it may be necessary for plaintiff to elect a theory, but at the pleading stage it is not.") (citations omitted).

Defendants argue that unjust enrichment claims must be premised on an implied or quasi-contract and there are no facts to infer such contracts between Bard and Plaintiff because Bard sold its IPCs to the Mayo Clinic. Doc. 5832 at 19. But "[i]t is of no moment that [Plaintiff] paid the hospital which purchased the device, as opposed to paying [Bard] directly. The hospital has been made whole; [Plaintiff] has not; and [Bard] retains the funds paid for the . . . product." *Kinetic*, 672 F. Supp. 2d at 948; *see also Herlache v. Rucks*, 990 N.W.2d 443, 447-52 (Minn. 2023) (affirming an unjust enrichment award where the defendant was unjustly enriched not only by money the plaintiff paid directly to the defendant but also by payments made to third parties); *Warren v. ACOVA, Inc.*, 21 N.W.3d 218, 242-43 (Minn. Ct. App. 2025) (explaining that "the defining element of a claim for unjust enrichment is the defendant's wrongful retention of a benefit, without regard to whether that benefit has been conferred by the plaintiff").

The Court will deny Defendants' motion on the unjust enrichment claim. Doc. 5832 at 19.

23

1      ### G.    Punitive Damages.

2      Plaintiff seeks an award of punitive damages.  *See* Doc. 216 ¶ 15, 1889 ¶¶ 484-87.

3      Under Minnesota law, punitive damages may be awarded "upon clear and convincing

4      evidence that the acts of the defendant show deliberate disregard for the rights or safety of

5      others." Minn. Stat. § 549.20(1)(a).  A defendant acts with such deliberate disregard where

6      it "has knowledge of facts or intentionally disregards facts that create a high probability of

7      injury to the rights or safety of others" and "deliberately proceeds to act in conscious or

8      intentional disregard of" or "with indifference to the high probability of injury to the rights

9      or safety of others." *Id.* § 549.20(1)(b).  Relevant factors for determining whether an award

10     of punitive damages is warranted include "the seriousness of hazard to the public arising

11     from the defendant's misconduct, the profitability of the misconduct to the defendant, the

12     duration of the misconduct and any concealment of it, the degree of the defendant's

13     awareness of the hazard and of its excessiveness, [and] the attitude and conduct of the

14     defendant upon discovery of the misconduct[.]" *Id.* § 549.20(3).

15     Defendants argue that Plaintiff lacks clear and convincing evidence that Bard acted

16     with malicious, intentional, or deliberate disregard for his safety.  Doc. 5832 at 20-21.

17     Plaintiff claims that Bard's actions constitute a deliberate disregard for the safety of

18     Plaintiff and other patients given Bard's knowledge of the high probability of increased

19     infection risks posed by the PowerPort and its other uncoated and outdated IPCs.

20     Doc. 6248 at 18.  Plaintiff argues that a jury reasonably could award punitive damages

21     because evidence shows that Bard knew its IPCs were less safe than coated devices, and

22     yet never implemented known and feasible design improvements to address the serious risk

23     of infection. *Id.* at 18-19.

24     Minnesota courts have found that "willful indifference consist[s] of knowingly

25     continuing to market a profitable, but defectively manufactured, product." *Olson v. Snap*

26     *Prods., Inc.*, 29 F. Supp. 2d 1027, 1039 (D. Minn. 1998) (citing *Gryc v. Dayton-Hudson*

27     *Corp.*, 297 N.W.2d 727 (Minn. 1980)).  Plaintiff has presented evidence that IPCs made

28     without antimicrobial coatings or anti-fouling technologies, such as the PowerPort with a

ChronoFlex catheter, have a significantly higher risk of infection than IPCs that include such coatings or technologies. Doc. 6248-1 ¶¶ 42, 46. Plaintiff asserts that Bard knew that antimicrobial coatings are common in the industry and have been sought by its customers and recommended by the Centers for Disease Control and Prevention for years. *Id.* ¶¶ 47, 54-55. Plaintiff further asserts that Bard's knowledge of the serious infection risk from uncoated IPCs is what prompted it to design the Avertex coated port, but Bard refused to spend less than $1 million to clear this life-saving technology and failed to act for more than 15 years. *Id.* ¶ 54. Bard also represented that its IPCs are biocompatible, but knew that the rough polyurethane catheters attract bacteria and are predisposed to microbial colonization and infection. *Id.* ¶ 11.

This description of the evidence is made in the light most favorable to Plaintiff, as required for a summary judgment ruling, and is disputed vigorously by Defendants. *See*, *e.g.*, Docs. 5832 at 20-21, 6416 at 11-12. But if believed by the jury, this evidence is sufficient to support a finding that Bard's uncoated IPCs "created a substantial danger to the public" and that Bard "continued to market [the devices] even though there were economically feasible measures which could have been taken to reduce this danger[.]" *Gryc*, 297 N.W.2d at 741. A jury reasonably could conclude that Bard acted with deliberate disregard for the safety of Plaintiff and other patients who received Bard IPCs. Minn. Stat. § 549.20(1)(a); *see Kruszka*, 19 F. Supp. at 898 ("Plaintiffs point to a long list of evidence that, if true, could lead a reasonable jury to find that Defendant had acted with the requisite disregard for the safety of patients taking Aredia. For example, Plaintiffs present evidence of a number of instances that Defendant was made aware of concerns that bisphosphonates caused ONJ prior to the time that labels and information to doctors communicated that information. Plaintiffs also point to evidence that Defendant was aware doctors had seen patients with ONJ and were concerned about a link to bisphosphonates.") (citations omitted).

Defendants note that they complied with applicable FDA regulations and the FDA cleared their IPCs for market. Doc. 5832 at 21. But Defendants cite no legal authority

1    suggesting that compliance with federal regulations precludes an award of punitive

2    damages, particularly where, as in this case, the device at issue was cleared by the FDA

3    under 510(k) review which focuses primarily on equivalence with other products, not

4    safety.  Defendants also note that the Mayo Clinic where Plaintiff received his IPC

5    "achieved a 0.55 percent early infection rate using predominantly Bard IPCs."  *Id.*  But as

6    explained, the short-term study Defendants cite does not indicate that Bard IPCs were used

7    predominantly and did not involve a comparison of IPCs with and without antimicrobial

8    coating or anti-fouling technologies.  *See* Docs. 5832-24, 6248-1 ¶ 42.

9         The Court will deny Defendants' motion on Plaintiff's request for punitive damages.

10   Doc. 5832 at 20-21.

11        **IT IS ORDERED:**

12        1.    Defendants' motion for summary judgment (Doc. 5832) is **granted in part**

13   and **denied in part**.  The motion is granted with respect to Plaintiff's negligent

14   misrepresentation claim (Count IX).  The motion is denied with respect to Plaintiff's claims

15   for design defect (Counts I and II), failure to warn (Counts III and IV), fraudulent

16   misrepresentation (Count  X), fraudulent concealment (Count XI), consumer fraud and

17   unlawful trade practices (Count XII), unjust enrichment (Count XIII), and punitive

18   damages.

19        2.    A final pretrial conference is set for April 9, 2026 at 10:00 a.m.  The trial is

20   set to begin on April 21, 2026 at 9:00 a.m.  *See* Docs. 6028, 6875.

21        Dated this 5th day of March, 2026.

22

23

24                               David G. Campbell

25                         Senior United States District Judge

26

27

28