**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Buddy D. Ratner, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Buddy D. Ratner, Ph.D. Doc. 5198.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5198, 5758, 6021.  The Court will grant the motion in part.

**I.      Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including materials science experts.  Plaintiffs have identified Buddy D. Ratner, Ph.D. as a biomaterials science expert. Dr. Ratner has studied "biomaterials science and the design of implantable polymeric materials and biomedical devices" for more than 50 years.  Doc. 5198-1 at 2.  He holds a Ph.D. in Polymer Chemistry and has been a faculty member of the University of Washington since 1972.  *Id.* at 2, 160.  He is currently a Professor in the Departments of Bioengineering and Chemical Engineering and an Adjunct Professor in the Department of Materials Science and Engineering, among other academic positions.  *Id.* at 2-3.  Dr. Ratner has authored 360 peer-reviewed publications on biomaterials science, polymers, and surface studies.  *Id.* at 3.  He is a member of "the U.S. National Academy of engineering, which puts [him] in the top 0.1% of all practicing engineers."  *Id.*  Defendants move to exclude Dr. Ratner's opinions under Federal Rule of Evidence 702.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles

3

and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Defendants bring several challenges to Ratner's opinions.

**A.    Report Preparation Under Rule 26.**

Defendants argue that Ratner has violated Federal Rule of Civil Procedure 26 because Plaintiffs' lawyers wrote most of his report. Doc. 5198 at 2. Rule 26 permits attorneys to assist in preparing expert reports. When the rule was amended in 1993 to require retained experts to prepare detailed reports of their opinions and testimony, the Advisory Committee on the Federal Rules of Civil Procedure specifically instructed that the new rule "does not preclude counsel from providing assistance to experts in preparing

the reports[.]" Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment. The Advisory Committee further amended Rule 26 in 2010 by providing that attorney-expert communications, including in preparing reports, were not subject to discovery with the exception of a few narrow categories of information. *See* Fed. R. Civ. P. 26(b)(4)(C); Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment ("Rule 26(b)(4)(C) is added to provide work-product protection for attorney-expert communications regardless of the form of the communications, whether oral, written, electronic, or otherwise."). These amendments underscored the reality that attorneys work with experts in preparing their testimony.

Courts likewise recognize that lawyers can assist experts in preparing reports, including counsel's "editorial assistance on the report, counsel's composing of initial drafts of reports based upon communications with the expert and allowing the expert to substantively revise the report to reflect the expert's opinions, or counsel's drafting of the report with the expert's substantive assistance[.]" *Accentra Inc. v. Staples, Inc.*, No. CV 07-5862 ABC (RZX), 2010 WL 11459205, at *4 (C.D. Cal. Oct. 7, 2010) (citations omitted) (collecting cases). The expert must "substantially participate in the preparation of his report." *Id.* (citation omitted).

Defendants argue Ratner wrote "only about a third" of his report, which was otherwise co-authored by Plaintiffs' counsel. Doc. 5198 at 3 (citations omitted). This is not an accurate summary of Ratner's deposition testimony. He testified that he wrote the initial draft of his report. Doc. 5198-2 at 16. Although the final report wound up being about three times longer than his initial draft (*id.* at 18), Ratner testified that he worked "back and forth with [his] attorneys," he "went through and qualified . . . every word in there as being something [he] would approve of," and he used "much the same process [he] would] use in a scientific paper" (*id.* at 16). Ratner spent about 50 hours working on the report. *Id.* (testifying he spent about two-thirds of his 75 billed hours on the report — it was "very time-consuming").

Ratner's report describes the process he used in forming his opinions. "My analysis began with a comprehensive and systematic review of the relevant scientific literature[.]" Doc. 5198-1 at 4. "I also reviewed depositions of Defendants' current and former employees, as well as design files, testing data and reports, memos, and other historical documents produced by Defendants[.]" *Id.* "Additionally, I personally examined two of Defendants' IPCs," "I synthesized and integrated the findings from all these sources and, on those bases, made the scientific judgments set forth in [my] report based on my background, education, training, and experience." *Id.* He confirmed that "this report sets forth not only my expert opinions, but also explains how my analysis of the scientific literature, internal documents, and other evidence led to and supports those opinions." *Id.*

Courts find Rule 26 satisfied when an expert testifies that he participated in the writing of his report and that it accurately reflects his opinions. *See, e.g.*, *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 477 (9th Cir. 2021) (affirming admission of expert testimony where expert testified "60% of his report was written by counsel" but "he signed his report after reviewing and editing it and determining that it accurately reflected his analysis and opinion with regard to the case"); *Keystone Mfg. Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 567 (W.D.N.Y. 2005) (admitting expert testimony where the expert testified he was "actively and substantively involved in the preparation and content of his report").

Defendants also contend that Plaintiffs' counsel "identified the 'safer alternative designs' and the devices that use those technologies" as discussed in Ratner's report. Doc. 5198 at 3 (citations omitted). This too misstates his testimony. Ratner testified that the designs were identified in his exchanges with the attorneys. Doc. 5198-2 at 4. While the attorneys created a chart listing the designs, this was after Ratner formed his opinions and signed his report, as shown by the fact that he first saw the chart the day before his deposition. *Id*. The Court will not exclude Ratner's testimony under Rule 26.

