**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
|---|---|
| | **ORDER** |
| | **David W. Grainger, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of David W. Grainger, Ph.D. Doc. 5208.[1] The motion is fully briefed and no party requests oral argument. *See* Docs. 5208, 5756, 6027. The Court will grant the motion in part.

## I.     Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication,

---

[1] *See also* Docs. 5211, 5214, 5216, 5217 (additional exhibits to Plaintiffs' motion (Doc. 5208)).

intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

Defendants have identified David W. Grainger, Ph.D. as a biomedical engineering expert.  Dr. Grainger is a current Ole and Marty Jensen Endowed Professor and Chair of Biomedical Engineering at the University of Utah.  Doc. 5208-1 at 4.  He is also a professor of Biomedical Engineering, adjunct professor of Chemistry, adjunct professor in the School of Dentistry, and adjunct professor of Orthopedics at the University of Utah.  *Id.*  Dr. Grainger received his Ph.D. in Pharmaceutical Chemistry at the University of Utah in 1987.  *Id.*  Through his 40-year career, Grainger has developed "areas of research and technical expertise" that are "broadly defined as 'materials in medicine,' including Polymer Biomaterials and Polymer Drug Delivery Matrices, Combination Medical Devices, [and] Implant Infection and Biofilms," among other biomedical focus areas.  *Id.*  Plaintiffs move to exclude Dr. Grainger's opinions under Federal Rule of Evidence 702.

**II.   Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles

and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Plaintiffs do not dispute that Grainger is qualified to render his opinions, but contend his opinions are methodologically flawed, lack a factual foundation, or will be unhelpful to the jury.

**A.    "Contradiction" Opinions.**

Grainger opines that Plaintiffs' materials science expert, Dr. Ratner, "doesn't believe" the opinions offered through his own report, which Grainger opines "consistently contradicts" Ratner's published work and the work of "global experts" in the field of

materials science ("contradiction opinions").  Doc. 5208 at 5 (citing Docs. 5208-1 at 3, 5208-2 at 15).  Plaintiffs argue Grainger "did not employ any scientific method or rely on sufficient facts or data" to reach his contradiction opinions, which they also contend are unhelpful.  *Id.*

**1.    Reliable Methodology.**

Plaintiffs contend Grainger's report "omits reference to any scientific method by which any of his opinions were formulated."  *Id.*  Grainger does not articulate his methodology clearly in his report.  *See* Doc. 5208-1.  But Rule 702 rejects a bright-line approach in determining the reliability of an expert's opinions.  *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules."; "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (citations omitted)).

The Court may consider Grainger's report in its entirety when identifying his methodology.  *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *5 (D. Ariz. Dec. 21, 2017).  This includes considering Grainger's knowledge and experience when determining whether his opinions were informed by reliable principles and methods.  *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)); *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *4 (D. Ariz.

5

Jan. 22, 2018) ("[E]xpert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))).

As mentioned above, Grainger holds an endowed chair in biomedical engineering and is an adjunct professor of chemistry and orthopedics.  He has 40 years' experience in using various materials in medicine, including polymer biomaterials, and experience in implant infection and biofilms.  Doc. 5208-2 at 15.  In preparing his opinions, Grainger conducted a literature search as he reviewed Ratner's report "paragraph by paragraph[.]" *Id.* at 14.  His literature review was informed by substantial scholarly experience.  *See* Doc. 5208-1 at 6 ("I am on editorial boards of several of the highest-ranking peer-reviewed scientific journals in my field[.]"; "I am also a regular journal peer-reviewer for major scientific journals[.]"); *id.* at 7 ("I routinely handle and review hundreds of original scientific manuscripts annually since 1995.").  Grainger has published 244 peer reviewed scientific articles which have been heavily cited by the science community.  *See id.* at 7, 58-71 ("As of April, 2025, I have an Hirsch (H-) index of 73, and my published work has been cited over 21,500 times.").[2]

