WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| ———————————————————— | No. CV-23-01975-PHX-DGC |
| Robert Cook, | |
| Individual Plaintiff, | **ORDER** |
| v. | **Darren R. Hurst, M.D.** |
| Becton Dickinson and Company, et al., | |
| Defendants. | |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Darren R. Hurst, M.D. Doc. 5828.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5828, 6236, 6413.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

1

peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue

2

compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Cook brings his lawsuit in this MDL. Doc. 216 (Case No. CV-23-01975-PHX-DGC). On August 24, 2022, Plaintiff had a Bard port implanted, and he subsequently suffered from an infection. *Id.* at 4. Plaintiff raises claims typical of this MDL, alleging the infection was caused by the Bard port. *Id.* at 5.

The parties plan to use various expert witnesses at trial, including medical professionals. Plaintiff has identified Darren Hurst, M.D., as a medical expert. Dr. Hurst is an interventional radiologist. Doc. 5828-4 at 5. He practices as the Chief of Vascular and Interventional Radiology for the St. Elizabeth Health System and holds other radiology-practice positions. *Id.* at 5, 50. He is also an Assistant Professor of Interventional Radiology at the University of Kentucky College of Medicine. *Id.* at 5, 51. Hurst regularly implants and removes port catheters. *Id.* at 5. Defendants move to exclude Hurst's opinions under Federal Rule of Evidence 702.

**II.    Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than

not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Plaintiff moves to exclude several opinions of Hurst.

**A.    Opinions on Plaintiff's Emotional Distress.**

Defendants argue Hurst, an interventional radiologist, "is not qualified to opine on Plaintiff's emotional state." Doc. 5828 at 3 (citation omitted). They additionally argue

that his opinion on Plaintiff's emotional distress is not supported by sufficient facts or data, is unreliable, and is irrelevant.  *Id.* at 4.

Hurst provides the following opinion regarding Plaintiff's emotional distress:

The infection and subsequent explant contributed to [Plaintiff's] . . . pain and suffering, [and] emotional distress . . . . Nursing notes . . .  describe him as "very overwhelmed" and anxious about the cancer and infection (Nurse Grabowski 9/6/22). Deposition testimony confirms the emotional distress: "we both cried," and felt "scared," facing uncertainty day by day after the infection was diagnosed (Potter depo. 69:1–80:16). These . . . psychological impacts directly stem from the catheter-related infection.

Doc. 5828-1 at 9 (footnote omitted).

In his rebuttal report, Hurst opines:

Both [Plaintiff] and his wife testified to the emotional distress caused by the infection. Indeed, the records reflect that they were "very overwhelmed" by his "port infection." These harms were real, disruptive, and directly attributable to his catheter related bloodstream infection and sepsis. As [Plaintiff] testified, he continued to experience emotional distress relating to the fear of infection with his replacement port, and to this day he suffers emotional distress as a result of his infection.

Doc. 5828-2 at 5-6.

"Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor.'" *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992).  A medical doctor's qualification to opine in one area, however, "does not mean he is qualified to testify on all other medical topics." *Gorney v. Safeway Inc.*, No. CV-23-01413-PHX-SHD, 2025 WL 2586133, at *5 (D. Ariz. Sept. 8, 2025) (citation omitted).  Plaintiff must still show by a preponderance of the evidence that Hurst's knowledge, skill, experience, training, or education equip him to opine on Plaintiff's emotional distress.  Fed. R. Evid. 702.

Hurst has no experience, training, or education in diagnosing emotional or psychiatric distress beyond his psychiatry rotations in medical school, which he completed

more than thirty years ago. Docs. 5828-1 at 15, 5828-3 at 33 ("Q. Do you have any specific training, Dr. Hurst, regarding the diagnosis of emotional distress or psychiatric distress to a patient? A. Only my medical training. That's it. Q. Are you a clinical psychologist A. No. Q. When in your medical training did you learn regarding the diagnosis of emotional or psychological distress for a patient as a result of medical care and treatment? A. In medical school. I mean, psychiatry rotations."). His 30-year career has been dedicated to interventional radiology. *See* Doc. 5828-1 at 15. The Court is not persuaded Hurst's long-ago psychiatry rotation qualifies him to opine about Plaintiff's emotional distress.

