WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 <br><br> **ORDER** <br><br> **Expert Witness Donna-Bea Tillman** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Donna-Bea Tillman, Ph.D. Doc. 4829.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5334, 5578.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The FDA applies different levels of scrutiny to medical devices before approving or clearing them for market. The most rigorous level of scrutiny is known as "premarket approval," often referred to as the "PMA" process. 21 U.S.C. § 360e(a). To comply, a manufacturer must file an application that provides the FDA with a broad range of detailed information showing the device is safe and effective. 21 U.S.C. § 360e(c). Medical devices can also be cleared through the less rigorous section "510(k)" review. A manufacturer can satisfy this review and be exempt from the PMA process by providing premarket notice to the FDA that its device is substantially equivalent to another device that is already on the market, typically referred to as a "predicate" device. 21 U.S.C. § 360c(f)(1)(A).

Because the regulatory process for medical devices is beyond the ken of average jurors, it will be helpful to have qualified FDA experts describe how the process works. *See In re Bard IVC Filters Prods. Liab. Litig.,* No. MDL 15-02641-PHX DGC, 2017 WL 5625547, at *6 (D. Ariz. Nov. 22, 2017). Defendants have identified Dr. Tillman as an FDA expert. Tillman has prepared a 134-page report which discusses her qualifications as an FDA expert (Doc. 4829-1 at 7-8), the medical device regulatory background (*id.* at 9-49), the FDA's regulation of implantable ports, including Bard IPCs (*id.* at 49-130), and the opinions of Defendants' FDA experts, Drs. Michael Beatrice and Madris Kinard (*id.* at 131-140). Plaintiffs argue that many of the opinions Tillman offers are inadmissible under Federal Rule of Evidence 702. Doc. 4826.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

III.    **Discussion.**

Plaintiffs argue that (1) Tillman should be precluded from opining on the ultimate legal issue of safety (Doc. 4829 at 3-7); (2) she should be precluded from opining on the FDA's state of mind (*id.* at 7-8); (3) she cannot offer opinions beyond basic FDA regulatory requirements and the exchange of information with the FDA because she failed to review sufficient documents (*id.* at 9-10); (4) she is not qualified to offer certain opinions (*id.* at 10-15); and (5) she should not be permitted to opine that Plaintiffs' experts are unqualified or unreliable (*id.* at 15-17).

   A.    **Safety Issue.**

After the motion and response, Plaintiffs state that only two issues remain from this section of their motion: (1) whether Tillman may testify that the ultimate design of Bard's ports was "safe"; and (2) whether Tillman may testify that by clearing Bard's products, the FDA found them to be "safe and effective."  Doc. 5578 at 3.

On the first issue, Tillman does not claim to be a design expert.  She therefore may not opine that the design of the IPCs was safe.

On the second issue, Tillman may not testify that the FDA found, through the 510(k) process, that Bard IPCs were safe and effective.  She may testify, as Plaintiffs agree, that in clearing an IPC, the FDA determined that it was as safe and effective as its predicate device.  Doc. 4829 at 6.

   B.    **FDA's State of Mind.**

Plaintiffs argue that while Tillman may opine that *she* believes Bard complied with the FDA regulations, she cannot opine that *the FDA* considered Bard to be in substantial compliance with those regulations.  *Id.* at 7-8.  Defendants concede that Tillman cannot opine on the FDA's state of mind.  Doc. 5334 at 8; *see In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Inferences about the intent or motive of . . . others lie outside the bounds of expert testimony." (citation omitted)); *In re Traylsol Prods. Liab. Litig.*, No. 09-MD-01928, 2010 WL 4102247, at *6 (S.D. Fla. Sept. 10, 2010) (excluding opinions about "the FDA's

motive, knowledge, intent, and state of mind" because they fell outside "the scope of [the witness's] knowledge and expertise and are classic jury questions").

