**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Kimberly Trautman** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Kimberly Trautman, M.S. Doc. 4830. The motion is fully briefed and no party requests oral argument. *See* Docs. 5336, 5575. The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

The FDA applies different levels of scrutiny to medical devices before approving or clearing them for market.  The most rigorous level of scrutiny is known as "premarket approval," often referred to as the "PMA" process.  21 U.S.C. § 360e(a).  To comply, a manufacturer must file an application that provides a broad range of detailed information to the FDA showing that the device is safe and effective.  21 U.S.C. § 360e(c).  Other medical devices can be cleared through the less rigorous section "510(k)" review.  A manufacturer can satisfy this review and be exempt from the PMA process by providing premarket notice to the FDA that its device is substantially equivalent to another device that is already on the market, typically referred to as a "predicate" device.  21 U.S.C. § 360c(f)(1)(A).

Because the FDA regulatory process for medical devices is complex and beyond the ken of average jurors, it will be helpful to have qualified FDA experts describe how the process works.  *See In re Bard IVC Filters Prods. Liab. Litig.,* No. MDL 15-02641-PHX DGC, 2017 WL 5625547, at *6 (D. Ariz. Nov. 22, 2017).  Defendants have identified Ms. Trautman as an FDA expert.  She has prepared a 134-page report which discusses her qualifications as an FDA expert (Doc. 4829-1 ¶¶ 21-31); the FDA's regulation standards for Class II medical devices, including IPCs (*id.* ¶¶ 32-64); the FDA's enforcement role (*id.* ¶¶ 65-85); the regulatory history of Bard IPCs (*id.* ¶¶ 86-94); quality management systems ("QMS") and design controls for Bard IPCs (*id.* ¶¶ 95-208); and the reports of Plaintiffs' experts, Drs. Michael Beatrice, Madris Kinard, and Becky Smith (*id.* ¶¶ 209-97).

Trautman opines that: (1) the FDA has stated that the Class II regulatory process for IPCs has been effective in providing reasonable assurance of safety and effectiveness (*id.* ¶ 17); (2) by classifying IPCs as Class II medical devices, the FDA instructed IPC manufacturers to use 510(k) review for market entry (*id.* ¶ 18); (3) Bard substantially complied with regulatory requirements in the United States, including requirements for QMS, medical device reporting, 510(k) review, and risk management systems (*id.* ¶¶ 17-19, 298); (4) the FDA continues to allow Bard IPCs to remain on the market, has expressed no concerns about the safety, design, or labeling of the IPCs, and has the power to take regulatory actions if it found the IPCs were unsafe (*id.* ¶¶ 299-300); and (5) Bard made reasonable efforts to take the FDA requirements seriously and to address issues as they arose over the many decades that its IPCs have been marketed (*id.* ¶ 301).  Plaintiffs argue that some of these opinions are inadmissible under Federal Rule of Evidence 702. Doc. 4826.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023

amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.     Discussion.**

Plaintiffs argue that (1) Trautman is not qualified to opine on the alleged benefits of ports or on port complication rates (Doc. 4830 at 3-4); (2) she should be precluded from opining on the ultimate legal issue of safety (*id.* at 4-7); (3) she should be precluded from opining on the FDA's state of mind (*id.* at 8-9); (4) she cannot offer opinions beyond basic FDA regulatory requirements and the exchange of information with the FDA because she failed to review sufficient documents (*id.* at 9-10); (5) she is not qualified to offer certain opinions (*id.* at 10-16); and (6) she should not be permitted to opine that Plaintiffs' experts are unqualified or unreliable (*id.* at 16-17).

**A.     Port Benefits and Complication Rates.**

Plaintiffs argue Trautman is not qualified to opine on port benefits and complication rates. Doc. 4830 at 3-4. Specifically, Plaintiffs contend that Trautman should not be permitted to testify that ports "are both safer and cheaper" than other central venous access devices, to delineate the purported "[k]nown benefits" of ports, or to opine that ports have a "low complication rate." *Id.* at 3 (quoting Doc. 4830-1 ¶¶ 10-11). Defendants concede that Trautman may not compare ports to other access devices or opine that ports have

benefits compared to the other devices.  Doc. 5336 at 2-3.  The Court will grant Plaintiffs' motion in this regard.

