**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| _____ | No. CV-23-01975-PHX-DGC |
| Robert Cook, | |
| Individual Plaintiff, | **ORDER** |
| v. | **Joan Sorich, M.S.N., R.N.** |
| Becton Dickinson and Company, et al., | |
| Defendants. | |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Joan Sorich, M.S.N., R.N. Doc. 5792. The motion is fully briefed and no party requests oral argument. *See* Docs. 5792, 6235, 6406. The Court will grant the motion in part.

## I.      Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

1

peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue

compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Cook brings his lawsuit in this MDL. Doc. 216 (Case No. CV-23-01975-PHX-DGC). On August 24, 2022, Plaintiff had a Bard port implanted, and he subsequently suffered from an infection. *Id.* at 4. Plaintiff raises claims typical of this MDL, alleging the infection was caused by the Bard port. *Id.* at 5.

Plaintiff has identified Joan Sorich, M.S.N., R.N., as a medical expert. Nurse Sorich has over 40 years of experience as a Registered Nurse. Doc. 5792-1 at 2. Beyond her bachelor's degree in nursing, Sorich received a master's degree in nursing in Adult Health in 1990, which qualified her as an Oncology Clinical Nurse Specialist. *Id.* at 2, 24. She has since spent approximately 35 years practicing as an Oncology Nurse. *Id.* at 2. Sorich has "cared for thousands of patients with Central Venous Access Devices," including ports. *Id.* at 3. She has "significant experience regarding [catheter related bloodstream infections] and infection control measures." *Id.* Sorich is currently the Clinical Nurse Manager of Oncology at the Jamaica Hospital Medical Center. *Id.* at 20. Defendants move to exclude her opinions under Federal Rule of Evidence 702.

/ / /

/ / /

3

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

/ / /

**III.    Discussion.**

Defendants move to exclude several opinions.

**A.    Emotional Distress Opinions.**

Sorich's report includes a subsection titled "Mr. Cook endured past and ongoing pain, suffering, and emotional distress from his [catheter related bloodstream infection]." Doc. 5792-1 at 16.  She states: "I inquired with Mr. Cook about the impact of his infection during our interview on September 17, 2025.  He described how out of all of his cancer treatment . . . [,] that the scariest, most difficult part was his port infection." *Id.* at 16-17. Sorich further states that "[a]s Mr. Cook testified, because his cancer has recurred, he continues to wonder about the impact of that infection on his long-term prognosis." *Id.* at 16.

Defendants argue Sorich cannot opine that Plaintiff's "infection was the 'scariest' part of his cancer treatment" and that his infection "resulted in ongoing concerns about his 'long-term prognosis'" because she "is not qualified to opine on Mr. Cook's emotional distress and repeat descriptions of the same that come solely from Mr. Cook himself." Doc. 5792 at 5, 7.  Plaintiff argues Sorich is qualified by her experience as an oncology nurse to render emotional distress opinions.  Doc. 6235 at 4.  They cite her "over 40 years of experience treating 'thousands' of patients with ports," and her experience with "quality of life during cancer treatment" and "symptom management."  *Id.* (quoting Doc. 5792-1 at 3, 5, 22).

"Ordinarily, courts impose no requirement that an expert be a specialist in a given field, although there may be a requirement that he or she be of a certain profession, such as a doctor." *Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385 (9th Cir. 1992).  A medical expert's qualification to opine in one area, however, "does not mean he is qualified to testify on all other medical topics." *Gorney v. Safeway Inc.*, No. CV-23-01413-PHX-SHD, 2025 WL 2586133, at *5 (D. Ariz. Sept. 8, 2025) (citation omitted).  Plaintiff must show by a preponderance of the evidence that Sorich's knowledge, skill, experience, training, or education qualify her to opine on Plaintiff's emotional distress.  Fed. R. Evid. 702.

