**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br><br>**ORDER**<br><br>**Deborah E. Leckband, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Deborah E. Leckband, Ph.D.  Doc. 5196.[1]  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5195, 5196, 5746, 6020.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication,

---

[1] Defendants originally filed an unsigned version of their 702 motion with exhibits attached (Doc. 5195).  They then filed a signed version of their 702 motion (Doc. 5196) with no exhibits attached.  Throughout this order, the Court refers to Defendants' signed motion (*id.*) and the exhibits attached to the unsigned version (Doc. 5195).

1

intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

Plaintiffs have identified Deborah E. Leckband, Ph.D. as a biomaterials science expert.  Dr. Leckband holds a Ph.D. in Chemistry.  Doc. 5195-1 at 4.  She has been on the faculty at the University of Illinois in Urbana-Champaign for approximately 30 years and is currently the Reid T. Milner Professor of Chemical and Biomolecular Engineering and Professor of Bioengineering.  *Id.* at 2; Doc. 5195-2 at 3.  Leckband oversees a "research program focused on molecular force measurements of biomaterials, biomolecular (protein) interactions, and cell adhesion."  Doc. 5195-1 at 4.  She has published more than 140 peer-reviewed articles.  Doc. 5195-2 at 15-22.  She serves as an editor of the international journal Colloids and Surfaces B (Biointerfaces) and reviews over 450 manuscripts annually on "biomaterials and nanoparticles engineered to address clinical problems," including infection.  Doc. 5195-1 at 3.  Leckband has held numerous elected positions, including offices in the Biomedical Engineering Society.  *Id.* at 4.  Defendants move to exclude Dr. Leckband's opinions under Federal Rule of Evidence 702.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the

3

trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Defendants challenge several opinions of Leckband.

    **A.    Design Defect Opinions.**

        **1.    Qualifications Under Rule 702(a).**

Defendants argue Leckband exceeds the scope of her qualifications as a biomaterials scientist when she opines that Bard's IPCs are defectively designed and unreasonably

4

dangerous based on risks associated with uncoated polyurethane and silicone catheters. Doc. 5196 at 4 (citations omitted). Defendants contend she never (1) "designed, manufactured, or tested any implantable medical device," (2) "developed any materials specifically for catheters or IPCs," or (3) provided "her proposed coating or design improvements to any medical device manufacturer." *Id.* (citation modified); *see also* Doc. 6020 at 2 (arguing in their reply that Leckband is "not a practicing engineer or clinician," "does not hold any degree in mechanical or biomedical engineering[,] and has no experience in medical device development"). Defendants cite no case law requiring an expert to possess these particular qualifications or experiences to be qualified under Rule 702 to opine on materials used in a medical device, and they acknowledge "Rule 702 does not require narrow sub-specialization." Doc. 6020 at 3.

As explained by Plaintiffs, Leckband's opinions regarding the use of uncoated polyurethane and silicone catheters in Bard's IPCs "address how catheter surface properties trigger or resist the biological reactions that cause thrombosis and infection." Doc. 5746 at 3. Plaintiffs argue Leckband is qualified to render such opinions because her 30-year career has centered on "studying and ultimately neutralizing the mechanistic prerequisites . . . for those material-related complications." *Id.* (citing Doc. 5195-1 at 2-3, 7).

A review of Leckband's experience as a biomaterials scientist demonstrates she is qualified to render her design defect opinions. As a Professor of Chemical and Biomolecular Engineering and Professor of Bioengineering, Leckband supervises a research program "focused on molecular force measurements of biomaterials, biomolecular (protein) interactions, and cell adhesion." Doc. 5195-1 at 3-4. She has served two 4-year terms as a member of the Biomaterials and Biointerfaces (BMBI) and Cell and Molecular Technologies (CMT) study sections of the National Institutes of Health. *Id.* at 4. In these positions, she "reviewed proposals from research teams across the US that addressed biomaterials, . . . biocompatibility, [and] hemocompatibility[.]" *Id.* She has also held elected offices in the Biomedical Engineering Society. *Id.*

Leckband has "experience with in vitro testing of biomaterials and medical devices," and as an editor for Colloids and Surfaces B she "evaluate[s] the rigors of methods used" in "manuscripts documenting the biocompatibility of nanomaterials and biomaterials." *Id.* at 6. She has authored peer-reviewed publications "deal[ing] directly with the types of materials that are used . . . to coat ports and catheters. . . . [i]ncluding polyethylene glycol and zwitterionic materials" (Doc. 5746-1 at 7), and she has consulted for medical device companies on anti-fouling coatings (*id.* at 4-5).

