**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Brian T. McVerry, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Brian T. McVerry, Ph.D. Doc. 5206.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5206, 5749, 6026.  The Court will grant the motion in part.

**I.     Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiffs have identified Brian T. McVerry, Ph.D. as a materials science expert. Dr. McVerry holds a Ph.D. in Chemistry from UCLA, with a material science emphasis. Doc. 5206-1 at 2. After completion of his Ph.D. in 2016, Dr. McVerry cofounded Silq Technologies, a medical device manufacturer that applies a zwitterionic surface treatment to medical implants to protect against fouling, bacterial adhesion, thrombosis, and fibrosis.[1] *Id.* at 4. As Chief Technology Officer, McVerry "lead[s] the scientific and engineering teams to evaluate the feasibility of manufacturing and commercialization of each new medical device project[.]" *Id.* He has "more than a decade of experience studying, reviewing, and authoring peer-reviewed articles on the importance of blood-biomaterial interactions . . . and its facilitation of" biological complications such as "thrombus formation, thrombosis, bacterial colonization, [and] biofilm formation[.]" *Id.*; *see also id.* at 49-50 (listing McVerry's publications and patents). Defendants move to exclude McVerry's opinions under Federal Rule of Evidence 702.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony

---

[1] Silq Technologies was formerly Hydrophilic, Inc. Doc. 5206-1 at 3.

3

is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Defendants move to exclude several opinions of McVerry.

    **A.        Design Defect Opinions.**

        **1.        Qualifications Under Rule 702(a).**

Defendants challenge McVerry's opinion that "Bard's IPCs are 'unreasonably dangerous and defectively designed' because the uncoated catheters attached to the ports can cause thrombosis and infection."  Doc. 5206 at 3 (citations omitted).  They argue

McVerry is not qualified to render such design defect opinions because "he has no experience designing, manufacturing, or obtaining FDA clearance for any IPC." *Id.* at 3-4. "[N]or has the zwitterionic coating developed by his company, Silq [Technologies], been applied to any FDA cleared vascular access device." *Id.* at 4 (citations omitted). Defendants cite no case law requiring such requirements for an otherwise qualified expert to opine on the design of a medical device.

Defendants argue McVerry "has not conducted any reported testing of any Bard IPC or of any of the other devices incorporating alternative technologies which he asserts are 'safer,' aside from his own." *Id.* (citations omitted). But an expert is not required to test alternative designs in all cases. In *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435 (9th Cir. 2017), the Court of Appeals explained that while the expert's "alternative design was *capable* of being tested," the plaintiff permissibly "chose not to do so" because alternative design testing is not required by Rule 702. *Id.* at 440.

Plaintiffs must show by a preponderance of the evidence that McVerry is qualified by "knowledge, skill, experience, training, or education" to render his design defect opinions. Fed. R. Evid. 702. Plaintiffs have met this burden. *See* Doc. 5749 at 2-4. McVerry "holds a Ph.D. in chemistry with an emphasis in materials science[.]" *Id.* at 2. He has "more than a decade of experience studying, reviewing, and authoring peer-reviewed articles on the importance of blood-biomaterial interactions, and its facilitation of platelet adhesion, thrombus formation, thrombosis, bacterial colonization, biofilm formation, and the foreign-body response." Doc. 5206-1 at 4. He developed a technique for "the deposition of zwitterionic materials to surfaces at large scale," which he commercialized through cofounding Silq Technologies, "a medical device manufacturer that applies zwitterionic surface treatment to the surfaces of medical implants to protect them against fouling, bacterial adhesion, thrombosis, and fibrosis." *Id.* Through his current position as Chief Technology Officer, he "lead[s] the scientific and engineering teams to evaluate the feasibility of manufacturing and commercialization of each new medical device project[.]" *Id.* He "regularly review[s] and analyze[s] data and results" of

5

(1) "*In vitro* testing of biomaterials or medical devices, including blood loop studies, bacterial adhesion assays, [and] biofilm quantification assays," (2) "*In vivo* testing of biomaterials or medical devices," and (3) "Clinical Studies with animal and human subjects," among other testing methods. *Id.* at 3-4. The Court finds McVerry's education, his experience studying biomaterials and related biological complications, and his development of biomaterial technology qualifies him to render design defect opinions, including his opinion that Bard's uncoated catheters can cause thrombosis and infection.

