**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Dr. Ronald Thisted** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Ronald Thisted, Ph.D. Doc. 4831. The motion is fully briefed and no party requests oral argument. *See* Docs. 5327, 5579. The Court will deny the motion.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including biostatisticians and epidemiologists.  Defendants have identified Dr. Thisted as an expert in biostatistics, epidemiology, clinical research methods, and evidence-based medicine.  *See* Doc. 5327 at 2, 3-5.  Defendants tasked Thisted with evaluating the relevance and quality of scientific literature regarding adverse event rates for IPCs and other venous access devices, determining whether IPC-related adverse events were widely known in the medical community, and examining the strengths and limitations of opinions of Plaintiffs' experts and the literature on which they rely.  Docs. 5327 at 2, 4381-1 ¶¶ 1-2, 22-25.

Thisted has prepared a 103-page report which provides his expert qualifications (Doc. 4831-1 ¶¶ 6-19); a background on evidence-based medicine, including the hierarchy of evidence, study design principals, and statistical and epidemiological concepts (*id.* ¶¶ 51-86); an evidence-based review of the scientific literature, including human and animal studies, studies with no original clinical data, and laboratory test results (*id.* ¶¶ 87-215); and rebuttals to certain opinions of Plaintiffs' expert Dr. Becky Smith, an epidemiologist and infection disease specialist, and Drs. Bernard Camins and William Jarvis, infectious disease specialists (*id.* ¶¶ 216-300).  Thisted opines that (1) the risks of catheter-related bloodstream infections ("CRBSI"), thrombosis, and fractures involving IPCs have been well-documented in the scientific literature for the last 25 years (*id.* ¶ 36); (2) he would expect healthcare professionals who prescribe, implant, or maintain IPCs to be familiar with these risks and to consider them in making treatment choices (*id.* ¶ 37);

3

(3) there is no Level I or Level II evidence showing that Bard IPCs are associated with a higher rate of CRBSI, thrombosis, or fracture than the rates of these complications for other implanted port systems (*id.* ¶¶ 38-40); (4) complication rates for peripherally inserted central catheters and central lines are generally higher than for IPCs (*id.* ¶ 41-42); (5) there is no peer-reviewed literature or other good evidence showing that catheters with antimicrobial coatings reduce the risk of CRBSI in long-term applications (*id.* ¶¶ 43, 45); (6) there is no published literature showing that IPCs with antithrombotic materials reduce the rate of thrombosis (*id.* ¶ 44); (7) no medical organization or governmental agency recommends the use of antimicrobial-coated catheters over standard catheters for use exceeding one month (*id.* ¶ 46); (8) laboratory and animal testing cannot be relied on to show that the effects seen in such testing would occur in IPCs in clinical practice or would occur to the same degree (*id.* ¶¶ 47-48); and (9) Drs. Smith, Camins, and Jarvis draw inferences about potential clinical outcomes from laboratory and animal studies despite explicit warnings in the studies against making such inferential leaps (*id.* ¶ 49).  Plaintiffs move to exclude Thisted's opinions under Federal Rule of Evidence 702.  Doc. 4831.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that

the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

### III.    Discussion.

Plaintiffs argue that Thisted is not qualified to critique or offer medical opinions (Doc. 4831 at 3-9), his opinions regarding what the scientific evidence shows about causation are not reliable (*id.* at 9-14), and his opinions are not relevant or helpful to the jury (*id.* at 14-15). Thisted's qualifications will be addressed in part A below, and the reliability and relevance of his opinions in parts B and C.

