**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| _____ | |
| Robert Cook, | No. CV-23-01975-PHX-DGC |
|             Individual Plaintiff, | |
| v. | **ORDER** |
| Becton Dickinson and Company, et al., | |
|             Defendants. | |

The Court took several matters under advisement during the final pretrial conference last week.  *See* Doc. 8035.  The Court now rules on those matters.

**1.    Grainger Trial Deposition.**

Defendants ask that their expert, Dr. Grainger, who will be unavailable during trial, sit for a preservation deposition so his testimony can be played at trial.  Plaintiff does not object to a deposition, but argues that Grainger is solely a rebuttal witness to Plaintiff's experts Ratner and El-Ghannam, neither of whom will testify in the Cook trial.  He argues that Grainger, as a rebuttal expert, should not be permitted to testify when the experts he rebuts will not be heard by the jury.  Doc. 7933 at 36.

1

Defendants respond that Grainger's report contains affirmative opinions separate from his rebuttal opinions, and that he may testify about those affirmative opinions even if Ratner and El-Ghannam do not testify. *Id.* at 53-54.

The Court has carefully reviewed Grainger's expert report with Defendants' argument in mind (Doc. 5208-1), and is satisfied he renders only rebuttal opinions in response to Ratner and El-Ghannam. The report's introduction says: "This report describes my opinions related to the matters below. Though I do not address every opinion from Dr. Ratner and Dr. El-Ghannam, I provide rebuttals to highlight the methodological flaws in Dr. Ratner's report . . . . Additionally, I show that Dr. El-Ghannam's SEM analysis is faulty." *Id.* at 3.

Of the 38 substantive pages of Grainger's report (Doc. 5208-1 at 8-45), 25 rebut the opinions of Ratner (*id.* at 8-32) and 13 rebut El-Ghannam's SEM analysis (*id.* at 32-45). Every page of the Ratner rebuttal refers to Ratner several times. *See, e.g.*, *id.* at 8 ("Contrary to Dr. Ratner's unsupported assertions in his Report"), 9 ("Contrary to Dr. Ratner's assertions about coating technologies in his report"), 10 ("Dr. Ratner discusses various surface coatings to improve biomaterials biocompatibility, but none have been successfully commercialized."), 12 ("Dr. Ratner provides no valid scientific evidence"), 15 ("Dr Ratner contradicts his writings"), 19 ("Dr. Ratner produces no evidence in his report"), 20 ("Dr. Ratner ignores the risks posed by coating."), 21 ("Dr Ratner speculates about the viability of new coatings"), 23 ("Dr. Ratner makes no mention of the reported inherent and documented clinical risks"), 26 ("Dr. Ratner fails to recognize the lack of validation and lack of correlation of in vitro bacterial adhesion [models]"), 29 ("Endexo has risks that Ratner does not address").

Grainger renders no affirmative opinion that is separate from his rebuttal opinions. Defendants argue he provides "affirmative opinions about the state of coating science, translation barriers, regulatory costs, known coating risks, and testing limitations." Doc. 7933 at 54. But each of these opinions is in response to Ratner. *See, e.g.*, Doc. 5208-1 at 9-11 (coating science opinion: "Contrary to Dr. Ratner's assertions about coating

technologies . . . , his advocacy of applying strategies to improve biomaterials with coatings go unrealized[.]"), 21-23 (translation barriers opinion: "The 'medical implant technology silence' in responding to Dr. Ratner's bold biomaterials predictions reveals . . . a notable lack of any evident critical translation beyond academic fantasy[.]"), 10-11 (regulatory costs opinion: "Dr. Ratner discusses various surface coatings . . . , but none have been successfully commercialized. . . . [P]ublished data provides evidence for the translation cost of bringing medical device technology through the various required processes[.]"), 17-20 (coating risks opinion: "Dr. Ratner fails to acknowledge the long history of known in vivo risks . . . reported for . . . catheter coating failures."), 24-26 (testing limitations opinion: "Dr. Ratner fails to recognize the lack of validation . . . of in vitro . . . models with clinical human infection incidence. This is a well-recognized limitation of such correlations."). Some of these opinions cover several paragraphs, but they still respond to Ratner.

Plaintiff's counsel stated affirmatively at the final pretrial conference that Ratner will not testify at trial. El-Ghannam is not on Plaintiff's witness list. *See* Doc. 7933-1. Because Grainger is solely a rebuttal expert to these two witnesses, and they will not testify, he is precluded from testifying in the Cook trial. As a result, his preservation deposition for the Cook trial is not necessary.

