WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 **ORDER** **Dr. Amir Sheikhi** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Amir Sheikhi, Ph.D. Doc. 5209.  The motion is fully briefed and no party requests oral argument. *See* Docs. 5209, 5765, 6023.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis.  Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

Plaintiffs have identified Amir Sheikhi, Ph.D. as a chemical and biomedical engineering expert.  Dr. Sheikhi earned his Ph.D. in Chemical Engineering in 2015.  Doc. 5209-1 at 3.  Thereafter, he completed post-doctoral fellowships with a focus on biomaterials.  *See id.*  During his postdoctoral fellowship in bioengineering at UCLA, Sheikhi "developed several types of biomaterials" and "conducted research on characterizing zwitterionic coatings to render catheters antibiofouling."  *Id.*  Since 2024, he has served as an Associate Professor of Chemical Engineering at Penn State, "with courtesy appointments in Biomedical Engineering, Chemistry, and Neurosurgery[.]"  *Id.* "With a multidisciplinary background spanning chemical engineering, chemistry, and biomedical engineering," Sheikhi is "recognized for [his] innovative work on biomaterials and regenerative medicine[.]"  *Id.* at 3-4.  Sheikhi has authored "more than 80 peer-reviewed publications" in "the fields of biomaterials, biointerfaces, tissue engineering, and sustainable materials."  *Id.* at 5.  Defendants move to exclude Sheikhi's opinions under Federal Rule of Evidence 702.

**II.    Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony

3

is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

**A.    Design Defect Opinions.**

Defendants argue Sheikhi's design defect opinions "are neither relevant nor reliable. He is not qualified to offer them, they will not assist but will rather mislead the jury, and they are based on insufficient facts and data."  Doc. 5209 at 4 (citations omitted). Defendants move for exclusion under Rule 702(a)-(b) and Rule 403.  *Id.*

Defendants first challenge Sheikhi's qualifications. They contend "Sheikhi lacks the expertise necessary to opine on medical device or IPC design, standard of care, industry standards, or on manufacturing capability." *Id.* at 5. Defendants challenge broad categories of opinions.

They first challenge Sheikhi's design defect opinion that "Bard's IPCs are 'unreasonably dangerous and defectively designed' because the catheters are not coated, modified, or reinforced, which he claims 'increase the risk of thrombosis, infection, [and] fracture" (Doc. 5209-1 at 166-67). Doc. 5209 at 3 (footnote omitted). Defendants argue that "[w]hile he may be qualified to testify about the chemical properties of the coatings he promotes . . . , he has no expertise in applying any of these technologies to any medical device for commercialization." *Id.* at 4 (footnote omitted). Defendants cite no case law or explain why Sheikhi must have direct experience commercializing alternative designs. Defendants acknowledge Sheikhi "conducted lab research on a zwitterionic coating that may have been used and commercialized on a Foley catheter[.]" *Id.* at 4 n.5 (citation and emphasis omitted). His experience does not become irrelevant because the Foley catheter is not an IPC, or the fact that it was commercialized in "only 2,000 products since 2022" by the company of Plaintiffs' other expert, Dr. McVerry. *Id.*

Sheikhi holds a Ph.D. in Chemical Engineering. Doc. 5209-1 at 3. As a tenured associate professor of Chemical Engineering with an appointment in Biomedical Engineering among other appointments, he has experience in biomedical engineering with a focus on biomaterials and biointerfaces. *Id.* Sheikhi has "developed several types of biomaterials, including shear-thinning hydrogels for catheter-based endovascular therapies," and he has "conducted research on characterizing zwitterionic coatings to render catheters antibiofouling" (*id.*), a direct issue of this litigation. His previous postdoctoral fellowships also involved a biomaterials focus. *See id.*

Sheikhi has experience conducting laboratory testing used in biomaterials research. *Id.* at 4. This includes "biological and biocompatibility tests" which he has conducted "to "determine antimicrobial thresholds," and "blood-material interaction tests, . . . to assess

how materials interface with blood components." *Id.* His work has included both in vivo and in vitro testing, and he has authored more than 80 peer-reviewed publications in the fields of "biomaterials, biointerfaces, tissue engineering, and sustainable materials." *Id.* at 4-5 (accumulating over 4,350 citations as of March 2025).

