**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

IN RE:  Bard Implanted Port Catheter
Products Liability Litigation

_____

Kimberly Divelbliss,

Individual Plaintiff,

v.

Becton Dickinson and Company, et al.,

Defendants.

MDL No. 3081

No. CV-23-01627-PHX-DGC

**ORDER**

**Darren R. Hurst, M.D.**

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Darren R. Hurst, M.D. Doc. 7091.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 7091, 7420, 7664.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

1

peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter.  The port is a small reservoir with a self-sealing silicone center where a needle can be inserted to deliver medication.  The port typically is implanted beneath the chest skin and below the collarbone.  Port bodies vary in shape and size and are made of plastic, silicone, or titanium.  The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein.  The catheter is tunneled under the skin to an insertion point in a central vein.  Catheters vary in width and are made of silicone or polyurethane.  IPCs typically are implanted by an interventional radiologist or a vascular surgeon.  A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA").  Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans.  Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port.  Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury.  Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots.  Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue

2

compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

Plaintiff Divelbliss brings her lawsuit in this MDL.  Doc. 26 (CV-23-01627-PHX-DGC).  On July 13, 2017, Plaintiff had a Bard port implanted.  *Id.* ¶ 53.  On December 13, 2019, Plaintiff discovered through an emergency room visit that a piece of the port catheter had broken off and lodged in her heart.  *Id.* ¶ 62.  She underwent emergency surgery to remove the port.  *Id.* ¶ 63.  Plaintiff raises claims typical of this MDL.  *Id.* at 15-29.

The parties plan to use various expert witnesses at trial, including medical professionals.  Plaintiff has identified Darren Hurst, M.D., as a medical expert.  Dr. Hurst is an interventional radiologist.  Doc. 7091-4 at 5.  He practices as the Chief of Vascular and Interventional Radiology for the St. Elizabeth Health System and holds other radiology-practice positions.  *Id.* at 5, 50-51.  He is also an Assistant Professor of Interventional Radiology at the University of Kentucky College of Medicine.  *Id.* at 5, 51.  Hurst regularly implants and removes port catheters.  *Id.* at 5.  Defendants move to exclude Hurst's opinions under Federal Rule of Evidence 702.

**II.     Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the

proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Defendants move to exclude several opinions of Hurst.

///

///

4

### A.    Opinions on IPC Design and Alternative Designs.

Defendants argue Hurst is not qualified to opine on the design of its IPCs or any alternative design.  Doc. 7091 at 4.  They refer to Hurst's opinions that (1) the risk of fracture reduces for a catheter made of polyurethane or with mesh reinforcement, (2) Plaintiff's catheter fractured from subclavian access, its weaker design, or both, and (3) "the flexural fatigue mechanism" described in Bard's records "is entirely consistent" with a catheter that has undergone the "material degradation" present in Plaintiff's port catheter, "as degraded material would be more susceptible to fatigue failure under the mechanical stresses present in this case." *See id.* at 4-5.

In addressing Hurst's general opinions, this Court ruled that he is not qualified to opine on IPC alternative designs. *See* Doc. 7196 at 14.  Plaintiff acknowledges the Court's prior ruling, but argues Hurst is qualified to opine on polyurethane catheters as an alternative design because he has extensive clinical experience with the AngioDynamics port, which has a polyurethane catheter.  Doc. 7420 at 4.

Hurst "has used AngioDynamics ports exclusively for the last 10 or 11 years" and has also used Bard ports.  *Id.* at 4-5 (citing Doc. 7420-1 at 5-6)).  He was involved in his hospital's decision to use the AngioDynamics port through his 10-year participation on the product assessment committee.  *Id.*  The committee "vet[s] products" to determine which will be used in the hospital, and it considers "products' instructions for use, medical literature, marketing materials, and pricing information."  *Id.*; Doc. 7664-1 at 3.  The committee "chose to stock a port with a polyurethane catheter, specifically the AngioDynamics port, at least five years ago," and that decision was "based on data that they had regarding its catheter and the design of the port itself[.]"  Doc. 7420 at 4  (citing Doc. 7420-1 at 4).

