**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| _____ | No. CV-23-01627-PHX-DGC |
| Kimberly Divelbliss, | **ORDER** |
| Individual Plaintiff, | **Ralph Reichle, M.D.** |
| v. | |
| Becton Dickinson and Company, et al., | |
| Defendants. | |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiff has filed a motion to exclude the expert opinions of Ralph Reichle, M.D. Doc. 7095.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 7095, 7412, 7668.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

1

peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue

compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis.  *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

Plaintiff Divelbliss brings her lawsuit in this MDL.  Doc. 26 (CV-23-01627-PHX-DGC).  On July 13, 2017, Plaintiff had a Bard port implanted.  *Id.* ¶ 53.  On December 13, 2019, Plaintiff discovered through an emergency room visit that a piece of the port catheter had broken off and lodged in her heart.  *Id.* ¶ 62.  She underwent emergency surgery to remove the port.  *Id.* ¶ 63.  Plaintiff raises claims typical of this MDL.  *Id.* at 15-29.

Defendants have identified Ralph Reichle, M.D., as a medical expert.  Dr. Reichle is a board-certified interventional radiologist with over 30 years of practice.  Doc. 7095-2 at 3.  He is certified in Diagnostic Radiology by the American Board of Radiology and maintains a Certificate in Interventional Radiology from the American Board of Radiology.  *Id.*  Reichle has practiced interventional and diagnostic radiology at Mount Auburn Hospital since 1994, and was Chief of Interventional Radiology from 2012 through 2023.  *Id.*  Since 1994, Reichle has had a Faculty Academic Appointment at Harvard Medical School and currently serves as an Assistant Professor of Radiology.  *Id.*  He also has held a faculty appointment at Massachusetts General Hospital since 2007.  *Id.*  Plaintiff moves to exclude Reichle's opinions under Federal Rule of Evidence 702.

/ / /

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050.  If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible.  *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

/ / /

4

### III. Discussion.

Plaintiff moves to exclude several opinions of Reichle.

### A. Causation and Defect Opinions.

Plaintiff argues Reichle's "causation and defect opinions should be excluded because he did not perform a reliable differential [etiology]," and his literature review "simply ignored contradictory studies." Doc. 7095 at 4.[1] She refers to Reichle's opinion that her catheter fracture was caused by the placement of Vicryl "locking" sutures in the soft tissue around the catheter, resulting in scar tissue that caused the catheter to kink and fracture. *Id.* at 8. Reichle's defect opinion flows from his causation opinion: because the catheter fracture was caused by the placement of sutures, the port catheter was not defective. *Id.*

Plaintiff argues that although Reichle repeatedly claims to have performed a differential etiology (Doc. 7095-2 at 2, 5), he did not. Doc. 7095 at 4. "[A] reliable differential [etiology] may form the basis of an expert's causation testimony." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014). The expert "first assumes the pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234 (9th Cir. 2017).

Defendants argue Reichle was not required to perform a differential etiology under Rule 702. Doc. 7412 at 9. True, *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009), but when an expert bases his causation opinion on a differential etiology, as Reichle clearly does (Doc. 7095-2 at 2), he must rule in potential causes and rule out those without plausible evidence. *Wendell*, 858 F.3d at 1234.

Defendants' cited cases support this distinction. In two of the cases, the expert did not claim to perform a differential etiology and the courts were not required to decide its

---

[1] Reichle uses the phrase "differential diagnosis" in his report, but the Court will use the phrase "differential etiology," which more accurately describes a search for the cause of a medical condition. *See Engilis*, 151 F.4th at 1044 n.1.

sufficiency.  *See Millenkamp*, 562 F.3d at 979 ("Dr. Kertz did not purport to employ differential [etiology.]"); *Parenti v. Cnty. of Monterey*, No. 14-CV-05481-BLF, 2017 WL 1709349, at *3 (N.D. Cal. May 3, 2017) ("Dr. Sheridan's report does not indicate that he utilized differential [etiology] methodology[.]").  *Parenti* did acknowledge, however, that when an expert does claim to have performed a differential etiology, he must "consider alternate causes."  2017 WL 1709349, at *3 (explaining the Ninth Circuit has affirmed decisions "excluding expert opinions that expressly relied on differential [etiology] but failed to consider alternate causes."  (citations omitted)).

Defendants cite a third case for the proposition that "when a doctor offers a reasonable medical opinion, grounded in their relevant experience, appropriate analysis, and in the medical literature, their opinions should not be excluded."  *Allen v. Am. Cap. Ltd.*, 287 F. Supp. 3d 763, 790 (D. Ariz. 2017).  This is an accurate statement, but Reichle said at least three times that he arrived at his opinion by applying a differential etiology.  *See* Doc. 7095-2 at 2, 5.  In *Allen*, the expert performed a satisfactory differential etiology because he "clearly considered, and ruled out" the relevant possible causes.  287 F. Supp. 3d at 790-91.

