**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation<br><br>_____<br><br>Kimberly Divelbliss,<br><br>　　　　　Individual Plaintiff,<br><br>v.<br><br>Becton Dickinson and Company, et al.,<br><br>　　　　　Defendants. | MDL No. 3081<br><br>No. CV-23-01627-PHX-DGC<br><br>**ORDER**<br><br>**Eduards Ziedins, M.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiff has filed a motion to exclude the expert opinions of Eduards Ziedins, M.D. Doc. 7096.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 7096, 7414, 7669.  The Court will deny the motion.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Divelbliss brings her lawsuit in this MDL. Doc. 26 (CV-23-01627-PHX-DGC). On July 13, 2017, Plaintiff had a Bard port implanted. *Id.* ¶ 53. On December 13, 2019, Plaintiff discovered through an emergency room visit that a piece of the port catheter

had broken off and lodged in her heart. *Id.* ¶ 62. She underwent emergency surgery to remove the port. *Id.* ¶ 63. Plaintiff raises claims typical of this MDL. *Id.* at 15-29.

Defendants have identified Eduards Ziedins, M.D., as a medical expert. Dr. Ziedins is a board-certified general surgeon and has been employed by the University of Vermont Medical Center since 2003. Doc. 7096-2 at 2. He primarily practices at Central Vermont Medical Center and focuses on surgical oncology. *Id.* He places and removes IPCs. *Id.* Ziedins is also an associate professor at the University of Vermont Medical School. *Id.* He trains residents and surgeons on how to place IPCs. *Id.* Plaintiff moves to exclude Ziedins' opinions under Federal Rule of Evidence 702.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

Plaintiff challenges Ziedins' opinions under Rule 702(b)-(d).

### A. Challenges Under Rule 702(c).

Plaintiff argues Ziedins failed to perform a differential etiology in reaching his opinion that Plaintiff's sutures caused the catheter fracture. Doc. 7096 at 4-5. The Ninth Circuit has recognized that "a sufficiently reliable differential etiology 'may form the basis of an expert's causation testimony.'" *Engilis*, 151 F.4th at 1045 (citation omitted). The expert "first assumes the pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234 (9th Cir. 2017).

A differential etiology is not the only basis for a reliable medical opinion. *See Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009) ("Dr. Kertz did not purport to employ differential [etiology], and *Clausen* does not preclude the use of all other methods to determine the cause of an illness. Accordingly, the district court did not abuse its discretion in admitting this expert testimony." (citation omitted)); *cf.* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." (citations omitted)). Ziedins does not claim to have

performed a differential etiology, and Plaintiff does not argue otherwise.  *See* Doc. 7096 at 5.

Expert testimony "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010).  Ziedins' opinion that Plaintiff's sutures caused the catheter fracture is based on his more than twenty years of clinical experience as a general surgeon.  Doc. 7096-2 at 2; *see Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed. R. Evid. 702 notes for the 2000 amendments)). He has considerable experience implanting and removing IPCs, and he trains surgical residents and surgeons on "how to properly place central venous catheters and the associated port."  Doc. 7096-2 at 2.  Because of his clinical practice, Ziedins is aware of the inherent risks of port catheters, and he has "dealt with all [the common] complications over the span of [his] career[.]"  *Id.* He has treated patients with catheter fractures, the very complication at issue in Plaintiff's case.  Doc. 7414-1 at 12-13.

Ziedins reviewed Plaintiff's medical records and medical imaging, and the deposition testimony and operative notes of implanting physician Dr. Richardson and explanting physician Dr. Aguila.  *See* Doc. 7096-2 at 11-16.  He opines on the placement of the sutures based on Dr. Richardson's operative notes and deposition testimony.  *Id.* at 12-14.  Ziedins notes that the relevant instructions for use recommend against the suture technique used by Dr. Richardson.  *Id.* at 12.  And he notes that the site of the catheter fracture corresponds with the location of the sutures placed by Dr. Richardson and with the extreme bending of the catheter seen in some of Plaintiff's chest images.  *Id.* at 14.  Ziedins also conducted an independent medical literature review.  Doc. 7414-1 at 8-9.

