**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| Kimberly Divelbliss,<br>Individual Plaintiff,<br>v.<br>Becton Dickinson and Company, et al.,<br>Defendants. | No. CV-23-01627-PHX-DGC<br><br>**ORDER**<br>**Michael Shehata, M.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiff has filed a motion to exclude the expert opinions of Michael Shehata, M.D. Doc. 7094. The motion is fully briefed and no party requests oral argument. *See* Docs. 7094, 7413, 7670. The Court will deny the motion.

## I. Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Divelbliss brings her lawsuit in this MDL. Doc. 26 (CV-23-01627-PHX-DGC). On July 13, 2017, Plaintiff had a Bard port implanted. *Id.* ¶ 53. On December 13, 2019, Plaintiff discovered through an emergency room visit that a piece of the port catheter

had broken off and dislodged in her heart. *Id.* ¶ 62. She underwent emergency surgery to remove the port. *Id.* ¶ 63. Plaintiff raises claims typical of this MDL. *Id.* at 15-29.

Defendants have identified Michael Shehata, M.D., as a medical expert. Dr. Shehata is a cardiac electrophysiologist who is board certified in cardiovascular medicine and cardiac electrophysiology. Doc. 7094-2 at 2. He practices at Smidt Heart Institute of the Cedars-Sinai Medical Center, where he is the Interim Division Director of Cardiac Electrophysiology (since 2025), and the Director of the Interventional Electrophysiology Laboratory (since 2018), among other positions. Doc. 7413-1 at 2. As the Director of the Clinical Cardiac Electrophysiology Fellowship Training Program at Cedars and a Clinical Professor in the Cardiology Division of the Department of Medicine at UCLA, he also is responsible for teaching and training other doctors in electrophysiology. *Id.* He has published over 50 peer-reviewed articles on electrophysiology. *Id.* at 11-17. He has "extensive experience caring for patients with cardiac rhythm disorders," and routinely performs "catheter-based ablation procedures[] and cardiac device implantations including pacemakers and defibrillators." Doc. 7094-2 at 2. He performs 250-300 ablations and places 50-70 pacemakers per year. Doc. 7413-2 at 6-7. Plaintiff moves to exclude Shehata's opinions under Federal Rule of Evidence 702.

## II. Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's

note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

Plaintiff moves to exclude several opinions of Shehata.

### A. Causation Opinion.

Plaintiff seeks to exclude Shehata's opinion that there is "no medical evidence that [Plaintiff's] repeated symptoms and complaints, in addition to the four separate electrophysiology procedures as well as pacemaker implantation performed on [Plaintiff,] . . . were related to the fractured port catheter embolization event from December 2019[.]" Doc. 7094 at 4 (quoting Doc. 7094-2 at 13). She contends Shehata's opinion is unreliable because "he never performed a differential diagnosis." *Id.* at 4-5.

Shehata's central opinion is that Plaintiff's treating physician, Dr. Dim, misdiagnosed her post-embolization arrhythmia as a new supraventricular tachycardia ("SVT") – a type of arrhythmia stemming from the upper chambers of the heart. Shehata

concludes that the arrhythmia was not new, but instead was a continuation of her historical premature ventricular contractions ("PVCs") stemming from the lower chambers.[1]

Shehata's "opinions are based on [his] clinical experience, together with review of medical records, case depositions, expert reports and [his] knowledge of the pertinent medical literature with regards to this matter." Doc. 7094-2 at 2. He also states that his opinions are based on a differential diagnosis. *Id.* at 18. In a differential diagnosis, "the expert [first] rules in all of the potential hypotheses that might explain a patient's symptoms," and "must then engage in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003). "The expert must provide reasons for rejecting alternative hypotheses 'using scientific methods and procedures' and the elimination of those hypotheses must be founded on more than 'subjective beliefs or unsupported speculation.'" *Id.* (citation omitted).

