**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Becky A. Smith, M.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Becky A. Smith, M.D. Doc. 4827.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 4827, 5321, 5552.  The Court will grant the motion in part.

## I.    Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

2

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiffs have identified Becky A. Smith, M.D., as a medical expert.  Dr. Smith is an epidemiologist board certified in Internal Medicine and Infectious Diseases, and a Professor of Medicine at Duke University.  Doc. 4827-1 at 2.  She has "extensive education and experience in the areas of infectious disease, healthcare epidemiology, and infection control*,*" and has "held successive leadership roles in large healthcare systems with a focus on the investigation, epidemiological analysis, and prevention of infectious diseases."  *Id.* Dr. Smith currently serves as the Medical Director of Infection Prevention and Hospital Epidemiology at Duke University and as Chair of the Hospital Infection Control Committee.  *Id.*  She is also an ad hoc reviewer for two peer-reviewed medical journals and has "published more than 60 peer-reviewed articles in the fields of healthcare epidemiology and infectious disease."  *Id.* at 3.  Defendants move to exclude Dr. Smith's opinions under Federal Rule of Evidence 702.

## II.    Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles

and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III.    Discussion.**

Defendants enumerate 15 opinions of Smith, which they move to exclude under Rule 702.

**A.    Opinions on Safer Alternative Designs.**

Defendants move to exclude 11 alternative design opinions offered by Smith — opinions numbered 2 through 11 and 15 of her report. Doc. 4827 at 3-5. Defendants argue that Smith "expressly disavowed" the opinions "and the requisite expertise to offer those opinions" in her deposition. *Id.* at 5, 9. The Court has reviewed the deposition pages cited by Defendants and largely agrees with their characterization of Smith's testimony.

Plaintiffs apparently do too, as they do not oppose exclusion of Smith's alternative design opinions. Doc. 5321 at 6. Based on concessions made in her deposition and Plaintiffs' agreement that her alternative design opinions should be excluded, the Court will exclude opinions 2-11 and 15 of Smith's expert report. *See* Doc. 4287-1 at 4-6.

Beyond these opinions, Defendants seek to exclude all opinions highlighted in yellow in Exhibit A to their motion. *See* Doc. 4827-1. This is too broad a request. The yellow highlighting covers 15 single-spaced pages of Smith's report. *Id.* at 11-26. Defendants provide no detailed discussion of the content of these pages, and the Court will not guess at their objections to specific sentences or words. Defendants can object at trial if they think Smith's testimony is covered by the rulings in this order or is otherwise inadmissible.

Plaintiffs argue that Defendants' challenge "is overbroad" and the Court should not exclude her opinions "about the nature, causes, and burdens of catheter-related complications." Doc. 5321 at 6-7. They argue those opinions are supported by Smith's specialized knowledge and clinical experience as a hospital epidemiologist. *Id.* at 6 (citing Doc. 4827-1 at 2-3, 6-11, 11-3). Specifically, Plaintiffs argue Smith's clinical experience "includes analyzing how complications such as catheter-related thrombosis, infection, and mechanical failure arise and can be reduced in clinical practice." *Id.* (citing Doc. 4827-1 at 2-3). They argue this experience supports her opinions about (1) "the real-world risks of catheter-related complications, the mechanisms by which those complications occur, their prevalence, and the burden they impose on patients and hospital systems," and (2) "modifiable and non-modifiable risk factors for catheter-related complications[.]" *Id.* (citing Doc. 4827-1 at 6-11, 11-13). Plaintiffs identify four opinions they contend Smith should be permitted to give:

- Defendants' ports pose well-established risks of catheter-related thrombosis, infection, and mechanical failure (Doc. 4827-1 at 4, 30);

- The root causes and pathogenesis of catheter-related thrombosis, infection, and mechanical failure, and the interrelation between catheter-related thrombosis and infection (*id.* at 4-5, 9-11; Doc. 5321-1 at 21);
- Port complications significantly impact patient morbidity and healthcare costs (Doc. 4827-1 at 7-9); and
- Modifiable and non-modifiable risk factors of catheter-related complications (*id.* at 11-13).

Doc. 5321 at 6.

Smith is qualified to give the first opinion as she does in the body of her report (Doc. 4827-1 at 6 (part D.)), but she may not give it as part of an opinion that Defendants' products should have been designed more safely as she does in other portions of her report (*id.* at 4, 30), for reasons stated above.

