**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE:  Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| | **ORDER** |
| | **Ahmed El-Ghannam, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Ahmed El-Ghannam, Ph.D. Doc. 5202.  The motion is fully briefed and no party requests oral argument.  *See* Docs. 5202, 5745, 6022, 6250.  The Court will grant the motion in part.

**I.    Background.**

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins.  IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition.  IPCs can remain in place for weeks, months, or even years until treatment is completed.

1

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options.  Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices.  *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs.  Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient.  *See* Docs. 23, 2023-1.

Plaintiffs have identified Ahmed El-Ghannam, Ph.D., as a materials science expert.  Dr. El-Ghannam holds a Ph.D. in Bioengineering from the University of Pennsylvania.  Doc. 5202-1 at 2.  He is a Professor in the Department of Mechanical Engineering and Engineering Science at the University of North Carolina, having joined the faculty in 2007 as an Associate Professor.  *Id.*  He has "worked on the design and development of several medical devices and products," and has published peer-reviewed scientific literature on the topic of implantable medical devices.  *Id.* at 3.  Defendants move to exclude his opinions under Federal Rule of Evidence 702.

**II.    Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(a)-(d).  The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements.  Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that

3

expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III. Discussion.**

Defendants challenge several opinions of El-Ghannam under Rule 702.

**A. SEM Analysis Opinions.**

Defendants argue El-Ghannam's scanning electron microscopy ("SEM") analysis opinions must be excluded because his SEM technique was unreliable. Doc. 5202 at 6. SEM analysis involves placing material under an electron microscope to reveal its surface level and composition details in high resolution. *See* Doc. 5202-1 at 7-8. The material is first coated in a metal overlay to increase conductivity. *Id.* at 8.

Defendants argue El-Ghannam used a metal coating that was too thick – up to 150nm according to defense experts Drs. Mkhoyan and MacLean, and well beyond the acceptable 10-15nm range El-Ghannam claims to have applied (*id.*). Doc. 5202 at 7-8. They argue that because the metal coating was too thick, any cracking El-Ghannam attributes to the catheters' surface is cracking in the coating itself. *Id.*

4

El-Ghannam acknowledged during his deposition that he did not measure the thickness of the coating, but explained that is "not the common practice" because observing surface details under the microscope confirms the coating was not too thick, and surface details are visible on his SEM images. Docs. 5202-2 at 41-44, 5202-3 at 3-4. He states that he applied approximately 10-15 nm of metal using the same technique he uses in his published work — work which receives peer review — and that he is never asked to measure the metal layer. *See* Doc. 5202-3 at 3 (stating that he "routinely analyze[s] . . . various biomaterials and medical devices using the same coater and the same protocol" and his "analyses are frequently published in peer reviewed journals"); *see also* Doc. 5745-1 at 16-17 (testifying that measuring the coating thickness is "not the common practice" and "[w]e don't really measure that after coating"). El-Ghannam explained that measuring the metal layer is not necessary if you can see fine details on the surface of the sample, details that would not be visible if the metal layer were too thick. Doc. 5745-1 at 18-19 ("I can prove that this is a polymer surface because the barium sulfate particles exist in the polymer, not in the gold. The polymeric debris exist in the polymer, not in the gold.").

Defendants do not dispute that surface details such as barium sulfate particles are visible in El-Ghannam's images. If the coating was too thick, defense expert Dr. Mkhoyan asserts, it would "mask the features, fine features" on the surface. Doc. 5745-6 at 3-6. Defense expert Dr. MacLean similarly opines in his report that "when a gold coat is applied at more than 10-25 nm, detailed features of the surfaces are lost." Doc. 5203-4 at 6 (citation omitted). The presence of fine details in El-Ghannam's SEM images supports his claim that the coating was not too thick.

