**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| Kimberly Divelbliss,<br>Individual Plaintiff,<br>v.<br>Becton Dickinson and Company, et al.,<br>Defendants. | No. CV-23-01627-PHX-DGC<br>**ORDER**<br>**Ahmed El-Ghannam, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Defendants have filed a motion to exclude the expert opinions of Ahmed El-Ghannam, Ph.D. Doc. 7090. The motion is fully briefed and no party requests oral argument. *See* Docs. 7090, 7421, 7665. The Court will grant the motion in part.

## I. Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into

peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Plaintiff Divelbliss brings her lawsuit in this MDL. Doc. 26 (CV-23-01627-PHX-DGC). On July 13, 2017, Plaintiff had a Bard port implanted. *Id.* ¶ 53. On December 13, 2019, Plaintiff discovered through an emergency room visit that a piece of the port catheter

had broken off and lodged in her heart. *Id.* ¶ 62. She underwent emergency surgery to remove the port. *Id.* ¶ 63. Plaintiff raises claims typical of this MDL. *Id.* at 15-29.

Plaintiff has identified Ahmed El-Ghannam, Ph.D., as a materials science expert. Dr. El-Ghannam holds a Ph.D. in Bioengineering from the University of Pennsylvania. Doc. 5202-1 at 2. He is a Professor in the Department of Mechanical Engineering and Engineering Science at the University of North Carolina, having joined the faculty in 2007 as an Associate Professor. *Id.* He has "worked on the design and development of several medical devices and products," and has published peer-reviewed scientific literature on the topic of implantable medical devices. *Id.* at 3. Defendants move to exclude his opinions under Federal Rule of Evidence 702.

**II. Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

**III. Discussion.**

Defendants move to exclude several opinions of El-Ghannam.

**A. Causation Opinions.**

El-Ghannam opines that, "[*a*]*bsent any other clinical or external factors*, the degradation plainly evident on multiple surfaces of the Divelbliss catheter more likely than not caused the ultimate failure of the device via a complete fracture of the catheter." Doc. 7090-1 at 2 (emphasis added); *see also id.* at 76. He also opines that, "[*a*]*bsent any other clinical or external factors*, barium [sulfate] release substantially contributed to the catheter fracture." *Id.* at 2 (emphasis added); *see also id.* at 76. His causation opinion thus is clearly conditioned on the absence of other clinical or external factors.

Defendants argue that El-Ghannam's causation opinions must be excluded because he did not perform a differential etiology, especially when he conditions his opinions on the absence of other clinical or external factors he did not address. Doc. 7090 at 3-4 (quoting Doc. 7090-1 at 2). It is true that a differential etiology "first assumes the pertinence of all potential causes[.]" *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234 (9th Cir. 2017). And it is also true that El-Ghannam did not address all potential causes. Significantly, however, El-Ghannam does not claim to have performed a differential etiology. And a causation opinion need not adopt that method of analysis to be reliable. *Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 979 (9th Cir. 2009).

El-Ghannam conducted scientific testing of Plaintiff's catheter. Doc. 7090-1 at 43-75. He identified material degradation, which he opines was caused by the catheter's "exposure to adversely high temperature" during the manufacturing process and the "non-homogenous dispersion of barium sulfate particles" on the catheter's surface. *Id.* at 75. He reaches his causation opinions based on this testing, as well as his testing on additional explanted and exemplar catheters, and on his years of experience in biomaterials research and teaching and his literature review. *Id.* at 76.

Without doubt, El-Ghannam conditions his causation opinions on the "absen[ce of] any other clinical or external factors[.]" *Id.* at 2, 76. And he made no attempt to address one significant potential cause identified by Defendants – mechanical stress from Plaintiff's sutures. Doc. 7090 at 3. El-Ghannam received and reviewed Plaintiff's medical records (Doc. 7090-1 at 3, 94), and he acknowledged during his deposition that he was aware of the potential factor of Plaintiff's sutures. Doc. 7090-2 at 3-4.

