**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br>**ORDER**<br>**K. Andre Mkhoyan, Ph.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of K. Andre Mkhoyan, Ph.D. Doc. 5177. The motion is fully briefed and no party requests oral argument. *See* Docs. 5177, 5754, 6019. The Court will deny the motion.

## I. Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The parties plan to use various expert witnesses at trial, including materials science experts. Defendants have identified K. Andre Mkhoyan, Ph.D., as a materials science expert. Dr. Mkhoyan holds a Ph.D. in Applied Physics and is a professor in the Department of Chemical Engineering and Materials Science at the University of Minnesota. Doc. 5177-1 at 3. He has conducted research in Electron Microscopy since 1999, including on SEM analysis, which has resulted in Mkhoyan publishing over 200 peer reviewed papers. *Id.* at 3-4. Through his long-standing membership with the Microscopy Society of America, Mkhoyan has participated in numerous national and international conferences, including "often participat[ing] in panel discussions for electron microscopy related topics organized by the National Science Foundation." *Id.* at 5. Plaintiffs move to exclude his opinions under Federal Rule of Evidence 702.

## II. Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the

expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

Mkhoyan opines there are "methodological and other flaws" in the report of Plaintiffs' expert, Dr. El-Ghannam, which "render his opinions wholly unreliable." Doc. 5177-1 at 5-6. Mkhoyan lists four alleged flaws, one of which is the thickness of the metal coating applied in Dr. El-Ghannam's SEM analysis. *Id.* at 6. Plaintiffs challenge Mkhoyan's coating thickness opinions.

### A. Challenges under Rule 702(b) and (c).

Plaintiffs argue Mkhoyan's coating thickness opinions should be excluded under Rule 702(b) and (c) because they are "based on a single measurement" of the coating's thickness taken not from a catheter but from the tape Dr. El-Ghannam used to affix

catheters during his SEM analysis. Doc. 5177 at 5-6. They argue Mkhoyan cannot "extrapolat[e] from a single measurement taken on one adhesive copper tape with different physical properties than the . . . catheters, and upon which the metal atoms might have fallen or condensed differently than they did on the catheters." *Id.* at 7.

Defendants contend Mkhoyan's opinions are not solely based on a single measurement of the coating on the tape, but instead, on "(1) coating thickness measurements on both tape and catheters; (2) extensive hands-on examination of catheter samples; (3) visual analysis of Dr. El-Ghannam's own images; (4) properly controlled microscopy showing actual catheter characteristics; and (5) application of established electron microscopy principles." Doc. 5754 at 6. Defendants do not cite any part of Mkhoyan's report, however, to show he measured the coating thickness on catheters as opposed to tape. They cite figure 13 of his report, which only shows he observed cracking during Dr. El-Ghannam's SEM analysis. Mkhoyan confirmed during his deposition that he did not measure the coating of the catheter in figure 13. Doc. 5754-2 at 5-7.

The Court nonetheless concludes that Mkhoyan's coating thickness opinions are supported by sufficient facts and data and a reliable methodology. In his report, Mkhoyan states that "[s]ince the catheters and the double-sided copper tape on which they are mounted were coated with a layer of platinum at the same time, the thickness of the coated platinum layer can be measured from the sample as well as from the tape," and that "[a] best practice for measuring the thickness of the coated metal layer is to find a region on the sample or on the tape that is aligned vertically." Doc. 5177-1 at 26; *see also* Doc. 5177-2 at 12-13 (Mkhoyan testifying it is "common practice" to measure the coating on the tape to avoid "ruining" or "modifying the sample").

Mkhoyan then explains he took measurements from the tape, which "reveal[ed] a 120-150 nm thick platinum layer," and his report contains two figures in support. Doc. 5177-1 at 28-29 (figures 10 and 11). He opines this measurement "is more than 10 times the appropriate level for proper SEM imaging." *Id.* at 26; *see also* Doc. 5177-2 at 35 (Mkhoyan testifying that a "reliable SEM analysis" should apply "no more than a 10,

15[nm]" coating). Mkhoyan's measurements greatly exceed the 15nm coating Dr. El-Ghannam claims to have applied in his SEM analysis. Doc. 5202-1 at 8.

