**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081<br>**ORDER**<br>**Expert Witness Malcolm Sydnor, M.D.** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Malcolm Sydnor, M.D. Doc. 4824. The motion is fully briefed. *See* Docs. 4824, 5331, 5573. The Court will grant the motion in part.

## I. Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and the medical community is aware of their risks. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

Defendants have identified Malcolm Sydnor, M.D., as a medical expert. Since 2004, Dr. Sydnor has been board certified in diagnostic radiology, and has held a subspecialty certification in vascular and interventional radiology since 2007. Doc. 4824-1 at 4. He is a Professor of Radiology and Surgery at Virginia Commonwealth University and has been practicing interventional radiology full-time since 2005. *Id.* at 4-5. He has implanted and removed thousands of ports from numerous manufacturers. *Id.* at 6. His "most extensive experience has been with Bard ports." *Id.* Plaintiffs move to exclude Sydnor's opinions under Federal Rule of Evidence 702.

## II. Legal Standard.

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent of the expert testimony must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that

expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

Plaintiffs challenge several of Sydnor's opinions under Rule 702.

### A. Safety and Efficacy of Ports.

Plaintiffs argue Sydnor's opinions "related to the efficacy and safety of ports" that are based on his personal experience, or anecdotally from his colleagues' experience, should be excluded under Rule 702(b)-(c). Doc. 4824 at 4. They reference only Sydnor's opinions that "[t]he benefits [of ports] can be enormous" and that patients "are aware of [the] risks" (Doc. 4824-1 at 34), that he "ha[s] seen no randomized clinical trials or prospective cohort studies that Bard ports are less safe or less beneficial compared to ports made by any other manufacturer" (*id.* at 23), and that "[n]one of the potential complications identified in the Bard port IFUs are more common in Bard ports than other ports in [his] experience" (*id.*). Plaintiffs argue he "provides no scientific or analytical basis for these conclusions, nor does he cite any peer-reviewed literature or comparative data to support

them." Doc. 4824 at 4. According to Plaintiffs, "[t]hese opinions are unsupported by data, have no reliable foundation, cannot be tested, and should therefore be excluded." *Id.*

"[A] doctor's experience can serve as a sufficient foundation for opinions about the medical devices the doctor uses in his clinical practice," including his opinion the device is "safe and effective." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 993675, at *2 (D. Ariz. Feb. 21, 2018); *see also Engilis*, 151 F.4th at 1053 ("[A]n expert's specialized knowledge . . . . can also 'serve as the requisite "facts or data" on which they render an opinion.'" (citation omitted)). Sydnor's report describes his extensive clinical experience with ports. During his twenty years of practice as an interventional radiologist, he has implanted and removed thousands of ports. Doc. 4824-1 at 5. His "most extensive experience has been with Bard ports," but he also implants ports from numerous other manufacturers. *Id.* His clinical practice requires him to be familiar with the risks and benefits of ports, which he routinely communicates to patients. *Id.* at 7. He also regularly teaches radiology residents and vascular surgery fellows on how to implant and remove ports. *Id.* at 5. Sydnor's substantial experience supports his general opinions on port safety and efficacy.

Sydnor's safety and efficacy opinions are further supported by the medical literature he cites. *See, e,g.*, Doc. 4824-1 at 15 (citing two medical articles to support his opinions on short-term port risks); *id.* at 18-19 (citing 12 medical articles to support his opinions on long-term port risks); *id.* at 21-22 (citing four medical articles to support his opinions on the benefits of ports compared to other central venous catheters). Defendants have shown by a preponderance of the evidence that Sydnor's opinions that IPCs are safe and effective are sufficiently supported by his clinical experience and literature.

