**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

IN RE: Bard Implanted Port Catheter Products Liability Litigation

MDL No. 3081

**ORDER**

**Christy Foreman, MBE**

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). Plaintiffs have filed a motion to exclude the expert opinions of Christy Foreman, MBE. Doc. 4828. The motion is fully briefed and no party requests oral argument. *See* Docs. 4828, 5335, 5574. The Court will grant the motion in part.

## I. Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir disc with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. Port bodies vary in shape and size and are made of plastic, silicone, or titanium. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

This MDL involves multiple versions of Bard IPCs, each of which received premarket clearance from the Food and Drug Administration ("FDA"). Bard IPCs contain barium sulfate, a radiopaque substance that can be seen on diagnostic imaging such as X-ray, CT, and MRI scans. Several Bard IPCs are manufactured using polyoxymethylene ("POM"), an acetal thermoplastic polymer, in the construction of the port. Many Bard IPCs have a port with raised palpation bumps on the silicone center, which help identify these IPCs as power-injectable devices.

Each Plaintiff in this MDL had a Bard IPC implanted in his or her body, and claims it was defective and caused serious injury. Plaintiffs allege that the barium sulfate in the IPC degrades the mechanical integrity of the catheter, leading to surface irregularities that cause catheter fracture, infection, and blood clots. Plaintiffs further allege that Bard's manufacturing process for the POM-containing IPCs lacks adequate measures to stabilize the POM to prevent oxidative degradation, which causes cracks, fissures, and other physical defects in the polymer and increases the risk of fracture, infection, and thrombosis. Plaintiffs also allege that the palpation bumps on the power-injectable IPCs cause undue compression stress on the tissue surrounding the port, leading to ulceration and tissue necrosis. *See* Docs. 23, 1889.

Plaintiffs claim that safer alternative designs and manufacturing processes were available to Bard and that Bard IPCs are more dangerous than other available treatment

options. Plaintiffs assert a host of state law claims, including design and manufacturing defects, failure to warn, breach of warranty, misrepresentation, concealment, and consumer fraud and unfair trade practices. *See* Docs. 23, 1889.

Bard disputes Plaintiffs' allegations and contends its IPCs are safe and effective and that the medical community is aware of risks associated with IPCs. Bard further contends that various factors impact the performance and wear of IPCs, including where the catheter is inserted and how well the device is maintained by medical professionals and the patient. *See* Docs. 23, 2023-1.

The FDA applies different levels of scrutiny to medical devices before approving or clearing them for market. The most rigorous level of scrutiny is known as "premarket approval," often referred to as the "PMA" process. 21 U.S.C. § 360e(a). To comply, a manufacturer must file an application that provides a broad range of detailed information to the FDA showing that the device is safe and effective. *Id.* § 360e(c). Other medical devices can be cleared through the less rigorous section "510(k)" review. A manufacturer can satisfy this review and be exempt from the PMA process by providing premarket notice to the FDA that its device is substantially equivalent to another device that is already on the market, typically referred to as a "predicate" device. *Id.* § 360c(f)(1)(A).

Defendants have identified Christy Foreman, MBE, as an FDA expert. Ms. Foreman holds a master's degree in biomedical engineering. Doc. 4828-1 at 7. In 1996, she began her 22-year employment with the FDA as a reviewer for the Office of Device Evaluation ("ODE") of the Center for Devices and Radiological Health ("CDRH"). *Id.* She reviewed medical device submissions through various regulatory processes, including the 510(k) process. *Id.* Foreman later served in senior roles at the FDA, including as Deputy Division Director for the Office of Compliance, Deputy Office Director for Science and Engineering and Chief Scientific Officer for the ODE, and as Office Director for the ODE. *Id.* In 2018, she joined Biologics Consulting as a Principal Consultant, where she advised clients on "regulatory strategies for medical devices[.]" *Id.* at 8. In 2024, she joined Drive DeVilbiss Healthcare as Senior Vice President and remains in that position.

*Id.* She is also an adjunct lecturer at the Catholic University of America where she teaches a course on medical device design and regulation in the Biomedical Engineering Department. *Id.* Plaintiffs move to exclude Foreman's opinions under Rules 702 and 403.

