**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation | MDL No. 3081 |
| May Lattanzio, Individual Plaintiff, v. Becton Dickinson and Company, et al., Defendants. | No. CV-24-00680-PHX-DGC<br><br>**ORDER** |

This multidistrict litigation ("MDL") involves thousands of personal injury cases related to implanted port catheters ("IPCs" or "ports") designed, manufactured, and marketed by Defendants Becton Dickenson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively, "Defendants" or "Bard"). The MDL Plaintiffs received implants of Bard IPCs and claim they are defective and have caused serious injury.

Plaintiff May Lattanzio brings one of the MDL cases. She received a Bard IPC and claims that it caused an infection. Her case has been chosen as one of several bellwether cases and is set for trial in October 2026.

Defendants have filed a motion for summary judgment. Doc. 5815. The motion is fully briefed and no party requests oral argument. *See* Docs. 6253, 6255. For reasons stated below, the Court will deny the motion.

## I. Background.

An IPC is a medical device surgically implanted under the skin to provide repeated access to a patient's vascular system without the need for multiple needlesticks into peripheral veins. IPCs are used to deliver chemotherapy and immunotherapy medication, intravenous fluids, blood transfusions, and parenteral nutrition. IPCs can remain in place for weeks, months, or even years until treatment is completed.

IPCs consist of a port and a catheter. The port is a small reservoir with a self-sealing silicone center where a needle can be inserted to deliver medication. The port typically is implanted beneath the chest skin and below the collarbone. The port is attached to a catheter, which is a thin flexible tube for delivery of the medication to a vein. The catheter is tunneled under the skin to an insertion point in a central vein. Catheters vary in width and are made of silicone or polyurethane. IPCs typically are implanted by an interventional radiologist or a vascular surgeon. A nurse or other medical professional then accesses the IPC to inject the medication, which flows from the port to the catheter and into the vein.

## II. Plaintiff Lattanzio.

On August 16, 2013, Plaintiff Lattanzio received a Bard PowerPort IPC with a silicone catheter at Gulf Coast Medical Center in Panama City, Florida for chemotherapy. Dr. George Reiss, a general surgeon, implanted the PowerPort.

On December 1, 2013, Plaintiff was hospitalized for a high fever with severe symptoms, including loss of use of her limbs, unconsciousness, rigors, and possible sepsis. A blood culture test was positive for a staphylococcus epidermidis infection. Plaintiff received antibiotic treatment, which resolved her symptoms. On December 13, 2013, Plaintiff's PowerPort was removed and she was discharged from the hospital.

Plaintiff claims the PowerPort caused her to suffer a catheter-related bloodstream infection and sepsis. She alleges the PowerPort was defectively designed because the silicone used in the catheter is a rough, hydrophobic material ripe for infection and Bard failed to coat the catheter with antimicrobials or to use other non-fouling technologies.

Plaintiff also alleges that Bard failed to warn about and concealed the PowerPort's risks, and that Bard made misrepresentations about the PowerPort.

Plaintiff asserts various claims under Florida law, some of which have been withdrawn.[1] The following claims remain: design defect (Counts I and II), failure to warn (Counts III and IV), misrepresentation and concealment (Counts IX, X, and XI), and punitive damages. *See* Doc. 1889 (amended master complaint); Doc. 1, CV-24-00680 (Plaintiff's short-form complaint).[2] Defendants move for summary judgment on the remaining claims. Doc. 5815 at 2-3.

**III. Summary Judgment Standard.**

Summary judgment is appropriate if the moving party shows there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 322, 323 (1986).

The moving party "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Only disputes regarding facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence in the light most favorable to the nonmoving party,

---

[1] The parties agree that Florida substantive law governs Plaintiff's claims and Defendants' defenses. *See* Docs. 5815 at 4, 6253 at 4, 10631 at 4.

[2] The master complaint sets forth allegations and claims the MDL Plaintiffs assert generally. *See* Doc. 145. Plaintiff-specific allegations are contained in individual short-form complaints, profile forms, and fact sheets. *See id.*; Docs. 476, 477. The master complaint asserts seventeen claims and seeks both compensatory and punitive damages. Doc. 1889 ¶¶ 268-487. Plaintiff Lattanzio does not assert loss of consortium, wrongful death, or survival claims set forth in the master complaint (Counts XIV-XVI), and has withdrawn claims for manufacturing defect (Counts V and VI), breach of warranty (Counts VII and VIII), consumer fraud (Count XII), unjust enrichment (Count XIII), and successor liability (Doc. XVII). *See* Docs. 5815 at 2, 6253 at 2 n.2.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and draw justifiable inferences in that party's favor, *Anderson*, 477 U.S. at 255.

**IV. Discussion.**

Defendants argue that summary judgment is warranted because: (1) Plaintiff's claims are barred by Florida's statute of limitations (Doc. 5815 at 5-8); (2) the failure to warn claims fail because Bard's warnings were adequate as a matter of law and the learned intermediary doctrine bars the claims (*id.* at 8-11); (3) the design defect claims fail because the PowerPort is an "unavoidably unsafe product" under comment k to Restatement (Second) of Torts § 402A and Plaintiff presents no evidence that the risks of the PowerPort outweigh its benefits (*id.* at 11-17); (4) the misrepresentation and concealment claims collapse into the failure to warn claims (*id.* at 17-18); and (5) the punitive damages claim fails because Plaintiff offers no evidence to support an award of such damages (*id.* at 18-21).

**A. Statute of Limitations Defense.**

Florida's statute of limitations for products liability actions, including those asserting misrepresentation and fraud claims, is four years. Fla. Stat. § 95.11(3)(d), (i); *see Cole v. Westgate Resorts, Ltd.*, No. 6:24-CV-01852-PGB-LHP, 2025 WL 2443625, at *3 (M.D. Fla. Aug. 24, 2025). Under Florida's discovery rule, the statute of limitations begins to run on "the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence." Fla. Stat. § 95.031(2)(b).

