**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation<br><br>THIS DOCUMENT RELATES TO:<br><br>May Lattanzio,<br><br>C.A. No. *2:24-cv-00680-DGC*<br><br>May Lattanzio,<br><br>Plaintiff,<br><br>v.<br><br>Becton, Dickinson and Company, et al.,<br><br>Defendants. | MDL No. 3081<br><br>**FINAL PRETRIAL ORDER** |

The following is the Final Pretrial Order for the Lattanzio bellwether trial.

**A. TRIAL COUNSEL FOR THE PARTIES**

**Plaintiff:**

Stuart N. Ratzan (FL #911445)
(Admitted Pro Hac Vice)
Kimberly L. Boldt (FL #957399)
(Admitted Pro Hac Vice)
Ratzan, Weissman & Boldt, P.A.
2850 Tigertail Avenue, Ste. 400
Coconut Grove, FL 33133
Phone: (305) 374-6366
Fax: (305) 374-6755
Email: stuart@rwblawyers.com
Email: kimberly@rwblawyers.com

Robert Brown, III (FL #621609)
(Admitted Pro Hac Vice)
Robert Brown Law
3225 Aviation Avenue, Ste. 101
Miami, FL 33133
Phone: (305) 491-0666
Email: rbbrownlaw@gmail.com

Cameron Cano (TX #24101314)
Scott + Scott, LLP
7718 Wood Hollow Drive, Ste. 105
Austin, Texas 78731
Phone: (737) 843-2007
Email: ccano@scott-scott.com

**Defendants:**

Edward J. Fanning, Jr.
(Admitted Pro Hac Vice)
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone: (973) 639-7927
Fax: (973) 297-3868
efanning@mccarter.com

Elizabeth C. Helm
(Admitted Pro Hac Vice)
Brandee J. Kowalzyk
(Admitted Pro Hac Vice)
Nelson Mullins Riley & Scarborough
Atlantic Station
201 17th St. NW, Ste. 1700
Atlanta, GA 30363
Phone: (404) 322-6000
Fax: (404) 322-6050
kate.helm@nelsonmullins.com
brandee.kowalzyk@nelsonmullins.com

Jennifer Saulino
(Admitted Pro Hac Vice)
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
Phone : (202)736-8000
Fax : (202-736-8711
jennifer.saulino@sidley.com

## B. STATEMENT OF JURISDICTION

Jurisdiction is appropriate in this Court based on diversity of citizenship under 28 U.S.C. § 1332(a)(1). The parties to this action are citizens of different states, and Plaintiff alleges that she has suffered damages in an amount exceeding the minimum jurisdictional limits of this Court. See May Lattanzio's Master Short Form Complaint and Jury Trial Demand, Case No. 2:24-cv-00680-DGC, Doc. 1, p. 6, filed on 03/28/24.

At all relevant times, Plaintiff has been domiciled in Florida, making her a citizen of Florida for diversity purposes. See May Lattanzio's Master Short Form Complaint and Jury Trial Demand, Case 2:24-cv-00680-DGC, Doc. 1 at p. 6, filed on 03/28/24. At all relevant times, Defendant Becton, Dickinson and Company ("BD") has been a citizen of New Jersey, as a corporation organized under the laws of New Jersey with its principal place of business in New Jersey. See Defendants' Answer to Plaintiffs' Long Form Complaint, Case 2:23-md-03081-DGC Document 100-1, filed on 11/09/23. At all relevant times, Defendant C.R. Bard, Inc. ("C.R. Bard") has been a citizen of New Jersey, as a corporation organized under the laws of New Jersey with its principal place of business in New Jersey. Doc. 100-1 at pp. 5-7. At all relevant times, Defendant Bard Access Systems, Inc. ("BAS") has been a citizen of Utah, as a corporation organized under the laws of Utah with its principal place of business in Utah. Doc. 100-1 at pp. 5-7. At all relevant times, Defendant Bard Peripheral Vascular, Inc. ("BPV") has been a citizen of Arizona, as a corporation organized under the laws of Arizona with its principal place of business in Arizona. Doc. 100-1 at pp. 5-7.

## C. STIPULATIONS AND UNCONTESTED FACTS AND LAW

1. **The following material facts are admitted by the parties and require no proof:**[1]

   a. The Defendants in this case are Becton, Dickinson and Company; C.R.

---

[1] The parties stipulate to reading the following statements to the jury before opening statements.

Bard, Inc.; Bard Access Systems, Inc.; and Bard Peripheral Vascular, Inc. Becton Dickinson is the parent company of C. R. Bard, Bard Access Systems, and Bard Peripheral Vascular, which are all wholly owned subsidiaries. Throughout this case, including in this pretrial order, the jury instructions, and the verdict form, all four Defendants will be referred to collectively as "Bard" or "Defendants."

b. The product that is the subject of this lawsuit is a PowerPort™ M.R.I.™ Implantable Port With Pre-Attached 9.6F Open-Ended Single-Lumen Venous Catheter ("PowerPort") that was designed, manufactured, marketed, and sold by Defendants.

c. The catheter of the product at issue is made from silicone.

d. On August 16, 2013, Plaintiff was implanted with the PowerPort.

**2. The following material facts, although not admitted, will not be contested at trial by evidence to the contrary:**

a. Plaintiff is not seeking to recover past or future lost wages as part of her damages or future medical expenses.[2]

**3. The following issues of law are uncontested and stipulated by the parties:**

a. Plaintiff's claims and Defendants' defenses are governed by Florida substantive law.

b. The law set forth in any stipulated/agreed jury instructions is stipulated as applicable by the parties.

**D. <u>CONTESTED ISSUES OF FACT AND LAW</u>**

1. The following matters are disputed issues of fact:

**(1) Design Defect – Strict Liability and Negligence (Counts I and II)**

[2] Plaintiff does not stipulate to reading this statement to the jury.

**Plaintiff's Contention**: Defendants' design of the Bard PowerPort M.R.I. Implantable Port was defective, rendering the port unreasonably dangerous to users of the port, in this case Plaintiff May Lattanzio. A properly designed port includes an antimicrobial coating and anti-fouling technology, both of which prevent infection by preventing bacteria from forming colonies on the port. The Defendants' port contained neither, rendering it defective and unreasonably dangerous to users who could, and this did, develop a port infection. At all relevant times, Plaintiff's port reached her in the hospital's operating room without any substantial changes, and the port was used as intended and in a way that Defendants could reasonably have anticipated.

Additionally, Defendants owed a duty to use ordinary care in designing the PowerPort. Defendants did not use ordinary care in designing the port. They breached their duty because they did not apply the knowledge they themselves recognized regarding the need to solve port infections and did not pursue the new design they developed to solve the infection defect. In fact, the Defendants knew how to manufacture a port that corrected these defects, manufactured prototypes of the port that corrected these defects which it submitted to the FDA and then discontinued the development of the new port due to profit concerns.

The defective design of Plaintiff's port was a legal cause (i.e., contributed substantially) in bringing about and producing her injuries and damages. Had Defendants designed a port that was not defective as alleged, Plaintiff's injuries and damages would have been prevented.

**Defendants' Contention**: The PowerPort was properly designed and Defendants used reasonable care in designing it. Infection is a known risk of every implantable port, and Plaintiff's own experts do not claim that Bard ports have a higher risk of infection than other U.S. IPCs. Plaintiff's PowerPort functioned as intended and allowed her to receive most of her chemotherapy without complication.

Plaintiff also cannot show that antimicrobial coating or anti-fouling technology was a safer, feasible design that would have prevented her alleged infection. The

alternative IPCs Plaintiff identifies were not available in the U.S. when she received her IPC, and the technologies she identifies had not been shown clinically to reduce infection in an IPC. Her experts did not perform testing, risk-benefit analysis, or feasibility analysis needed to prove otherwise. Bard's evaluation or development of other technologies does not establish that the PowerPort was defective or that Bard acted unreasonably in designing it.

Nor does the evidence show that Plaintiff's PowerPort caused her infection. Only one of four blood-culture bottles grew *Staphylococcus epidermidis*, a common skin contaminant; the catheter-tip and port cultures were negative; Dr. Reiss saw no signs of infection when he removed the IPC, and the catheter-tip and port-fluid cultures were negative; and her symptoms had resolved before removal. Her treating doctors never determined the source of her sepsis and could not tie it to her IPC. Her symptoms could instead have resulted from her immunosuppressed state, severe dehydration, a viral illness, or transient bacteremia from any number of sources. There is also no evidence that any proposed alternative design would have prevented her alleged injury. The PowerPort's design thus did not cause Plaintiff's alleged injuries.

**(2) Failure to Warn – Strict Liability and Negligence (Counts III and IV)**

**Plaintiff's Contention:** Defendants' design of the Bard PowerPort M.R.I. Implantable Port was defective, rendering it unreasonably dangerous to users, including Plaintiff, because the known foreseeable risks of harm from the use of the port could have been avoided or reduced had the Defendants provided reasonable instructions and warnings. For example, Defendants failed to warn of the true infections rates from their uncoated ports. When the Defendants elected not to proceed with the development of their new port design that addressed the defect by significantly reducing infection rates and instead elected to keep the product on the market, Defendants failed to warn about the danger posed by the continued use of their product.

Additionally, Defendants owed a duty to use reasonable care in giving appropriate warnings and instructions about particular risks associated with the reasonably foreseeable use of the PowerPort. Defendants did not use reasonable care in giving appropriate warnings regarding the risks associated with the foreseeable use of the PowerPort. They breached their duty by failing to disclose the true infection rates from their uncoated ports. They also breached their duty by failing to warn about the increased risk of infection from use of their product after electing not to continue the development of the new design that would have addressed the defect by significantly reducing infection rates.

The Defendants' failure to warn was a legal cause (i.e., contributed substantially) in bringing about and producing her injuries and damages. Had Defendants provided reasonable instructions and warnings, Plaintiff's injuries and damages would have been prevented.

