Edward J. Fanning (Admitted *Pro Hac Vice*)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Phone: (973) 639-8486
Fax: (973) 797-3868
Email: efanning@mccarter.com

Richard B. North, Jr. (Admitted *Pro Hac Vice*)
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Ste. 1700
Atlanta, GA 30363
Phone: (404) 322-6000
Fax: (404) 322-6050
Email: richard.north@nelsonmullins.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation<br><br>THIS DOCUMENT RELATES TO:<br><br>*Kimberly Divelbliss*<br>*Civil Case No. 2:23-cv-01627-DGC* | MDL No. 3081<br><br>**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MEMORANDUM IN SUPPORT**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**ORAL ARGUMENT REQUESTED** |

**MOTION**

Pursuant to Fed. R. Civ. P. 50(b), Defendants Becton, Dickinson and Company, C. R. Bard, Inc., Bard Access Systems, Inc., and Bard Peripheral Vascular, Inc. (collectively "Bard") renew their Rule 50(a) motion for judgment as a matter of law on Plaintiff Kimberly Divelbliss's design defect (Counts I, II) and failure to warn (Counts III, IV) claims. This motion is supported by the accompanying memorandum of law, all pleadings, papers, and other documents on file with this Court, the minutes of the court clerk, and the reporter's transcripts of the trial.

**MEMORANDUM OF LAW IN SUPPORT**

**I. Introduction**

Bard is entitled to judgment as a matter of law on Plaintiff's failure to warn and design defect claims because Plaintiff "has been fully heard" on them during a three-week jury trial, and no "reasonable jury" would "have a legally sufficient evidentiary basis to find for" Plaintiff on those claims on this trial record. Fed. R. Civ. P. 50(a)(1).

Bard cannot be held liable for Plaintiff's failure to warn claims under New Mexico law because Dr. Gregory Richardson, Plaintiff's implanting surgeon, testified that he was already aware of the risks of fracture, catheter embolization, and cardiac arrythmia that Plaintiff experienced with her IPC, and that he did not believe he would have changed his treatment decision even if he had received the information Plaintiff claims Bard withheld from him. Thus, Plaintiff's warnings claims fail as a matter of law.

Plaintiff's design claims fare no better because Plaintiff failed to introduce admissible expert evidence of specific causation, e.g., that a design defect caused the fracture of her specific catheter resulting in her injuries. The jury needs expert testimony on design defect causation in this case. The only expert testimony Plaintiff offered on specific causation came from her materials science engineer Dr. Ahmed El-Ghannam and her medical expert Dr. Darren Hurst. However, both opinions were inadmissible. Plaintiff's biomaterials engineer Dr. Amir Sheikhi offered no case-specific opinion at all about Plaintiff's specific catheter fracture. Because "[i]nadmissible evidence contributes

nothing to a 'legally sufficient evidentiary basis'" under Rule 50, *Weisgram v. Marley Co.*, 528 U.S. 440, 453 (2000), there is no legally sufficient evidentiary basis to support Plaintiff's design defect causation theory. Accordingly, Plaintiff's design claims fail.

On this record, no reasonable jury could find for Plaintiff on her failure to warn and design claims. The Court should enter judgment as a matter of law in Bard's favor.

## II. Factual Background

At the close of Plaintiff's case-in-chief, Bard moved for judgment as a matter of law under Rule 50(a) on Plaintiff's claims for design defect, failure to warn, manufacturing defect, misrepresentation, fraudulent concealment, punitive damages, and medical expenses. (**Ex. A**, Excerpts from the Reporter's Transcript of Proceedings ("Trial Tr.") 1574:11-15, 2469:5–2476:23.) The Court denied Bard's Rule 50(a) motion on Plaintiff's claims for design defect, failure to warn, and punitive damages, granted the motion with respect to certain medical expenses, and took under advisement Plaintiff's manufacturing defect and fraudulent concealment claims. (*Id.* at 2784:1-10, 2796:12-18, 2798:16-21.) Plaintiff withdrew her claims for negligent and fraudulent misrepresentation, (*id.* at 2785:3-4), and the Court entered an Order dismissing those claims with prejudice. (Doc. 10541.) Plaintiff later withdrew her claim for medical expenses. (**Ex. A**, Trial Tr. 2842:7-20.) The jury ultimately returned a verdict for Bard on Plaintiff's claims for manufacturing defect, fraudulent concealment, and punitive damages, but returned a verdict in Plaintiff's favor on her design defect and failure to warn claims. (Doc. 10619 at 1-4.) The Court entered judgment on September 10, 2026. (Doc. 10711.) Bard now timely renews its motion for judgment as a matter of law under Rule 50(b) on Plaintiff's failure to warn and design defect claims.

