Edward J. Fanning (Admitted *Pro Hac Vice*)
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
Phone: (973) 639-8486
Fax: (973) 797-3868
Email: efanning@mccarter.com

Richard B. North, Jr. (Admitted *Pro Hac Vice*)
NELSON MULLINS RILEY &
SCARBOROUGH, LLP
Atlantic Station
201 17th Street, NW, Ste. 1700
Atlanta, GA 30363
Phone: (404) 322-6000
Fax: (404) 322-6050
Email: richard.north@nelsonmullins.com

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE: Bard Implanted Port Catheter Products Liability Litigation<br><br>THIS DOCUMENT RELATES TO:<br><br>*Kimberly Divelbliss*<br>*Civil Case No. 2:23-cv-01627-DGC* | MDL No. 3081<br><br>**DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR A NEW TRIAL OR REMITTITUR PURSUANT TO FED. R. CIV. P. 59**<br><br>(Assigned to the Honorable David G. Campbell)<br><br>**ORAL ARGUMENT REQUESTED** |

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 59, Defendants ("Bard") respectfully submit this Motion for a new trial or remittitur.

Defendants in complex litigation have a right to defend themselves through the retention of expert witnesses without plaintiffs weaponizing those experts' compensation to multiply their damages. But Plaintiff's counsel did exactly that in closing in this trial. Counsel asked the jury to award Plaintiff "2 million bucks a year at 20 to 30 years, that's 40 to $60 million based on how Bard has valued this case." **Ex. A**, Trial Tr. 2908:10-11. This $40-60 million valuation was not based on the evidence. Instead, as counsel sarcastically noted, it was "[b]ased on how much [Bard] paid that dude right there": its expert, Steve MacLean, Ph.D. *Id.* 2908:13-14.

Using expert compensation as a suggested baseline for Plaintiff's non-economic damages is an impermissible form of "unsubstantiated anchoring," "whereby attorneys suggest damages amounts by reference to objects or values with no rational connection to the facts of the case" or the plaintiff's injury. *Gregory v. Chohan*, 670 S.W.3d 546, 557–58 (Tex. 2023). Counsel exacerbated the harm done by this improper tactic by combining it with a "unit-of-time" argument. He suggested the jury take Bard's expert compensation as a per-year benchmark and multiply it by twenty or thirty to arrive at Plaintiff's damages and "send a message to Bard." **Ex. A**, Trial Tr. 2908:25. Courts around the country condemn these types of argument, as the use of multipliers and artificial benchmarks for calculating non-economic damages risks excessive verdicts.

That risk came to fruition in this case. The jury returned a manifestly excessive verdict of $40,000,000. That number directly ties to counsel's expert-fee-based "inflammatory benchmark" that "bear[s] no rational relation to [her] injuries." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 787 n.71 (5th Cir. 2018). This excessive verdict cannot stand under New Mexico law. The verdict has clear indications of passion, prejudice, undue influence, and a mistaken measure of damages. *Sandoval v. Chrysler Corp.*, 960 P.2d 834, 837 (N.M. Ct. App.

1998). Counsel's "reference to expert fees was meant simultaneously to activate the jury's passions and to anchor their minds to a salient, inflated, and irrelevant dollar figure" that ultimately "tainted the verdict that followed." *In re DePuy*, 888 F.3d at 787 n.71. And when counsel's inflammatory remarks are disregarded, the evidence does not substantially support the excessive award. *Gonzales v. Gen. Motors Corp.*, 553 P.2d 1281, 1287 (N.M. Ct. App. 1976).

Even before the Court gets to damages, two separate issues entitle Bard to a new trial on liability. ***First***, the Court's ruling on the admissibility of Dow Corning, Inc.'s 2005 Product Information Statement deprived Bard of a fair trial. The prejudicial nature of this superseded statement about the long-term use of silicone in implantable medical products substantially outweighed any probative value (there was none) and risked juror confusion. Plaintiff's counsel latched onto this erroneously admitted document in making several inflammatory arguments during closing. Furthermore, the timing of the Court's ruling prevented Bard's core research and design witness and regulatory expert from testifying about the 2005 statement. ***Second***, counsel's elicitation of testimony regarding the alleged occurrence of another Bard Groshong catheter fracture, inferences regarding the existence of other cases, and accusation that defense counsel broke the law deprived Bard of a fair trial. Those statements cannot be unheard by the jury.

For these reasons, Bard respectfully requests this Court grant Bard a new trial on liability and damages. In the alternative, this Court should remit the excessive verdict.

## ARGUMENT AND CITATIONS OF AUTHORITY

Rule 59 allows a district court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'" *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)). "In a diversity action, [the Court] appl[ies] state law to determine

whether the damages award is excessive." *City of Pomona v. SQM N. Am. Corp.*, 2023 WL 3143688, at *3 (9th Cir. Apr. 28, 2023). Under New Mexico law, "[t]he jury's award is excessive if . . . there is an indication of passion, prejudice, partiality, sympathy, undue influence[,] or a mistaken measure of damages on the part of the fact finder." *Morga v. FedEx Ground Package Sys., Inc.*, 512 P.3d 774, 782 (N.M. 2022) (second alteration in original) (quoting *Gonzales*, 553 P.2d at 1287). "[T]he district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict." *Merritt v. Arizona*, 2021 WL 1541635, at *3 (D. Ariz. Apr. 20, 2021) (alteration in original) (quoting *Goldstine v. FedEx Freight Inc.*, 2021 WL 952354, at *1 (W.D. Wash. Mar. 11, 2021)). "[I]nstead, the court may 'weigh the evidence and assess the credibility of the witnesses[.]'" *Id.* (second alteration in original) (quoting *Goldstine*, 2021 WL 952354, at *1).

## I. Counsel's Improper Argument in Closing Caused the Excessive Verdict

New Mexico courts have held that a verdict had indications of passion, prejudice, or a mistaken measure of damages where (1) the damages awarded exhibited a lack of relatedness to the injury and evidence of damages at trial, *Nava v. City of Santa Fe*, 103 P.3d 571, 577 (N.M. 2004); (2) the verdict mirrored the value of the injury advocated by counsel in closing after he engaged in improper argument, *Jackson v. Sw. Pub. Serv. Co.*, 349 P.2d 1029, 1042 (N.M. 1960); and (3) "[t]here [was] no evidence to support [certain] statements" made by plaintiff's counsel regarding the injury, *Gonzales*, 553 P.2d at 1287. As these decisions suggest, the Court's assessment of whether a verdict is excessive takes into consideration the relatedness between injury and award, as well as the impact of counsels' improper statements.