/ / /

/ / /

## B.     Opinions on Clinical Issues.

Defendants argue that as a biomaterials and polymer scientist, Ratner is not qualified to render opinions on clinical issues.  Doc. 5198 at 5.  They challenge three specific opinions.

### 1.     Cause Opinions.

Defendants argue Ratner is not qualified to opine on "whether Bard IPCs cause thrombosis, infection, or fracture[.]"  *Id.*  They cite two cases that precluded polymer experts from opining about medical complications resulting from the material composition of a medical device.  *See Zetz v. Bos. Sci. Corp.*, 644 F. Supp. 3d 684, 708 (E.D. Cal. 2022) (polymer chemist was "qualified to testify generally that polypropylene is susceptible to oxidation and degrades but [was] not qualified to opine on medical complications caused by polypropylene degradation"); *Roeder v. Am. Med. Sys., Inc.*, No. 20-1051-JWB, 2021 WL 4819443, at *4 (D. Kan. Oct. 15, 2021) ("Both experts have significant experience in polymer science.  However, they are not medical doctors and have not conducted differential diagnoses.  Therefore . . . they are unqualified to offer an opinion regarding medical complications 'resulting from alleged polypropylene degradation.'").

Ratner is not just a polymer expert.  He is a biomaterials scientist whose primary study for 50 years has been "the design of implantable polymeric materials and biomedical devices that are safe and effective for clinical use with patients."  Doc. 5198-1 at 2.  His research has included "biocompatibility, the synthesis of polymeric biomaterials . . . for use in biomedical applications (including central venous catheters, specifically)," and "blood-biomaterial interactions (including . . . thrombus formation, thrombosis, bacterial colonization, biofilm formation, and foreign body reaction)[.]"  *Id.*

Ratner has "designed and developed a zwitterionic surface treatment" that has shown efficacy in reducing "thrombus formation" and which can be bonded to surfaces of "intravenous catheters, including silicone and aliphatic polycarbonate urethane IPCs," to "reduce the biological reactions that lead to material-induced thrombosis and infection."  *Id.*  He has "authored and published well over 560 articles, books, and book chapters,"

7

including 360 peer-reviewed publications, "in the fields of biomaterials science, polymers and surface studies," including the topics of "engineering of biomaterial polymers and surfaces that eliminate and/or significantly reduce biological responses to medical implants . . . to reduce serious clinical complications, like material-induced thrombosis, infection, and mechanical complications." *Id.* at 3.

Given this substantial experience in researching and developing materials for use in medical products to reduce thrombosis, bacterial colonization, and biofilm formation, and his peer-reviewed research on biomaterials and clinical complications, the Court finds by a preponderance of the evidence that Ratner meets the qualification requirements of Rule 702 on the issue of whether Bard IPCs cause thrombosis, infection, or fracture.

Defendants point to Ratner's deposition testimony where he admitted his lack of experience with IPCs. *See* Doc. 5198 at 5. But Ratner has extensive experience with polymer materials which are used in Bard's IPCs and with the use of materials for implantable medical products. Doc. 5198-1 at 2. His lack of direct experience with IPCs does not preclude his opinion on whether the *materials* in Bard's IPCs caused certain medical complications – a topic within his expertise as a biomaterials scientist.

Ratner acknowledged his "strength was in the scientific literature," not the "medical literature," and that counsel provided him with literature to inform him on the clinical side of IPCs. *See* Doc. 5198-2 at 13-14. An expert cannot merely recite the literature of other experts to render opinions. *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023), *aff'd sub nom. Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025). But if Ratner's opinions on whether Bard IPC's cause certain medical complications are confined to his expertise as a biomaterials scientist, the Court finds they are sufficiently supported to satisfy Rule 702.

### 2.    Impacts on Healthcare Systems and Individuals.

Defendants argue Ratner is not qualified to opine on "whether and how [port-complication] outcomes impact individuals or healthcare systems[.]" Doc. 5198 at 5. Ratner opines that catheter-related blood stream infections ("CRBSIs") "significantly

burden the healthcare system" and that "CRBSIs are the 'most costly [health care-associated infections],' based on meta-analyses of scientific literature analyzing the issue." Doc. 5198-1 at 15.  He cites literature in support, but Plaintiffs identify no experience Ratner has in the finances of the healthcare system, and he cannot qualify himself simply by reading literature in preparation for this testimony.  *See In re Roundup*, 2023 WL 7928751, at *3.  Ratner's opinions on the impact of port complications on healthcare systems will be excluded.[1]

### 3.    Alternative Designs.

Defendants argue Ratner is not qualified to opine about "whether any proposed alternative design is 'safer.'"  Doc. 5198 at 5.  Ratner opines that safer alternative designs "significantly reduce" certain IPC-related medical complications.  *See* Doc. 5198-1 at 6 ("Numerous safer alternative designs . . . prevent or significantly reduce protein adsorption, platelet adhesion, thrombus formation, and the FBR, and thus significantly reduce thrombosis."; "Numerous safer alternative designs . . . prevent or significantly reduce bacterial colonization and biofilm formation, and thus significantly reduce CRBSI.").