Grainger testified that his experience in reviewing literature and his history with Ratner informed his view that Ratner did not believe his own opinions, and contradicted himself and global experts.  Doc. 5208-2 at 18-19 ("I pride myself in understanding and remembering the literature. . . . So I used those skills and I used that history and I used my history with Dr. Ratner to make this rationale.").  Grainger concluded Ratner was contradicting himself based on his familiarity with Ratner's work.  *Id.* at 15 ("[W]e have a lot of track record together.  I'm proud of lots of it.  And so when I read this report,  I said, He didn't say that; he said this.  And I read this report and said, He didn't say that; he said this.  And so of course understanding  that I had to document my assertions, I went  and

---

[2] The Hirsch index "is utilized as an indicator of 'individual scientific achievement[.]'" Taimur Saleem, *The Hirsch index - A Play on Numbers or a True Appraisal Of Academic Output?*, Nat'l Libr. of Med. (July 7, 2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC3224391/.

found the literature that I knew existed."); Doc. 5756-1 at 35 ("I try to say that . . . with some personal knowledge and 40 years of professional experience listening to him and reading his writings, even reviewing his writings, reviewing his proposals, that, wait a minute, this doesn't make sense to me as an expert in this field.").

Considering Grainger's extensive experience in researching and publishing scientific literature, his knowledge in the field of biomedical engineering, and his familiarity with Ratner's work, the Court finds by a preponderance of the evidence that his opinions are supported by a reliable methodology.

Plaintiffs argue that Grainger "consulted his own memory for an instance where he thought Dr. Ratner had once written something different, pulled that prior publication, and cited it as an alleged contradiction with Dr. Ratner's report." Doc. 5208 at 6. But Rule 702 permits an expert to draw from his knowledge and experience to reliably inform his opinion. *See McBroom*, 2021 WL 2709292, at *5 ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (citation omitted)).

For the same reasons, the Court rejects Plaintiffs' argument that Grainger must identify some "communication, . . . document, . . . [or] data" from his relationship with Ratner that reliably informs his contradiction opinions. Doc. 6027 at 7. The case law does not require an expert to memorialize his experience in a record before he can rely on that experience as a basis for his methodology. *See, e.g.*, *Geiger*, 2020 WL 3268675, at *6 ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (citation omitted)).

Plaintiffs argue Grainger's reliance on six publications by Ratner that contradict his opinions is unreliable because they were published two decades ago (2002 to 2007), and Grainger "failed to test or validate his recollection against Dr. Ratner's more recent body of literature." Doc. 5208 at 6. They also argue Grainger's methodology is unreliable because he "makes no mention [of] his prior article lauding Dr. Ratner's 'breakthrough'

[zwitterionic] technology," and he "conducts no literature searches to determine whether Dr. Ratner had further advanced non-fouling coating technology in the ensuing 12 years." *Id.* at 8. This detailed level of critique is suitable for cross-examination, but not for a Rule 702 motion. Plaintiffs' counsel do not get to decide what literature Grainger reviews, nor does Rule 702 require an expert to review every relevant source. *See Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *11 (D. Ariz. Feb. 13, 2023) ("Defendants complain Wert[] . . . did not review 'thousands of pages' they believe are relevant. . . . Defendants do not cite any authority establishing such a rule[.]").

Plaintiffs also argue Grainger's reliance on Ratner's articles published in 2002 through 2007 equates to him "ignoring the innovation that he admits occurred over the past 20 years." Doc. 5208 at 7. But the deposition testimony Plaintiffs cite does not support this argument; Grainger testified only that his knowledge has increased over the past 20 years. *See* Doc. 5208-2 at 8. This does not render his reliance on Ratner's 2002-2007 articles unreliable.

Plaintiffs cite Ratner's scholarship on the concept of biocompatibility as an example of how Grainger's reliance on Ratner's 2002-2007 work is unreliable. Doc. 5208 at 7. Grainger cites Ratner's older scholarship to support his opinion that Ratner "believes biocompatibility is 'not yet' understood and 'impossible to achieve[.]'" *Id.* (citing Doc. 5208-1 at 12). Plaintiffs contend Ratner's more recent work "has fundamentally redefined biocompatibility[.]" *Id.* This too is a credibility argument Plaintiffs may assert at trial. The Court finds by a preponderance of the evidence that Grainger's opinions are supported by a sufficiently reliable methodology.