Plaintiff argues that Hurst "has decades of experience dating back to medical school, when he was trained in the diagnosis of emotional and psychological distress, which he put into practice while doing psychiatry rotations," citing the same deposition testimony quoted above. Doc. 6236 at 4. Hurst's decades of experience are in interventional radiology. He never states in his report or deposition testimony that he was "trained in the diagnosis of emotional and psychological distress[.]" *Id.* Plaintiffs have not shown by a preponderance of the evidence that Hurst – who apparently has never met or talked with Plaintiff – is qualified to diagnose or opine on Plaintiff's emotional injuries.

Plaintiff relies on Hurst's citation of two medical studies in his report, but he does not discuss these studies (*see* Doc. 5828-1 at 9 n.5) and an expert cannot become qualified simply by citing literature. *See In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023), *aff'd sub nom. Engilis*, 151 F.4th 1040.

Plaintiff argues that "[c]ourts routinely hold doctors are qualified" to testify about a patient's emotional distress, but he cites only one Northern District of Georgia case in support. Doc. 6236 at 4 (citing *Giusto v. Int'l Paper Co.*, 571 F. Supp. 3d 1346 (N.D. Ga. 2021)). The Court disagrees with the lax legal standard applied in *Giusto*, especially after the 2024 amendments to Rule 702 which emphasized that courts must find every element of Rule 702 satisfied. *See Giusto*, 571 F. Supp. 3d at 1361 ("Rule 702 takes a liberal

approach to expert witness qualification." (citation omitted)).  The Court will exclude Hurst's emotional distress testimony.

### B.    Alternative Design Opinions.

Defendants argue Hurst is not qualified to opine about the existence of IPC alternative designs.  Doc. 5828 at 6-7.  Defendants incorporate by reference their motion to exclude the opinions of Drs. Hurst and Weinstein in the MDL generally.  *See* Doc. 4832. The Court has ruled on that motion and found Hurst not qualified to opine on IPC alternative designs under Rule 702(a).  *See* Doc. 7196 at 14.

Plaintiff acknowledges that the Court's prior ruling applies to this bellwether case: "any rulings on the admissibility of his general opinions will apply to his testimony in all actions in this MDL, including this bellwether."  Doc. 6236 at 6.  Plaintiff also confirms that Hurst asserts no new alternative design opinions in this bellwether case: "nothing related to alternative designs that Defendants have moved to exclude is newly identified in Dr. Hurst's case specific reports."  *Id.* at 8.  The Court's prior ruling therefore applies to all of Hurst's alternative design opinions in this bellwether case.  The Court will exclude his alternative design opinions.

### C.    Opinions on Plaintiff's or Dr. Frimpong's Use of a Bard Port.

Hurst opines that "neither [Plaintiff] nor Dr. Frimpong possessed, and Bard did not supply, material-specific infection-risk information that more likely than not would have influenced the decision to proceed" with implantation of the Bard port.  Doc. 5828-1 at 8. During his deposition, Hurst clarified that the "decision to proceed" was shared by Plaintiff and Dr. Frimpong.  Doc. 5828-3 at 12 ("Dr. Frimpong serves as the decision-maker with [Plaintiff]. So it's basically both of them [who make the decision to proceed.]").

Defendants argue Hurst's opinion is unreliable and lacking a factual foundation. Doc. 5828 at 10.  They argue that under the Minnesota law governing Plaintiff's bellwether trial, "any warnings run[] to the learned intermediary" – Dr. Frimpong – and not to Plaintiff, and that a failure-to-warn theory fails when "the learned intermediary already knows the risk or would have made the same choice[.]"  *Id.* at 8 (citing *Kapps v. Biosense Webster,*

*Inc.*, 813 F. Supp. 2d 1128, 1152 (D. Minn. 2011); *McDougall v. CRC Indus.*, No. 20-1499 (JRT/LIB), 2023 U.S. Dist. LEXIS 149741, at *26 (D. Minn. Aug. 25, 2023)).  Defendants contend Hurst offered no evidence that Dr. Frimpong would not have made a different choice had he been provided instructions for use ("IFUs") with "material-specific infection-risk information," where Hurst solely relies on his opinion that interventional radiologists are "always looking to keep the risk of infection and thrombosis from [IPCs] . . . as low as reasonably possible," which would include Dr. Frimpong.  Doc. 5828 at 9 (citing Doc. 5828-3 at 14-15).