Defendants contend, however, that Tillman may testify that the FDA "was satisfied" or "not convinced" or "concerned." Doc. 5334 at 8. The Court does not agree. Such testimony conveys what the FDA was thinking and is impermissible. *See Robinson v. Ethicon Inc.*, No. H-20-3760, 2022 WL 20689753, at *3 (S.D. Tex. Oct. 5, 2022) (expert opinion about what FDA "understood" was impermissible state-of-mind testimony).

The Court will grant Plaintiffs' motion and preclude Tillman from opining on the FDA's state of mind. She cannot opine that the FDA "was satisfied" or "not convinced" or "concerned." Nor can she opine that because the FDA did not ask Bard to change its labeling, the FDA "determined that the labeling met regulatory requirements and provided appropriate risk information and instructions." Doc. 4829-1 at 70; *see* Docs. 4829 at 8, 5578 at 3-4.

### C.    Tillman's Document Review.

Plaintiffs contend that Tillman should be limited to offering opinions about basic FDA regulatory requirements and the documented exchange of information with the FDA. Doc. 4829 at 9. Plaintiffs argue that any opinions beyond that limited scope are based on insufficient facts or data and are unreliable because Tillman did not conduct a "fulsome review of documents." *Id.*

Defendants explain that Tillman strategically chose which documents to review and she thoroughly reviewed every document she deemed important, including FDA Guidance documents and Bard's 510(k) submissions. Doc. 5334 at 8. Defendants also note that Tillman's 134-page report details her analysis in depth and cites hundreds of documents supporting her opinions. *Id.* Plaintiffs do not address these points in their reply. *See* Doc. 5578.

The Court finds by a preponderance of the evidence that Tillman's opinions are based on sufficient facts and data. "[T]here is no legal requirement that experts review every document produced in litigation." *In re Takata Airbag Prods. Liab. Litig.*, No. 15-

MD-02599, 2022 WL 18956175, at *3 (S.D. Fla. Dec. 28, 2022); *see also Kang v. Mayor & Aldermen of City of Savannah*, No. CV421-111, 2024 WL 150082, at *5 (S.D. Ga. Jan. 12, 2024) ("The challenged opinions are not based on insufficient facts or data simply because Register and Vowell did not review every available document before writing their expert reports."); *Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *11 (D. Ariz. Feb. 13, 2023) ("Defendants complain Wert's opinions are not based on 'sufficient facts or data' because he did not review 'thousands of pages' they believe are relevant. . . . Defendants do not cite any authority establishing such a rule[.]" (citation omitted)). Plaintiffs may cross-examine Tillman at trial about documents she did not review. *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

### D. Other Opinions Plaintiffs Seek to Exclude.

Plaintiffs argue that Tillman is not qualified to opine on: (1) cautionary statements in a material data safety sheet ("MSDS"); (2) the sufficiency of Bard's IPC labeling; (3) complaint rates for Bard ports; (4) the feasibility of safer alternative designs; (5) antimicrobial coatings; and (6) determinations by Japanese regulatory agencies. Doc. 4829 at 10-15.

### 1. Cautionary Statements in an MSDS.

Plaintiffs challenge Tillman's opinion that "some raw materials manufacturers put cautionary information in an MSDS regarding the use of the material in medical devices to protect themselves from possible product liability claims." Doc. 4829 at 10 (quoting Doc. 4829-1 at 43). Plaintiffs assert that there is no support for this opinion on the intent of any raw material supplier, let alone DuPont, the relevant supplier that Tillman fails to mention. *Id.*