With respect to complication rates, the parties' briefs are ships passing in the night. Defendants argue Trautman is qualified to explain the topic of complication rates to the jury, having written the FDA regulations that requires medical device manufacturers to review and evaluate all complaints.  *Id.* at 3.  They further argue she can testify on the importance of complaint handling and investigation and her thorough review of Bard's complaint handling procedures.  *Id.*  Plaintiffs do not address these issues.  Doc. 5575 at 2-3.

Plaintiffs, on the other hand, focus on Trautman's single-sentence assertion that IPCs have "low complication rates."  *See* Doc. 4830-1 at 10.  Defendants never address this specific statement.  Doc. 5336 at 2-3.

The Court concludes that, based on her FDA experience and her detailed review of Bard documents and procedures, Trautman can explain the topic of complication rates to the jury and can testify on the importance of complaint handling and her review of Bard's complaint handling procedures.  Trautman cannot opine on general IPC complication rates, a topic for which she provides little foundation in her report.  *See* Doc. 4830-1 ¶ 11.

**B.    Safety Issue.**

After the motion and response, Plaintiffs state that only two issues remain from this section of their motion: (1) whether Trautman may testify that the ultimate design of Bard's ports was "safe"; and (2) whether Trautman may testify that by clearing Bard's products, the FDA found them to be "safe and effective."  Doc. 5575 at 3.

On the first issue, Trautman does not claim to be a design expert.  She therefore may not opine that the design of the IPCs was safe.

On the second issue, Trautman may not testify that the FDA found, through the 510(k) process, that Bard IPCs were safe and effective.  She may testify, as Plaintiffs agree, that in clearing an IPC, the FDA determined that it was as safe and effective as its predicate device.  Doc. 4830 at 7.

### C.    FDA's State of Mind.

Plaintiffs argue that Trautman should be precluded from opining on the FDA's state of mind, explaining that while Trautman may opine that *she* believes Bard complied with FDA regulations, she cannot opine that *the FDA* considered Bard to be in substantial compliance with the regulations.  Doc. 4830 at 8.  Defendants concede that Trautman cannot opine on the FDA's state of mind.  Doc. 5336 at 8; *see In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Inferences about the intent or motive of . . . others lie outside the bounds of expert testimony." (citation omitted)); *In re Traylsol Prods. Liab. Litig.*, No. 09-MD-01928, 2010 WL 4102247, at *6 (S.D. Fla. Sept. 10, 2010) (excluding opinions about "the FDA's motive, knowledge, intent, and state of mind" because they fell outside "the scope of [the witness's] knowledge and expertise and are classic jury questions").  The Court will not permit Trautman to opine on what the FDA thought or believed, but she may describe the FDA's actions and the circumstances under which such actions are taken.  This distinction will require the Court to draw lines at trial.[1]

### D.    Trautman's Document Review.

Plaintiffs contend that Trautman should be limited to offering opinions about basic FDA regulatory requirements and the documented exchange of information with the FDA. Doc. 4830 at 9.  Plaintiffs argue that any opinions beyond that limited scope are based on insufficient facts or data and are unreliable because Trautman did not conduct a "fulsome review of documents."  *Id.*

Defendants explain that Trautman strategically chose which documents to review, reviewed almost every document identified in her report, and thoroughly reviewed every

---

[1] As an example, Plaintiffs challenge one of Trautman's specific opinions: "If the FDA found [Bard ports] were unsafe or posed an unreasonable risk to patients, it was within FDA's power to have taken one of the regulatory actions discussed above, which it did not."  Doc. 4830-1 ¶ 300.  Defendants argue that this opinion addresses only objective facts, not FDA's motivations.  Doc. 5336 at 8 (citing *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (an expert can opine on what the FDA did and what it said, but cannot opine on the FDA's motivations)).  Plaintiffs do not address this argument in their reply.  The Court agrees with Defendants' argument and will not exclude this opinion.

document she deemed important. Doc. 5336 at 9. Defendants also note that Trautman's 134-page report details her analysis in depth and cites hundreds of documents supporting her opinions. *Id.* Plaintiffs do not address these points in their reply.