When asked if she was "offering the opinion that [Plaintiff's] infection affected his long-term prognosis," Sorich answered, "I'm not equipped to do that nor could I say that[.]" Doc. 5792-2 at 10. She also testified that she was not aware of any evidence in the record "that would support his statement that his long-term prognosis was affected by his infection[.]" *Id.*

Sorich testified that she does not "diagnos[e] or treat psychiatric conditions." *Id.* at 3. She does not "provide therapy sessions to treat patients for anxiety or depression[.]" *Id.* Her role is "emotional support." *Id.*

Plaintiff argues Sorich's deposition testimony "makes clear" her "experience does involve recognizing when patients are in emotional distress, 'asking questions' to help identify such issues, and providing emotional support in response to that condition." Doc. 6235 at 5 (emphasis omitted). The Court acknowledges that Sorich, as an oncology nurse, performs an integral role in patient treatment, including emotional support. *See* Doc. 5792-1 at 16. The Court accepts Sorich's assertion that "there are interventions within [her] scope that support a patient['s] psycho-emotional well-being[.]" Doc. 5792-2 at 3. But experience identifying emotional distress and providing emotional support does not qualify her to opine as an expert on whether Plaintiff – whom she has never treated – suffered "past and ongoing pain, suffering, and emotional distress[.]" Doc. 5792-1 at 16.

The three cases cited by Plaintiff are distinguishable. *See* Doc. 6235 at 5. In *Saldana v. Texas Department of Transportation*, 2015 WL 3952328 (W.D. Tex. June 29, 2015), the nurse had treated patients with psychological disorders, prescribed medication for mental health disorders, and treated the plaintiff for more than 10 years, resulting in her "personal knowledge" of the plaintiff's "symptoms and [her] doctor's diagnoses." *See id.* at *6. By contrast, Sorich does not treat psychiatric conditions because, as she conceded, "[t]hat's not within [her] scope." Doc. 5792-2 at 3. Nor was she a treating nurse of Plaintiff, having only spoken to him for purposes of this litigation. *Id.* at 8.

In *Garrison v. Colvin*, 759 F.3d 995 (9th Cir. 2014), the Court of Appeals did not address the question of whether an expert was qualified under Rule 702. Instead, it

6

concluded only that the administrative law judge in a Social Security disability case had erred in failing to recognize that a nurse practitioner constituted an "other source[]" under Social Security review law that could provide evidence about a claimant's impairment. *Id.* at 1013-14. Further, the nurse in *Garrison* was the plaintiff's "primary psychiatric care giver" and diagnosed her mental health disorders. *Id.* at 1002.

The third cited case, *Richardson v. Methodist Hospital of Hattiesburg, Inc.*, 807 So. 2d 1244 (Miss. 2002), is a Mississippi Supreme Court decision that found a nurse qualified to opine about "whether the inadequate nursing care resulted in worsening [the plaintiff's] *physical* pain and suffering," as opposed to the mental and emotional damages at issue here. *Id.* at 1246 (emphasis added).

Plaintiff has not shown by a preponderance of the evidence that Sorich is qualified to opine about his damages, including emotional distress.[1]

**B.    Opinions on the Severity and Impact of Plaintiff's Medical Conditions.**

Defendants argue Sorich's "opinions on the severity of [Plaintiff's] infection or whether he was cancer-free at a point in July 2022" should be excluded because she concedes she is not qualified to offer such opinions. Doc. 5792 at 8. Defendants first cite Sorich's opinion that Plaintiff suffered from a "life-threatening" infection. Doc. 5792-1 at 16 ("[Plaintiff] was hospitalized for 6 days with a life-threatening infection and sepsis."). When asked during her deposition whether she "intend[s] to offer an independent opinion on the severity of [Plaintiff's] infection," Sorich said "I'm not equipped to do that." Doc. 5792-2 at 11-12. She explained that "[she's] not a physician," and that "a physician would really be the one to" determine the severity of a patient's infection. *Id.* at 11.