In short, a significant portion of Leckband's work "investigates interactions of materials (biological and synthetic) with proteins, cells, and tissues." Doc. 5195-1 at 2. Such experience and specialized knowledge qualify her to render design defect opinions focused on the biological response to materials used in Bard's uncoated catheters.

Defendants also argue Leckband is not qualified to opine that "Bard's catheter materials cause higher rates of thrombosis, infection, and occlusion than alternative designs" because (1) "she is not a medical doctor, biostatistician, or epidemiologist," and (2) "has no training in clinical trial design and has never developed or overseen human clinical studies for implantable devices." Doc. 5196 at 5 (citations omitted). But Rule 702(a) instructs only that Leckband must be qualified by her "knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702.

Leckband's 30-year career as a biomaterials scientist has equipped her with significant knowledge regarding biomaterials and biocompatibility. She has applied this knowledge in the context of medical devices through the "in vitro testing of biomaterials and medical devices" and consulting for medical device companies, including "regarding anti-fouling coatings." Docs. 5195-1 at 6, 5746-1 at 4-5. Specific focus areas of Leckband's work includes "thrombus formation, bacterial adhesion, . . . zwitterionic materials, . . . non-fouling surface coatings, . . . [and] non-fouling and anti-microbial materials." Doc. 5195-1 at 7. Her specialized knowledge and experience regarding biological responses to catheter materials and the biocompatibility of catheter materials

6

qualify her to opine that Bard's catheter materials cause higher rates of thrombosis, infection, and occlusion than alternative materials.

Defendants' cited case law is distinguishable. In two of their cases, the expert at issue was a polymer chemist and was precluded from opining about medical complications. *See Zetz v. Bos. Sci. Corp.*, 644 F. Supp. 3d 684, 708 (E.D. Cal. 2022) (polymer chemist was "not qualified to opine on medical complications caused by polypropylene degradation"); *Roeder v. Am. Med. Sys., Inc.*, No. 20-1051-JWB, 2021 WL 4819443, at *4 (D. Kan. Oct. 15, 2021) (doctor of chemical engineering and doctor of polymer science "not qualified to offer opinions regarding medical complications"). Although trained in chemistry, Leckband is a biomaterial scientist with years of experience addressing the biological response to polymer materials and related biological complications. Defendants' third case, *Contreras v. Brown*, No. CV-17-08217-PHX-JAT, 2018 WL 7254917, at *3-4 (D. Ariz. Dec. 4, 2018), blocked a specific causation opinion, which Leckband does not render. But the case allowed the expert to opine about "general types" of medical complications. *See id.* at *3 ("Manning would exceed the scope [of] his expertise as a biomechanical engineer by testifying to the medical causation of Plaintiffs' specific injuries, rather than the general types of injuries that may be caused by forces generated in a crash."). Leckband provides such general causation opinions.

Defendants also cite *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *27 (D. Ariz. Aug. 2, 2019), for the proposition that "[w]hen experts rely 'primarily on experience, then [they] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Doc. 5196 at 5. They argue that because Leckband "has no relevant experience to explain," she cannot make this showing. *Id.* Leckband's experience, as laid out above, is relevant to her design defect opinions. Her 48-page report demonstrates how her experience in biomaterials leads to her design defect conclusions, and how that experience is both a sufficient basis for her related opinions and reliably applied to the facts. *See* Doc. 5195-1.

Defendants further contend Leckband is not qualified to opine about "medical risks, patient complications, clinical outcomes, or causation related to IPCs." Doc. 5196 at 5. The Court is hesitant to rule on such a broadly-described set of opinions. Leckband's experience qualifies her to opine on biological responses to IPC materials, the associated biological complications, and the general causation between IPC materials and such biological complications. Defendants may object at trial if they believe Leckband's testimony strays beyond her biomaterials expertise.