Defendants summarily contend McVerry's design defect opinions should be excluded under Rule 702(a) because they will not help the jury. Doc. 5206 at 4. Defendants provide no explanation of why this is true.

Defendants assert McVerry is not a mechanical engineer and acknowledges he can offer no mechanical opinions in this case. *Id.* But they cite no opinions rendered by McVerry that discusses mechanical properties. He testified during his deposition that he renders no mechanical opinions. Doc. 5206-3 at 41.

Defendants argue McVerry is not qualified to opine on "medical risks, patient complications, clinical outcomes, [and] causation related to IPCs" because he "is not a medical doctor or an epidemiologist, and he has never treated patients or diagnosed CRBSI or thrombosis." Doc. 5206 at 4. They cite only McVerry's opinion "that the materials used in Bard's IPCs cause or result in higher rates of thrombosis and infection." *Id.* (citing Docs. 5206-1 at 5-6, 5206-2 at 12). The Court finds that this opinion falls within the scope of McVerry's expertise. His experience in biomaterials includes studying and researching how blood-biomaterial interactions "facilitat[e] . . . thrombus formation, thrombosis, bacterial colonization, [and] biofilm formation[.]" Doc. 5206-1 at 4. He has specialized knowledge on the causal effect of biomaterials on thrombosis, infection, and related biological complications.

Defendants contend McVerry "has never conducted animal studies, let alone human clinical studies for IPCs." Doc. 5206 at 4 (citation omitted). But he regularly analyzes animal and human clinical studies on biomaterial topics. Doc. 5206-1 at 3-4.

6

Defendants' cited case law is not persuasive. In two of the cases, the court excluded a biomechanical engineer's specific medical causation opinion, which McVerry does not render. *See Contreras v. Brown*, No. CV-17-08217-PHX-JAT, 2018 WL 7254917, at *3 (D. Ariz. Dec. 4, 2018) ("Manning would exceed the scope his expertise as a biomechanical engineer by testifying to the medical causation of Plaintiffs' specific injuries, rather than the general types of injuries that may be caused by forces generated in a crash."); *Aldan v. Home Depot USA Inc.*, No. 3:20-CV-05694-TL, 2023 WL 5630076, at *9 (W.D. Wash. Aug. 31, 2023) ("Mr. Probst is not qualified to provide testimony as to whether the incident caused Mr. Aldan's alleged injuries." (emphasis omitted)). Further, *Conteras* found the biomechanical engineer qualified to render general medical causation opinions. 2018 WL 7254917, at *3.

Defendants' third case, *Roeder v. Am. Med. Sys., Inc.*, No. 20-1051-JWB, 2021 WL 4819443, at *4 (D. Kan. Oct. 15, 2021), excluded the medical complication opinions of a doctor of chemical engineering and a doctor of polymer science. McVerry's Ph.D. is in chemistry, but he has a decade of experience studying "blood-biomaterial interactions" and related biological complications. Doc. 5206-1 at 4.

Nor is the Court persuaded by *Boneta v. Am. Med. Sys., Inc.*, No. 20-CIV-60409-RAR, 2021 WL 6134790, at *5 (S.D. Fla. Sept. 27, 2021), which holds that a biomedical and chemical engineer's "technical expertise in biomedical engineering and chemistry does not qualify him to opine on potential clinical complications that may result from polypropylene mesh degradation inside a patient's body." McVerry has experience studying biological complications resulting from blood-biomaterial interactions, including thrombosis and infection. Doc. 5206-1 at 4. Such experience qualifies him to give general medical causation opinions about IPC materials and their effect on biological complications.

Defendants provide no citations for McVerry's other opinions on "medical risks, patient complications, clinical outcomes, [and] causation related to IPCs" they seek to

7

exclude (Doc. 5206 at 4), and the Court cannot identify them. Defendants may object at trial if they believe McVerry's testimony exceeds the scope of the Courts' ruling.