#### A.    Thisted's Qualifications.

Thisted has more than fifty years of experience in biostatistics and epidemiology. Doc. 4831-1 ¶ 6. He earned a Ph.D. in statistics from Stanford University in 1977. *Id.* ¶ 8. He served on the faculty of the University of Chicago for more than 40 years, ultimately as Professor Emeritus of Statistics and Public Health Sciences. *Id.* ¶¶ 7, 9. He taught courses on statistics, computation, epidemiology, and clinical research methods, and served as Co-Director of the Clinical Research Training Program and Chair of the Department of Health Studies. *Id.* ¶¶ 9, 12. He is a Fellow of the American Statistical Association and

the American Association for the Advancement of Science. *Id.* ¶ 14. He has authored more than 100 peer-reviewed publications in leading medical journals, written dozens of chapters, comments, and reviews in other publications, and reviewed grant proposals for the National Institutes of Health and the National Science Foundation. *Id.* at ¶¶ 15-16. Since the 1970s, Thisted has collaborated with healthcare professionals in designing and interpreting clinical studies, and has consulted for the pharmaceutical and medical device industries on the design of clinical trials and statistical analysis of the results. *Id.* ¶¶ 17-18; *see also id.* at 107-22 (Thisted's CV).

Plaintiffs argue Thisted is not qualified to critique or offer "medical opinions" because he is not a medical doctor, engineer, or materials scientist, and has no expertise in infectious diseases, hematology, or interventional radiology. Doc. 4831 at 2, 4-6. Plaintiffs assert that Thisted "catalogues the scientific literature cited by Drs. Smith, Camins, and Jarvis . . . and then opines as to why the literature cannot support a *medical* opinion." *Id.* at 6. Plaintiffs cite various paragraphs of Thisted's report in which he discusses literature on vitro studies, in vivo animal models, laboratory test results, and practice guidelines, but do not identify the purported "medical opinions" they claim are impermissible. *Id.* (citing Doc. 4831-1 ¶¶ 189-215, 300)).[1]

Defendants explain that the opinions of Plaintiffs' experts that Thisted critiques are literature-based causation opinions, not medical opinions, and that even a cursory review of Thisted's report shows that he offers no medical opinion and instead focuses on the literature Plaintiffs' experts cite and the studies he found through his own research. Doc. 5327 at 2, 7. Defendants argue that Thisted is eminently qualified to opine on the quality and relevance of scientific literature and the strengths and limitations of the literature-based causation opinions of Plaintiffs' experts. *Id.* at 3-5, 7-8. Defendants further argue that Rule 702 does not require a medical degree for statistical or

---

[1] Nor do Plaintiffs address the opinions Thisted provides in the "summary of opinions" section of his report. *See* Doc. 4831-1 ¶¶ 36-50.

epidemiological critiques. *Id.* at 7. Plaintiffs do not address these arguments in their reply. *See* Doc. 5579 at 2-3.[2]

The Court concludes that Thisted's extensive experience in biostatistics, epidemiology, clinical research methods, and evidence-based medicine (*see* Doc. 4831-1 ¶¶ 6-19) qualifies him to opine on the quality and relevance of scientific literature and the strengths and limitations of the literature-based causation opinions of Plaintiffs' experts. Plaintiffs concede that as a biostatistician, Thisted may evaluate whether statistical evidence of an association exists, whether studies are adequately powered, randomized, and controlled, and whether reported confidence intervals support an author's conclusions. Doc. 4831-1 at 6. Defendants make clear that this is precisely what Thisted has done in this case and that he disclaims opinions outside his expertise. Doc. 5327 at 8. Plaintiffs may object at trial if they believe Thisted attempts to offer impermissible medical opinions.[3]

Plaintiffs argue that Thisted has no training or experience related to the medical and clinical issues in this case. Doc. 4831 at 6-7. But he is or has been a professor at the University of Chiago in public health sciences, biostatistics, clinical research and training, clinical pharmacology and pharmacogenomics, anesthesia, and critical care. Doc. 4831-1 at 108. For 15 years he taught a required first-year course in Chicago's Pritzker School of Medicine on epidemiology and clinical investigation that focused on evidence-based medicine, clinical evidence, critical appraisal of medical literature, and the relative merits

[2] Plaintiffs argue in their reply that the following opinion in the introduction section of Thisted's report does not concern any research study: "As explained below, I disagree with the opinions of both Dr. Smith and Drs. Camins and Jarvis that Defendants' port catheters cause bloodstream infections, thromboses, or fractures at a rate higher than alternative totally implanted port catheters." *Id.* at 7-8 (citing Doc. 4831-3 ¶ 3). Plaintiffs do not address Thisted's explanation for this opinion, which focuses primarily on the medical literature relied on by Smith, Camins, and Jarvis (*see, e.g.,* Doc. 4831-1 at 67-101), nor did they challenge this opinion in their motion. *See* Doc. 4831 at 3-9. The Court will not consider an argument made for the first time in a reply brief. *See United States v. Anderson*, 472 F.3d 662, 668 (9th Cir. 2006).