### 2. Sloan Kettering Email.

Defendants seek to exclude an email dated January 30, 2008, sent by Dr. George Getrajdman, a radiologist at Memorial Sloan Kettering Hospital, to Kelly Powers, a Bard officer. Doc. 7524 at 2. The email states that "[a]ll my doctors have come to love silicone as much as I do. They hate the PowerPort because of the polyurethane." Doc. 7524-1. The email further states: "I want to again encourage you to coat inside and outside of catheters w[ith] the thought that early infection probably comes from outside and more common late infection probably from inside. These are things that your competitors will use against you." *Id*. Defendants argue these statements are hearsay and not admissible as a business record or for purposes of notice, and also that they are inadmissible expert

3

opinions.  Doc. 7524 at 3-4.  Plaintiff argues the email is admissible as an adoptive admission under Rule 801(d)(2)(B) because it was forwarded by Powers to others within Bard (Docs. 7752-1, 7752-2), and is also admissible for purposes of notice, including on punitive damages (Doc. 7752 at 2-4).  They further argue that it is not an inadmissible expert opinion.  *Id.* at 4.

The Court is not persuaded that the email qualifies as an adoptive admission under Rule 801(d)(2)(B).  The rule concerns hearsay "statements," not entire documents.  Powers' email forwarding Dr. Getrajdman's email within Bard focuses on the statement that doctors at Sloan Kettering love the new silicone product.  He congratulates Elizabeth Richardson, a Bard employee, for completing the project.  Docs. 7752-1, 7752-2.  His email does not mention or respond to either the statement that doctors hate the polyurethane PowerPort or the statement encouraging development of a coated product.  Emails that respond to Powers' email also congratulate Richardson for the silicone project.  Doc. 7752-1.

An adoptive admission occurs when the party against whom the evidence is to be offered appears to have "adopted or believed [the evidence] to be true[.]"  Fed. R. Evid. 801(d)(2)(B).  Powers' email says nothing about the original email's reference to doctors hating polyurethane or encouraging coated catheters.  It is entirely silent on these issues.  *See* Doc. 7752-1.  The same is true of responses the other Bard employees provide to the email.  They all focus on the original email's congratulations of Richardson.  *See* Docs. 7752-1, 7752-2.

Plaintiff argues that Powers showed adoption by merely forwarding the email.  Doc. 7752 at 2.  The Court is not persuaded.  Each of the cases cited by Plaintiff included something more.  *See Transbay Auto Serv. Inc. v. Chevron USA Inc.*, 807 F.3d 1113, 1121 (9th Cir. 2015) (by delivering an appraisal to a bank for purpose of obtaining a bank loan, party manifested an adoption or belief in the truth of the appraisal); *Sea-Land Serv., Inc. v. Lozen Intern., LLC*, 285 F.3d 808, 821 (9th Cir. 2002) (party copied entire body of memorandum into an email to a colleague and added, "Yikes, Pls note the rail screwed us

4

up," manifesting an adoption or belief in the truth of information contained in the original memorandum); *Hardy v. Kish*, No. 1:23-CV-00306-BLW, 2025 WL 2374329, at \*6 (D. Idaho Aug. 14, 2025) (party received a report on what Snell said to a reporter and responded to Snell, thanking him for doing "damage control," thereby manifesting an adoption or belief in the truth of Snell's report); *Crawford-Brunt v. Kruskall*, No. CV 17-11432-FDS, 2020 WL 5836299, at \*3 (D. Mass. Sept. 28, 2020) (treasurer of company forwarded capitalization table he had received from CFO of company with the comment, "Finally got a copy from our CFO.  Thanks again for your advice!").  These cases each show more than mere forwarding of a document.  They find adoption when a party delivers a document for purposes of obtaining a loan, incorporates content from a document and specifically comments as if it is true, responds to the creator of a document and thanks him for doing damage control by making the comments reflected in the document, or, as company treasurer, forwarding a financial document received from his company's CFO and specifically noting the source as the CFO.[1]

Powers' email forwarding the Sloan Kettering email to other Bard employees does none of these things with respect to the relevant information in the email – that doctors hate polyurethane and request coating of catheters.  Powers' only comment focuses on a different statement in the doctor's email – his report that Sloan Kettering is pleased with the silicone catheters.  Powers congratulates Elizabeth Richardson for her work on the silicone project.  Doc. 7752-1 at 3.  The Court cannot conclude that forwarding the email with this unrelated congratulations – or the responsive congratulations from other Bard employees – "manifested that [they] adopted or believed to be true" the statements about doctors hating polyurethane or wanting a coating.  Fed. R. Evid. 801(d)(2)(B).