Through his research and lecturing in the field of biomaterials, Sheikhi has become "familiar with biologics-biomaterial interactions, such as protein adsorption, platelet adhesion, thrombus formation, bacterial colonization, biofilm formation, and foreign body response." *Id.* at 5. He has "practical knowledge of zwitterions and hydrophobicity/ hydrophilicity, as well as microfluidics and the synthesis of polymeric biomaterials," which he teaches in his CHE 555: Engineering Soft Materials course. *Id.* "Understanding biodegradation, non-fouling moieties, and antimicrobial agents is also integral to some of [his] research projects." *Id.*

Given his specialized knowledge of biomaterials and biological complications, the Court finds Sheikhi qualified by a preponderance of the evidence to opine that the lack of coating on Bard's IPCs increases the risk of thrombosis, infection, and fracture.

Defendants contend Sheikhi is unqualified to render his design defect opinions because he (1) "has never worked for a medical device manufacturer or in the industry and has never designed an IPC," (2) "has no experience in designing, testing, or manufacturing any medical device," (3) and "has never commercialized any product or technology." Doc. 5209 at 4 (citations omitted). As with other experts in this litigation, the Court does not find this lack of industry experience disqualifying. Sheikhi has specialized training and experience on several subjects directly related to the device design issues in this litigation. Defendants can challenge his lack of industry experience through cross-examination.

Defendants separately challenge Sheikhi's "standard of care" opinions under Rule 702(a) as based not on scientific or specialized knowledge, "but on his own personal views about proper corporate behavior." *Id.* at 5 (quoting *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 11446831, at *3 (D. Ariz. Jan. 22, 2018)).

They cite the following standard-of-care opinions of Sheikhi as improperly opining on proper corporate behavior:

- "[O]ne of [Bard's] responsibilities, in my opinion as a scientist and a human is to make these products safer."  Doc. 5209-2 at 43.
- "Bard could do and had to do a better job in making their catheter the safer alternative design."  *Id.* at 92-93.

The Court agrees these opinions improperly opine on proper corporate behavior. "Personal views on proper corporate behavior are not appropriate expert opinions" from an expert such as Sheikhi. *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495187, at *3 (D. Ariz. Jan. 22, 2018) (citations omitted); *see also In re Bard IVC Filters*, No. MDL 15-02641-PHX DGC, 2018 WL 823277, at *4 (D. Ariz. Feb. 12, 2018).  These opinions are excluded.

Defendants also move to exclude Sheikhi's standard-of-care opinion under Rule 702(b) as lacking a reliable factual foundation.  Docs. 5209 at 5, 6023 at 4.  They refer broadly to his opinion that "Bard['s] uncoated unmodified unreinforced IPCs violate the modern standard of care in catheter-related engineering."  Doc. 5209-3 at 3, 51; *see also* Doc. 5209-2 at 38-50, 97-98 (testifying the same).

Defendants contend Sheikhi "made up his defect theory and the standard of care that he claims Bard violated.  He cannot identify any court, regulatory or testing body, any medical or engineering community, or any other entity who adopts his defect theory or defines this standard."  Doc. 5209 at 5 (citation omitted).  They argue that because "no IPC in the U.S. contains all of the safer alternative designs he claims set the standard of care," he "cannot reliably opine that a standard of care requiring use of any of his proposed designs exists given there is no IPC in the U.S. that meets it."  *Id.* at 5-6 (citation omitted).

Plaintiffs argue Defendants mischaracterize Sheikhi's design defect opinions as relying on a breach of a "modern standard of care in catheter-related engineering" (Doc. 5209-3 at 3, 51).  Doc. 5765 at 5.  They contend Sheikhi "never offered 'standard of care' opinions."  *Id.*  They explain that because "he is not a lawyer or native English

7

speaker," then "he did not employ 'standard of care' in any legal sense[.]" *Id.* (citations omitted).