But Hurst's alternative design opinions go beyond his clinical experiences in choosing and using the AngioDynamics port.  He opines on mesh reinforcement as an alternative design (Doc. 7091-1 at 13), that the "weaker silicone design" of the Bard port catheter "increased the likelihood of fracture" in Plaintiff's case (*id.* at 15), and that

"degraded [catheter] material would be more susceptible to fatigue failure under the mechanical stresses present in this case" (*id.*).  Defendants challenge these opinions (Doc. 7091 at 4), but Plaintiff does not address them in her response (*see* Doc. 7420).

Even Hurst's opinions on the AngioDynamics port go beyond his clinical experience.  He opines, for example, about the comparative risk of catheter fracture in AngioDynamics and Bard catheters.  Doc. 7091-3 at 25 ("The Groshong catheter demonstrates a higher risk of fracture . . . in comparison to the . . . polyurethane catheters[.]").  But as Defendants note, Hurst has never implanted in his clinical practice a Groshong catheter like the one used here, has implanted a port using the subclavian approach that was used in this case only once or twice in his career, and has experienced a fractured port catheter only with a subclavian placement.  Docs. 7664-1 at 7, 10, 16, 22, 7664-2 at 3.  Further, Hurst did not assess Bard ports for his hospital's product selection committee, "could not recall whether he was on the committee when [the hospital] temporarily stopped stocking Bard ports in 2014 – or if he was, why that decision was made – and he did not track adverse events related to any port products or review testing documents from any other port manufacturers."  Doc. 7664 at 4 (citing Doc. 7664-1 at 5, 11-14, 15, 20-21).  And to the extent Hurst relies on his personal review of literature (Doc. 7091-3 at 26-27), he cannot simply repeat the findings of others as his opinions.  *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("It is not enough to simply read the . . . studies in the literature and describe their findings."), *aff'd sub nom. Engilis*, 151 F.4th 1040.

This Court in its prior order found Hurst has "no experience designing ports or testing port materials," and has not "produced any studies, research, or literature on port materials or design."  Doc. 7196 at 12 (citations omitted).  Hurst may testify about his experiences on the committee in choosing the AngioDynamics port, and in his patient care involving Bard and AngioDynamics ports.  *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion."); *Geiger v. Creative*

*Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (citation omitted)).  But for the same reasons discussed in the Court's prior order (Doc. 7196 at 12-13), Hurst is not qualified to opine that the risk of fracture is less for a catheter made of polyurethane or with mesh reinforcement (Docs. 7091-1 at 13, 7091-3 at 15), that Bard's port design may have contributed to Plaintiff's catheter fracture (Docs. 7091-1 at 15, 7091-3 at 29-30), or on the correlation between the flexural fatigue mechanism and the alleged degraded material in Plaintiff's catheter (Doc. 7091-1 at 15).  Those opinions go beyond the bounds of Hurst's experience with the AngioDynamics port.

**B.     Opinion on What Dr. Richardson "Would Have Done."**

Defendants seek exclusion of Hurst's opinion "regarding what Dr. Richardson, the implanting physician, would have done if he had been provided with additional information[.]" Doc. 7091 at 8.  But Hurst does not render this opinion at the pages of his report and deposition transcript cited by Defendants.  *Id.* (citing Docs. 7091-1 at 13-14, 7091-3 at 23, 25).  Plaintiff confirms Hurst has not and will not opine "that Dr. Richardson would not have used the Bard port if he had been provided with additional information." Doc. 7420 at 8.  In their reply, Defendants do not address this response by Plaintiff. Doc. 7664 at 2 n.1.

Defendants cite Hurst's opinions about what information was and was not provided in Bard's IFUs and what information should have been provided, and the reasonable expectations of physicians (Docs. 7091-1 at 13-14, 7091-3 at 23, 25). Defendants do not challenge those opinions.  Because they cited them, however, the Court restates its prior rulings that Hurst is qualified to opine on the reasonable expectations of physicians and "whether port-related risks known to the medical community were disclosed through Bard's IFUs," but he may not opine on content he believes should have been included in

the IFUs (Doc. 7196 at 16, 20), a subject he discussed during his deposition (Doc. 7091-3 at 25) and in his report (Doc. 7091-1 at 14).[1]

### C.    Opinions on Plaintiff's Cardiac Injuries.

Defendants seek to exclude Hurst's opinions on "Plaintiff's purported cardiac injuries because he is not qualified to offer cardiac opinions" and because such opinions are unreliable and unsupported by sufficient facts and data. Doc. 7091 at 10. They specifically challenge Hurst's opinions "on any ongoing cardiac issues" of Plaintiff. *Id.* at 11-12. Plaintiff contends Hurst "has not opined, nor does he intend to opine," on Plaintiff's ongoing cardiac issues, and confirms Hurst "will not offer . . . opinions regarding Plaintiff's ongoing cardiac complications[.]" Doc. 7420 at 10.