Plaintiff argues Reichle "did not rule in or rule out multiple, obvious alternative causes of the catheter fracture, including 1) pinch-off syndrome, 2) flex fatigue, and 3) degradation."  Doc. 7095 at 5.  The Court agrees.

Plaintiff contends that "because Dr. Reichle opined that the catheter is in the pinch-off zone, he must take the analysis a step further and rule out that pinch off occurred in this case."  Doc. 7668 at 2.  Reichle identified pinch-off syndrome as a contributing cause of Plaintiff's catheter fracture.  *See* Doc. 7095-32 at 20 ("[T]hat kinking is a result of the Vicryl suture and the catheter in the pinch-off zone getting stretched and causing this kink."), 33-34 (fracture caused in part by "the fact that [the catheter] was placed in the pinch-off zone").  Defendants contend this is a sufficient treatment of pinch off as a possible factor in this case, but Reichle never addresses whether pinch off could be the sole

cause of Plaintiff's fracture and if not, why not. He therefore fails to rule in or out a possible alternative explanation for Plaintiff's injury.

Reichle refers to "flex fatigue" as "repetitive bending, repetitive wear and tear." Doc. 7412 at 11. He opines that such repetitive bending of Plaintiff's catheter was caused by the sutures. *See* Docs. 7095-2 at 15-18, 7095-3 at 20. But as with pinch off, Reichle never addresses whether repetitive bending was itself an independent cause of Plaintiff's catheter failure and therefore does not rule in or out a possible cause of her injury.

Defendants concede Reichle did not rule in degradation of the catheter as a possible cause, but argue he is not qualified to opine on degradation because he is not a materials scientist. Doc. 7412 at 12. That may be true, but Reichle nonetheless used differential etiology to opine not only that suturing was the most likely cause of Plaintiff's fracture, but also that the catheter was not defective. *See* Doc. 7095-2 at 18 ("In my opinion, with a reasonable degree of medical certainty, the Bard port catheter, used to replace the clotted right subclavian port catheter, fractured due to the use of Vicryl sutures to stitch the soft tissues around the catheter, *and not to any defect in the port catheter*." (emphasis added)).

If Reichle is going to use differential etiology to arrive at an opinion that the catheter was not defective, he must rule in all possible causes. He cannot ignore a possible cause – indeed, a cause alleged in this case – simply because he does not have the expertise to address it. That would be like saying a tire expert opining on the cause of an auto accident need not address road conditions, driver behavior, weather, alcohol impairment, or a host of additional possible causes because he is not an expert in any of them. Stated differently, the central point of differential etiology – identifying and then systematically ruling out possible causes – would be meaningless if the range of possible causes could be reduced in every case to the retained expert's field of expertise. If Defendants were going to retain experts to apply differential etiology to determine the cause of Plaintiff's fracture, they could have used other, complimentary experts to rule out possible causes Reichle cannot address. But Reichle does not identify any other expert he relied on to exclude degradation

as a possible cause or to conclude that it is a less likely explanation of Plaintiff's fracture than his posited reason. Reichle simply leaves degradation entirely unaddressed.

The Court concludes that Reichle has not performed a reliable differential etiology. The essence of that analytical approach is to rule in all plausible causes, then rule out those that provide a less reliable explanation for the injury, thereby arriving at a final cause or small group of causes which the expert can analyze to arrive at the most likely. "A causation opinion arrived at by ruling out various possible causes is reliable only if the expert first 'ruled in' only those potential causes that could have produced the injury in question." *Jensen v. Camco Mfg., LLC*, No. CV-23-00266-PHX DGC, 2024 WL 4566781, at *3 (D. Ariz. Oct. 24, 2024), *aff'd*, No. 24-7092, 2026 WL 64295 (9th Cir. Jan. 8, 2026). "The expert must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1058 (9th Cir. 2003) (citation omitted). "A district court is justified in excluding evidence if an expert utterly fails . . . to offer an explanation for why the proffered alternative cause was ruled out" or why it was not ruled in at the start of the process. *Id.* (citation modified).

Reichle failed to address pinch off, repetitive bending, and degradation as possible causes of Plaintiff's fracture. His analysis therefore failed to explain why each of them was a less reliable explanation of Plaintiff's injury than his espoused cause, Dr. Richardson's use of stitches. Although Reichle arguably could have reached his opinion through a different approach, he did not do so. He used differential etiology, and his failure to use it accurately renders his resulting opinion unreliable. The Court therefore will exclude Reichle's opinion on the cause of the catheter fracture in this case.[2]

---

[2] Plaintiff additionally challenges Reichle's causation opinion by arguing he "cherry picked the literature" to support his opinion that "[t]here is no peer reviewed evidence that Bard port catheters have a higher rate of fracture and embolization." Docs. 7095 at 7, 7668 at 5 (quoting Doc. 7095-2 at 19). In light of the Court's conclusion that his causation opinion is not reliable, the Court need not address this issue.