The Court finds this to be a sufficiently reliable opinion for admission under Rule 702.  Ziedins' "opinion is based on [his] medical training, expertise from years of surgical

5

practice and ongoing medical education.  [His] conclusions are a result of careful review of the materials, medical records and radiological imaging provided for this case."  Doc. 7096-2 at 17.  Defendants have shown by a preponderance of the evidence that Ziedins' causation opinion "is the product of reliable principles and methods[.]"  Fed. R. Evid. 702(c).

That Ziedins "did not consider device defect as a potential cause," yet "acknowledged catheter fractures 'can occur even without surgical error'" and "agreed that material degradation can be a contributing factor to catheter fracture" (Doc. 7096 at 5-6), does not make his causation opinion inadmissibly unreliable.  His years of experience as a surgeon dealing with implanted ports, as well as his careful review of the facts, sufficiently support his opinion.  Ziedins was retained "to specifically review surgical aspects of placement of a Bard Powerport catheter and subsequent fracture of the device."  Doc. 7096-2 at 2.  He addresses these matters in a reliable way.  Plaintiff is free to cross-examine him on matters he does not address, or his lack of qualification to opine on product design, and the jury will decide whether to accept his experience-based causation testimony.  On defective design, Ziedins did testify that physicians "implant thousands" of catheters "and it's extremely rare that we run into the catheter fractures.  And so in my experience it's sort of . . . more the extreme situations where patients have had catheters for a particularly long period of time."  Doc. 7096-3 at 18.[1]  This experience-based opinion is admissible.

### B.    Challenges Under Rule 702(b).

Plaintiff challenges Ziedins' causation opinion under Rule 702(b).  For the reasons explained above – Ziedins' review of Plaintiff's medical imaging, medical record, Drs. Richardson and Aguila's deposition testimony, as well as medical literature – Defendants have shown by a preponderance of the evidence that Ziedins' opinion is supported by sufficient facts and data.  Fed. R. Evid. 702(b).

---

[1] The Court instructed early in this litigation that deposition testimony elicited by opposing counsel will not be precluded for nondisclosure.  Doc. 114 ¶ II.F.

Plaintiff argues Ziedins' causation opinion "rests almost entirely on his interpretation of select imaging taken with [Plaintiff's] arms raised," and "ignored the standard arms-at-the-side chest X-rays, which are the proper imaging for evaluating catheter position, and which uniformly show normal catheter position without kinking." Doc. 7096 at 7.[2]  But Ziedins reviewed the imaging Plaintiff claims he ignored.  *See* Doc. 7096-2 at 12.  He testified during his deposition that the kinking caused by the suture placement would only be visible from certain positions.  Doc. 7096-3 at 13.  That Ziedins finds some images more informative than others does not mean his opinion lacks a sufficient factual basis.  *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

Plaintiff attempts to undermine Ziedins' opinion by arguing her own experts, Drs. Hurst and Kraut, each concluded that arms-raised imaging is not appropriate to identify abnormal kinking in a catheter because that position naturally curves the catheter in any patient.  Doc. 7096 at 7-8.  But such expert disagreement does not render one side's experts inadmissible, provided all are qualified to opine under Rule 702, as is Ziedins.

Plaintiff argues that Ziedins' "report contains virtually no discussion of [the] extended period of normal use" of Plaintiff's catheter before it fractured, which "render[s] unreliable his theory that absorbable sutures or scar tissue compressed the catheter so radically that it fractured." *Id.* at 8-9.  But Ziedins did consider Plaintiff's period of normal port use and accounted for it in reaching his causation opinion.  *See* Doc. 7096-2 at 15-16 ("Repetitive motion by the patient for daily routine activities over a two-year period caused unusual wear on the catheter thus resulting in fracture of the catheter in an unlikely position

---

[2] Plaintiff raises the same challenge under Rule 702(c) (Doc. 7096 at 6), but this ultimately is a challenge to the factual basis of Ziedins' causation opinion, which the court addresses under Rule 702(b).

as demonstrated by the radiological images and provided pictures of the damaged catheter.").