Shehata had a reasonable basis for "ruling in" PVCs as the condition from which Plaintiff was suffering after the catheter fracture. He applied his 18 years of clinical experience as a cardiac electrophysiologist, reviewed Plaintiff's medical records, and observed her documented history of PVCs originating from the left ventricle. Doc. 7094-2 at 14, 17-18. He noted Plaintiff's numerous preexisting conditions and medications that were "exacerbating factors" of her historical PVCs, and opined that they continued as risk factors for future arrhythmias. *Id.* at 14, 18 ("Mrs. Divelbliss may be at risk for development of future arrhythmias . . . , but this would be related to her underlying risk factors including the major driver being high blood pressure, which she has had for many

---

[1] "Differential diagnosis is the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003), *as amended on denial of reh'g* (Sept. 25, 2003) (citation modified). In contrast, differential etiology "refers to identifying the causal factors involved in an individual's disease or illness." *Engilis*, 151 F.4th at 1044 n.1 (citation modified). In this case, Shehata addresses the question of whether Plaintiff's post-fracture symptoms were a new SVT or a continuation of her previous PVCs. This is a differential diagnosis.

years per review of the medical record."). He therefore ruled in Plaintiff's historical PVCs as a possible diagnosis of her post-embolization arrhythmia.

Shehata also had a reasonable basis for not ruling in SVTs as the condition from which Plaintiff was suffering. He explains that an SVT stems from the upper chambers of the heart, and yet he found "no evidence that any recurrent sustained SVT ever occurred as numerous EKGs, Holter monitors and eventually a pacemaker placement failed to document or record evidence of 'SVT[.]'" *Id.* at 17, 21; Doc. 7094-3 at 19 (testifying the same). He further notes that Plaintiff was implanted with a pacemaker which "ha[d] the capability to record 'high rate' events," yet "there was no provided evidence that sustained SVT arrhythmia was recorded by the pacemaker[.]" Doc. 7094-2 at 15. Shehata also found that Plaintiff's "symptoms appeared to be consistent both before and after her catheter fragment event in December 2019 and repetitive testing before and after by ambulatory monitoring and EKGs never documented any change in the degree of 'arrhythmias[.]'" *Id.* at 18.

Shehata also relied on his experience treating SVTs. He explains that "short and long term success rates for ablation of AVNRT," the specific type of SVT Dr. Dim diagnosed Plaintiff with, "are well known to be 95% with a single procedure, yet in this case, four separate procedures were performed for the same diagnosis and condition[.]" *Id.* at 15 (citation omitted). Shehata has "never experienced a case of four recurrent electrophysiology procedures required to treat or cure this type of arrhythmia in [his] practice." *Id.* That Dr. Dim's four ablations did not successfully treat Plaintiff's arrhythmias, as would be expected by Shehata, an experienced cardiac electrophysiologist, supports his conclusion that Plaintiff's condition was not SVT.

Shehata also disputes the evidence Dr. Dim relied on in reaching his SVT diagnosis. He opines that the temporary insertion of a pigtail catheter into Plaintiff's left ventricle by Dr. Dim resulted in "a documented short run of a wide complex irregular rhythm," which was "diagnosed incorrectly by Dr. Dim as SVT, an upper heart chamber arrhythmia, and he used this as the basis for the initial electrophysiology procedure with catheter ablation

for AVNRT that he performed." *Id.* at 14. Shehata opines that a doctor cannot diagnose an AVNRT unless there is a "sustained documented arrhythmia on an EKG or some form of monitoring that's consistent with AVNRT," which Shehata concludes was not present here. Doc. 7094-3 at 17 at 15 ("[D]uring each procedure Dr. Dim makes a diagnosis of AVNRT, despite no documented induction of arrhythmia during the procedure[.]"). Otherwise, a doctor must "induce the arrhythmia, to induce the tachycardia and diagnose it," and Shehata concludes "[t]here's no indication from reviewing any of Dr. Dim's procedural notes, four separate times, that he ever does that, documents that, nor did I ever see anything that I could review that showed me induction of tachycardia." *Id.* at 17.

Shehata does not opine on a specific cause of Plaintiff's historical PVCs, but such an opinion is not required to see that they predated the fracture and continued afterwards. *See id.* at 27 ("I'm stating that I think [Plaintiff's preexisting conditions] could have been exacerbating factors. I am not sure of the ultimate underlying cause of her premature beats, which have been there throughout review of all of her medical records."). He concludes that Plaintiff's post-fracture arrhythmia was a continuation of her historical PVCs.