In the second opinion, Smith addresses the root causes of catheter-related thrombosis, infection, and mechanical failure only as part of her opinions on how Defendants can improve their products – opinions she is not qualified to provide. *See id.* at 4 (opinions 3, 4, 6), 13-14. This opinion therefore will not be admitted.

Smith is qualified to give the third opinion identified by Plaintiffs.

Smith's fourth opinion includes catheter materials and design as part of how catheter risks can be modified and the role to be played by manufacturers like Defendants – testimony she is not qualified to give. *Id.* at 11-13. Smith may testify about steps hospitals and medical providers can take to moderate catheter-related risks, but she may not opine on steps Defendants or similar manufacturers should take.

**B.    Opinions on Corporate Conduct.**

Defendants challenge Smith's opinions numbered 12, 13 and 14 in her report, which they categorize as opining on corporate conduct. Doc. 4827 at 9-11. The Court will address them separately.

First, Smith opines that "Defendants have never funded a clinical study demonstrating the efficacy of their IPCs compared to safer alternative designs, despite the

substantial body of evidence — clinical studies, mechanistic analyses, and real-world outcomes — demonstrating that their IPCs pose comparatively significant risks of CRT, CRBSI, and mechanical failures." Doc. 4827-1 at 5. Plaintiffs contend Smith's opinion "flows directly (and properly) from [her] training and experience as an infectious disease physician and hospital epidemiologist who evaluates and relies on clinical data regarding device safety and efficacy to guide patient care." Doc. 5321 at 8. The Court disagrees.

Whether and when a corporation should fund clinical studies of its products on the market is not a matter dictated by an infectious disease doctor's clinical practice. It is a matter of federal regulation, corporate ethics, and corporate risk mitigation, none of which lie within Smith's expertise. She agreed she is not an expert in corporate ethics (Doc. 4827-2 at 23), or on what a company should or should not do in the field of product development (*id.* at 27-28). She agreed she does not have the expertise to say whether a company should be required to investigate new technologies or fund studies. *Id.* at 47-48. She is unaware of any industry standard that would have required Bard to incorporate alleged design improvements into its products and reiterated "this isn't my area of expertise or anything." *Id.* at 53-54. And she agreed she is not an expert in FDA regulations or compliance. *Id.* at 19-20. This opinion will be excluded. *See In re Bard IVC Filters, No. MDL 15-02641-PHX DGC*, 2018 WL 823277, at *4 (D. Ariz. Feb. 12, 2018) (explaining because "the Doctors are not regulatory or corporate experts, . . . they will not be permitted to opine on Bard's obligations").

Second, Smith opines that "Defendants' domestic instructions for use (IFUs) fail to warn that their IPCs should be removed after treatment is complete, although their Japanese IFUs contain that warning," and that "Defendants' IFUs fail to warn about the risk of fracture due to material fatigue with long-term use of their IPCs, despite the fact that the IFU includes a pinch-off warning." Doc. 4827-1 at 5. Plaintiffs argue that a doctor's clinical experience in relying on IFUs qualifies her to opine on the adequacy of an IFUs' warnings. *See Arevalo v. Coloplast Corp.*, No. 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *5 (N.D. Fla. July 7, 2020) (admitting "Dr. Kohli's opinions regarding the

7

risks physicians expect to be included in IFUs and how those compare to the risks actually included in the Aris IFU"), *aff'd sub nom. Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646 (11th Cir. Nov. 8, 2022); *Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *14 (S.D.W. Va. Feb. 7, 2015) ("Dr. [Raybon] . . . is qualified to evaluate Bard's warnings based on his knowledge of and experience with the risks of the Avaulta.").