Defendants contend the dispute is not whether the surface details are visible, but whether they "are actually features of the catheter or artifacts of the excessive metal coating itself." Doc. 6022 at 9. El-Ghannam explained that he was able to identify barium sulfate particles and debris in the polymer which are part of the catheter, not the gold coating. Doc. 5745-1 at 18-19. This supports his assertion that the visible details are features of the catheter and not the coating. *Id.*

5

The defense experts tested the thickness of the coating on an undisclosed number of the catheters subject to El-Ghannam's analysis. Doc. 5202 at 7-8. It is not clear, therefore, whether their tests were performed on a sufficient number of samples to provide a meaningful criticism. The Court cannot exclude El-Ghannam's SEM analysis based on their measurements.

Defendants' separate argument – that Plaintiffs' own expert, Dr. Ratner, criticized El-Ghannam's methodology (Docs. 5202 at 4-5, 6022 at 7) – also does not warrant exclusion of El-Ghannam's SEM analysis opinions. The testimony of Dr. Ratner relied on by Defendants is very imprecise. He recalled expressing some criticism of El-Ghannam's opinion, but he could not recall the details and he characterized it as a "very small part." Doc. 5202-4 at 4. Dr. Ratner confirmed that he did not disagree in his rebuttal report with Dr. Grainger's criticisms of El-Ghannam's opinion, but he provided no further detail. *Id.* at 6. He did not identify what he did or did not agree with in Dr. Grainger's criticism.

Defendants argue that during an August 5, 2025 discovery hearing, El-Ghannam presented images of a catheter with no metal coating and no cracking to demonstrate that his cutting technique does not cause cracking. Doc. 5202 at 9. They contend the lack of cracking in this catheter proves El-Ghannam's coating caused the cracking. *Id.* Plaintiffs point to El-Ghannam's deposition testimony where he explains there was no cracking on the *outer* surface of the catheter (Doc. 5745-1 at 9), as opposed to cracking on the inner surface, which is shown in many of the images in his report. Doc. 5745 at 9. Defendants point to El-Ghannam's contrary statement that his SEM analysis "showed cracking of both the inner and outer surface of the [pristine] catheters." Doc. 6022 at 11 (quoting Doc. 5202-1 at 24). This level of granular disagreement is proper material for cross-examination, not exclusion of El-Ghannam's opinions.

Defendants next argue El-Ghannam did not control for a known variable in SEM analysis: heat generated from the process can alter the surface of the material being tested. Doc. 5202 at 9-10. El-Ghannam states in his rebuttal report that he "did not observe any heating of the samples" that would be evidenced by softening and curving of the catheter

walls. Doc. 5202-3 at 2. He also explains the "bacteria cell membrane and the biofilm matrix deposited on the infected catheters," which is also visible in the SEM images, would not be intact if heating occurred. *Id.*

Further, El-Ghannam has extensive experience in SEM. Doc. 5202-1 at 4. He "routinely analyze[s materials] . . . attached on various biomaterials and medical devices using the same coater and the same protocol" used in his SEM analysis for this case. Doc. 5202-3 at 3. His "analyses are frequently published in peer reviewed journals, . . . [without] any heat problem for any biological or polymeric samples." *Id.* This experience serves as a reliable basis for his observations that there was no significant heating of the catheters during his testing. *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020); *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021).

Defendants next argue El-Ghannam's testing caused cracks in the catheters that he attributes to Bard's manufacturing process. Doc. 5202 at 10. They point to "three sequential SEM photos from Dr. El-Ghannam's report . . . that irrefutably show the crack [in a catheter] developing in real time during the examination[.]" *Id.* at 10-11 (emphasis omitted). Plaintiffs assert El-Ghannam did not present this single instance of cracking as preexisting – the sequential photos were included as additional images in his report. Doc. 5745 at 10. They contend "issues can still occur at high magnifications" such as in SEM analysis, and the fact a catheter cracked during testing supports finding the material was already degraded because El-Ghannam testified an intact polymer surface "will resist the cracking," but weak material can "result in this cracking[.]" *Id.* (quoting Doc. 5745-1 at 27-28). The Court is unpersuaded that one instance of cracking caused by testing renders El-Ghannam's SEM analysis unreliable. He disclosed the images in his report and never claims the cracking of this single catheter preexisted his testing.