The Court cannot conclude, however, that El-Ghannam's failure to address the possible impact of Plaintiff's sutures is a basis for excluding the conditional causation opinion he does provide. By making his opinion conditional, El-Ghannam acknowledged that other potential causes must be addressed before his opinion applies. He opined, in effect, that degradation and barium sulfate release most likely caused the catheter's fracture if there are no other plausible explanations for the failure. Plaintiff states she will rely on other experts – Drs. Hurst and Kraut – to opine that there are no other plausible explanations, including Plaintiff's sutures.

Plaintiff argues, correctly, that "[e]xpert testimony is often complementary in complex cases like this one." Doc. 7421 at 5 (citing *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) (finding it "not dispositive" that "no single expert provides a self-sufficient opinion that an identified defect or defects in fact caused" a given product failure or injury)). Plaintiff summarizes the opinions of her experts that collectively will present her case: "Dr. El-Ghannam addresses the biomaterials question[,] . . . Dr. Hurst addresses

clinical causes . . . and rul[es] out alternative medical explanations for fracture," and "Dr. Kraut addresses implantation, concluding . . . that neither suturing nor subclavian placement increased fragmentation risk." *Id.* (citations omitted). The Court cannot conclude that this approach is unreliable under Rule 702.

The Court would have difficulty with El-Ghannam's opinion if it was unconditional – if he conclusively identified the actual cause without considering plausible alternative explanations. Or if he claimed to engage in a differential etiology and then failed to rule in all relevant possible causes. But El-Ghannam does neither. He provides a conditional causation opinion based on his specific field of expertise, and that will be presented with other experts who address other possible causes. His opinion is reliably supported by his extensive experience in SEM, FTIR, and other scientific testing methods, as discussed in his general report. Doc. 5202-1 at 4; *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)). The Court will not exclude his causation opinion because it is conditional.

The Court notes, however, that El-Ghannam will not be permitted to opine that the catheter's degradation was caused by "exposure to adversely high temperature" during Bard's manufacturing process. Doc. 7090-1 at 75. The Court excluded this opinion when it addressed his general expert report. Doc. 10030 at 9-10. El-Ghannam simply incorporates this opinion into his Divelbliss report with no further discussion of Bard's manufacturing processes. He may not opine that Bard's manufacturing processes caused the degradation or defects.

Defendants also challenge El-Ghannam's rebuttal opinion disputing Dr. MacLean's opinion that Plaintiff's sutures caused the catheter fracture (Doc. 7090-3 at 53). Doc. 7090 at 5. But Defendants do not argue that the rebuttal report was untimely or that it fails to address an opinion provided by Dr. MacLean. The fact that it addresses an issue not

addressed in El-Ghannam's original report is not problematic – that often is the case when an expert seeks to rebut the opinions of an opposing expert. *Cf. Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports.").

To the extent Defendants argue that El-Ghannam's rebuttal opinion is itself unreliable (Doc. 7665 at 5 n.1), the Court disagrees. He supported his opinion by performing additional SEM testing, which confirmed non-homogenous dispersion of barium sulfate and reinforced his opinion that such dispersion caused the fracture. Doc. 7090-3 at 53. It also revealed cracking on both sides of the catheter wall, which he opines is inconsistent with the sutures causing the fracture because sutures would cause greater tensile stress at the outer surface. *Id.* This additional SEM testing, with which El-Ghannam has extensive experience (Doc. 5202-1 at 4), reliably supports his rebuttal opinion. *See McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *5 (D. Ariz. July 1, 2021); *Geiger*, 2020 WL 3268675, at *6. El-Ghannam was not required to address various other factors Defendants view as important. Docs. 7090 at 5, 7665 at 6-7; *see Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