When asked whether he measured the coating of a catheter from Dr. El-Ghannam's SEM analysis as opposed to the coating of the tape, Mkhoyan testified that figures 22 and 23 of his report contain images of catheters showing "metal flakes" and "a scale bar" that can be used to estimate the coating thickness. Docs. 5177-1 at 43-44, 5754-2 at 9-11. Mkhoyan also "review[ed] . . . the images provided in Dr. El-Ghannam's expert report and rebuttal report," as acknowledged by Plaintiffs. Doc. 5177 at 5.

The Court is satisfied Mkhoyan's testing as discussed above – which provided measurements of the coating thickness from Dr. El-Ghannam's SEM analysis – coupled with his review of Dr. El-Ghannam's report and rebuttal report, is a sufficient factual basis for his coating thickness opinions.

Those opinions are also supported by a reliable methodology. Mkhoyan is a professor in the Department of Chemical Engineering and Materials Science at the University of Minnesota, where he teaches numerous courses on Electron Microscopy. Doc. 5177-1 at 3-4. He has conducted research on Electron Microscopy since 1999, including research on SEM analysis that has focused in part on "methodology development." *Id.* He has published over 200 peer-reviewed papers. *Id.* His experience serves as a reliable methodology for his opinions criticizing the methodology of Dr. El-Ghannam's SEM analysis. *See Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)).

Plaintiffs argue Mkhoyan admitted "there is no basis in literature or generally accepted scientific practices allowing materials engineers to determine the thickness" of a catheter's coating based on the thickness of the affixed tape's coating. Doc. 5177 at 11 (citing Doc. 5177-2 at 12-13). Mkhoyan made no such admission. He acknowledged he

cites no source that discusses measuring the coating from tape, but he explained that measuring the tape's coating is "common sense" because the thickness "should be the same as a sample," and this method prevents "ruining" or "modifying the sample." Doc. 5177-2 at 12-13. He testified this method is "common practice" (*id.* at 13), and explained in his report it is a "best practice" (Doc. 5177-1 at 26). Mkhoyan's experience in SEM analysis (*id.* at 3-4) supports this opinion. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion."); *Geiger*, 2020 WL 3268675, at *6. The Court cannot conclude his coating thickness opinions are unreliable merely because he provides measurements from the tape rather than the adjacent catheter.

Plaintiffs argue Mkhoyan "purports to opine on the thickness of the metallic layer on every single catheter analyzed by Dr. El-Ghannam by extrapolating from a single measurement" from the tape. Doc. 5177 at 7; *see also* Doc. 6019 at 5. They cite Ninth Circuit case law where expert testimony was excluded based on an insufficient sample size. Doc. 5177 at 10. But Plaintiffs cite nowhere in Mkhoyan's report where he opines all the catheters analyzed by Dr. El-Ghannam had an overly thick coating. Instead, he opines the coating "in some instances approaches and even exceeds an order of magnitude greater than indicated and needed." Doc. 5177-1 at 6, 27 (referring to figure 10 of his report to opine "the platinum films deposited on *these* catheter samples are inordinately thick" (emphasis added)). This opinion is supported by Mkhoyan's testing as discussed above.

Plaintiffs argue that Mkhoyan, to opine that "all of Dr. El-Ghannam's SEM images are unreliable because they have too thick of a metal layer," "needed to assess a large enough sample size to determine the frequency at which there was too thick of a metal layer, not just whether any one sample had too much metal." Doc. 5177 at 11. Their reply cites Mkhoyan's deposition testimony where he acknowledges that a greater sample size is optimal to determine the frequency of a methodological flaw. Docs. 6019 at 7, 5177-2 at 5-6. Plaintiffs are free to cross-examine Mkhoyan about his limited testing, but the Court will not exclude his opinion on this basis.