The caselaw cited by Plaintiffs is distinguishable because it rules on expert opinions discussing complication rates or patient outcomes, and Plaintiffs cite no such opinion of Sydnor's. *See Montera v. Premier Nutrition Corp.*, No. 16-CV-06980-RS, 2022 WL 1225031, at *9 (N.D. Cal. Apr. 26, 2022), *aff'd in part*, 111 F.4th 1018 (9th Cir. 2024) (excluding expert's opinions "on the effectiveness of glucosamine from his clinical

observations" because "courts have excluded doctors' observations about rates of patient outcomes 'where the expert was unable to provide verifiable data from the expert's practice.'" (citations omitted)); *Rose v. Bos. Sci. Corp.*, No. 2:20-CV-00716-BJR, 2020 WL 4195470, at *1 (W.D. Wash. July 21, 2020) ("[E]xperts cannot testify on personal complication rates where they have not provided "objective data to back up [such] assertion[s]."). Plaintiffs also cite *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1246-47 (W.D. Wash. 2018), which is inapposite because it involved an expert hired to conduct a study on the defendant's complaint process. The expert's opinions were excluded because they were based on an inadequate sample size, not because they were based on her personal experience. *Id.*

Plaintiffs also cite a ruling by this Court from a previous MDL excluding the expert opinion that Bard's IVC filters have higher complication rates than other manufacturers. *In re Bard IVC Filters Prods. Liab. Litig.*, No. 2:15-md-02641-DGC, Doc. 9772 at 4-5 (D. Ariz. Jan. 22, 2018). That rate-related opinion was quantifiable and should have been supported by data, which is different from Sydnor's opinion that in his experience "[n]one of the potential complications identified in the Bard port IFUs are more common in Bard ports than other ports[.]" Doc. 4824-1 at 23; *see In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 6186496, at *2 (D. Ariz. Feb. 21, 2018) (holding admissible interventional radiologist's opinion that "[in his] own experience, [he has] not encountered unexpectedly high complication rates with Bard filter devices").

Contrary to Plaintiffs' assertion, Sydnor was not required to cite a "study comparing Bard's ports to other manufactures" or "objective data or analysis of his own patients' outcomes" to support his opinion that he has "seen no randomized clinical trials or prospective cohort studies that Bard ports are less safe or less beneficial compared to ports made by any other manufacturer." Doc. 4824 at 5. Sydnor does not claim Bard's ports are safer than other manufacturers' ports. He may reliably opine that he has seen no trials or studies showing Bard ports are less safe based on his literature review as discussed above.

Plaintiffs argue Sydnor may not rely on the experiences of unnamed colleagues to support his opinions. Doc. 4824 at 5. In their reply, they contend he impermissibly relies "on the experience of his colleagues via word-of-mouth recollections." Doc. 5573 at 3. But they cite no opinion of Sydnor's in their motion or reply where he does so.

Sydnor states in his report that for his "entire 20-year career as a licensed physician and attending Interventional Radiologist" he has relied in part on his "colleagues' experiences in the multiple hospitals where [he has] worked and trained, and [his] own personal experience to inform [his] clinical decisions and understanding about risks and benefits of medical products and medicines." Doc. 4824-1 at 29-30. In his deposition, he testified that his experience includes observing his colleagues place "tens of thousands of ports . . . over the last 20 years[.]" Doc. 5331-1 at 14. It would be expected that Sydnor's expert knowledge would be informed by the experiences of colleagues with whom he works. Sydnor may not opine about the specific experiences of colleagues, but Plaintiffs cite no such opinion.

In their reply, Plaintiffs say their "point is that Dr. Sydnor has no verifiable source for his [safety and efficacy] opinions, from practice or otherwise." Doc. 573 at 3. But when an expert's opinion is supported by his clinical experience, he can rely on that experience and need not point to some other objective source. *See Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) ("An expert's specialized knowledge and experience can serve as the requisite 'facts or data' on which they render an opinion."); *Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)).

**B. Comparative Complication Rate Opinions.**

Plaintiffs argue "to the extent that Dr. Sydnor seeks to testify that Bard ports have lower complication rates than other ports, such testimony should be excluded" for the same

reasons they raised above. Doc. 4824 at 7. But they do not cite a single opinion of Sydnor's. Defendants confirm Sydnor does not render such an opinion. Doc. 5331 at 7.