**II. Legal Standard.**

Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the proponent of the expert's testimony "demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent must show by a preponderance of the evidence that the testimony satisfies each of these requirements. Fed. R. Evid. 104(a); Fed. R. Evid. 702 advisory committee's note to 2023 amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025) ("Consistent with the 2023 amendment, our precedent establishes that Rule 702 requires a proponent of expert testimony to demonstrate each of the requirements of Rule 702 by a preponderance of the evidence.").

The Court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions satisfy Rule 702. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013); *Engilis*, 151 F.4th at 1050. If the proponent does not meet its Rule 702 burden, the expert testimony is not admissible. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, 2019 WL 3532179, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("[T]he Court may admit expert

opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence.").

## III. Discussion.

Plaintiffs move to exclude several opinions of Foreman.

### A. Port Benefits and Complication Rates.

Plaintiffs argue Foreman is not qualified "to testify to the alleged benefits of ports and port complication rates" because "she has never worked on ports or catheters" and has no medical training. Doc. 4828 at 3-4 (citations omitted). They cite Foreman's opinion that "IPCs are safer and preferred" when compared to PICCs. Doc. 4828-1 at 73. Defendants confirm Foreman "will not compare ports to PICCs at trial[.]" Doc. 5335 at 2. The Court will hold Defendants to this position.

Plaintiffs also cite her opinion that "device related infections occur but generally at a low prevalence rate." Doc. 4828-1 at 73. Foreman bases her opinion on her "experience working at FDA in roles where this type of issue was discussed both in terms of policy and individual products[.]" *Id.* Foreman may state her general opinion that in her experience at the FDA, device-related infections occurred at a low rate.

Plaintiffs cite Foreman's opinions that IPCs have "lower infection rates than other catheters," and "[f]or devices that are externally communicating . . . the risk of infection differs as compared to that of a device that is contained entirely within the body such as an IPC." *Id.* at 73-74. Foreman does not cite her experience in support, but instead references a retrospective study. *Id.* at 73 & n.141. But reliance on a study does not qualify Foreman to render these opinions. *See In re Roundup Prods. Liab. Litig.*, No. 16-MD-02741-VC, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023) ("[I]t's certainly not enough to read and report on the summaries of the studies performed by other bodies or experts."), *aff'd sub nom. Engilis*, 151 F.4th 1040; *Buck v. Ford Motor Co.*, 810 F. Supp. 2d 815, 844 (N.D. Ohio 2011) ("An expert must make some findings and not merely regurgitate another expert's opinion." (citation modified)).

Defendants contend Foreman is qualified to render such opinions on "comparative rates of infection for particular devices" because "[s]he has vast FDA, regulatory, quality, and medical device industry experience" and a master's degree in biomedical engineering. Doc. 5335 at 2-3 (citation modified). That Foreman holds a master's degree in biomedical engineering does not in itself qualify her to opine on port infection rates. Nor does her "FDA, regulatory, quality, and medical device industry experience[.]" *Id.* at 3. Defendants specifically refer to her experience in complaint handling and FDA regulatory compliance (*id.*), but they do not explain how these experiences relate to her port infection rate opinions. Foreman's qualifications discussed in her report and CV similarly provide no support. *See* Doc. 4828-1 at 7-9, 109-113.

During her deposition, Foreman testified that as an FDA reviewer, she never worked with port catheters. *See* Doc. 4828-2 at 6-7. Although port catheters were "under [her] purview" in her senior roles (*id.* at 7), Foreman confirmed she did not recall ever dealing with an IPC issue. *Id.* at 8 ("Q. But you don't have any specific recollection of an [IPC] issue ever being raised to the level of you having to deal with it? A. Correct. Q. Okay. So . . . you have no specific recollection of ever working on an [IPC]? A. Correct."). Nor has she worked on IPCs in her positions since leaving the FDA. *Id.* at 23. She confirmed she has "no personal experience" with an IPC. *Id.* at 25.

Defendants have not shown by a preponderance of the evidence that Foreman is qualified to opine on port infection or comparative infection rates. These opinions will be excluded.

Plaintiffs seek to exclude Foreman's opinions on "patient or physician preferences[.]" Doc. 4828 at 4 (citations omitted). They cite Foreman's opinion that "[t]hese materials have advantages and disadvantages, with the choice of material used made by an implanting physician based on preference, patient specific, or application dependent reasons." Doc. 4828-1 at 81. Defendants do not respond. *See* Doc. 5335 at 3. Foreman is not a physician and has no apparent experience in the decision-making process of patient care. She may not opine on patient or physician preferences.