"The Florida Supreme Court has explained that the knowledge required to commence the running of the limitations period under the discovery rule need 'not rise to that of legal certainty.'" *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1323 (11th Cir. 2017) (quoting *Univ. of Miami v. Bogorff*, 583 So.2d 1000, 1004 (Fla. 1991)). "Rather, 'plaintiffs need only have notice, through the exercise of reasonable diligence, of the possible invasion of their legal rights.'" *Id.* "Notice, in turn, 'has two essential ingredients: an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition, and . . . exposure to the product in question. Use of the conjunction 'and' in this

equation necessarily implies that the connection must be to some extent causal.'" *Id.* (quoting *Babush v. Am. Home Prods. Corp.*, 589 So.2d 1379, 1381 (Fla. Dist. Ct. App. 1991)).

Defendants argue that Plaintiff's claims are barred under Florida's four-year statute of limitations because her claims accrued no later than December 13, 2013, and Plaintiff filed her complaint on March 28, 2024. Doc. 5815 at 5-8. Defendants identify the following facts, which they claim are undisputed, in support of their argument that the claims accrued by December 13, 2013: (1) Plaintiff associated pain she experienced in November 2013 with the PowerPort (Doc. 5815-1 ¶ 18); (2) Plaintiff experienced soreness around the implant site and the pain subsided after the PowerPort was removed (*id.* ¶¶ 19, 30); (3) on December 1, 2013, Plaintiff experienced loss of use of her limbs, unconsciousness, rigors, and a fever that she attributed to the PowerPort (*id.* ¶ 20); (4) Plaintiff was hospitalized and received treatment for possible sepsis related to the PowerPort from December 1-13, 2013 (*id.* ¶ 21); (5) Plaintiff knew in August 2013 that the PowerPort would be removed following her chemotherapy treatment, but doctors told her on December 13, 2013 that the device needed to be removed because it was possibly infected (*id.* ¶¶ 15, 23); (6) Plaintiff's medical records state that the PowerPort was removed for "[s]epsis with probable infected port" (*id.* ¶ 25); (7) Plaintiff's husband testified that she experienced injuries from the PowerPort in December 2013 and her symptoms improved after the device was removed (*id.* ¶ 31); and (8) when Plaintiff contacted attorneys about a potential lawsuit after seeing a Facebook advertisement, she knew she had suffered an infection that she attributed to the PowerPort (*id.* ¶ 26).

Plaintiff disputes several of these asserted facts, including that she attributed her fever and other symptoms to the PowerPort, that doctors told her the device needed to be removed because it was possibly infected, and that she attributed her infection to the device before seeing the Facebook advertisement. Doc. 6255 ¶¶ 18, 20-21, 23, 26, 30-31. Plaintiff argues that Defendants misconstrue the factual record and improperly draw inferences in their favor. Doc. 6253 at 8. Relying on the Eleventh Circuit's decision in *Redding v.*

*Coloplast Corp*, 104 F.4th 1302 (11th Cir. 2024), Plaintiff argues that summary judgment is not appropriate because factual issues exist as to whether she should have known that her infection was distinct in some way from conditions naturally to be expected from her cancer treatment and implantation surgery, and whether she had reason to suspect a causal connection between the infection and the PowerPort. *Id.* at 5-7.

In *Redding*, the Eleventh Circuit applied Florida law to hold that the district court properly denied the defendant's motion for judgment as a matter of law on its statute of limitations defense. 104 F.4th at 1313. The plaintiff in that case brought a products liability suit against the manufacturer of vaginal mesh devices, alleging that the mesh implants she received had eroded due to a design defect and had caused her to suffer an infection and other symptoms. *Id.* at 1304. The defendant argued that the suit was barred by Florida's statute of limitations, contending that more than four years before filing suit, the plaintiff knew she had suffered an injury and there was a reasonable possibility that her mesh implants caused the injury. *Id.* at 1307-08. The Eleventh Circuit agreed with the district court that there was sufficient evidence for a reasonable jury to find that the plaintiff "should not have known with the exercise of due diligence of 'an injury distinct in some way from conditions naturally to be expected from' her implantation surgery." *Id.* at 1311 (quoting *Babush*, 589 So. 2d at 1381). The Eleventh Circuit also found that the evidence did not show the plaintiff "had reason to suspect a causal connection between the . . . mesh devices and her symptoms between the initial surgery . . . and the statute of limitations cut-off date[.]" *Id.* The court found persuasive that, although the plaintiff had suffered an infection, her doctor "explained that infection could result from any surgery" and "never told her that the mesh devices caused her symptoms or were in any way defective[.]" *Id.* The court also explained that because erosion is a known risk of mesh implants, "it is difficult to distinguish between a normal surgical side effect or complication and a product deficiency." *Id.* at 1312 & n.15.

This case likewise presents factual issues as to when Plaintiff should have known that her infection was caused by the PowerPort. *See* Doc. 6253 at 23-27. The medical

consent form Plaintiff signed before the implantation surgery informed her that there was a risk of infection with any surgical procedure – it did not state that contracting an infection could be abnormal or could be caused by the PowerPort. Docs. 5815-6 at 2, 6255 ¶ 154. Plaintiff also was aware prior to surgery that chemotherapy could weaken her immune system and make her more susceptible to infections. Docs. 6255 ¶ 153, 6255-2 at 66.[3] Plaintiff has testified that none of her healthcare providers told her the PowerPort was the cause of her infection or provided a reason for the device's removal. Docs. 6255 ¶ 23, 6255-2 at 66-73. Prior to the removal procedure, Plaintiff's surgeon discussed the possibility of implanting a second port catheter, suggesting that he did not believe the device to be defective. Docs. 5815-8 at 4, 6255 ¶ 165. After the PowerPort was removed, a culture from the device tested negative for bacterial growth. Docs. 6255 ¶ 164, 6255-1 at 12.