**Defendants' Contention:** The PowerPort's warnings were adequate, and Defendants used reasonable care in warning of the well-known risk of infection. The IFU warns of "Catheter or port-related sepsis"—the exact complication Plaintiff claims occurred. Dr. Reiss had reviewed the IFU many times, independently knew that infection is an inherent risk of all IPCs, and discussed that risk with Plaintiff. Plaintiff signed a consent form acknowledging infection as a known risk. Her experts even admit that Bard's IFU warned of infection, that no other port manufacturer includes infection-rate data in its IFU, and Dr. Hurst does not know whether FDA would allow such information. There is also no evidence that Bard IPCs have a higher infection rate than other U.S. IPCs.

Bard's consideration or discontinuation of other IPC technologies did not make its warnings inadequate. There is no clinical evidence that the antimicrobial or anti-fouling technologies Plaintiff identifies would reduce infection in an implantable port generally or would have prevented Plaintiff's alleged infection specifically. Nor is there evidence that Bard concealed a known infection risk. Instead, Bard disclosed that risk

directly in the IFU ("Catheter or port-related sepsis").

Lastly, no alleged warning deficiency caused Plaintiff's injuries. Dr. Reiss already knew the infection risk, did not rely on any Bard statement or omission in deciding to use the IPC, and never testified that additional information would have changed that decision.

**(3) Fraudulent Misrepresentation, Negligent Misrepresentation, and Fraudulent Concealment -- (Counts IX, X, and XI)**

**Plaintiff's Contention:** Defendants falsely represented and/or omitted material facts to Plaintiff, directly or indirectly through her surgeon. For example, Defendants represented that the port's materials were "biocompatible" in the Instructions for Use ("[a]ll materials are biocompatible") while omitting information about the uncoated port's heightened risk of infection arising from its hydrophobic, rough surface. Defendants buried one reference to infection in a long list of "possible complications" when it knew that infection was the one complication that occurred repeatedly. As other examples, Defendants failed to disclose the port's infections rate was at 3.5 to 15.2 percent, that Bard developed an antimicrobial coating to address and decrease that infection rate, and that Bard discontinued its safer design because the FDA required further testing. Plaintiff's surgeon read the Instructions for Use and relied on the Defendants to disclose accurate, truthful material facts.

With respect to their omissions, Defendants had a duty to disclose because they have special knowledge of material facts that Plaintiff and her doctors were unable to get. Defendants further had a duty to disclose based on speaking (i.e., making representations, including in the Instructions for Use) and needing to say enough to prevent their words from misleading Plaintiff and her doctors. Plaintiff's surgeon read the Instructions for Use and relied on the Defendants to not only disclose accurate, truthful material facts, but also to refrain from withholding accurate, truthful material facts.

Defendants knew the representations were false and/or misleading or made these misrepresentations or omissions without knowing they were true or false. Defendants knew that these representations and/or omissions were material. Defendants made these representations with the intent that Plaintiff, through her surgeon, would rely on them, and she did in fact rely on them. Defendants failed to disclose material information and facts it knew physicians, like Plaintiff's surgeon, would want to know to fully inform their patients about the risks associated with the PowerPort and alternative treatment options. Defendants withheld material infomation and facts from healthcare professionals, like Plaintiff's surgeon, so that Plaintiff, through her surgeon, would consent to use Defendants' PowerPort. Plaintiff's reliance, directly or indirectly through her surgeon, contributed substantially to producing her injuries and damages. Had Plaintiff and/or her surgeon known the truth, they would not have used a Bard port.

**Defendants' Contention:** Defendants made no false or misleading statement and did not conceal any material fact about the PowerPort. Plaintiff's misrepresentation and concealment claims simply repackage her failure-to-warn claims. And Bard disclosed the very risk Plaintiff says was concealed: the IFU identified "Catheter or port-related sepsis" as a known complication and said it and other complications are documented in the medical literature. The IFU describing IPC materials as biocompatible was not a representation that the IPC carried no infection risk; the same IFU expressly warned of catheter- or port-related sepsis. Plaintiff's own experts admit that Bard's IFU warned of infection and that infection is a well-known risk of implantable ports.

Nor did Bard conceal a "true infection rate" or known defect. Plaintiff's experts identify no other IPC manufacturer that includes infection-rate data in its IFU, and Dr. Hurst does not know whether FDA would allow such information. There is no evidence that Bard ports have a higher infection rate than other U.S. ports, no clinical evidence that the antimicrobial or anti-fouling technologies Plaintiff identifies would have prevented Plaintiff's alleged infection, and no evidence that Bard concealed a known defect from doctors or FDA. Bard's decision not to continue development of another

product did not make what it said about the PowerPort false or misleading.

Plaintiff also cannot show reliance or causation. Dr. Reiss did not rely on any statement or omission by Bard in deciding to use the IPC, and he never testified that additional information would have changed his decision. He already knew that infection is an inherent risk of every IPC and discussed that risk with Plaintiff. Plaintiff herself never spoke with anyone at Bard, never received information from Bard about her IPC, did not know Bard manufactured it, and did not research IPCs before implant. The evidence also does not establish that the IPC caused her infection. She therefore cannot show that any statement or omission by Bard caused her to receive the PowerPort or caused her alleged injuries.

**(4) Compensatory damages**

**Plaintiff's Contention:** Plaintiff claims that she suffered a catheter-related bloodstream infection ("CRBSI") and sepsis from the Defendants' port. She is entitled to compensatory damages for her bodily injury and resulting, past and future, pain and suffering, physical impairment, mental anguish, inconvenience, and loss of capacity for the enjoyment of life.

**Defendants' Contention:** The evidence does not show that the PowerPort caused Plaintiff's alleged infection, sepsis, or resulting damages. She had clinically improved and was off antibiotics before the IPC was removed. She then completed her cancer treatment, and Dr. Chen considers her cancer cured. The brief treatment delay associated with her hospitalization did not significantly affect her care. There is also no evidence of lasting or future injury. No provider has identified any impairment to the veins in her arms, and medical records describe her IPC site as healed without ongoing complaints.

**(5) Punitive damages**

**Plaintiff's Contention:** Defendants are guilty of intentional misconduct and/or gross negligence and therefore liable for punitive damages. Defendants had actual

knowledge of the wrongfulness of their conduct and the high probability of injury or damage to Plaintiff from that conduct. In addition to or alternatively, Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct, like users of its PowerPort. For example, Defendants are liable for punitive damages for their conduct in selling and marketing a product (the PowerPort) that they knew was defective and continuing to do so despite knowing how to make the product safer and actually having designed the safer model; discontinuing the development of the safer design of the product for profit; ignoring feedback from healthcare providers about the need for a coated port; failing to warn consumers (patients and doctors) about the higher risks of infection when using the PowerPort that Defendants knew existed; affirmatively withholding data about infections rates to ensure that the product remained profitable; and, among other things, steering doctors away from safer alternatives with coatings despite Defendants knowing they developed the same type of coatings to reduce infections and abandoned it. In this case, a punitive damage award against the Defendants is necessary to punish Defendants and to deter others from engaging in the same or similar conduct.

**Defendants' Contention:** Nothing in the record supports punitive damages against Defendants. There is no evidence of intentional misconduct, gross negligence, or conscious disregard for patient safety. Defendants did not hide the risk of infection. The PowerPort was FDA-cleared, underwent extensive testing, and expressly warned doctors that catheter- or port-related sepsis was a possible complication. Plaintiff's own experts agree that Bard warned of infection, do not contend that Bard IPCs have a higher infection risk than other U.S. ports, and do not believe Bard IPCs should be removed from the market. No regulatory agency, medical society, or medical organization has determined that their risks outweigh their benefits.

Plaintiff's coating and concealment theories do not show otherwise. There is no evidence that Bard knew the PowerPort was defective or concealed a known defect from

doctors. Plaintiff identifies no other IPC manufacturer that includes infection-rate data in its IFU, and there is no clinical evidence that the alternative technologies Plaintiff identifies were superior or would have prevented Plaintiff's alleged infection. Defendants' decision not to continue pursuing an antimicrobial coating after FDA found the proposed product not substantially equivalent does not show conscious disregard for patient safety. The conduct of Plaintiff's own experts further undercuts this claim. Several continue to use Bard IPCs or work at institutions that do, even after reviewing the evidence in this litigation.

The evidence also does not establish that the PowerPort caused Plaintiff's alleged infection or any lasting injury. Nothing in the record shows that Defendants knew the PowerPort posed a high probability of injury or consciously disregarded patient safety.

**2. The following matters are disputed issues of law:**

**(1) Application of the statute of limitations**

**Defendants' Contention**: All of Plaintiff's claims are time-barred by the applicable statutes of limitations under Florida law. *See* Fla. Stat. Sec. 95.11(3)(d), (i), (j); *Fields v. Mylan Pharm., Inc.,* 751 F. Supp. 2d 1260, 1262 (N.D. Fla. 2009). The statute of limitations begins to run "from the time the cause of action accrues." Fla. Stat. Sec. 95.031. Florida follows the delayed discovery rule in which the cause of action accrues either (1) when a plaintiff discovered facts giving rise to the action, or (2) when a plaintiff should have discovered facts with the exercise of due diligence. *Id.* Sec. 95.031(2)(b); *accord Sotolongo v. Ethicon, Inc.*, 591 F. Supp. 3d 1242, 1249 (S.D. Fla. 2022). Plaintiff need not know with legal certainty that the product caused her injury, as actual or constructive knowledge of the possible connection is enough. *Univ. of Miami v. Bogorff*, 583 So. 2d 1000, 1004 (Fla. 1991) (because knowledge of the contents of accessible medical records is imputed," the plaintiffs had constructive knowledge that the drug may have contributed to the injury).