## III. Argument

### A. Bard is entitled to judgment as a matter of law on Plaintiff's failure to warn claims.

To prevail on her failure to warn claim under New Mexico law, Plaintiff "must prove that (1) no warning was provided or the warning was inadequate and (2) the

inadequacy or absence of the warning caused the plaintiff's injury." *Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 961 (D.N.M. 2021) (citation modified); (Doc. 9649 at 9). However, "[t]here is no duty to warn of dangers actually known to the user of a product, regardless of whether the duty rests in negligence . . . or on strict tort liability." *Jones v. Minnesota Min. & Mfg. Co.*, 669 P.2d 744, 749 (N.M. Ct. App. 1983). "In the context of a failure to warn claim involving a medical device, 'a medical device manufacturer must warn the doctor, not the patient.'" *Suttman-Villars*, 553 F. Supp. 3d at 961. Thus, "[i]n this case there would be no duty to warn the surgeon if he actually knew of the danger." *Perfetti v. McGhan Med.*, 662 P.2d 646, 651 (N.M. Ct. App. 1983). Nor could Bard be held liable if Plaintiff "failed to present evidence that Dr. [Richardson] would have changed h[is] treatment decision" had a different warning been provided. *Silva v. Smithkline Beecham Corp.*, No. 31,276, 2013 WL 4516160, at *3-4 (N.M. Ct. App. Feb. 7, 2013). The trial record demonstrates that Plaintiff's warnings claims fail for both reasons, and therefore, Bard is entitled to judgment as a matter of law.

**1. Dr. Richardson already knew of the danger, and there is no legally sufficient evidence to rebut that knowledge.**

A failure to warn claim fails as a matter of law when the learned intermediary already knows of the danger the warning would cover. Here, there is legally insufficient evidence to support the jury's verdict that Bard's allegedly inadequate warnings proximately caused Plaintiff's injuries because the trial record establishes that Dr. Richardson, the relevant learned intermediary as Plaintiff's implanting surgeon, was independently aware of the risks of Bard's PowerPort IPC with a Groshong silicone catheter. Dr. Richardson has implanted and removed hundreds of IPCs over his decades-long career—"the vast majority" of which were Bard ports—and he specifically requested his hospital switch to the Groshong catheter within a year or two after IPCs became common devices to implant because he preferred its design and complication profile over other catheters. (**Ex. B**, Richardson Dep. 11:8-17, 27:3-18, 107:16-108:4,

111:14-112:10.)[1]

The relevant inquiry is whether Dr. Richardson, the learned intermediary, had actual knowledge of "the nature and extent of the danger," *Jones*, 669 P.2d at 750, and "stated he knew of the danger." *Hines v. St. Joseph's Hosp.*, 527 P.2d 1075, 1077 (N.M. Ct. App. 1974). No New Mexico court has ever held more than that is required. Plaintiff's theory in this case is that her Groshong silicone catheter fractured, embolized to her heart, and caused her cardiac arrythmia. That is "the nature and extent of the danger" that she experienced. *Jones*, 669 P.2d at 750. Dr. Richardson testified he was already aware of that specific danger prior to the time he recommended and placed the device in Plaintiff. However, he believed "that the risk of that was far, far outweighed by their utility." (**Ex. B**, Richardson Dep. 113:14-20.)

**Commented [A1]:** Do we think that "claims that" will be poorly perceived by the judge—we're not really challenging that this happened, right?

Specifically, Dr. Hurst testified: "Q. And prior to placing the port and catheter in Mrs. Divelbliss, did you have an understanding that ***a catheter attached to a port could fracture for a reason other than pinch-off***? A. Oh, yeah, sure." (*Id.* at 154:25-155:4 (emphasis added).) "Q. Have you had occasion to explant an implantable port catheter because it fractured while inside a patient's body? A. Yes. Q. Do you have an estimate as to how many times that has occurred, that being a fracture requiring explant? A. Maybe two or three." (*Id.* at 24:22-25:4.) "Q. … And were you satisfied with the performance of those catheters as far as that percentage of fracture? A. Yes. I felt that ***some degree of problems with these devices was just inherent in the device itself, and I felt that the risk of that was far, far outweighed by their utility***." (*Id.* at 113:14-20 (emphasis added).) "Q. And prior to your implantation of the port and catheter in Mrs. Divelbliss in July of 2017, you were aware that ***a catheter could potentially break and embolize and go into a patient's heart***, correct? A. Yes." (*Id.* at 158:21-159:1 (emphasis added).) "Q. And, Doctor, if a foreign object like a catheter goes into a patient's heart, is

[1] The video deposition of Dr. Richardson was played (but not transcribed) in open court at trial on August 20 and August 26, 2026. **Exhibit B** contains excerpts played during Bard's case-in-chief on August 26. (**Ex. A**, Trial Tr. 1575:10-11.) **Exhibit C** contains excerpts played during Plaintiff's case-in-chief on August 20. (*Id.* at 715:11-12.)

it your understanding that that could ***potentially cause cardiac arrhythmia***? A. There's a potential for that, yes." (*Id.* at 157:25-158:7 (emphasis added).)