Plaintiff's counsel utilized two impermissible tactics—anchoring and a unit-of-time argument—that resulted in an excessive verdict under New Mexico law. Specifically, counsel concluded his closing with the following argument:

> ***So what is this case worth? Bard paid one expert $1.5 million to defend it in this case. One person. They paid Dr. Thisted 300,000 more. We're over 2 million bucks in just expert fees, not even including litigation***

> ***lawyer costs. To do what? To sit in a padded office in an ivory tower and write a report for a year. 2 million bucks?***
>
> ***If Bard is willing to spend 2 million bucks to defend this case, I respectfully and humbly submit to you that it's worth $2 million for a catheter to hit her heart and change her life forever.*** It's worth $2 million a year to chronically live with chest pain, a racing heartbeat, and heart attacks. It's worth $2 million a year to have gone through four ablations, a pacemaker implantation that'll be in her body until she's, unfortunately, not here anymore. $2 million a year for medications that you're on for the rest of your life to make sure that your heart beats the right way while your pacemaker tries to calibrate it. That's dangerous medication. But, more importantly, seriously, $2 million a year for what she really lost, her prior life. Her prior life to be an active, independent woman; to go to the rodeos; to suit her kids up; to do all that kind of stuff. Her life. That's what she's lost. I mean, yeah, there's damages. There's ablations, there's pacemakers, there's medications, and there's all that stuff. But let's be real. Her life. She's already gone through this for seven years.
>
> ***And these are big numbers. I'm aware of that. But if Bard's willing to pay experts $2 million a year, 2 million in total for a year of work, it's been seven years to date.*** Seven times $2 million is $14 million for already what she's gone through. She's got a long life ahead. She's only 55 years old. I mean, I hope she lives for 40 years. I hope she lives for 50 years.
>
> I hope you break 100, but, you know, maybe it won't quite be 100, but it'll definitely be 20 or 30.
>
> ***2 million bucks a year at 20 to 30 years, that's 40 to $60 million based on how Bard has valued this case. Not me. Not someone else. Based on how this company values this case. Based on how much they paid that dude right there, million dollar man, Million Dollar MacLean. 1,500,000 to defend Bard from Bard and BD. If you want to award more than that, please do. But when you total up those figures, we're talking 40 to $60 million based on how Bard values this case.***
>
> When this is done, you all get to move on. You go back to your lives. And I know you've probably got stuff going on. We've – I'm aware. But she doesn't get to. She's stuck with this for the rest of her life. This is her one shot. We're not coming back here. She's not coming back here. I'm never going to have the privilege again of saying I represent Ms. Divelbliss.
>
> ***So send a message to Bard. Tell them this is wrong. Do justice for Ms. Divelbliss because, as my mentor has said, anything less than justice is injustice.***

**Ex. A**, Trial Tr. 2907:1-2909:2 (emphasis added).

Defense counsel promptly objected to this argument. *Id.* 2912:13-25. Then, in rebuttal, Plaintiff's counsel closed with another reference to Bard's expert compensation:

> And so the answer to all the questions is going to be yes. You all award what you want to, but ***I encourage you to think about over and above what these lawyers have paid their traveling road show, every one of***

> ***them, per year, per month, or whatever.*** Think about her life, because this case is about hers. It's the only case she's got. Bard's going to have a lot more, and this is her one shot for vindication.

*Id.* 2967:3-9 (emphasis added). Defense counsel then reiterated the objection to the anchoring and unit-of-time argument. Specifically, counsel argued that "what Mr. Sacchet did, trying to tie the compensation of an expert to an award to a plaintiff, is inappropriate." *Id.* 2977:17-23. Defense counsel further stated that the improper argument is "a ground for a mistrial" and that the jury "should be instructed that they cannot base [damages on] that." *Id.* 2978:3-5. For the reasons that follow, this Court should hold that counsel's closing (1) is impermissible as a matter of federal trial procedure, and (2) resulted in a tainted and excessive verdict under New Mexico law.

### A. Counsel Engaged in Improper Argument by Anchoring Damages to Bard's Expert Compensation and Using a Unit-of-Time Multiplier

Although state law governs whether a verdict is excessive, the propriety of Plaintiff's arguments is a matter of federal trial procedure. *See Showan v. Pressdee*, 922 F.3d 1211, 1220 (11th Cir. 2019); *Hammonds v. Yeager*, 2017 WL 10560471, at *1 (C.D. Cal. Aug. 9, 2017). This Court can readily conclude from persuasive authority within and outside the Ninth Circuit that an attorney cannot couple a unit-of-time argument with expert compensation as the benchmark for non-economic damages. Such a tactic unduly risks inflaming the jury and the awarding of damages on grounds other than the evidence.

The Ninth Circuit's decision in *C.R. v. PLB Management, LLC*, 2024 WL 5482654, at *2 (9th Cir. Mar. 24, 2025), supports Bard's position. The Ninth Circuit affirmed an order granting a new trial on damages where counsel "encouraged" the jury "to 'pick a number' and 'multiply it' leading to the inference that the jury should award damages for 'every single day that goes by.'" *Id.* Here, Plaintiff's counsel engaged in substantially similar conduct by asking the jury to pick Bard's expert fees as their baseline number, and multiple it to award damages on a yearly basis. Immediately after encouraging the jury to use this formula, Plaintiff's counsel further encouraged the jury

to "send a message." **Ex. A**, Trial Tr. 2907:1-2909:2. As in *C.R.*, Bard is entitled to a new trial on damages because counsel's argument influenced the verdict.

Courts nationwide disfavor the use of formulas, unit-of-time arguments, and unsubstantiated anchoring when used to calculate non-economic damages. The treatment of each of these tactics by courts around the country confirms that a new trial is warranted here, where Plaintiff's counsel used these prejudicial tactics in ***tandem*** in his closing.