Ratner's focus as a biomaterials scientist has included studying materials used in biomedical applications, "including central venous catheters, specifically[.]"  *Id.* at 2.  His work centers on understanding how biomaterials interact with the body and can result in complications such as "thrombosis, bacterial colonization, [and] biofilm formation."  *Id.* His peer-reviewed articles include topics on "engineering of biomaterial polymers and surfaces" to eliminate or reduce serious medical complications.  *Id.* at 3.  The Court finds by a preponderance of the evidence that Ratner's 50 years of experience in biomaterials science, studying "the design of implantable polymeric materials and biomedical devices" (*id.* at 2), satisfies Rule 702's qualification requirements for opining on safer alternative designs.

---

[1] Defendants do not cite any opinion of Ratner that discusses "whether and how [port-complication] outcomes impact individuals[.]"  Doc. 5198 at 5.  The Court therefore cannot address this part of their argument.

Caselaw supports this conclusion. Courts have held that biomechanical and biomedical engineers may opine on general causation of medical complications. *See, e.g., Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *9 (S.D.W. Va. Feb. 7, 2015) ("[A]s a biomedical engineer, Dr. Brennan has extensive education and experience in biomaterials generally – which includes polymers – as well as knowledge of how these materials respond when implanted in the human body. . . . Dr. Brennan is qualified to offer opinions on the effect of polypropylene mesh on the human body."); *Lampton v. C. R. Bard, Inc.*, No. 4:19-CV-00734-NKL, 2020 WL 7081107, at *3 (W.D. Mo. Dec. 3, 2020) ("Dr. LaDisa's testimony about the thrombotic event does not go beyond his training and expertise in biomedical engineering."); *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 632 (S.D.W. Va. 2013), *on reconsideration in part* (June 14, 2013) ("Dr. El-Ghannam is qualified by virtue of his education, experience and training as a biomedical engineer to testify as to causation – how the Avaulta mesh 'affects the biological system.'"). It follows that biomaterials scientists such as Ratner can testify about how a medical device affects the biological system and reach conclusions on safer alternative designs.

Defendants argue there is a "critical difference between concepts (like polymer degradation, bacterial adhesion, and platelet accumulation) and clinical outcomes (such as infection and thrombosis)." Doc. 5198 at 6. They contend Ratner "cannot bridge the gap between blood-biomaterial interactions and the clinical performance of Bard IPCs." *Id.* As a non-clinician, Ratner does not have experience diagnosing and treating clinical outcomes, but a primary focus of his work as a biomaterials scientist is considering the clinical outcomes that result from blood-biomaterial interactions. *See* Doc. 5198-1 at 2 ("Primary focuses of my research and development endeavors include . . . blood-biomaterial interactions []including . . . thrombus formation, thrombosis, bacterial colonization, [and] biofilm formation[.]"). He "designed and developed a zwitterionic surface treatment" that is aimed at reducing "material-induced thrombosis and infection." *Id.*

Plaintiffs have shown by a preponderance of the evidence that Ratner is qualified to opine about whether Bard IPCs cause thrombosis, infection, or fracture, and whether any proposed alternative design is safer.

### C.   Methodology Challenges.

Defendants argue Ratner's methodology is unreliable based on the same contentions raised in their Rule 26 challenge (Doc. 5198 at 6-7), which the Court has rejected.  To the extent Defendants argue Ratner's deposition testimony contradicts his report (*id.* at 7 n.2), they are free to cross-examine him on this point, but it is not a basis to exclude his opinions. Defendants raise two other methodology challenges.

### 1.   Document Review.

Defendants challenge Ratner's method of document review, arguing he "identified no objective search criteria subject to validation, rendering his literature search unreliable." *Id.* at 7-8.  Defendants do not cite any deposition testimony where they questioned Ratner on his search criteria.  Ratner testified that his "analysis began with a comprehensive and systematic review of the relevant scientific literature."  Doc. 5198-1 at 4.  And having authored more than 500 publications and worked in the field for 50 years, there is no doubt he is familiar with the scientific literature.  The Court will not exclude his opinion on the basis of an allegedly defective literature review.

Defendants argue "Plaintiffs' counsel provided Dr. Ratner with 50-70% of the literature he reviewed," and that "[g]iven his lack of clinical expertise, he cannot offer opinions based on documents he received from counsel."  Doc. 5198 at 8 (citation omitted). But as set forth above, the Court has found Ratner qualified to opine on clinical outcomes. And experts may rely on facts and data provided by others.  *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1142 (9th Cir. 1997) ("The fact that [an expert's] opinions are based on data collected by others is immaterial; Federal Rule of Evidence 703 expressly allows such opinion testimony."); *Kim v. Benihana, Inc.*, No. 22-55529, 2023 WL 3674673, at *1 (9th Cir. May 26, 2023) ("In arriving at an opinion, an expert may rely on . . . reliable data collected by others[.]"  (citation modified)).