Plaintiffs contend Grainger's "lack of work on zwitterionic materials over the past decade" compounds the flaws of his methodology. *Id.* Grainger's post-doctoral work, completed in 1988-89, focused on zwitterionic materials. Doc. 5208-2 at 11. And he has performed work with zwitterionic materials at Semprus. *See id.* That this work was not completed in the past decade does not preclude Grainger from drawing on it to inform his opinions today. *See Geiger*, 2020 WL 3268675, at *6 ("An expert's opinion can be based

8

on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (citation omitted)).

Plaintiffs take issue with Grainger's review of the greater body of literature. They argue "[w]hen it comes to the work of others, [Grainger] offers no discernible methodology at all, merely plucking a few citations out of the ether without any systematic review." Doc. 5208 at 7. But Plaintiffs cite no part of Grainger's report demonstrating his failure to apply his methodology when reviewing the work of others.

Plaintiffs clarify they do not argue that Grainger "was obliged to survey all or even most of [Ratner's] literature." *Id.* at 8. They argue only that Grainger's methodology fails where he "relied solely on limited personal recall for his opinions on Dr. Ratner's true views, anchored his portrayal of Dr. Ratner's supposed 'contradictions' to six outdated publications among a universe of hundreds, and followed no process whatsoever for evaluating the broader scientific literature." *Id.* As discussed above, Grainger did not rely solely on personal recall – he consulted literature which he cited in his report, a literature review that was informed by 40 years of experience researching and publishing in the field of biomedical engineering. An expert's experience can reliably inform his opinions. *Geiger*, 2020 WL 3268675, at *6.

## 2. Sufficient Facts or Data.

Plaintiffs argue that "[t]he two factual bases for Dr. Grainger's 'contradictions' opinions – his subjective knowledge of Dr. Ratner and six of Dr. Ratner's decades-old publications – cannot support conclusions about this case." Doc. 5208 at 9. Defendants contend Grainger's opinions are not based on "subjective belief or speculation," but instead "on his over 40 years of specialized knowledge, education, training, and direct experience working alongside Dr. Ratner" and teaching biomedical engineering students. Doc. 5756 at 4.

The Court concludes that Grainger's knowledge and experience from working alongside Ratner over the course of his career can serve as a factual foundation for his opinions. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An

expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion."). Grainger's opinions are further supported by his literature review, demonstrated by references cited throughout his report. *See* Doc. 5208-1. The Court finds by a preponderance of the evidence that Grainger's contradiction opinions are supported by sufficient facts and data.

### 3. Helpful Opinions.

Plaintiffs raise several arguments challenging whether Grainger's contradiction opinions will "help the trier of fact to understand the evidence or to determine a fact in issue." Doc. 5208 at 10 (quoting Fed. R. Evid. 702(a)). Plaintiffs argue Grainger "should not be permitted to act as a credibility judge of sorts by instructing the jury not to believe Dr. Ratner or instructing them on Dr. Ratner's supposed thoughts." *Id.*; *see also* Doc. 6027 at 8. The Ninth Circuit has instructed that while an expert witness "is not permitted to testify specifically to a witness' credibility, we know of no rule barring expert testimony because it might indirectly impeach the credibility of an opposing party's testimony." *Reed v. Lieurance*, 863 F.3d 1196, 1209 (9th Cir. 2017) (citation modified). Grainger can present opinions that contradict Ratner's opinions, including citing Ratner's publications, but Grainger's testimony should not be couched in terms of what Ratner really believes or whether Ratner is testifying truthfully. Plaintiffs may object if they believe Grainger crosses this line. "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 6523833, at *9 (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)).