Plaintiff contends Hurst cites other facts to support his opinion.  He points to Dr. Frimpong's deposition testimony where he agrees that literature suggesting Bard ports have a greater risk of infection than other ports "could . . . have impacted [his] decision to reimplant another Bard port."  Doc. 6236 at 10 (quoting Doc. 6236-1 at 6-7).  This testimony supports Hurst's opinion that, had Dr. Frimpong been supplied with "material-specific infection-risk information" on the Bard port, his decision to proceed "more likely than not would have [been] influenced[.]"  Doc. 5828-1 at 8.  Frimpong's testimony supports a failure-to-warn claim under Minnesota law and provides a sufficient factual basis for Hurst's opinion.  *See also* Doc. 7345 at 19 (denying summary judgment on failure to warn claim in this case because evidence presents a factual question on whether Dr. Frimpong would have made a different implant decision with full disclosure).

Defendants argue "Hurst disregarded facts contrary to his speculative conclusion, including that (1) Dr. Frimpong implanted Plaintiff twice with the same device, once following his infection, and (2) Dr. Frimpong had testified relying on Mayo Clinic's extensive research on devices offered for use by its providers."  Doc. 5828 at 9.  The Court rejected similar arguments in denying summary judgment on the failure to warn claim.  *See* Doc. 7345 at 18-19.  Moreover, Dr. Frimpong twice implanted the Bard port without the benefit of Plaintiff's alleged "material-specific infection-risk information."  And his reliance on Mayo Clinic's research on devices does not preclude him from being influenced

by additional warnings from Bard. Frimpong testified that he expects and relies on manufacturers to provide complete risk information about ports. *See* Doc. 6236-1 at 4-5.

Thus, Defendants' selected facts do not preclude the possibility that additional warnings could have influenced Dr. Frimpong's decision to implant the Bard port. This is a jury question. *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

The Court reaches the same conclusion regarding Defendants' contentions that (1) Hurst "testified he did not recall Dr. Frimpong's testimony that no information presented to him during his deposition . . . would have altered his decision to select the Bard IPC for either of Plaintiff's procedures," (2) "Dr. Frimpong testified that he was aware of the risks of infection associated with port placement," and (3) "[e]ven so, Dr. Frimpong continued to find that the benefits of the IPC outweighed the risks to Plaintiff, in favor of a second placement[.]" Doc. 5828 at 9. None of these facts preclude the possibility that additional warnings could have influenced Dr. Frimpong's decision to implant the Bard port.

The Court rejects Defendants "fit" argument under Rule 702(a) raised in their reply. Doc. 6413 at 4. They argue Hurst's opinion lacks "fit" because "he ignored that Dr. Frimpong has no say in which IPCs Mayo Clinic stocked[.]" *Id.* Defendants do not cite to the record to support their assertion that Mayo had control over the IPCs available to Dr. Frimpong. Even if Dr. Frimpong had no control over the IPCs available to his patients, it does not preclude him from deciding not to implant a certain manufacturer's IPC based on the risks associated with that IPC.

The Court does not follow Defendants' final argument. They argue "Dr. Hurst's own findings contradict his conclusions about what Plaintiff and Dr. Frimpong might have done with alternative warnings. Dr. Hurst's own findings and review seemingly contradict his conclusions regarding the actions Plaintiff and Dr. Frimpong might have taken if

alternative warnings were provided." Doc. 5828 at 9-10. Defendants provide no explanation as to what "findings" they refer to. Even so, any contradiction as to the factual findings underpinning Hurst's findings or conclusions may be raised on cross examination. *See Smilovits*, 2019 WL 6875492, at \*5. The Court finds Plaintiff has shown by a preponderance of the evidence that Hurst's opinion is supported by sufficient facts or data.

### D.    "Reasonable" Actions of Physicians Opinions.

Defendants argue that Hurst's "statements about what 'reasonable interventional radiologists' would prefer are unsupported generalizations that do not rest on data, surveys, or methodology," are unhelpful to the jury, and "stray toward legal conclusions." Doc. 5828 at 10 (citation omitted). This Court in prior litigation found Hurst qualified to opine about the reasonable expectations of physicians. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495189, at \*5 (D. Ariz. Jan. 22, 2018) ("Dr. Hurst's training and years of experience as an interventional radiologist qualifies him to opine on [what reasonable physicians expect from medical device manufacturers]."); *see also In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 11696720, at \*5 (D. Ariz. Dec. 22, 2017) (permitting radiologists to "testify[] about disclosures that reasonable radiologists expect to receive from manufacturers of IVC filters. Such testimony, if relevant, appears to be well within their expertise and experience, and the Court can identify no basis under Rule 702 for precluding it.").

Hurst opines that "if you're a reasonable interventional radiologist, you're going to try and reduce the risk to your patients whenever possible." Doc 5828-3 at 26-27. This opinion is informed by Hurst's 30 years of experience and satisfies Rule 702(c). *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at \*4 (D. Ariz. Jan. 22, 2018) ("[E]xpert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Primiano v. Plaintiff*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))); *Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at \*6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive

experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)).