7

According to Tillman, the fact that raw materials manufacturers put cautionary statements in an MSDS to protect themselves from liability "is well known in the medical device industry[.]"  Doc. 4829-1 at 43.  Tillman explains that she "was aware of this practice" when she was at the FDA, and cites the 1998 Biomaterials Access Assurance Act, which states that some "suppliers have ceased supplying certain raw materials and component parts for use in medical devices for a number of reasons, including concerns about the costs of . . . litigation." *Id.* (citing 21 U.S.C. § 1601).  Tillman also testified that she has "seen instances where there are medical caution statements in MSDS's . . . where nobody has been able to show [her] any scientific basis for why those statements are in there and that [she] believe[s] are due to litigation concerns."  Doc. 5334-1 at 23.  Defendants state that Tillman's challenged opinion is based on her seventeen years of experience at the FDA's Center for Devices and Radiological Health, including several years as the Director of the Office of Device Evaluation.  Doc. 5334 at 9.  The Court finds this experience, and Tillman's stated reasons for her challenged opinion, sufficient to support the opinion.  *See McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))); *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

Plaintiffs argue that Tillman should be precluded from opining on DuPont's warning for Delrin, a POM resin that Bard used in some of its IPCs.  Doc. 4929 at 10-11.  DuPont provides this warning in its MSDS for Delrin: "Caution: Do not use this product in medical applications involving permanent implantation in the human body."[1]  Plaintiffs explain that Tillman conceded at her deposition that she has never spoken with anyone at Bard or

---

[1] *See* Dupont, Delrin, https://www.professionalplastics.com/professionalplastics/content/downloads/Delrin500Properties.pdf (last visited Mar. 16, 2026).

DuPont about the warning, never reviewed any documents showing communications between Bard and DuPont discussing the intent of the warning, and never reviewed any documents showing that Bard informed DuPont that Delrin would be used in Bard IPCs. Doc. 4929 at 10-11.  Defendants do not address this argument in their response.  *See* Doc. 5334 at 9-10.  The Court will preclude Tillman from opining on DuPont's warnings in its MSDS for Delrin.[2]

## 2.    IPC Labeling.

Plaintiffs challenge Tillman's opinion that the "FDA does evaluate … the accuracy of the labeling during its review of 510(k) submissions" and "ensure[s] that required labeling" is "accurate" and "appropriate."  Doc. 4829 at 11 (citing Doc. 4829-1 at 26, 137). Tillman provides numerous examples of the FDA requesting labeling revisions during 510(k) review to include additional risk information.  Doc. 4829-1 at 136-37.  Tillman explains that "these examples clearly illustrate that [the] FDA does evaluate risk information and the accuracy of the labeling during its review of 510(k) submissions."  *Id.* at 137.  The Court will not preclude Tillman from offering this opinion.[3]

Without identifying any specific opinion, Plaintiffs argue that Tillman should be precluded from opining on how the sufficiency of labeling would impact treating physician product selection.  Doc. 4829 at 11.  Defendants make clear that Tillman offers no such opinion.  Doc. 5334 at 12.  The Court will deny Plaintiffs' motion as moot on this issue.

## 3.    Complaint Rates for Bard Ports.

Plaintiffs seek to exclude opinions on the complaint rates for Bard ports.  Doc. 4829 at 12.  Plaintiffs do not dispute Defendants' assertion that Tillman's report contains no such opinions.  Doc. 5334 at 12.  The Court will deny Plaintiffs' motion as moot in this regard.

---

[2] Contrary to Defendants' assertion (*id.* at 10), Tillman's testimony as to whether the FDA had "concerns" about the Delrin Master File constitutes impermissible testimony about the FDA's state of mind.  The Court will not permit such testimony.

[3] According to Plaintiffs, Tillman purportedly acknowledges that the FDA's review of labeling is limited to evaluating a device's intended use rather than the sufficiency of the instructions and warnings.  Doc. 4829 at 11.  But Tillman merely explains that determining the intended use of a device is the FDA's "first step in the substantial equivalence process" and that a 510(k) submission must include labeling "sufficient to describe the device [and] its intended use."  Doc. 4829-1 at 9, 18.