The Court finds by a preponderance of the evidence that Trautman's opinions are based on sufficient facts and data. "[T]here is no legal requirement that experts review every document produced in litigation." *In re Takata Airbag Prods. Liab. Litig.*, No. 15-MD-02599, 2022 WL 18956175, at *3 (S.D. Fla. Dec. 28, 2022); *see also Kang v. Mayor & Aldermen of City of Savannah*, No. CV421-111, 2024 WL 150082, at *5 (S.D. Ga. Jan. 12, 2024) ("The challenged opinions are not based on insufficient facts or data simply because Register and Vowell did not review every available document before writing their expert reports."); *Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *11 (D. Ariz. Feb. 13, 2023) ("Defendants complain Wert's opinions are not based on 'sufficient facts or data' because he did not review 'thousands of pages' they believe are relevant. . . . Defendants do not cite any authority establishing such a rule[.]" (citation omitted)). Plaintiffs may cross-examine Trautman at trial about documents she did not review. *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

### E.    Other Opinions Plaintiffs Seek to Exclude.

Plaintiffs argue that Trautman is not qualified to opine on: (1) cautionary statements in a material data safety sheet ("MSDS"); (2) the sufficiency of Bard's IPC labeling; (3) complaint rates for Bard ports and Bard's use of the FDA's Alternative Summary Reporting ("ASR") program; (4) the feasibility of safer port products; (5) the FDA's "conservative" approach to antimicrobial coatings; (6) Dr. Smith's experiences with IPC complaint reporting practices; and (7) legislative history and the FDA's intent. Doc. 4830 at 10-16.

### 1.    Cautionary Statements in MSDSs, Including DuPont's.

Plaintiffs argue that Trautman should not be permitted to opine that the caution in DuPont's MSDS – that its product should not be used for medical devices implanted in the body – is unscientific and consistent with "suppliers [being] hesitant to provide important device components to the MedTech industry because of the risk of product liability lawsuits." Doc. 4830 at 10 (citing Doc. 4830-1 ¶¶ 165-68). Plaintiffs argue that Trautman has no basis for knowing DuPont's intentions and cites nothing for this opinion. *Id.*

Defendants argue that Trautman's challenged opinion is based on her 24 years of experience at the FDA's Center for Devices and Radiological Health ("CDHR"), and note that her opinion is consistent with the 1998 Biomaterials Access Assurance Act, which states that some "suppliers have ceased supplying certain raw materials and component parts for use in medical devices for a number of reasons, including concerns about the costs of . . . litigation." Doc. 5336 at 10 (citing 21 U.S.C. § 1601). Trautman states that "[t]hroughout [her] career at FDA, [she] had knowledge of several different chemical companies that would add unscientific and unsubstantiated language into [an MSDS] simply to try to avoid liability lawsuits against the chemical company." Doc. 4830-1 ¶ 168. Trautman "knew of many such cases" when she was at the FDA, including a chemical company that made bio-silicone used in breast implants in the 1990s. *Id.*

The Court finds Trautman's experience sufficient to admit her opinion about why chemical companies place disclaimers in their MSDSs. *See McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))); *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

The Court also concludes, however, that Defendants have not provided a sufficient factual basis for Trautman to opine on the reasons for DuPont's warning. She cites nothing

to support this opinion (Doc. 4830-1 ¶ 168), and she conceded at her deposition that she has never spoken with anyone at Bard or DuPont about the warning, never reviewed any documents showing communications between Bard and DuPont about the warning, and never reviewed any documents showing that Bard informed DuPont that its product would be used in Bard IPCs.  Doc. 4930 at 11.  The Court will preclude Trautman from opining on DuPont's warning in its MSDS.[2]

### 2. IPC Labeling.

Plaintiffs argue Trautman should be precluded from opining on the sufficiency of IPC labeling to prevent patient injury or on how it would impact treating physician decisions.  Doc. 4830 at 11.  Defendants make clear that Trautman offers no opinion on the sufficiency of Bard's labeling to prevent injury or on how labeling would impact treating physician product selection.  Doc. 5336 at 12.  The Court will deny Plaintiffs' motion as moot on this issue.