Plaintiff asserts, however, that Sorich does not offer a diagnosis opinion. Sorich testified that "[r]ecognizing" Plaintiff had a life-threatening infection "is not [the same as] diagnosing." *See id.* at 12. She instead is "reporting" that Plaintiff had a life-threatening

---

[1] The Court further notes that Sorich offers no analysis in reaching her emotional distress opinions (Doc. 5792-1 at 16-17), and concedes she merely repeats Plaintiff's own statements (Doc. 5792-2 at 8-10). Plaintiff can testify about his own condition. Repeating his statements without expert analysis is not the proper role of a Rule 702 expert.

infection, based not on her own diagnosis but "on what [she] read from the physician notes in [Plaintiff's] medical record." *See id.* at 11. Sorich explained:

> [Plaintiff] was septic and . . . that's a life-threatening condition. . . . I didn't make that up. I didn't decide that. I didn't diagnose that. . . . [T]hat was written . . . in his chart. He . . . had severe sepsis, so I think severe sepsis is severe. . . . [I]t was a pretty bad infection. I only say that based on my past experience as a nurse manager in bone marrow transplant.

Doc. 6235-1 at 6-7.

The Court understands from this testimony that Plaintiff's medical chart reported he had severe sepsis. From this, Sorich concludes he had a life-threatening infection. Sorich explained there is an "established standard" in the medical community for categorizing severe sepsis as "life threatening":

> Severe sepsis is life-threatening. So there are . . . grades of infection. You can say either Grade 1, Grade 2, Grade 3, Grade 4. There is [an Eastern Cooperative Oncology Group] . . . grading scale for toxicities or conditions like this. So severe is life-threatening, and that's an established standard. . . . And it's based on my past experience and familiarity with that set of grading criteria that allows me to say that . . . severe sepsis is life-threatening.

*Id.* at 9.

Sorich's 35 years of experience as an oncology nurse (Doc. 5792-1 at 2), through which she has gained "experience and familiarity" with the Eastern Cooperative Oncology Group ("ECOG") grading criteria for categorizing an infection as life threatening, qualifies her to conclude from Plaintiff's chart that he had a life-threatening infection.[2]

Defendants also object to Sorich's opinion that "[Plaintiff] was free of disease until July 2022[.]" Doc. 5792-1 at 6. They contend she is not qualified to render this opinion.

Sorich agreed in her deposition that she is "not qualified to offer an opinion as to whether [Plaintiff] was free of cancer at any particular point in time," but stated she did not believe she had rendered such an opinion. Doc. 5792-2 at 14. She characterized the

---

[2] The Court notes that while Defendants' infectious disease expert, Dr. Allos, disputes whether Plaintiff suffered from "severe" sepsis despite his treating physician rendering such a diagnosis (Doc. 5864-1 at 12, 15), Defendants do not challenge Plaintiff's diagnosis of "severe" sepsis in this motion or reply.

statement as a summary of what she read in Plaintiff's medical records. *See id*. But Sorich's report does not merely recount what his chart says, it asserts affirmatively that: "Mr. Cook was free of disease until July 2022[.]" *See* Doc. 5792-1 at 6. Because she admits she is not qualified to provide such an opinion, the Court will exclude it.

**IT IS ORDERED:**

1. Defendants' motion to exclude the opinions of Joan Sorich, M.S.N., R.N. (Doc. 5792) is **granted in part and denied in part**. Nurse Sorich may not opine (1) about Plaintiff's emotional distress, or (2) that Plaintiff was free of disease until July of 2022.

2. There being no requests to seal the briefs on this motion, the Clerk's Office is directed to file the motion (Doc. 5792), Plaintiff's response (Doc. 6235), and Defendants' reply (Doc. 6406) on the public docket with the same document number and filing date.

Dated this 23rd day of March, 2026.

David G. Campbell
Senior United States District Judge

9