Defendants argue that Leckband's design defect opinions should also be excluded under Rule 702(a) because they will not be helpful to the jury. *Id.* They do not explain how Leckband's opinions that Bard's IPCs are defectively designed and unreasonably dangerous based on the catheter materials, and that Bard's catheter materials cause higher rates of certain medical complications, will be unhelpful to the jury in this products liability dispute.

### 2.    Opinion Based on "Personal" Views.

Defendants argue Leckband's "opinion that Bard's IPCs became 'defective' when new technology emerged reflects her personal views, not expert knowledge, and will not help the jury" under Rule 702(a). *Id.* They cite the following statements from her deposition:

- Leckband testified that "even though the benefits [of ports] outweigh the risks, [she] think[s] they could be made safer." Doc. 5195-4 at 41 ("[T]hat's the view in . . . bioengineering. You understand that there are technologies that benefit patients, but you also understand that it is our duty to identify technologies or approaches that reduce or minimize the risk to patients.").

- She testified that "the ports are defective because they do not . . . incorporate the best available technology which has been shown to reduce, say, in this case thrombosis, and so a benchmark for that would be the Orphis MPC-coated port. And that has . . . been shown to have a significant reduction in" infection rate. *Id.* at 51-52.

- She agreed "that when you have a product on the market and a safer product is available, . . . that when a safer device is available, the older product becomes defective[.]" *Id.* at 65-66 ("[T]he safer product is reducing patient risk and that new product starts to set now the standards for the industry.").

Defendants argue these opinions are based on Leckband's "personal views about proper corporate behavior" and are neither helpful to the jury nor based on her specialized knowledge. Doc. 5196 at 6 (citation omitted). Plaintiffs contend that "[n]one of her opinions reflect personal notions of 'proper corporate behavior,'" but instead "draw on a critical mass of independent scientific research and are corroborated by Defendants' own test data." Doc. 5746 at 10 (citation omitted).

The above statements by Leckband do not improperly opine on corporate behavior. Leckband does not frame her opinions in terms of Bard's corporate decision-making.

Defendants alternatively argue Leckband's opinions tend to suggest Bard's IPCs became defective "because there are technologies that might make them safer," but "that is not the law in most jurisdictions." Doc. 5196 at 7 (emphasis and footnote omitted). Defendants cite the law of several states. *Id.* (Florida, New York, Missouri, Michigan, Oklahoma, Texas, and New Jersey). They acknowledge that "this is a state specific issue" and reserve the right to raise this argument on a case-specific basis. *Id.* at 7 n.2. As Defendants seem to recognize, the Court cannot entirely exclude Leckband's opinions when exclusion depends on applicable state law, and they have not addressed the law that will apply in any of the six bellwether trials.

Defendants separately seek to exclude Leckband's opinions that "foray[] into Bard's internal decisionmaking, intent, and motives, claiming Bard 'knew' about complications but declined changes for business reasons." *Id.* at 6 (citations omitted). They cite 23 pages of Leckband's report and rebuttal report, and 3 pages of her deposition testimony. The Court will not exclude 26 report and deposition pages on the basis of this nonspecific argument. Defendants can object at trial if they believe Leckband's testimony enters state-of-mind territory.

Defendants also seek to exclude Leckband's opinions as narrative. *Id.* at 6-7. This objection must also be raised at trial. *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *8 (D. Ariz. Dec. 21, 2017) ("The objection that testimony is 'narrative' is an objection as to form, foundation, or responsiveness, and must be presented at trial." (citation omitted)).

### 3.      Factual Basis and Reliable Methodology.

Defendants argue Leckband's "design defect opinions lack a reliable factual basis" and are not supported by a reliable methodology. Doc. 5196 at 8. Defendants primarily challenge her opinion that "the polyurethane and silicone materials used in Bard's IPCs cause thrombosis and infection at higher rates than alternative coatings would have." *Id.* (citations omitted). They argue this opinion is not factually supported where "[s]he reviewed approximately 911 out of over 2 million documents produced[.]" *Id.* (citation omitted). Of course, reviewing two million documents is not feasible. Leckband testified that she had access to a database containing two million Bard documents produced in this litigation, and conducted her own searches to identify those relevant to her opinions. *See* Doc. 5746-1 at 14-18. Some of the 911 documents she reviewed were provided by Plaintiffs' counsel, but more than half were found through her own searches. *Id.* at 18. More than 900 documents provides a sufficient factual basis for Leckband's opinion. "[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a Daubert motion." *Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) (citation modified).