### 2.    Opinion Based on "Personal" Views.

Defendants argue McVerry's "opinion that Bard's IPCs became 'defective' just because alternative technology exists is based on personal views, not expert knowledge, and will not help the jury" under Rule 702(a). *Id.* at 5. Plaintiffs dispute Defendants' framing of McVerry's opinions and contend the opinions "draw on a critical mass of independent scientific research and are corroborated by Defendants' own test data." Doc. 5749 at 5.

Defendants cite 18 pages of McVerry's report they claim reflect his personal opinions. *See* Doc. 5206-1 at 6, 29-46. But these pages reflect more than personal opinions. They assert that Defendants' IPCs are defectively designed because their catheters are made with materials that induce surface fouling, which causes thrombosis and blood infections, and that safer alternative designs were available in the form of non-fouling surface coatings. *See id.* at 29-46. The pages are supported by 133 footnotes citing scientific literature, numerous documents produced by Defendants, and depositions. *See id.*

Defendants further contend that McVerry's opinion impermissibly reflects his personal views on proper corporate behavior. Doc. 5206 at 5. McVerry generally does not frame his design defect opinions in terms of Defendants' decision making. He does, however, opine that "Defendants repeatedly passed on safer alternative [designs]" and, "[i]n doing so, prioritized political marketing considerations over patient safety." Doc. 5206-1 at 6. Plaintiffs have identified no experience that qualifies McVerry to opine on Defendants' priorities. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) ("Personal views on proper corporate behavior are not appropriate expert opinions."); *In re Bard IVC Filters*, No. MDL 15-02641-PHX DGC, 2018 WL 823277, at *4 (D. Ariz. Feb. 12, 2018) (explaining because

"the Doctors are not regulatory or corporate experts, . . . they will not be permitted to opine on Bard's obligations"). This opinion is excluded.

Defendants alternatively argue McVerry's design defect opinions tend to suggest Bard's "IPCs are defective merely because Bard's design was not the safest imaginable, given later technologies," but "that is not the law in most jurisdictions." Doc. 5206 at 5 (footnote omitted). Defendants cite the law of several states. *Id.* (Florida, Missouri, New York, Michigan, Oklahoma, and Texas). They acknowledge "this may be a state specific issue" and reserve the right to raise this argument on a case-specific basis. *Id.* at 5 n.3. As Defendants appear to recognize, the Court cannot entirely exclude McVerry's opinions when exclusion depends on applicable state law, and they have not specifically addressed the law that will apply in any of the six bellwether trials.

### 3.    Factual Basis and Reliable Methodology.

Defendants argue McVerry's design defect opinions lack a reliable methodology and factual basis under Rule 702(b)-(d). *Id.* at 6. The Court will first address methodology.

McVerry states that "as a chemist and material scientist, [he] create[s] new materials to solve problems." Doc. 5206-1 at 4. His first step "is to fully understand the fundamentals of the problem." *Id.* He then investigates "what others in the scientific community have attempted to do to solve the problem and if the proposed solutions are sufficient." *Id.* He does this by "sourcing and reading peer-reviewed articles, analyzing data, and communicating with experts." *Id.* at 4-5. He "followed the same methodology when reviewing the evidence in this case." *Id.* at 5.

McVerry has a "decade of experience studying, reviewing, and authoring peer-reviewed articles" on "blood-biomaterial interactions" and the related biological complications, as well as experience cofounding Silq Technologies and "lead[ing] the scientific and engineering teams to evaluate the feasibility of manufacturing . . . each new medical device project." *Id.* at 4. "An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." *Geiger v. Creative Impact Inc.*, No. CV-

18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) (quoting Fed R. Evid. 702 notes for the 2000 amendments)). McVerry's experience, coupled with his review of 879 documents (*see* Doc. 5206-1 at 54-66), several depositions, and numerous scientific studies and articles (*see id.* at 67-83), provides a sufficiently reliable method for rendering his design defect opinions.

The Court is also satisfied that McVerry's opinions have a sufficient factual basis. This includes his own experience, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion."), as well as the extensive documents, depositions, and scientific literature cited in his report (Doc. 5206-1 at 54-83).