[3] Plaintiffs argue that Thisted misinterpreted epidemiological studies because he admitted at his deposition that he did not understand the meaning of the term "evulsion" or that "MPC" refers to "zwitterionic coating." Doc. 4831 at 5. Plaintiffs will be free to cross-examine Thisted on this issue, but it does not render him unqualified. *See* Doc. 5327 at 8-9.

and drawbacks of the most common study designs in medical literature. *Id*. at 7. He is a member of the International Biometric Society (*id.* at 108) and has published works in medical and clinical journals (*id.* at 109-10) and on in vitro studies, medical sciences, and medical decision making (*id.* at 110, 113, 115), and has taught courses in clinical research methods (*id.* at 119-20).

Plaintiffs provide a 17-item bullet-point list of topics they claim would be "equally problematic" for Thisted to opine on because his purported opinions on these topics are not grounded in statistics or epidemiology. Doc. 4831 at 7-8. Plaintiffs provide string cites to paragraphs of Thisted's report, but they do not address his rationale in those paragraphs or the scientific literature he addresses. *Id.* Nor do Plaintiffs address Defendants' argument that the paragraphs and their underlying citations show Thisted is rebutting the opinions of Plaintiffs' experts based on scientific literature. Docs. 5327 at 9, 5579 at 2-3. Plaintiff's argument is unpersuasive.

The Court finds by a preponderance of the evidence that Thisted is qualified under Rule 702 to provide the opinions in his report.

**B.    Reliability of Thisted's Opinions.**

Plaintiffs challenge Thisted's opinions that there is no evidence in the scientific literature showing that Bard IPCs are associated with a higher rate of CRBSI, thrombosis, or fracture than the rates of these complications for other implanted port systems. Doc. 4831 at 9 (citing Doc. 4831-1 ¶¶ 38-40, 102-03, 297-301; Doc. 4832-2 at 21-22). Plaintiffs argue that Thisted used no recognized epidemiological method in reaching these opinions. *Id.* at 9-10.

Thisted explains his methodology. He assessed relevant scientific literature using established principles of evidence-based medicine review, including hierarchy of evidence principles; concepts of statistics, such as statistical testing and statistical significance; and fundamental aspects of clinical and epidemiologic study design, such as the distinction between prospective and retrospective clinical studies, randomized clinical trials, and the importance of controls to eliminate bias. Doc. 4831-1 ¶¶ 31, 51. Because the devices at

issue are implantable port catheters typically used for long-term central venous access, Thisted gave more weight to clinical evidence from studies involving implantable ports than to other methods of central venous access, and gave less weight to clinical evidence from short- or medium-term studies than to longer-term investigations. *Id.* ¶ 32. Similarly, he gave greater weight to clinical reports of adverse event rates that take length of exposure into account, less weight to anecdotal accounts that provide no comparative data, and more weight to rigorously designed and executed studies comparing outcomes under different conditions. *Id.* He also gave less weight to laboratory studies and animal models than to studies of clinical outcomes in actual patients. *Id.*; *see also* Doc. 5327 at 5-6.

Thisted states that the methods he employed are the same methods he has taught at the University of Chicago and the Pritzker School of Medicine in statistics, epidemiology, public health, and medicine. Doc. 4831-1 ¶ 28. As already noted, one of the courses he taught focused on evidence-based medicine, including assessment of clinical evidence, critical appraisal of the medical literature, and the relative merits and drawbacks of study designs commonly seen in the medical literature. *Id.* Thisted states that his opinions are also based on his training, experience, and practice as a biostatistician, epidemiologist, and clinical research scientist over the last 50 years. *Id.*