Plaintiff also contends that Powers' silence on the negative contents in the email constituted an adoptive admission.  Doc. 7752 at 3.  Courts recognize that silence can

---

[1] Plaintiff also cites *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 973 (C.D. Cal. 2006).  This case cites *Sea-Land* for the bare proposition that incorporation of content into an email represents adoption of the content for purposes of Rule 801(d)(2)(B).  *Id.*  But the case provides no explanation for this overly-simple characterization of *Sea-Land* and is not persuasive.

manifest adoption when the circumstances reasonably would lead one to believe that the silent party would respond if he disagreed with the statement. *See United States v. Monks*, 774 F.2d 945, 951 (9th Cir. 1985). Plaintiff argues that Powers, Bard's vice president of research and development, reasonably would be expected to say something about the negative contents of the email if he disagreed with them. While this is a close question, Powers' clear purpose in forwarding the email was to congratulate a colleague. No other purpose is evident from his e-mail. *See* Doc. 7752-1 at 3. The Court cannot conclude that such a communication reasonably would be expected to include Powers' comments on other portions of the email. The Court concludes that his silence on those portions should not be taken as a manifestation that he "adopted or believed [them] to be true." Fed. R. Evid. 801(d)(2)(B).

Plaintiff argues the email should be admitted to show Defendants had "notice" of "danger" and "safer designs." Doc. 7752 at 4. But the parties' proposed jury instructions do not identify notice as an element of any of Plaintiff's claims. *See* Doc. 7932.

Plaintiff also argues the email is relevant for notice on the issue of punitive damages. The Court will address this argument in the punitive damages phase of this case, if there is one.

Defendants' Motion in Limine 5 (Doc. 7524) is **granted in part** as set forth above.

**3.    Japan Instructions for Use.**

Defendants' Motion in Limine 8 asks the Court to exclude evidence or testimony regarding the Instructions for Use for Bard IPCs marketed in Japan ("Japan IFU"). Doc. 7534 at 2. Defendants argue the impetus for the Japanese government's directive on IPC warnings was catheter breakage, an alleged defect not at issue in Plaintiff's case. *Id.* at 2-3. This assertion is supported by the Japanese directive, which focuses on breakage. *See* Doc. 7534-1. Defendants primarily argue the Japanese directive and Japan IFU are not relevant in this infection case. Doc. 7534 at 2.

Plaintiff responds that Defendants' Japan IFU also contains a warning about infection (Doc. 7757 at 2), but he never argues that Defendants' U.S. IFU does not contain

such a warning (*see id.*).  The Court accordingly directed counsel to address this issue at the final pretrial conference.  Doc. 7945 at 7 (rejecting other portions of Plaintiff's argument).  The Court noted that unless the U.S. IFU lacks an infection warning, it is not clear why the Japan IFU infection warning is relevant.

At the final pretrial conference, the parties noted that both the U.S. and Japan IFUs identify "Catheter or Port-related Sepsis" as potential adverse events from use of Defendants' products.  Docs. 7757-1 at 19, 7757-2 at 5.  The warnings are the same.  In this respect, the Japan IFU is not relevant.

Plaintiff also argues that the Japan IFU mentions "Infection Related to the Placed Device" (Doc. 7757-1 at 19), and asserted the U.S. version does not (*see* Doc. 7757-2).  But the U.S. IFU has a "Possible Complications" list that includes "Infection, including but not limited to, pocket, catheter tunnel, and/or blood stream."  *Id.* at 5.  This warning appears to cover the subject briefly identified in the Japan IFU, with even greater detail.

Because it appears the U.S. IFU includes all of the infection warnings contained in the Japan IFU, the Court concludes that the Japan IFU is not relevant.  Defendants' Motion in Limine 8 (Doc. 7534) is **granted**.  Plaintiff may raise this issue with the Court if he believes the Japan IFU somehow becomes relevant during trial.

### 4.    Bard Replacement Port.

Plaintiff asks the Court to exclude evidence and argument regarding the fact that Plaintiff's post-infection replacement port was a Bard port and did not become infected.  Doc. 7528.  Plaintiff argues these facts are irrelevant because they do not make it more or less likely that his infection was caused by the previous Bard port.  *Id*. at 2.  Defendants identify several other ways the replacement port is relevant.  Doc. 7761.  The Court directed the parties to address this at the final pretrial conference.  Doc. 7945 at 11-12 (rejecting some of Defendants' other arguments).