The Court agrees with Plaintiffs that Sheikhi's design defect opinions do not rely on a purported breach of standard of care in catheter-related engineering. As explained by Plaintiffs, his design defect opinions address the availability of safer alternative designs that could have been applied to Bard's IPCs. *Id.* at 6. These opinions are supported by the literature and internal documents Sheikhi cites, coupled with his experience. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

But Sheikhi's opinions that "Bard['s] uncoated unmodified unreinforced IPCs violate the modern standard of care in catheter-related engineering" (Doc. 5209-3 at 51), and that "the scientific evidence establishes that non-fouling, antimicrobial, and mechanically robust IPCs are not speculative upgrades; they are the modern standard of care" (*id.* at 3), do present standard-of-care opinions not otherwise explained by Sheikhi. These opinions are not supported by sufficient facts and data. Doc. 5765 at 5. Sheikhi confirmed as much when he testified that his reference to the "modern standard of care" is colloquial. *See* Doc 5209-2 at 39. Sheikhi's standard-of-care opinion is excluded. Fed. R. Evid. 702(b).

Defendants argue Sheikhi's design defect opinions will be unhelpful and misleading under Rules 702(a) and 403 because they tend to suggest Bard's IPCs are "defective merely because Bard was told about technologies that might make them safer," but "that is not the law in most jurisdictions." Doc. 5209 at 7 (footnote omitted). Defendants cite the law of several states. *Id.* (Florida, Missouri, New York, Michigan, Oklahoma, Texas, and New Jersey). They acknowledge "this is a state specific issue" and reserve the right to raise this argument on a case-specific basis. *Id.* at 7 n.7. As Defendants appear to recognize, the Court cannot entirely exclude Sheikhi's opinions when exclusion depends on applicable

state law, and they have not specifically addressed the law that will apply in any of the six bellwether trials.

### B.    Safer Alternative Design Opinions.

Defendants raise various challenges to Sheikhi's alternative design opinions under Rule 702(a)-(d). *Id.* at 8-9. They first argue that his "summary of studies related to coatings or technologies that have never been tested, evaluated, analyzed or successfully used on IPCs do not establish a viable alternative design for Bard's IPCs." *Id.* at 9. Defendants contend Sheikhi "offers no evidence these technologies could be implemented on Bard's IPCs in a practical, safe, scalable, and clinically effective way other than 'I see no reason why they couldn't,'" and that "[a]n alternative that exists only in theory – or in a different context – is not feasible and will not help the jury determine whether Bard's existing design was defective" under Rule 702(a). *Id.*

In making their "summary of studies" argument, Defendants cites 85 pages of Sheikhi's report. *See id.* at 8 (citing Doc. 5209-1 at 9, 32-53, 64-80, 90-117, 120-131, 149-156, 165-167). This is not proper argument. It is not the Court's responsibility to scour these pages trying to identify the opinions Defendants challenge and the bases for those opinions.

And the Court disagrees with Defendants' general contention that Sheikhi offers no evidence that the technologies discussed in his report could feasibly be applied to Bard's IPCs. Sheikhi discusses technologies used in various central venous catheters ("CVCs"). *See, e.g.*, Doc. 5209-1 at 34 (discussing the HydroPICC); *id.* (discussing the Poly-2-methoxyethylacrylate (PMEA) coating which "has been applied to the internal surfaces of a port catheter system, including the chamber, catheter, and connecting stem, to prevent thrombotic"); *id.* at 40 (discussing the application of the MPC polymer coating to catheters including the Argon Careflow). Plaintiffs argue in this case that the biological interactions giving rise to the medical complications at issue in this litigation are similar across IPCs and alternate CVCs. Doc. 5765 at 10. Sheikhi's opinions regarding these technologies are not inapplicable to the jury's task of evaluating Plaintiffs' proposed alternative designs.

Further, Sheikhi does not need to explain the feasibility of each technology he discusses in his summary of studies because he does not propose each discussed technology as a safer alternative design. Defendants acknowledge he proposes three specific alternate designs: the Rhapsody IPC, the BioFlo IPC, and the Orphis IPC. *See* Doc. 5209 at 11-13.