Defendants also argue Hurst is not qualified to "opine that the catheter fragment caused Plaintiff's arrhythmia." Doc. 7664 at 6; *see* Doc. 7091-3 at 7 ("[T]here was definitely arrhythmia that was caused by the catheter"). The Court agrees. Hurst is an interventional radiologist, not a cardiologist. Doc. 7091-3 at 7. He treats catheter fractures in his practice and observes cardiac arrythmia in such patients (*id.* 6-7), but this is not sufficient qualification for him to opine on the *cause* of cardiac arrhythmias. "[T]he ability to diagnose medical conditions is not remotely the same, . . . as the ability to deduce . . . in a scientifically reliable manner, the causes of those medical conditions." *Wilson v. Pinnacle Foods Inc.*, No. 3:19-CV-229-BJB, 2022 WL 419595, at *6 (W.D. Ky. Feb. 10, 2022) (citation modified)); *see also Stambolian v. Novartis Pharms. Corp.*, No. CV 12-04378 BRO FMOX, 2013 WL 6345566, at *6 (C.D. Cal. Dec. 6, 2013) (holding doctor qualified to treat medical condition at issue but not qualified to diagnose the cause). Hurst concedes he is not qualified to opine on Plaintiff's ongoing cardiac complications. Doc. 7091-3 at 7-8. It follows that he is not qualified to opine on the cause of the complications. Hurst's causation opinion is excluded.

---

[1] Although Hurst's testimony about what information should have been included in Bard's IFUs was elicited by defense counsel (Doc. 7091-3 at 25), a fact that would have overcome a nondisclosure objection by Defendants, Hurst's testimony on this issue is precluded because he is not qualified under Rule 702 to render the opinion.

Hurst may, however, opine that cardiac arrythmia is a common complication of a catheter fracture. Hurst supports this opinion with his experience as an interventional radiologist treating fractured catheters. Doc. 7901-3 at 6-7 ("[A]rrhythmia is . . . one of the first things that you're going to see if you have some sort of foreign body . . . within the heart, in my experience with catheter fragments[.]"), 9 (Hurst testifying that he has "personally removed catheter fragment from a patient's heart" five or six times). It is common knowledge in the medical community that cardiac arrythmia is a known complication of a catheter fracture – Bard's IFU warns about it. Doc. 4822-1 at 23. Hurst's opinion that cardiac arrythmia is a common complication of a catheter fracture is supported by sufficient facts and data and is reliable. *See Elosu*, 26 F.4th at 1024; *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018) ("[C]linical experience [can be] sufficient to satisfy the threshold reliability requirements of Rule 702."); *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *4 (D. Ariz. Jan. 22, 2018) ("[E]xpert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010))).

Defendants contend the following statement from Hurst's report "suggests that he might venture into cardiac opinions": "Dr. Dim further confirmed that [Plaintiff's] recurrent palpitations were likely related to the prior right atrial foreign body, explaining that although the fragment had been removed, the cellular damage it caused persisted, leaving [Plaintiff] at risk for developing arrythmia." Doc. 7091 at 11. The Court reminds Plaintiff that an expert may not act as a conduit for another expert's opinions. While Plaintiff contends such statements from Hurst's report are simply a summary of Plaintiff's medical chronology and not Hurst's opinions (Doc. 7420 at 10), experts cannot "engage in lengthy factual narratives not necessary to the jury's understanding of their opinions[.]" *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL

495187, at *4 (D. Ariz. Jan. 22, 2018).  Defendants may object at trial where they deem appropriate.

**IT IS ORDERED** Defendants' motion to exclude the opinions of Darren R. Hurst, M.D. (Doc. 7091) is **granted in part and denied in part**.  Dr. Hurst may not opine on (1) the design of IPCs or alternative designs as explained above, (2) what information he thinks should have been included in the IFUs, or (3) the cause of Plaintiff's cardiac arrythmia.

Dated this 6th day of July, 2026.

David G. Campbell
Senior United States District Judge