Turning to Reichle's related defect opinion – that Plaintiff's catheter fracture was caused by the sutures and not by any catheter defect – Plaintiff argues that "[b]ecause his defect opinion flows from the unreliable causation opinions . . . [,] it is also unreliable." Doc. 7095 at 8 (citing Doc. 7095-2 at 18).  The Court agrees and will exclude his defect opinion for reasons explained above.

### B.    Opinions on Sutures and Scar Tissue.

Plaintiff challenges several of Reichle's opinions regarding the placement and effect of Plaintiff's sutures.  *Id.* at 9.[3]  Plaintiff argues Reichle's "opinion that Dr. Richardson[] placed absorbable sutures around the port catheter is contradicted by the evidence" because Dr. Richardson "testified unequivocally" that his locking stitch "does not contact the catheter at all," "only pinches the muscular tissue around the catheter," "does not go around the catheter," and "was 'nowhere near the fracture site.'"  Docs. 7095 at 9, 7668 at 5 (citations omitted).  Reichle's opinion is that Dr. Richardson "placed a Vicryl absorbable stitch in the soft tissues around the port catheter[.]" Doc. 7095-2 at 15.  That opinion is not inconsistent with Dr. Richardson's testimony cited by Plaintiff.

Defendants argue there is more than one "plausible interpretation" of Dr. Richardson's testimony, and cite to testimony where he explains "the locking part has to do with to snug the soft tissue around the catheter," and he can place a stitch "so it encircles the muscle and gently constricts it around the catheter[.]"  Doc. 7412 at 17 (quoting Doc. 7095-17 at 37).  Plaintiff contends "encircling muscle around the catheter is not the same as encircling the catheter itself[.]"  Doc. 7668 at 6.  On this record, the Court cannot say Reichle's opinion is without support.  *See* Doc. 7095-2 at 15.  Plaintiff may cross-examine Reichle if she believes he misrepresents Dr. Richardson's testimony.

Plaintiff next argues Reichle's "opinion that absorbable sutures caused scar tissue is pure speculation with no basis in objective facts."  Doc. 7095 at 9.  But during his deposition, Reichle confirmed his opinion that "indentations" visible on a scan of

---

[3] Plaintiff argues Reichle's opinions "should all be excluded as the product of unreliable methodology," but her arguments challenge the factual basis of Reichle's opinions and not his methodology.  Doc. 7095 at 9-10.  The Court will address the factual basis.

Plaintiff's implanted catheter were scar tissue caused by the sutures.  Doc. 7095-3 at 25 ("Q. So do you believe that these indentations that you believe are causing constriction are scar tissue? A. Yes. Because the Vicryl sutures, whenever you put them in, . . . they cause an inflammatory reaction. And that is going to lead to scar tissue.").[4]  He later clarified that he "cannot actually see scar tissue" on the scan but "can just see the effects of [scar tissue]." *Id.* at 28. This observation of Reichle's, coupled with his clinical experience that "[i]n every port removal [he has] performed, where the port has been in place for at least a few months and where Vicryl suture was used at the time of placement, there has been the development of scar tissue at the site of the absorbed suture" (Doc. 7095-2 at 15), supports his opinion that Plaintiff's sutures caused scar tissue.[5]  *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

Reichle's opinion that the sutures and scar tissue "caused catheter constriction and stress leading to fracture" (Doc. 7095 at 10) is his causation opinion, which is excluded as discussed above.  His more limited statement that sutures and scar tissue "caused catheter constriction and stress" (*id.*) is essentially the same causation opinion and is also excluded.

Plaintiff's final argument that Reichle "ignored years of [Plaintiff's] normal port infusion, apparently unimpeded by the constriction he alleges exists" (Doc. 7095 at 10), relates to his excluded causation opinion and need not be addressed.

**IT IS ORDERED** Plaintiff's motion to exclude the opinions of Ralph Reichle, M.D. (Doc. 7095) is **granted in part** as set forth above.

Dated this 8th day of July, 2026.

David G. Campbell
Senior United States District Judge

---

[4] Reichle gave this testimony in response to opposing counsel's questioning, and it was therefore sufficiently disclosed under the Court's early instruction.  Doc. 114 ¶ II.F.

[5] The Court agrees with Plaintiff that Reichle's experience alone, given the existence of Plaintiff's medical records, would not support his case-specific opinion about whether her sutures caused scar tissue (Doc. 7668 at 6).  But Reichle – a radiologist – also testified that Plaintiff's scan shows the effects of scar tissue.  Doc. 7095-3 at 28.  Plaintiff's counsel did not ask Reichle to clarify whether scar tissue is ever visible on a scan, or what he meant by the "effects" of scar tissue.  *See id.*