C.     Challenges Under Rule 702(d).

Plaintiff challenges Ziedins' opinion that the sutures caused scar tissue that tethered the catheter.  Doc. 7096 at 9-11.  She contends this opinion "rests solely on the general proposition that scarring is 'the body's natural process of how we heal.'"  *Id.* at 9 (quoting Doc. 7096-3 at 12).  But in his report, Ziedins relies on a "flexion point" that he observed on Plaintiff's imaging, which he opines would be caused by "the scarring as a result of suture placement . . . tether[ing] the catheter[.]"  Doc. 7096-2 at 13.  During his deposition, Ziedins confirmed he "would expect to see either the catheter being angulated or a significant kink" when there is scarring.  Doc. 7096-3 at 12.  He also testified that scarring is not only expected but intended by the physician to hold the tissue together.  *Id.* ("We place . . . absorbable sutures with the intention the body will heal and scar that tissue together[.]").

Plaintiff argues Dr. Richardson "testified unequivocally" that his locking stitch "does not contact the catheter at all," "only pinches the muscular tissue around the catheter," "does not go around the catheter," and was "'nowhere near the fracture site.'" Docs. 7096 at 11 (citations omitted).  Defendants contend Dr. Richardson's testimony "is not 'unequivocal'" – he testified that he "can place a stitch down through the muscle so it encircles the muscle and gently constricts it around the catheter," and that the "locking part has to do with to snug the soft tissue around the catheter to prevent bleeding."  Doc. 7414 at 15 (quoting Doc. 7096-9 at 10). Plaintiff contends that Ziedins ignores this testimony. Doc. 7669 at 5-6.  But Plaintiff cites no opinion where Ziedins claims Dr. Richardson's stitch was around the catheter.  Ziedins opines that the "restriction of the catheter" resulted from the "catheter [being] sutured to surrounding tissue."  Doc. 7096-2 at 12; *see also id.* (Ziedins opining that "additional sutures were placed in the subcutaneous tissues adjacent to the catheter located roughly 1-2 cm beyond the body of the exposed catheter before

entering the muscle"). His opinions are not so inconsistent with Dr. Richardson's less-than-clear testimony that they are unreliable.

Plaintiff raises several additional arguments under Rule 702(d) that do not warrant exclusion of Ziedins' opinions. She argues his scar tissue opinion "is contradicted by the explant record" because Dr. Aguila's operative report does not mention "scar tissue, tethering, adhesions, or difficulty removing the catheter"; that "[i]f tethering scar tissue existed, the fragment could not have embolized"; that Plaintiff's arms-raised imaging "shows the catheter moves freely with arm position," which "defeats" Ziedins' tethering theory; and the fact the catheter "functioned normally for 26 additional months" after the sutures dissolved is inconsistent with Ziedins' theory that the catheter was being constricted by scar tissue left by the sutures. Docs. 7096 at 9-10, 7669 at 6-8. These critiques of Ziedins' opinions are not a basis to exclude opinions the Court otherwise finds sufficient under Rule 702(d).[3] "Where the foundation is sufficient, the litigant is entitled to have the jury decide upon [the expert's] credibility, rather than the judge." *Primiano*, 598 F.3d at 565-66 (citation modified).

**IT IS ORDERED** that Plaintiff's motion to exclude the opinions of Eduards Ziedins, M.D. (Doc. 7096) is **denied**.

Dated this 13th day of July, 2026.

David G. Campbell
Senior United States District Judge

---

[3] Nor will the Court exclude Ziedins' opinion because he agreed during his deposition that "a surgeon can 'deviate from an IFU recommendation if there's a good clinical reason and if it's within the standard of care.'" Doc. 7096 at 11 (quoting Doc. 7096-3 at 19). He does not opine that Dr. Richardson violated the standard of care, and Plaintiff cites no authority holding that a treating physician's actions cannot be the cause of harm unless they violate the standard of care.