The Court finds that Shehata reasonably ruled in PVCs as the explanation for Plaintiff's post-fracture arrhythmias and reasonably ruled out SVTs for the reasons stated above. This differential diagnosis was reliable – he ruled in relevant hypotheses and ruled out those for which he found no evidence based on his thorough review of Plaintiff's medical records. *See Clausen*, 339 F.3d at 1058.

Plaintiff cites Shehata's deposition testimony that he "didn't rule . . . out" that "the embolized catheter may have exacerbated existing PVCs[.]" Doc. 7094 at 6. But the testimony cited by Plaintiff restates his opinion that any temporary arrhythmia would have subsided after the fractured catheter was removed. Doc. 7094-3 at 17. And Shehata explained in his report that "[e]xacerbation of PVCs would not be expected to be the long-term sequelae of any right sided heart catheter fragment embolization." Doc. 7094-2 at 14. Shehata found no evidence, despite Plaintiff having been subject to many instances of

heartbeat monitoring, that her existing PVCs "were worsened by the transient catheter fragment" (*id.* 18).

Plaintiff argues Shehata "admitted that he did not conduct a differential diagnosis to ascertain the cause of Ms. Divelbliss's post-embolization arrhythmia." Doc. 7094 at 6 (citing Doc. 7094-3 at 15). But the testimony cited by Plaintiff reflects Shehata's opinion that there is no "clear documentation or evidence" that Plaintiff sustained a newly onset SVT, and his explanation that "[i]t's hard to form a differential for a condition that [he did not] really see documented." Doc. 7094-3 at 15. Shehata's testimony does not disavow his differential diagnosis discussed above. It restates his opinion that no medical evidence supports Dr. Dim's diagnosis of SVT.

Plaintiff argues Shehata "agrees that there is evidence of some catheter injury to the heart" because he "confessed in deposition that the . . . catheter fragment caused some injury to the heart muscle, as evidenced by troponins in the blood, and that could cause heart tissue damage that can affect the electrical system of the heart." Doc. 7094 at 5 (citing Doc. 7094-3 at 13-14, 19). But Shehata never disputes temporary injury resulting from the fracture. His report acknowledges the catheter fracture temporarily affected the electrical system of the heart through causing "direct endocardial stimulation" that resulted in "mildly elevated cardiac troponin enzymes[.]" Doc. 7094-2 at 13-14. He opines, rather, than "[n]o *significant permanent injury* or scar would be expected from this type of transient endocardial stimulation," and that "[o]nce the fragment was removed in this case, [Plaintiff] experienced a notable regression in her symptoms, again supporting the transient nature of such an event." *Id.* at 14 (emphasis added). His opinion that a temporary injury resulted from the catheter fracture is not inconsistent with his ultimate opinion that the catheter fracture did not cause a newly onset SVT.

Shehata's "conclusions [are] not mere subjective beliefs or unsupported speculation." *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009) (citing *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir.1994)). He disagrees with evidence Dr. Dim relies on in diagnosing Plaintiff with a newly onset SVT, and he

explains his reasoning. Shehata concludes that Plaintiff's post-embolization arrhythmia was a continuation of her historical PVCs, and he supports this conclusion with record evidence. This is a sufficiently reliable opinion under Rule 702.

**B. "No Evidence of Injury" Opinion.**

Plaintiff argues Shehata "ignored heart anatomy relative to arrhythmia" because "unlike PVCs, [Plaintiff's] post-fracture arrhythmia comes from the upper chamber of the heart," which is where the fractured catheter lodged itself. Doc. 7094 at 6. Subsequent to the fracture, Dr. Dim diagnosed Plaintiff with AVNRT, a specific SVT "originat[ing] from the upper chamber of the heart." *Id.* at 6-8. Shehata contends Dr. Dim's temporary placement of a pigtail catheter in Plaintiff's left ventricle caused temporary irregular heartbeats that Dr. Dim misattributes to AVNRT, and that the irregular heartbeats were originating from the lower as opposed to upper chambers of Plaintiff's heart, which is inconsistent with AVNRT. Docs. 7094-2 at 5, 14, 7094-3 at 17.