While it is true that Smith relies in part on IFUs when evaluating "complication rates associated with [a medical] device" for purposes of her clinical analysis of infection rates and prevention (Doc. 4827-1 at 4), she does not rely on IFUs for purposes of deciding when an IPC should be implanted in a patient — the key issue in this case. Nor is Smith qualified to opine on what modifications Defendants should make to their IFUs. *See, e.g.*, *id.* at 26 ("Bard should also modify its Instructions For Use (IFUs) for these devices."), 27 ("To fulfill their obligations to provide clear, accurate, and comprehensive warnings and IFUs for their IPCs, Defendants should revise their IFUs to recommend IPC removal after treatment is complete . . . and to explicitly warn about the risk of fracture[.]"). As explained by this Court in priors order of this MDL (*see, e.g.*, Doc. 7196 at 14-17), a doctor's clinical experience in relying on IFUs does not qualify her to opine on what information should be included in an IFU. *See In re: Ethicon, Inc.*, No. 2327, 2016 WL 4958312, at *3 (S.D.W. Va. Aug. 25, 2016) ("While an expert who is a urogynecologist may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant IFU, the same expert must possess additional expertise to offer expert testimony about what information should or should not be included in an IFU." (citation omitted)); *Foster v. Ethicon, Inc.*, No. 5:20-CV-06099-BCW, 2021 WL 1700062, at *2 (W.D. Mo. Mar. 26, 2021) (same); *Fields v. Ethicon, Inc.*, No. CV421-020, 2023 WL 348340, at *6 (S.D. Ga. Jan. 20, 2023) ("Although an expert relying solely on his experience as a urogynecologist may be qualified to opine on the risks associated with a product or procedure, and whether an IFU adequately communicates those risks, he may not offer opinions as to what [a]

8

[d]efendant was, for example, obligated to include in its IFUs, or whether an IFU complies with regulatory standards." (citation modified)).

Third, Smith opines that "Defendants justify their failure to implement safer alternative design technologies by reference to the 'acceptably low' rates of IPC-related complication complaints reported to them by customers in comparison to the annual sales volume for their IPCs."  Doc. 4827-1 at 5; *see also id.* at 27.  Although Smith has experience "systematically evaluat[ing] . . . adverse events and customer complaint data" for clinical evaluation purposes (*id.* at 4), she is not qualified to give this opinion.  In addition to the fact that it implicitly opines there are safer alternative designs — something she concedes she is not qualified to address — her opinion impermissibly opines on Defendants' corporate obligations, state of mind, and regulatory and FDA requirements, as discussed above.

The Court will exclude Smith's opinions 12, 13, and 14.  *See* Doc. 4827-1 at 5. Beyond these three opinions, Defendants seek to exclude all corporate conduct opinions that are "highlighted in blue in Exhibit A" of their motion.  Doc. 4827 at 10 n.6.  This is too broad a request.  The blue highlighting covers five single-spaced pages of Smith's report. Doc. 4827-1 at 26-30.  Defendants provide no detailed discussion of the content of these pages, and the Court will not guess at their objections to specific sentences or words. Defendants can object at trial if they think testimony is covered by the rulings in this order or is otherwise inadmissible.

**C.    Opinion on Generic Risks of IPCs.**

Defendants move to exclude as "unreliable and unhelpful" Smith's opinion that "Defendants' [IPCs] can cause serious clinical complications, including [CRT], [CRBSI], and mechanical failure, such as kinking and fracture[.]"  Doc. 4827 at 11 (quoting Doc. 4827-1 at 4).  But Smith may reliably opine on the generic risks associated with all IPCs, including Defendants' IPCs, given her clinical experience in monitoring epidemiological evidence of these healthcare associated complications, among others, to mitigate them in her hospital system, and in evaluating new medical devices and technologies designed to

reduce these complications among others (Doc. 4827-1 at 3).  *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at \*6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)); *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at \*5 (D. Ariz. July 1, 2021) ("[C]linical experience [can be] sufficient to satisfy the threshold reliability requirements of Rule 702." (citation omitted)).  This opinion is helpful because these catheter-related complications are at issue across this MDL.  Smith may not opine, however, that a "significant proportion of the overall IPC complication rates reported in the scientific literature necessarily involve Defendants' IPCs" based on Bard's market share.  Doc. 4827-1 at 7.  This opinion is not supported by Smith's clinical experience and is a mere recitation of the literature.  *See In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at \*3 (N.D. Cal. Nov. 15, 2023) ("[I]t's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *aff'd sub nom. Engilis*, 151 F.4th 1040; *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)).

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Becky A. Smith, M.D. (Doc. 4827) is **granted in part and denied in part**.  Dr. Smith may not render opinions 2-15 of her report.  Doc. 4827-1 at 4-6.

Dated this 12th day of August, 2026.

_David G. Campbell_
David G. Campbell
Senior United States District Judge

10