Defendants argue El-Ghannam did not rule out the possibility that this one instance of cracking during testing occurred because the coating was too thick, a "well-known concept" identified by defense expert Dr. MacLean. Doc. 6022 at 11-12. But Defendants

do not rule out the alternate possibility provided by El-Ghannam — that degraded catheters have an increased risk of cracking during SEM analysis. Doc. 5745-1 at 27-28. That El-Ghannam cites no scholarship to support his opinion does not render it unreliable where he has years of experience in SEM analysis. *See Geiger*, 2020 WL 3268675, at *6 ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (citation omitted)); *McBroom*, 2021 WL 2709292, at *5.

Finally, the Court notes that other courts have admitted El-Ghannam's opinions despite Rule 702 challenges to his methodology. *See In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 635 (S.D.W. Va. 2013) (finding El-Ghannam's "[SEM] testing methodology is sufficiently reliable for his design defect opinion to pass a *Daubert* challenge"), *on reconsideration in part* (June 14, 2013); *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1375 (M.D. Ga. 2010) (finding El-Ghannam's opinions "to be sufficiently reliable and helpful to be considered by the jury"); *cf. In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2020 WL 6603389, at *12 (S.D. Ohio Sept. 10, 2020) ("The Court is not persuaded that Dr. El-Ghannam's pore size opinions, based on his [SEM] analysis are unreliable," but noting he "will have to provide further foundation" because of "some confusion in the record").

The Court will not exclude El-Ghannam's SEM analysis opinions.

**B.      EDS Analysis Opinions.**

       **1.      Presence of Oxygen.**

EDS analysis determines the elements present in a material. Doc. 5202-1 at 36. El-Ghannam conducted EDS analysis to determine the presence of  barium sulfate in Bard's port catheters. *Id.* at 37. Defendants argue "his atomic percentage measurements show twice as much barium as sulfur, and absolutely no oxygen" despite the fact "barium sulfate consists of one barium, one sulfur, and four oxygen molecules." Doc. 5202 at 11-12. El-Ghannam explained he did not include oxygen in his EDS analysis because "the elements of interest" were barium and sulfur, so "[t]here was no need to measure all possible

8

elements present on the material." Doc. 5202-3 at 12. Plaintiffs also note that the underlying polyurethane and silicone contain oxygen, and detection of oxygen therefore would not distinguish barium sulfate from the underlying materials. Doc. 5745 at 12. El-Ghannam also explained in his deposition that when conducting his EDS analysis, he was not looking for the specific ratio of barium and sulfur consistent with barium sulfate because (1) it was enough that he detected these two elements because they "are only in barium sulfate, and not in the underlying polymer" (Doc. 5745-1 at 21-23), and (2) "the rough surface of the catheter limits the ability of the EDS analysis to detect exact concentrations of elements present on the surface of the sample" (*id.* at 20-21).

El-Ghannam's explanation adequately responds to Defendant's criticism for Rule 702 purposes. Defendants may cross-examine El-Ghannam on this issue during trial.

### 2.    Heating During Manufacturing.

Defendants argue that El-Ghannam claims Bard's "manufacturing or sterilization processes . . . caused cracks that weakened" Bard's catheters, and yet he "reviewed no Bard testing or manufacturing documents," "conducted no experiment to verify this theory," and "ignores the catheter he analyzed for the August 2025 hearing which showed no cracks." Doc. 5202 at 12 (citations omitted). Plaintiffs do not respond to this argument.

El-Ghannam opines that cracking and fragmentation of the catheters' surface visible in his SEM analysis was caused by Bard's manufacturing processes. Doc. 5202-1 at 5, 80 ("SEM analysis showed defective surface with very poor surface finish. The poor surface finish is likely associated with manufacturing procedures. The pores observed on the surface is likely created . . . during manufacturing."). He explains "[t]he wavey nature and the presence of crests and troughs on the surface induce roughness and indicate internal stress created during manufacturing," which "is likely due to inappropriate thermal control during manufacturing." *Id.* at 83; *see also id.* at 82 ("The strands and debris on the inner surface of the pristine PDMS catheter are created during manufacturing and likely creep happens during thermal processing.").