**B. Untimely Disclosure.**

Defendants argue El-Ghannam improperly supplements his opinions first brought in his general report. They argue he includes in his Divelbliss report "SEM analysis of an uncoated catheter exemplar to rehabilitate his discredited gold-coating methodology" that Defendants challenge in a separate Rule 702 motion seeking to exclude his general report opinions. Doc. 7090 at 2, 9-10. But in ruling on that motion, this Court held his gold-coating methodology to be sufficiently reliable. Doc. 10030 at 4-8. The reliability of El-

Ghannam's SEM analysis therefore does not rest on his inclusion of an uncoated catheter not addressed in his general report. Further, El-Ghannam never states that the uncoated catheter – which serves as a control in his Divelbliss SEM testing – is necessary to reliably perform SEM analysis. Defendants are free to cross-examine El-Ghannam on his decision not to include an uncoated catheter in his general report.

Nor is the inclusion of the uncoated catheter in the Divelbliss SEM testing a violation of case management order 9 ("CMO 9") or Rule 26(a). Doc. 7090 at 10. Nothing in the CMO suggested that an expert could not engage in additional analysis in a case-specific opinion.

Defendants next argue El-Ghannam improperly "bolster[s] his expanded definition of 'biocompatibility[.]'" *Id.* at 2. They first challenged his definition in their Rule 702 motion to exclude his general report opinions, where they argued "biocompatibility" is a term of art defined by the FDA. This Court has rejected that argument. Doc. 10030 at 10-11.

In his general report, El-Ghannam opines that biocompatibility means a material can "perform its function as intended within the body without harming the body[.]" Doc. 5202-1 at 101. In his Divelbliss report, he opines biocompatibility means a material can "perform its intended function within the body without eliciting adverse local or systemic effects, while also supporting appropriate cellular or tissue responses." Doc. 7090-1 at 2. This definition is not materially different from his earlier definition and therefore is not an untimely disclosure under CMO 9 or Rule 26(a). Doc. 7090 at 13.

Defendants further criticize El-Ghannam for including an additional "catheter biocompatibility" definition not disclosed in his general report, which spans seven sentences and cites two new sources. *Id.* at 12-13 (citing Doc. 7090-1 at 2-3). Plaintiff argues that because the Divelbliss report is case-specific, "by definition, it falls outside CMO 9." Doc. 7421 at 8. But again, nothing in CMO 9 suggests that an expert could not engage in additional analysis or provide additional opinions in case-specific reports.

In their reply, Defendants take issue with El-Ghannam's citation to ISO 10993, an international standard for evaluating biocompatibility. Doc. 7665 at 12. They essentially contend he cannot cite ISO 10993 in his Divelbliss report and claim to have followed this standard when it was not included in his general report. *Id.* El-Ghannam testified in his deposition that he follows ISO 10993 in his work. Doc. 7421-3 at 12.[1] He may testify about it to the extent it is disclosed in his Divelbliss report.

Defendants argue El-Ghannam's opinion that "a design that prevented barium [sulfate] release and degradation would have prevented the fracture" (Doc. 7090-1 at 2, 76) should have been disclosed in his general report because it is an "entirely generic" opinion not specific to Plaintiff's case. Doc. 7090 at 11. They also argue this opinion is "vague and speculative." *Id.* at 11-12. But Plaintiff states that El-Ghannam "confirmed under oath that he was not offering or proposing any alternative design," and states that she will not "use his report or testimony for that end." Doc. 7421 at 10. The Court will hold Plaintiff to this assertion.

**IT IS ORDERED** Defendants' motion to exclude the opinions of Ahmed El-Ghannam, Ph.D. (Doc. 7090) is **granted in part and denied in part**. Dr. El-Ghannam may not opine that the degradation or defects of the catheter were likely caused by Bard's manufacturing processes.

Dated this 13th day of August, 2026.

David G. Campbell

David G. Campbell
Senior United States District Judge

[1] This testimony was elicited by opposing counsel and thus is not inadmissible for non-disclosure. Doc. 114 ¶ II.F.