Plaintiffs argue the tape that Mkhoyan measured has "different physical properties than the polyurethane or silicone catheters, and upon which the metal atoms might have fallen or condensed differently than they did on the catheters." Doc. 5177 at 7; *see also* Doc. 6019 at 2. This criticism of Mkhoyan's testing is also appropriate for cross-examination, but not to exclude his otherwise supported coating thickness opinions.

Nor is defense expert Dr. Grainger's opinion that the "sputter coater model used by Dr. El-Ghannam[] can yield uneven coating thickness" a basis to exclude Mkhoyan's opinions. Doc. 5177 at 7-8 (quoting Doc. 5177-5 at 34); *see also* Doc. 6019 at 4-5. That Dr. Grainger *expects* sputter coating to result in uneven coating does not preclude Mkhoyan from opining on the basis of his expertise and experience that Dr. El-Ghannam's SEM analysis resulted in coating thickness that "in some instances" was "greater than indicated and needed" (Doc. 5177-1 at 6), "more than 10 times the appropriate level for proper SEM imaging" (*id.* at 26), and that this methodological flaw combined with others identified by Mkhoyan renders Dr. El-Ghannam's SEM analysis unreliable (*id.* at 5).

Plaintiffs contend Mkhoyan "testified that two images from Figure 22 in his report allowed him to estimate metal thickness from the catheter sample shown, but this estimate was not actually presented in his report." Doc. 5177 at 8; *see also* Doc. 5177-2 at 18-19. They further contend Mkhoyan testified that the coating thickness cannot be measured in many of Dr. El-Ghannam's SEM images because "the metal layer needs to be from the side view to have an estimate of thickness." Doc. 5177-2 at 38. But neither of these contentions undermine the measurements Mkhoyan *did* provide through his testing, presented in figures 10 and 11 of his report.[1] *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others

---

[1] Plaintiffs' related contention – that the SEM images in the appendix of Dr. MacLean's report provide no coating thickness measurements and are oriented in a way that they cannot be reliably measured – is irrelevant because as Plaintiffs acknowledge, Mkhoyan never claimed to rely on those images. Doc. 5177 at 9.

should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

**B. Contrary Evidence Challenge.**

Plaintiffs argue Mkhoyan acknowledged many of Dr. El-Ghannam's SEM images "undermine[] his 'thick metal' theory." Doc. 5177 at 11. They cite numerous SEM images showing fine surface details of the catheters analyzed by Dr. El-Ghannam. *Id.* at 12. Mkhoyan testified surface details would not be visible if the metal coating was too thick, yet he "offered no comment on these images[.]" *Id.* (citation omitted). Defendants argue the fact some surface details are visible "does not disprove excessive coating thickness in other areas or samples because there is no way to corroborate the metal thickness purely based on the images," and where Mkhoyan explained many of the SEM images could not be analyzed for coating thickness due to the positioning of the catheters. Docs. 5754 at 17, 5177-2 at 37-38. As explained above, Mkhoyan never opines that all catheters of Dr. El-Ghannam's SEM analysis contained too thick a coating. He instead opines that Dr. El-Ghannam "improperly coat[ed the catheters] with a layer of metal that in some instances . . . exceeds an order of magnitude greater than indicated and needed." Doc. 5177-1 at 6. That surface details are visible on some SEM images is not inconsistent with this opinion.

**C. Concluding Thought.**

As should be apparent from this and other orders dealing with the SEM analyses in this case, the Court finds both parties' SEM experts to be well credentialed and highly experienced, and finds a sufficient basis for their opinions. *See* Docs. 7432 (Grainger), 10030 (El-Ghannam), 10058 (El-Ghannam case-specific). The Court's task is not to decide which expert is right. These experts clear the Rule 702 hurdle, and the jury should hear from them and weigh their credibility.

**IT IS ORDERED** that Plaintiffs' motion to exclude the opinions of K. Andre Mkhoyan, Ph.D. (Doc. 5177) is **denied.**

Dated this 17th day of August, 2026.

David G. Campbell
David G. Campbell
Senior United States District Judge