As discussed above, Sydnor may opine that he "ha[s] seen no randomized clinical trials or prospective cohort studies that Bard ports are less safe or less beneficial compared to ports made by any other manufacturer" (Doc. 4824-1 at 23), and that "[n]one of the potential complications identified in the Bard port IFUs are more common in Bard ports than other ports in [his] experience" (*id.*). Those opinions do not implicate quantifiable comparative complication rates and are reliably supported by his clinical experience and literature review. His related opinion – not cited by Plaintiffs – that he has not "found the rates of risk reported in the peer-reviewed medical literature for Bard ports to demonstrate higher rates of complication for Bard ports" (*id.*), is reliably supported by his literature review.

**C. Port Design Opinions.**

Plaintiffs contend Sydnor is not qualified under Rule 702(a) to render opinions on port design or design defect. Doc. 4824 at 8. The Court agrees.

Sydnor acknowledged during his deposition that "he is not an engineer, has never designed an implantable medical device, has no experience conducting device design studies," has never published a peer reviewed article on ports, is not an expert in FDA regulations, has never drafted Instructions for Use ("IFUs") for an implantable medical device, has no "formal education, training, or experience in the manufacturing processes relating to implantable medical devices," and "has no background in materials science, biomechanics, or biomedical engineering." Docs. 4824 at 9, 4824-2 at 3-5. Sydnor concedes in his report that "[interventional radiologists] and other physicians do not go into great detail regarding the makeup of catheter coatings and materials" because "[w]e are physicians, not biomechanical engineers." Doc. 4824-1 at 29 ("[C]atheter material and coatings . . . [are] beyond the scope of what I and all of the other Interventional Radiologists I have worked with and interacted with over my 20-year career concern ourselves with in our daily practices."). He is not qualified to offer port design or design defect opinions.

Defendants claim Sydnor does not offer design opinions. Doc. 5331 at 10. But as cited by Plaintiffs, Sydnor opines "[t]here is no evidence that antibiotic impregnated catheters of any type prevent infection[.]" Doc. 4824-1 at 17 (citation omitted). This opinion on port catheter materials is outside his experience and training as an interventional radiologist. Defendants argue Sydnor cites a study, *Lai et al.*, to support his opinion (Doc. 5331 at 10), but he cannot rely on medical literature alone to inform his opinions. *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("It is not enough to simply read the conflicting studies in the literature and describe their findings. And it's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *aff'd sub nom. Engilis*, 151 F.4th 1040; *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)). This opinion is excluded.

Plaintiffs argue Sydnor's rebuttal opinions are design opinions outside the scope of his qualifications. Doc. 4824-1 at 29. The Court disagrees. Those opinions do not discuss port material or design. Instead, Sydnor rebuts the opinions of Plaintiffs' medical experts on catheter material and coatings by stating such opinions are "beyond the scope" of international radiologists and other physicians. *Id.* He then criticizes the methodology of the literature relied on by Plaintiffs' medical experts to support their catheter coatings opinions. *Id.* at 30 ("If all thrombotic events were included in both studies, complication profiles would be very similar and not statistically different[.]'), 31 ("the [Khalid et al.] study is methodologically flawed, lacks device-specific relevance, and provides no credible basis for establishing causation."), 32 ("[Iida et al.] was a nonrandomized, retrospective study without prospective infection criteria.").

Plaintiffs do not challenge whether Sydnor is qualified to discuss literature methodology. The Court notes he has published medical literature and relies on it in his practice as an interventional radiologist. Doc. 4824-1 at 4-5, 29. He is therefore qualified to render these rebuttal opinions, which discuss only methodological flaws in the literature

relied on by Plaintiffs' experts. "It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 834 (D. Minn. 2011).[1]

Sydnor may not, however, opine on the risks associated with catheter coatings through his rebuttal opinions. *See* Doc. 4824-1 at 32-33 ("[T]here was an FDA Safety Alert in 2015 . . . warning that hydrophilic and hydrophobic coating on catheters can separate . . . [,] causing severe complications . . . . This highlights potential risks with coated medical devices[.]"). Sydnor relies on the 2015 FDA Safety Alert that he reviewed to reach this opinion, and Defendants argue Sydnor routinely interprets FDA safety communications in his clinical practice. Doc. 5331 at 11. Perhaps so, but he may not rely on one FDA alert to opine on the risks of catheter coatings. An expert may not merely repeat the findings of other experts. *See*, *e.g.*, *In re Roundup Prods. Liab. Litig.*, 2023 WL 7928751, at *3.