### B. The 510(k) Process.

Plaintiffs argue Foreman may not opine that Bard's ports were "approved" through the 510(k) process. *Id.* at 5. Defendants confirm "[s]he has not and will not testify that Bard's implantable port devices are 'FDA approved,' nor that the terms 'FDA cleared' and 'FDA approved' are interchangeable." Doc. 5335 at 5. The Court will hold Defendants to this position.

Plaintiffs acknowledge Foreman may opine that "in clearing a port device, the FDA determined it was 'as safe and effective' as its predicate(s)," but argue she "may not testify or imply that the FDA determined Bard's ports were 'safe[.]'" Doc. 4828 at 7. They cite her opinions that "each substantially equivalent decision [by the FDA], while not an independent determination of reasonable assurance of safety and effectiveness, is a determination of reasonable assurance of safety and effectiveness," and that Class II devices such as ports are subject to "general plus special controls [that] provide a reasonable assurance of safety and effectiveness." Doc. 4828-1 at 11-12. Foreman further opines that "[f]or all classes, FDA's standard is the same. There must be 'reasonable assurance' that the device is safe and effective." *Id.* at 12. She cites an FDA guidance document (*id.* at 11 n.4), which states:

> Because devices are classified according to the level of regulatory control necessary to provide a reasonable assurance of safety and effectiveness, classification of a new device through the 510(k) process requires FDA to determine the issues of safety and effectiveness presented by the new device, and the regulatory controls necessary to address those issues.

U.S. Department of Health and Human Services, FDA, The 510(k) Program: Evaluating Substantial Equivalence in Premarket Notifications [510(k)] 3-4 (2014) (footnotes omitted).

A few observations are warranted.

First, the Court has not determined that FDA evidence will be admissible in the Lattanzio trial. That will be a decision for the presiding judge.

Second, as the Court previously has noted, "[t]he 510(k) process focuses on device equivalence, not device safety." *In re Bard IVC*, 289 F. Supp. 3d 1045, 1047-48 (D. Ariz. 2018). It does not determine a device is "safe and effective," only "that the device is substantially equivalent to the predicate device." *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 5625547, at *7 (D. Ariz. Nov. 22, 2017), *aff'd sub nom. In re Bard IVC Filters Prod. Liab. Litig.*, 969 F.3d 1067 (9th Cir. 2020) (citation omitted). While the FDA may find "the device 'is as safe and effective' as the predicate device," this is a comparative exercise, not a safety determination. *Id.*

Foreman's opinions come close to stating that the FDA makes a safety determination in the 510(k) process. Such an opinion is inconsistent with the 510(k) standard. Thus, if allowed to testify on FDA issues by the presiding judge, Foreman may describe the safety aspects of the 510(k) process as a comparative standard, but she may not opine or imply that it is equivalent to the PMA process or that it is an affirmative approval of product safety by the FDA.

Plaintiffs acknowledge Foreman "may testify that Bard's design processes complied with FDA regulations[.]" Doc. 4828 at 6; *see also* Doc. 5574 at 3 ("Plaintiffs . . . agree that Ms. Foreman may testify to the requirements of the [Quality System Regulation ("QSR")] and that, in her opinion, Bard followed these requirements."). In her report, Foreman quotes the QSR of the FDA. *See* Doc. 4828-1 at 26 ("The scope of the regulation states that: 'The requirements in this part are intended to ensure that finished devices will be safe and effective[.]'") Plaintiffs contend Foreman "may not testify or imply that Bard's designs met FDA requirements for safety" because she is not qualified to opine on port design, and Bard's compliance with "'minimum' FDA regulatory standards" is not a safety determination. Doc. 4828 at 6. Defendants contend Foreman properly "discusses Bard's compliance with the design controls provisions of the QSR, based upon her detailed review of statute, internal Bard documents and her own robust knowledge and FDA experience." Doc. 5335 at 6-7.

The Court agrees with Defendants. But consistent with the Court's statement above, Foreman may not render opinions that effectively suggest the FDA controlled the design or approved the safety and effectiveness of the PowerPort. She may describe the comparative nature of 510(k) review, and note that there are some design and safety considerations involved in that comparative review, but she may not imply that Defendants' product is safe because it received 510(k) clearance. The Court has given an FDA jury instruction in the last two bellwether trials that makes this distinction clear, and the presiding judge can decide whether a similar instruction is warranted.