Like *Redding*, there is sufficient evidence in this case to support a jury finding that Plaintiff had no meaningful way to "distinguish between a normal surgical side effect or complication and a product deficiency." 104 F.4th at 1312 n.15. "It is possible that [the infection] did not strike [Plaintiff] or her physicians as a potential product defect because [infection] was a known risk" of surgical procedures and cancer treatment. *Id.* at 1312 (citation omitted); *see also Eghnayem*, 873 F.3d at 1324 ("While Eghnayem did exhibit one new symptom in 2008 – urinary incontinence – that could have been associated with a defect in the Pinnacle, that symptom was not so obviously unusual as to indisputably put Eghnayem on notice about her claim. Incontinence is a more dramatic symptom than some, but judgment as a matter of law is a high standard, and it was not 'patently clear' or 'obvious' that Eghnayem's incontinence was a sufficiently distinct symptom from what might be expected after vaginal surgery to put her on notice of her cause of action against BSC."); *Pirlein v. Ethicon, Inc.*, No. 20-62202-CIV, 2021 WL 4990612, at *5 (S.D. Fla. Oct. 1, 2021) ("[I]t appears that Plaintiff was warned of certain possible adverse effects

[3] Defendants' experts agree that cancer patients like Plaintiff are particularly at risk for infections. Doc. 6255 ¶¶ 156-58.

that could result from her implantation surgery, and that the symptoms she experienced resembled those she had been warned about. Construing the evidence in the light most favorable to Plaintiff, as the Court must at this phase, the Court finds that Plaintiff's symptoms are not 'sufficiently distinct' from what could normally be expected after such operations, and so it should be left to the factfinder to determine whether the symptoms she experienced gave her notice of a potential cause of action for a defective mesh." (quoting *Eghnayem*, 873 F.3d at 1324)); *Babush*, 589 So. 2d at 1381-82 (reversing summary judgment on statute of limitations grounds even though the plaintiff had been told that the prescription drug he was taking was toxic to the liver and a World Health Organization study disclosed that liver damage resulted from ingesting the drug).

Defendants emphasize that Plaintiff's medical records note a "probable infected port." Docs. 5815 at 7, 6404 at 5 & n.2 (citing Doc. 5815-1 ¶ 25; *Babush*, 589 So. 2d at 1381). But there is a distinction between the PowerPort being infected and the PowerPort causing the infection, and this notation does not establish that Plaintiff knew or should have known that the PowerPort caused her infection. Plaintiff's surgeon testified that the fact that physicians recommend removing an IPC does not necessarily indicate that the device is the source of the infection. Docs. 6255 ¶ 163, 6255-1 at 13. And as Plaintiff notes, Defendants' own experts opine that nothing in her medical records shows she suffered a port-related infection. Doc. 6253 at 7 (citing Doc. 6255 ¶¶ 160-62).[4]

Defendants' citation to *Bogorff*, 583 So. 2d at 1004, is inapposite. Doc. 5815 at 6. When the child in *Bogorff* experienced slurred speech, impaired motor skills, convulsions, a coma, and resulting paralysis and brain damage following injections of certain cancer medications, the Florida Supreme Court found a "dramatic change" in the child's condition sufficient to serve as notice for limitations purposes. 583 So. 2d at 1001, 1004. In this case, by contrast, a jury reasonably could find that Plaintiff's infection did not signal a

[4] For example, Defendants' infectious disease expert, Dr. Kogelman, states: "if in fact, the line was indeed infected, this is a known complication of intravascular lines. Patients who are immunocompromised due to chemotherapy, like Ms. Lattanzio, are at the highest risk. . . . There is no indication in this case that there was something unusual about her case, the infection or the line itself." Doc. 6255-39 at 4.

"dramatic change" in her condition from what had been warned about and could be expected post-surgery. *See Redding*, 104 F.4th at 1311 ("Like Eghnayem – and unlike the child in *Bogorff* – Redding's symptoms during her five follow-up appointments . . . did not signal a 'dramatic change' in her condition from what would be expected post-implantation surgery. For example, although Redding had an infection, Dr. Weaver explained that infection could result from any surgery.").

Defendants cite two federal court cases involving the drug Taxotere, *McElrath v. Sanofi-Aventis US LLC*, No. 3:23cv12137-MCR-HTC, 2024 WL 1252377 (N.D. Fla. Mar. 13, 2024), and *Cunningham v. Sanofi-Aventis U.S. LLC*, No. 8:23-cv-2472-TPB-AEP, 2024 WL 3012966 (M.D. Fla. June 14, 2024). Doc. 5815 at 7. But the permanent hair loss experienced by the plaintiffs in those cases was "a sufficiently dramatic injury suggesting a product defect, and lack of hair regrowth . . . after chemotherapy sufficiently '[stood] out from the norm to start the statutory clock.'" *McElrath*, 2024 WL 1252377, at *4 (citation omitted); *see Cunningham*, 2024 WL 3012966, at *3 (same). The cases also involved medical literature and popular news articles suggesting that the use of Taxotere may result in permanent hair loss. *See Cunningham*, 2024 WL 3012966, at *3 (citing *McElrath*, 2024 WL 1252377, at *5). Defendants identify no medical literature or news articles from which Plaintiff reasonably should have discovered that the PowerPort causes catheter-related blood stream infections.