Here, Plaintiff's claims against Bard accrued – and the applicable statute of limitations began to run – at the latest, on December 13, 2013, when:

- Plaintiff testified that she had experienced port-site pain and soreness that she associated with her IPC.
- Plaintiff testified that she experienced loss of use of her limbs, unconsciousness, rigors, and a fever on or around December 1, 2013, that she attributed to her IPC.
- Plaintiff testified that she was hospitalized and received treatment for possible sepsis allegedly related to her IPC from December 1, 2013 to December 13, 2013.
- Her doctors recommended removing the IPC because it was a possible source of infection and told her it needed to be removed because it was possibly infected.
- Her medical records stated that the IPC was removed for "[s]epsis with probable infected port." (PPR_PPF11-12)

These facts gave Plaintiff actual and constructive notice of an injury potentially connected to her IPC. She did not need to know that the IPC was legally defective or have definitive proof that it caused her injury before the limitations period began to run. The cases Plaintiff cites— *Babush v. Am. Home Prods. Corp.*, 589 So. 2d 1379 (Fla. 4th DCA 1991) and *Redding v. Coloplast Corp.*, 104 F.4th 1302 (11th Cir. 2024)—are inapposite because neither of those plaintiffs had reason to believe that there was a causal connection between their products and injuries, including from medical records. *Babush*, 589 So. 2d at 1381–82 (no evidence "that Babush knew, earlier or from any other source, or should have known (by virtue of his own medical records) that there was a causal connection between the drug and the injury"); *Redding*, 104 F.4th at 1311 (plaintiff had no "reason to suspect a causal connection" between her device and her symptoms, and no doctor told her that the device might be "causing her harm"). Here, on the other hand, Plaintiff's December 2013 records explicitly say her IPC was removed because it "is potentially the

source of infection" and she had "sepsis with probable infected port." PPR_PPF 6–8, 11–12. That knowledge is imputed to her. *Bogorff*, 583 So. 2d at 1004. Because she had the required notice by December 2013 but did not file suit until March 28, 2024, her claims are time-barred.

**Plaintiff's Contention**:

Plaintiff preserves her position that her claims are not barred by the statute of limitations. Under Florida law, the statute of limitations for a products liability claim is four years. Fla. Stat. § 95.11(3)(e), 95.031. Pursuant to Florida's discovery rule, the limitations period does not begin to run until "the date that the facts giving rise to the cause of action were discovered, or should have been discovered with the exercise of due diligence." Fla. Stat. Ann § 95.031(2)(b).

For the limitations period to begin running on a products liability claim, the plaintiff must have actual or constructive knowledge of (1) "an injury distinct in some way from conditions naturally to be expected from the plaintiff's condition" and (2) "exposure to the product in question." Babush v. Am. Home Prods. Corp., 589 So. 2d 1379, 1381 (Fla. 4th DCA 1991) (reversing summary judgment). "Use of the conjunction 'and' in this equation necessarily implies that the connection must be to some extent causal." Id. Applying this rule, the Eleventh Circuit explained that under Florida law, the limitations period does not begin to run if the plaintiff's symptoms were "not so obviously unusual as to indisputably put [the plaintiff] on notice about her claim." Eghnayem v. Bos. Sci. Corp., 873 F.3d 1304, 1323–24 (11th Cir. 2017).

In a recent, thoroughly reasoned opinion, the Eleventh Circuit applied Babush to hold that the district court properly denied the defendant's motion for judgment as a matter of law on a limitations defense in a case involving a medical device, a vaginal mesh sling. Redding v. Coloplast Corp., 104 F.4th 1302 (11th Cir. 2024). The Eleventh Circuit reasoned that in the medical device context, "it is difficult to distinguish between a normal surgical side effect or complication and a product deficiency." Id. at 1312 n.15. "It is possible that mesh erosion did not strike [the plaintiff] or her physicians as a

potential product defect because erosion was a known risk of pelvic mesh implantation." Id. at 1312 (quoting Stark v. Johnson & Johnson, 10 F.4th 823, 830 (7th Cir. 2021)).

Here, fact issues similarly exist. Approximately three-and-a-half months after her August 2013 port-catheter implantation, Ms. Lattanzio experienced symptoms indicative of sepsis and was hospitalized on December 1, 2013, for treatment. See Doc. 6255 ¶ 61–62. The following day, a blood culture was positive for Staph. epidermidis. Id. ¶ 64. Ms. Lattanzio remained hospitalized for thirteen days and was discharged. Her fever subsided seven days into her treatment, and her port-catheter was removed nearly a week later, on December 13, 2013, the same day she was discharged. Id. ¶ 65–66.

It is undisputed that at the time she contracted her blood infection, Ms. Lattanzio was undergoing chemotherapy treatment for breast cancer and had a weakened immune system. Id. ¶ 153. Her doctors had informed her and she was aware that she was immuno-compromised and susceptible to infection. Id. Defendants' own experts admit that immunocompromised patients like Ms. Lattanzio are particularly at risk of infection, a "common road bump" in cancer care. Id. ¶ 156–58. Consent forms and hospital documentation given to Ms. Lattanzio prior to implantation listed infection as a risk of the procedure—never, however, suggesting that contracting an infection could be abnormal or potentially due to a product defect. Id. ¶ 154. After Ms. Lattanzio's IPC was removed, a culture of the port and fluid were performed. The culture was negative for bacterial growth. Id. ¶ 164. Consequently, like in Redding, Ms. Lattanzio had no meaningful way to "distinguish between a normal surgical side effect or complication and a product deficiency." Redding v. Coloplast Corp., 104 F.4th at 1312 n.15. "It is possible that [the infection] did not strike [Ms. Lattanzio] or her physicians as a potential product defect because [infection] was a known risk" of immunocompromised cancer patients' treatment. Id. at 1312 (citation omitted).

At no time did any doctor tell Ms. Lattanzio that the port-catheter "caused her [infection] or [was] in any way defective." Id. at 1311. See Doc. 6255 ¶ 23. To the contrary. Prior to her port removal, Ms. Lattanzio's surgeon, Dr. Reiss, discussed the

possibility of having a second port implanted, suggesting to any reasonable person that Dr. Reiss did not believe the product to be defective. Id. ¶ 165. Ms. Lattanzio's husband was similarly never told that Ms. Lattanzio's infection was caused by the port. Id. ¶ 23.

Ms. Lattanzio testified that it was not until she saw advertisements on Facebook sometime in December 2023 that she learned about her potential claim. See Doc. 6255 ¶ 26. She never testified that prior to that time, she attributed her infection to her IPC being defective. Id.

With respect to Ms. Lattanzio's fraud claims, the statute of limitations does not begin to run until the plaintiff knew or had reason to know, through the exercise of due diligence, of the facts constituting the fraud. *Smith v. Bruster*, 151 So. 3d 511, 514 (Fla. 1st DCA 2014) ("In a fraud action, the last element occurs, and thus the cause of action accrues, when the plaintiff knew, or through the exercise of due diligence should have known, of the facts constituting the fraud."); *Brugiere v. Credit Commerciale France*, 679 So. 2d 875, 877 (Fla. 1st DCA 1996) ("In cases of fraud, the statute of limitations ordinarily begins to run with the discovery of the fraud."); *Ambrose v. Catholic Social Services, Inc.,* 736 So. 2d 146, 149 (Fla. 5th DCA 1999) ("[T]he four-year limitation period began to run on the date that [plaintiff] knew or should have known of [defendant's] misrepresentation[.]"); *Koehler v. Merrill Lynch & Co., Inc.*, 706 So. 2d 1370, 1372 (Fla. 2d DCA 1998) ("A cause of action for fraud does not accrue until the basis of the action is discovered or should be discovered through due diligence."). The record facts do not support any claim that Ms. Lattanzio knew or had reason to know of the facts constituting the alleged fraud in this case outside the statute of limitations period for those fraud claims.

**Court's Ruling:** The Court denied Defendants' motion for summary judgment on the statute of limitations defense. See Doc. 10999 at 4–10. Defendants may raise the statute of limitations defense at trial.

**(2) Learned intermediary doctrine**

**<u>Defendants' Contention</u>:** Florida's learned intermediary doctrine applies. *See, Small v. Amgen, Inc.*, 723 F. App'x 722, 724-25 (11th Cir. 2018). Plaintiff's reliance on *Aubin v. Union Carbide Corp.*, 177 So. 3d 489 (Fla. 2015) to argue otherwise is misplaced, as the Eleventh Circuit has twice made clear. *Aubin* involved a bulk asbestos supplier—not a medical device or physician-patient relationship—and thus does not alter Florida's learned intermediary doctrine. *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1350 (11th Cir. 2023); *Salinero v. Johnson & Johnson*, 995 F.3d 959, 967–68 (11th Cir. 2021). In the physician-patient context, Florida has applied the learned intermediary doctrine for almost four decades because a physician is in a better position than a patient to understand the risks associated with medical devices and prescription drugs. *Felix v. Hoffman LaRoche, Inc.,* 540 So. 2d 102, 104 (Fla. 1989). Under the learned intermediary doctrine, a manufacturer's duty to warn is to the prescribing physician who stands between the manufacturer and patient as a "learned intermediary" with knowledge and expertise to decide which medical devices are appropriate for a patient. *Cates v. Zeltiq Aesthetics, Inc.*, 73 F.4th 1342, 1347 (11th Cir.), *cert. denied*, 144 S. Ct. 526 (2023); *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp. 2d 1270, 1286 (M.D. Fla. 2009), *aff'd*, 634 F.3d 1296 (11th Cir. 2011).

In order to prevail on her failure-to-warn claims, Plaintiff must show that Bard provided inadequate warnings to her implanting physician, Dr. Reiss. *See, e.g., Small v. Amgen, Inc.*, 134 F. Supp. 3d 1358, 1367 (M.D. Fla 2015), *aff'd*, 723 F. App'x 722 (11th Cir. 2018). Plaintiff cannot make that showing.