That testimony satisfies the learned intermediary's actual-knowledge requirement under New Mexico law. *See Hines*, 527 P.2d at 1077 (affirming summary judgment where the learned intermediary "stated he knew of the danger"). Dr. Richardson had extensive experience using almost exclusively Bard ports with his preferred Groshong catheter. Taken in this context, this testimony shows not mere "general knowledge of IPC fracture risks and related complications," but rather specific knowledge of risks with the Groshong that he used for decades. (*Cf.* Doc. 9649 at 12). Dr. Richardson testified that by the time he placed "this catheter in 2017" he "had a very good understanding" of the potential risks, including the specific risks at issue, based on his prior experience and that of his fellow surgeons, his education, and his ongoing review of medical literature. (**Ex. B**, Richardson Dep. 131:5-23; *see also id.* at 30:9-31:2, 147:11-148:4.)[2]

Contrary to what the Court suggested in its summary judgment Order, Bard need not show that Dr. Richardson knew of any of Plaintiff's alleged "increased risks associated with the device" either because no New Mexico law requires comparative risk information in product warnings. (*Cf.* Doc. 9649 at 12.) Nor does the Court's summary judgment ruling compel a different result; the trial record is different than and "supersedes" the record Plaintiff relied on to avoid summary judgment on Dr. Richardson's knowledge. *Jensen v. EXC, Inc.*, 82 F.4th 835, 856 (9th Cir. 2023). "[W]here an actual trial has intervened between the summary judgment ruling and the final judgment on appeal, any claim that the evidence is insufficient to support a verdict in one side's favor 'must be evaluated in light of the character and quality of the evidence received in court' at that trial." *Id.* (citation omitted). The Court based its summary judgment ruling on finding questions of fact on five "specific risks Plaintiff claims existed in the PowerPort" that Dr. Richardson purportedly "testified that he was not

[2] Dr. Richardson also testified he "would have been aware of the possible complications relating to the Bard implantable port catheter [listed in the PowerPort IFU] as of the time [he] placed it inside Ms. Divelbliss." (**Ex. C**, Richardson Dep. 78:16-22.)

aware of." (Doc. 9649 at 12.) But Plaintiff presented Dr. Richardson's testimony on only two of the five bases at trial, and his testimony as to those two was extremely narrow.

***First***, Plaintiff claimed Dr. Richardson testified he was not aware that "Groshong silicone catheters were weaker and more prone to fracture than other catheters." (*Id.*; Doc. 7418-1 at 43 ¶ 255 (citing Richardson Dep. 98:10-99:15).) Not so. He testified only that no one "at Bard or Becton, Dickinson" "ever told him … that Groshong silicone catheters are more fragile than standard catheters and usage should be questioned." (**Ex. C**, Richardson Dep. 98:10-14; *id.* at 98:23-99:16 (questioning whether "manufacturer told you"). That testimony speaks only to whether he was told so by Bard, not whether he lacked such actual knowledge, which is the relevant inquiry. *Jones*, 669 P.2d at 75-52 (evaluating physicians' testimony on lack of actual knowledge). The question is also premised on comparative warnings that again no New Mexico law requires, *see supra*.

***Second***, the Court found a question of fact based on Dr. Richardson's purported lack of knowledge that "lifelong cardiac arrythmia (as opposed to reversible arrhythmia) is a possible complication." (Doc. 9649 at 12.) As a threshold matter, there is no record evidence that the Groshong carries any potential risk of lifelong arrythmia—let alone that any such risk was "foreseeable" or known to Bard so as to require any warning. *Perfetti*, 662 P.2d at 650. Nevertheless, Dr. Richardson's trial testimony was limited to whether the PowerPort IFU "tells [him] that [is] a possible complication," and did not address whether he lacked actual knowledge. (**Ex. C**, Richardson Dep. 78:16-79:14).

Because this narrow testimony does not rebut or negate Dr. Richardson's affirmative testimony showing he had actual knowledge of the specific risks Plaintiff experienced, no reasonable jury could find Bard had a duty to warn of those risks, and insufficient evidence exists to support their verdict on Plaintiff's failure to warn claims.

**2. There is no legally sufficient evidence to support proximate cause.**

"To satisfy the burden of proving causation," Plaintiff "must show that adequate warnings would have altered Dr. [Richardson's] decision to treat [her] with [the PowerPort]." *Silva*, 2013 WL 4516160, at *3. What is required is not merely showing

"Dr. Richardson would have acted differently if [Bard] had provided additional warnings and information." (Doc. 9649 at 13.) Plaintiff must instead "present evidence that Dr. [Richardson] would have ***changed*** h[is] treatment decision." *Silva*, 2013 WL 4516160, at *4 (emphasis added).[3] The record is devoid of such evidence, so Plaintiff's claims fail.

To the contrary, Dr. Richardson testified that "in retrospect," even with the benefit of hindsight, all the information he now knows, and all the hypotheticals and additional information Plaintiff offered or showed him during his testimony, he still would not have changed his decision to treat Plaintiff with the PowerPort in July 2017—"I don't believe so." (**Ex. B**, Richardson Dep. 116:6-21 ("At that time, 2017, I had no reason to change catheter suppliers, no.").) He gave more credence to his own experience over IFU warnings and was satisfied with Bard ports with his preferred Groshong catheter (that he requested his hospital stock) from his extensive experience placing and removing them. (*Id.* at 30:9-32:3, 108:10-19, 113:5-23, 162:11-16.) He rejected Plaintiff's attempts to get him to say that he would have altered his treatment decision via questions he deemed "[t]otally hypothetical," even responding it would be "pure speculation" to say he would have used "a better port" had one been available, explaining he would first "have to look at the data, look at the studies" for both products and would rely on his own experience with them in making treatment decisions. (*Id.* at 103:10-104:7, 150:10-151:3, 153:5-19.)