Even standing alone, the use of a unit-of-time argument was sufficiently prejudicial to warrant a new trial—particularly given that the Court did not provide a specific instruction about counsel's argument. The First and Third Circuits flatly proscribe the use of formulas to calculate damages for pain and suffering.[1] Certain circuits permit unit-of-time arguments, but caution that the "district 'court must use care to the end that the argument will not inflame the jury and result in an excessive verdict.'" *Showan*, 922 F.3d at 1220 (quoting *Baron Tube Co. v. Transp. Ins. Co.*, 365 F.2d 858, 864 (5th Cir. 1966)).[2] "[S]pecifying target amounts for the jury to award is disfavored" because the target "anchor the jurors' expectations of a fair award at a place set by counsel, rather than by the evidence. . . ." *Consorti*, 72 F.3d at 1016. Indeed, "unit-of-

---

[1] *See Rodríguez v. Señor Frog's de la Isla, Inc.*, 642 F.3d 28, 37 (1st Cir. 2011); *Waldorf v. Shuta*, 896 F.2d 723, 744 (3d Cir. 1990).

[2] *See, e.g.*, *Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1016 (2d Cir. 1995) ("encourag[ing] trial judges to bar such recommendations" because "[s]pecific proposals have a real potential to sway the jury unduly"); *Murphy v. Nat'l R. R. Passenger Corp.*, 547 F.2d 816, 818 (4th Cir. 1977) ("If [a unit-of-time] argument is allowed, . . . the court should caution the jury that the dollar figures mentioned by counsel do not constitute evidence but merely represent argument which the jury may disregard in its deliberations."); *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1240 (5th Cir. 1985) ("Breaking down a large time span into its smaller parts of weeks, days or even hours holds a great appeal to a juror looking for a more understandable and manageable way to approach the task of fixing damages. However, this court has found such arguments impermissible because they tend to produce excessive verdicts."); *Waldron v. Hardwick*, 406 F.2d 86, 89 (7th Cir. 1969) (stating that unit-of-time arguments are "permissible if made within limitations which the trial judge to insure fairness may impose such as the giving of a suitable cautionary instruction or the taking of other safeguards"); *Vanskike v. ACF Indus., Inc.*, 665 F.2d 188, 211 (8th Cir. 1981) ("[A]lthough we continue to condemn instructions requiring per diem mathematical calculations, we do not disapprove of per diem closing arguments as long as such arguments are carefully controlled by the district court.").

time calculations are arbitrary and artificial" because "[t]he same amount of pain and suffering does not occur from year to year nor can the degree of pain and suffering that will occur in any year be quantified with any degree of certainty." *Vanskike*, 665 F.2d at 211 (quoting *Flanigan v. Burlington N., Inc.*, 632 F.2d 880, 886 (8th Cir. 1980)). For these reasons, courts require a specific instruction to avoid prejudice and prevent excessive verdicts.[3]

Unsubstantiated anchoring is also an improper trial tactic because it risks causing excessive verdicts. In condemning that practice, the Texas Supreme Court explained:

> The self-evident purpose of these anchors . . . is to get jurors to think about the appropriate damages award on a magnitude similar to the numbers offered, despite the lack of any rational connection between reasonable compensation and the anchors suggested. Unsubstantiated anchors . . . have nothing to do with the emotional injuries suffered by the plaintiff and cannot rationally connect the extent of the injuries to the amount awarded.

*Gregory*, 670 S.W.3d at 558. In particular, unsubstantiated anchors that relate to a defendant's financial condition "suggest that [a defendant] can afford a large award and that [the defendant] should be punished for denying [the plaintiff] justice for [her injuries]." *Id.* Such an argument "has nothing to do with compensation." *Id.*

No United States Court of Appeals has approved—or will likely approve—the use of a unit-of-time argument in tandem with anchoring to expert fees. Coupling these arguments risks inflaming the jury and producing an excessive verdict. Indeed, the Fifth Circuit has held that coupling of a unit-of-time argument to expert fees ***taints*** a verdict:

---

[3] *See Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 377 (5th Cir. 1989) ("Without a specific cautionary instruction, there is a danger that this argument will create an illusion in the jury's mind that pain and suffering damages can and perhaps should properly be measured or calculated by simple multiplication rather than through the jury's sound discretion."); *Mosser v. Fruehauf Corp.*, 940 F.2d 77, 82 (4th Cir. 1991) ("[T]he trial court should 'certainly not limit itself to the frequently used boiler-plate type of charge to the effect that 'arguments of counsel are not evidence,' but should specifically 'caution the jury that the dollar figures mentioned by counsel do not constitute evidence but merely represent argument which the jury may disregard in its deliberations.'" (first quoting *Mileski v. Long Island R.R. Co.*, 499 F.2d 1169, 1174 (2d Cir. 1974); then quoting *Murphy*, 547 F.2d at 818)).

> As a general matter, unit-of-time arguments like this one are impermissible because they can lead the jury to believe that the determination of a proper award for pain and suffering is a matter of precise and accurate determination and not, as it really is, a matter to be left to the jury's determination, uninfluenced by arguments and charts. Lanier's reference to expert fees was meant simultaneously to activate the jury's passions and to anchor their minds to a salient, inflated, and irrelevant dollar figure. The inflammatory benchmark, bearing no rational relation to plaintiffs' injuries, easily amplified the risk of an excessive verdict. The argument was designed to mislead, and tainted the verdict that followed.

*In re DePuy*, 888 F.3d at 787 n.71 (internal quotations and citations omitted).

Plaintiff's counsel utilized the same tactics to fan the flames of the jury's passions. He rhetorically asked "what is this case worth," and then answered that question by stating "Bard has valued this case" at "2 million a year" based on its expert compensation. **Ex. A**, Trial Tr. 2907:1, 2908:10-17. But that figure is plainly irrelevant to Plaintiff's injuries. Counsel then asked the jury to consider that valuation on a yearly basis, amplifying the risk of an excessive verdict just as in *In re DePuy*.