11

Defendants argue Ratner "ignores contrary documents," conducted his document and deposition reviews from "a database containing preselected Bard documents," and "cherry-picked" from that database or otherwise reviewed documents "at random." Doc. 5198 at 8-9. But "[n]othing in Rule 702 or Daubert 'requires an expert to consider every single article on a topic in order to be admitted as an expert.'" *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *3 (D. Ariz. July 1, 2021) (citations omitted) (collecting cases). "[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, 'criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a Daubert motion.'" *Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) (citation omitted).

Defendants may cross-examine Ratner about any perceived shortcomings in his document review, but this is not a basis to exclude his opinions. *McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino v. Bos. Sci. Corp.*, No. 2:13-CV-01617, 2016 WL 2939521, at *7 (S.D.W. Va. May 19, 2016) ("[I]f there are certain device-specific publications that Dr. Galloway failed to review in preparing his expert report, BSC is free to inquire about those publications on cross-examination.").

## 2.    Failure to Conduct Alternative Design Testing.

Defendants challenge Ratner's methodology on the ground that he did not test his alternative designs. Doc. 5198 at 9. They contend "[c]ourts have 'consistently recognized the importance of testing the alternative design as a factor [to be] consider[ed] in evaluating the reliability of the proposed expert testimony.'" *Id.* (quoting *Winters v. Fru-Con Inc.*, 498 F.3d 734, 742 (7th Cir. 2007)). Defendants rely on the Seventh Circuit's *Winters* decision, but acknowledge that *Winters* treats alternative design testing only as one factor to be considered when evaluating the reliability of an expert's opinions. *Id. Winters*

12

confirmed design testing is "not mandated" because Rule 702 is a "flexible inquiry." *Winters*, 498 F.3d at 742 (citation omitted).

The Ninth Circuit similarly does not require an expert to test their alternative designs in all cases. In *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435 (9th Cir. 2017), the Court of Appeals explained that while the expert's "alternative design was *capable* of being tested," the plaintiff permissibly "chose not to do so" because alternative design testing is not required by Rule 702. *Id.* at 440.

Several of Ratner's alternative designs have been tested. *See* Doc. 5758 at 9. For example, the *Iida* 2021 study (Doc. 5198-13) tested the use of a 2-methacryloyloxyethyl phosphorylcholine polymer coating in catheters. This is the same coating present in an alternative design offered by Ratner. *See* Doc. 5198-1 at 143 ("The Orphis CV Kit Neo . . . is a non-fouling safer alternative design to Defendants' unmodified IPCs. As discussed elsewhere in this report . . . , the Orphis is a polyurethane and polyethylene terephthalate IPC with a zwitterionic polymer coating (2-methacryloyloxyethyl phosphorylcholine) ('MPC') on all blood-contacting catheter surfaces.").

As another example, Bard's own testing of catheter coatings in its Thrombodyne study concluded Corline, a thromboresistant Heparin-based coating (*id.* at 84), performed better than other coatings (Doc. 5204-4 at 2, 5). Ratner identifies other manufacturers' catheters with heparin-based coatings as safer alternative designs. *See* Doc. 5198-1 at 85-86 ("Defendants' competitors have manufactured and sold catheters with antithrombogenic properties and/or non-fouling coatings for use on intravenous catheters for decades," including "Celsite Port (Heparin) . . . and Palindrome Emerald catheters (Heparin)."). Further, Plaintiffs cite other examples of Ratner's alternative designs being tested by the scientific community and Defendants. *See* Doc. 5758 at 9 n.3.

Defendants contend Ratner "acknowledges that many of his opinions on alternative design do not consider long-term use and design tradeoffs." Doc. 5198 at 9-10 (citing Doc. 5198-2 at 59-63, 63-69). They claim Ratner acknowledged that a tradeoff for thicker catheter walls is a negative impact on the valve affixed to the catheter. Doc. 5198-2 at 59-

13

63. But Ratner testified the catheter and valve are separate components and that increasing the catheter wall thickness should not affect the valve. *Id.* at 61 ("Q. What do you think happens to the valve . . . if you thicken the walls? A. The valve should be independent. It could be designed to be completely independent of the wall thickness. The valve should have nothing to do with the wall thickness. Q. Why? . . . A. Because the valve is one component, and the walls are another component[.]").

Defendants also claim Ratner acknowledged that the use of mesh to counteract the stiffness caused by a thicker catheter wall would negatively impact the surface of the catheter. *Id.* at 63-69. But Ratner testified that "[i]f [insertion of the mesh is] done correctly, nothing" would happen to the catheter surface. *Id*. at 67.

In short, Defendants' contentions regarding whether Ratner considered the long-term use and design tradeoffs of his alternative designs are appropriate for cross-examination, but they are not a basis for exclusion of his alternative design opinions.