Plaintiffs argue Defendants "should be precluded from funneling . . . statements [from Ratner's past literature] through Dr. Grainger as a conduit for impeachment." Doc. 5208 at 10. They contend Grainger may not "invite the jury to infer dishonesty . . . by opining that Dr. Ratner's decades-old statements contradict his current opinions." Doc. 6027 at 8. As argued by Defendants, however, "parties are free to question the scientific reliability of conclusions based on the underlying facts of the analysis."

Doc. 5756 at 3 (quoting *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011)). "It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834 (D. Minn. 2011). Again, however, Grainger may not state his opinions in terms of what Ratner really believes or whether he is being honest, and Plaintiffs may object if Grainger does.

The Court disagrees with Plaintiffs' contention that Grainger testifying about Ratner's past statements would "create unfair prejudice, waste time, confuse the issues, and mislead the jury about the science." Doc. 5208 at 10 (citing Fed. R. Evid. 403). Grainger may critique Ratner's methodology and opinions by drawing from Ratner's past publications. *See Aviva Sports, Inc.*, 829 F. Supp. 2d at 834 ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports.").

Plaintiffs also argue that Grainger "should be precluded from offering any variation of testimony that Dr. Ratner's opinions have 'methodological flaws' or are 'scientifically unreliable.'" Doc. 5208 at 10. They cite *Capri Sun GmbH v. American Beverage Corp.*, 595 F. Supp. 3d 83, 142 (S.D.N.Y. 2022), for the proposition that the Court must exclude "terminology in court [that] would imply [opposing expert's] work falls below the legal threshold for admissibility." *Id.* at 11. Plaintiffs point to Grainger's statement that his rebuttal opinions "highlight the methodological flaws in Dr. Ratner's report, which make his 'safer alternative' claims scientifically unreliable . . . from an engineering standpoint." *Id.* at 10 (citing Doc. 5208-1 at 3). But the scientific reliability of Ratner's opinions is fair game in this trial, as is the scientific reliability of Grainger's opinions. Grainger certainly cannot opine that Ratner's opinions should not have been admitted in evidence, but he is free to criticize Ratner's methodology based on his expertise as a biomedical engineer.

### B. Dismissing Ratner's Scientific Evidence as "Invalid."

Grainger's report includes the following heading: "Dr. Ratner provides no valid scientific evidence that the coatings and technologies he advocates in his report are safe

and effective or commercially viable for IPCs." Doc. 5208-1 at 12.  Plaintiffs contend this opinion is methodologically flawed for "citing isolated and decades-old publications from memory . . . , while disregarding the substantial scientific and industrial progress that has occurred in the interim."  Doc. 5208 at 11.  The Court has rejected this argument above.

What is more, the Court is not persuaded by Plaintiffs' broad framing of Grainger's heading.  Directly under the heading Plaintiffs cite, Grainger provides this opinion:

> Dr. Ratner's assertions in his report regarding biomaterials design principles and materials strategies to improve human implant performance are theoretical, conceptual, and primarily academic. They have not yet been applied to practical implant device engineering and scaled for clinical application.  These principles and strategies have not been validated at scale under the quality systems required for all device translations to humans, nor have they been tested to withstand necessary sterilization, manufacturing, or scaled coating technological deployment.

Doc. 5208-1 at 12.

The Court will not exclude this testimony.  "It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports."  *Aviva Sports, Inc.*, 829 F. Supp. 2d at 834.  Grainger's opinion is supported by the same methodology as his other opinions – 40 years of experience in biomedical engineering and in researching, reviewing, and publishing scientific literature.

His opinion is also supported by sufficient facts or data.  Plaintiffs contend that Grainger's opinion "challenge[s] the validity of the scientific evidence presented in Dr. Ratner's report without actually engaging with a single piece of that evidence."  Doc. 5208 at 11.  But as the Court has noted, knowledge and experience alone can serve as a sufficient factual foundation for an opinion.  *See Elosu*, 26 F.4th at 1024.  Grainger's knowledge and experience in biomedical engineering supports his opinions on the clinical viability of Ratner's alternative designs.