Hurst also opines that "[r]easonable interventional radiologists would, if reasonably available, prefer and select an implantable port that featured a coated catheter that reduced the risk of infection." Doc. 5828-1 at 8. The admissibility of this testimony is a more complicated question. As the Court held in its previous MDL:

> Whether the doctors should also be permitted to testify about what doctors would have done with additional information seems more problematic. Whether and when to use a particular product appears to be a more fact- and patient-specific decision, not amenable to broad generalizations. The propriety of testimony on this subject will depend heavily on the context and relevancy of the question. The Court will need to draw these lines during trial.

*In re Bard IVC Filters Prods. Liab. Litig.*, 2017 WL 11696720, at *5. The Court reaches the same conclusion here. It will rule on objections when they are made during trial.

Defendants further argue that "Hurst concedes that [his 'reasonable' actions of physicians] opinions are based on simply his experience as an interventional radiologist" and lack any methodology. Doc. 5828 at 10 (citing Doc. 5828-3 at 29) (footnote omitted). But an expert's opinion can be supported by experience alone. *See Geiger*, 2020 WL 3268675, at *6 ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (citation omitted)); *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) ("[C]linical experience [can be] sufficient to satisfy the threshold reliability requirements of Rule 702." (quoting *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018))).

Nor does the Court accept Defendants' contention that Hurst's "reasonable" actions opinions lack a factual foundation. Doc. 5828 at 10. His "experience [as an interventional radiologist] can serve as the requisite 'facts or data'" for his opinions. *See Elosu v.*

11

*Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022).  He did not need to perform a survey to reach his opinions.  *See* Doc. 5828 at 10.

Finally, Hurst's reasonable-actions opinions are not legal conclusions. What doctors might do with additional information is a factual question to be decided by the jury, not a legal issue to be decided by the Court.

**E.    "Supervision" Opinion.**

Defendants challenge Hurst's opinion that Plaintiff's at-home de-accessing procedure was "supervised" by Ms. Oglesbee, a family friend who was a Physician Assistant ("PA").[1]  Docs. 5828 at 11, 5828-1 at 8 ("It was reasonable and appropriate for [Plaintiff] and his wife, after receiving formal training and instructional videos, to de-access the port at home under PA [Ms. Oglesbee's] supervision."), 5828-2 at 4 ("Mrs. Potter testified that . . . their first deaccess at home was supervised by [Ms. Oglesbee], a physician assistant/medical professional who was a family friend.").  Defendants argue this testimony is not supported by facts and data, is unhelpful under Rule 702(a), and "risks confusing the jury about what the lay witnesses actually said" and should be excluded under Federal Rule of Evidence 403.  Doc. 5828 at 11.

Ms. Oglesbee never testified that she supervised Plaintiff's at-home de-accessing. In a portion of her deposition not cited by either party, Oglesbee testified that she "did not supervise" Plaintiff's de-accessing.  *See* Doc. 6241-4 at 3.  Hurst bases his contrary opinion on the fact that Oglesbee "was present for the [de-accessing] procedure" and, if Ms. Potter had questions, "she could ask her."  Doc. 5828-3 at 32.  But his opinion that Oglesbee "supervised" the procedure contradicts Oglesbee's testimony.  Doc.  6241-4 at 3.

Plaintiff argues that Hurst's opinion as a trained interventional radiologist will help the jury.  Doc. 6236 at 12-13.  But this is beside the point.  The unreliability of Hurst's opinion is established by Oglesbee: "I did not supervise. I was just kind of there.  I was not there in an official capacity.  I was just there as a friend, just to be there."  Doc. 6241-4 at

---

[1] Ms. Oglesbee is also referred to as Ms. McGuigan in parts of the record.

3.  The Court will exclude Hurst's testimony that Oglesbee "supervised" the de-accessing procedure.   The Court does not exclude his opinion that at-home de-accessing was reasonable.  If Defendants object to portions of that testimony, they can say so at trial.

**IT IS ORDERED:** Defendants' motion to exclude the opinions of Darren R. Hurst, M.D. (Doc. 5828) is **granted in part and denied in part**.  Dr. Hurst may not opine (1) on Plaintiff's emotional state or that he experienced "emotional distress," (2) on the alternative designs of IPCs, or (3) that Ms. Oglesbee "supervised" Plaintiff's at-home de-accessing procedure.

Dated this 13th day of March, 2026.

David G. Campbell
Senior United States District Judge