### 4.    Feasibility of Safer Alternative Designs.

Plaintiffs argue that any opinions regarding the feasibility of safer alternative designs should be excluded. Doc. 4829 at 13. Plaintiffs cite several pages of Tillman's report, but fail to identify the specific opinions they seek to have excluded. *Id.*; *see* Doc. 4829-1 at 107-116. A review of the portion of Tillman's report cited by Plaintiffs shows that her opinions relate to Bard's 510(k) submission for its port with an antimicrobial coating. These opinions are based on her regulatory experience at the FDA and are supported by sufficient facts and data. *See* Doc. 5334 at 14. Defendants make clear that Tillman offers no opinion on the feasibility of safer alternative designs from a technical or engineering perspective. *Id.* at 14-15. The Court agrees with Defendants, however, that if proper foundation is laid, Tillman should not be precluded from opining about the feasibility of the FDA *clearing* a safer alternative device. *Id.* at 14; *see* Doc. 4829 at 13.[4]

### 5.    Antimicrobial Coatings.

Plaintiffs challenge Tillman's opinions regarding the feasibility of the FDA clearing ports with antimicrobial coatings given the FDA's "raising the bar" with respect to the level of evidence needed to support antimicrobial technologies. Doc. 4829 at 13-14. Tillman provides the following opinion in this regard:

> My assessment of this series of events is that FDA cleared a small number of CVC catheters with antimicrobial agents in the time period prior to roughly 2010. Around this time, there was an increasing concern about the issue of antimicrobial resistance (e.g., FDA's Draft Guidance "Premarket Notification [510(k)] Submissions for Medical Devices that Include Antimicrobial Agents" published on July 19, 2007), and the regulatory bar for clearance of CVC catheters with antimicrobial agents began to be significantly raised. This conclusion is supported by the fact that several of the devices I described are currently being marketed based on 510(k) clearances that occurred in the 1990s.

Doc. 4829-1 at 39. Tillman similarly opines:

---

[4] But as explained, Tillman will not be permitted to opine on the FDA's state of mind.

10

[B]ased on my experience at FDA and on my review of the relevant regulatory records (discussed above), the nanotechnology concerns do not appear to be the only basis for FDA's NSE decision.  As discussed in detail above in the Section on Antimicrobial Agents, it was around this time that FDA started to publicly express concerns about the issue of Antimicrobial Resistance, and FDA was raising the bar with respect to the level of evidence needed to support antimicrobial claims.  It is my opinion that this was a period of transition for FDA requirements for clearance of devices with antimicrobial agents, and [that] while the Agency had determined that what it had accepted in the past was no longer sufficient, it was still not clear what would be needed in the future.

*Id.* at 115.  Plaintiffs contend that Tillman simply relies on unspecified discussions with unnamed colleagues and that her opinions lack "fit" given the temporal disparity between the time when Bard sought clearance of antimicrobial coatings and the events Tillman discusses in her report.  Doc. 4829 at 13-14; *see* Doc. 4829-1 at 33-34, 36, 107.

Defendants argue that Tillman's opinions are well supported by facts and data and clearly fit the facts of this case.  Doc. 5334 at 15-15.  Defendants note that Tillman's report provides a comprehensive regulatory history of three types of products cleared with antimicrobial coatings from the 1990s to today: (1) wound dressings, (2) CVC catheters, and (3) intravascular administration sets.  *Id.* at 15 (citing Doc. 4829-1 at 32-40).  Tillman also explains that clearances for devices with antimicrobial coatings occurred in the 1990s and the FDA did not clear any other device with antimicrobial coatings before 2010, when Bard received the FDA's "Not Substantially Equivalent" determination for its port with an antimicrobial coating.  *Id.*

Defendants have shown, by a preponderance of the evidence, that Tillman's opinions about the FDA raising the bar with respect to antimicrobial technologies are based on sufficient facts and data and a reliable methodology.  *See McBroom*, 2021 WL 2709292, at *5; *Elosu*, 26 F.4th at 1024.  But as explained, Tillman may not opine on the FDA's state of mind, including the FDA's "concerns" about antimicrobial technologies.  *See Holley v. Gilead Scis., Inc.*, No. 18-CV-06972-JST, 2023 WL 2469632, at *7 (N.D. Cal. Feb. 27, 2023) (explaining that while experts can "testify about their interpretation of the meaning

11

of documents in the regulatory history," they may not opine "on the state of mind of the FDA"); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (an FDA expert can opine on what the FDA did, what it said, and what documents mean, but cannot opine on the FDA's thoughts or motivations).