Defendants assert that Trautman will opine that Bard's IPC labelling complied with 21 C.F.R. § 820.  *Id.*  Plaintiffs respond by arguing that Bard fails to explain the relevancy of this opinion (Doc. 5575 at 5), but relevancy was not part of Plaintiffs' original argument on Trautman's IPC opinions (*see* Doc. 4830 at 11-12).

Trautman's report contains a thorough analysis of FDA requirements for labeling in the context of QMS, and her opinion on Bard's compliance with labeling requirements is based on her experience in the FDA's CDHR Office of Compliance.  This provides sufficient factual foundation and reliability for Trautman's opinion, and the Court cannot conclude at this stage that the opinion will be irrelevant, particularly since it is offered in response to Plaintiffs' experts.  *See* Doc. 4830-1 ¶ 210; *see also In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, No. 2:18-CV-1509, 2021 WL 2643109, at *7 (S.D. Ohio June 28, 2021) (reciting Trautman's FDA experience and

---

[2] Defendants argue that Trautman is not offering any opinion on what DuPont intended (Doc. 5336 at 10), but the Court disagrees.  She specifically states that DuPont's warning is consistent with the trend of chemical suppliers seeking to avoid legal liability, a clear assertion that DuPont issued its warning for that reason.  Doc. 4830-1 ¶¶ 165-68.

finding her qualified to opine that the defendants were "in compliance with the QMS regulations"). The Court will deny Plaintiffs' motion on this point.

### 3. Complaint Rates and ASR Program.

This portion of Plaintiffs' motion is imprecise. Plaintiffs argue that Trautman uses her report to "shoehorn in unsupported opinions," citing an 18-page segment of her report. Doc. 4830 at 12 (citing Doc. 4830-1 at 79-98). But they identify only one specific opinion to which they object: "[I]n my experience, there is generally less underreporting for implantable devices as compared to . . . durable medical equipment." *Id*. (quoting Doc. 4830-1 ¶ 191). Plaintiffs argue generically that Trautman should not be allowed to "recite Defendants' litigation talking points," but with no further specificity about which opinions they seek to exclude. *Id.* at 13.

The one opinion Plaintiffs identify is based on Trautman's years of FDA experience. Doc. 4830-1 ¶ 191. She explains that lower underreporting for implantable devices is "due to the direct involvement of surgeons and patient care professionals (including hospital risk managers)." *Id*.; *see also* Doc. 4830-2 at 34 (testifying that "[w]hen they are direct prescription devices, surgical devices, there is a better accountability for the complaints getting to the manufacturers in general"). The Court finds this to be a sufficient basis for her opinion.

Contrary to the argument in Plaintiffs' reply (Doc. 5575 at 6), the Court can find no place in Trautman's report where she offers an opinion on specific complaint rates for Bard ports. Plaintiffs provide the Court with no citation where the opinion is found. *Id.*

Plaintiffs also argue that Trautman should be precluded from opining about Bard's use of the ASR program because she does not know how many device manufacturers used the program or whether other IPC manufacturers used the program. Doc. 4830 at 13. But this lack of knowledge does not render her ASR opinions unfounded. Trautman devotes several pages of her report to the ASR program, its purpose, which types of adverse events manufacturers could submit through the program, and Bard's compliance with its requirements. Doc. 4830-1 at 25, 87-89, 118-26; *see* Doc. 5336 at 13. The Court finds by

a preponderance of the evidence that her ASR opinions are supported by sufficient facts and data and a reliable methodology arising from her experience.

The Court will deny Plaintiffs' motion on these issues.

### 4. Feasibility of Safer Port Products.

Plaintiffs contend that Trautman should be precluded from opining on the feasibility of Bard designing safer port products.  Doc. 4830 at 13.  Plaintiffs cite a few pages of Trautman's report, but fail to identify specific opinions they seek to have excluded.  *Id.*; *see* Doc. 4830-1 at 130-32.  Defendants explain that while Trautman disputes the factual basis of the opinions of Plaintiffs' experts on safer alternative designs, she offers no opinion on the feasibility of a safer alternative design from an engineering or technical perspective.  Doc. 5336 at 13.  The Court will deny Plaintiffs' motion on this issue.