Defendants criticize Leckband's document review, arguing she "read portions of five engineer depositions while ignoring over 15 others" that she conceded "could contradict her opinions." Doc. 5196 at 8 (citations omitted); *see also* Doc. 6020 at 5-6. But Leckband selected the depositions she reviewed based on her review of other Bard

documents and specifically to identify those most relevant to her opinions. *See* Doc. 5746-1 at 22-27.

Citing two studies she allegedly overlooked, Defendants argue Leckband's literature review was also selective. Doc. 6020 at 8 ("[T]he record shows [Leckband's] selective uptake of favorable studies and disregard of contrary evidence"). This is not a basis for exclusion. *See McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *4 (D. Ariz. July 1, 2021) ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino v. Bos. Sci. Corp.*, No. 2:13-CV-01617, 2016 WL 2939521, at *7 (S.D.W. Va. May 19, 2016) ("[I]f there are certain device-specific publications that Dr. Galloway failed to review . . . , BSC is free to inquire about those publications on cross-examination.").

Nor will the Court exclude Leckband's opinions because some 95% of the documents on her materials considered list also appear on Plaintiffs' other experts' lists. Doc. 6020 at 6. When counsel prepare a large case for trial and work with multiple experts in the process, as they are allowed to do, such overlap is not a surprise. And beyond her document and literature review, Leckband's 30 years of experience as a biomaterials scientist, studying the "properties of biomaterials" and "fundamental surface properties that impact material performance and biocompatibility" (Doc. 5195-1 at 2), supports her design defect opinions. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

Several of Defendants' other arguments are unpersuasive.

- Defendants argue that "Leckband admit[ted] she cannot quantify any reduction in complication rates from her proposed alternatives." Doc. 5196 at 8 (citation omitted). But as confirmed by Leckband, her opinion is "not quantitative, it's relative." *Id.* at 8-9 (citing Doc. 5195-4 at 42).

11

- Defendants acknowledge Leckband "cites some scientific articles and laboratory studies suggesting that surface chemistry can influence protein adhesion (and that protein adhesion can in theory promote clotting)," but argue that she must provide data "bridging" the cited scholarship "to actual patient outcomes with Bard's IPCs." *Id.* at 9 (emphasis omitted). Defendants cite no case law in support of this argument. If Leckband's opinion that Defendants' IPCs are made of defective materials satisfies Rule 702, however, it is not inadmissible because it does not go as far as it could, or as Defendants think it should.

- Nor is she required to (1) "consult[] on, conduct[], or publish[] clinical trials that showed a reduction in thrombosis or infection would occur if Bard used different coating materials," (2) identify "head-to-head clinical trial studies" demonstrating the same, or (3) offer "facts or data to isolate how much (if any) additional risk is attributable specifically to Bard's use of uncoated polyurethane or silicone as opposed to other [patient-specific] factors." *Id.* (citations omitted). Defendants cite no case law to support these contentions. This argument suggests an expert's opinion must be perfect and complete before being admissible, but that is not the requirement of Rule 702.

- Defendants argue Leckband "performed zero testing of Bard's IPCs or of any of her proposed alternative designs to determine whether Bard's IPCs actually have higher complication rates or whether her suggested technologies would reduce those rates." Doc. 5196 at 9-10 (citations omitted). But an expert is not required to test their alternative designs in all cases. In *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435 (9th Cir. 2017), the Court of Appeals explained that while the expert's "alternative design was *capable* of being tested," the plaintiff permissibly "chose not to do so" because alternative design testing is not required by Rule 702. *Id.* at 440.