Defendants contend McVerry's design defect opinion "is based on a skewed and limited selection of information" because (1) he reviewed only approximately 879 of 2 million documents produced by Defendants and only 5 depositions of the 20 engineers deposed, (2) he did not review a particular deposition that Defendants deem relevant, and (3) his "review consisted of unspecified keyword searches[.]" Doc. 5206 at 7 (citations omitted). A review of two million documents is not feasible. McVerry conducted word searches of this universe of documents to identify the 879 documents he deemed relevant. *See* Doc. 5749-1 at 15. That McVerry may not have reviewed certain documents Defendants deem relevant is not a basis for exclusion. *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a Daubert motion." (citation modified)).

Nor does the Court accept Defendants' argument that McVerry's opinions must be excluded because Defendants cannot exactly duplicate his word search. Doc. 5206 at 7. Defendants are familiar with the universe of documents produced in this case. They can question McVerry at trial about any key document they think he missed. And he did name

10

some of his keyword searches during his deposition.  Doc. 5749-1 at 15 ("Things like 'coatings,' 'thrombosis,' 'biofilm,' 'platelet,' 'deposition.'").

The decision in *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1158-59 (S.D. Fla. 2022), does not help Defendants' position.  The expert testimony in that case was held unreliable because the expert omitted contradictory tests from his report because those tests "did not produce the outcomes . . . he was seeking to include in his report." *Id.*  McVerry admits to no such selective review of evidence.  In fact, he explained during his deposition that his methodology is inconsistent with cherry-picking because he considers the "entirety" of the sources he reviews.  Doc. 5749-1 at 13 ("[I]t's really the entirety of everything we look at, right?  It's not just cherry-pick one thing here, one thing here.  It's just -- it's all of these things, all of these articles of research, are they consistent?  Are they reliable?  And that is how we strive to be as accurate as possible.").

Defendants contend McVerry "offered no opinion quantifying the reduction in complication rates from his proposed alternatives," but instead "advances a general proposition—with no scientific support—that coating technologies 'would prevent or significantly reduce the risk of thrombosis or CRBSI.'"  Doc. 5206 at 8 (quoting Doc. 5206-1 at 6).  But if an expert's opinion otherwise satisfies Rule 702, the rule does not require the expert to present a quantified complication rate.  Further, the opinion quoted by Defendants (Doc. 5206-1 at 6) is from the "Summary of Opinions" section of McVerry's report.  It contains no supporting citations because it's a summary.  As discussed above, McVerry's design defect opinions are not without scientific support – he cites many scientific studies and articles in support of his opinions.  *See* Doc. 5206-1 at 29-46.

The Court similarly rejects Defendants' contention that McVerry's design defect opinions should be excluded because he did not perform testing of any Bard IPC or any alternative design to show Bard's IPCs have higher complication rates.  Doc. 5206 at 8. As discussed above, an expert is not required to test an alternative design.  *Ramirez*, 686 F. App'x at 440.   And as argued by Plaintiffs, McVerry's report demonstrates his alternative design has been tested — Defendants tested antimicrobial coatings proposed by

11

McVerry and alternate manufacturers have adopted such technologies. *See* Doc. 5749 at 8 & n.4.

### B. Safer Alternative Design Opinions.

#### 1. Alternative Designs Not Commercially Available.

Defendants contend McVerry's "opinions about designs that have not been cleared for use on IPCs by the FDA are improper and, thus, will not help the jury under Rule 702(a)." Doc. 5206 at 9. They make two arguments based on this contention.[2]