Plaintiffs assert that hierarchy of evidence is "no methodology at all" because it is "simply a descriptive classification system that ranks the strength and reliability of different clinical study designs." Doc. 4831 at 10. But hierarchy of evidence is only one of several tools Thisted used in performing his evidence-based review of the literature. *See* Doc. 4831-1 ¶¶ 31, 51, 87-215. Plaintiffs cite no authority suggesting that applying hierarchy of evidence principles as part of an evidence-based review of scientific literature is unreliable. To the contrary, Plaintiffs' epidemiology expert, Dr. Smith, agreed that hierarchy of evidence is taught in medical school and Thisted is "100 percent correct as to where the studies rank on hierarchy of evidence." Doc. 5327-1 at 3-4; *see* Doc. 5327 at 10.

Plaintiffs assert that Thisted's "only abstract imperative" is set forth in paragraph 32 of his report, in which he explains why he gave more or less weight to certain types of

9

studies. Doc. 4831 at 11. Plaintiffs argue that in the areas of Thisted's expertise – statistics and epidemiology – "scientific reliability requires more than reviewing studies one by one and discarding those he disfavors." *Id.* at 9. But Plaintiffs omit Thisted's comprehensive discussion in paragraphs 51 through 86 on the background and application of "statistical testing and statistical significance, and on fundamental aspects of clinical and epidemiologic study design." Doc. 4831-1 ¶ 51. Plaintiffs also omit that Thisted evaluates the literature cited by Plaintiffs' experts "arranged according to the level and strength for addressing the specific questions [they] considered, . . . specifically concerning rates of complications attributable to Bard central venous ports." *Id.* ¶ 93; *see* Doc. 5327 at 13.

Plaintiffs argue that Thisted's methodology is unreliable because he did not apply the Bradford Hill criteria. Doc. 4831 at 11-14. These criteria are used by epidemiologists to establish a causal link. *In re Zoloft Prods. Liab. Litig.*, 858 F.3d 787, 795 (3rd Cir. 2017) ("The Bradford Hill criteria are metrics that epidemiologists use to distinguish a causal connection from a mere association."). The criteria "'start with an association demonstrated by epidemiology and then apply' eight or nine criteria to determine whether that association is causal." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018) (quoting *In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1234 (D. Colo. 1998)).

Plaintiffs, who have the burden of proving causation in this case, do not claim that their own experts used the Bradford Hill criteria. Nor do they explain why Defendants, who do not have the burden of proving of disproving causation, are required to use the criteria. It would be one thing for Plaintiffs to argue that their experts used Bradford Hill and Thisted failed to address it. Plaintiffs do not make this argument. They instead contend that Thisted was required to use Bradford Hill to *criticize* the evidence Plaintiffs rely on to show causation. The Court finds Plaintiffs' argument wholly unpersuasive. Defendants are entitled to discredit the evidence Plaintiffs present to prove their case, and Thisted's opinion will be relevant and helpful to the jury in evaluating the studies and medical articles on which Plaintiffs rely to prove causation.

The Court finds by a preponderance of the evidence that Thisted uses a sufficiently reliable methodology under Rule 702. *See* Doc. 5327 at 5-6, 13-16.

**C.    Relevance of Thisted's Opinions.**

Plaintiffs argue Thisted's opinions will not help the jury because he does not say whether Bard's IPCs "are safer or less safe" than alternative designs or whether anti-microbial and non-fouling surfaces are unsafe or ineffective in reducing catheter-related complications. Doc. 4831 at 14. But Plaintiffs, not Defendants, bear the burden of proof on these issues. Defense counsel, not Plaintiffs' counsel, get to determine the scope of Thisted's opinions. His opinions directly address a significant part of Plaintiffs' claim – that scientific literature and other evidence on adverse-event rates show Defendants' IPCs are more dangerous than other alternatives and cause the injuries at issue in this litigation. The jury will be required to evaluate Plaintiffs' evidence, and Thisted's opinions will be helpful in that evaluation if the jury decides to believe them.

**IT IS ORDERED** that Plaintiffs' motion to exclude opinions of Ronald Thisted, Ph.D. (Doc. 4831) is **denied.**

Dated this 14th day of April, 2026.

David G. Campbell
Senior United States District Judge

11