Defendants argue that Dr. Frimpong's use of another Bard port is relevant to the learned intermediary doctrine. That defense requires Defendants to prove that the prescribing physician would have taken the same course of action even if Defendants had

provided the additional warnings Plaintiff claims are necessary. Doc. 7345 at 19. Defendants argue in this case that Dr. Frimpong would have used a Bard port for Plaintiff's implant even if he had received Plaintiff's additional warnings.

The Court finds Dr. Frimpong's use of a second Bard port for Plaintiff is relevant to this issue. Plaintiff will argue at trial that additional warnings would have deterred Dr. Frimpong from using a Bard port in the first place. The fact that an actual blood infection in Plaintiff while using a Bard port did not deter Dr. Frimpong from again using a Bard port supports Defendants' argument that Dr. Frimpong understood the infection risks that come with ports and would not have been deterred from using a Bard port by additional infection warnings in Defendants' IFU. Plaintiff will of course be free to argue that Dr. Frimpong did not understand the magnitude of infection risks presented by Bard ports and would have acted differently had he known. The jury will decide this issue. The Court concludes that Dr. Frimpong's use of a second Bard port is relevant to Defendants' learned intermediary defense.

Plaintiff argues that the evidence, even if relevant, should be excluded under Rule 403. Plaintiff's counsel emphasized the *Boncher* case during the final pretrial conference, but that decision is unpublished and Plaintiff has provided no copy for the Court to review. *See* Doc. 7528 at 4.

The Court does conclude, however, that Rule 403 precludes Defendants from asserting that Dr. Frimpong's decision to use a Bard IPC for the replacement device, and the fact that Plaintiff did not contract a further infection, decrease the likelihood of harm and the gravity of harm elements in the design-defect balancing test. One data point is too thin a reed upon which to hang such arguments, and likely will confuse the jury and lead to unfair prejudice. For the same reason, the Court concludes that Defendants cannot turn Dr. Frimpong's decision to use a Bard replacement device into expert evidence that reasonable medical providers did not consider the likelihood of harm to be too high, or the gravity of the harm too severe, when using Bard ports.

Use of the second implanted Bard port therefore will be admitted only on the learned intermediary doctrine issue. Plaintiff can request a limiting instruction if he believes one is warranted. Plaintiff's Motion in Limine 8 (Doc. 7528) is **denied**, but with the instructions contained in this order.

### 5. Bifurcation.

The Court, in its discretion under Federal Rule of Civil Procedure 42(b), concludes that the issue of punitive damages should be bifurcated from the general liability portion of the trial. Evidence of Defendants' net worth and the Sloan Kettering email shall not be admitted until the punitive damages portion of the trial, if any. Argument and instruction on punitive damages will also be reserved for this later phase of trial. Each side must reserve an hour of their trial time for a possible punitive damages phase.

### 6. FDA Evidence.

Plaintiff's Motion in Limine 1 asks the Court to exclude evidence and argument about the FDA, including 510(k) clearance of the PowerPort at issue in this case. Doc. 7512. The parties argued this issue at the final pretrial conference.

In the IVC MDL litigation overseen by the undersigned judge, evidence of FDA clearance of the blood filter at issue was admitted during trial. *In re Bard IVC Filters Prods. Liab. Lit., Sherr-Una Booker*, 289 F. Supp. 3d 1045 (D. Ariz. 2018) ("*Booker*"). The Court concluded that the relevancy of the evidence was not outweighed by the danger of unfair prejudice. As Defendants note, several courts have followed this decision. As Plaintiff notes, several others have excluded evidence of 510(k) clearance in medical product litigation. Doc. 7512 at 3 n.2. Three federal courts of appeal have affirmed exclusion of FDA evidence in such cases. *See Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1018 (7th Cir. 2020); *Eghnayem v. Bos. Sci.*, 873 F.3d 1304, 1318-19 (11th Cir. 2017); *In re C.R. Bard*, 810 F.3d 913, 922 (4th Cir. 2016).

The Court views this as a close evidentiary question, as it did in the IVC litigation. In this case, however, the Court finds evidence of the PowerPort's 510(k) clearance less relevant than it was in *Booker*.