Defendants separately argue Sheikhi's alternative design opinions should be excluded under Rule 702(c)-(d) because "he has done no testing to support his conclusion that any alternative design is, in fact, safer." *Id.* at 9-11 (emphasis omitted). But an expert is not required to test their alternative designs in all cases. In *Ramirez v. ITW Food Equip. Grp., LLC*, 686 F. App'x 435 (9th Cir. 2017), the Court of Appeals explained that while the expert's "alternative design was *capable* of being tested," the plaintiff permissibly "chose not to do so" because alternative design testing is not required by Rule 702. *Id.* at 440.

Defendants argue Sheikhi's alternative design opinions are unreliable because (1) "[h]e relies on literature that does not involve IPCs" (Doc. 5209 at 9) (citations omitted), (2) he "conducted no risk benefit . . . analysis for his purported safer alternative designs," where he "cited tests or studies [that] looked only at isolated factors and did not compare the full array of performance characteristics that matter for an IPC" (*id.* at 11), and (3) he "has never published h[is] opinions or subjected them to peer review" (*id.* at 16) (citation omitted). But Sheikhi's training and experience, and his report's detailed discussion of the reasons for his alternative designs, clears the preponderance of the evidence threshold for reliability under Rule 702. The Court's role is not to determine if Sheikhi's opinions are correct. *Alaska Rent-A-Car, Inc.*, 738 F.3d at 969-70. Defendants' contentions are appropriate for cross examination.

The Court also finds Sheikhi's alternative design opinions supported by a reliable methodology. Sheikhi explains his methodology in his report. Doc. 5209-1 at 5. He "rigorously gather[s] and analyz[es] the most pertinent data and evidence, sourced from laboratory experiments, published literature, regulatory guidance, and/or industry reports." *Id.* He "appl[ies] the same scientific rigor, reproducibility, and relevance to conclude that

10

[his] findings are well-supported, objective, and as unbiased as possible. The same analytical methodology guides [his] interpretation of complex materials data and medical device performance, forming the foundation of [his] opinions and conclusions in this case." *Id.* His methodology is further supported by his experience, including his familiarity with conducting laboratory testing used in biomaterials research, his authorship of biomaterials peer-reviewed publications, and his post-doctoral fellowship work developing types of biomaterials. Doc. 5209-1 at 3-5; *see McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021) ("Although some expert testimony 'rests upon scientific foundations,' in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999))).

Defendants separately challenge Sheikhi's opinions concerning specific alternative designs. They first argue his opinions on the Rhapsody IPC as a safer alternative design should be excluded because (1) "he does not know if [the Rhapsody IPC] was ever commercially available," (2) "[h]e did not cite and could not recall any literature comparing the risks or benefits of Rhapsody to any other IPC," and (3) he does not "know the source for his claim that Rhapsody can help prevent kinking or pinch-off[.]" Doc. 5209 at 11 (citations omitted). Defendants have not cited any state law relevant to the bellwether trials that requires an alternative design to be commercially available. Nor have they demonstrated a risk-benefit analysis is necessary under any state law. And that Sheikhi could not recall the source of his kinking/pinch-off claim during his deposition does not disqualify his opinions under Rule 702.

Defendants next argue Sheikhi's opinions on the BioFlo IPC as a safer alternative design should be excluded because he unreliably compares the *Piran* 2014 and *Suleman* 2019 studies, which they contend "were separate observational studies (not a head-to-head comparison), that differed in important ways[.]" *Id.* at 12. They list three differences between the studies: (1) whether pulmonary embolisms were reported in the study, (2) the follow up duration, and (3) whether patients on anticoagulants were excluded from the

study. *Id.* They also note that neither study directly compares Bard IPCs and BioFlo IPCs. *Id.* Defendants contend that "[w]hen analyzed with consistent endpoints; there is no statistically significant difference" between the two studies. *Id.* Plaintiffs respond in similar detail. Doc. 5765 at 15-16.