The doctors reach different opinions from the medical evidence, but this is not a basis for excluding one of them. Shehata's opinion is supported by his interpretation of Plaintiff's EKG tracing, which he opines demonstrates the irregular heartbeat was not specific to the upper chambers of the heart (Doc. 7094-3 at 17), and by the correlation between the timing of Plaintiff's irregular heartbeat and the temporary placement of the pigtail catheter (Doc. 7094-2 at 14). These facts support his opinion that Dr. Dim's diagnosis of AVNRT was instead a temporary arrhythmia caused by the pigtail catheter. *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

Plaintiff argues that "objective evidence shows abnormal atrial beats, originating in the upper chamber, and Dr. Shehata admits that – yet refuses to rule out the catheter as a cause of those abnormal atrial beats." Doc. 7094-2 at 8. She refers to Shehata's deposition

testimony that Dr. Dim's SVT diagnosis is based on "short, nonsustained episodes of atrial ectopy, which she does have on a couple of Holter tracings, a few beats." Doc. 7094-3 at 19. But Shehata opines that a nonsustained episode of atrial ectopy does not support a diagnosis of sustained SVT. *Id.* ("[I]f you have three or four beats of a nonsustained SVT, Dr. X may say, that's SVT. I may describe it as nonsustained SVT and just atrial ectopy, right. So . . . it's all degrees, but I'm not arguing the fact of what Dr. Dim saw or didn't see. I'm saying my review of the records, I don't see anything that falls into the category of the sustained SVT consistent with AV nodal reentry.").

Plaintiff argues Shehata's opinion that there is no evidence of SVT is inconsistent with clinical guidelines, referring to a 2015 report authored by the American College of Cardiology/American Heart Association Task Force on Clinical Practice Guidelines and the Heart Rhythm Society. Doc. 7094 at 10 (citing Doc. 7094-7). But Shehata does not rely on this report to support his opinion. He relies on his 18 years of clinical experience as a cardiac electrophysiologist. *See* Doc. 7094-2 at 2; *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *4 (D. Ariz. July 1, 2021) ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino v. Bos. Sci. Corp.*, No. 2:13-CV-01617, 2016 WL 2939521, at *7 (S.D.W. Va. May 19, 2016) ("[I]f there are certain device-specific publications that Dr. Galloway failed to review in preparing his expert report, BSC is free to inquire about those publications on cross-examination.")

Plaintiff cites additional evidence supporting Dr. Dim's diagnosis of a newly onset SVT (Doc. 7094 at 10-12), including Plaintiff's electrophysiology study results, her symptoms, and Apple Watch data, which she contends "cannot be explained" by Shehata's diagnosis of PVCs. *Id.* at 12. Plaintiff may present this evidence at trial, but it is not a basis to exclude opinions which are otherwise supported by Shehata's reliance on Plaintiff's medical records and relevant deposition testimony as discussed above (Doc. 7094-2 at 2), and by his 18 years of clinical experience. *See Smilovits*, 2019 WL 6875492, at *5; *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An

expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion.").

**C. Opinions Regarding Sotalol.**

Plaintiff argues Shehata's "opinions that sotalol was an inappropriate treatment for [Plaintiff] are not reliable." Doc. 7094 at 13. She cites his partial testimony that "there's no guidelines . . . evidence of using sotalol for SVT. It's used for atrial fibrillation," and that "I don't think you're going to see sotalol in the guidelines . . . for SVT." Doc. 7094-3 at 23. Plaintiff asserts this is contradicted by the American College of Cardiology report that lists sotalol as a third-line treatment option for SVT. *See* Docs. 7094 at 13, 7413-10 at 4. But Shehata testified sotalol is a "second- or third-line drug" used to treat SVT, as opposed to a first-line drug, because of its risks. Doc. 7094-3 at 22 ("I wouldn't say [sotalol is] totally inappropriate. I would just say . . . it would be not be the first-line choice. . . . [S]otalol carries with it some proarrythmatic risk . . . . that's why it's not generally used as a first-line drug. It's used as a second- or third-line drug."). That opinion comports with the report's classification of sotalol as a class IIb drug (below class I and IIa drugs), and their "weak" recommendation for sotalol as a drug that "might be considered" and where the effectiveness is "unknown . . . or not well established." Doc. 7413-10 at 3-5.