El-Ghannam never explains how he reached the conclusion that the cracking was likely caused by "inappropriate thermal control[.]" *Id.* at 83.  He does not explain what was inappropriate about Bard's thermal control or why thermal control was the cause of the surface roughness as opposed to any other step of the manufacturing process. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified[.]" *Daubert*, 509 U.S. at 593 (citation omitted).  "Merely generating hypotheses – even reasonable ones – is not enough." *Davis*, 2019 WL 3532179, at *9.

To the extent El-Ghannam cites  literature to support his opinion that manufacturing processes were the cause of cracking and surface roughness, reliance on literature alone is not enough.  *See In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("[I]t's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *aff'd sub nom. Engilis*, 151 F.4th 1040; *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)).  This opinion will be excluded.

**C.     Biocompatibility Opinions**.

Defendants argue "biocompatible" is a term of art defined by the FDA as the "ability of a device material to perform with an appropriate host response in a specific application," which they claim El-Ghannam defines incorrectly as a material that "is able to perform its function as intended within the body without harming the body."  Doc. 5202-1 at 101. Plaintiffs contend El-Ghannam "is not offering a regulatory opinion about biocompatibility as it relates to FDA clearance of Defendants' products," and that biocompatibility is a "generally recognized concept in the materials science field[.]" Doc. 5745 at 12-13.

El-Ghannam's use of the term "biocompatible" need not comply with the FDA's definition — he renders no opinion on Bard's FDA compliance.[1]  The Court agrees with

---

[1] Defendants cite one instance in El-Ghannam's deposition testimony where he refers in passing to his "FDA analyses[.]" *See* Doc. 5202-2 at 30.  Counsel then clarified that El-Ghannam had not cited any FDA standard in his expert report, a clarification that can be made through cross-examination at trial, if relevant.  *Id.* at 30-31.

Plaintiffs that biocompatibility can be a generally recognized concept within the scientific community. *See* Docs. 5198-1 at 9 (plaintiffs' materials science expert defining biocompatibility as "a catheter's ability to fulfill its therapeutic functions without inducing any local or systemic adverse effects"), 5203-1 at 24 (defense materials science expert defining biocompatibility as a material that is "nontoxic, nonallergenic, nonimmunogenic, noncarcinogenic (i.e., induces an appropriate host response), is chemically inert and stable" (citation omitted)); *McBroom*, 2021 WL 2709292, at *16 (holding that "[e]xpert witnesses may properly offer opinions" on "knowledge of the medical community in general" (citation omitted)).

Defendants argue that El-Ghannam's definition of biocompatibility, combined with his opinions that Bard's catheters are "not suitable for use as intended" and "harm the body when performing their intended function," amount to an impermissible legal conclusion. Doc. 5202 at 15. The Court disagrees. These are factual issues in this case, not legal matters on which the Court will instruct the jury.

### C.    Rule 702(b) Challenge.

Defendants argue El-Ghannam's "opinions about the safety of Bard IPCs are not supported by an adequate factual foundation." *Id.* They refer to El-Ghannam having tested only two explanted patient catheters and six new catheters. *Id.* This Court, in addressing Dr. MacLean's sample size, explained there is no specific number of samples that renders an expert's analysis unreliable. Doc. 7222 at 19. El-Ghannam's testing of eight catheters does not render his opinions without a sufficient factual foundation.

Defendants contend El-Ghannam's samples do not include "any explanted silicone catheter" or "any explanted catheter that functioned without incident." Doc. 5202 at 16. But Plaintiffs note the practical reality that "Dr. El-Ghannam had no way to get a catheter explanted from a patient who had not suffered a device-related adverse event." Doc. 5745 at 14. He instead "evaluated pristine Bard polyurethane and silicone catheters" and used a "tissue culture medium . . . 'to simulate the physiological environment the catheters would be exposed to *in vivo*' before re-evaluating them." *Id.* (quoting Doc. 5202-3 at 56). El-

Ghannam's testing therefore accounted for both polyurethane and silicone functioning catheters exposed to an *in vivo* environment.