The cases cited by Defendants are distinguishable. Doc. 5331 at 11-12. In two of them, the expert's opinions were supported by specific clinical experience not shared by Sydnor. *See Heinrich v. Ethicon, Inc.*, No. 220CV00166APGVCF, 2021 WL 1854648, at *3 (D. Nev. May 10, 2021) (doctor's opinion on medical device materials was supported by "his own experience with both [material] types"); *Godreau-Rivera v. Coloplast Corp.*, 598 F. Supp. 3d 196, 210 (D. Del. 2022) (doctor opining on the design of mesh products had "authored multiple peer-reviewed articles . . . relating to mesh products"). Sydnor testified that he has never conducted a study or published literature focused on implantable chest ports, the medical device at issue in this MDL. Doc. 4824-2 at 3-4. Defendants cite nowhere in his report or deposition testimony where he claims to have worked with various port catheter materials in his practice as an interventional radiologist.

---

[1] The Court notes that Sydnor's rebuttal opinions might be moot because they address design opinions of Drs. Hurst, Weinstein, Camins, and Jarvis (Doc. 4824-1 at 29) that have almost wholly been excluded (Doc. 6614 10-11, 7196 at 11-14).

In the third case cited by Defendants, the doctor offered only a broad opinion as to the safety and efficacy of the medical device he has used. *See Nunez v. Coloplast Corp.*, No. 19-CV-24000, 2020 WL 2315077, at *4 (S.D. Fla. May 11, 2020) (holding admissible doctor's opinion that the medical device was "safe and effective" and "there [was] no medical or scientific support for the theory that [it was] defective").

Defendants also cite this Court's earlier decision admitting certain technical opinions from doctors. *See In re Bard*, No. MDL 15-02641-PHX DGC, 2017 WL 11696720, at *6 (D. Ariz. Dec. 22, 2017). The Court admitted only those technical opinions that "might reasonably be based on expertise and experience in implanting, monitoring, and removing IVC filters," and excluded all others. *Id.* Sydnor's design opinions excluded above are not reasonably based on his clinical experience.

### D. Instructions for Use Opinions.

Plaintiffs argue Sydnor cannot opine on the adequacy of Bard's IFUs under Rule 702(a)-(c). Doc. 4824 at 10.

As argued by Defendants (Doc. 5331 at 13-14), the weight of the caselaw holds that a doctor's clinical experience qualifies him to discuss the adequacy of warnings in IFUs. *Kelley v. C.R. Bard, Inc.*, 644 F. Supp. 3d 1316, 1341-42 (N.D. Ga. 2022) ("Culligan is qualified to testify regarding the adequacy of the IFU warnings. . . . [A] doctor relying on a product warning in his or her practice qualifies him or her to make conclusions on the adequacy of the product's warning." (citations omitted)), *vacating in part*, No. 2:20-CV-00045-SCJ, 2023 WL 2370109 (N.D. Ga. Jan. 24, 2023); *Arevalo v. Coloplast Corp.*, No. 3:19CV3577-TKW-MJF, 2020 WL 3958505, at *5 (N.D. Fla. July 7, 2020) (admitting "Dr. Kohli's opinions regarding the risks physicians expect to be included in IFUs and how those compare to the risks actually included in the Aris IFU"), *aff'd sub nom. Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646 (11th Cir. Nov. 8, 2022); *Wise v. C.R. Bard, Inc.*, No. 2:12-CV-01378, 2015 WL 521202, at *14 (S.D.W. Va. Feb. 7, 2015) ("Dr. [Raybon] . . . is qualified to evaluate Bard's warnings based on his knowledge of and experience with the risks of the Avaulta."); *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691,

719 (S.D.W. Va. 2014) ("[A]s a urologist, Dr. Blaivas is qualified to testify about the risks of implanting the TVT–O and whether those risks were adequately expressed on the TVT–O's IFU.").