Plaintiffs separately argue Foreman may not opine about the risk-benefit analysis of the FDA, including in the context of the 510(k) process, because this is an "impermissible legal conclusion." Doc. 4828 at 8. Plaintiffs do not elaborate on this argument or cite any authority in support. *Id.* They cite Foreman's report where she quotes 21 CFR 860.7(d)(1): "There is reasonable assurance that a device is safe when it can be determined . . . that the probable benefits to health from use of the device for its intended uses and conditions of use, when accompanied by adequate directions and warnings against unsafe use, outweigh any probable risks." Doc. 4828-1 at 13 (footnote omitted). Foreman may rely upon the regulations she discusses.

Plaintiffs also cite her opinion that the "FDA evaluates device changes in a benefit/risk framework." *Id.* at 70. This is factual opinion, not an improper legal conclusion.

Plaintiffs cite pages 74-75 of Foreman's report, where she opines that "the inclusion of the additional antimicrobial or antithrombotic agents can raise additional risks[.]" *Id.* at 74-75. She also opines that "given that no other company appears to market an antimicrobial catheter, it does not appear that a positive benefit risk profile has been presented." *Id.* at 75. These too are not legal conclusions. Foreman does not opine on how the risks associated with antimicrobial or antithrombotic agents would impact the risk-benefit analysis of Bard's ports, and she may acknowledge that a risk-benefit analysis has not been performed on an antimicrobial catheter.

Plaintiffs argue Foreman "is not qualified to perform a risk-benefit assessment[.]" Doc. 4828 at 8. But she performs no such assessment. Foreman only explains the risk-benefit analysis framework under the FDA, and Plaintiffs acknowledge she "has the qualifications to provide context on the general regulatory regime" of the FDA. *Id.* at 3. Foreman does not need expertise in ports to render her risk-benefit opinions (*id.* at 8), which do not discuss the use or design of ports.

Plaintiffs otherwise argue these opinions "do[] not 'fit' the disputed issues in this MDL" and would confuse and mislead the jury under Rule 403. *Id.* Whether FDA evidence should be admitted in this trial will be a decision for the presiding judge.

**C. FDA's State of Mind.**

Plaintiffs argue Foreman cannot opine on the FDA's state of mind. *Id.* at 8-9. Defendants confirm she will not. Doc. 5335 at 8. The Court will hold Defendants to this position. *See In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 WL 6523833, at *9 (D. Ariz. Dec. 21, 2017) ("Inferences about the intent or motive of . . . others lie outside the bounds of expert testimony." (citation omitted)); *In re Traylsol Prods. Liab. Litig.*, No. 09-MD-01928, 2010 WL 4102247, at *6 (S.D. Fla. Sept. 10, 2010) (excluding opinions about "the FDA's motive, knowledge, intent, and state of mind" because they fell outside "the scope of [the witness's] knowledge and expertise and are classic jury questions").

Plaintiffs cite Foreman's opinions that the "FDA has not issued any public health notification related to implanted ports," that "[n]o [522] study was ever ordered for Bard's implantable port products," and the "FDA has not proposed to change the classification of implantable port devices." Doc. 4828-1 at 29, 42-43. These are not state of mind opinions. Plaintiffs contend "Foreman should not be permitted to suggest that the FDA's inaction apparently means the FDA had blessed Bard's processes and products." Doc. 4828 at 9. The Court agrees, but Foreman never states such an opinion. Defendants confirm Foreman will only "testify about how the FDA operates" and "the actions that the FDA took or did not take[.]" Doc. 5335 at 8-9. Such testimony is permissible. *See In re Mirena IUD Prods.*

*Liab. Litig.*, 169 F. Supp. 3d 396, 466 (S.D.N.Y. 2016) (FDA expert can opine on what the FDA did, what it said, and what documents mean, but cannot opine on the FDA's thoughts or motivations).

**D. Document Review.**

Plaintiffs argue Foreman "failed to conduct a fulsome review of documents" and cannot meet Rule 702(b) and (d) for "opinions beyond basic FDA regulatory requirements and the objectively documented exchange of information with the FDA[.]" Doc. 4828 at 10. Plaintiffs rely on Foreman's deposition testimony acknowledging she did not review all 6,491 documents listed on her reliance list, presumably referring to her materials considered list. *Id.* (citing Doc. 4828-2 at 9-14, 15-17). But Foreman clarified that her methodology, "based on [her] experience at [the] FDA, [and her] experience auditing companies," is to "have a general list of types of documents that [she] request[s] and . . . that it be broad," and she then reads some documents fully and samples others, where she "might increase [her] sampling plan" if she "saw some inconsistencies" to ensure she sampled a "representative set." Doc. 4828-2 at 12-13. She testified this method is "similar to what [the] FDA does when they do an inspection," with which she has extensive experience. *Id.* at 13. The Court cannot say Foreman did not, through her document review, apply a reliable methodology to the facts of the case. Fed. R. Evid. 702(d).