Defendants argue this case is similar to the *Kruse* case in the IVC Filter MDL, in which the Court granted summary judgment on limitations grounds. Doc. 5815 at 7-8 (citing *In re Bard IVC Filters Prods. Liab. Litig.*, No. CV-15-01634-PHX-DGC, 2018 WL 3957737 (D. Ariz. Aug. 17, 2018)). But *Kruse* was decided under Nebraska law, and the undisputed facts clearly showed that the plaintiff knew of her abdominal pain and even suspected that it was caused by her IVC filter more than four years before she filed suit. *See In re Bard*, 2018 WL 3957737, at *3 ("Plaintiff contends that the date she discovered her injury is a disputed issue of fact that should be left to the jury. But Plaintiff does not dispute the facts set forth above. Those facts, even when construed in her favor, show that

Plaintiff experienced previously unknown pain after the filter implant, continued to have the pain, . . . called the IVC number designated for people with filter problems, mentioned the pain to [nurse] Kristi Eggers, suggested to Eggers that the pain was caused by the filter, and scheduled an appointment to have the filter removed.").

The Court will not grant summary judgment on the statute of limitations defense. Doc. 5815 at 5-8.

**B. Failure to Warn Claims (Counts III and IV).**

Plaintiff asserts strict liability and negligent failure to warn claims. *See* Doc. 1889 ¶¶ 301-341; Doc. 1 ¶ 15, CV-24-00680. "Under Florida law, to succeed on a failure to warn claim a plaintiff must show (1) that the product warning was inadequate; (2) that the inadequacy proximately caused her injury; and (3) that she in fact suffered an injury from using the product." *Eghnayem*, 873 F.3d at 1321 (citing *Hoffmann-La Roche Inc. v. Mason*, 27 So.3d 75, 77 (Fla. Dist. Ct. App. 2009)); *see also Salinero v. Johnson & Johnson*, 995 F.3d 959, 964 (11th Cir. 2021) (same); *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1347 (11th Cir. 2023) (same).

"For medical products like the [PowerPort], the duty to warn is directed to physicians rather than patients under the 'learned intermediary' doctrine.' This is so because the prescribing physician acts as an intermediary between the manufacturer and the consumer, weighing the potential benefits of a device against the dangers in deciding whether to recommend it to meet the patient's needs." *Eghnayem*, 873 F.3d at 1321 (citing *Felix v. Hoffmann-LaRoche, Inc.*, 540 So.2d 102, 104 (Fla. 1989)); *see also Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1286-87 (M.D. Fla. 2009) ("The subject medical devices at issue in this case are available only by prescription. The physician acts as a learned intermediary between a manufacturer or seller and a patient. . . . The duty to warn is fulfilled by an adequate warning given to the members of the medical community lawfully authorized to prescribe, dispense and administer the medical devices[.]" (citing *Buckner v. Allergan Pharms., Inc.*, 400 So.2d 820 (Fla. Dist. Ct. App. 1981))); *Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1367 (M.D. Fla. 2015) ("[T]he manufacturer's duty to

warn is directed to physicians rather than patients under Florida's 'learned intermediary doctrine.'" (citing *Felix*, 540 So.2d at 104; *Buckner*, 400 So.2d at 822)); *Dyer v. Coloplast Corp.*, No. 8:24-CV-2867-VMC-SPF, 2026 WL 1906696, at *3 (M.D. Fla. July 2, 2026) ("Florida law applies the learned intermediary doctrine whereby the duty to warn runs to the physician and not the patient." (quoting *Bailey v. Janssen Pharm., Inc.*, 288 F. App'x 597, 608 (11th Cir. 2008))).

Plaintiff cites *Aubin*, 177 So. 3d at 518, for the proposition that a medical device manufacturer's duty to warn runs to the patient, not the physician. Doc. 6253 at 9. But "[o]ver almost four decades, Florida's courts have applied the learned intermediary doctrine to failure-to-warn cases involving physicians who administer medical drugs and devices to their patients." *Salinero*, 995 F.3d at 967. "The problem with [Plaintiff's] citation to *Aubin* is that the case did not involve a prescription drug or a medical device prescribed by a physician for a patient. In no way did it implicate the physician-patient relationship, nor did the Florida Supreme Court borrow from Florida's medical learned intermediary cases in reaching its decision. Instead, it drew its support from other decisions involving an asbestos manufacturer-supplier and an intermediary-manufacturer. Nothing in the *Aubin* decision addresses or purports to overturn the analysis in *Felix* or the decisions of Florida's intermediate appellate courts opining on the quite different circumstances surrounding physicians and their patients." *Id.* at 967-68 (citations omitted); *see also Cates*, 73 F.4th at 1350 ("The court in *Aubin* was concerned with whether the learned intermediary doctrine applied in the first place. . . . But here, whether the learned intermediary doctrine applies is not at issue. Manufacturers of medical products . . . are reasonable in directing warnings to medical providers because medical providers use their expertise to decide 'whether to recommend the device to meet the patient's needs.'" (citations omitted)).[5]

---

[5] Because the law of the Eleventh Circuit would be controlling if this case were to be tried in a Florida federal court, the Court will follow the Eleventh Circuit's conclusion that under Florida's learned intermediary doctrine, a medical device manufacturer's duty to warn runs to the prescribing physician. *See Salinero*, 995 F.3d at 967-68; *Cates*, 73 F.4th at 1350.

Defendants argue that summary judgment is warranted because (1) the warnings provided in the PowerPort's Instructions for Use ("IFU") are adequate as a matter of law, and (2) the learned intermediary doctrine forecloses the failure to warn claims. Doc. 5815 at 2-3, 8-11.

**1. Adequacy of the Warning.**

Defendants contend that the PowerPort's IFU identifies the risks and injuries that Plaintiff experienced. *Id.* at 10. The IFU warns that "[c]atheter or port-related sepsis" is a possible complication. *See* Docs. 5815-1 ¶¶ 4-5, 5815-4 at 2.