First, Bard's warnings were adequate as a matter of law. A warning is adequate as a matter of law when it is "accurate, clear, and unambiguous" and "makes apparent the potential harmful consequences of the product." *Cates*, 73 F.4th at 1348 (cleaned up). Under the learned intermediary doctrine, the adequacy of medical device warnings must be weighed against the knowledge of the medical community to which they are directed, not that of patients. *Id.* Here, Bard's warnings for its IPCs were adequate as a matter of

law. The IFU that accompanied Plaintiff's IPC warns, under the title "Possible Complications," that "Catheter or port-related sepsis" is a known risk. Thus, Bard's labeling is adequate as a matter of law because it warned of Plaintiff's alleged injuries and placed physicians "on notice" of the possibility of the precise risk about which Plaintiff complains. *See, e.g.*, *Cates*, 73 F.4th at 1347-50 (affirming summary judgment where user manual provided clear, accurate, and unambiguous warning of the risk of potential complications); *Nunez v. Coloplast Corp.*, 461 F. Supp. 3d 1266-67 (S.D. Fla. 2020) ("[T]he Court has reviewed the IFU extensively and finds them to be adequate as a matter of law . . . they clearly and unambiguously state that 'urinary tract infection,' 'pelvic/urogenital pain,' and 'dyspareunia' are all possible."); *Colville v. Pharmacia & Upjohn Co., LLC*, 565 F. Supp. 2d 1314, 1321 (N.D. Fla. 2008) ("Because Depo–Provera's warnings were accurate, clear, and unambiguous, this Court finds that the adequacy of the warning is a question of law.").

Second, the evidence will show that the implanter/learned intermediary, Dr. Reiss, knew of the risk of infection. He reviewed the IFU multiple times over hundreds of procedures, stating "after a few hundred, I think I've got it down." He testified he always discusses infection risks with patients and did so with Plaintiff. Plaintiff's signed informed consent confirmed she understood infection was a known risk. *See Ocasio v. C.R. Bard, Inc.,* No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *5 (M.D. Fla. June 3, 2015) (granting summary judgment because "there is no evidence that the IFU failed to adequately apprise Dr. Zweibel of the dangers of the G2 filter"); *Timmons v. Purdue Pharma Co.*, No. 8:04-CV-1479-T-26MAP, 2006 WL 263602, *4 (M.D. Fla. Feb. 2, 2006) (same where different warning would not have changed physician's decision).

It is also well-established under Florida law that a plaintiff cannot establish causation due to a manufacturer's failure to warn of a particular risk if the prescribing physician had independent knowledge of the product's risks. *See, e.g.*, *Nunez*, 461 F. Supp. at 1267; *Small*, 723 F. App'x at 725; *MacMorris v. Wyeth, Inc.*, No. 2:04CV596FTM-29DNF, 2005 WL 1528626, at *2-3 (M.D. Fla. June 27, 2005);

*Christopher v. Cutter Labs.*, 53 F.3d 1184, 1192 (11th Cir. 1995). So even had the IFU been somehow inadequate, which it was not, Dr. Reiss testified that he knew that infection/sepsis was a known risk associated with the IPC, and that this risk was commonly known among doctors placing IPCs.

Finally, Plaintiff offers no evidence Dr. Reiss would have changed his decision or course of treatment had the warnings said more, which independently defeats proximate causation under Florida's learned-intermediary doctrine. *Small,* 723 F. App'x at 725 (citation omitted) ("[R]egardless of the sufficiency of the warning, where 'a learned intermediary has actual knowledge of the substance of the alleged warning and would have taken the same course of action even with the information the plaintiff contends should have been provided, courts typically conclude that the learned intermediary doctrine applies or that the causal link is broken and the plaintiff cannot recover.'").

**Plaintiff's Contention:** Under Florida law, a defendant is liable for failure to warn "if it knowingly placed a dangerous product on the market, the dangerous condition of which is unnoticeable, and failed to properly warn of the dangerous condition." Aubin v. Union Carbide Corp., 177 So. 3d 489, 514 (Fla. 2015) (citation omitted). The adequacy of a warning is typically a question of fact. It only becomes a question of law "where the warning is accurate, clear, and unambiguous." Felix v. Hoffmann-LaRoche, Inc., 540 So. 2d 102, 105 (Fla. 1989).

Florida has adopted a narrow version of the learned intermediary doctrine. Florida's learned intermediary doctrine does not modify the elements of a failure to warn claim. Instead, is a "fact-intensive" affirmative defense on which the defendant bears the burden of proof. See Fla. Std. Civ. Jury Inst. 403.18(c); Messina v. Ethicon, Inc., No. 6:20-CV-1170-PGB-LRH, 2021 WL 1329072, at *3 (M.D. Fla. Mar. 31, 2021).

Under the rule, a manufacturer's duty to warn never runs to the doctor, but always to the patient. Aubin, 177 So. 3d at 518. The manufacturer can prove that it fulfilled its duty to warn the patient by relying on a doctor as a learned intermediary to provide the relevant warnings to the patient. The manufacturer must, however, prove that its reliance

on the intermediary was reasonable. "[T]he learned intermediary defense is a doctrine that a manufacturer can use to argue to the jury that its duty to warn was fulfilled, provided that the evidence supports that defense and the jury instruction accurately explains the factors for the jury to consider in determining whether the manufacturer's reliance was reasonable[.]" Aubin, 177 So. 3d at 516, 519; Union Carbide Corp. v. Font, 299 So. 3d 491, 496 (Fla. 3d DCA 2020); Fla. Std. Civ. Jury Inst. 403.18(c).

1. Whether Defendants' Direct Warnings Were Inadequate is a jury question.

May Lattanzio has testified that to the best of her recollection, she received no direct warning from her doctors or from Bard about any risks of Bard's port-catheter. See Doc. 6255 ¶ 124. Bard did, however, address product information directly to patients. The PowerPort's IFUs mention an online "patient education module" that Bard published with the goal of "help[ing] patients select their best access option." Id. ¶ 126. On its website, Bard touted the benefits of its port-catheters, but never once warned patients about the devices' potential side-effects or dangers; the words "infection" and "sepsis" do not appear on the website at all. Id. ¶ 127. Bard also appears to have provided information directly to patients via a post-implantation "Patient Discharge Packet," which detailed the benefits of the PowerPort (for example, its power injectability and the absence of repeated needle sticks). Id. ¶ 128–29. The Patient Discharge Packet, however, does not list infection or sepsis as a potential risk or side-effect of the device. Id. ¶ 130–32. Years later, Bard modified its direct-to-patient communications to specifically warn patients of "venous blood clots, skin erosion, infection, a collapsed lung, or clotting of the port catheter." Id. ¶ 133. No such warning existed at the time of Ms. Lattanzio's implantation.

2. Whether Defendants' Indirect Warnings Were Inadequate is a jury question.

As to indirect communications, Bard's warnings were also insufficient, See Doc. 6255 ¶ 135, and it was unreasonable for Bard to rely on intermediaries to communicate them to Ms. Lattanzio. At the very least, reasonableness presents a question of fact.

Doctors rely on device manufacturers to provide them with information about a device's benefits and drawbacks to "ensure informed clinical decision-making." See Doc. 6255 ¶ 143–47. Dr. Reiss, who implanted Ms. Lattanzio with the PowerPort, testified that if Bard had information suggesting that its product's "infection rates were not low," he would have expected Bard to provide him with that information via notice to doctors, and he would have informed Ms. Lattanzio. Id. ¶ 12, 152. Yet Bard trained its employees not to discuss infection rates with doctors. Id. ¶ 190. All the time, Bard knew that medical providers were not privy to the adverse events data that Bard transmitted to FDA via Alternative Summary Reporting, including during the time that Ms. Lattanzio's port was placed. Id. ¶ 148–51.

Not only that, but the risk of failed information transmission is heightened in the port-catheter context, where (as Defendants know) medical decision-making is unusually decentralized. As here, one treater—the oncologist, Dr. Nanfro—typically determines that a port-catheter is advisable for administration of chemotherapy. See Doc. 6255 ¶ 59, 140. A separate treater—here, the general surgeon, Dr. Reiss—is then charged with implanting the device. But that treater frequently does not select the device. Id. ¶ 13, 141. Instead, in this case, the hospital selected the specific device, as Defendants knew. Id. Yet, as here, it is the surgeon who undertakes the informed-consent discussion with the patient. Id. ¶ 142. The buck stops with no one, making any reliance by the manufacturer on a learned intermediary manifestly unreasonable.

**Court's Ruling:** The Court denied Defendants' motion for summary judgment on Plaintiff's failure to warn claims being barred by the learned intermediary doctrine. See Doc. 10999 at 10–14. Defendants may raise the learned intermediary defense at trial.

**(3) Comment K—Unavoidably Unsafe Product**

**Defendants' Contention:** Comment k applies to Plaintiff's strict liability design defect claim. Defendants incorporate their summary judgment briefing and proposed jury instruction on this issue. Florida recognizes that some useful medical products

cannot be made completely safe for their intended use and are not defective if they are as safe as current knowledge and testing permit, properly prepared and marketed, and accompanied by adequate warnings. *See Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 731–33 (Fla. 2d DCA 1991); *Tillman v. C. R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1340–41 (M.D. Fla. 2015). The PowerPort is one such product. Plaintiff's experts and doctors agree that IPCs deliver life-saving chemotherapy but all carry risks, including infection. The PowerPort was FDA-cleared, and Plaintiff identifies no reasonable alternative design available in the U.S. when she received it. The evidence will show that her IPC was properly prepared and marketed, and its IFU expressly warned of catheter- or port-related sepsis—a risk Dr. Reiss independently knew. The unavoidable risk of infection therefore does not make the PowerPort defective or unreasonably dangerous.

**Plaintiff's Contention:** Defendants raised Comment k to the Restatement (Second) of Torts § 402A in their motion for summary judgment, which applies to "unavoidably unsafe" products. Plaintiff opposed that motion and incorporates her response and counterstatement of facts here. See Docs. 6253 and 6255. Under Florida law, Comment k is an affirmative defense on which the Defendants bear the burden of proof. Tillman v. C.R. Bard, Inc., 96 F. Supp. 3d 1307, 1341 (M.D. Fla. 2015) (citing Adams v. G.D. Searle & Co., 576 So. 2d 728, 733 (Fla. 2d DCA 1991)). "[T]o be protected under comment k, a defendant must show that the product is as safe as current testing and research permit, and that the product's benefits outweigh the known risks as of the date the product is distributed." Id. at 1340 (citing Adams, 576 So. at 732–33). See also Ocasio v. C.R. Bard, Inc., No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *6 (M.D. Fla. June 3, 2015) (denying Bard's motion for summary judgment because "Bard fails to address whether the G2 filter was as safe as current testing and research permitted or whether its benefits outweighed its known risks—and, as Plaintiffs contend, the evidence reveals that the G2 filter was far from being as safe as it could have been made"); Small v. Amgen, Inc., 134 F. Supp. 3d 1358, 1373 (M.D. Fla. 2015), aff'd, 723 F. App'x 722 (11th Cir. 2018) (denying summary judgment because "Defendants have

not … proffered any evidence showing that Enbrel was as safe as it could be at the time of Ms. Small's injuries."). Even if a product is unavoidably unsafe, a defendant is relieved from liability only if the product is "properly prepared and accompanied by proper directions and warnings." Small, 134 F. Supp. 3d at 1373. Plaintiff contends that Defendants will not be able to prove that the PowerPort M.R.I. was as safe as it could have been. FDA clearance under 510(k) does establish the safety of the product. In addition, Plaintiff contends that Defendants will not be able to prove that the product was accompanied by proper directions and warnings.