The only causation testimony Plaintiff presented at trial from Dr. Richardson is insufficient to show he would have ***changed*** his decision in this case.[4] Dr. Richardson testified that he would not implant an IPC in a patient if the manufacturer had "told" him it was "unsafe"—"If the manufacturer actually told me that, no, I would not have, I would

[3] *See also Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1235 (D.N.M. 2019), *aff'd*, No. 19-2073, 2021 WL 4979300 (10th Cir. Oct. 27, 2021) (collecting cases holding that a plaintiff must "establish that a different warning would have ***changed*** the physician's decision to prescribe the drug, i.e., that, but for the alleged inadequate warning, the physician ***would not have prescribed the product***" (emphasis added) (citation omitted)).

[4] Plaintiff did not present testimony at trial from Dr. Richardson "that he would have considered placing a more fracture-resistant catheter in his patients," which this Court relied on in part in finding a question of fact for its summary judgment ruling. (Doc. 9649 at 13; Doc. 7418-1 at 43 ¶ 257 (citing Richardson Dep. 101:9-18).)

not use that product." (**Ex. C**, Richardson Dep. 98:23-99:6.) But testimony based on such a highly generic purported "adequate warning" cannot possibly be enough to satisfy Plaintiff's proximate causation burden. All medical devices have risks. "A warning is adequate only if it discloses both 'the nature and extent of the danger.'" (Doc. 9649 at 10 (citation omitted).) Plaintiff's proposed generic warning ("unsafe") does neither. Moreover, her failure to warn theory at trial was not based on Bard failing to generically warn Dr. Richardson that its PowerPort or its Groshong catheter were "unsafe."

The only other causation testimony the jury had to support their verdict was Dr. Richardson's testimony that if Bard had "told" him that a Groshong silicone catheter "was more fragile than standard catheters **and** its usage should be questioned," he "would have factored" that information into his decision-making as far as selection of devices for patients. (**Ex. C**, Richardson Dep. 99:7-15 (emphasis added).) The causation inquiry turns not on whether he would have considered additional information; it turns on whether that additional information would have "changed" his ultimate decision to implant the subject device in Plaintiff in July 2017, *Silva*, 2013 WL 4516160, at *4, "i.e., that, but for the alleged inadequate warning, the physician ***would not have prescribed the product***." *Nowell*, 372 F. Supp. 3d at 1235 (emphasis added). Because Dr. Richardson did not testify that he would have changed his decision—in fact, he testified the opposite—the jury had legally insufficient evidence to support its warnings verdict.

**B. Bard is entitled to judgment as a matter of law on Plaintiff's design defect claims.**

To prevail on her design defect claims, Plaintiff must show that a "defective condition of the product was the proximate cause of [her] injury." *Rivera v. City of Las Cruces*, 2013 WL 4532559, at *3 (N.M. Ct. App. May 7, 2013) (quoting *Tenney v. Seven–Up Co.*, 584 P.2d 205, 206 (N.M. Ct. App. 1978)); *accord Munoz v. FCA US LLC*, 2023 WL 3746540, at *3 (10th Cir. June 1, 2023) (same); *Nowell*, 372 F. Supp. 3d at 1247 (dismissing negligence claim where there was no plausibly alleged "causal link between a potential defect in the Defendants' mesh and Nowell's injuries."); UJI 13-

1402 (under a negligence claim, a product supplier must "use ordinary care to avoid a foreseeable risk of *injury caused by a condition of the product* . . ." (emphasis added)).

"New Mexico, along with other jurisdictions, has required expert testimony when the issue of causation is presented in a context which is not a matter of common knowledge." *Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1061 (D.N.M. 2016); *see Foreman v. Worthington Cylinders Wisconsin, LLC*, 2012 WL 13080072, at *2 (D.N.M. July 30, 2012) (granting summary judgment because "[the plaintiff] has not disclosed any experts who could testify at trial that a defect existed in the blowtorch at the time of sale, or that a defect caused the fire"). "Whether a defect in a medical device caused Plaintiff harm is a matter outside a layperson's common understanding. Therefore, expert testimony on this point is required." *Bailey v. Ethicon Inc.*, 2021 WL 4844393, at *8 (D. Ariz. July 13, 2021), *report and recommendation adopted*, 2021 WL 4190625 (D. Ariz. Sept. 15, 2021).

Critically, however, "[i]nadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis'" under Rule 50. *Weisgram*, 528 U.S. at 453 (holding judgment as a matter of law proper where expert testimony should have been excluded). Hence, "a district court's Rule 50 ruling should be based only on admissible evidence and [the] district court may reconsider the admissibility of the evidence submitted to the jury in weighing the Rule 50 motion." *Santos-Arrieta v. Hosp. Del Maestro*, 14 F.4th 1, 7 n.13 (1st Cir. 2021) (citing *Goodman v. Pennsylvania Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002) ("erroneously admitted evidence should not be considered when ruling on motions for judgment as a matter of law") and *United States of Am. for the Use of Salinas Constr., Inc. v. W. Sur. Co.*, 2016 WL 3632487, at *6 (W.D. Wash. July 7, 2016) ("'[I]n determining whether there is a legally sufficient evidentiary basis for the verdict, erroneously admitted evidence will play no role in the court's application of the appropriate legal standard.'") (citation omitted)).