Making matters worse, counsel's assertion that Mr. MacLean's total expert compensation was $1,500,000 "in this case" was simply wrong and exacerbated the prejudice to Bard and excessiveness of the verdict. *Id.* 2907:1-2. Dr. MacLean was paid about $1,250,000 for his general report applicable to all cases in the MDL, and only $250,000 for his case-specific report and testimony. *See id.* 2705:25-2708:15. Critically, counsel knew this $1,500,000 figure was misleading and inaccurate, as he opposed an instruction to the jury about expert compensation. *See id.* 2847:19-2851:21. And counsel knew that defense counsel could not respond by pointing to the general MDL work without tipping the jury off to additional cases. By utilizing the total compensation in closing and referring to "this case," counsel was able to inflate the baseline for his anchoring and unit-of-time multiplier. For these reasons, counsel's argument was improper and prohibited as a matter of federal trial procedure.

### B. The Jury's Verdict Has Indications of Passion, Prejudice, Undue Influence, and a Mistaken Measure of Damages

Counsel's improper argument resulted in an excessive verdict under New Mexico law. *See Jackson*, 349 P.2d at 1042; *Gonzales*, 553 P.2d at 1287; *Thompson v. Ford*

*Motor Co.*, 2025 WL 370431, at *24, *27 n.39 (D. Colo. Feb. 3, 2025) (granting new trial where counsel "[e]ngaged in irrelevant and prejudicial discussion of Defendant's litigation costs" during closing and holding that "the oversized nature of the award confirm[ed] the remarks played to the jury's passions rather than their reason").

"[T]he purpose of compensatory damages is to make an injured person whole." *Lovelace Med. Ctr. v. Mendez*, 805 P.2d 603, 616 (N.M. 1991). A plaintiff may recover non-economic damages, such as past and future pain and suffering and loss of enjoyment of life. *See Morga*, 512 P.3d at 786. Simply put, "asking the jury to assess damages in relation to how much [Bard] pays its expert witnesses" is ***not*** a "correct way to calculate non-economic damages." *Barabin v. Scapa Dryer Fabrics, Inc.*, 2018 WL 2583133, at *10 n.10 (W.D. Wash. June 4, 2018) (giving "no credence to [the plaintiff's] unit-of-time argument" in which counsel "ask[ed] the court to assess damages in relation to how much [the defendant] pays its expert witnesses").

A compensatory damages award tied to expert compensation and a multiplier reflects a "mistaken . . . measure of damages" under New Mexico law. *Jackson*, 349 P.2d at 1042; *see also Barabin*, 2018 WL 2583133, at *10 n.10. (noting that the court "fails to see the relevance of such an argument"); *In re DePuy*, 888 F.3d at 787 n.71 (stating that expert expenses "bear[] no rational relation to plaintiffs' injuries"). The amount a litigant pays its experts has no bearing on how much money is needed to reasonably compensate a plaintiff for the pain and suffering she endured or may endure in the future. After learning that Bard paid its experts, the "jurors [were] no closer to gaining a sense of how to compensate [Plaintiff] for [her] injuries." *Gregory*, 670 S.W.3d at 558. The clear purpose behind discussing Bard's expert compensation was to anchor the jury to a considerable sum of money and induce the jury to decide the case on improper considerations. The reference to expert fees suggests that Bard can afford a large award, and that Bard should be punished for denying Plaintiff compensation in favor of funding its own defense. Defense costs have nothing to do with Plaintiff's pain and suffering.

Counsel's unit-of-time argument exacerbated the prejudice and mistaken measure of damages.

The improper argument directly influenced the verdict. Counsels' references to expert compensation were nearly the last things out of their mouths before they sat down. Counsel offered no alternative numeric benchmark for the jury to consider in valuing Plaintiff's non-economic damages.[4] The jury, in turn, applied the proffered formula and returned a verdict for $40 million. The parity between the verdict and counsel's requested range strongly supports a finding that "the jury was mistaken as to the measure of damages" and acted on passion, prejudice, or undue influence. *Jackson*, 349 P.2d at 1042 (emphasizing that "the argument of counsel concerning a leg being worth $100,000 might have contributed to [the jury's mistaken $95,000 verdict], since the verdict was so close to that figure"); *Westbrook*, 754 F.2d at 1240 (granting new trial after "the jury awarded precisely the amount of money the formula produced" on the basis that "the size of this award is, in part, directly attributable to an uncorrected unit of time argument"); *Gregory*, 670 S.W.3d at 558-59 (holding that verdict was excessive and influenced by counsel's "two cents a mile" calculation).

Counsel's attempt to "reanchor" in rebuttal did not cure the prejudice caused by his colleague's prior argument about Bard's expert compensation. **Ex. A**, Trial Tr. 2978:12. Counsel concluded his remarks by effectively suggesting that Bard's expert fees should be the *floor* for a damages award, asking the jury to "think about over and above what these lawyers have paid their traveling road show, every one of them, per year, per month, or whatever." *Id.* 2966:25-2967:9. The parity between the verdict and counsel's improper argument shows the "reanchoring" had no impact on the verdict.

Moreover, the Court did not provide the jury with the requested—and required—instruction about counsels' inflammatory argument. *See id.* 2978:3-7; *In re DePuy*, 888

---

[4] Just before closing arguments, Plaintiff's counsel strategically withdrew her claim for the $61,000 in medical expenses **Ex. A**, Trial Tr. 2842:7-21. This allowed counsel to more forcefully anchor non-economic damages to Bard's expert compensation.

F.3d at 787, n.71 (holding that general instruction that "any statement or arguments made by the lawyers are not evidence and are not instructions on the law" was "inadequate" (citing *Colburn*, 883 F.2d at 377-78)). With respect to damages in particular, both federal and New Mexico courts regularly take note of the fact that a jury's award tracks (or exceeds) a plaintiff's dollar demand in closing even though such arguments are not evidence. *See, e.g.*, *Jackson*, 349 P.2d at 1042; *Westbrook*, 754 F.2d at 1240 (5th Cir. 1985); *Thompson*, 2025 WL 370431, at *24, *27 n.39.

This Court should hold that the verdict has clear indications of passion, prejudice, undue influence, and/or a mistaken measure of damages. Bard is entitled to a new trial.