The Court reaches the same conclusion on Defendants contention that Ratner "did not consider the economic feasibility of incorporating his proposed technologies into an IPC." Doc. 5198 at 9-10 (citing Doc. 5198-2 at 52). Ratner does offer a general metric for determining that the cost of a bloodstream infection can outweigh the cost of an alternative design. Doc. 5198-2 at 52 ("I often use this statistic, that a bloodstream infection costs $37,000 and if a $2 increase on a catheter can prevent that, that would be worth the investment.").

Defendants further contend Ratner "does not identify a 'defect-free' design to reduce the risk of infection, thrombosis, and fracture in an FDA-cleared IPC." Doc. 5198 at 10. But Defendants cite no state product liability law that requires an expert to identify a defect-free alternative design, and no Rule 702 authority that imposes such a requirement.

Defendants contend Ratner (1) "does not set out the specifications for his alternative IPC designs or show how they would be technically feasible," (2) "does not provide any criteria that even allow his hypotheses on the safety and efficacy of proposed alternative technologies to be tested," (3) "does not offer objective metrics on how much his proposed

14

designs would reduce the risk of thrombosis or infection," and (4) does not "identify any metric, such as a complication rate or an allowable limit of thrombogenicity, at which a catheter becomes 'unreasonably dangerous' or, conversely, at what point something becomes a 'safer alternative design.'" *Id.* Defendants cite no authority that Ratner was required to make such specific findings for his alternative design opinions to be admissible under relevant state law or Rule 702.

Plaintiffs, like Defendants, need not show that their expert's testimony is perfect, complete, or persuasive. They must show that it satisfies Rule 702 by a preponderance of the evidence. Ratner clears this threshold. His decades of experience in biomaterials science supports the reliability of his design opinions. *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *4 (D. Ariz. Jan. 22, 2018) ("[E]xpert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))). Defendants can present their criticisms of his opinions at trial and the jury will decide whether to believe him.

### D.    Specific Alternative Design Opinions.

Defendants cite two cases for the propositions that an expert's opinion may be excluded if it "is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached" and that the reliability of "individual studies . . . as well as the Plaintiffs' experts' processes for evaluating and weighing the studies" may be considered when deciding whether those studies support the experts' opinions. Doc. 5198 at 10-11 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1168 (S.D. Fla. 2022)). While this may be true in some cases, in this case the argument devolves into a highly detailed credibility debate that must be resolved by the jury.

Defendants challenge three of Ratner's alternative design opinions based on the alleged unreliability of certain data he cites.

///

15

### 1. BioFlo Opinions.

Ratner opines that "AngioDynamics' BioFlo IPC is an 'antithrombogenic safer alternative design to Defendants' unmodified IPCs.'" *Id.* at 11 (quoting Doc. 5198-1 at 86). Defendants argue Ratner's opinion "is not based on a reliable weighing of the cited data." *Id.*

Defendants first argue Ratner's opinion is unreliable because it is inconsistent with AngioDyamic's own claims about its BioFlo IPC. They point to the following two claims of AngioDynamics: (1) "[p]re-clinical in-vitro evaluations do not necessarily predict clinical performance with respect to thrombus formation," and (2) "[t]here is no clinical evidence that establishes the superiority of AngioDynamics' BioFlo PICCs." *Id.* That pre-clinical in-vitro evaluations "do not necessarily predict" clinical performance does not preclude correlation. And that AngioDynamics denied clinical evidence of BioFlo PICCs' superiority – with no indication of what it was being compared to – does not mean that it is not a safer alternative design. References to statements contrary to Ratner's opinions do not create a basis for exclusion. *See McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies.").

Defendants argue that Ratner's opinion that "BioFlo IPCs have lower thrombosis rates than Bard IPCs" unreliably relies on the *Piran* 2014 and *Suleman* 2019 studies because those were "separate observational studies (not a head-to-head comparison) that differed in important ways[.]" Doc. 5198 at 11. They list four differences between the studies: (1) whether pulmonary embolisms were reported in the study, (2) the follow up duration, (3) whether patients on anticoagulants were excluded from the study, and (4) whether the study was retrospective or prospective. *Id.* at 12. Defendants also argue neither study directly compared the Bard and BioFlo devices and that "there is not a statistically significant difference in the primary endpoint rate in *Piran* and *Suleman* if all [pulmonary embolisms] are included." *Id.*

16

Plaintiffs respond by pointing to the studies' similarities. Doc. 5758 at 10-11. ("Both evaluated the same oncology population, endpoint (port-related DVT), and median follow-up period (12 months) at the same institution (Ottawa Hospital), and both excluded patients on therapeutic anticoagulation."). They argue Defendants "misdirect[] to the wrong endpoint – pulmonary embolism, a downstream sequela of thrombosis – rather than the endpoint relevant to material design, port-related [deep vein thrombosis]." *Id.* at 11. Plaintiffs argue that any differences between the studies are undermined by the studies themselves drawing comparative conclusions: after discussing other studies, the *Suleman* study concluded that the lower rate of upper extremity deep vein thrombosis reported in its study might be related to its use of antithrombogenic polymer catheters, such as BioFlo, rather than silicone catheters, such as Bard's ports. *Id.*; *see* Doc. 5198-7 at 5 ("[L]ower reported rate of IVAD-related UEDVT might be related to the use of a device with an antithrombogenic polymer instead of the classic silicone catheter.").