Additionally, Grainger provides 28 citations across 7 sources.  *See* Doc. 5208-1 at 12-15.  He points to several publications of Ratner's.  *See id.* at 12.  Defendants discuss in detail the literature Grainger relies on to undermine the clinical viability of Ratner's

alternative designs.  *See* Doc. 5756 at 10-13.  Granted, Grainger cites only Ratner's older publications from 2002 through 2007, and that is fair game for cross-examination and argument, but the Court does not find it to be a basis for exclusion under Rule 702.

Plaintiffs continue to attack the factual underpinnings of Grainger's opinion.  They argue Grainger (1) "does not analyze any of the clinical studies, meta-analyses and systematic reviews, or bench and animal studies relied on by Dr. Ratner to demonstrate the safety, efficacy, and feasibility of those technologies," (2) he only cites two studies on the risks of chlorhexidine, one he misinterprets, and the other does not discuss chlorhexidine, (3) he cites a "recent experimental study" (*Sylvia*, 2018) in support of finding chlorhexidine poorly performing in human use, but the study does not support his position, and (4) the scientific record "includes multiple clinical studies demonstrating that surface-modification technologies" are safe, effective, and commercially viable, contrary to Grainger's opinion.  Docs.  5208 at 12-13, 6027 at 9-10.  As noted in the Court's order on Ratner's proposed testimony, this level of granularity presents a classic credibility question that must be addressed at trial.  If Rule 702 is satisfied, it is not the Court's role to determine the correctness of Grainger's positions.  *See Engilis*, 151 F.4th at 1050.

Plaintiffs argue that even if Grainger's opinion satisfies Rule 702, it should be excluded under Rule 403 because "any probative value is substantially outweighed by the danger of unfair prejudice that would result from allowing Dr. Grainger to offer 'powerful and quite misleading' testimony about the validity of scientific evidence that he admittedly did not review and rely on."  Doc. 5208 at 14.  The Court is not persuaded.  Plaintiffs are fully capable of clarifying the basis and nature of Grainger's opinions during trial, and they certainly can make a Rule 403 objection if they deem it warranted.

### C.    SEM Opinions.

Grainger critiques Dr. El-Ghannam's SEM analysis of Defendants' exemplar and explanted catheters.  Plaintiffs do not challenge most of the criticisms he levels against El-Ghannam's analysis.  *See* Doc. 5208-1 at 32-33.

Plaintiffs do challenge one narrow part of Grainger's rebuttal – his opinion that El-Ghannam's SEM analysis included "excess sample metal coating thickness," and his opinion "from many of Dr. El-Ghannam's SEM images" that El-Ghannam applied an "overly thick layer" of approximately 150nm, resulting in an "excessive sputtered platinum or gold overlayer[.]" *Id.* at 33, 35, 39. Plaintiffs argue Grainger "never provides supporting data, methods, or citations to support" these opinions. Doc. 5208 at 17.

Grainger's primary criticism is that El-Ghannam's report fails to address many technical and scientific issues that affect its reliability, including details regarding the manner in which El-Ghannam coated the sample catheters. *See* Doc. 5208-1 at 32-37. Grainger's critique reflects a detailed understanding of the Denton IV sputter coater used by El-Ghannam, as well as the many technical and scientific issues that must be considered if it is to be used accurately. Grainger opines that El-Ghannam failed to address many of these issues. *Id.*

In the midst of this critique, Grainger includes this opinion:

> As noted in "Figure 2" below, sputtered film thickness for SEM sample preparation varies with multiple variables and between samples based on gas type (argon, nitrogen etc.), metal target source chemistry (gold, platinum or blend), operating vacuum pressure, applied current and sputter time. These factors all affect sputtered metal coating thickness and uniformity and are not included as important experimentally routine, and essential details in the El-Ghannam methods reporting. This vigilance is important as it appears from many of Dr. El-Ghannam's SEM images in his report that the metal coating (platinum and gold as he reports) is applied as an overly thick layer (approx. 150nm, up to 10-fold higher than typically used for optimal SEM non-conducting sample preparation).