### 6.    Japanese Regulatory Agencies.

Plaintiffs move to preclude Tillman from opining on determinations made by Japanese regulatory agencies.  Doc. 4829 at 14-15.  Defendants explain that Tillman's opinion is that there can be different warnings in different jurisdictions, and the fact that a warning is required elsewhere does not mean it is required in the United States.  Doc. 5334 at 17; *see* Doc. 4829-1 at 137.  Plaintiffs do not challenge this opinion and it will not be excluded.  Doc. 5578 at 7.

Plaintiffs seek to exclude the opinions in which Tillman discusses the adverse event reports that the Japanese regulatory agency observed for Bard's IPCs, the additional contraindications which it required to be placed on the IPCs sold in Japan, and her view that it was reasonable for Bard not to issue the same warnings to doctors and patients in the United States.  Docs. 4829 at 14, 5578 at 7-8.  Specifically, Plaintiffs challenge the following opinion:

> It is important to note that while there appeared to be increase in the rate of Catheter Break at Stem in Japan, this was a regional issue that was not seen elsewhere.  The root cause analysis suggested that the failure was due to the user "angling and/rocking the cath-loc as it is being advanced on the Ti stem".  The IFU already included a Precaution that "The catheter must be straight with no sign of kinking", and the recommendation was that this be repeated on a hang tag for the device when it is sold in Japan.  It is my expert opinion that Bard's determination that it was not necessary to take any additional measures regarding the devices sold in the US was consistent with the observed facts and the relevant US medical device regulations.

Doc. 4829-1 at 106.  Plaintiffs also challenge Tillman's opinion that the warning to reduce dwell time as instructed by the Japanese regulatory agency "was added to the labeling in Japan due to an elevated adverse event rate that was only seen in Japan[,]" and that she has "not seen any evidence that it was necessary for Bard to add a similar statement to the US

labeling." *Id.* at 137. Plaintiffs argue that Tillman has no experience with Japanese regulatory agencies and she reached these opinions without sufficient facts or data and with no reliable methodology. Docs. 4829 at 15, 5578 at 8.

This is not an opinion about Japanese regulatory agencies; it is an opinion about what warnings should be provided in the United States, sufficiently supported by Tillman's years of experience at the FDA and her familiarity with U.S. medical device regulations. Doc. 4829-1 at 106. The Court does not agree that Tillman lacks a sufficient factual basis or methodology for these opinions. Her FDA experience provides a reliable methodology, and she based her opinion on depositions and documents concerning the Japanese issues in question. *See id.* at 105-06, 136-37. The Court will not exclude the challenged opinion.

**E.    Tillman's Criticisms of Plaintiffs' Experts.**

Plaintiffs argue that while Tillman may disagree with Plaintiffs' experts and even criticize their qualifications and methodologies, she cannot opine that the experts are "unqualified" or "unreliable." Doc. 4829 at 15-17. Defendants make clear that Tillman offers no such opinions. Doc. 5334 at 18. The Court will deny Plaintiffs' motion as moot in this regard.

**IT IS ORDERED:** Defendants' motion to exclude opinions of Dr. Donna-Bea Tillman (Doc. 4829) is **granted in part** and **denied in part**. The motion is **granted** as follows: Tillman cannot: (1) opine that the design of Bard IPCs was safe; (2) opine that the FDA found, through the 510(k) process, that Bard IPCs were safe and effective; (3) opine on the FDA's state of mind; or (4) opine on DuPont's warning in its MSDS for Delrin.

Dated this 18th day of March, 2026.

David G. Campbell
Senior United States District Judge

13