### 5. Antimicrobial Coatings.

Plaintiffs move to exclude Trautman's opinion that the "FDA continues to be conservative in allowing [antimicrobial] claims within cleared 510(k)s."  Doc. 4830 at 14 (quoting Doc. 4830-1 ¶ 285).  Trautman explains that the basis for the opinion is the FDA's "Not Substantially Equivalent" determination for Bard's IPC with an antimicrobial coating and her own experience trying to obtain 510(k) clearance for devices with antimicrobial coatings.  Doc. 4830-1 ¶ 285.  The Court finds this to be a sufficient basis for Trautman's opinion.  She may state her opinion that the FDA has taken a conservative approach to antimicrobial coatings, but she cannot opine on the FDA's mindset or attitudes.  *See* Doc. 4830 at 14, 5575 at 7; *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (FDA expert can opine on what the FDA did, what it said, and what documents mean, but cannot opine on the FDA's thoughts or motivations).

### 6. Dr. Smith's Experiences with IPC Complaint Reporting.

Plaintiffs assert that Trautman criticizes Dr. Smith and the port complaint reporting practices she observed at Duke University Hospital.  Doc. 4830 at 14.  Plaintiffs cite several pages of Trautman's report, but fail to identify specific opinions they seek to have excluded.  *Id.*; *see* Doc. 4830-1 at 132-36.

Defendants explain that Trautman identifies specific errors in Dr. Smith's understanding of mandatory reporting requirements. Doc. 5336 at 14-15. For example, Trautman disagrees with Smith's opinion that "there is no systemic or mandatory reporting of catheter-related complications and healthcare providers, including [her] hospital system, do not typically report such complications to manufacturers." Doc. 4830-1 ¶ 293. Trautman explains that the "FDA has several systemic reporting systems, including the Manufacturer's MedWatch eMDR system," and that the "Safe Medical Devices Act of 1990 requires user facilities to report device-related deaths and serious injuries to the manufacturer or to FDA." *Id.*

The Court will deny Plaintiffs' motion on this issue because Trautman's opinions are sufficiently supported by her extensive FDA experience. Plaintiffs may cross-examine Trautman at trial regarding her work with a cardiologist from Duke University Hospital and material she purportedly relied on in forming her opinions. *See* Doc. 4830 at 14-15.

### 7.    Legislative History and the FDA's Intent.

Plaintiffs argue that Trautman should be precluded from discussing legislative history and the FDA's intent. Doc. 4830 at 15-16 (citing Doc. 4830-1 at 14 (an FDA guidance document "was intended to assist manufacturers in understanding the intent of the design control requirements"); *id.* at 21 (the preamble to a regulation "outlines [the FDA's] intent in its rulemaking")). Defendants explain that Trautman permissibly discusses the QSRs and what they mean based on her personal experience *writing* the regulations, but concede that she cannot opine on the FDA's intent and will not offer an opinion on legislative history. Doc. 5336 at 17-18. The Court will grant Plaintiffs' motion on these specific points. Trautman may testify about the QSRs and what they mean based on her personal experience writing the regulations, but she may not opine on legislative history or the FDA's intent. More precise line drawing must occur at trial.

### F.    Trautman's Criticisms of Plaintiffs' Experts.

Plaintiffs argue that while Trautman may disagree with Plaintiffs' experts and even criticize their qualifications and methodologies, she cannot opine that the experts are

"unqualified" or "unreliable." Doc. 4830 at 16-17. Defendants make clear that Trautman offers no such opinions. Doc. 5336 at 15. The Court will deny Plaintiffs' motion as moot in this regard.

**IT IS ORDERED** that Plaintiffs' motion to exclude opinions of Kimberly Trautman (Doc. 4830) is **granted in part** and **denied in part**. The motion is **granted** as follows: Trautman cannot (1) compare ports to other central venous access devices or opine that ports have benefits compared to such devices; (2) opine on port complication rates; (3) opine that the design of Bard IPCs was safe; (4) opine that the FDA found through the 510(k) process that Bard IPCs were safe and effective; (5) opine on the FDA's state of mind; (6) opine on DuPont's warnings in its MSDS for Delrin; or (7) opine on legislative history or the FDA's intent.

Dated this 19th day of March, 2026.

David G. Campbell
Senior United States District Judge