- Nor was Leckband required to (1) "examine[] or handle[] any of the alternative design devices she advocates Bard should have used," (2) "publish[] or subject[]

12

to peer-review her opinions that uncoated Bard IPCs have increase[d] thrombosis or infection risk," or (3) "develop[] any materials specifically for catheters or IPCs." Doc. 5196 at 10-11 (citations omitted). Leckband's review of 911 Bard internal documents, five engineer depositions, and relevant medical literature (with a focus on peer reviewed journals (Doc. 5195-1 at 7)), combined with her decades of experience as a biomaterials scientist, satisfies the preponderance of the evidence standard for the factual basis requirement of Rule 702(b). *Engilis*, 151 F.4th at 1050.

Defendants' separate challenge to the methodology underlying Leckband's design defect opinions (Doc. 5196 at 11) is also unavailing. Leckband's report explains her methodology. Doc. 5195-1 at 7. She describes the method of her literature review, reciting the databases she typically consults and the sources she considers in such a review. *See id.* And she describes how she determines the veracity of those respective sources. *See id.*

Leckband's report also explains that her experience guides her assessment of the "accuracy and scholarly rigor" of sources. *Id.* Her years of experience as a biomaterials scientist can also reliably support her design defect opinions in satisfaction of Rule 702(c). *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)); *McBroom*, 2021 WL 2709292, at *5 ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))).

Further, that Leckband testified her document selection process likely could not be replicated (Doc. 5196 at 10-11) does not render her opinions inadmissible. Opinions based on years of experience in a field where the expert has published and reviewed relevant materials is not akin to a specific scientific test that cannot be replicated.

### B.    Safer Alternative Design Opinions.

Defendants raise various challenges to Leckband's alternative design opinions under Rule 702(b)-(d). Doc. 5196 at 11-18. Her methodology, as discussed above, applies as well to her alternative design opinions. Those opinions are also supported by sufficient facts and data. The Safer Alternative Designs sections of Leckband's report cite Bard's internal documents, various depositions, and medical literature. *See* Doc. 5195-1 at 28-40, 43-46. The factual basis of her opinions are further supported by her years of experience as a biomaterials scientist. *Elosu*, 26 F.4th at 1024 ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

Defendants argue that Leckband's opinions proffering the Orphis IPC as an alternative design should be excluded because the Orphis is not a "feasible alternative" since it "has never been FDA-cleared or sold in the U.S." Doc. 5196 at 12. And they seek to exclude Leckband from opining about "any other non-U.S. port[.]" *Id.* at 13. In support, Defendants cite cases where an expert was precluded from opining about alternative designs not available in the United States because such designs were not considered a "marketable reality," "practicable," or "feasible" under the relevant state law. *Id.* at 12 (collecting cases).

But some courts have declined to exclude testimony based on alternative designs not cleared by the FDA or commercially available at the time the product at issue was manufactured. *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2327, 2020 WL 1060970, at *3 (S.D.W. Va. Feb. 13, 2020) ("[That] PVDF was not cleared by the FDA . . . . has no bearing on whether PVDF mesh is a safer alternative to other mesh products."); *cf. Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1330 (N.D. Ga. 2022), *on reconsideration in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023) (explaining that "[s]ustaining Defendant's objection" to expert testimony on an alternative design that "was not available at the time of Plaintiff's implant, so it could not be a safer alternative" would have "require[d] assessing the contours of Georgia law on

design defects – an inquiry exceeding Rule 702's analysis of qualification, reliability, and relevance").

Other jurisdictions are split on whether an alternative design must be commercially available at the time of injury. *Compare Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071, at *7 (S.D. Tex. Mar. 23, 2021) ("This Court did not find any authority in Texas, . . . establishing that lack of FDA approval precludes an alternative design. In fact, the MDL court has repeatedly . . . held that the fact that PVDF was not cleared by the FDA does not . . . have any bearing on whether PVDF mesh is a safer alternative[.]"), *with Pizzitola v. Ethicon, Inc.*, No. 4:20-CV-2256, 2020 WL 6365545, at *4-5 (S.D. Tex. Aug. 31, 2020) ("In Texas, a plaintiff must prove that a safer alternative design was economically and technologically feasible at the time the allegedly defective product was manufactured. . . . [Plaintiff's safer alternative] designs had not been used or tested by hospitals at the time the Prolift mesh and TVT-O sling were implanted in Plaintiff because the FDA had not yet cleared the use of these designs. Because these designs had not been used or tested, they were not technologically feasible in 2009." (citation omitted)).