First, Defendants argue the Orphis IPC, which McVerry opines is a safer alternative design, "has never been sold or provided to U.S. consumers or manufacturers [and thus] cannot qualify as a feasible alternative design." *Id.* at 10. Defendants cite cases where the expert was precluded from testifying about alternative designs not commercially available. *See, e.g.*, *Gomez v. Am. Med. Sys. Inc.*, No. CV-20-00393-PHX-ROS, 2021 WL 1163087, at *6-7 (D. Ariz. Mar. 26, 2021); *Wood v. Am. Med. Sys. Inc.*, No. 120CV00441DDDKLM, 2021 WL 1178547, at *10 (D. Colo. Mar. 26, 2021). Other courts have declined to exclude testimony based on alternative designs not cleared by the FDA or commercially available. *See, e.g.*, *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2327, 2020 WL 1060970, at *3 (S.D.W. Va. Feb. 13, 2020) ("[That] PVDF was not cleared by the FDA . . . has no bearing on whether PVDF mesh is a safer alternative to other mesh products."); *cf. Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1330 (N.D. Ga. 2022), *on reconsideration in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023) (declining to sustain an objection on expert testimony regarding an alternative design not available at the time of the plaintiff's implant because it would "require assessing the contours of Georgia law on design defects – an inquiry exceeding Rule 702's analysis of qualification, reliability, and relevance"). And some jurisdictions are split on whether an alternative design must be commercially available at the time of injury. *Compare Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071, at *7 (S.D. Tex. Mar. 23, 2021), *with*

---

[2] The Court has addressed both of these arguments in prior orders of this litigation. Docs. 7374 at 17-19, 21, 7767 at 14-16.

*Pizzitola v. Ethicon, Inc.*, No. 4:20-CV-2256, 2020 WL 6365545, at *4-5 (S.D. Tex. Aug. 31, 2020).

Defendants have not shown that state laws relevant to the bellwether trials in this MDL require an alternative design to be commercially available in the United States. The Court will not exclude McVerry's opinion entirely when state laws vary on this issue.

Second, Defendants argue McVerry's "opinions related to coating technologies that have been used in non-IPC devices (like PICC lines, urinary catheters, and hemodialysis catheters) and/or have not been commercialized in the U.S. do not establish a viable alternative design for Bard's IPCs because none of those coatings had ever been applied to any commercially available IPC." Doc. 5206 at 10-11 (citations omitted). As noted, however, whether an alternative design must be commercially available in the U.S. is a state law issue Defendants have not addressed in any detail.

Nor will the Court exclude McVerry's alternative design opinions because they are based on "non-IPC" devices. Defendants reference to "non-IPC devices" cites other central venous catheters ("CVCs"). Both IPCs and CVCs are "designed to provide stable, repeated central venous access for fluids or medications." Doc. 5749 at 9. They share similar material composition and biological interactions when used to provide central venous access. *Id.* Bard's own Associate Director of Material Science, James Freasier, acknowledged coatings applied to PICCs can be applied to IPCs. Doc. 5753-4 at 3-4.

Further, because Defendants have not shown that FDA clearance of an alternative design is a requirement of the relevant state law, the Court will not exclude McVerry's alternative design opinion regarding his zwitterionic coating based on his not seeking FDA clearance for application of the coating to IPCs. Doc. 5206 at 11.

### 2.    Factual Basis and Reliable Methodology.

Defendants challenge the factual basis and methodology of McVerry's safer alternative design opinions. *Id.* They argue his "alternative design opinions are unreliable because, again, he performed no testing or analysis to evaluate whether any of his proposed technologies could be applied to Bard's IPCs or would confer safety benefits without

13

introducing other drawbacks." *Id.* As discussed above, lack of testing does not render an alternative design opinion inadmissible if it otherwise satisfies Rule 702. *Ramirez*, 686 F. App'x at 440. If Defendants view it as a meaningful weakness, they can address that issue through cross-examination and argument at trial.

Defendants separately take issue with McVerry's reference to two unpublished clinical trials conducted by his company, Silq Technologies. They argue McVerry cannot rely on unpublished clinical trials "because nothing on these studies has been made available to Bard." Doc. 5206 at 12-13. But McVerry does not rely on the results of the two unpublished trials. He mentions only that they are about to be completed — "two post-market randomized clinical trials comparing ClearTract to unmodified and silver-coated catheters are reaching conclusion in the United States." Doc. 5206-1 at 32.