*Booker* was governed by Georgia law. That law included negligence principles and "the concept of reasonableness, i.e., whether the manufacturer acted reasonably in choosing a particular product design." 289 F. Supp. 3d at 1047 (citation modified). A factor the jury could consider in evaluating reasonableness was "the manufacturer's compliance with federal regulations." *Id.* "Given these principles of Georgia law, the Court [found] that evidence of Bard's compliance with the 510(k) process, while certainly not dispositive, [was] nonetheless relevant to the reasonableness of Bard's conduct and whether the company defectively designed the G2 filter." *Id.*

This case is governed by Minnesota law. A design defect claim under Minnesota law does not include compliance with federal regulations as a factor for the jury to consider. Indeed, Defendants' proposed jury instructions on design defect do not include this factor. *See* Doc. 7032 at 58-59. Minnesota's design defect law requires Plaintiff to prove that (1) the port was in a defective condition unreasonably dangerous for its intended use, (2) the defect existed in the port when it left Bard's control, and (3) the defect in the port was a direct cause of Plaintiff's injury. *See* Doc. 7345 at 4. A manufacturer has a duty to use reasonable care to design a product that is not in a defective and unreasonably dangerous condition. *See id.* at 5; CIVJIG 75.20 Design Defect, 4A Minn. Prac., Jury Instr. Guides (6th ed. 2025). In determining whether a defendant did use reasonable care, the jury may consider factors such as the danger presented by the product, the likelihood that harm will result from its use, the seriousness of the harm, the cost and ease of taking effective precautions to avoid the harm, and whether the manufacturer considered the "knowledge and technology in the field." CIVJIG 75.20. Defendants propose several additional factors for this case, including the usefulness and desirability of the product, the availability of a substitute product that would meet the same need and not be as unsafe, Defendants' ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility, the users' ability to avoid danger by exercising care in use of the product, and the users' anticipated awareness of the dangers inherent in the product and their avoidability because of general public knowledge

of the condition of the product or of the existence of suitable warnings or instructions. Doc. 7932 at 59. Compliance with government regulations is not in Minnesota's standard jury instruction or on Defendants' list. *See* CIVJIG 75.20; Doc. 7032 at 58-59.

Thus, the factor that led the Court in *Booker* to conclude that 510(k) evidence was relevant to a central claim in the case is not present in this case. Defendants argue, perhaps by focusing on the Minnesota factor of whether the manufacturer considered the "knowledge and technology in the field," that 510(k) clearance sets an "industry standard" for IPCs. *See* Doc. 7748 at 2-3 (citing Minnesota cases mentioning "industry standards" and "state of the art" as relevant for a jury's consideration of design defect). The Court does not agree. Clearance of products under 510(k) does not set any kind of industry standard for device design, or otherwise prescribe the knowledge and technology in any particular field. As the Supreme Court has explained, "the FDA does not 'require' that a device allowed to enter the market as a substantial equivalent 'take any particular form for any particular reason[.]'" *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 323 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 493 (1996)). The FDA simply determines that a device is substantially equivalent to another device on the market without determining whether the other device reflects the latest knowledge or technology of the field. The FDA does not prescribe design or safety standards like the National Highway Traffic Safety Administration's standard for seatbelts or automotive design. Clearance under 510(k) is "a qualification for an exemption rather than a requirement." *Id.* at 322.

While it is true that 510(k) review requires applicants to show their device is substantially equivalent to a predicate device, this is a comparative exercise, not a standard-setting process. Indeed, if the predicate device itself received 510(k) clearance, the FDA has never made a determination that it was safe or effective. In short, 510(k) clearance does not set a standard for "knowledge and technology in the field" as relevant to the Minnesota design defect claim asserted by Plaintiff.

Nor can the Court conclude that 510(k) clearance is relevant to an issue that will be central in this case – the safety of the port received by Plaintiff. A different kind of FDA

11

review, known as the "premarket approval" process, actually determines whether a product is safe and effective.  It is, as the Supreme Court has noted, "federal safety review."  *Id.* at 323.  The port at issue in this case did not undergo FDA premarket approval.  It was cleared through the 510(k) process, which requires only a showing of substantial equivalence.  As the Supreme Court has noted, "510(k) is focused on *equivalence*, not safety[.]"  *Id*. (citation omitted).