As the Court explained in prior orders in this MDL (Docs. 7374 at 17, 7767 at 18), this level of granularity raises a credibility issue Defendants should address through questioning and argument at trial, not through a Rule 702 motion. Defendants' contention that Sheikhi "ignored contrary peer-reviewed literature when forming his opinions that found anti-thrombogenic coatings provide no benefit" (Doc. 5209 at 12 (footnote omitted)) is likewise not a basis for exclusion. *McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino v. Bos. Sci. Corp.*, No. 2:13-CV-01617, 2016 WL 2939521, at *7 (S.D.W. Va. May 19, 2016) ("[I]f there are certain device-specific publications that Dr. Galloway failed to review in preparing his expert report, BSC is free to inquire about those publications on cross-examination.").

Defendants challenge Sheikhi's opinions regarding the Orphis IPC as a safer alternative design. They contend he cannot rely on the *Iida* study to support his Orphis opinions because the study is "fundamentally flawed" based on (1) its lack of a "randomization or standardized infection definition," (2) its failure "to calculate whether infection rates differed statistically between early and late periods," and (3) where "no assurance groups were comparable in disease severity or clinical practices." Doc. 5209 at 13 (citation omitted). Yet prior to this litigation, Defendants consulted the *Iida* study when conducting a clinical data evaluation of equivalent devices without mentioning the methodological flaws they raise in this motion. *See* Doc. 5773-1 at 98-101. Further, Plaintiffs confirm Sheikhi does not solely rely on *Iida* to reach his opinion. "For each technology [Sheikhi considered], he scoured the literature and examined hundreds of

12

sources to assess the 'accuracy, consistency, and validity of the original data' before relying on it." Doc. 5765 at 16 (quoting Doc. 5209-1 at 7-8).

The Court will not exclude Sheikhi's opinions based on Defendants' criticism of one study when his opinions otherwise have a "reasonable factual foundation[.]" *Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a Daubert motion." (citation modified)). This too is a credibility issue the Court will not decide through a Rule 702 motion.

Defendants argue Sheikhi's opinions on alternative designs that have not been cleared for use on IPCs by the FDA will not help the jury because designs that are neither sold, tested, nor approved in the U.S. cannot serve as the benchmark for what is reasonably feasible or safe, and that relying on such designs would unfairly suggest the existence of designs that are not realistically available. Doc. 5209 at 14. They contend "[a] reasonable alternative design is both technologically and legally feasible for use in the U.S. market," and that "Courts around the country have found that products that are not available for use in the U.S. cannot suffice as evidence of a safer alternative design." *Id.* at 15 (citations omitted).

Defendants cite cases where the expert was precluded from testifying about alternative designs not commercially available on the U.S. market. *See, e.g.*, *Gomez v. Am. Med. Sys. Inc.*, No. CV-20-00393-PHX-ROS, 2021 WL 12313068, at *8 (D. Ariz. June 17, 2021); *Wood v. Am. Med. Sys. Inc.*, No. 120CV00441DDDKLM, 2021 WL 1178547, at *10 (D. Colo. Mar. 26, 2021). Other courts have declined to exclude testimony based on alternative designs not cleared by the FDA or commercially available. *See, e.g.*, *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2327, 2020 WL 1060970, at *3 (S.D.W. Va. Feb. 13, 2020) ("[That] PVDF was not cleared by the FDA . . . has no bearing on whether PVDF mesh is a safer alternative to other mesh products."); *cf. Kelley*

13

*v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1330 (N.D. Ga. 2022), *on reconsideration in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023) (declining to sustain an objection on expert testimony regarding an alternative design not available at the time of the plaintiff's implant because it would "require assessing the contours of Georgia law on design defects – an inquiry exceeding Rule 702's analysis of qualification, reliability, and relevance"). And some jurisdictions are split on whether an alternative design must be commercially available at the time of injury. *Compare Bell v. Ethicon Inc.*, No. 4:20-CV-3678, 2021 WL 1111071, at *7 (S.D. Tex. Mar. 23, 2021), *with Pizzitola v. Ethicon, Inc.*, No. 4:20-CV-2256, 2020 WL 6365545, at *4-5 (S.D. Tex. Aug. 31, 2020).

Defendants have not shown that state laws relevant to the bellwether trials in this MDL require an alternative design to be commercially available in the United States. The Court will not exclude Sheikhi's opinions on the Orphis IPC or other non-U.S. alternative designs for all purposes in this MDL when state laws vary on this issue.