Shehata's opinion that sotalol is not a first-line treatment option for SVT, based on his years of experience in this field (Doc. 7094-3 at 22), is sufficiently reliable. *See McBroom*, 2021 WL 2709292, at *5 ("[C]linical experience [can be] sufficient to satisfy the threshold reliability requirements of Rule 702." (citation omitted)).

Plaintiff argues Shehata "attacks Dr. Dim's decision to implant a pacemaker on the basis that sotalol, itself, was not indicated and slowed the heart rate, necessitating pacemaker implantation." Doc. 7094 at 14. She contends that "[w]ithout Dr. Shehata's erroneous assumption that sotalol is not indicated, Dr. Shehata cannot reliably explain why that treatment was inappropriate here." *Id.* But as discussed above, Shehata does not entirely disavow sotalol as a treatment option – he opines it is not the first-line choice. He explains that sotalol "can result in bradycardia as well as QT prolongation which can be

proarrhythmic," meaning triggering an arrhythmia or worsening an existing one, and he notes that Plaintiff's medical records show she "had the native capacity to maintain a relatively normal heart rate and that certainly without the use of sotalol, which was not clearly indicated in her case, there would be no clear need for a pacemaker implantation." Doc. 7094-2 at 15. His opinion that "[p]acemaker implantation . . . [was] not related to the fragment embolization" is based on his knowledge of the risk of sotalol and Plaintiff's medical records indicating she was prescribed sotalol.

Plaintiff challenges Shehata's opinions that Dr. Dim's treatment of Plaintiff fell below the standard of care, arguing they are irrelevant and unhelpful. Doc. 7094 at 14. But whether Dr. Dim's treatment fell below the standard of care is relevant to the question of whether Plaintiff's treatment was necessary and therefore whether her injuries were caused by Defendants' IPC. *See* Doc. 7411 at 6-10. Whether malpractice by Dr. Dim was foreseeable as a matter of law, and whether Defendants have evidence to support their causation and apportionment of fault arguments (Doc. 7094 at 14), are issues "addressed in full in Plaintiff's summary judgment briefing" (Doc. 7670 at 12), not to be prematurely decided through a Rule 702 challenge.

Plaintiff argues Shehata is unqualified to opine on Dr. Dim's medical recordkeeping, presumably referring to his opinion that Dr. Dim's absence of recorded interrogation reports of Plaintiff's pacemaker fell below the standard of care. Doc. 7094-2 at 16. She contends the legal standard for determining the medical standard of care requires a healthcare provider "practicing under the same or similar circumstances," and that Shehata, who practices in a "large, resource rich, academic medical center," practices under difference circumstances than Dr. Dim, a solo practitioner. Doc. 7094 at 14-15 (emphasis omitted). Defendants correctly argue that Plaintiff cites the wrong legal standard. Doc. 7413 at 17-18. Plaintiff does not reply. Doc. 7670 at 12.

The Court is satisfied Shehata is qualified to opine on the standard of medical care. *Keller v. United States*, 58 F.3d 1194, 1197 (7th Cir. 1995) (explaining that under New Mexico state law, "[a]lthough local differences in care are considered as a factor, . . .

doctors from other localities may testify as to the standard of care[.]"); *Blauwkamp v. Univ. of N.M. Hosp.*, 836 P.2d 1249, 1254 (N.M. 1992) ("[H]ow localities differ, such as the lack of facilities, is merely one consideration for the fact-finder." (citation modified)). Shehata may opine on Dr. Dim's absence of recorded interrogation reports because this supports his conclusion that no medical records corroborated Dr. Dim's SVT diagnosis. And his opinion that Dr. Dim's recordkeeping fell below the standard of care is relevant to the jury's evaluation of the credibility of Dr. Dim's opinions.

**IT IS ORDERED:**

**1.** There being no motions to seal, the clerk's office is directed to file on the public docket with the same filing date and document number: **Plaintiff's Rule 702 Motion (Doc. 7094), Defendants' Response (Doc. 7413), and Plaintiff's Reply (Doc. 7670).**

**2.** Plaintiff's motion to exclude the opinions of Michael Shehata, M.D. (Doc. 7094) is **denied**.

Dated this 10th day of August, 2026.

David G. Campbell
Senior United States District Judge