Defendants argue the pristine catheters El-Ghannam tested were not truly "pristine" "because he cut them and soaked them in TCM and 70% ethanol, nor did he inspect a statistically significant number of new ports[.]" Doc. 5202 at 16. Plaintiffs cite numerous figures from his report demonstrating that he recorded the pristine catheters before and after TCM immersion. *See, e.g.*, Doc. 5202-1 at 42 (figure showing FTIR analysis . . . of Bard pristine Polycarbonate Urethane . . . before (dotted curve) and after (solid red curve) immersion in TCM[.]"). Defendants' sample size argument is rejected as discussed above.[2]

Defendants contend El-Ghannam did not test any other manufacturer's catheter, and "[w]ithout any data on any control group, other device, or industry benchmark, [his] opinion that Bard's design specifically increases risk is wholly unsupported." Doc. 5202 at 16. But El-Ghannam offers no opinion on the design of any other manufacturer's port catheter. He was not required to test other manufacturers' catheters to sufficiently support his opinions on the design of Bard's port catheters. And if Defendants believe his data set was too small for his opinion to be valid, they can address that issue in cross-examination and argument.

### D.    Rule 702(d) Challenge.

Defendants challenge El-Ghannam's opinion that "[d]ata in the literature has correlated the roughness of a catheter to increased risk of blood clotting, or thrombosis." Doc. 5202 at 17 (quoting Doc. 5202-1 at 102). They argue "he fails to analyze the degree of roughness supporting such a correlation" and explain whether the degree of roughness in Bard's catheters was "significant or relevant." *Id.* This is a highly detailed criticism

---

[2] In their reply, Defendants contend "Plaintiffs discuss TCM immersion, but Dr. El-Ghannam's sputter coating is the main problem." Doc. 6022 at 14. But Defendants in their motion specifically challenge El-Ghannam's TCM immersion to argue he did not test any pristine catheters. *See* Doc. 5202 at 16. Defendants' reply also argues for the first time that El-Ghannam's opinions on Bard's IPCs and manufacturing processes increasing the risk of harm are inadmissible because he does not provide comparison rates for the baseline risk of harm. Doc. 6022 at 14-15. The Court will not rule on an argument raised for the first time in reply.

12

that does not affect the overall reliability of El-Ghannam's opinion and that may be raised during cross-examination. The Court cannot say his reliance on literature identifying a correlation between catheter roughness and certain increased risks, coupled with his scientific testing that found roughness in Bard's catheters, is an unreliable application of his methodology to the facts.

Defendants relatedly argue "literature may show certain manufacturing processes cause certain flaws or degradation. But here, Dr. El-Ghannam simply assumed it did because he found cracks in 8 out of 9 catheters[.]" Doc. 5202 at 17. As discussed above, El-Ghannam's manufacturing process opinions are excluded.

Defendants argue El-Ghannam "makes sweeping conclusions that because all of Bard's catheters degrade, they cause all infection, thrombosis, and fracture." *Id.* But he does not make such a claim. Doc 5202-3 at 6 (opining his SEM data "are in agreement with the data in the literature and showed both roughness of the surface of the pristine catheter and biofilm formation (infection) in the explanted catheter that . . . is due to the roughness of the inner surface of the catheter").

Defendants seek to exclude as unreliable and speculative El-Ghannam's opinion that "[t]he infection and biofilm observed in Patient 1 catheter are likely due to the defects in the pristine catheter[.]" Doc. 5202-1 at 64. They also seek to exclude his opinion that "[b]acteria and biofilm were also observed on the entire inner surface of the catheter explant used to treat Patient 1. Samples from two locations in the catheter explant were analyzed and both confirmed the presence of biofilm and bacteria. This evidence further supports the lack of biocompatibility determination." *Id.* at 102.

Plaintiffs contend El-Ghannam's focus is not on the specific cause of Patient 1's injuries. "[R]ather, the explanted catheters from those two patients are examples used alongside the six pristine catheters to correlate" El-Ghannam's ultimate conclusions. Doc. 5745 at 16. But El-Ghannam does opine that the infection and biofilm he observed were due to catheter defects, an opinion for which he provides little foundation. The factors that led to infection or biofilm in a specific patient involve far more than just the catheter's

13

surface characteristics.  The Court will exclude El-Ghannam's opinions on the cause of Patient 1's infection and biofilm.