In his report, Sydnor states that he "reviewed each of the [IFUs] listed in [his] materials reviewed list" and that the "IFUs warn of all potential complications described in detail" in his report, "including air embolism, bleeding, arrhythmias, catheter embolization, fibrin sheath formation, infection, vascular thrombosis, pinchoff including fracture, and skin erosion." Doc. 4824-1 at 23. He opines "[t]he details of these IFUs are consistent with IFUs of other port products [he has] used." *Id.* He states port "risks and complications have been long and well reported in the medical literature," which he has relied on through his practice as an interventional radiologist. *Id.* at 23, 29. His practice routinely involves reviewing and discussing those risks with patients. *Id.* at 7. He opines that "[n]one of the potential complications identified in the Bard port IFUs are more common in Bard ports than other ports in [his] experience[.]" *Id.* at 23.

Sydnor's knowledge of the risks of ports, and his experience relying on IFUs in his clinical practice, qualifies him to opine on whether Bard's IFUs contain known port complications and are consistent with other port manufacturer IFUs that Sydnor has used. Fed. R. Evid. 702(a). His clinical experience in using IFUs (*id.* at 23) and routinely reviewing port risks (*id.* at 7) serves as a sufficient factual basis and reliable methodology for his opinions. *See Elosu*, 26 F.4th at 1024; *Geiger*, 2020 WL 3268675, at *6.

Plaintiffs argue Sydnor is not qualified to opine on the adequacy of Bard's IFUs "because he has no experience whatsoever in drafting IFUs and/or interacting with the FDA regarding the content of IFUs." Doc. 4824 at 11. But Sydnor did not need such experience to reliably opine on the contents of Bard's IFUs. He is in the target audience for IFUs and he uses them regularly. Expert testimony can reliably be based "'in the knowledge and experience of the relevant discipline.'" *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2018 WL 495188, at *4 (D. Ariz. Jan. 22, 2018) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27,

2010)); *McBroom v. Ethicon*, Inc., No. CV-20-02127-PHX-DGC, 2021 WL 2709292, at *16 (D. Ariz. July 1, 2021) (holding that "[e]xpert witnesses may properly offer opinions" on "knowledge of the medical community in general" (citation omitted)). As discussed above, Sydnor's customary practice as an interventional radiologist includes using and relying on IFUs.

Plaintiffs argue Sydnor's IFU opinions are not based on sufficient facts or data because he "never reviewed internal company materials to evaluate whether Bard's IFUs were consistent with what the company knew about its device risks." Doc. 4824 at 11. They contend that a failure to warn claim under any state law "depends on what the product manufacturer knew or should have known in making decisions about warnings," and "[w]ithout knowing what information Bard had about complications associated with its ports, Dr. Sydnor could not possibly give a reliable opinion as to whether Bard sufficiently warned about those complications." *Id.* But Sydnor does not opine on whether Bard sufficiently warned about the complications it knew. He opines on whether Bard's IFUs contain information similar to the IFUs he has used, and whether Bard's IFUs contain information on widely known port complications. Doc. 4824-1 at 23. His clinical experience provides a sufficient factual basis for his opinions.

Plaintiffs relatedly argue that Sydnor "cannot reliably opine on whether Bard's IFUs meet industry norms or standards for adequate warnings" because he did not review IFUs from other U.S. port manufacturers. Doc. 4824 at 12. Sydnor does not render such an opinion.

In their reply, Plaintiffs argue that Sydnor's opinions "ventur[e] into what the manufacturer should or should not have included in the IFU." Doc. 5573 at 5. But they cite no opinion of Sydnor's, and the Court found no such opinion in his report.

**IT IS ORDERED** that Plaintiffs' motion to exclude the opinions of Malcolm Sydnor, M.D. (Doc. 4824) is **granted in part and denied in part.** Dr Sydnor may not opine on port design or design defect, including his opinion that "[t]here is no evidence

that antibiotic impregnated catheters of any type prevent infection" (Doc. 4824-1 at 17), and his opinion on the risks associated with catheter coatings (*id.* at 32-33).

Dated this 8th day of September, 2026.

David G. Campbell
Senior United States District Judge