Nor does her document review reflect an insufficient factual basis for her opinions. Fed. R. Evid. 702(b). Foreman was not required to review every document made available to her. *Kang v. Mayor & Aldermen of City of Savannah*, No. CV421-111, 2024 WL 150082, at *5 (S.D. Ga. Jan. 12, 2024) ("The challenged opinions are not based on insufficient facts or data simply because Register and Vowell did not review every available document before writing their expert reports."); *Walsh v. Reliance Tr. Co.*, No. CV-19-03178-PHX-ROS, 2023 WL 1966921, at *11 (D. Ariz. Feb. 13, 2023) ("Defendants complain Wert's opinions are not based on 'sufficient facts or data' because he did not review 'thousands of pages' they believe are relevant. . . . Defendants do not cite any authority establishing such a rule[.]" (citation omitted)).

Foreman testified that she reviewed the documents cited in her report, which contains 202 footnotes, the majority of which cite sources. *See* Docs. 4828-1 at 10-97, 4828-2 at 13. Foreman's document review, coupled with her experience, *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022), is a sufficient factual basis for her opinions. Plaintiffs may cross-examine her about documents she did not review. *See Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *5 (D. Ariz. Dec. 17, 2019) ("[U]nless an expert's opinion lacks enough accurate factual information to provide a reasonable factual foundation, criticism of an expert's decision to base an opinion on some facts but not others should be challenged through the traditional means at trial, not through a *Daubert* motion." (citation modified)).

**E. Opinions on Cautionary Statements.**

Defendants' materials supplier, DuPont, issued a cautionary statement that its "materials are not designed or manufactured for use in implantation in the human body or in contact with internal body fluids or tissues." Doc. 4828-1 at 80 (emphasis omitted). A similar cautionary statement is contained in DuPont's Material Safety Data Sheet ("MSDS"). *See id.* at 81. Plaintiffs argue Foreman is not qualified under Rule 702(a) to opine that "[t]hese types of limited liability statements have arisen from lawsuits such as the Dow Corning silicone breast implant litigation," and that it "does not mean that this material cannot or should not be used for prescription medical devices." Doc. 4828 at 11-12 (quoting Doc. 4828-1 at 80-81).

In response, Defendants cite Foreman's two decades of experience working within the CDRH of the FDA. Doc. 5335 at 11 (citing Doc. 4828-1 at 109-10). They also note her opinion is consistent with the 1998 Biomaterials Access Assurance Act, which "states that some 'suppliers have ceased supplying certain raw materials and component parts for use in medical devices for a number of reasons, including concerns about the costs of such litigation.'" *Id.* (quoting 21 U.S.C. § 1601) (emphasis omitted).

The Court finds that Foreman's experience overseeing the regulatory processes of the FDA (Doc. 4828-1 at 7-8) qualifies her to opine on why materials suppliers issue

cautionary statements and why such statements do not preclude a material from being used in a medical device. Such opinions are not "impermissible mindreading" (Doc. 4828 at 11), but are opinions based on her extensive experience in the FDA. Nor are they irrelevant (*id.* at 12) in light of Plaintiffs' design defect claims.

The Court cautions Defendants, however, that Foreman may not opine specifically on Dow's or DuPont's reasons for issuing cautionary statements. Foreman does not explain any experience or cite any source that would support such an opinion. She testified during her deposition that she did not review the deposition of a DuPont employee taken in this litigation. Doc. 4828-2 at 11.[1]

**F. Sufficiency of Labeling Opinions.**

Plaintiffs contend that although Foreman is "arguably qualified to retell the applicable labeling requirements," she is not qualified to opine that "Bard's labeling appears appropriate" because she "has no expertise as a physician or surgeon" or with IPC products. Doc. 4828 at 12 (quoting Doc. 4828-1 at 65) (citations omitted). The Court disagrees. Foreman's experience in reviewing 510(k) submissions, as well as Investigational Device Exemption submissions and Premarket Approval Application submissions (Doc. 4828-1 at 7), which she explains involves reviewing and commenting on labeling of the submitted devices (*id.* at 65), qualifies her to testify that Bard's labeling appears appropriate under the applicable 510(k) review process.