"In determining the adequacy of a warning, the critical inquiry is whether it was adequate to warn the physician of the possibility that the [medical device] may cause the injury alleged by the plaintiff." *Small*, 134 F. Supp. 3d at 1367 (citing *Upjohn Co. v. MacMurdo*, 562 So.2d 680, 683 (Fla. 1990)); *see also Wolicki-Gables*, 641 F. Supp. 2d at 1286-87 (same). "'While in many instances the adequacy of warnings is a question of fact,' the Florida Supreme Court held that this question can be resolved as 'a question of law where the warning is accurate, clear, and unambiguous.'" *Cates*, 73 F.4th at 1348 (quoting *Felix*, 540 So. 2d at 105).

Plaintiff presents evidence that Defendants' warnings were inadequate because the PowerPort's IFU does not warn that infection and sepsis can be life-threatening, particularly for immunocompromised cancer patients; Defendants knowingly used internal complaint tracking methods that understated the incidence of catheter-related infections; and the IFU did not disclose that the rates of infection for Bard ports were high and infection is the most common complication of port catheters. Doc. 6255 ¶¶ 168-90. Plaintiff also presents evidence that Defendants do not include infection in the "warnings" section of the IFU, and instead includes dozens of less common adverse events. *Id.* at 11 (citing Doc. 6255 ¶¶ 4-5); *see* Doc. 5815-4 at 2.

Plaintiff's evidence creates a question of fact on whether Defendants' warnings were accurate, clear, and unambiguous. *See Scheman-Gonzalez v. Saber Mfg. Co.*, 816 So. 2d 1133, 1139 (Fla. Dist. Ct. App. 2002) ("This court has recognized that, 'to warn

adequately, the product label must make apparent the potential harmful consequences. The warning should be of such intensity as to cause a reasonable man to exercise for his own safety caution commensurate with the potential danger.'" (citation omitted)); *Dyer*, 2026 WL 1906706, at *5 ("True, the IFU warn of general pain-related complications that may be permanent and the possibility that a patient may need to undergo further surgeries. However, Ms. Dyer has offered the expert testimony of Dr. Kohli, who opines that the IFU nevertheless are deficient because, among other things, they do not include specific warnings regarding the comparative risks of the implantation of polypropylene retropubic slings and the implantation of polypropylene transobturator slings, generally, and the Aris, in particular. Dr. Kohli's opinion raises a genuine issue of material fact as to whether the warnings in the IFU are adequate.").

Defendants contend that a warning is adequate as a matter of law where it warns of the possibility of the adverse event the plaintiff experienced. Doc. 5815 at 9 (citing *Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) (finding a contraceptive warning to be adequate as a matter of law where it warned about abnormal bleeding outside the menstrual period, the specific injury the plaintiff had experienced)). But the PowerPort's IFU does not warn that the device may cause a catheter-related bloodstream infection, the adverse event Plaintiff claims she experienced. *See* Doc. 6253 at 11.

The Court cannot find the PowerPort's warnings adequate as a matter of law. Doc. 5815 at 9-10.[6]

**2. Learned Intermediary Doctrine.**

Defendants contend that the failure to warn claims are foreclosed by the learned intermediary doctrine because Dr. Reiss read the PowerPort's IFU multiple times and knew of infection risks before implanting the PowerPort in Plaintiff, and because a different warning would not have changed his decision to treat Plaintiff with the device. Doc. 5815

[6] The Court reaches this conclusion fully aware that warning a learned intermediary about a medical device is somewhat easier than warning the typical consumer. *See* Doc. 6404 at 6 (citing *Eghnayem*, 873 F.3d at 1321-22).

at 10. Plaintiff argues that factual disputes preclude summary judgment based on the learned intermediary doctrine. Doc. 6253 at 11.

Dr. Reiss testified that before implanting the PowerPort he would have wanted to know that infection rates for the PowerPort were not low and that in vivo degradation of its catheter material could make infections significantly more likely. *See* Doc. 6255 ¶¶ 12, 152; Doc. 6255-1 at 7-11. He further testified that he would have expected Bard to provide him with any such information and he would have shared it with Plaintiff before her surgery. *Id.* Dr. Reiss also testified that if there had been a port-catheter with protections that reduced the risk of infection, he would have selected the one that works best for the patient. *Id.*

Construed in the light most favorable to Plaintiff, the evidence presents a triable issue as to whether Dr. Reiss knew the information Defendants allegedly failed to provide and whether he would have acted differently if Defendants had provided additional warnings and information. The Court will deny Defendants' motion based on this argument. Doc. 5815 at 10-11.[7]

**C. Design Defect Claims (Counts I and II).**

Plaintiff asserts strict liability and negligent design defect claims. *See* Doc. 1889 ¶¶ 268-300; Doc. 1 ¶ 15, CV-24-00680. "A design defect claim under Florida law requires 'first, that the product is defective; and second, that such defect caused [the] plaintiff's injuries." *Cates*, 73 F.4th at 1350-51 (quoting *Liggett Grp., Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. Dist. Ct. App. 2007)). Defendants argue that the design defect claims fail because: (1) the PowerPort is an "unavoidably unsafe product" under comment k to Restatement § 402A; and (2) Plaintiff presents no evidence that the PowerPort's risks outweigh its benefits. Doc. 5815 at 3, 11-16.

/ / /

[7] Defendants contend that the failure to warn claims fail because Plaintiff does not have a qualified expert to opine on the sufficiency of the PowerPort's IFU. *Id.* at 11 n.5. Defendants cite their Rule 702 motions to exclude the warning-based opinions of Drs. Beatrice, Hurst, and Weinstein (Docs. 4826, 4832), but the Court has largely denied those motions (*see* Docs. 6988 at 12-13, 7196 at 14-17).