**Court's Ruling:** The Court denied Defendants' motion for summary judgment on Plaintiff's design defect claims under comment k to Restatement § 402A. See Doc. 10999 at 14–16. Defendants may raise their defense based on comment k at trial.

**(4) Bifurcation/Trifurcation of trial**

The parties agree that the trial should be bifurcated into at least two phases, with the jury deciding liability, compensatory damages, and whether punitive damages are warranted in the first phase; and, if the jury determines that punitive damages should be awarded during the first phase, the amount of punitive damages should be determined during the second phase. Defendants further urge the Court to conduct a separate, first-phase limited to the issue of application of Florida's statute of limitations, to which Plaintiff objects.

**Defendants' Contention**: Defendants moved for summary judgment arguing that Plaintiff's claims are by Florida's statute of limitations. (ECF No. 5815 at 4-7). If that motion is denied, and because that threshold issue could dispose of the entire case, Defendants request, under Federal Rule of Civil Procedure 42(b), a separate first-phase trial limited to claim accrual and timeliness. This Court, and numerous other district courts, have recognized that statute of limitations defenses are especially suited for bifurcation because they present a discrete, potentially dispositive issue that can be resolved before the parties and the Court expend substantial resources litigating liability,

causation, and damages. *See, e.g.*, *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2661463, at *2 (D. Ariz. June 29, 2021) (Campbell, J.) ("The Court will grant Defendants' motion because bifurcation will effectuate Rule 42(b)'s purposes of convenience, avoidance of prejudice, and potentially saving the Court, parties, witnesses, and jurors considerable time and resources. . . The Court will conduct an initial jury trial on the narrow issue of Defendants' statute of limitations defense. If necessary, a second trial will be held, with a different jury, on the merits of Plaintiffs' claims."); *Gomez v. City of Torrance*, 438 F. App'x 626, 628 (9th Cir. 2011) ("The district court did not abuse its discretion in bifurcating the trial into a statute of limitations phase and a liability phase because the statute of limitations issue was dispositive…"). *Heinrich v. Ethicon, Inc.*, No. 220CV00166APGVCF, 2021 WL 2801961, at *1 (D. Nev. Apr. 15, 2021) ("A separate, preliminary trial on the limitations defense will promote judicial economy, avoid jury confusion of the issues, and prevent possible undue prejudice."); *Houck v. Ethicon Inc.*, No. CV GLR-20-3122, 2024 WL 243395, at *2 (D. Md. Jan. 18, 2024) ("Here, the viability of Houck's liability claims depends upon whether it is first determined that Houck's claims are not time barred. In the interest of efficiency, the Court will bifurcate this case."); see also *Young v. Mentor Worldwide LLC*, 312 F. Supp. 3d 765, 768 (E.D. Ark. 2018) ("Mentor's statute of limitations defense is potentially dispositive, and a preliminary trial will not consume the time and expense necessary for a trial on the merits. The Court finds that a separate, initial trial on the statute of limitations question is especially warranted in this case, as it will promote judicial economy, avoid confusion of the issues, and prevent possible undue prejudice."); *Adams v. Zimmer US, Inc.*, No. CV 17-621, 2020 WL 12933111, at *1 n.1 (E.D. Pa. Mar. 13, 2020) ("Bifurcation could also lead to convenience, expedition, and savings for the parties, their witnesses, and the court. If the court decided not to bifurcate, the parties would engage in a potentially weeks-long trial to determine whether the statute of limitations defense applies and whether the defendants are liable. If the jury determined that the statute of limitations defense applied in an unbifurcated

trial, the liability portion of the trial would be an unnecessary expenditure of time and resources for all involved. If, instead, the jury determines that the statute of limitations defense applies in a bifurcated trial, the trial will last a matter of days. The parties can avoid spending additional time, money, and resources on litigation; witnesses can avoid coming to Easton to testify; and court resources can also be conserved."); *Grisham v. Philip Morris, Inc.*, 2009 WL 9102320, at *4 (C.D. Cal. Dec. 3, 2009) (ordering bifurcation and noting that "the Ninth Circuit has previously affirmed a trial order's Rule 42(b) bifurcation of trial so that the statute of limitations questions were tried separately from the merits" (citing *Burnham Chem. Co. v. Borax Consol.*, 170 F.2d 569, 572-73, 578 (9th Cir.1948)); *Gomez v. City of Torrance*, 438 F. App'x 626, 628 (9th Cir. 2011) ("The district court did not abuse its discretion in bifurcating the trial into a statute of limitations phase and a liability phase because the statute of limitations issue was dispositive . . . ."). *See also Gilbert v. State Farm Mut. Automobile Ins. Co.*, 311 F.R.D. 685, 686 (M.D. Fla. 2015) ("Rule 42(b) does not set a high standard for the court but rather it 'confers broad discretion on the district court' to permit bifurcation when it furthers convenience." (quoting *Harrington v. Cleburne Cnty. Bd. of Educ.*, 251 F.3d 935, 938 (11th Cir. 2001)); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) ("Rule 42(b) of the Federal Rules of Civil Procedure confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues"); *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 998 (9th Cir. 2001) (holding that bifurcation of trial under Rule 42(b) of the Federal Rules of Civil Procedure was not abuse of discretion), opinion amended on denial of reh'g, 272 F.3d 1289 (9th Cir. 2001); *Estate of Diaz v. City of Anaheim*, 840 F.3d 592, 601 (9th Cir. 2016) (The power to bifurcate includes "the authority to separate trials into liability and damage phases." (*citing De Anda v. City of Long Beach*, 7 F.3d 1418, 1421 (9th Cir. 1993)).

**Plaintiff's Contention:** Plaintiff's position on the phasing of this trial is that there should be two phases, with bifurcation of the amount of punitive damages tried in

a second phase. This Court should not order a three-phase trial with a first phase solely devoted to Defendants' affirmative defense of statute of limitations.

Fed. R. Civ. P. 42(b) grants the trial court discretion to order separate trials on issues or claims for "convenience, to avoid prejudice, or to expedite and economize" the proceedings. "The party requesting an order for separate trials has the burden to show such bifurcation 'will promote judicial economy and avoid inconvenience or prejudice to the parties.'" *TDBBS LLC v. Ethical Products Inc.,* No. CV-19-01312-PHX-SMB, 2019 WL 13198122, at *1 (D. Ariz. Oct. 17, 2019) (quoting *Spectra-Physics Lasers, Inc. v. Uniphase Corp.,* 144 F.R.D. 99, 101 (N.D. Cal. 1992)). "Factors to be considered when determining whether to bifurcate a trial include: avoiding prejudice, separability of the issues, convenience, judicial economy, and reducing risk of confusion." Id. (quoting Bates v. United Parcel Service, 204 F.R.D. 440, 448 (N.D. Cal. 2001)).

This Court should deny Defendants' request for trifurcation of these proceedings with a separate trial devoted only to Defendants' statute of limitations affirmative defense. The Middle District of Florida's reasoning in *Mason v. Ethicon, Inc.*, No. 6:20-CV-1078-RBD-DCI, 2021 WL 2580113, at *1 (M.D. Fla. May 10, 2021), a medical device case like this one, applies with full force here:

> Defendants contend a separate trial on the statute of limitations would save time and resources because it would be shorter than a trial on the merits and could resolve the entire case. But this assumes Defendants prevail on the statute of limitations issue. If Plaintiff prevails, a separate trial will not save time. Just the opposite. As Plaintiff points out, there is overlapping evidence between the statute of limitations issue and liability—the jury will need to consider Plaintiff's extensive medical records and complications and what Plaintiff was told by her treating physician. While bifurcation on the statute of limitations issue is warranted in some circumstances, under the facts of this case, bifurcation would not be more efficient.

*See also, e.g., Thornton v. Ethicon Inc.,* No. CV-20-00460-TUC-JCH, 2021 WL 5578931, at *2 (D. Ariz. Nov. 29, 2021) ("Where the statute of limitations issue would

cause the consideration of the same extensive medical records, complications, and physician's testimony, bifurcation would not be more efficient. “); *Davis v. Johnson & Johnson*, No. 2:20-CV-02635-HLT, 2022 WL 2116337, at *1 (D. Kan. June 13, 2022) (denying bifurcation because, among other reasons, the overlap in factual issues underlying the statute of limitations affirmative defense and the other claims and defenses to be tried “suggest bifurcation would not serve judicial economy”); *W.N. Motors, Inc. v. Nissan N. Am., Inc*., No. 21-CV-11266-ADB, 2024 WL 4464900, at *1 (D. Mass. Oct. 10, 2024) (“Because there is likely to be an evidentiary overlap, bifurcation would create inefficiencies by requiring the parties to present the same witnesses and evidence in both trials.”).

Defendants are unlikely to prevail on their statute of limitations affirmative defense. First, as they noted, Defendants moved for summary judgment on this defense. The Court has not issued its ruling on that motion yet, but in her response, Plaintiff contested both the Defendants’ interpretation of the law and the facts relevant to the determination of the defense. See Doc. 6253, pp. 4-7. Under *Redding v. Coloplast Corp*., 104 F.4th 1302, 1304-11 (11th Cir. 2024), Defendants will need to prove both that Ms. Lattanzio was exposed to the product and sustained “an injury distinct in some way from conditions naturally to be expected from the plaintiff’s condition.” Id. In other words, the Defendants must prove that Ms. Lattanzio or her physician believed the infection was the result of “a potential product defect” (Id. at 1312) or a “product deficiency” (Id. at 1312, n. 5). Numerous pieces of evidence and the testimony of several witnesses will be relevant both to the limitations issue and the Parties’ other claims and defenses.