No reasonable jury could find for Plaintiff on design defect causation based on the admissible trial record: El-Ghannam's case-specific causation opinion was

conditioned on testimony that was inadmissible under Rules 26 and 37, and Hurst's unqualified opinion was inadmissible under Rule 702; thus, neither can be considered in determining sufficiency under Rule 50. *Id.* Moreover, Sheikhi's general causation opinion explicitly did not address Plaintiff's specific catheter or how it fractured. But even if considered, Hurst's and Sheikhi's opinions are insufficient to support the verdict because they are wholly inconsistent with El-Ghannam's causation opinion after his examination of Plaintiff's actual explanted device. Because Plaintiff lacks the requisite, admissible expert testimony to carry her specific defect causation burden, Bard is entitled to judgment as a matter of law on Plaintiff's design defect claims.

**1. El-Ghannam's conditional causation opinion is insufficient.**

Plaintiff's only defect causation evidence from anyone who examined her actual fractured catheter came from El-Ghannam who conducted testing on her catheter and identified alleged degradation of the silicone material, non-homogenous dispersion of barium sulfate particles, barium sulfate release, and cracking of the catheter's surface. (*E.g.*, **Ex. A**, Trial Tr. 570-575, 590-592, 596-597, 622-623, 705-706.) El-Ghannam opined that the degradation and barium sulfate release combined with cyclic loading—repeat mechanical stresses on the catheter *in vivo* from catheter use and patient movement and biology—to cause crack formation, leading to crack propagation and ultimately complete fracture of Plaintiff's catheter. (*Id.*)

Critically, however, as this Court recognized in its Rule 702 Order, El-Ghannam's causation opinion "[w]ithout doubt" was "clearly conditioned on the absence of other clinical or external factors" that he did not rule out. (Doc. 10058 at 4-5.)[5] "By making his opinion conditional, El-Ghannam acknowledged that other potential causes must be addressed before his opinion applies." (*Id.* at 5.) In other words, a failure to rule out all

[5] Specifically, El-Ghannam opined in his case-specific report in this case that, "[*a*]*bsent any other clinical or external factors*, the degradation plainly evident on multiple surfaces of the Divelbliss catheter more likely than not caused the ultimate failure of the device via a complete fracture of the catheter." (**Ex. D**, El-Ghannam *Divelbliss* Case-Specific Expert Report ("El-Ghannam *Divelbliss* Rep.") at 2, 75 (emphasis added).) He opined further that "[*a*]*bsent any other clinical or external factors*, barium sul[f]ate release substantially contributed to the catheter fracture." (*Id.* (emphasis added).)

other factors, clinical **and** external, would be fatal as then El-Ghannam's opinion would not apply and could not support a design verdict.[6] To avoid exclusion, Plaintiff averred she would "rely on other experts – Drs. Hurst and Kraut – to opine that there are no other plausible explanations" at trial. (*Id.* at 5-6.) The Court held it could not find this approach unreliable under Rule 702 as El-Ghannam "provides a conditional causation opinion based on his specific field of expertise, and that will be presented with other experts who address other possible causes." (*Id.* at 6.) The Court reiterated at trial: "it's a conditional opinion that can come in as a conditional opinion and plaintiff will have the burden of eliminating the other causes through other witnesses." (**Ex. A**, Trial Tr. 568:4-7.)

At trial, El-Ghannam confirmed on cross examination that his causation opinion was conditional—"that clinical or external factors impacting the catheter must be ruled out"—and that he "did not really focus on that at all." (*Id.* at 646:23-647:8.) He explained: "I'm not a clinician. I don't discuss clinical issues. I look at the materials and I analyze the material. That's my specialty." (*Id.* at 653:11-15.) He agreed his "opinion in this case is dependent on there being an absence of any other clinical or external factors," (*id.* at 653:16-19, 657:12-21), and that he did not withdraw this condition at trial. (*Id.* at 655:5-8.) And he ultimately stood by his testimony that he "did not consider and rule out any other clinical or external factors." (*Id.* at 652:15-22.)