**II. The Evidence Does Not Substantially Support the Damages Awarded**

It is clear that counsel's improper argument impacted the jury's verdict. Independent of that conclusion, the verdict is excessive under New Mexico law because the evidence does not substantially support the magnitude of damages awarded. *Gonzalez*, 553 P.2d at 1287; *Sandoval*, 960 P.2d at 837.

"To determine if a verdict is supported by substantial evidence, '[t]he proper approach is to examine [the p]laintiff's evidence related to damages and determine whether that evidence could justify the amount of the verdict.'" *Morga*, 512 P.3d at 784 (alterations in original) (quoting *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 215 P.3d 791, 797 (N.M. Ct. App. 2009)). The Court must "compare the amount awarded to the injury received and consider whether 'the amount awarded is so grossly out of proportion . . . as to shock the conscience.'" *Id.* (quoting *Lujan v. Reed*, 434 P.2d 378, 386 (N.M. 1967)).

"A party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty." *Sandoval*, 215 P.3d at 798. "There is no exception to the [that] rule for future damages. The ultimate fact which the plaintiff has the burden of proving is future damages reasonably certain to occur as a result of the original injury." *Rael v. F & S Co.*, 612 P.2d 1318, 1322 (N.M. Ct. App. 1979). Such damages "must be based upon the evidence adduced at trial." *Sanchez v.*

*Martinez*, 653 P.2d 897, 902–03 (N.M. Ct. App.1982). Although there is no fixed standard for awarding damages for pain and suffering, "[t]here 'must be an upper limit' to every damages award." *Bell v. Williams*, 108 F.4th 809, 831 (9th Cir. 2024) (quoting *Gasperini*, 518 U.S. at 435). "Otherwise, if left unrestrained, compensatory damages awards could go beyond their compensatory function and turn punitive." *Id.* "Locating the upper limit is a question of law, not fact . . . ." *Id.*

The jury was instructed to award damages for the following relevant categories of damages : (1) "[t]he nature, extent and duration of the injury including disfigurement"; (2) "[t]he pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injury"; and (3) "[t]he loss of enjoyment of life experienced and reasonably certain to be experienced in the future as a result of the injury." Doc. 10598, at 30. The jury was further instructed that they "must use [their] judgment to decide a ***reasonable amount*** to compensate the plaintiff" for pain and suffering or loss of enjoyment of life. *Id.* (emphasis added).

**A. The Nature, Extent, and Duration of Plaintiff's Injury**

Plaintiff's injury does not substantially support an eight-figure verdict. For starters, Dr. Dim and Plaintiff's medical expert ***agree*** that Plaintiff is presently stable and in good condition. **Ex. A**, Trial Tr. 1018:9-1019:15, 1065:11-20. Plaintiff has no planned future medical interventions with Dr. Dim related to her heart. Her current treatment consists of follow-up "cardiac therapy"—comprised of "physical exercise . . . counseling, dietary, nutrition, cooking classes, and remote training from nutritionist and other experts"—"every three to four months." *Id.* 832:12-833:2; 937:19-938:8. Dr. Dim has not recommended any further procedures given that Plaintiff is stable. *See id.* 1018:9-1019:15. According to Dr. Dim, Plaintiff "hasn't had any more symptoms" following her final ablation. *Id.* 1011:20-1012:1. With respect to a potential fifth ablation, Dr. Dim testified:

> Why would I recommend when she's doing well? I don't have any evidence. Again, because she has a continuous pacemaker that checks her

> heartbeat. It's not showing anything. So I -- and I've never written in my notes that she will need another.
>
> Right now she's stable from my standpoint. The medication dose is appropriate. I witnessed, literally witnessed her doing exercise therapy in my clinic so I could see her heart rate response. So I knew that what we've done for her has helped her. So I wouldn't recommend another . . . .

1018:17-1019:2. Dr. Dim similarly testified that he could not predict that Ms. Divelbliss's pacemaker or component parts would need to be replaced. *Id.* 929:12-930:2.

Plaintiff's cardiology and electrophysiology expert, Dr. Cuoco, similarly testified he is "sort of optimistic that after the fourth ablation [that her AV Node Reentrant Tachycardia ("AVNRT")] is fixed." *Id.* 1065:11-20. Dr. Cuoco also testified that he could not conclude to a reasonable degree of medical certainty that Plaintiff would develop any future medical complications. *Id.* 1062:24-1063:10.

Plaintiff allegedly suffered two underlying injuries: (1) harm arising from the catheter fracture; and (2) harm arising from Dr. Dim's unnecessary ablations, pacemaker implantation and sotalol prescription. Neither injury supports the damages awarded.

The evidence related to the injury associated with the catheter fracture was not sufficiently severe in nature, extent, or duration to warrant millions in damages. Dr. Dim did not deem the fragment to be an emergency that required medical attention; instead, he deemed it reasonable to treat the issue "within a few days." *Id.* 951:8-18. Dr. Aguila, the explanting physician, testified that it was a "very quick procedure[]" that took "10 minutes or 7 minutes." Doc. 10212-3, at 15, 90:16-18. Dr. Shehata opined that any injury "would have been quite minor and . . . quite short lived and nothing that [he] would expect to lead to any long-term sequelae or long-term consequences." **Ex. A**, Trial Tr. 2298:19-2299:2. Plaintiff's unbiased treatment at National Jewish corroborates Dr. Shehata's opinion. At a January 2020 visit, cardiologist Dr. Darlene Kim determined that Plaintiff did not have a myocardial infarction related to the catheter fracture. *See* **Ex. B**, Trial Ex. 657.0002; Doc. 10485-3, at 41:25-42:03. Although the event triggered "significant arrhythmia," Plaintiff reported that she "has not had symptoms reminiscent of the days leading up to the removal of the port catheter section." **Ex. B**, Trial Ex.

657.0002. Dr. Kim opined that the catheter may have impacted her heart rhythm while embolized, but "then once you remove it, . . . you wouldn't necessarily expect it to persist." Doc. 10485-3, at 50:10-16; *see also id.* at 77:13-78:12. Following a holster monitor test, Dr. Kim testified that she did not recommend further monitoring or treatment. *Id.* 92:16-93:12.