This is a classic credibility issue that Defendants should address through questioning and argument at trial, not through a Rule 702 motion. The same is true for Defendants' argument that "Dr. Ratner's reliance on hospital studies is unavailing given that they are not peer reviewed" (Doc. 5198 at 11) and their argument that Ratner "ignores peer-reviewed literature finding antithrombogenic coatings provide no benefit" (*id.*).

### 2.      Orphis Opinions.

Defendants challenge Ratner's opinion that the Orphis CV Kit Neo ("Orphis"), "a zwitterionic-coated ('MPC') IPC with mesh reinforcement only available in Japan," is a "safer alternative design for fracture, infection, and thrombosis." *Id.* at 13. They contend his Orphis opinion is irrelevant and not supported by the cited data. *Id.*

Defendants contend Ratner cannot opine that Orphis is a safer alternative design because it has not been approved by the FDA for use in the United States. *Id.* They cite cases where the expert was not permitted to opine about alternative designs not available in the United States because such designs were not considered "commercially available," "practicable," or "feasible" under the relevant state law. *See Gomez v. Am. Med. Sys. Inc.*,

No. CV-20-00393-PHX-ROS, 2021 WL 12313068, at *8 (D. Ariz. June 17, 2021) ("[T]he Ultrapro mesh is irrelevant because it was unavailable in the United States at the time of the implantation."); *Wood v. Am. Med. Sys. Inc.*, No. 120CV00441DDDKLM, 2021 WL 1178547, at *10 (D. Colo. Mar. 26, 2021) ("To recover for a claim of negligent design in Colorado, a plaintiff must show . . . [the alternative design] was practicable and available at the time the allegedly dangerous product was sold" and so "testimony about Dynamesh and Ultrapro is inadmissible because neither is available to American patients" (citation modified)).

Other cases permit consideration of an alternative design not cleared by the FDA. *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2327, 2020 WL 1060970, at *3 (S.D.W. Va. Feb. 13, 2020) ("To the extent Ethicon argues that Dr. Klinge's testimony that PVDF was a safer alternative is unreliable because PVDF was not cleared by the FDA, this does not render Dr. Klinge's testimony unreliable."); *cf. Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1330 (N.D. Ga. 2022), *on reconsideration in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023) (explaining that where the defendant argued for exclusion of the alternative design opinion because "a sling with less polypropylene mesh was not available at the time of Plaintiff's implant, so it could not be a safer alternative, . . . [s]ustaining Defendant's objection would require assessing the contours of Georgia law on design defects – an inquiry exceeding Rule 702's analysis of qualification, reliability, and relevance.").

Some jurisdictions are split on whether an alternative design must be commercially available at the time of injury. *Compare Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071, at *7 (S.D. Tex. Mar. 23, 2021) ("This Court did not find any authority in Texas, . . . establishing that lack of FDA approval precludes an alternative design. In fact, the MDL court has repeatedly . . . held that the fact that PVDF was not cleared by the FDA does not render the testimony unreliable nor does it have any bearing on whether PVDF mesh is a safer alternative to other mesh products."), *with Pizzitola v. Ethicon, Inc.*, No. 4:20-CV-2256, 2020 WL 6365545, at *4-5 (S.D. Tex. Aug. 31, 2020) ("In Texas, a plaintiff

18

must prove that a safer alternative design was economically and technologically feasible at the time the allegedly defective product was manufactured. . . . [Plaintiff's safer alternative] designs had not been used or tested by hospitals at the time the Prolift mesh and TVT-O sling were implanted in Plaintiff because the FDA had not yet cleared the use of these designs. Because these designs had not been used or tested, they were not technologically feasible in 2009. Therefore, any alternative designs . . . that had not been cleared by the FDA at the time of implantation cannot be considered safer alternative designs." (citation omitted)).

Defendants cite cases from Arizona, Colorado, and Texas, but they have not tied their argument to the state law that will be applied in any bellwether trial in this MDL. Whether a design defect claim requires showing that alternative designs are commercially available, practicable, or technically feasible is a state-law question Defendants do not address. The Court will not exclude Ratner's Orphis opinion on this ground.

Defendants next contend Ratner's Orphis opinion "does not reliably flow from the cited sources." Doc. 5198 at 13. They claim Ratner's opinion is primarily based on his "misrepresentation of Bard testing" and on the *Iida* study, which they argue poses "significant limitations." *Id.*

Defendants again present a granular critique of a study, claiming there are five "methodological flaws" of the *Iida* study. *Id.* Yet, as argued by Plaintiffs, Bard consulted the *Iida* study in its internal documents without mentioning a flawed methodology. *See* Doc. 5764-5 at 98-101. Defendants also contend the *Iida* study does not support finding Orphis to be a safer alternative design for thrombosis because *Iida* reported no cases of thrombosis, rendering Ratner's opinion speculative. Doc. 5198 at 14. Plaintiffs argue that Ratner "simply noted that *Iida* reported no thrombotic events, which coheres with the non-fouling science underlying the Orphis's coating." Doc. 5758 at 13 (citing Doc. 5198-1 at 98).