*Id.* at 35. Figure 2 then includes a graph depicting metal overlayer sputtering thickness variations from Denton IV sputter coater, as used by El-Ghannam. *Id.* at 38. Grainger also includes Figures 1 and 3 (*id.* at 37-38), which show the "challenges with SEM image interpretation, both qualitatively and quantitively," and in "reliably assessing fine surface feature dimensions and surface textural features, as well as object physical dimensions

under high vacuum compared with low vacuum imaging conditions on non-conducting samples[.]" *Id.* at 36.

Plaintiffs contend Grainger's "only 'examples'" of excessive metal coating thickness "are front-view SEMs" from Defendants' own expert, Dr. Mkhoyan, who admits they cannot be used to estimate coating thickness. Doc. 5208 at 17. Grainger cites Mkhoyan's expert report as information he reviewed in forming his opinions (Doc. 5208-1 at 45), but Grainger's opinion is based on far more. He provides a detailed discussion of the equipment El-Ghannam used to coat Defendants' catheters and the many technical and scientific issues El-Ghannam failed to address, as well as the many other alleged flaws in his opinions. *Id.* at 32-45. The Court cannot conclude that Grainger's opinions are based on insufficient facts and data.

Plaintiffs argue Defendants cannot rely on Grainger having reviewed Mkhoyan's report, "who tested a limited subset of Dr. El-Ghannam's catheter samples," because "Grainger never identified Dr. Mkhoyan's report as the basis for his coating-thickness opinion." Doc. 5208 at 17. But as acknowledged by Plaintiffs, Mkhoyan's report is listed on Grainger's "Materials Reviewed" list. *Id.* And Grainger specifically refers to "many of Dr. El-Ghannam's SEM images." Doc. 5208-1 at 33.

Plaintiffs contend "Rule 702 does not permit an expert to adopt another expert's conclusions without independent validation," and "[n]owhere does Dr. Grainger assess the validity of Dr. Mkhoyan's SEM methods or opinions." Doc. 5208 at 17. But Plaintiffs cite no point in Grainger's report or deposition testimony where he adopts Mkhoyan's conclusions. He reviewed Mkhoyan's report and could use the information it contains, along with his highly detailed critique of El-Ghannam's use of the Denton IV sputter coater, in forming his own opinions. "In arriving at an opinion, an expert may rely on . . . reliable data collected by others[.]" *Kim v. Benihana, Inc.*, No. 22-55529, 2023 WL 3674673, at *1 (9th Cir. May 26, 2023) (citation modified)); *see also In re Bard IVC Filters Prods. Liab. Litig.*, 2018 WL 495188, at *3 (explaining experts "can rely on opinions stated by other experts"); Fed. R. Evid. 703.

15

Plaintiffs argue "Dr. Grainger never acknowledges surface degradation plainly visible in many of Dr. El-Ghannam's SEM images . . . , which could not appear if the coating were truly excessively thick[.]" Doc. 5208 at 17-18.  They contend this failure is significant given that Defense experts Mkhoyan and MacLean "agree that a thick metal layer would obscure such fine detail." *Id.* at 18.  Plaintiffs may cross-examine Grainger on this point, but it is not a basis to exclude his opinions on El-Ghannam's SEM analysis.

### D.    Grainger's Remaining Opinions.

Plaintiffs argue Grainger's "remaining opinions about Dr. Ratner violate Rule 702." *Id.* at 14.

### 1.    FDA Advisory Opinion.

Plaintiffs cite Grainger's opinion that "Endexo has risks that Ratner does not address." Doc. 5208-1 at 29.  This opinion is presented as a heading in Grainger's report, and Plaintiffs contend it should be excluded where it is not supported by facts or data.  Doc. 5208 at 14.