This issue is heavily influenced by state law, and Defendants do not show that states relevant to this MDL require an alternative design to have been commercially available in the United States when Bard's IPCs were manufactured. The Court cannot exclude Leckband's alternative design opinions entirely when that decision turns on state law.

Similarly, the Court will not exclude Leckband's "opinions related to coating technologies (Semprus and HBM and other devices) that have been used in non-IPC devices (like PICC lines or peripheral catheters)" merely because "none of those coatings had ever been applied to any commercially available IPC." Doc. 5196 at 13 (citations omitted). As argued by Plaintiffs, IPCs, PICCs, and peripheral catheters are all central venous catheters "designed to provide stable, repeated central venous access for fluids or medications." Doc. 5746 at 12 (citation omitted). They share similar surface properties and biological interactions when used to provide central venous access. *Id.* Bard's own Associate Director of Material Science, James Freasier, acknowledged coatings applied to

15

PICCs can be applied to IPCs.  *See* Doc. 5748-1 at 3-4 ("Q. [T]hese antimicrobial or antithrombotic coatings that are used in PICCs, they can be applied to port catheters, correct? A. Yes. They can be applied to port catheters." (objection omitted)).  And the FDA has cleared, through the 510(k) process, an IPC design which it considered "substantially equivalent" to a PICC predicate device.  *See* Doc. 5747-6 at 2, 5.

Nor will Leckband's alternative design opinions be excluded because she (1) failed to consider the drawbacks of her alternative designs (Doc. 5196 at 13), (2) failed to show their feasibility by not providing "any meaningful comparison of the cost versus utility" of her alternative designs (*id.* at 14), (3) ignored the risk-benefit trade-offs of her designs (*id.* at 14-15), or (4) cited tests or studies that "looked only at isolated factors and did not compare the full array of performance characteristics that matter for an implantable port" (*id.* at 15).  These granular criticisms are appropriate for cross-examination, but are not a basis for exclusion.  If Rule 702 is satisfied, as it is here, the Court's role is not to determine the correctness of Leckband's positions.  *See Engilis*, 151 F.4th at 1050.

Defendants contend Leckband's barium sulfate opinions should be excluded because she "claims that the concentration of barium sulfate in Bard's IPCs causes a higher risk of thrombosis and infection," but provides no support, including failing to "analyze[] the concentration of barium sulfate in other IPCs" to compare their concentration of barium sulfate.  Doc. 5196 at 15 (citations omitted).  Plaintiffs contend Defendants misstate Leckband's opinion: "[s]he does not opine about the relative instability of different barium sulfate concentrations," but instead criticizes Defendants' failure "to encapsulate the barium sulfate particles with a coating, leaving the catheter surfaces rough and prone to detachment and migration of particles into the bloodstream[.]"  Doc. 5746 at 15 (citations and emphasis omitted).  Leckband's report contains the kinds of opinions Plaintiffs describe.  *See, e.g.*, Doc. 5195-1 at 23 ("Coating catheters with a second polymer can both lock in the barium-sulfate particles and create a smoother catheter surface," which "reduces protein and bacterial adhesion and thus reduces biofilm formation and CRBSI." (footnote omitted)), 28 ("Bard catheters are unreasonably dangerous because they lack a polymer

16

coating that can lock in [barium sulfate] particles[.]"), 43 ("Bard catheters are dangerous because they lack a polymer coating that can lock-in [barium sulfate] particles[.]"). This opinion – as clarified by Plaintiffs – is supported by the medical literature and internal documents she cites. *See, e.g.*, Doc. 5195-1 at 23.

But Leckband has also expressed the barium sulfate opinions Defendants challenge. During her deposition, she opined that an increased concertation of barium sulfate would increase the roughness of the catheter and in turn increase the risk of infection, with no mention of the need for a coating to contain the barium sulfate. *See* Doc. 5195-4 at 55-58. Part of her report also suggests that Bard's catheters are defectively designed merely because they contain barium sulfate, rather than for failing to contain the barium sulfate through a coating. Doc. 5195-1 at 47 ("Bard catheters are further unreasonably dangerous and defectively designed because they contain radiopaque [barium sulfate] particles that delaminate from the catheter and increase surface roughness[.]"). Leckband may not render these opinions, which necessarily are based on the concentrations of barium sulfate contained in Bard's IPCs, without providing a basis for a concentration-based opinion. The Court will preclude this opinion.