The Court will not exclude McVerry's opinion on ClearTract as an alternative design because his experience and personal knowledge support the opinion. *See McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))); *Geiger*, 2020 WL 3268675, at *6. McVerry cofounded Silq Technologies and, as Chief Technology Officer, he "lead[s] the scientific and engineering teams to evaluate the feasibility of manufacturing . . . each new medical device project[.]" Doc. 5206-1 at 4. The Court is satisfied McVerry has sufficient personal knowledge of the ClearTract catheter to reliably support his opinion. Further, he cites sources in support of his opinion that were disclosed to Defendants. *See* Doc. 5206-1 at 32 nn.130-33, 135. Defendants' cited caselaw is distinguishable. *See Longoria v. Kodiak Concepts LLC*, No. CV-18-02334-PHX-DWL, 2021 WL 1100373 (D. Ariz. Mar. 23, 2021) (excluding expert opinion that relied on undisclosed contracts and where the expert otherwise had "no first-hand experience" in the particular industry to support his opinion).[3]

_____

[3] The Court notes that it intends to hold both sides' experts to testimony disclosed in their

The Court will not exclude McVerry's alternative design opinions because (1) he "conducted no risk benefit analysis for his purported safer alternative designs" (Doc. 5206 at 13), (2) "his cited tests or studies looked only at isolated factors and did not compare the full array of performance characteristics that matter for an IPC" (*id.*), or (3) he "ignores contrary peer-reviewed literature finding antithrombogenic coatings provide no benefit" (*id.* at 14) (footnote omitted). These highly detailed arguments regarding the strength or correctness of McVerry's opinions are suitable for cross-examination, but provide no basis to exclude his sufficiently supported opinions. *See Smilovits*, 2019 WL 6875492, at *5; *McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969-70 ("The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury.").

Defendants argue that McVerry unreliably relies on the *Piran* 2014 and *Suleman* 2019 studies to support his opinion that the BioFlo IPC is a safer alternative design because those were "separate observational studies (not a head-to-head comparison) that differed in important ways[.]" Doc. 5206 at 14. They list three differences between the studies: (1) whether pulmonary embolisms were reported in the study, (2) the follow up duration, and (3) whether patients on anticoagulants were excluded from the study. *Id.* They also note that neither study directly compares Bard IPCs and BioFlo IPCs. *Id.* Defendants contend that "[w]hen analyzed with consistent endpoints, there is no statistically significant difference" between the two studies. *Id.* Plaintiffs have equally detailed responses. Doc. 5749 at 13-14. As the Court explained in prior orders in this MDL (Docs. 7374 at 17, 7767

expert reports or elicited by opposing counsel in a deposition. *See* Doc. 114, ¶ II.F. McVerry does not describe the results of the two unpublished clinical trials in his report. *See* Doc. 5206-1 at 32. He offered in his deposition to provide defense counsel with the trial results when they become available (Doc. 5206-3 at 157), but that is not the same as including the results in his report as required by Rule 26(a)(2)(B). Plaintiffs cite to deposition testimony where McVerry provided some detail about the trials, but this testimony was elicited by Plaintiffs' counsel, not defense counsel (*see* Doc. 5749-1 at 53-55), and cannot be used as a basis for his testifying about it at trial.

at 17-18), this level of granularity raises a credibility issue Defendants should address through questioning and argument at trial, not through a Rule 702 motion.

Defendants also challenge McVerry's reliance on the *Iida* study to support his opinion that the Orphis IPC is a safer alternative design. Doc. 5206 at 14-15. They contend the *Iida* study is "fundamentally flawed" based on (1) its lack of a "randomization or standardized infection definition," (2) its failure "to calculate whether infection rates differed statistically between early and late periods," and (3) where "no assurance groups were comparable in disease severity or clinical practices." *Id.* (citation omitted). Yet prior to this litigation, Defendants consulted the *Iida* study when conducting a clinical data evaluation of equivalent devices without mentioning the methodological flaws they raise in this motion. *See* Doc. 5753-8 at 98-101. In any event, this level of detail is again appropriate for cross examination, but not a basis to exclude McVerry's opinion.

Defendants argue McVerry "has never published [his alternative design] opinions or subjected them to peer review," nor has he "conducted . . . clinical or animal studies to support them." Doc. 5206 at 17. But Rule 702 is satisfied so long as "an expert's opinion [contains] . . . enough accurate factual information to provide a reasonable factual foundation," as does McVerry's. *Smilovits*, 2019 WL 6875492, at *5.