Defendants stated at the final pretrial conference that they will not argue to the jury that the 510(k) process shows their product is safe, but they do intend to argue that it shows their product is as safe and effective as its predicate devices.  But this fact has little probative value on the issue of safety.  As Defendants' counsel confirmed at the conference, the predicate devices for Plaintiff's port were also cleared through the 510(k) process.  No premarket-approval safety determination was made by the FDA with respect to those devices.  As a result, saying Plaintiff's port is as safe and effective as its predicate devices says little about the port's actual safety.

The limited probative value of 510(k) clearance on port safety impacts the Court's balancing under Rule 403, a rule invoked by Plaintiff.  If evidence and argument of the port's 510(k) clearance were admitted at trial on the issue of safety, it would consume substantial time and evidence.  Each side would present FDA regulatory experts to explain the 510(k) clearance process from their point of view.  Defendants would present evidence of the port's 510(k) application, Defendants' exchanges with the FDA, and other details of the clearance process.  Plaintiff would present evidence and argument that Defendants' disclosures to the FDA were not fully forthcoming and that Defendants' subsequent tracking and FDA reporting of port complications were deficient.  The danger of confusing the jury and wasting time substantially outweighs the limited probative value of the port's 510(k) clearance on the issue of safety.  Fed. R. Evid. 403.  The Court will exclude evidence of the PowerPort's clearance by the FDA from trial.

But this does not address all FDA issues.  Plaintiff claims that Defendants' proposed Avertex port, which included antimicrobial coating, was a feasible safer alternative design

Defendants could have used instead of Plaintiff's PowerPort.  (Plaintiff must show there were safer alternatives to prevail on his design defect claim.)  Defendants sought 510(k) clearance for the Avertex, but the FDA found it not substantially equivalent and told Defendants that more testing was required.  Defendants ultimately decided not to pursue the Avertex design.  In responding to Plaintiff's claim that it was a feasible and safer alternative to the PowerPort, and in responding to Plaintiff's argument that Defendants decided not to pursue the Avertex design solely for profit reasons, Defendants should be allowed to tell the jury that it sought 510(k) clearance and was denied.  That denial, including some of the testing the FDA required before further consideration, are relevant to Defendants' assertion that Avertex was not a feasible and safer alternative to the PowerPort.

Relatedly, experts retained by Defendants will testify that the FDA became stricter in reviewing 510(k) applications for antimicrobial products, in part out of safety concerns.  This evidence will respond to Plaintiff's contention that a range of antimicrobial designs were available for Defendants to use.  It is relevant to Defendants' contention that the alternative antimicrobial designs identified by Plaintiff were, in fact, not feasible and safer designs when Defendants sold the PowerPort implanted in Plaintiff.

The Court views this evidence as directly relevant to Defendants' defense against the design defect claim.  The Court does not conclude that the FDA evidence on these discrete issues will raise Rule 403 problems.  This evidence will be permitted.

Finally, Defendants stated at the final pretrial conference that they intend to present evidence they fully reported port failures to the FDA and the FDA never took regulatory actions against them.  The obvious intent of this evidence will be to suggest to the jury that the FDA viewed Defendants' ports as safe and effective products that could remain on the market.  The Court views this evidence as only marginally relevant.  The FDA could have had many reasons for not taking action against Defendants or the PowerPort.  If admitted, this evidence will prompt much evidence and argument about the thoroughness and accuracy of Defendants' complaint tracking and reports to the FDA, as the Court has seen

13

through proposed expert testimony.  The danger of confusing the jury and wasting time substantially outweighs the very limited probative value of the FDA-reporting and non-action evidence.  Fed. R. Evid. 403.  The Court will exclude this evidence.

In summary, the Court will **grant in part** Plaintiff's Motion in Limine 1. Doc. 7512.  Defendants may not present evidence regarding the 510(k) clearance or clearance process for the PowerPort, may not argue the FDA found the PowerPort to be as safe and effective as its predicate device or devices, and may not present evidence or argument that they fully reported all incidents related to the PowerPort to the FDA and it took no regulatory action against the PowerPort.  Defendants may present evidence of the 510(k) application process and result for the Avertex port, and expert evidence that the FDA raised the bar for clearance of antimicrobial IPCs.

So that the jury does not unfairly speculate that the PowerPort was sold without FDA clearance, the parties can prepare a stipulation, or the Court will give an instruction, that the PowerPort received 510(k) clearance from the FDA, which entailed a finding that it was substantially equivalent to devices already on the market.  The parties shall submit a joint proposed stipulation or instruction to the Court by noon on **April 17, 2026**.

Dated this 14th day of April, 2026.

David G. Campbell
Senior United States District Judge

14