Nor will the Court exclude Sheikhi's alternative design opinions based on Defendants' contention that they "do not grow[] naturally and directly out of research[.]" Doc. 5209 at 15 (citation modified). Defendants provide no further explanation as to why Sheikhi's opinions do not stem from the research described in his 195-page report (Doc. 52091-1), 14-page document review list (*id.* at 222-35), and 7-page literature review list (*id.* at 236-42).

In their reply, Defendants clarify that beyond their particularized challenges to Sheikhi's opinions on the Rhapsody, BioFlo, and Orphis IPCs, they also broadly seek exclusion of those opinions under Rule 702(b)-(d). Doc. 6023 at 9. Sheikhi's methodology, as discussed above and described in his report (Doc. 5209-1 at 5), applies with equal weight to his Rhapsody, BioFlo, and Orphis opinions. These opinions are factually supported by the materials Sheikhi cites throughout his report, and his biomaterials experience. *See Elosu*, 26 F.4th at 1024.

/ / /

/ / /

14

### C.   Medical and Regulatory Opinions.

Defendants argue Sheikhi "is not qualified to offer medical or regulatory opinions." Doc. 5209 at 15.  They contend that because he "is not a medical doctor, and admits he is not qualified to treat or diagnose patients or provide medical advice," then "he is not qualified to offer his opinions on purported health risks or medical complications, 'clinical outcomes,' 'clinical performance,' or what is 'clinically relevant' or important, or on medical causation for 'the various injuries and adverse outcomes sustained by Plaintiffs.'" *Id.* at 15-16 (citations omitted).  Plaintiffs argue that none of Sheikhi's opinions "involve[] medical diagnoses or requires a medical degree," and instead "lie at the foundation of biomaterials science: understanding how implanted materials provoke or resist the biological reactions that cause device-related complications and designing safer materials to mitigate those risks," which they contend Sheikhi is qualified to render based on his "expertise in biomedical engineering[.]"  Doc. 5765 at 6, 8 (citations omitted).

The Court agrees with Plaintiffs.  Sheikhi's opinions cited by Defendants (Doc. 5209 at 16) are within the scope of his expertise.  His experience in biomaterials includes laboratory testing used in biomaterials research, "biological and biocompatibility tests," and experience with "blood-material interaction tests, . . . to assess how materials interface with blood components."  Doc. 5209-1 at 4.  Sheikhi has become "familiar with biologics-biomaterial interactions, such as protein adsorption, platelet adhesion, thrombus formation, bacterial colonization, biofilm formation, and foreign body response."  *Id.* at 5.  He explained that "[u]nderstanding biodegradation, non-fouling moieties, and antimicrobial agents is also integral to some of [his] research projects."  *Id.*

Sheikhi's experience in the field of biomaterials qualifies him to opine about the biological complications associated with biomaterials, clinical outcomes, and performance of biomaterials, and on the causal effect of biomaterials on thrombosis, infection, and related biological complications.  Defendants reliance on *Contreras v. Brown*, No. CV-17-08217-PHX-JAT, 2018 WL 7254917, at *3 (D. Ariz. Dec. 4, 2018), is misplaced because in that case the court excluded a biomechanical engineer's specific medical causation

opinion, which Sheikhi does not render.  So too is their reliance on *Roeder v. Am. Med. Sys., Inc.*, No. 20-1051-JWB, 2021 WL 4819443 (D. Kan. Oct. 15, 2021), where a doctor of chemical engineering and doctor of polymer science were held "not qualified to offer opinions regarding medical complications."  *Id.* at *4.  Beyond his Ph.D. in Chemical Engineering, Sheikhi has significant experience in biomaterials and biological complications, as discussed above.

Defendants argue Sheikhi is not qualified to render regulatory opinions, including "whether Bard complied with FDA regulations or guidance, what FDA's state of mind is with respect to Dr. Sheikhi's purported safer alternative designs or Bard's regulatory submissions, or the implications of 510(k) clearance and the types of data that may be used to obtain regulatory clearance."  Doc. 5209 at 16.  Plaintiffs do not respond to Defendants argument and instead only contend Sheikhi "may identify FDA-cleared devices that already employ similar catheter technologies that he proposes as alternative designs."  Doc. 5765 at 5.