Defendants argue that El-Ghannam ignored contrary facts and literature.  Doc. 5202 at 18.  The Court is not persuaded that this is a basis for exclusion.  *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)); *McBroom*, 2021 WL 2709292, at *4 ("The Court cannot exclude Dr. Flynn's opinions based on mere references to articles that Plaintiff believes are contrary to the literature on which Dr. Flynn relies[.]"); *Trevino v. Bos. Sci. Corp.*, No. 2:13-CV-01617, 2016 WL 2939521, at *7 (S.D.W. Va. May 19, 2016) ("[I]f there are certain device-specific publications that Dr. Galloway failed to review[,] BSC is free to inquire about those publications on cross-examination.").

### E.    Untimely Challenge Regarding AI Use.

Defendants argue for the first time in their reply that during his deposition, El-Ghannam "gave deliberately misleading testimony" about his AI use "that destroys his credibility and reliability and renders his entire opinion inadmissible."  Doc. 6022 at 2.  It is well established, however, that courts will not consider arguments raised for the first time in a reply brief.  *See Bach v. Forever Living Prods. U.S., Inc.*, 473 F. Supp. 2d 1110, 1122 n.6 (W.D. Wash. 2007) (citing *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 n.6 (9th Cir. 2004)); *Gadda v. State Bar of Cal.*, 511 F.3d 933, 937 n.2 (9th Cir. 2007).

The Court also observes, however, that Defendants cite no particular part of El-Ghannam's general report that they claim was AI-generated. Instead, they argue that "numerous citations are now suspicious" because hallucinated citations were contained in an El-Ghannam case-specific report in this MDL,[3] but they acknowledge that "Bard has

---

[3] That case has been dismissed.  Doc. 8389.

14

not identified any fully hallucinated citations in the General Report[.]"  Doc. 6022 at 5. Mere suspicion is not enough to exclude El-Ghannam's opinions.

The cases cited by Defendants are distinguishable.  One case excluded the expert's declaration because it contained confirmed AI-hallucinated sources.  *See Kohls v. Ellison*, No. 24-CV-3754 (LMP/DLM), 2025 WL 66514, at * (D. Minn. Jan. 10, 2025).  The others involved plagiarism (Doc. 6022 at 3, 4 n.1), which Defendants imply may have occurred here through AI use, but they do not directly argue this and present no evidence to support it.

After acknowledging he used Chat-GPT, El-Ghannam testified that he used the references and wrote his report "based on that."  Doc. 6022-1 at 12 ("I use all engines, including ChatGPT, and I go to the references and read these articles and put my report based on that."), 16 ("[Q.] Did you cut and paste from ChatGPT? [A.]: I really don't remember . . . But my general way of writing my report is that I read and check the references and write my report on that basis." (objection omitted)).  Defendants' cited case law acknowledges experts may use AI in the report writing process.  *Kohls*, 2025 WL 66514, at *4 ("[T]he Court does not fault Professor Hancock for using AI for research purposes. AI, in many ways, has the potential to revolutionize legal practice for the better.")

El-Ghannam testified that he wrote his report.  Doc. 6022-1 at 9 (Q. [D]id you use an artificial intelligence platform or program to write or edit your report? A. I wrote the report by myself.").  The report is signed by him and confirms the opinions offered are his own.  *See* Doc. 5202-1 at 4-5, 103.

**IT IS ORDERED** that Defendants' motion to exclude the opinions of Dr. Ahmed El-Ghannam (Doc. 5202) is **granted in part and denied in part**.  Dr. El-Ghannam may not opine (1) that the cracking of the catheter's surface was likely caused by Bard's manufacturing processes, and (2) on the cause of Patient 1's infection and biofilm.

Dated this 12th day of August, 2026.

David G. Campbell
Senior United States District Judge

15