Plaintiffs contend that because Foreman states "510(k)s normally only contain labeling sufficient to describe the device's intended use" (*id.* at 24), she cannot opine on "the sufficiency of Bard's instructions and warnings[.]" Doc. 4828 at 12. But Foreman identifies numerous Bard 510(k) submissions on which the FDA provided labeling

[1] Plaintiffs argue in their reply that Foreman "conceded that she has never spoken with anyone at Bard or DuPont about the relevant warnings, has never reviewed any documents showing communications between Bard and DuPont discussing the intent of the warnings, and has never reviewed any documents showing that Bard informed DuPont that the Delrin would be used in a permanent implantable device like the subject IPCs." Doc. 5574 at 4. But Plaintiffs cite no part of Foreman's report or deposition in support. Nor will the Court address the reply's reference to Rule 702(b)-(c). Plaintiffs' motion challenged Foreman's cautionary statement opinions only under Rule 702(a) (Doc. 4828 at 11-12).

comments. Doc. 4828-1 at 65. Plaintiffs may cross-examine her about whether those comments discuss instructions and warnings.

Plaintiffs argue under Rules 702 and 403 that Foreman cannot opine that the FDA "approved" Bard's instructions and warnings as "accurate or appropriate" or imply the FDA clearing a device "signals FDA approv[al]." Doc. 4828 at 13 (citation modified). Foreman never renders such opinions. Plaintiffs cite her opinion that "[o]nly once FDA is satisfied with the response will FDA then find the device substantially equivalent. When FDA is not satisfied, it will, in my experience, issue a performance-based [Not Substantially Equivalent.]" Doc. 4828-1 at 65. That opinion is silent on FDA approval.

A closer issue is Foreman's opinion that "[w]hile 510(k) labeling is not approved *in exactly the same way* that PMA labeling would be approved, it is reviewed by the FDA medical device reviewer who may comment on the labeling." *Id.* (emphasis added). Defendants assert Foreman "clearly states in her report that '510(k) labeling is not approved[.]'" Doc. 5335 at 13 (citation omitted). The Court will hold Defendants to this position – Foreman cannot opine or imply that the FDA "approved" Bard's labeling or the instructions and warnings it contained through the 510(k) process.

Plaintiffs argue Foreman cannot opine that physicians qualify as "learned intermediar[ies]." Doc. 4828 at 13 (citing Doc. 4828-1 at 65-66). Defendants confirm Foreman "does not offer or plan to offer an opinion about 'how [labeling] would impact treating physician product selection,' nor use the term of art 'learned intermediary' to refer to a plaintiff's physician." Doc. 5335 at 14. The Court will hold Defendants to this position.

**G. Antimicrobial Coatings Opinion.**

Plaintiffs argue Foreman's opinion that "[a]t the time of [Bard's Avertex antimicrobial] submission [in 2010], heightened regulatory scrutiny existed regarding nanotechnology" (Doc. 4828-1 at 52) is based on insufficient facts and data and is not supported by a reliable methodology. Doc. 4828 at 13. The Court disagrees. Foreman bases her opinion on (1) the FDA's forming of the "Nanotechnology Task Force in 2006, which published a report in 2007" that found "nanoscale materials present regulatory

challenges,"[2] and (2) that in her "experience, when new science-based groups are formed, heightened awareness and scrutiny exists for potential products that may fit the criteria." Doc. 4828-1 at 52 (footnotes omitted). This provides a sufficient factual basis for her opinions. *Elosu*, 26 F.4th at 1024.

Foreman's experience in overseeing the regulatory processes of the FDA during the relevant period (Doc. 4828-1 at 110) separately serves as a reliable methodology for her opinion on the heightened regulatory scrutiny around nanotechnology. *Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3268675, at *6 (D. Ariz. June 17, 2020) ("An expert's opinion can be based on 'the application of extensive experience,' which satisfies Rule 702(c)'s requirement that an expert opinion be based upon reliable principles and methods." (quoting Fed R. Evid. 702 notes for the 2000 amendments)). She was not required to conduct analysis of prior or other contemporaneous submissions to demonstrate a reliable methodology. Doc. 4828 at 13.