**1. Comment k.**

Comment k to Restatement § 402A provides an exemption from strict liability for certain "unavoidably unsafe products," explaining:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous.

Restatement § 402A, cmt. k. By its terms, "comment k applies to products which current knowledge and technology cannot make safe for their ordinary use, but for which society has a need great enough to justify using the product despite its dangers." *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 731 (Fla. Dist. Ct. App. 1991).[8]

In *Adams*, the Florida court of appeals "reasoned that the comment should not uniformly protect all prescription drugs or medical products. Rather, only 'a product which is as safe as current testing and research permits should be protected. The reverse is also true; a product which is not as safe as current technology can make it should not be protected." *Tillman*, 96 F. Supp. 3d at 1340 (quoting *Adams*, 576 So. 2d at 732). Thus, the *Adams* court "concluded that comment k 'is an affirmative defense to a strict liability claim[.]'" *Id.* (quoting *Adams*, 576 So. 2d at 733); *see also Ramkelawan v. Globus Med. Inc.*, No. 5:18-CV-100-OC-30PRL, 2018 WL 8368675, at *4 (M.D. Fla. Aug. 8, 2018) ("Florida has adopted comment k into its jurisprudence . . . as an affirmative defense."). Defendants bear the burden of proof on this affirmative defense. "[T]o be protected under comment k, a defendant must show that the product is as safe as current testing and research permit, and that the product's benefits outweigh the known risks as of the date the product is distributed." *Tillman*, 96 F. Supp. 3d at 1340.

[8] Comment k further explains that unavoidably unsafe products "are especially common in the field of drugs." Restatement § 402A, cmt. k. "An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve." *Id.*; *see also Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1340 (M.D. Fla. 2015) (discussing comment k).

Defendants assert that the PowerPort was as safe as current testing and research permitted when it was designed in 2007, citing the FDA clearance letter in support. Doc. 5815 at 13 (citing Doc. 5815-1 ¶ 54). But the FDA's clearance of the PowerPort under 510(k) review does not show that the PowerPort was as safe as it could be at the time. The FDA determined only that "the device is substantially equivalent to . . . legally marketed predicate devices[.]" Doc. 5815-27 at 4; *see also* Doc. 6253 at 17-18 n.7; *Small*, 134 F. Supp. 3d at 1373 ("Defendants have not . . . proffered any evidence showing that Enbrel was as safe as it could be at the time of Ms. Small's injuries. . . . Accordingly, defendants' motion for summary judgment is denied as to plaintiffs' design and manufacturing defect claims.")

Defendants also contend that Plaintiff's design defect claims are precluded under comment k because IPCs deliver live-saving chemotherapy treatment and infection is an inherent risk of all IPCs. Doc. 5815 at 13. But Defendants have failed to show, as a matter of undisputed fact, that the PowerPort's benefits outweigh its known risks, or that the device was accompanied by proper instructions and warnings. As discussed in the punitive damages section below, Plaintiff presents evidence that the PowerPort includes risks long known to Bard that were not fully disclosed to the public or Plaintiff's physician. *See Ocasio v. C.R. Bard, Inc.*, No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *6 (M.D. Fla. June 3, 2015) ("[T]here is a genuine issue of material fact whether comment k applies here. . . . Bard asserts that it is undisputed that IVC filters are life-saving devices, and that they all carry risks of serious injury, including perforation. However, Bard fails to address whether the G2 filter was as safe as current testing and research permitted or whether its benefits outweighed its known risks.").

The Court will deny Defendants' motion based on comment k to Restatement § 402A. Doc. 5815 at 12-13.

/ / /

/ / /

/ / /

**2. Risk-Benefit Analysis.**[9]

Generally speaking, the risk-benefit test "considers whether 'the risk of danger in the design outweighs the benefits.'" *Hogarty v. Orgill, Inc.*, No. 5:25-CV-122-KKM-PRL, 2026 WL 1613955, at *8 (M.D. Fla. June 5, 2026) (quoting *Force v. Ford Motor Co.*, 879 So. 2d 103, 105 (Fla. Dist. Ct. App. 2004)); *see also Anderson*, 2015 WL 12843836, at *7 ("The exact contours of the risk-utility test are unclear. . . . [I]n its most basic form, the risk-utility analysis balances the risk of danger in the design with the benefits of the design." (citations omitted)).

Defendants assert that Plaintiff's experts, Drs. Weinstein and Leckband, concede that the benefits of Bard IPCs outweigh their risks. Doc. 5815 at 14 (citing Doc. 5815-1 ¶¶ 37-38, 46). But Defendants do not explain why these two opinions alone establish as a matter of law that the benefits of the PowerPort's design outweigh its risks. *See* Doc. 6255 ¶ 46. Defendants further assert that none of Plaintiff's experts conducted a risk-benefit analysis, but Plaintiff identifies the opinion of Dr. McVerry that the risk of danger in the design of Bard's IPCs, which used outdated "legacy chemistry," outweighs the design's benefits. Doc. 6255 ¶ 47; *see* Doc. 5815-22 at 5-6.