The same is true for Ms. Lattanzio’s fraud claims. The statute of limitations does not begin to run on those claims until the plaintiff knew or had reason to know, through the exercise of due diligence, of the facts constituting the fraud. *Smith v. Bruster*, 151 So. 3d 511, 514 (Fla. 1st DCA 2014) (“In a fraud action, the last element occurs, and thus the cause of action accrues, when the plaintiff knew, or through the exercise of due diligence should have known, of the facts constituting the fraud.”); *Brugiere v. Credit*

*Commerciale France*, 679 So. 2d 875, 877 (Fla. 1st DCA 1996) ("In cases of fraud, the statute of limitations ordinarily begins to run with the discovery of the fraud."); *Ambrose v. Catholic Social Services, Inc.*, 736 So. 2d 146, 149 (Fla. 5th DCA 1999) ("[T]he four-year limitation period began to run on the date that [plaintiff] knew or should have known of [defendant's] misrepresentation[.]"); *Koehler v. Merrill Lynch & Co., Inc.*, 706 So. 2d 1370, 1372 (Fla. 2d DCA 1998) ("A cause of action for fraud does not accrue until the basis of the action is discovered or should be discovered through due diligence."). The record facts do not support any claim that Ms. Lattanzio knew or had reason to know of the facts constituting the alleged fraud in this case outside the statute of limitations period for those fraud claims. All the evidence related to Plaintiff's fraud claims would have to included in the initial bifurcated proceeding and then again in the main portion of the trial. The duplication of evidence on this alone warrants rejecting the Defendants' request.

In addition, Defendants' cited case law is not persuasive for at least three reasons. First, none involved a proposal to trifurcate proceedings, a procedure that Judge Campbell explicitly rejected in one of Defendants' own cited cases, *McBroom v. Ethicon, Inc.*, No. CV-20-02127-PHX-DGC, 2021 WL 2661463, at *3 (D. Ariz. June 29, 2021) (Campbell, J.). Judge Campbell allowed a bifurcation on the statute of limitations issue in *McBroom* only because the defendants agreed not to seek bifurcation of the punitive damages issue. *McBroom*, 2021 WL 2661463, at *3. Judge Campbell explicitly rejected the exact same trifurcated procedure Defendants propose here.

Second, many of Defendants' cited cases do not involve bifurcation of a statute of limitations defense. *Jinro Am. Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 998 (9th Cir.), opinion amended on denial of reh'g, 272 F.3d 1289 (9th Cir. 2001) (bifurcation of contract validity); *Estate of Diaz v. City of Anaheim,* 840 F.3d 592, 602 (9th Cir. 2016) (bifurcation of liability and damages); *Gilbert v. State Farm Mut. Auto. Ins. Co.*, 311 F.R.D. 685 (M.D. Fla. 2015) (same); *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002) (bifurcation of liability issues in employment discrimination

lawsuit). These cases provide little guidance here because they address different bifurcation questions and therefore do not bear on the specific efficiency and overlap concerns presented by a standalone limitations phase.

Third, in those cases cited by Defendants that do involve bifurcation of the statute of limitations defense, the court ordered bifurcation under circumstances distinct from those present here. In McBroom, Judge Campbell ordered bifurcation only because the limitations issue could be decided by hearing the testimony of a single witness, the plaintiff. 2021 WL 2661463, at *3. *Grisham v. Philip Morris, Inc.,* No. CV 02-7930 SVW RCX, 2009 WL 9102320, at *3 (C.D. Cal. Dec. 3, 2009) and *Gomez v. City of Torrance*, 438 F. App'x 626, 628 (9th Cir. 2011) were decided under California law, which has enacted a state statute expressly providing for bifurcation of the statute of limitations affirmative defense. *Adams v. Zimmer US, Inc.,* No. CV 17-621, 2020 WL 12933111, at *1 (E.D. Pa. Mar. 13, 2020) and *Heinrich v. Ethicon, Inc.*, No. 220CV00166APGVCF, 2021 WL 2801961, at *2 (D. Nev. Apr. 15, 2021) dealt with requests to empanel two separate juries to avoid juror confusion. That is not the procedure that Defendants appear to be requesting here, although they failed to directly state whether they are seeking separate juries.

Finally, it bears noting that none of Defendants' cited cases was an MDL bellwether case. It also bears noting that, with the exception of *Gomez v. City of Torrance,* No. CV 07-790 ODW (SH), 2010 WL 1710330, at *6 (C.D. Cal. Apr. 23, 2010), aff'd in part, 438 Fed.Appx. 626 (9th Cir. 2011), which involved a complex equitable estoppel issue, when the courts in Defendants' cited cases ordered bifurcation, the case either settled before any trial whatsoever (including on the statute of

limitations)[3], or the Plaintiff prevailed at the limitations phase[4], creating the exact inefficiency that Defendants claim to want to avoid.

**Court's Ruling:** The Court will exercise its discretion under Federal Rule of Civil Procedure 42(b) and bifurcate the determination of punitive damages from the rest of the trial. Similar to the IVC, Cook, and Divelbliss bellwether trials, the trial will be divided into two phases: liability, compensatory damages, and whether punitive damages should be awarded will be decided in the first phase, and if necessary, the amount of punitive damages will be determined in the second phase. See In re Bard IVC Filters Prods. Liab. Litig., No. CV-16-00893-PHX-DGC, 2018 WL 4184950, at *3 (D. Ariz. Aug. 31, 2018); Doc. 8076 at 9 (Cook Order); Doc. 9562 (Divelbliss Order). Arguments to be raised by Defendants related to a statute of limitations defense can be raised during the first phase.

**(4) Number of Jurors:**

The parties agree that 9 jurors should be seated.

## E. LIST OF WITNESSES

1. The following Witness Lists are attached hereto:

   a. Plaintiff's Witness List is attached hereto as **Exhibit 1**.

   b. Defendants' Witness List is attached hereto as **Exhibit 2**.

2. Plaintiff has subpoenaed current Bard employee Andrew Sheffield to testify live during Plaintiff's case. The subpoena Plaintiff served on Aug. 24, 2026, requests Mr. Sheffield's appearance on "10/13/2026 or 10/14/2026, final date TBD." Upon receipt of the subpoena and conferral with Mr. Sheffield, Defendants' counsel

---

[3] Young v. Mentor Worldwide LLC, No. 4:17-cv-00063-SWW (E.D. Ark.); Adams v. Zimmer US, Inc., No. 5:17-cv-00621-EGS (E.D. Pa.); Houck v. Ethicon, Inc., No. 1:20-cv-03122-GLR (D. Md.).

[4] McBroom v. Ethicon, Inc., No. 2:20-cv-02127-DGC (D. Ariz.); Heinrich v. Ethicon, Inc., No. 2:20-cv-00166-CDS-MDC (D. Nev.).

promptly advised Plaintiff's counsel that Mr. Sheffield is not available on October 14, 2026, due to a long-planned meeting involving many individuals traveling from out of state. Defendants requested the courtesy of Mr. Sheffield being called on a date other than October 14. As of the date of this filing, Plaintiff's counsel has not confirmed when they intend to call Mr. Sheffield or if they will agree to a date other than October 14, 2026.

3. Each party understands that it is responsible for ensuring that the witnesses it wishes to call to testify are subpoenaed. Each party further understands that any witness a party wishes to call shall be listed on that party's list of witnesses; the party cannot rely on the witness having been listed or subpoenaed by another party.

4. Many of the parties' summaries state that the witness will testify consistent with his/her deposition or, in the case of experts, his/her report. The parties do not waive any objections, and these descriptions are subject to the rulings by the Court on Rule 702 motions and motions in limine. Counsel agrees that they and the witnesses will abide by those rulings.

5. The parties will provide a joint master list of the names of every witness who may be called at trial. *See* Doc. 8508 at 3. The parties propose that they provide this to the Court closer to trial, as in *Cook*, as the parties anticipate that their witness lists may be narrowed further by the Court's pending rulings on motions in limine and Rule 702 motions. *See infra*.

## F. LIST OF EXHIBITS

1. The following Exhibit Lists are attached hereto:

    a. Plaintiff's Exhibit List is attached hereto as **Exhibit 3**.

    b. Defendants' Exhibit List is attached hereto as **Exhibit 4**.

2. The parties have listed exhibits on their exhibit lists subject to pending motions in limine and other rulings by the Court. By listing exhibits, the parties do not contend that the exhibits are necessarily admissible and do not intend to waive any

objection they have to the admissibility of the same.

3. The parties agree that at trial, they may introduce for admission exhibits listed on either Plaintiff's or Defendants' exhibit list.

4. The parties have met and conferred on the issue of exchanging and providing to the Courtroom Deputy Clerk impeachment exhibits 48 hours in advance of the trial. The parties agree that they would like to provide those to the Courtroom Deputy Clerk only 24 hours in advance of the witness testifying, and pursuant to the Court's instructions that they be in a sealed envelope.

5. The parties continue to meet and confer regarding exhibits and will attempt to stipulate to the admission of exhibits in advance of trial. As to the following exhibits, the parties have reached the following stipulations:

a. Plaintiff's medical records are stipulated to be authentic and satisfy the business records exception. In so stipulating, the parties do not stipulate to admissibility.

6. As to the following exhibits, the party against whom the exhibit is to be offered objects to the admission of the exhibit and offers the objection stated below:

a. Objections to Plaintiff's Exhibits are attached hereto as **Exhibit 3.**

b. Objections to Defendants' Exhibits are attached hereto as **Exhibit 4.**

7. Each party hereby acknowledges by signing this joint Proposed Final Pretrial Order that any objections not specifically raised herein are waived.

## G. DEPOSITIONS TO BE OFFERED

1. Pursuant to Case Management Order No. 49 (Doc. 9961), the parties will submit their deposition designations on September 18, 2026.