While Drs. Hurst and Kraut addressed some clinical factors at trial (such as suturing), neither they nor any other witness addressed or ruled out the other "external factors" on which El-Ghannam conditioned his opinion. Instead, over Bard's Rule 26 objection, Plaintiff elicited an entirely new, undisclosed opinion ruling out these other

[6] The Court reconfirmed this at trial when explaining (in response to Bard's objection to the testimony) what happens if after El-Ghannam is allowed to offer his "conditional opinion and plaintiff [fails to carry her] burden of eliminating the other causes through *other witnesses*[:] then you've got a good argument because you've got on cross that Dr. El-Ghannam said they had to be eliminated and you can tell the jury they didn't get addressed. That seems to me to be the way to handle it." (**Ex. A**, Trial. Tr. 568:3-13 (emphasis added).) As shown *infra*, Bard was deprived of that effective jury argument when El-Ghannam was later permitted to offer entirely new, undisclosed, inadmissible opinions eliminating those factors during redirect after Bard had setup that very cross.

external factors ("like a blow to the chest, a car wreck, or something like that") from El-Ghannam himself during redirect. (*Id.* at 704:16-705:13.) Because this nondisclosure was neither substantially justified nor harmless, the opinion "is not allowed" under Rule 37(c)(1). *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1051 (9th Cir. 2025) (holding "opinion was inadmissible" under Rule 37 as "it was not disclosed in his expert report"). El-Ghannam did not disclose let alone exclude any external factors in his case-specific reports or deposition despite conditioning his causation opinion on their absence. (**Ex. E**, Dec. 12, 2025, El-Ghannam *Divelbliss* Dep. 115:3-12 ("External factors like what?")).

Plaintiff knew the importance of this testimony long before trial from Bard's Rule 702 Motion and the Court's related Order, which it reiterated again before El-Ghannam's testimony. Yet Plaintiff waited until the close of El-Ghannam's redirect examination to surprise Bard with this new opinion after Bard had emphasized its critical absence. That is not fair redirect.[7] That is allowing an expert to rewrite an opinion on the stand. (**Ex. A**, Trial Tr. 706:15-17 (Q. "[D]oes that ***update*** exactly what your opinions are sitting here on this stand today in front of this jury? A. That's correct.") (emphasis added).) This late disclosure during redirect provided Bard no notice at all, and prevented Bard from cross-examining El-Ghannam on his new opinion. *Francis v. Clark Equip. Co.*, 993 F.2d 545, 550–52 (6th Cir. 1993) (finding prejudicial error where plaintiff's expert was allowed to testify to matter and defendant was forbidden "cross-examination on the same subject matter," finding defendant "was prejudiced when its right to rebut such testimony

---

[7] The Court ruled that cross was "the way to handle" Bard's objection to El-Ghannam offering his conditional opinion on direct before Plaintiff's other witnesses had ruled out the clinical and external factors. *Supra* n.6. Thus, Bard did not "open the door" to this new opinion by examining El-Ghannam on his disclosed opinion that external factors needed to be excluded, which he had not done. *Cf. Valadez v. Watkins Motor Lines, Inc.*, 758 F.3d 975, 981 (8th Cir. 2014) ("The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination."); *see also Rivera v. Ring*, 810 F. App'x 859, 866 (11th Cir. 2020) ("'Opening the door,' also known as 'curative admissibility,' occurs when a party offers inadmissible evidence before a jury. To correct any unfair prejudice caused by the inadmissible evidence, the district court 'may in its discretion allow the opposing party to offer otherwise inadmissible evidence on the same matter.'"). "The doctrine of opening the door cannot be subverted into a rule for injection of prejudice," as happened here. *Valadez*, 758 F.3d at 981.

was effectively denied"). Rule 26 requires pretrial disclosure to prevent this prejudice; Rule 37 renders this opinion inadmissible. "Inadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis'" under Rule 50. *Weisgram*, 528 U.S. at 453. Because El-Ghannam's causation opinion remained conditional in the absence of admissible expert testimony ruling out "external factors," the jury had a legally insufficient evidentiary basis for its design defect verdict.

**2. Hurst's specific causation opinion is inadmissible and insufficient.**

In an attempt to bridge this evidentiary gap on causation, Plaintiff had Hurst opine, again over Bard's objection, that Plaintiff's catheter appeared to have fractured due to "flexural fatigue" based on the alleged location of the fracture from his review of X-ray imaging (not any examination of Plaintiff's actual explanted catheter). (**Ex. A**, Trial Tr. 1385-1396, 1415-1417, 1434-1435; *see also* Doc. 7091-1 at 14 ("Internal Bard documents I have reviewed show that the placement of ports in the subclavian vein exposes the catheter to additional mechanical stress because of the narrow costoclavicular space, increasing the chance of catheter fatigue and fracture, especially at sites where the catheter bends or is fixed, such as where it enters the vein or meets the port stem."); *id.* at 15 ("In Ms. Divelbliss' case, chest radiographs showed that the catheter was placed in the subclavian vein [and that] the break occurred near the rigid-flexible junction where the catheter meets the port stem, a pattern that matches the flexural fatigue mechanism described in Bard's records").) But Hurst, a medical doctor, is not qualified under Rule 702 to offer a flexural fatigue opinion based solely on fracture location in imaging and Bard's internal documents concerning this failure mechanism.