As for the injuries associated with Dr. Dim's treatment, the evidence shows that the catheter fragment neither required, nor was a cause of, Dr. Dim's treatment. In addition to the testimony from Drs. Shehata and Kim, the evidence demonstrates that Dr. Dim misdiagnosed Plaintiff given that he was unable to induce the condition he claimed required ablations. *Id.* 2313:3-2316:5. Accordingly, Bard was not liable for Dr. Dim's treatment. *See Pegasus Legal Servs. for Child. v. Bd. of Regents of the Univ. of N.M.*, 2026 WL 1466042, at *5 (N.M. Ct. App. May 20, 2026). But even if Bard were liable for those injuries, they still would not substantially support millions in damages given that Plaintiff is stable and in good condition.

**B. Pain and Suffering and Loss of Enjoyment of Life**

As for Plaintiff's alleged pain and suffering and loss of enjoyment of life, the jury undoubtedly latched onto Plaintiff's anchoring and unit-of-time argument that sought to award her $2,000,000 per year for the next twenty years. *See* **Ex. A**, Trial Tr. 2906:16-17, 2908:10-20. Plaintiff failed to prove those forward-looking damages with reasonable certainty, *Rael*, 612 P.2d at 1322, and the amount of damages awarded is not substantially supported by the evidence, *Gonzales*, 553 P.2d at 1287.

The testimony from Plaintiff's treating cardiologist and cardiology expert regarding her stable condition undermines any suggestion that Plaintiff continues or will experience pain and suffering or loss of enjoyment of life ***related to the catheter fracture***. Plaintiff's ongoing issues stem from unrelated medical conditions, including but not limited to, (1) her preexisting common variable immunodeficiency ("CVID") that causes abdominal pain, nausea, dizziness, gastrointestinal issues, and infections, *see* **Ex. A**, Trial Tr. 1259:4-25 (discussing side-effects of CVID); (2) her preexisting asthma

and shortness of breath, *id.* 1260:4-15; and (3) her 2021 gastric bypass surgery, which caused dumping syndrome, diarrhea, nausea, and cramps, *id.* 1293:16-24, 1295:2-24.

The frequency of Plaintiff's hospitalizations pre- and post-fracture refutes counsel's argument that Plaintiff "lost . . . [h]er prior life to be an active, independent woman." *Id.* 2907:19-22. Plaintiff went to the hospital twelve times in 2019 prior to the catheter fracture for various ailments. *See, e.g.*, *id.* 1263:18-19, 1267:1-16 (discussing emergency room visit for dizziness, shortness of breath and palpitations and noting lack of regular exercise); *id.* 1269:15-23 (discussing emergency room visit for dyspnea); *id.* 1274:16-1275:3 (discussing hospital visit where plaintiff was diagnosed with premature ventricular contractions and admitting that plaintiff had irregular heartbeats during exercise); *id.* 1280:9-1282:19 (discussing October and November 2019 hospital admissions for bilateral pulmonary embolism and pain from blood clots); *id.* 1285:2-8 (summarizing 12 hospital visits). In November 2019, Plaintiff in fact complained to her doctors that she was tired of constantly being in the hospital and suffered from palpitations from stress caused by her medical issues. *Id.* 1282:16-23, 1284:16-22. Fast-forward to 2025, Plaintiff went to the emergency room approximately twenty times for matters unrelated to the catheter fracture. *See id.* 1306:14-1307:2. These visits were for hip pain, abdominal pain, diarrhea, gastrointestinal issues, shoulder pain, chest pain, and nausea for which Plaintiff was prescribed pain medication. *See id.* 1307:3-1312:24.

The takeaway from Plaintiff's medical history is twofold. First, Plaintiff's contention that the catheter fracture is the primary reason for her hospital visits, poor health, lack of intimacy with her husband, and inability to see her children and grandchildren is belied by the record. Second, any ongoing or future pain and suffering and loss of enjoyment of life must account for the unrelated medical issues that Plaintiff experiences. When these facts are appropriately considered, a $40,000,000 verdict is not substantially supported by the evidence and is so grossly out of proportion to Plaintiff's injury as to shock the conscience.

## III. Bard Is Entitled to a New Trial on Medical Causation and Damages

Bard is entitled to a new trial on liability—specifically, medical causation and successive tortfeasor liability—and damages because "the liability issues [are not] 'distinct and separable' from the damages issues." *Marroquin v. City of Los Angeles*, 112 F.4th 1204, 1212 (9th Cir. 2024) (quoting *Gasoline Prods. Co. v. Champlin Refin. Co.*, 283 U.S. 494, 500 (1931)). "[T]he Seventh Amendment . . . prohibits ordering a new trial limited to damages when damages issues are 'so interwoven with [liability issues] that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty.'" *Id.* at 1211 (alterations in original) (quoting *United Air Lines, Inc. v. Wiener*, 286 F.2d 302, 305 (9th Cir. 1961)). "Thus, when a tangled or complex fact situation would make it unfair to one party to determine damages apart from liability, a district court errs by granting a new trial limited to damages." *Id.* (internal quotation marks and citations omitted).

Liability and damages related to Dr. Dim's medical treatment present precisely the type of complex and tangled factual situation that warrants a re-trial on both issues. Bard presented substantial evidence that Plaintiff suffered no long-term adverse consequences following the removal of the catheter and that Dr. Dim had no test results that supported his diagnosis and treatment. *See, e.g.*, **Ex. A**, Trial Tr. 2298:19-2299:2, 2950:14-2951:3. That argument is central to both causation and damages. A core liability issue was whether the catheter fracture required Dr. Dim's treatment, as Bard is only liable for the injuries associated with Dr. Dim's care if the catheter fracture was "a proximate cause of—both a cause-in-fact of and a foreseeable cause of—[the] subsequent medical treatment." *Pegasus*, 2026 WL 1466042, at *5. In turn, Bard argued that there was no basis to award damages for the subsequent treatment and any consequences therefrom. **Ex. A**, Trial Tr. 2946:1-2949:21. Liability and damages are therefore sufficiently interwoven to require re-submission of both issues to a jury in a new trial.

"[A] Seventh Amendment violation may also result when a jury's mistake in awarding damages tainted the liability finding." *Marroquin*, 112 F.4th at 1212. Given

that the jury's verdict ties directly Plaintiff's improper anchoring and unit-of-time argument, this Court should hold that the jury's mistaken damages calculation tainted the liability determination as to the subsequent medical treatment.