In his discussion of *Iida*, Ratner opines that where thrombosis commonly leads to port removal (evulsion) "the significantly lower rate of port evulsion and longer port

availability at six months for the Orphis relative to Defendants IPCs suggests that the Orphis generated fewer such thrombotic complications." Doc. 5198-1 at 98 (citations omitted). He further opines that thrombosis and infection are interrelated, and "the reduction in CRBSI associated with the Orphis necessarily reduces the risk of thrombosis, as the overall lower removal rate and longer availability rate (as compared to Defendants' IPCs) in the *Iida* study reveals." *Id.* (citations omitted). Such inferences, when supported by the *Iida* study among others, are permissible expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993) ("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known.").

Defendants also contend the *Iida* study does not support finding Orphis to be a safer alternative design for fracture because *Iida* "report[s] a single incidence of fracture without identifying whether it was of an Orphis or a Bard catheter." Doc. 5198 at 14. They further contend that Ratner "did not weigh the sample size of n=1 when crediting Bard's testing as support for Orphis as a safer design for fracture," and that he "misrepresents the 2017 comparative testing of ChronoFlex Silk, Orphis, and other devices." *Id.* at 15.

Ratner does not rely on *Iida* for his opinion that Orphis is a safer alternative design for fracture. He treated multiple data sources as "corroborative" of his opinion. Doc. 5758 at 13-14. As argued by Plaintiffs, "[r]egarding Orphis's braided mesh reinforcement, Dr. Ratner relied on: (1) the manufacturers' durability testing, (2) Defendants' internal bench data, and (3) first principles regarding material strength." *Id.* at 13. "Defendants' own testing confirmed Orphis's superior fracture and kink resistance compared to their ChronoFlex and Groshong catheters." *Id.* (footnote omitted).

Again, these are credibility arguments for trial. They do not show Ratner's opinions fail to clear the Rule 702 threshold.

///

///

### 3. Opinions on Non-IPC Designs.

Defendants argue Ratner's opinion that Semprus Sustain Technology ("SST"), "a zwitterionic surfactant (sulfobetaine), is a 'non-fouling safer alternative design to Defendants' unmodified IPCs' for infection and thrombosis is also unreliably drawn from the cited data." Doc. 5198 at 16. They contend the Nylus PICC – the only FDA cleared device with SST – has "different indications for use than those for IPCs[.]" *Id.* But as argued by Plaintiffs, both PICCs and IPCs are central venous catheters ("CVCs") that use coating technologies. Doc. 5758 at 14-15 (citing Doc. 5761-2 at 2-3). All CVCs "provid[e] central venous access. All are placed in central veins, indicated for prolonged use, made from the same polymers, and face similar physiological stresses." *Id.* at 15 (citation omitted). Bard's own Associate Director of Material Science, James Freasier, acknowledged coatings applied to PICCs can be applied to IPCs. *See* Doc. 5762-4 at 3-4 ("Q. And these coatings that are out in the industry, these antimicrobial or antithrombotic coatings that are used in PICCs, they can be applied to port catheters, correct? A. Yes. They can be applied to port catheters." (objection omitted)).

Defendants next contend Ratner unreliably relies on the Nylus PICC because it "was never commercialized in the Unites States." Doc. 5198 at 16. As discussed above, Defendants cite no state law applicable to this MDL requiring a safer alternative design to be commercially available.

Defendants challenge Ratner's reliance on *in vitro* studies and animal studies. They argue Ratner "draws conclusions beyond the limitations" of the Nylus PICC 510(k) summary. *Id.* That summary states that while *in vitro* and short term *in vivo* acute animal studies have demonstrated reduced thrombus accumulation on the Nylus PICC surface compared to an unmodified catheter, "[p]reclinical *in vitro* and animal models do not necessarily predict clinical performance with respect to thrombus accumulation." *Id.*

Defendants similarly take issue with the *Smith* 2012 study, contending the study's canine model used "to test the *in vivo* thrombogenicity of modified PICCs" is unreliable where the authors noted "the highly thrombotic canine model . . . may not be predictive of

21

human response" and "that long-term *in vivo* models 'are not well established for PICC thrombosis[.]'" *Id.*

"[W]hile animal studies are not per se inadmissible, there must be a basis for extrapolating them to the human population." *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *16 (D. Ariz. Aug. 2, 2019) (citation omitted); *Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1397 (D. Or. 1996) (same).  "[E]xperts must consider the differences between the animals studied and human anatomy and physiology." *Davis*, 2019 WL 3532179, at *16.  They "should account for any unique characteristics of the study that might make it less relevant to humans or to the question addressed in the causation analysis." *Id.* (citations omitted).