Grainger explains in this section why Endexo has not been clinically proven to have antithrombogenic properties or be "superhydrophobic," as claimed by Ratner, and he contends it therefore is not a viable safer alternative design.  *See* Doc. 5208-1 at 29-31. The risk of Endexo discussed by Grainger is his observation that "the Endexo materials [Ratner] describes as used in the BioFlo catheter exhibit water contact angles consistently below 150°," which would be more liable to "promote protein adsorption and/or microbial Colonization." *Id.* at 30-31.  Grainger supports this opinion by (1) referring to the *Wu* 2021 article relied on by Ratner to define "superhydrophobic," and (2) citing three tables from the patent document for Endexo ("Tables, 2, 4, 6 in Santerre, US patent 6,127,507, Oct. 3, assignee: Interface Biologics Inc, Canada") (*id.*), which show the contact angle measurements for the Endexo materials which fail to meet the standard for classification as "superhydrophobic."  This portion of his opinion is supported by sufficient facts and data.

Plaintiffs point to Grainger's deposition testimony about an FDA advisory to demonstrate Endexo's risks. Doc. 5208 at 14. Plaintiffs argue this testimony should be excluded because it was not included in Grainger's expert report. *Id.* Defendants respond that it is admissible because the testimony was elicited in Grainger's deposition, relying on the Court's statement in a case management order that the Court "usually permits parties to present opinions of their experts that were elicited by opposing counsel during depositions of the experts." Doc. 114, ¶ II.F. In this case, however, Plaintiffs' counsel did not elicit Grainger's testimony about the FDA advisory. Plaintiffs' counsel asked a simple question: "And you're aware that Endexo is being used on ports today?" Doc. 5208-2 at 23. Grainger answered: "I am aware of that." *Id.* Grainger then proceeded to volunteer that he was "also aware" of recent FDA guidance – something not included in the question – and he spoke at length about it. *See id.* at 23-24. Plaintiffs' counsel immediately moved to strike as nonresponsive. *Id.* at 24. Defense counsel later asked questions to expand Grainger's testimony on the FDA guidance. *Id.* at 25.

Because Grainger's testimony about the FDA advisory was not included in his report or elicited by Plaintiffs' counsel in his deposition, it has not been properly disclosed. Defendants argue briefly that the late disclosure is "substantially justified" because the advisory was released only one week before his deposition. Doc. 5756 at 14. They also suggest the late disclosure was "harmless." *Id.* These appear to be references to Federal Rule of Civil Procedure 37(c)(1)'s standard for allowing late disclosures.

Plaintiffs do not address Rule 37(c)(1), likely because Defendants never cite the rule and Defendants' argument is contained only in a passing sentence. *Id.* But Plaintiffs do attach as an exhibit to their reply the FDA advisory Grainger discussed. *See* Doc. 6027-4. The two-page document is not framed as an FDA "advisory." *See id.* It is titled "PFAS in Medical Devices" and it reassures the reader that PFAS materials – which have been receiving much attention in the press lately as a potential health hazard – are contained in many medical devices but are safe. *See id.* The FDA states "there is no reason to restrict their continued use[.]" *Id.* at 2. The FDA relies on a 2021 independent safety review by

ECRI that surveyed more than 1,750 peer reviewed scientific articles and found "no conclusive evidence of patient health issues" associated with PFAS materials in medical devices. *Id.* at 3.

The Court does not find Grainger's untimely mention of this issue to be substantially justified. Health concerns regarding PFAS materials have been publicly visible for several years and the ECRI independent safety review relied on by the FDA has been available since 2021. Grainger could have addressed this issue in his report. Nor does the Court find the introduction of this new issue to be harmless. When Grainger expanded his testimony in response to defense questioning, he said PFAS materials "used commonly in medical devices are coming under fire by consumer safety groups, by medical safety groups, by patient advocacy groups for unnecessary exposure to contaminating additives that are health-hazardous[.]" Doc. 5208-2 at 26. This does not accurately reflect the FDA document, and it injects an entirely new issue into the case – whether Defendants' ability to use Endexo as a safer alternative IPC is limited by health concerns over PFAS material. That issue, if injected into the case now, would range well beyond the recent FDA document. Expert disclosures are closed, and it would not be harmless to add this new issue to the case now. The Court will exclude Grainger's late-disclosed testimony about the FDA document.