### C.    Reliance on Incomparable Studies.

Defendants argue that Leckband's opinion that "BioFlo IPCs have lower thrombosis rates than Bard's IPCs" unreliably relies on the *Piran* 2014 and *Suleman* 2019 studies because those were "separate observational studies (not a head-to-head comparison) that differed in important ways[.]" Doc. 5196 at 16. They list three differences between the studies: (1) whether pulmonary embolisms were reported in the study, (2) the follow up duration, and (3) whether patients on anticoagulants were excluded from the study. *Id.* They also note that neither study directly compares Bard IPCs and BioFlo IPCs. *Id.* Defendants contend that "[w]hen analyzed with consistent endpoints, there is no statistically significant difference" between the two studies. *Id.* Plaintiffs have equally detailed responses. Doc. 5746 at 16-17.

As the Court explained in a prior order in this MDL (Doc. 7374 at 17), this level of granularity raises a credibility issue Defendants should address through questioning and argument at trial, not through a Rule 702 motion.  Defendants' contention that Leckband "ignores contrary peer-reviewed literature finding antithrombogenic coatings provide no benefit" (Doc. 5196 at 16 (footnote omitted)) is likewise not a basis for exclusion. *McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino*, 2016 WL 2939521, at *7 ("[I]f there are certain device-specific publications that Dr. Galloway failed to review in preparing his expert report, BSC is free to inquire about those publications on cross-examination.").

Defendants argue Leckband unreliably relies on the *Iida* study to support her opinion that "Orphis is safer than Bard's IPCs."  Doc. 5196 at 16.  They contend the *Iida* study is "fundamentally flawed" based on (1) its lack of a "randomization or standardized infection definition," (2) its failure "to calculate whether infection rates differed statistically between early and late periods," and (3) where "no assurance groups were comparable in disease severity or clinical practices."  *Id.* at 16-17 (citation omitted).  Yet prior to this litigation, Defendants consulted the *Iida* study when conducting a clinical data evaluation of equivalent devices without mentioning the methodological flaws they raise in this motion.  *See* Doc. 5748-6 at 98-101.

In any event, Plaintiffs clarify Leckband does not solely rely on *Iida* to reach her opinion. "For every technology and study [Leckband considered], she surveyed the literature, examined and compared data from hundreds of sources, and 'assess[ed] the accuracy and scholarly rigor of sources based on [her] knowledge and experience and by cross checking against other literature.'"  Doc. 5746 at 18 (quoting Doc. 5195-1 at 7).

The Court will not exclude Leckband's opinion based on Defendants' criticism of one study when Leckband's opinion otherwise has a "reasonable factual foundation[.]" *Smilovits*, 2019 WL 6875492, at *5.  This too is a credibility issue the Court will not decide through a Rule 702 motion.

### D. Improper Legal Conclusions.

Defendants argue Leckband cannot opine that Bard IPCs are "unreasonably dangerous" or "defectively designed" because these are "legal terms of art" and thus "improper legal conclusions." Doc. 5196 at 18 (citations omitted). Plaintiffs assure Leckband "will not couch her opinions in legal terminology, such as 'unreasonably dangerous' or 'defective.'" Doc. 5746 at 18.

Defendants cite cases finding "unreasonably dangerous" and "defectively designed" to be improper legal conclusions, but this question turns in part on the product liability law of the relevant state and Defendants discuss no state law relevant to the strict liability claims brought in this MDL. Doc. 5746 at 18. Defendants can object in specific cases if they believe Leckband's testimony is venturing into legal terminology under the relevant state's law.

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Leckband (Docs. 5195, 5196) is **granted in part**. Dr. Leckband may not opine that the concentration of barium sulfate in Bard's IPCs causes a higher risk of thrombosis and infection. The motion is otherwise **denied**.

Dated this 30th day of March, 2026.

David G. Campbell
Senior United States District Judge