Defendants contend McVerry cannot reference non-IPC devices using his proposed safer alternative technologies because while McVerry asserts "there is no difference in application of such alternative technologies to any type of catheter," he "fails to provide any justification" for this assertion. Doc. 5206 at 15 (citation omitted). As explained by Plaintiffs – and discussed above – the non-IPC devices proffered by McVerry are CVCs, and McVerry's opinion that his alternative technologies can apply to IPCs and CVCs is sufficiently supported by his education, experience, and the documents, depositions, and literature on which he relies. Doc. 5749 at 9-10. Any criticisms Defendants have regarding McVerry's reference to non-IPC devices may be raised during cross-examination.

Defendants argue that McVerry "fails to justify his reliance on lower-quality studies such as *in vivo*, *in vitro*, and animal studies to extrapolate[] his way to his opinion that

16

application of the alternative technologies to Bard's IPCs would make the IPCs safer." Doc. 5206 at 15-16. They cite *Davis*, 2019 WL 3532179, at *16, for the proposition that "while animal studies are not per se inadmissible, there must be a basis for extrapolating them to the human population." In his rebuttal report, McVerry provides a detailed explanation of why *in vivo* and *in vitro* studies are reliable methods for predicting clinical performance. *See* Doc. 5206-2 at 2-4. He explains both have a "well-established role in biomaterials science" and notes that the "FDA routinely clears medical devices (including IPCs) through the 510(k) pathway based solely on *in vitro* and/or *in vivo* testing[.]" *Id.* at 3.[4]

McVerry also has extensive experience reviewing *in vivo*, *in vitro*, and animal studies. Doc. 5206-1 at 3-4. He "regularly review[s] and analyze[s] data and results" of (1) "*In vitro* testing of biomaterials or medical devices, including blood loop studies, bacterial adhesion assays, [and] biofilm quantification assays," (2) "*In vivo* testing of biomaterials or medical devices," and (3) "Clinical Studies with animal and human subjects[.]" *Id.* McVerry's familiarity with these kinds of studies and his demonstration of their longstanding use evaluating medical devices support the reliability of his opinions.

Defendants separately challenge the factual basis and reliability of McVerry's opinions on the feasibility of his alternative designs. They contend McVerry "assumes but has never attempted to analyze whether it would be feasible" from a (1) technical, (2) economical/commercial, or (2) regulatory standpoint "for Bard to apply the alternative technologies to its existing IPCs." Doc. 5206 at 16.

On the technical feasibility of McVerry's alternative designs, Defendants make no further argument or cite any particular opinion they seek to exclude. On the commercial feasibility of his opinions, Defendants cite only his opinion regarding the Semprus Sustain technology used on the Nylus PICC, which was FDA-cleared but never commercialized. Doc. 5206-1 at 31. Defendants contend McVerry gave "no explanation for the failure of this product to be successfully commercialized" and acknowledged in his deposition that

---

[4] Defendants cite McVerry's rebuttal report throughout their motion. *See* Doc. 5206.

"'commercialization is a lot more complicated' and its failure 'could have been for several reasons.'" Doc. 5206 at 16 (citation omitted). McVerry does not affirmatively state that commercialization of the Semprus technology is feasible. *See* Doc. 5206-1 at 31. He states only that "with adequate optimization parameters, [Semprus technology] could be applied to Defendants'" IPCs. *Id.*; *see also* Doc. 5206-3 at 45 (testifying the same).

Plaintiffs argue McVerry's discussion of the Semprus technology "illustrates that zwitterionic coatings have been successfully developed and FDA-cleared for CVCs." Doc. 5749 at 16. But McVerry's discussion is silent on the "adequate optimization parameters" he suggests would make the Semprus technology commercially feasible when applied to Bard's IPCs. *See* Doc. 5206-1 at 31. The Court finds McVerry's experience as Silq's Chief Technology Officer, through which he "lead[s] the scientific and engineering teams to evaluate the feasibility of . . . commercializ[ing] . . . each new medical device project" (*id.* at 4), reliably supports his limited opinion on Semprus technology in satisfaction of Rule 702(b)-(d). *See Elosu*, 26 F.4th at 1024; *McBroom*, 2021 WL 2709292, at *5. Defendants may object at trial if they believe he testifies beyond the limited opinion – "adequate optimization parameters" – he has offered.