Sheikhi's report states he is "familiar" with "the types of evidence that typically underpin medical device evaluations" and "Food and Drug Administration (FDA) processes such as 510(k) submissions, premarket approval (PMA), investigational device exemptions (IDE), and pre-submissions[.]"  Doc. 5209-1 at 5.  But mere familiarity is not enough to qualify Sheikhi as an expert on FDA processes, and his report provides no further explanation for his familiarity.

In the pages of Sheikhi's report and rebuttal report cited by Defendants (Doc. 5209 at 16), he discusses Bard's lack of adherence to FDA guidance and Defendants' interactions with the 510(k) clearance process based on Bard's internal documents and deposition testimony of Bard employees.  *See, e.g.*, Doc. 5209-1 at 67 n.7 ("Defendants' port team did not follow the FDA's guidance regarding the number of sheep to test or proper implantation procedures [to use in their pilot sheep studies.]" (citations omitted)); *id.* at 123 (describing the contents of a 510(k) Premarket Notification and explaining that "[g]iven those claims, Defendants anticipated 510(k) clearance" but "[t]he FDA . . .

questioned the nanoparticles and leachate in the antimicrobial PowerPort catheters, which resulted in the issuance of Not Substantially Equivalent letter," but "Defendants did not attempt to 'address [the FDA's] remaining 8 questions and resubmit' their 510k application" (citations omitted)).  Sheikhi also explains what is – and what is not – achieved through 510(k) clearance of a medical device.  Doc. 5209-3 at 3 ("Regulatory determinations of 'substantial equivalence' through the 510(k) pathway do not permit medical device manufacturers to ignore safer designs and that optimal patient protection demands both procedural sterility and material innovation.");  *id.* at 20 ("[T]he 510(k) pathway is neither an approval of safety nor a test of clinical superiority. By statute it asks only whether the new device is 'substantially equivalent' to a previously marketed predicate." (citation omitted)).

Plaintiffs do not argue Sheikhi is qualified to opine on Defendants' interactions with the FDA or other FDA-related issues in this case, and Sheikhi's report does not explain how he is qualified to provide such opinions.  Plaintiffs have not shown by a preponderance of the evidence that he is qualified to render FDA-related opinions.

Nor may Sheikhi opine that the "FDA does not have issues with coatings per se; it was simply wary of Defendants' incomplete submissions and assessments when attempting to clear its antimicrobial IPC prototype."  *Id.* at 19.  This opinion discusses the motive behind the FDA's decision, which lies outside the bounds of Sheikhi's expertise.  And Sheikhi may not opine that "it [is] more likely than not . . . that the FDA would clear an antimicrobial implanted port catheter."  Doc. 5209-2 at 105.  As argued by Defendants (Docs. 5209 at 16, 6023 at 11), this opinion was not disclosed in Sheikhi's report (Doc. 5209-1 at 166-67) and was elicited by Plaintiffs' counsel during his deposition (*see* Doc. 114 ¶ II.F).  Such an opinion also exceeds his qualifications to opine on FDA regulatory processes as discussed above.

Plaintiffs point to Defendants' materials science and biomedical engineering experts, Drs. MacLean and Grainger, arguing "Defendants [cannot] wield FDA evidence as both a sword and shield[.]"  Doc. 5765 at 5.  But Plaintiffs never challenged whether

17

MacLean or Grainger were qualified to render any purported FDA or regulatory opinion. Docs. 5203, 5208. Further, MacLean has experience with regulatory processes not demonstrated by Sheikhi. Doc. 7222 at 8 ("MacLean has experience in product compliance assessments and in assessing risk during the product qualification stage. He is 'well versed in product recall investigations' across numerous federal agencies and is 'familiar with testing and material standards[.]'" (citations omitted)). His 510(k) process opinions were narrowly cabined to that experience. *See id.* at 17-18.