Plaintiffs challenge Foreman's opinion that Defendants' 510(k) "submission had an antimicrobial coating as well as what FDA perceived to be nanotechnology. . . . The regulatory history for K101432 reflects an FDA belief that the coating was based on nanotechnology[.]" Doc. 4828-1 at 52. This opinion is based on the regulatory history, which addresses this subject, not on Foreman's opinion about what the FDA perceived or believed. So long as this opinion is confined to what Foreman sees in the regulatory history, the Court finds it admissible under Rule 702.

Plaintiffs challenge Foreman's related opinion that the FDA "had concerns regarding coatings[.]" Doc. 4828 at 14 (quoting Doc. 4828-1 at 70-71). They contend her opinion must be excluded for lack of fit and insufficient factual basis, and for impermissibly opining on the FDA's state of mind regarding coatings. *Id.* Foreman sufficiently supports her opinion by citing her experience, *Elosu*, 26 F.4th at 1024, where she spent over 20 years overseeing the regulatory processes of the FDA (Doc. 4828-1 at 7-

---

[2] *Nanotechnology Task Force Report 2007*, U.S. FOOD & DRUG ADMIN. (July 23, 2007), https://www.fda.gov/science-research/nanotechnology-programs-fda/nanotechnology-task-force-report-2007.

8), and an American Society of Anesthesiologists' webpage discussing an FDA 2015 safety communication on lubricious coatings risks (*id.* at 71 n.133).

Plaintiffs contend this 2015 communication "does not have bearing on the FDA's approach to antimicrobial coatings in 2010 when Bard submitted K101432 with antimicrobial claims," especially where the 2015 communication discusses lubricious coatings, not antimicrobial coatings. Doc. 4828 at 14. But the 2015 communication explains that the FDA has been on notice to recalls concerning lubricous coatings since January 1, 2010. *See* Doc. 4828-1 at 71 n.133. And while lubricious coatings – which intend to reduce friction – differ from antimicrobial coatings, the 2015 communication makes clear the FDA had concerns about "[c]oating separation" on medical devices, including on "intravascular catheters." *Id.* The Court cannot say this does not fit with the issue of Bard's K101432 submission, which included the Avertex antimicrobial technology receiving a Not Substantially Equivalent decision by the FDA. Plaintiffs may raise on cross-examination the fact the 2015 communication discusses lubricious coatings specifically.

This also is not an impermissible state of mind opinion. Foreman relies on the FDA 2015 communication on coating risks to support her opinion that the FDA had concerns about coatings. *In re Mirena*, 169 F. Supp. 3d at 466 (FDA expert "may opine on [FDA authored] documents, including what they mean, and on commentary provided by the FDA").

**H. Criticisms of Plaintiffs' Experts.**

Plaintiffs argue certain rebuttal opinions of Foreman are effectively Rule 702 challenges being brought through an expert, which should "be excluded as unhelpful under Rule 702(a), as well as confusing and misleading under Rule 403." Doc. 4828 at 14-15.

Plaintiffs challenge Foreman's rebuttal opinions of Ms. Kinard (*id.*), but they cite no opinion of Foreman's rebutting Ms. Kinard that they seek to exclude. They also challenge Foreman's rebuttal opinions of Dr. Beatrice. *Id.* They cite Foreman's opinions that "[Dr. Beatrice's] statement [discussing complication data] is an incomplete analysis

and lacks context to form a reliable opinion" because "raw numbers of reports are not sufficient to draw conclusions," and that "it does not appear that Dr. Beatrice performed an independent analysis of the events to support this opinion and rather just adopted the opinion of another expert." Doc. 4828-1 at 85, 90. The underlying opinions of Dr. Beatrice that Foreman criticizes were excluded. Doc. 69811 at 11. This issue is therefore moot.

**IT IS ORDERED** that Plaintiffs' motion to exclude opinions of Christy Foreman, MBE (Doc. 4828) is **granted in part** and **denied in part**. Ms. Foreman cannot opine (1) on port infection rates or comparative infection rates, (2) on patient or physician preferences, (3) that the FDA approved Bard's labeling, or the instructions and warnings it contained, through the 510(k) process, (4) on DuPont or Dow's reasons for issuing its cautionary statements, or (5) on what the FDA perceived or believed.

Dated this 8th day of September, 2026.

David G. Campbell
Senior United States District Judge