Defendants assert that the following factors are relevant under the risk-benefit test: (1) the likelihood and gravity of potential injury against the product's utility; (2) the availability at the time of manufacture of safer products to meet the same need; (3) obviousness of the danger; (4) common knowledge and normal public expectation of the danger; (5) adequacy of instructions and warnings; and (6) the ability to eliminate or

---

[9] The parties dispute whether the risk-benefit test, *see Cavanaugh v. Stryker Corp.*, 308 So. 3d 149, 154-55 (Fla. Dist. Ct. App. 2020), or the consumer expectations test, *see Aubin*, 177 So. 3d at 510-11, applies to the design defect claims. Docs. 6253 at 12-15, 6404 at 8-10. The Court need not decide the issue at this stage because Defendants do not move for summary judgment under the consumer expectations test (*see* Doc. 5815 at 11-16), and as explained further, fact issues preclude summary judgment under the risk-benefit test. *See Anderson v. Techtronic Indus. N. Am., Inc.*, No: 6:13-cv-1571-Orl-41TBS, 2015 WL 12843836, at *7 (M.D. Fla. Apr. 14, 2015) (finding that the defendants were not moving for summary judgment under the consumer-expectation test where they did not address the test in their motion). The Court will not consider Defendants' argument, first made in their reply brief, that the design defect claims fail under the consumer expectations test. *See* Doc. 6404 at 10-11.

minimize the danger without seriously impairing the product or making it unduly expensive. Doc. 5815 at 14 (citing *Radiation Technology, Inc. v. Ware Const. Co.*, 445 So. 2d 329, 331 (Fla. 1983)).[10]

Defendants do not address the first factor identified in *Radiation Technology* – the likelihood and gravity of potential injury against the product's utility. *See* Doc. 5815 at 14-16.

Regarding the second factor, Defendants contend that Plaintiff has identified no safer alternative design that was available when she received her PowerPort. *Id.* at 15. In Florida, however, "a plaintiff need not demonstrate the existence of a reasonable alternative design for a strict liability design defect claim." *Dyer*, 2026 WL 1906696, at *6 (citation omitted); *see also Aubin*, 177 So. 3d at 511 ("[W]e conclude that the Third Restatement's risk utility test and establishment of a reasonable alternative design mandate are not requirements for finding strict liability[.]"); *Anderson v. Techtronic Indus. N. Am., Inc.*, No. 6:13-cv-1571-Orl-40TBS, 2015 WL 7429060, at *3 (M.D. Fla. Nov. 23, 2015) ("The *Aubin* Court . . . recommitted to the approach taken by the Second Restatement . . . that the availability of a reasonable alternative design is only one factor to consider in determining whether a product is defective."). Even so, Plaintiff's experts do address alternative designs, opining that catheters made with antimicrobial or non-fouling technologies reduce the risk of infection. Doc. 6253 at 15 (citing Doc. 6255 ¶ 84); *see* Doc. 6255-7 at 85. Plaintiff identifies multiple ports that she claims are economically feasible and more infection resistant than the PowerPort, noting that Bard's own Avertex port with antimicrobial coating reduced the risk of the very bacteria – staphylococcus epidermidis – that infected Plaintiff. Doc. 6253 at 16-17.[11] Defendants' citation to *Beauregard v.*

---

[10] In *Aubin*, the Florida Supreme Court noted that *Radiation Technology* was a negligence action, not a strict liability case. 177 So. 3d at 510 ("Florida is counted by the reporters as having adopted the 'risk/benefit' test for design defect cases and implicitly requiring proof of a reasonable alternative design. *See* Restatement (Third) of Torts: Prods. Liab § 2(b), Reporters' Note, cmt. d (1998). In support, the reporters rely on *Radiation Technology* . . . as the 'leading case' in Florida for these legal principles. But this reliance is misplaced because *Radiation Technology* was not a strict liability case – the legal issue before the Court involved a jury instruction in a negligence action.").

[11] Defendants cite no legal authority suggesting that an alternative design must be

*Continental Tire North America Inc.*, 435 F. App'x 877, 879-80 (11th Cir. 2011), is misplaced because the expert in that case testified that he had no opinions on the product's design, but nonetheless speculated on potential design defects.

Defendants further argue that Plaintiff offers no evidence of obviousness, common knowledge and normal public expectation, inadequate warnings, or economic feasibility. Doc. 5815 at 16. But as Defendants acknowledge, "no single factor is determinative or even necessary; all that is required to impose strict liability is to show that the risk of danger posed by the product outweighs its usefulness." *Anderson*, 2015 WL 7429060, at *3. The Court also finds a question of fact on the adequacy of Defendants' warnings, as explained above.

The Court will deny Defendants' motion based on a risk-benefit analysis. Doc. 5815 at 14-16.

**D. Misrepresentation and Concealment Claims (Counts IX-XI).**

Plaintiff asserts misrepresentation and concealment claims. *See* Docs. 1889 ¶¶ 394-438; Doc. 1 ¶ 15, CV-24-00680. Defendants argue that because this case involves the learned intermediary doctrine, the misrepresentation and concealment claims collapse into the failure to warn claims. Doc. 5815 at 17-18 (citing *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1373 (S.D. Fla. 2007); *Salinero v. Johnson & Johnson*, 400 F. Supp. 3d 1334, 1352-53 (S.D. Fla. 2019); *Gibson v. C R Bard Inc.*, No. 6:21-CV-638-PGB-DAB, 2023 WL 3563461, at *6 (M.D. Fla. Mar. 22, 2023)).