2. The parties have included deposition designations subject to pending motions in limine and other rulings by the Court. By making those designations the parties do not contend that the testimony is necessarily admissible and do not intend to waive any objection they have to the admissibility of the same.

3. Each party hereby acknowledges by signing this joint Proposed Final Pretrial Order that any deposition not listed as provided herein will not be allowed, absent good cause.

4. Defendants agree with the procedure for presenting deposition testimony at trial established in the *Cook* case. In lieu of presenting background testimony at trial, a party may read an agreed-upon introduction of the witness into the record; however, neither party is required to read an introduction, no party is prohibited from designating background testimony, and no party may read an introduction to which the other party has not agreed. The parties agree to work in good faith to reach such agreements wherever possible.

Defendants agree that in the *Cook* trial, the parties presented their own affirmative designations during their own case and the party presenting a deposition was required to include only those counter-designations necessary for completeness and not counter-designations beyond that scope. So long as the parties agree to abide by the scope of completeness designations as defined by the Court in *Cook* and further clarified by the Court in *Divelbliss*, Defendants do not oppose the procedure for inclusion of completeness designations.

<u>Plaintiff's Position:</u>

To the extent the Court determines that any counter-designation is not necessary for completeness, Plaintiff reserves the right to play the designations in her rebuttal case, and separately reserves the right to play or read her affirmative designations in her rebuttal case to the extent not played or read in her case-in-chief, subject to the Court's ruling on any objection raised by the defense, if any.

<u>Defendants' Position:</u>

Defendants do not agree that any negotiation or agreement regarding the timing of when counter-designations are played may usurp or impact in any way the federal court standard for rebuttal evidence, that being evidence that "could not have been foreseen at the time Plaintiff presented her case in chief."

**<u>Court's Ruling</u>:**

Upon consideration of the Parties' Joint Motion to Set Deadline for Submission of Deposition Designations and Proposed Priority Lists (Doc. 11010), the Parties shall submit their deposition designations and proposed priority lists by October 5, 2026.

"[R]ebuttal evidence may not be offered merely to bolster [a party's] case-in-chief." <u>Brutsche v. City of Fed. Way</u>, 300 F. App'x 552, 2008 WL 4927353 at *1 (9th Cir. 2008). The Court will consider and rule at the time objections are made, if any, to designations raised in rebuttal that were not played or read during the cases-in-chief.

## H. <u>MOTIONS IN LIMINE (JURY TRIAL)</u>

1. Pursuant to First Amended Case Management Order No. 49 (Doc. 9961), the parties filed their motions in limine on August 21, 2026. Those that have not yet been ruled on are set forth in Section H, *infra*.

2. The parties have reached stipulations to agree that they are prohibited from making any reference or argument, or attempting to elicit or introduce any evidence in front of the jury suggesting and/or concerning the following topics:

a) Lawsuits like this one being an ill of our society, lawyer-driven, or lawyer-motivated. However, nothing about this agreement shall prevent a party from presenting evidence or offering argument that lawyers influenced experts' development of their opinions.

b) Outside of voir dire, litigation abuse, tort reform (including but not limited to caps on damages and remittitur), or the cost of litigation on society.

c) The financial status or resources (including transportation and lodging) of the attorneys representing parties or those attorneys' law firms, including the parties' attorneys' compensation, the number of attorneys or size of law firms, counsel's other businesses, jury consultants and related jury trial resources, attorneys' fee

arrangements, how litigation expenses are paid, or how much those expenses are, in connection with this or any other litigation, and prior or current clients of the parties' law firm or attorneys.

d) **Defendants' Proposal**: Attorney advertising (outside of voir dire), except that the parties are permitted to present evidence that Plaintiff saw and responded to a Facebook advertisement by the Ratzan Weissman & Boldt law firm, including the timing of these events.

**Plaintiff's Proposal**: Outside of voir dire, references to attorney advertising except that Plaintiff is permitted to present evidence of attorney advertising related to Plaintiff, including advertisements she viewed and the timing of that, assuming the Defendants intend to pursue their statute of limitations defense.

**Court's Ruling:** Outside of voir dire, references to attorney advertising except that the Parties are permitted to present evidence of attorney advertising related to Plaintiff, including the advertisements she viewed and the timing of the events, if relevant to a claim or defense.

e) References to organizations and attorney seminars, including but not limited to the Lanier Trial Academy, Mass Torts Made Perfect, American Association for Justice, The Reptile, Gerry Spence Trial College, the Defense Research Institute, Lawyers for Civil Justice, the Product Liability Advisory Council, the International Association of Defense Counsel, or the Federation of Defense and Corporate Counsel.

f) References to attorneys' specific personal experiences with having contracted cancer or having been treated for the disease, or a relative having contracted cancer or having been treated for the disease, except that this stipulation does not prevent attorneys from acknowledging general familiarity with chemotherapy procedures and the use of ports

to treat various medical conditions, including cancer.

g) References to settlement demands, negotiations, or offers of settlement.

h) References to the refusal of either party to enter a stipulation prior to trial or otherwise seeking any stipulation from counsel in the presence of the jury.

i) Outside of attorney objections, references to Rule 702 motions and motions in limine, or other such motions to exclude evidence and their contents, and any agreements, orders, or proceedings in connection with such motions.

j) References to any of the parties' conversations protected by attorney-client privilege.

k) References to multiple and/or superseded versions of the operative Complaint or any other pleading in this case, except that this stipulation does not apply to discovery responses, including profile forms and fact sheets.

3. The parties also stipulate to comply with the Court's rulings on the following motions in limine from the *Cook* bellwether case, with each party incorporating by reference and preserving the arguments made in the respective motion or opposition brief. The parties enter this stipulation without prejudice to arguing the admissibility of this evidence in later cases and without waiving arguments about the admissibility of such evidence (as set forth in their respective motions and responses in *Cook*) on appeal.

a) Lack of recall or FDA enforcement action as proof of safety or efficacy (Doc. 7945 at 17-19) (Cook Pl.'s MIL No. 2 in part)

b) Personal use of ports (Doc. 7945 at 17) (Cook Pl.'s MIL No. 3)

c) Unrelated litigation, excluding the AngioDynamics Stipulation, AngioDynamics MDL, and other lawsuits involving

competitors' products (Doc. 7945 at 13-14) (Cook Pl.'s MIL No. 5)

d) Misleading Safety-Related Evidence (Doc. 7945 at 12-13) (Cook Plaintiff's MIL No. 6)

e) FDA warning letter as to IVC Filters (Doc. 7945 at 1-2) (Cook Bard MIL No. 1)

f) Past criminal conviction (Doc. 7945 at 2-3) (Cook Bard MIL No. 2)

g) Confidentiality designations (Doc. 7945 at 3-4) (Cook Bard MIL No. 3)

h) Other claims and lawsuits (Doc. 7945 at 4) (Cook Bard MIL No. 4)

i) IPC monopoly (Doc. 7945 at 8) (Cook Bard MIL No. 9)

## I. LIST OF PENDING MOTIONS

| DKT | Filing party | Motion | DKT for Response and Reply |
|---|---|---|---|
| See Docs. 5815; 6253; 6255; 6404 | Defendants | Defendants' Motion for Summary Judgment as to Plaintiff May Lattanzio's Claims | See Docs. 5815; 6253; 6255; 6404 |
| 6474 | Defendants | Motion to Seal Certain Exhibits to the Parties' Briefing on Defendant's Motion for Summary Judgment | |
| 6491 | Plaintiff | Motion to Seal | See Docs. 6256, 5815, 6255 |
| 6492 | Plaintiff | Motion to Seal | See Docs. 5815, 6255 |

| DKT | Filing party | Motion | DKT for Response and Reply |
|---|---|---|---|
| Motions in Limine | | | |
| 10164 | Defendants | MIL No.1 to Exclude Bard's Japan IFU | |
| 10165 | Defendants | MIL No. 2 to Exclude Bard's Direct-to-Patient Materials | |
| 10166 | Defendants | MIL No. 3 to Exclude Plaintiff's Untimely Disclosed Demonstrative Exhibits | |
| 10167 | Defendants | MIL No. 4 to Exclude Expert Medical Testimony and Hearsay Statements by Lay Witnesses | |
| 10168 | Defendants | MIL No. 5 to Exclude Evidence Related to Implantable Port Catheter Devices Not Available in the United States | |
| 10169 | Defendants | MIL No. 6 to Exclude Evidence of Fracture | |
| 10170 | Defendants | MIL No. 7 to Exclude Evidence Related to Irrelevant Alternative Designs | |

| DKT | Filing party | Motion | DKT for Response and Reply |
|---|---|---|---|
| 10171 | Defendants | MIL No. 8 to Exclude Thrombosis-Related Evidence | |
| 10172 | Defendants | MIL No. 9 to Exclude Evidence of Dow and DuPont Medical Caution Statements | |
| 10174 | Plaintiff | MIL No. 1 Re: 510(k) Clearance, Regulatory Compliance, and "Lawfulness" as Proof of Safety | |
| 10175 | Plaintiff | MIL No. 2 Re: Antimicrobial Regulatory Evidence; Other-Device FDA Material | |
| 10176 | Plaintiff | MIL No. 3 Re: Unsupported Alternative Causes and Non-Party Fault | |
| 10177 | Plaintiff | MIL No. 4 Re: Corporate Character Evidence and Hybrid Witness Ultimate-Issue Safety Opinions | |
| 10178 | Plaintiff | MIL No. 5 Re: Market Share, Compliant Rates, Endorsements, and Absence of Criticism as Proof of Safety | |
| 10179 | Plaintiff | MIL No. 6 Re: Plaintiff's Unrelated Medical History, Comorbidities, and Treatment Choices | |

| DKT | Filing party | Motion | DKT for Response and Reply |
|---|---|---|---|
| 10180 | Plaintiff | MIL No. 7 Re: The Consent Form and Consent Discussion of Assumption of Risk | |
| 10181 | Plaintiff | MIL No. 8 Re: Risk Normalization by Comparison to Unrelated Products, Treatments, and Activities | |