As explained by Plaintiff's chemical and biomedical ***engineering*** expert, Dr. Amir Sheikhi, "flexural fatigue" is "repeated bending" of a catheter that eventually leads to fracture. (**Ex. A**, Trial Tr. 330:16-22 (Q. "Dr. Sheikhi, what is it called again when a device breaks from bending over time? A. It's called flexural fatigue or flex fatigue."); *id.* at 344:23-345:3 (discussing document concluding "that when devices fracture in use, it must be almost entirely due to the slow and repetitive process of bending" and agreeing

this is "the same flex fatigue mechanism [Sheikhi] told the jury about . . . It's exactly the same mechanism" and "confirms [his] opinion that these catheters break from flexural fatigue"), 524:12-15 ("[I]t's a mechanical failure. [F]lex fatigue [is] mainly bending").)[8]

Hurst is not qualified to opine on flexural fatigue because it is an engineering term, not a clinical term, and he is no engineer—by training, education, knowledge, experience, or otherwise. (*Id.* at 1434:23-24, 1435:5-25.) Indeed, Hurst testified that "flexural fatigue is a term that was coined by Bard internal, their R&D department," as "defined by the Bard internal documents." (**Ex. F**, June 11, 2025, Hurst General Dep. 111:23-25, 115:17-25; *see also id.* at 118:25-119:4 ("Bard used the word flexural fatigue. That may have come from their research -- R&D department or their scientists . . .").) Hurst has no training in failure analysis or fatigue analysis and has never reviewed internal documents from any manufacturer regarding their port products other than his work in this case. (**Ex. A**, Trial Tr. 1434:9-12, 1435:8-11.) As a physician, he is "not privy to those … confidential business documents" and "would not normally see" them in his practice. (*Id.* at 1434:13-22.) "A mere reading of Bard internal documents does not qualify" Hurst to opine on engineering terms or failure mechanisms. (Doc. 7196 at 13.)

Moreover, Plaintiff has not shown by a preponderance of the evidence that Hurst is qualified to opine on flexural fatigue based on any clinical experience with this failure mechanism. "Hurst has never implanted in his clinical practice a Groshong catheter like the one used here, has implanted a port using the subclavian approach that was used in this case only once or twice in his career," (Doc. 9425 at 6), and "personally ha[s] not had a fractured port." (**Ex. A**, Trial Tr. 1456:4-8, 1458:25-1459:1 ("I haven't had any fractures").) Although he claimed to have experience with fracture of other "silicone catheters that are for dialysis and for more temporary catheters" with non-port devices, (*id.* at 1455:5-14), and though he claimed to have "seen lots of fractures with silicone

[8] (*See also id.* at 291:13-16 ("[T]he catheter undergoes millions of bendings in the body as we do our daily life activities. It should be flex fatigue resistan[t] so that it doesn't break. It withstands the bending."), 330:5-9 ("[A]s it bends, it undergoes flexural fatigue and eventually breaks"), 332:12-15 ("flex fatigue happening because of bending and kinking of the catheter"), 333:7-9 ("it bends over time and completely fractures").)

catheters like the Groshong catheter that are placed by some of the surgeons in [his] area," he never testified that any of those silicone catheter fractures were the result of flexural fatigue. (*Id.* at 1458:25-1459:4.) "And to the extent Hurst relies on his personal review of literature [(Doc. 4832-2 at 18; Doc. 7091-3 at 3-5),] he cannot simply repeat the findings of others as his opinions." (Doc. 9425 at 6 (citing *In re Roundup Prods. Liab. Litig.*, 2023 WL 7928751, at *3 (N.D. Cal. Nov. 15, 2023), *aff'd sub nom. Engilis*, 151 F.4th 1040); *see also* Doc. 7196 at 13 ("Nor can [Hurst] rely on published literature or other expert opinions [he has] not verified.") (citing *In re Roundup*).)

The Court previously found Hurst not qualified to offer similar engineering opinions in this case, including as it relates to whether "Bard's port design may have contributed to Plaintiff's catheter fracture" and "the correlation between the flexural fatigue mechanism and the alleged degraded material in Plaintiff's catheter." (Doc. 9425 at 7 ("Hurst is not qualified"); *see also* Doc. 7196 at 12-14 (excluding unqualified engineering opinions concerning alternative designs with which Hurst has no clinical experience that were based "almost exclusively on Bard's internal documents"). For the same reasons, Hurst should be precluded from offering a causation opinion based on flexural fatigue. Hurst is simply not qualified to opine "about why the fracture occurred" or "why this product failed and how it failed." (**Ex. G**, Aug. 10, 2026, *Divelbliss* Hr'g Tr. 36:4-5, 38:16; *id.* at 36:12-16 (excluding "flexur[al] fatigue demonstrative" exhibit "that's clearly an illustration of how flex fatigue happened, this specific catheter in Ms. Divelbliss"), 38:15-19 ("[T]he demonstrative that I have excluded is a clear illustration of the fracture occurring and where it occurred and lines showing the flex fatigue").) Hurst's causation opinion is, thus, inadmissible under Rule 702 and should "play no role in the court's" determination of "whether there is a legally sufficient evidentiary basis for the verdict." *W. Sur. Co.*, 2016 WL 3632487, at *6; *Weisgram*, 528 U.S. at 453.