## IV. The Admission of the 2005 Dow Product Information Statement Deprived Bard of a Fair Trial and Constituted a Miscarriage of Justice

Dow prepared a Product Information Statement to accompany its raw silicone designed for customers fabricating medical devices. Dow included certain statements related to the scope of Dow's testing and the end-user's responsibilities as part of a risk-mitigation policy. *See* Doc. 10485-6, at 4-6, 11, 20:09-23:06, 26:08-15, 55:06-18. In 2011, years before Bard's manufacture of Plaintiff's particular device, Dow replaced its 2005 Statement's indication that "[t]hese products are not designed for, intended for and therefore not suitable for implantation greater than 29 days in the human body" with the statement that "[n]or does Dow Corning make any representation concerning the suitability of this product for applications of greater than 29 days of implantation in the human body." *Compare* **Ex. C**, Trial Ex. 591.0002, at 2, *with* **Ex. D**, Trial Ex. 1312.0002. This modification was significant. Dow withdrew an express disclaimer for long-term use in favor of a statement that it made no representations about long-term use. Notwithstanding this change, Plaintiff's counsel relentlessly sought admission of the prejudicial and non-probative 2005 Statement into evidence. The Court's admission of the 2005 Statement, after several prior rulings that the evidence was inadmissible, deprived Bard of a fair trial and tainted the verdict.

This Court initially reached the correct conclusion regarding the probative value and prejudicial impact of the 2005 Dow Statement. *See* **Ex. A**, Trial Tr. 15:13-12 ("[I]f the 2005 document was not the one in effect when the plaintiff's product was created or implanted, . . . [i]t seems to me what we ought to be showing the jury is the version that was in existence when Ms. Divelbliss's port was created and implanted."); *id.* 1723:1-1726:23 (noting that Plaintiff was "trying to make a great deal out of the Dow warning," cautioning on the risk of "mislead[ing] the jury into thinking that what Bard did . . . was

illegal" and that it would suggest that "the company was lying to the FDA or that the company was using a product that would fall apart after 29 days when nobody's established that"); *id.* 1752:3-16 (stating that relevance was "marginal at best").

Yet, ***after*** Bard had already presented its research and development witness Kelly Christian and regulatory expert Donna Bea Tillman, the Court reconsidered the admissibility of the 2005 Dow Statement, incorrectly finding the document to Plaintiff's design defect, misrepresentation, and punitive damages claims because the 2005 Statement was in effect when Bard obtained FDA clearance. *See id.* 2272:10-21. That was error for three reasons.

***First***, the 2005 Statement is not relevant to those claims. The Court misapplied the law by focusing on the time of the original 510(k) clearance. *See* **Ex. A**, Trial Tr. 2272:10-21. Under New Mexico law, design defect liability "consider[s] only the risks of harm from its condition or from the manner of its use *at the time of the injury*." N.M. Civ. UJI 13-1407 (emphasis added). What a third-party material supplier said in 2005, and then withdrew in 2011, is irrelevant to the defect analysis for an injury that occurred in 2019 as a result of a device manufactured years later. The lack of relevance also extends to the fraud and misrepresentation claims. Those claims turn on Bard's knowledge at the time that the representations were made to Plaintiff's implanting physician. *See, e.g., Healthsource, Inc. v. X-Ray Assocs. of N.M.*, 116 P.3d 861, 870 (N.M. Ct. App. 2005) (stating that knowledge of falsity of representation "at the time it was made"). So too is culpability assessed for punitive damages based on Bard's knowledge at the time of the allegedly malicious, willful, or reckless conduct—here, the alleged provision of inadequate warnings and sale of a defective device to Plaintiff's physicians in 2017. *See* N.M. Civ. UJI 13-1827. A third-party's superseded statement more than a decade before Bard provided the allegedly inadequate warnings and sold the allegedly defective device is irrelevant to punitive damages as a matter of law.

***Second***, the admission of that statement was unduly prejudicial and risked jury confusion. Once admitted, Plaintiff's counsel prominently made the 2005 Dow

Statement part of their closing argument—going as far as displaying a poster board of the 2005 statement before the jury, arguing that Bard should have put this outdated statement in the IFU provided to Plaintiff's physician, and suggesting that Bard hid Dow's statement from the FDA. **Ex. A**, Trial Tr. 2891:9-20. In short, Plaintiff's counsel used the 2005 Statement to suggest (1) a danger and risk that did not exist, and (2) a prohibition against the use of silicone in long-term implants that simply was not true. Such intended uses are quintessential examples of evidence that is barred by Rule 403 for undue prejudice and risks of juror confusion.

***Third***, even if the statement could have been properly admitted, the timing of the Court's ruling severely prejudiced Bard because the Court reversed itself too late to cure the prejudice with responsive evidence. Mr. Christian and Dr. Tillman would have presented explanatory testimony to the jury regarding what industry professionals and the FDA understood the statement to mean from business and safety perspectives, that the Statements were not based on any scientific evidence, and that they were routine disclaimers to protect materials suppliers from litigation. Bard was deprived of this opportunity due to the timing of the admission.

Accordingly, the Court erred in admitting the 2005 Statement. An erroneous evidentiary ruling is presumptively prejudicial. *See Sidibe v. Sutter Health*, 103 F.4th 675, 691-92, 707 (9th Cir. 2024). But here, the prejudice was exacerbated by the Court's omission of Bard's final two sentences from its proposed limiting instruction, which constituted separate legal error. *See id.* Bard's proposed instruction stated:

> Exhibit 591 is a 2005 Dow Corning product information sheet. The document was revised in 2011, and the revised version is Exhibit 1312. Exhibit 1312 was the operative Dow Corning product information sheet at the time the port catheter implanted in Ms. Divelbliss was manufactured. ***You may not consider Exhibit 591 as evidence that Bard was prohibited from using the silicone provided by Dow for devices implanted in the human body for longer than 29 days, nor may you consider it as evidence that silicone was shown to be unsafe for such use. The determination of the suitability, safety, and efficacy of a particular use must be based on all the evidence presented at trial.***

*See id.* 2494:12-2500:4, 2606:22-2607:6.