Ratner explains why the animal studies he cites can reliably be extrapolated to humans.  *Id.*  He distinguishes between *in vitro* studies and *in vivo* studies (*see* Doc. 5198-1 at 12-14), and he considered the limitations of both.  *See, e.g.*, *id.* at 14 ("As with *in vitro* studies, *in vivo* models have limitations, including that they are: (1) less controlled than *in vitro* studies, making it difficult to isolate certain parameters of interest; (2) inherently variable (given biological differences between individual animals or between animals and humans), and (3) more expensive and time-consuming than *in vitro* studies.").  He explains that despite their limitations, "properly designed *in vivo* studies are widely used in scientific research and widely accepted by regulatory agencies, like the FDA, to inform biocompatibility assessments for clinical use." *Id.*  Ratner's discussion of *in vivo* and *in vitro* studies is bolstered by his experience with both kinds of studies.  His research, including hundreds of peer-reviewed publications, "has involved the use of . . . *in vitro* and *in vivo* testing, including, as relevant here, blood loop studies, bacterial assays, and animal studies." *Id.* at 3.  Given Ratner's familiarity with *in vitro* and *in vivo* testing and their respective limitations, the Court will not exclude his Nylus PICC opinion based on his reliance on *Smith* 2012 and the Nylus PICC 510(k) summary.

Defendants also challenge Ratner's opinion that the "DGP" surface modification results in "significant improvements" in thrombus reduction over unmodified catheters.

Doc. 5198 at 16.  They contend Ratner's opinion is unsupported where he mistook an *in vitro* pre-sheep study supporting his opinion for an *in vivo* sheep study, where the former "is not equal to *in vivo* or clinical performance."  *Id.* at 18.  Plaintiffs respond that the mislabeling was a clerical error and that the results of the study remain accurate – a 94% reduction in thrombus – in support of Ratner's DGP opinion.  Doc. 5758 at 17; *see also* Doc. 5198-2 at 40-41.

The pre-sheep study was mislabeled as a sheep study on a chart summarizing Defendants' DGP blood loop studies.  *See* Doc. 5198-1 at 39.  The pre-sheep study nonetheless supports Ratner's DGP opinion.  *See id.*  And the blood loop study chart provided in Ratner's report details six separate studies in support of finding DGP-coated catheters reduce thrombus.  *Id.*  The Court finds by a preponderance of the evidence that Ratner's DGP opinion is supported by sufficient facts and data under Rule 702.  Defendants may cross-examine Ratner about the strength of the studies underlying his opinion, but this is not a basis to exclude it.

Nor is the fact Ratner "omit[ted] a blood loop study showing less significant thrombus reduction with DGP" (Doc. 5198 at 18) a basis for exclusion.  *McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino*, 2016 WL 2939521, at *7 ("[I]f there are certain device-specific publications that Dr. Galloway failed to review in preparing his expert report, BSC is free to inquire about those publications on cross-examination.").

Defendants claim Ratner's non-IPC opinions should be excluded under Rule 702(a) as speculative and "unmoored from the evidence in the case[.]"  Doc. 5198 at 18.  They point to Ratner's "assertions that non-IPC technologies will meet Bard's design and manufacturing requirements, improve the risk-benefit profile, be cleared by FDA, and prove to be feasibly scalable."  *Id.*  But Defendants do not expand on this argument.  Ratner's 157-page report, replete with literature and record citations, does not render his non-IPC opinions "unmoored from the evidence."

23

### E.      Legal Terms and Intent.

Defendants argue Ratner "cannot testify that Bard IPCs are 'defectively designed' or 'unreasonably dangerous,' or that any technologies are 'safer alternative designs'" because these are "terms of art" to be decided by the jury.  *Id.* (quoting *Neumann v. Home Depot U.S.A. Inc.*, 2022 WL 3042914, at *7 (D. Ariz. Aug. 2, 2022) ("Because Plaintiffs assert strict liability claims . . . , Dr. Morse should refrain from characterizing them as 'unreasonably dangerous' and 'defective.'  These are terms of art that will be ultimately determined by the jury." (citation omitted))).  Plaintiffs state Ratner "will not couch his opinions in legal jargon[.]"  Doc. 5758 at 18.  Plaintiffs bring strict liability claims (Doc. 1889 at 50, 54, 58), but the specific legal requirements of those claims will depend on the applicable state law, something Defendants do not discuss.  Defendants can object in specific cases if they believe Ratner's testimony is venturing into legal terminology under the relevant state's law.

Defendants also argue Ratner cannot testify about Bard's intent or state of mind.  Doc. 5198 at 18.  Plaintiffs' counsel assures "he will not opine on Defendants' state-of-mind."  Doc. 5758 at 18; *see also In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." (citation omitted)).  Defendants may object if they believe Ratner ventures into state of mind testimony.

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Ratner (Doc. 5198) is **granted in part** – Dr. Ratner may not render opinions on the impact of port complications upon healthcare systems.  The motion is otherwise **denied**.

Dated this 5th day of March, 2026.

David G. Campbell
Senior United States District Judge

24