### 2.    *Sertkaya* Reference Opinion.

Plaintiffs argue Grainger should "be precluded from testifying about the cost of bringing a port to market by reference to *Sertkaya* 2022." Doc. 5208 at 14 (citing Doc. 5208-1 at 11). They contend *Sertkaya* 2022 only addresses the cost of developing "novel therapeutic complex medical devices" that require "submission of a premarket approval (PMA) application' to the FDA," and that the alternative designs proffered by Plaintiffs' experts "fall under an entirely different regulatory pathway – the 510(k) clearance process," which was "expressly 'excluded' from *Sertkaya*'s analysis." *Id.* at 14-15. Plaintiffs argue that "[b]ecause *Sertkaya* concerns a device approval framework

inapplicable to ports, it provides no reliable basis for estimating the costs of implementing safer alternative designs for Defendants' ports." *Id.* at 15.

This argument is a serious oversimplification. Whether Plaintiffs' proposed alternative designs could be approved through the 510(k) process because there is a suitable predicate device on the market, or whether Plaintiffs' alternatives, when used for the first time in IPCs, would require PMA clearance, is not known at this time. Grainger opines that efforts to apply various coatings to IPCs have faced a history of failure. Doc. 5208-1 at 9. He provides examples and notes there is no coated IPC that has been cleared by the FDA for use on the U.S. market. *Id.* He observes that while many coatings are proposed in literature and patents, "the success record of most of these biomedical material coatings in long-term human implant use is very limited[.]" *Id.* He observes that the FDA's device-approval process can be less demanding and less costly when proven and approved materials are used, but that the opposite is true when non-clinically tested materials are used. *Id.* at 11. If Grainger's description of this state of affairs is accurate, it is entirely possible that clearance of an IPC with innovative materials could not proceed through the 510(k) process and would require the more demanding PMA route. Against this background, the Court will not exclude Grainger's reliance on *Sertkaya* 2022.

### 2.   Responding to Experts.

Plaintiffs argue Grainger should "be precluded from testifying in response to any expert other than Drs. Ratner and El-Ghannam" because Grainger had not seen any of the reports of Plaintiffs' other experts prior to preparing his report, which had a limited scope of "'highlight[ing] the methodological flaws in Dr. Ratner's report' and 'show[ing] that Dr. El-Ghannam's SEM analysis is faulty.'" Doc. 5208 at 15 (quoting Doc. 5208-3 at 3). They argue that any opinions regarding Plaintiffs' other experts would not be based on sufficient facts and data and should be excluded under Rule 702(b).

Grainger stated in his report that it was limited to rebutting Ratner and El-Ghannam. Doc. 5208-1 at 3. His report responds only to those opinions. *Id.* Yet, when asked during his deposition whether anything in his report "criticizes or comments" on other experts'

opinions that "he didn't have the expert report of," Grainger answered "[o]nly inasmuch as they would overlap with Dr. Ratner's." *See* Doc. 5208-2 at 4-5. Grainger gave the same answer for Plaintiffs' experts Amir Sheikhi, Deborah Leckband, and Brian McVerry.

This imprecise testimony does not provide a basis for Grainger to rebut the opinions of these other doctors. Defendants were required to disclose a "complete statement" of Grainger's opinions as well as "the basis and reasons" therefor. Fed. R. Civ. P. 26(a)(2)(B)(i). Grainger's cryptic deposition statements fail to provide meaningful disclosure with respect to Sheikhi, Leckband, and McVerry. Moreover, neither Grainger nor Defendants claim he read any of their reports. Thus, any rebuttal opinions would lack a factual foundation. The Court will preclude Grainger from opining on the testimony of these other experts.

**IT IS ORDERED t**hat Plaintiffs' motion to exclude the opinions of Dr. Grainger (Doc. 5208) is **granted in part** and **denied in part**. Dr. Grainger may not (1) opine about the FDA advisory or (2) offer testimony in response to any expert other than Drs. Ratner and El-Ghannam.

Dated this 10th day of March, 2026.

David G. Campbell
Senior United States District Judge

20