On McVerry's regulatory feasibility opinions, Defendants argue he "assumes the feasibility of Bard obtaining regulatory approval for an IPC applying one of his alternative technologies, yet he admits that he is not an FDA expert and is, therefore, not qualified to provide opinions on the likelihood of regulatory approval." Doc. 5206 at 17 (citing Doc. 5206-3 at 24-26). Plaintiffs argue "Rule 702 does not require . . . regulatory expertise for an expert to opine on the commercial feasibility of alternate designs," and they contend McVerry's "experience enables him to point to FDA-cleared catheters employing the same technologies as real-world proof that alternative designs can be brought to market without . . . regulatory obstacles." Doc. 5749 at 16-17 (citation omitted).

The Court agrees with Plaintiffs. McVerry does not opine on the FDA clearance process or the likelihood of his alternative designs achieving FDA clearance as applied to Bard's IPCs. He only cites alternative designs as being cleared by the FDA to show their

18

regulatory feasibility in medical devices comparable to Bard's IPC. *See, e.g.*, Doc. 5206-1 at 31 ("PC Technology has been FDA-cleared."; "The Semprus-coated Nylus PICC was cleared through the FDA submission 510(k) process[.]"), 32 ("The ClearTract catheter has been cleared by the FDA for commercial use[.]"), 33 ("Endexo Technology was cleared through the FDA 510(k) submission process[.]"). McVerry's experience "oversee[ing] and review[ing] all of Silq's FDA submissions" (Doc. 5206-1 at 4) reliably supports his regulatory feasibility opinions. Defendants are free to examine him regarding his lack of FDA expertise.

### C.    Intent, Motive or State of Mind Testimony.

Defendants contend McVerry's "opinions about Bard's design choices and its corporate knowledge, intent, motive, or state of mind" should be excluded under Rule 702 (a)-(b) because they "have 'no basis in any relevant body of knowledge or expertise' and will not assist the jury." Doc. 5206 at 17-18 (citation omitted). Defendants cite several opinions of McVerry in their reply. Doc. 6026 at 11-12. Except for his opinion excluded above and mentioned at the end of this order, the Court is not persuaded McVerry's other opinions cited by Defendants improperly discuss Bard's intent, motive, or corporate knowledge. Defendants can object at trial if they believe McVerry's testimony enters state-of-mind or corporate-knowledge territory.

### D.    Improper Legal Conclusions.

Defendants argue McVerry's opinions that (1) "Bard's IPCs are 'unreasonably dangerous' and 'defectively designed,'" (2) his alternate technologies are "safer alternative designs," and (3) Defendants failure to incorporate those alternative designs was "unreasonable and unconscionable" are "legal terms of art" and thus "improper legal conclusions." Docs. 5206 at 18 (citations omitted), 6026 at 11. They cite three cases from the Northern District of Florida, and the Eastern and Western Districts of Missouri, in support. *See* Doc. 5206 at 18. Plaintiffs assure McVerry "will not couch his opinions in legal terminology." Doc. 5749 at 18.

The question of whether McVerry's use of the above terms constitutes improper legal conclusions turns in part on the product liability law of the relevant state. Yet Defendants discuss no state law relevant to the strict liability claims brought in this MDL. *See* Doc. 5206 at 18. Defendants can object in specific cases if they believe McVerry's testimony is venturing into legal terminology under the relevant state's law.

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Brian McVerry (Doc. 5206) is **granted in part** and **denied in part**. Dr. McVerry may not opine that "Defendants repeatedly passed on safer alternative non-fouling and antimicrobial technologies . . . . In doing so, Defendants prioritized political marketing considerations over patient safety." The motion is otherwise **denied**.

Dated this 8th day of April, 2026.

David G. Campbell
Senior United States District Judge