Defendants lastly contend Sheikhi's medical and regulatory opinions should be excluded because "he has no experience with any of these subjects" and therefore cannot "explain how [his] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts" as instructed by *Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *27 (D. Ariz. Aug. 2, 2019). Sheikhi's experience, as laid out above, is relevant to his medical opinions. The 166 substantive pages of his report demonstrate how his experience in biomaterials and related biological complications leads to his conclusions, and how that experience is both a sufficient basis for his related opinions and reliably applied to the facts. *See* Doc. 5209-1.

### D. Improper Legal Conclusions.

Defendants argue Sheikhi's opinion that "Bard's IPCs are 'unreasonably dangerous' and 'defectively designed'" are "legal terms of art" and thus "improper legal conclusions." Docs. 5209 at 17 (citations omitted). They cite cases from the Eastern and Western Districts of Missouri, the Central District of Illinois, and the District of Arizona in support. *See id.* Plaintiffs assure Sheikhi "will not couch his opinions in legal jargon," but contend "he is permitted to use different words to convey his opinions." Doc. 5765 at 17. The question of whether Sheikhi's use of the terms "unreasonably dangerous" and "defectively designed" constitutes improper legal conclusions turns in part on the product liability law of the relevant state. Yet Defendants discuss no state law relevant to the strict liability claims brought in this MDL. *See* Doc. 5209 at 17. Defendants can object in specific cases

if they believe Sheikhi's testimony is venturing into legal terminology under the relevant state's law.

### E.    State of Mind Opinions.

Defendants cite numerous pages of Sheikhi's report, rebuttal report, and deposition testimony arguing Sheikhi improperly opines on "Bard's 'design choices' and its knowledge, intent, motive, or state of mind based on his review of a limited set of Bard documents[.]" *Id.* They argue these opinions should be excluded under Rule 702(a) and (b). *Id.* at 18.

The Court will not engage in an exhaustive review of the pages of Sheikhi's reports cited by Defendants where they cite no particular opinion they seek to exclude. But the Court's review did at times reveal opinions that crossed into corporate knowledge territory. *See, e.g.*, Doc. 5209-1 at 71 ("Defendants 'shelved' the Thrombus-Resistant Catheter project because they lacked the in-house expertise to recreate the DGP coating . . . . In the words of Mr. Thomas – Defendants' project leader – the Thrombus-Resistant Catheter project 'fell apart at Bard' because of lack of priority and resources as well as managerial reasons." (citations omitted)); *id.* at 124 ("Defendants have not used any antimicrobial or antifouling coatings or additives on their hydrophobic IPCs due to cost and time." (citations omitted)).

Sheikhi is not qualified to opine on the state of mind or corporate knowledge of Bard. *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *6 (D. Ariz. Jan. 22, 2018). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004)). Sheikhi's opinions must be cabined to his expertise as a chemical and biomedical engineer.

### F.    Improper Citations.

Defendants argue broadly that Sheikhi's opinions are "unreliable and should be excluded under Rule 702(c) and (d)" because "he repeatedly miscites Bard's internal

19

documents and corporate testimony and attributes statements or propositions to Bard that are wholly unsupported by the cited evidence." Docs. 5209 at 18, 6023 at 12. They provide a chart cataloging these purported citation errors from his report. Doc. 5209-14 (Ex. N).

After reviewing the chart, the Court is unpersuaded these citation errors render Sheikhi's opinions unreliable under Rule 702(c)-(d). The chart reflects Sheikhi's opinions paraphrasing Bard's internal documents. *See* Doc. 5209-14. Defendants' criticisms regarding the accuracy of the paraphrasing are appropriate for cross examination if the chart is in some way mentioned at trial (absent stipulated admission, the expert reports are inadmissible hearsay), but they are not a basis to exclude Sheikhi's opinions. *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)).

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Amir Sheikhi (Doc. 5209) is **granted in part** and **denied in part**. Dr. Sheikhi may not opine about (1) Bard's responsibilities to "make products safer," (2) the standard of care in catheter-related engineering, (3) FDA regulations and FDA interactions with Defendants, and (4) Defendants' corporate knowledge or state of mind. The motion is otherwise **denied**.

Dated this 14th day of April, 2026.

David G. Campbell
Senior United States District Judge