Plaintiff counters that no Florida state court has ever held that misrepresentation and concealment claims are subsumed by failure to warn claims, and that federal courts have rejected this argument. Doc. 6253 at 18 (citing *In re Davol, Inc.*, No. 2:18-CV-01320, 2021 WL 4552395, at *12 (S.D. Ohio Oct. 5, 2021) ("Contrary to Defendants' contention,

---

FDA-cleared or commercially available in the United States to be relevant to the risk-benefit analysis under Florida law. *See* Doc. 5815 at 15; *Thacker v. Ethicon, Inc.*, 47 F.4th 451, 464 (6th Cir. 2022) ("[I]t is illogical to say that an *alternative design* – that, *by definition*, was never put on the market – must have been approved by the FDA to support a design defect claim."); *In re Ethicon Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, No. MDL 2327, 2020 WL 1060970, at *3 (S.D.W. Va. Feb. 13, 2020) (explaining that FDA-clearance "has no bearing on whether PVDF mesh is a safer alternative to other mesh products").

this line of cases does not stand for the proposition that all fraud-based claims are 'repackaged' failure-to-warn claims if they address the same conduct; the operative issue is whether Plaintiffs are attempting to do an end-run around the learned intermediary doctrine by focusing on Defendants' statements to Mr. Milanesi, not Dr. Gill."); *Longoria v. Ethicon, Inc.*, No. 8:20-CV-2573-T-60CPT, 2020 WL 8641587, at *4 (M.D. Fla. Dec. 23, 2020) (denying summary judgment where there were fact issues as to the learned intermediary doctrine); *Ellerbee v. Ethicon, Inc.*, No. 8:20-CV-1514-T-60AEP, 2020 WL 5230595, at *4 (M.D. Fla. Sept. 2, 2020) (same)).

Defendants' reply states in passing that Plaintiff is attempting an end-run around the learned intermediary doctrine by relabeling her failure warn claims as misrepresentation and concealment claims. Doc. 6404 at 11. But Defendants provide no explanation of how this is so, and fail to address the specific facts and allegations for each claim. *See* Doc. 1889 ¶¶ 301-34, 394-438. The Court will deny Defendants' motion based on this argument. Doc. 5815 at 17-18.

**E. Punitive Damages.**

Plaintiff seeks an award of punitive damages. *See* Doc. 1889 ¶¶ 484-87; Doc. 1 ¶ 15, CV-24-00680. Under Florida law, a defendant may be held liable for punitive damages where "the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). "Intentional misconduct" means that the defendant "had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Id.* § 768.72(2)(a). "Gross negligence" means that the defendant's conduct "was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." *Id.* § 768.72(2)(b).

Defendants argue that Plaintiff lacks evidence that they acted with intentional misconduct or gross negligence in connection with their manufacture, design, or sale of the

PowerPort. Doc. 5815 at 18. Plaintiff claims that Defendants' actions constitute gross negligence or intentional misconduct given Defendants' knowledge of the increased infection risks posed by the PowerPort's silicone catheter. Doc. 6253 at 18-21.

Courts applying Florida law have held that evidence showing a defendant had knowledge of a product defect and concealed that information from the consuming public is sufficient to create a jury question on punitive damages. *See, e.g.*, *Sims v. BMW of N. Am. LLC*, No. 6:22-CV-1685-PGB-UAM, 2025 WL 724047, at *2 (M.D. Fla. Mar. 5, 2025). Plaintiff has presented evidence that as early as 2007, Defendants knew that their silicone catheters were unreasonably dangerous because they have an increased risk of infection and are not biocompatible for their intended use. Doc. 6253 at 19 (citing Doc. 6255 ¶¶ 73, 86-87, 99). Plaintiff further asserts that despite knowing about the increased infection rate, Defendants refused to develop and sell a more infection-resistant port with a smooth polyurethane catheter or a catheter made with antimicrobial or non-fouling technologies. *Id.* at 19-20 (citing Doc. 6255 ¶¶ 69, 75-76, 88-89, 106). Plaintiff further presents evidence that Defendants misrepresented the danger and concealed information from the FDA, doctors, and patients. *Id.* at 20 (citing Doc. 6255 ¶¶ 148-51, 177-85, 187, 190).

If believed by the jury, this evidence is sufficient to support a finding by clear and convincing evidence that Defendants engaged in intentional misconduct or gross negligence. *See* Fla. Stat. § 768.72(2)(a)-(b); *Sims*, 2025 WL 724047, at *2 ("Plaintiff bases his claim for punitive damages on Defendants' knowledge that the Takata airbags in their vehicles were defective and concealed that information from the consuming public. . . . While the bar is high for imposing punitive damages, if the jury accepts Plaintiff's evidence on Defendants' knowledge and alleged inaction, a reasonable jury could return a verdict for Plaintiff on punitive damages."); *Hendrix v. Evenflo Co.*, No. 3:07CV133 /MCR/EMT, 2008 WL 5412922, at *2 (N.D. Fla. Dec. 29, 2008) (denying summary judgment on punitive damages where there was "sufficient support in the record to raise a genuine issue of fact on whether Evenflo had knowledge of a product defect when it placed

[the product] into the stream of commerce"); *Fitzsimmons v. Biomet Orthopedics, Inc.*, No. 2:19-cv-182-FtM-29NPM, 2021 WL 211267, at *6 (M.D. Fla. Jan. 21, 2021) (same where the plaintiff "pointed to evidence that Biomet knew of issues with the [product] but decided against disclosing that information").

Defendants dispute that the risks of their IPCs outweigh the benefits or that they failed to provide adequate warnings, noting that Plaintiff's medical experts continue to place Bard IPCs. Doc. 5815 at 19-20. Defendants also contend that their decision not to pursue certain alternative designs reflects reasonable business judgment, not conscious disregard for patient safety. Doc. 6404 at 12. Defendants will be free to make these arguments to the jury, but they are not sufficient to warrant summary judgment.[12]

The Court will deny Defendants' motion on punitive damages. Doc. 5815 at 18-20.

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 5815) is **denied**.

Dated this 25th day of September, 2026.

David G. Campbell
Senior United States District Judge

---

[12] Defendants identify the *Dyer* case in a notice of supplemental authority. Doc. 10823. But the plaintiff in that case simply reiterated her arguments as to the design defect and failure to warn claims and identified no evidence that the defendant engaged in intentional misconduct or gross negligence. *See Dyer*, 2026 WL 1906706, at *7; Doc. 10864.