## J. PROCEDURES FOR EXPEDITING TRIAL

1. The parties agree to the following procedures that might expedite trial: The parties request the Court's ruling on the timing of the exchange of Opening statements and the exchange of exhibits for any punitive damages phase (the parties' positions are in bold).

| **Exchange** | **Timing (Arizona Time)** |
|---|---|
| **Opening statement power points,** limited to non-evidentiary demonstratives (i.e., do not need to disclose slides showing evidence likely to be admitted at trial, unless accompanied by any text, titles, or commentary). Parties will not be showing the jury in opening an exhibit that is not in evidence or that the parties have not agreed will come into evidence except for those exhibits that have been negotiated when disclosed for the subpoenaed company custodian. (*See* Cook Final Pre Trial Conference 04/09/2026, 62:15-16.) | 4:00 p.m. the day before opening statements |

| | |
|---|---|
| **Witnesses to be called** (including witnesses by deposition) | 7:00 p.m. 2 days before the witness is to be called. If a witness will be called on Wednesday, disclosure is 7:00 p.m. on Monday. The 2 days includes weekends and non-court days, e.g., 7:00 p.m. on Sunday for Tuesday witnesses and 7:00 p.m. on Monday for Wednesday witnesses. |
| **Final deposition run script, witness intros, and exhibits to be offered for a witness testifying by deposition** | No later than 9 a.m. 2 days before the day the deposition will be played. If witness will be called on Wednesday, the exchange is 9 a.m. on Monday. The 2 days include weekends and non-court days – e.g., 9 a.m. on Sunday for Tuesday witnesses and 9 a.m. on Monday for Wednesday witnesses.<br><br>Either party that wants to play counter-designations for completeness during the opposing party's deposition run for a given witness must send those counter-designations within 24 hours of receipt of final run script. |
| **Deposition final videos, witness intros, and exhibits to be offered for a witness testifying by deposition** | No later than 9 a.m. the day before the deposition will be played. If the deposition will be played on Wednesday, the exchange is 9 a.m. on Tuesday. This includes non-court days – e.g., 9 a.m. on Monday for depositions to be played on Tuesday. |
| **Exhibits and demonstrative exhibits to be used with a witness (with exhibit numbers), including all articles and literature. Parties can meet and confer and raise any issues with the judge on exhibits before trial starts that day.**<br><br>**Exhibits to be introduced into evidence not through a witness shall also be disclosed as though they were being used with a witness.** | 7:00 p.m. the evening before the day witness with whom the exhibits and demonstrative exhibits will be used will testify. If witness will be called on Wednesday, the exchange is 7:00 p.m. on Tuesday. This includes non-court days – e.g., 7:00 p.m. on Monday for Tuesday witnesses.<br><br>As for exhibits and demonstratives to be used in any punitive damages phase: 7:00 p.m. the evening before |

| | |
|---|---|
| **Demonstratives to be exchanged are limited to non-contemporaneously created demonstratives.**<br><br>**This also applies to exhibits and demonstratives to be used in any punitive damages phase.**<br><br>**Nothing stated herein nor any interpretation of this provision is intended to circumvent Rule 26 requirements. The parties reserve their rights to object to the admissibility or use of exhibits or demonstrative exhibits or aides, including any objections arising from rulings on the motions identified herein on the List of Pending Motions.** | the case is given to the jury for deliberations. |

a. **<u>Court's Ruling</u>:** The Court will advise on timing for exchange of Opening statements and the exchange of exhibits for the punitive damages phase during trial.

2. The parties have edited and will continue to edit videotaped depositions to limit the amount of time required for presentation.

3. The parties also agree that the court reporter does not need to transcribe testimony from video depositions. The party presenting a deposition by designation will file the final run script, along with any corrected transcription errors, within 48 hours after the testimony is presented.

4. The parties may use Rule 1006 summary exhibits in place of voluminous documentary evidence where possible.

5. The parties will use the courtroom technology to expedite the presentation of evidence.

**K. ESTIMATED LENGTH OF TRIAL**

Based on 66 hours of trial time, and estimating 3 hours for jury selection and 4 hours for deliberation, *see* 2/19/26 Tr. at 20:2-12, the parties request the following division of trial time:

**Defendants' Position**:

29.5 hours for Plaintiff(s) case, including opening statements, closing arguments, and rebuttal.

29.5 hours for Defendant(s) case, including opening statements and closing arguments.

**Plaintiff's Position**: Based on 66 hours of trial time and estimating 3 hours for jury selection, the Plaintiff requests the following division of trial time: 31 hours for the Plaintiff's case in chief, including opening statements and closing arguments; 31 hours for the Defendants' case, including opening statements and closing arguments; and 1 hour for Plaintiff's rebuttal, if any. Plaintiff objects to there being any time limitation on the jury's deliberation. In addition, the Plaintiff contends that 66 hours of total trial time is not sufficient should a phase 2 be required. The Plaintiff estimates that 3 hours will be needed for the presentation of her case in phase 2. As with phase 1, Plaintiff objects to their being any time limitation on the jury's deliberation.

**Court's Ruling:** Plaintiff is allotted 30 hours of trial time and Defendants are allotted 29 hours of trial time. These allotments are not inclusive of time for opening statements and closing statements. Plaintiff is permitted to reserve time for rebuttal. Jury selection will be accomplished in three hours. Proceedings in the jury's presence will commence at 9:00 a.m. MST each day. Counsel must appear at 8:30 a.m. MST each day to resolve any issues as necessary. There will be no time limitation on the jury's deliberation.

**L. JURY DEMAND**

1. A jury trial has been requested. See May Lattanzio's Master Short Form

Complaint and Jury Trial Demand, Case 2:24-cv-00680-DGC, Doc. 1, p. 6, filed on 03/28/24. The parties stipulate that the request was timely and properly made.

**M. PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR BENCH TRIALS**

This section is not applicable.

**N. JOINT PROPOSED JURY INSTRUCTIONS, JOINT PROPOSED VOIR DIRE QUESTIONS, AND PROPOSED FORMS OF VERDICT FOR JURY TRIALS**

The joint Proposed Jury Instructions, joint Proposed Voir Dire Questions, and Proposed Forms of Verdict are being contemporaneously filed in accordance with the instructions contained in Amended Case Management Order No. 49.

**O. CERTIFICATIONS**

The undersigned counsel for each of the parties in this action do hereby certify and acknowledge the following:

1. All discovery has been completed.

2. The identity of each witness has been disclosed to opposing counsel.

3. Each exhibit listed herein: (1) is in existence; (2) is numbered; and (3) has been disclosed and shown to opposing counsel.

4. The parties agree and stipulate that the statement of the case used in the juror questionnaire approved by the Court is to be used as the parties' joint statement of the case. It is attached hereto as **Exhibit 5**.

5. The parties have complied with all respects with the mandates of the Court's Rule 16 Scheduling Order and Order Setting Final Pretrial Conference.

6. The parties have made all of the disclosures required by the Federal Rules of Civil Procedure (unless otherwise previously ordered to the contrary).

7. The parties acknowledge that once this Proposed Final Pretrial Order has been signed and lodged by the parties, no amendments to this Order can be made without leave of Court.

## P. INFORMATION FOR COURT REPORTER

1. In order to facilitate the creation of an accurate record, the parties will file a "Notice to Court Reporter" by October 6, 2026, containing the following information that may be used at trial:

a. Proper names, including those of witnesses.

b. Acronyms.

c. Geographic locations.

d. Technical (including medical) terms, names or jargon.

e. Case names and citations.

f. Pronunciation of unusual or difficult words or names.

2. The parties will also send to the court reporter a copy of the concordance from key depositions.

Dated: September 25, 2026

Respectfully submitted,

*/s/ Edward J. Fanning, Jr.*
Edward J. Fanning, Jr.
(Admitted Pro Hac Vice)
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone: (973) 639-7927
Fax: (973) 297-3868
efanning@mccarter.com

*/s/ Elizabeth C. Helm*
Elizabeth C. "Kate" Helm
(Admitted Pro Hac Vice)
Brandee J. Kowalzyk
(Admitted Pro Hac Vice)

*/s/ Kimberly L. Boldt*
Stuart N. Ratzan (FL #911445)
(Admitted Pro Hac Vice)
Kimberly L. Boldt (FL #957399
(Admitted Pro Hac Vice)
Ratzan, Weissman & Boldt, P.A.
2850 Tigertail Avenue, Ste. 400
Coconut Grove, FL 33133
Phone: (305) 374-6366
Fax: (305) 374-6755
Email: stuart@rwblawyers.com
Email: kimberly@rwblawyers.com

Robert Brown, III (FL #621609)
(Admitted Pro Hac Vice)

Nelson Mullins Riley & Scarborough
Atlantic Station
201 17th St. NW, Ste. 1700
Atlanta, GA 30363
Phone: (404) 322-6155
Fax: (404) 322-6050
kate.helm@nelsonmullins.com
brandee.kowalzyk@nelsonmullins.com

*/s/ Jennifer Saulino*
Jennifer Saulino
(Admitted Pro Hac Vice)
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
Phone : (202)736-8000
Fax : (202-736-8711
jennifer.saulino@sidley.com

***Counsel for Defendants***

Robert Brown Law
3225 Aviation Avenue, Ste. 101
Miami, FL 33133
Phone: (305) 491-0666
Email: rbbrownlaw@gmail.com

Cameron Cano (TX #24101314)
Scott + Scott, LLP
7718 Wood Hollow Drive, Ste. 105
Austin, Texas 78731
Phone: (737) 843-2007
Email: ccano@scott-scott.com

***Counsel for Plaintiff***

Based on the foregoing,

**IT IS ORDERED** that this Final Pretrial Order jointly submitted by the Parties as modified by the Court's rulings herein is hereby **APPROVED** and **ADOPTED** as the official Pretrial Order of this Court.

Dated this __1st__ day of ___October_____, 2026.

/s/ Jennifer Choe-Groves
Hon. Jennifer Choe-Groves, U.S.D.J.*

* Judge Jennifer Choe-Groves, of the United States Court of International Trade, sitting by designation.