Additionally, Dr. Hurst's opinion that the fracture was caused by flexural fatigue (repetitive bending) based merely on its location on imaging is entirely inconsistent with El-Ghannam's engineering opinion that Plaintiff's catheter did **<u>not</u>** fracture due to

bending from his examination and analyses of the actual explanted catheter. (**Ex. A**, Trial Tr. at 658:23-25 (Q. "The other thing that you don't dispute is this catheter did not fail from bending; correct? A. Yes. Correct."), 659:4-7 (Q. "In fact, that's a heading in your rebuttal report, is it not? You have it in bold and headed, the bending of the catheter is not the reason for the failure; correct? A. Correct."); *id.* at 639:13-17 ("Q. So this bending did not cause this defect? A. Correct. Q. … And you've been able to rule that out in regard to your opinions? A. By several analyses and -- really multiple."); *id.* at 638:4-24 (explaining the location of cracks on the fracture surface of Plaintiff's catheter "denies that this fracture happens because there is a specific bending point that concentrated the stress and led to the fracture of the material," as does the absence of wrinkles on the fracture surface: "so when you bend it like that, you would expect[] to see that that inner part in here will start to form wrinkles, but when we look at the fracture surface, when we even look at that entire body of the fractured catheter, you don't see wrinkles at all").)

"On this issue of proximate cause, the question before this court is whether there was sufficient evidence to warrant submission to the jury that the specific defect alleged by the plaintiff," flexural fatigue fracture per Hurst, "caused plaintiff's injury." *Garner v. Raven Indus., Inc.*, 732 F.2d 112, 115 (10th Cir. 1984) (applying New Mexico law). No reasonable jury could conclude that Plaintiff's catheter failed due to flexural fatigue based merely on the alleged fracture location from a non-engineer's imaging review where Plaintiff's actual engineer who tested and examined the actual catheter opined: it did **<u>not</u>** fracture from bending. Therefore, the jury has a legally insufficient evidentiary basis for its design verdict, and Bard is entitled to judgment as a matter of law.

**3. Sheikhi's general causation opinion is insufficient.**

Nor can Plaintiff rely on Sheikhi's general causation opinion on flexural fatigue to satisfy her specific causation burden in this case. The Court in denying Bard's Rule 50(a) motion referred to Sheikhi's opinion even though Sheikhi never gave a specific causation opinion regarding what caused Plaintiff's fracture—nor could he. He never tested or examined Plaintiff's explanted catheter, nor did he review Plaintiff's medical

records, imaging, care and treatment, the implant procedure, or the removal. (**Ex. A**, Trial Tr. 433:5-434:9, 436:4-16, 444:12-15, 501:3-10.) He never issued a case-specific report. He made very clear he is "not opining on the specifics of Mrs. Divelbliss," "on the exact catheter that . . . was implanted in Mrs. Divelbliss," "the specific patient's catheter," or "on the specifics of the surgical procedure," and he has "not offered any opinion in [his] reports in this case with respect to how or why Mrs. Divelbliss's port catheter broke." (*Id.* at 434:9-10, 436:4-11, 501:11-19.) Further, just as with Hurst's opinion, Sheikhi's general causation opinion does not apply here because it is refuted by El-Ghannam's case-specific opinion that there was no bending after examination of Plaintiff's catheter. Thus, the jury still has a legally insufficient evidentiary basis for its design defect verdict.

**4. The jury could not reasonably infer specific causation.**

Finally, the jury cannot reasonably infer in this case that a defective condition in the design of Plaintiff's catheter caused her injury based on Sheikhi's general causation opinion (refuted by a case-specific opinion), El-Ghannam's imaging, and Bard's internal documents as Plaintiff posited at oral argument. (*Id.* at 2482:17-2483:1.) Plaintiff needs expert testimony establishing specific causation because "[w]hether a defect in a medical device caused Plaintiff harm is a matter outside a layperson's common understanding." *Bailey*, 2021 WL 4844393, at *8. And "Plaintiff cannot create a triable issue of fact by submitting conflicting evidence" from her ***own witnesses*** on whether her catheter failed due to flexural fatigue for the jury to resolve. *Petroleum Sales, Inc. v. Valero Ref. Co.*, 2006 WL 3708062, at *11 (N.D. Cal. Dec. 14, 2006), *aff'd*, 304 F. App'x 615 (9th Cir. 2008); *Ho by Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 862 (9th Cir. 1998). That is the case here as no reasonable jury could rely on Sheikhi's inapplicable general causation opinion over El-Ghannam's case-specific opinion that Plaintiff's catheter did **<u>not</u>** fracture from bending after his examination of the device.

## IV. Conclusion

For these reasons, this Court should grant Bard's motion and enter judgment as a matter of law under Rule 50(b) on Plaintiff's failure to warn and design defect claims.

DATED this 8th day of October, 2026.

NELSON MULLINS RILEY &
SCARBOROUGH, LLP

By: *<u>/s/ Richard B. North, Jr.</u>*
Richard B. North, Jr.
(Admitted *Pro Hac Vice*)
Atlantic Station
201 17th St. NW, Ste. 1700
Atlanta, GA 30363
Phone: (404) 322-6155
Fax: (404) 322-6050
richard.north@nelsonmullins.com

MCCARTER & ENGLISH, LLP

By: *<u>/s/ Edward J. Fanning, Jr.</u>*
Edward J. Fanning, Jr.
(Admitted *Pro Hac Vice*)
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone: (973) 639-7927
Fax: (973) 297-3868
efanning@mccarter.com

*Attorneys for Defendants*