The final instruction failed to relay the limitations on the permissible uses of the evidence. The third sentence would have advised the jury that the FDA did not prohibit the use of silicone and prevented the jury from relying on the hearsay within the 2005 Dow Statement for the truth of the matter asserted. The Court was legally required to instruct the jury regarding the permissible uses of the 2005 Dow Statement. *See In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 575 F. Supp. 3d 924, 932-33 (S.D. Ohio 2021) (requiring limiting instruction on permissible uses of material safety data sheet containing medical caution statement). In closing, Plaintiff used the 2005 Statement as a demonstrative, introduced the statement for the truth of the matter asserted, and suggested that Bard withheld information from the FDA. *See id.* 2891:9-14 ("[S]ilicone is not suitable for implantation greater than 29 days in the human body . . . Did Bard tell the FDA? Brutal."). Plaintiff utilized the 2005 Statement for the precise improper purposes that the Court recognized and for which no limiting instruction was provided. These erroneous rulings—admissibility, timing, and the instruction—warrant a new trial on liability because they deprived Bard of a fair trial.

## V. Various Prejudicial Statements From Plaintiff's Counsel and Her Witnesses Deprived Bard of a Fair Trial

One of Plaintiff's trial themes was that that Bard's complaint rate data is inaccurate or, worse, intentionally misleading. *See* **Ex. A**, Trial Tr. 2962:11-2963:10. Plaintiff's counsel elicited testimony about a prior Groshong catheter fracture from Dr. Cuoco, consistently implied that there are additional cases, and later accused defense counsel of breaking the law and trying to "trick" the jury. *See id.* 1026:5-21 (agreeing that he "personally had experience treating a patient who had a fractured port catheter invade their heart" and testifying that "it turned out to be the same catheter that we're discussing in this case"); *id.* 2894:20-2895:9 ("They literally broke the law in their opening statement. They told you the Groshong reduces thrombosis. They cannot say that. . . . But that's what they told you in their opening statement to try to trick you, to try to tell you that this device is all that when it's not."); *e.g., id.* 2957:3-4, 2967:3-9 (arguing that "[t]his

is the way they go about defending these cases, and it's wrong," asking the jury to think about Bard's "traveling road show," and the fact that "Bard's going to have a lot more [cases]"). Each of these tainted the jury's verdict.

The fact that Plaintiff's sole cardiology expert testified that he had a patient with the same injury involving the same catheter is extremely prejudicial and cannot be unheard by the jury. *See Nelson v. Brunswick Corp.*, 503 F.2d 376, 380 (9th Cir. 1974) (stating that evidence of other accidents poses a "danger" as it "may afford a basis for improper inferences . . . or operate to unfairly prejudice the party against whom it is directed"). The prejudice was magnified by the suggestion that defense counsel sought to "trick" the jury and by references that there are additional cases. These remarks cumulatively deprived Bard of a fair trial.

## VI. The Court Should Order Remittitur in the Alternative

In the alternative to ordering a new trial, Bard requests that this Court remit the excessive verdict. Federal courts apply state law for remittitur in diversity actions. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 437 (1996). Under New Mexico law, "[t]he amount of awards necessarily rests with the good sense and deliberate judgment of the tribunal assigned by law to ascertain what is just compensation, and, in the final analysis, each case must be decided on its own facts and circumstances." *Sandoval*, 960 P.2d at 838 (quoting *Powers v. Campbell*, 442 P.2d 792, 794 (N.M. 1968)). Trial judges have a duty to correct an "aberrant verdict . . . by using the tools at hand." *Id.* at 839. Bard respectfully submits that this Court should consider two potential benchmarks to determine what constitutes a "reasonable amount to compensate the plaintiff for the pain and suffering" and "loss of enjoyment of life." N.M. Civ. UJI 13-1807, -1807A.

***First***, New Mexico's applicable $600,000 cap on damages for medical negligence claims against health care providers can serve as an appropriate benchmark. *See* N.M. Stat. Ann. § 41-5-6(A). If Plaintiff had brought an action against Dr. Dim in connection with his negligently administered treatment, her recovery would be capped at that figure. *See Nez v. United States*, 367 F. Supp. 3d 1245, 1270 (D.N.M. 2019). The record

establishes that the non-economic damages related to Dr. Dim's medical treatment greatly exceeded any pain and suffering associated with the catheter fracture and removal. Dr. Dim did not deem the fragment to require emergency medical attention, Dr. Aguila removed the fragment in less than ten minutes, and Drs. Shehata and Kim both credibly testified that any resulting injury was short-lived.

***Second***, setting aside the clear influence that counsel's improper anchoring to Bard's expert compensation had on the jury's verdict, the ceiling for an award of non-economic damages may be the $2,000,000 suggested by Plaintiff's counsel. To be sure, Plaintiff's attempt to *multiply* that number into an annual sum payable for two decades into the future was baseless, given (1) the testimony from Plaintiff's treating physicians and expert that she is presently stable and unlikely to suffer future pain and suffering; and (2) Plaintiff's significant and unrelated medical issues contributing to any ongoing or future loss of enjoyment of life.

This Court should remit the verdict to $600,000 based on these benchmarks and the extensive mitigating factors to Plaintiff's non-economic damages. That figure reasonably and fairly compensates Plaintiff for her injuries. *See* N.M. Civ. UJI 13-1802.

## CONCLUSION

For these reasons, Defendants respectfully request this Court grant this Motion for a New Trial or Remittitur.

DATED this 8th day of October, 2026

NELSON MULLINS RILEY & SCARBOROUGH, LLP

By: /s/ Richard B. North, Jr.
Richard B. North, Jr.
(Admitted *Pro Hac Vice*)
Atlantic Station
201 17th St. NW, Ste. 1700
Atlanta, GA 30363
Phone: (404) 322-6155
Fax: (404) 322-6050
richard.north@nelsonmullins.com

MCCARTER & ENGLISH, LLP

By: _*/s/ Edward J. Fanning, Jr.*_
Edward J. Fanning, Jr.
(Admitted *Pro Hac Vice*)
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102
Phone: (973) 639-7927
Fax: (973) 297-3868
efanning@mccarter.com

*Attorneys for Defendants*